**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
Gerald H. Gline, Esq.
David M. Bass, Esq.
Ryan T. Jareck, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Proposed attorneys for 710 Long Ridge Road Operating
Company II, LLC, *et al.*, Debtors-in-Possession

|  | UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY CASE NO. 13- |
|---|---|
| In re: 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*,[1]  Debtors-in-Possession. | Chapter 11 (Joint Administration Pending)  **AFFIDAVIT OF VICTOR MATTHEW MARCOS IN SUPPORT OF DEBTORS' "FIRST DAY MOTIONS"** |

STATE OF NEW YORK    )
                     )SS.
COUNTY OF NEW YORK   )

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal identification number are: 710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford (4809), 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center (4730), 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center (4839), 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center (4716) and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center (4676).

VICTOR MATTHEW MARCOS, of full age, being duly sworn according to law, upon his oath, deposes and states:

1. I am the Vice President of each of 710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford, 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center, 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center, 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center, the debtors and debtors-in-possession in these Chapter 11 cases (collectively, the "**Debtors**"), which are inpatient skilled nursing facilities (the "**Facilities**") all located in the state of Connecticut. I have served in that role since August 1, 2012.

2. I am familiar with the Debtors' business and financial affairs and the Debtors' day-to-day operations, and am duly authorized to make this affidavit on the Debtors' behalf.[2] I submit this affidavit (a) in support of the Debtors' petitions for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), (b) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of these Chapter 11 cases, and (c) to provide general information about the Debtors' business operations that are germane to the Debtors' "First Day Motions" (as defined below). I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' businesses and

---

[2] Except as otherwise indicated, the factual statements in this affidavit are based on my personal knowledge, information supplied to me by others under my supervision, my discussions with the Debtors' investors, professionals and senior management of HealthBridge Management, LLC ("**HealthBridge**"), of which I am an officer, my review of relevant documents including legal filings in the matters referenced herein, and my experience and knowledge of the Debtors' operations and financial condition.

2

furtherance of their restructuring efforts. If I were called upon to testify, I would testify competently to the facts set forth in this Affidavit.

3. Part I of this Affidavit provides a brief situational overview. Part II of this Affidavit provides an introduction to the Debtors and their Chapter 11 cases, an overview of the Debtors' businesses, organizational and capital structure and their 2004 Chapter 11 cases. Part III describes the circumstances giving rise to the commencement of these Chapter 11 cases. Part IV sets forth the purpose of the Chapter 11 filings and identifies the First Day Motions required to ease the transition into Chapter 11.

## I. SITUATIONAL OVERVIEW

4. Unfortunately, the Debtors have fallen victim to the recent wave of bankruptcies and receiverships that has slammed the Connecticut nursing home industry, highlighting the financial strains on an industry that has watched a dozen or so nursing homes close in recent years. In addition to the deep cuts in Medicare reimbursements for nursing homes implemented by the federal government, along with a Medicaid system that is underfunded, the Debtors have been plagued with unworkably high labor costs under collective bargaining agreements covering their unionized workforce, primarily in the form of free pensions and free medical benefits obligations, negatively impacting the Debtors' ability to service their patients under the current capital structure. Those unworkable labor costs caused these Debtors to seek Chapter 11 relief in 2004 and now again in 2013.[3]

---

[3] Indeed, since 2007 in Connecticut, 69% of the troubled nursing homes (those homes which have closed, filed for Chapter 11 protection or sought receivership) have been unionized while statewide only 28% of the homes have a unionized workforce. Since 2011, the percentage of troubled homes with a unionized workforce increased to 84%.

3

51689/0001-9259860v4

5.Whether the Debtors can achieve long-term viability, and even short-term operational sustainability, depends directly and substantially on the Debtors' ability to achieve dramatic changes to their labor agreements, with a corresponding material reduction in their cost structure and pension and medical obligations.  That is the purpose and the focus of these Chapter 11 cases.  Indeed, the Debtors' cases have been initiated to implement interim and ultimately permanent modifications to their expired collective bargaining agreements because the Facilities are unable to sustain themselves given the existence of uneconomic provisions in these collective bargaining agreements, which constitute a crushingly high percentage of the Debtors' gross revenues and materially exceed market averages.  The interim and ultimately permanent modifications – whether through consensual agreements with the Union (as defined below) or otherwise – that restructures the Debtors' existing labor obligations is required for the Debtors to emerge in a strong operational and financial position, and with an enhanced ability to compete well into the future.

6.Toward that end, the Debtors and the Debtors' advisors have spent considerable time critically analyzing the Debtors' operations, cost structure and capital structure.  As a result of that review, the Debtors have developed a plan that they believe will allow the Debtors to regain long-term viability.  That plan is premised upon achieving a competitive cost structure, including relief from uncompetitive pension and medical benefit obligations, and obtaining relief from other restrictive labor arrangements that limit the Debtors' flexibility and competitiveness.

7.To successfully capitalize on that plan, the Debtors will require reasonable and combined efforts of the Debtors, the Union, several federal and state agencies, as well as through the support of their vendors and employees.  Regrettably, absent ultimate consensual agreements with the Union or the imposition of such other terms in accordance with applicable law, the

51689/0001-9259860v4

Debtors will join those skilled nursing facilities that have been forced to close in recent years in Connecticut, to the detriment of their employees and patients.

## II.     FACTUAL BACKGROUND

8. On the date hereof (the "**Filing Date**"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code. Since the Filing Date, the Debtors have remained in possession of their assets and continued to manage their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

### A.     The Debtors' Businesses

9. Each Debtor is a Delaware limited liability company with its principal place of business and office located at 173 Bridge Plaza North, Fort Lee, New Jersey 07024. Each of the five (5) Debtors operates a sub-acute and long-term nursing care facility for the elderly in Connecticut. The Facilities are: Long Ridge of Stamford, Newington Health Care Center, Westport Health Care Center, West River Health Care Center, and Danbury Health Care Center.

10. The Facilities are skilled nursing facilities that provide long-term care and short-term rehabilitation services. For long term care patients who have medical needs, the Facilities provide 24-hour-a-day nursing care, nutritional monitoring and planning, medication management and personal care. For individuals in need of nursing and/or rehabilitation services following a recent hospitalization for orthopedic surgery, stroke, oncology care, cardiac care, general surgery and other diagnoses, the Facilities offer medical and physical rehabilitation including physical, occupational and speech therapy, rehabilitative nursing and physician directed rehabilitation plans, IV therapy, wound care and other services.

11. Each Facility is supervised by a licensed administrator, and the nursing staff is supervised by a director of nursing. Each Facility also engages the services of a Medical Director to oversee the delivery of care to its patients. The Debtors receive revenue from

5

Medicare and Medicaid, patients who pay privately and from other third-party payors. The sources and amounts of each of the Debtors' revenues are determined by, among other things, the census at the applicable Facilities, the "case mix" of their patients, and reimbursement rates. The Debtors collectively employ approximately 1,140 salaried and hourly employees.

12. The Debtors have contracted day-to-day management of the Facilities to HealthBridge, a non-debtor national healthcare management company.

### B. The Debtors' Organizational Structure

13. A chart of the Debtors' organizational structure is attached as **Exhibit A**. Essentially, Care Realty, LLC. ("**Care Realty**"), is the 100% owner (sole member) of THCI Holding Company, LLC, which in turn, is the 100% owner (sole member) of THCI Mortgage Holding Company, LLC ("**THCI Mortgage**") and THCI Company LLC ("**THCI Company**"). THCI Mortgage is the 100% owner (sole member) of 710 Long Ridge Road, LLC. THCI Company is the 100% owner (sole member) of each of 240 Church Street, LLC, 1 Burr Road Company LLC, 245 Orange Avenue, LLC and 107 Osborne Street, LLC (and together with 710 Long Ridge Road, LLC shall be referred to herein collectively as, the "**Landlords**"). The applicable Landlords lease each of the Facilities to the Debtors, which are also wholly owned by THCI Mortgage and are the operating entities of each of the Facilities.

### C. The Debtors' Capital Structure

14. As more particularly described below, as of the Filing Date, the Debtors and various non-debtor affiliates are parties to separate financing agreements with M&T Bank ("**M&T**") and Housing & Healthcare Finance LLC insured by the U.S. Department of Housing

6

and Urban Development Federal Housing Administration ("**HUD**") under the provisions of section 232 of the National Housing Act, and the regulations thereunder.[4]

    (i)    <u>M&T Bank</u>

15. Prior to the Filing Date, Debtor 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center ("**Danbury**"), among other non-debtor related entities, entered into a secured first lien financing arrangement in the amount of $20 million (the "**M&T Loan**") with M&T Bank ("**M&T**"). The M&T Loan is governed by, *inter alia*, that certain loan and security agreement, term note, and deposit account control agreement, all dated September 15, 2010 (collectively, the "**M&T Loan Documents**"). In addition, non-debtor 107 Osborne Street LLC, the landlord for Danbury, entered into an absolute assignment of leases, rents, income and profits dated September 15, 2010 with M&T.

16. To secure repayment of the M&T Loan and all other obligations of Danbury incurred in connection with the M&T Loan and M&T Loan Documents, Danbury granted M&T a blanket security interest in and lien against substantially all assets of Danbury including accounts receivable (which term includes health-care-insurance receivables) and all other forms of obligations owing to Danbury, claims, deposits and deposit accounts, goods, instruments, inventory and all other contract rights or rights to the payment of money, insurance claims and proceeds.

17. In addition, Danbury is a party to that certain Deposit Account Control Agreement (Springing Agreement) (the "**Blocked Account Agreement**") with PNC Bank ("**PNC**"), as depository bank. Pursuant to the Blocked Account Agreement, two accounts in the

---

[4] Certain of the Debtors were also party to revolving credit facilities with Capital Source Bank ("**CapSource**"). Those facilities were undrawn and, shortly before the Filing Date, were terminated. The Debtors are, therefore, no longer indebted to CapSource.

name of the Danbury were established at PNC (the "**Blocked Account**" or together, the "**Blocked Accounts**").  One Blocked Account is for "government" deposits associated with Medicare and Medicaid and other Blocked Account is a "non-government" account associated with patients who pay privately or through other third party payors.  In accordance with the terms of the M&T Loan Documents and Blocked Account Agreement, Danbury is required to deposit forms of payment that it receives into the Blocked Account.  Danbury further acknowledges that it granted M&T under the M&T Loan Documents a first priority security interest in, lien upon, and pledge of the Blocked Accounts and the cash collateral maintained in the Blocked Accounts.

18. As of January 31, 2013, the total amount outstanding under the M&T Loan and M&T Loan Documents was approximately $18,887,268.

(ii) <u>HUD</u>

19. As described above in the Organizational Structure section, THCI Company owns 100% interests in certain of the Landlords and the Debtor operating companies.  Prior to the Filing Date, various Landlords refinanced certain facilities with a loan from HUD under the provisions of section 232 of the National Housing Act, and the regulations thereunder (each, a "**HUD Loan**" and collectively, the "**HUD Loans**").  In that regard, two (2) of the Landlords – 240 Church Street, LLC and 245 Orange Avenue, LLC – refinanced the Newington Health Care Center and West River Health Care Center with HUD Loans.

20. The applicable HUD Loans are secured by certain collateral, and 240 Church Street, LLC and 245 Orange Avenue, LLC have granted to HUD a security interest in certain collateral.[5]

21. Pursuant to the Intercreditor Agreement, CapSource had a first position security interest in, upon and to, all collateral of the applicable borrowers under the terminated HUD-related CapSource loans (the "**CapSource Borrowers**") with the exception of (i) the skilled nursing facility licenses and any other healthcare or long term care licenses for the Facilities, (ii) all Medicare and Medicaid/state/county provider agreements for the Facilities, (iii) the certificates of need for the Facilities, and (iv) the CapSource Borrowers' equipment (but only to the extent such equipment is required for the CapSource Borrowers' licensing and certification) and inventory directly related to such Facilities (collectively, the "**HUD Priority Collateral**"). HUD, in turn, has a first position security interest in, upon and to, all the HUD Priority Collateral and, under the Intercreditor Agreement had a subordinated, second position security interest in, upon and to, all of the other assets of the CapSource Borrowers. With the termination of CapSource loans, the Debtors believe that HUD has a first priority position security interest in, upon and to, all of the other assets of the CapSource Borrowers, including Newington and West River, among others.

22. As of January 31, 2013, the total amount outstanding under the HUD Loan associated with Newington Health Care Center was approximately $7,991,965. As of January

---

[5] Prior to the Filing Date, and while the Debtors and CapSource were parties to the revolving credit facilities, CapSource and HUD agreed upon CapSource's and HUD's respective rights in and to certain of the Debtors' collateral pursuant to an certain Intercreditor Agreement by and between CapSource and HUD dated as of June 29, 2010, as amended and restated January 31, 2011 (the "**Intercreditor Agreement**"). With the CapSource loans having been terminated, the Debtors submit that the terms of the Intercreditor Agreement, including the priorities in the Debtors' collateral, are no longer applicable.

31, 2013, the total amount outstanding under the HUD Loan associated with West River Health Care Center was approximately $6,254,977.

### D. The Debtors' 2004 Bankruptcy Filing

23. In 2003, HealthBridge replaced Haven Healthcare as manager of the Facilities, and assumed the prior management's contracts with the Union. Shortly after replacing Haven Healthcare, HealthBridge attempted to stabilize the operations and economics of each Facility, but was unable to do so primarily because of the predecessor collective bargaining agreements.

24. In late May 2004, the Facilities issued a notice that they intended to lay off certain of their employees, in an effort to make the staffing levels more appropriate and in line with other facilities in Connecticut. Each Facility believed its staffing level after implementing those layoffs would be sufficient to provide quality care to its patients. Contemporaneously with the delivery of the layoff notices, each Facility notified the Union that it wished to "re-open" each predecessor CBA (as specifically permitted by each predecessor CBA) to attempt to negotiate modifications that would allow each Facility to reduce staffing to an appropriate level, and avoid bankruptcy. Each Facility attempted to negotiate in good faith with the Union in that regard, but no agreement was reached nor meaningful progress made.

25. As a result, on June 27, 2004, the Debtors, among other entities, were forced to file for Chapter 11 relief in the United States Bankruptcy Court for the Southern District of New York. See In re 240 Church Street Operating Company II, LLC, *et al.*, Case No. 04-14388 (RDD) (Bankr. S.D.N.Y. 2004). In the prior bankruptcy proceedings, the parties ultimately reached a settlement incorporated within their confirmed Chapter 11 plan, the terms of which included respective new CBAs between the Union and each Facility effective from December 31, 2004 to March 16, 2011, referred to previously as the CBAs.

### III.     FACTORS THAT PRECIPITATED THE DEBTORS' CHAPTER 11 FILING

26.     The Debtors and New England Health Care Employees Union, District 1199, SEIU (the "**Union**") are parties to five separate, but similar, collective bargaining agreements (the "**CBAs**"), effective from December 31, 2004 through March 16, 2011, covering the unionized employees at each of the five Facilities.  After the CBAs expired, the Debtors continued to comply with those provisions of the CBAs, which continue in place under the National Labor Relations Act, 29 U.S.C. § 160(j) (the "**NLRA**"), and attempted to negotiate new agreements with the Union (the "**Terms of Employment**").  After more than 16 months of negotiations, in June 2012, good faith negotiation for new agreements between the Debtors and the Union reached an impasse.  As the Debtors are legally permitted to do at impasse, they informed the Union they would implement modified terms of employment that were consistent with the terms set forth in the Debtors' "Last, Best and Final" proposals (the "**Implemented Terms**") to the Union.  The Debtors imposed the Implemented Terms, effective June 17, 2012, and on July 3, 2012, approximately 700 Union workers walked off the job and participated in a strike to protest the new terms and conditions of employment.

27.     To ensure the safety of the patients and to continue operating, the Debtors hired replacement workers and have operated with the Implemented Terms in place since June 17, 2012.

28.     Unfortunately, however, simply striking was not enough.  Instead, as striking workers left the Facilities, certain Union members, apparently at the direction of the Union, committed a series of unconscionable acts of medical sabotage that put their frail, elderly, and memory-impaired patients at immediate and significant risk.  Utterly abandoning their responsibilities as caregivers, certain Union members endangered the health and well-being of the patients by committing criminal – and highly immoral – acts such as removing wrist bands

11

from over 30 patients, changing names on patient doors and wheelchairs, switching the names of patients in the memory care unit, removing stickers indicating how patients can be fed safely, tampering with medication records, and removing handles from lifts that safely transport patients to and from their beds. The perpetrators also carried out other acts such as hiding blood pressure cuffs and stethoscopes as well as damaging the Facilities' property.

29. As the irresponsible Union members surely anticipated, these acts of medical sabotage delayed and disrupted medical treatment for patients, thus placing those vulnerable persons in grave danger. Only prompt action by others at the Facilities and good fortune prevented serious harm to patients.

30. Although the identities of the specific perpetrators remain unknown (an investigation by the Connecticut Chief State's Attorney's Office is ongoing), what is known is that the acts of medical sabotage were coordinated across three Facilities in the hours before the strikes, and the Facilities' employees were the only ones with access to the patients when these acts occurred. What is also known is that members of the same Union engaged in similar acts of medical sabotage at other Connecticut health care facilities on the eve of a 2001 strike. At that time, among many other things, members of the Union also removed patient wristbands, damaged medical equipment, deliberately contaminated urethral catheter kits and formula feeding bottles, disorganized patients' narcotics cards, removed patient lifts, loosened bolts on a patient lift so that it collapsed while being used with a patient, and injected glue into the locks on various doors, including the door to the oxygen room.

31. The wrongful conduct of the Union is the subject of an action commenced by, among others, the Debtors, under the Racketeer Influenced and Corrupt Organizations Act, 18

U.S.C. § 1961 *et seq.* ("RICO"), currently pending before the United States District Court for the District of New Jersey.

32. On July 6, 2012, Jonathan B. Kreisberg, Regional Director of Region 34 (the "**Regional Director**") of the National Labor Relations Board (the "**Board**" or "**NLRB**") amended a complaint in a consolidated action already pending in proceedings before an Administrative Law Judge ("**ALJ Proceedings**") to include allegations that the Debtors imposed the Implemented Terms in the absence of a genuine, lawful impasse. In mid-July 2012, the Regional Director sought authorization from the Board and its Acting General Counsel to initiate temporary injunction proceedings pursuant to Section 10(j) of the NLRA, pending the final disposition of unfair labor practice charges in the ALJ Proceedings. After receiving such authorization, on September 7, 2012, the Regional Director filed a Petition for Section 10(j) relief in the United States District Court for the District of Connecticut. The Board maintained that the petition was necessary to restore the status quo ante (*i.e.*, the Terms of Employment) while the Board continued to prosecute the unfair labor practice charges in the pending ALJ Proceedings. The District Court denied the Debtors' request for discovery and to present testimony at an evidentiary hearing.

33. In a December 11, 2012 telephone conference with counsel, the District Court granted the Board its requested injunction and subsequently issued an order granting the petition (the "**10(j) Injunction**"). The District Court concluded that the Second Circuit has instructed that the Board is entitled to appropriate deference, and if the Board's legal theory is valid and its view of the facts have support in the record, then the District Court is to provide relief. The District Court further stated that it is not the place of the District Court to adjudicate the case as if it were brought by a private party seeking injunctive relief. The District Court also rejected the

Debtors' motion to dismiss the Petition for lack of subject matter jurisdiction, which had been premised on the Board's lack of a required quorum to authorize it as the result of the President's invalid recess appointments to the Board.

34. Pursuant to the 10(j) Injunction, the District Court, *inter alia*, ordered that the Debtors: (a) reinstate the striking workers, (b) reinstate the previous wages, benefits and other terms and conditions of employment for the employees that were in place on June 16, 2012 (*i.e.*, the Terms of Employment), and (c) bargain in good faith with the Unions.[6] See 10(j) Injunction at p. 4. The Debtors appealed the 10(j) Injunction to the Second Circuit Court of Appeals, which granted a temporary stay of the 10(j) Injunction. That temporary stay ended by order of a motions panel of the Second Circuit dated January 30, 2013.

35. On February 4, 2013, the Debtors filed an emergency application with the United States Supreme Court for partial stay of the 10(j) Injunction pending the appeal before the Second Circuit, or in the alternative, petition for writ of certiorari and partial stay of the 10(j) Injunction pending resolution of the petition. The Supreme Court denied the emergency request for partial stay on February 6, 2013. As a result, the Debtors are now required to comply with the 10(j) Injunction.

36. The Debtors are complying with the 10(j) Injunction, have offered reinstatement to all the striking employees, and are in the process of reinstating them. It is anticipated that those strikers who desire to be reinstated will return to work beginning on March 3, 2013. To facilitate that process, the Debtors are in the process of confirming that each Union employee is

---

[6] It is important to note that the District Court decision is not an adjudication of any of the alleged unfair labor practices. The Debtors dispute the contentions of the allegations in the ALJ Proceedings, which are ongoing. In particular, the Debtors assert and will establish, *inter alia*, that they bargained in good faith, the parties reached a lawful impasse, and the Debtors were therefore entitled under the NLRA to implement the Implemented Terms. Therefore, the Debtors contend they had no obligation to reinstate the striking Union employees or the terms and conditions of the employment existing prior to June 16, 2012.

still properly licensed and credentialed. In addition, the Debtors will provide the returning employees with refresher orientation and training to facilitate a smooth transition that ensures patient care is not disrupted or compromised in any way.[7]

37. The Debtors' appeal to the Second Circuit remains pending and has a number of legal bases. These include: the District Court lacked subject matter jurisdiction over the Petition because the Board did not have the required quorum to authorize it as the result invalid recess appointments; and the District Court improperly applied an unduly deferential standard to the Board's injunction request instead of subjecting the request to the more stringent standard typically required before a court can grant injunctive relief. Importantly, after the Debtors' appeal was filed, the U.S. Court of Appeals for the District of Columbia Circuit recently held that the same recess appointments that formed the basis for the Debtors' motion to dismiss in the District Court were in fact unconstitutionally appointed, casting doubt not only on the Board's legal authority to file the Petition itself but also on the Board's ability to ever issue an order finally adjudicating the ALJ Proceedings on the merits.

## IV. THE PURPOSE OF THE CHAPTER 11 FILING

38. If required to implement the Terms of Employment, the Debtors would lose approximately $1.3 million per month and, as a result, cannot sustain operations. The primary, if not sole, reason the Facilities are unable to sustain themselves is the existence of untenable economic provisions in the CBAs. Examples of these unsustainable provisions compared to industry averages are as follows:

---

[7] Unfortunately, some of the so far unidentified Union employees who engaged in the above-described unconscionable acts of medical sabotage will be reinstated pursuant to the 10(j) Order. In making its ruling, the District Court denied the Debtors' discovery requests and their request to present live testimony and to cross-examine the Board's witnesses, and relied solely on affidavits, correspondence, contract proposals, and the parties' bargaining notes. The District Court rejected the Debtors' argument that ordering the reinstatement of the same workers who committed acts of medical sabotage would cause irreparable injury and disserve the public interest.

(a) The Debtors spent over 225% more on pension benefits per resident day than the statewide average;

(b) The Debtors spent 17% more on pensions per day than seven facilities with Union contracts that went into bankruptcy or receivership during 2012;

(c) The Debtors had total benefit costs per day 24% higher than other Union facilities in the state;

(d) The Debtors had daily benefit costs 48% higher than the average of all facilities, Union and non-union, statewide; and that

(e) Per patient day labor costs – salaries and wages, benefits, health insurance, and pensions totaling $217.37 per day – represent approximately 90% of the average Medicaid daily rate at the Facilities, leaving inadequate Medicaid revenue to cover the other costs of operations such as food, rent, power and Connecticut nursing home taxes of $21.02 per day per resident. Of the patients in the Facilities, 76% are Medicaid patients.

39. The Debtors' management, along with their advisors, have evaluated their various restructuring options and determined that the best – and really only – way to sustain the financial and operating viability of the Facilities for the benefit of all stakeholders was to commence these Chapter 11 cases and pursue interim modifications to the CBAs under Section 1113(e) of the Bankruptcy Code and ultimately, achieve permanent modifications, whether through a global resolution with the Union or otherwise, that avoids the very immediate and real risk of these Facilities closing.

40. Unless and until such permanent modifications are in place, with the required reinstatement of the Union employees under the Terms of Employment, the interim modifications that are requested by the Debtors are absolutely essential to the continuation of the Debtors' businesses, even in the short term. Moreover, absent such permanent modifications, including as may result through a global resolution, the Debtors will be forced to close the Facilities, which comes with devastating consequences including the operator and the owner

16

suffering significant adverse economic consequences, each of the more than 1,100 employees losing their jobs and patients being forced to move to new homes at a time when changing residences may very well be detrimental to their well-being.  In order to avoid imminent closure and liquidation, the Debtors are filing a Motion for an Order Authorizing Debtors to Implement Imterim Modifications to their Collective Bargaining Agreements with the New England Health Care Employees Union District 1199, SEIU Pursuant to 11U.S.C. § 1113(e) and an application for an order shortening time so that this Motion can be heard on or before March 1, 2013.

    41.  To avoid the potentially disruptive impact the commencement of these Chapter 11 cases might have on the Debtors' business operations, to facilitate the Debtors' orderly transition into Chapter 11 and to maintain going concern value to the extent a restructuring can be pursued, the Debtors have requested the Court to consider, on an expedited basis, the following motions filed contemporaneously with their Chapter 11 petitions (collectively, the "**First Day Motions**"):

    (a)  Verified Application in Support of Debtors' Motion for an Order Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363;

    (b)  Verified Application in support of the Debtors' motion for an Order: (a) authorizing the Debtors to continue using their existing cash management system; (b) authorizing the Debtors, as applicable, to continue using their bank accounts and business forms; and (c) waiving compliance with investment guidelines under 11 U.S.C. § 345(b);

    (c)  Verified Application in support of the Debtors' motion for an Order: (i) authorizing the Debtors to (A) satisfy and, to the extent applicable, directing any payroll banks to honor pre-petition gross salaries, payroll taxes and related obligations to or for the benefit of the Debtors' employees, and (B) honor, in their discretion, pre-petition sick, vacation, personal, and similar themed days; and (ii) granting other related relief;

    (d)  Verified Application in support of the Debtors' motion for an order authorizing them to pay certain pre-petition taxes and fees pursuant to 11 U.S.C. §§ 507(a)(8) and 105(a);

    (e)  Application in support of the Debtors' motion for an order: (a) granting interim relief pursuant to 11 U.S.C. § 366(b); (b) authorizing the payment of adequate assurance for post-petition utility services; (c) fixing a final

    hearing date to determine the sufficiency of adequate assurance; and (d) granting other related relief;

(f)   Application in Support of motion for an administrative order establishing procedures for allowance and payment of interim compensation and reimbursement of expenses to professionals;

(g)   Application in support of motion for an Order authorizing the retention and compensation of professionals utilized by the Debtors in the ordinary course of their business *Nunc Pro Tunc* to the Filing Date; and

(h)   Application in support of the Debtors' motion for an Order approving the Debtors' retention of Logan & Company, Inc. as claims and noticing agent pursuant to 28 U.S.C. § 156(c).

42.   In addition to seeking the immediate relief under Section 1113(e) to stave off the closing of the Facilities, the purposes of the First Day Motions include, among other things, to: (a) enable the Debtors to operate effectively, ease the Debtors' transition into Chapter 11 and mitigate potentially adverse effects of the Chapter 11 filings; (b) minimize disruption of the Debtors' ability to continue providing quality service to their patients and, thus, preserve the patients' confidence and ensure their continued patronage; and (c) maintain vital vendor relationships. Each of the First Day Motions is crucial to the Debtors' restructuring efforts and preservation of the Debtors' assets and estates.[8]

---

[8] For a more detailed description of the First Day Motions, the Debtors respectfully refer the Court and parties-in-interest to the respective First Day Motions.

18

## V. CONCLUSION

43. The First Day Orders will enable the Debtors to stabilize and continue their operations in the ordinary course while the Debtors seek to reorganize under the Bankruptcy Code. Accordingly, the Debtors respectfully request that the Court enter those Orders.

                                            */s/ Victor Matthew Marcos*
                                            Victor Matthew Marcos

Sworn and subscribed to
before me this 24th day of
February, 2013

*/s/ Matthew C. Sheehan*
Matthew C. Sheehan, Esq.
An Attorney at Law of the
State of New Jersey

19