**NOT FOR PUBLICATION**

**FILED**

JAMES J. WALDRON, CLERK

**MAR. 4, 2013**

U.S. BANKRUPTCY COURT
NEWARK, N.J.

BY:  s/ Ronnie Plasner, DEPUTY

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re: <br><br> **710 LONG RIDGE ROAD OPERATING COMPANY, II, LLC, et al.,** <br><br> Debtors. | Case No.:  13-13653 (DHS) <br><br> Judge: Donald H. Steckroth, U.S.B.J. |

## OPINION

**<u>APPEARANCES</u>:**


Cole Schotz Meisel Forman & Leonard
Michael D. Sirota, Esq.
Gerald Gline, Esq.
David Bass, Esq.
25 Main Street
Hackensack, New Jersey  07601
***Counsel for Debtor***


Levy Ratner
Suzanne Hepner, Esq.
80 Eighth Avenue
New York, New York  10011
***Counsel for New England Health Care***
***Workers, District 1199 SEIU***


National Labor Relations Board
Special Litigation Branch
Dawn Goldstein, Esq.
Micah Jost, Esq.
Thomas Quigley, Esq.
John McGrath, Esq.
1099 14th Street, NW, Suite 8600
Washington, D.C.  20570
***Counsel for National Labor Relations Board***


Office of the United States Trustee
Donald F. MacMaster, Esq.
One Newark Center, Suite 2100
Newark, New Jersey  07102
***United States Trustee***

**THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE**

Before the Court is an emergent motion for an order authorizing five Chapter 11 debtors to implement interim modifications to collective bargaining agreements ("CBAs") with the New England Health Care Employees Union, District 1199, SEIU (the "Union") (the "Motion"). The debtors in this consolidated chapter 11 include 710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford, 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center, 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center, 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center (collectively "Debtors").

The Debtors request relief under 11 U.S.C. § 1113(e) arguing they would no longer be able to operate or pursue reorganization without implementation of proposed interim modified terms and that such consequence satisfies the requirements for relief under § 1113(e). 11 U.S.C. § 1113(e). The Motion is opposed by the Union and the National Labor Relations Board ("NLRB").

## BACKGROUND AND RELEVANT FACTS

### Debtors' Facts

The Debtors' Verified Application in support of their Motion sets forth the following relevant facts. Each of the Debtors is a Delaware limited liability company operating a sub-acute and long-term nursing care facility in Connecticut (the "Facilities"). The Debtors contract management of the Facilities to the non-debtor HealthBridge Management, LLC, a national healthcare management company ("HealthBridge").

The Facilities were staffed by service and maintenance employees, 700 represented by the Union ("Union Employees") and 432 non-union.   Each Debtor Facility entered into a separate CBA with its employees.   The terms of the CBAs were similar between the Facilities and the Union and required the Debtors to make payments to employees for wages and benefits, including but not limited to accrued sick and vacation time, and to make payments for health coverage, pensions and other benefits.   The CBAs were effective from December 31, 2004 through March 16, 2011 and are expired.

Upon time for renegotiation of the CBAs, the Debtors were faced with the need to make cost saving benefit reductions to both Union and non-union employees.   During a 16-month period and 36 bargaining sessions, the Debtors and Union bargained but came to no resolution. After the Debtors felt that they had reached an impasse in June of 2012, the Debtors implemented their "Last, Best and Final" proposals as new terms ("Implemented Terms"). Following the Implemented Terms, the Union Employees organized a strike, walked out, and the Debtors hired replacement workers.   The Debtors have operated the Facilities since June 2012 under the Implemented Terms.

The failed negotiations, strike, and replacement of the workforce lead to conduct and allegations by both the Union and the Debtors.   The Debtors instituted an action for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO Act") for the Union Employees' alleged wrongdoing in disrupting treatment of patients and damaging the Facilities in protest.   The action is still pending in the United States District Court for the District of New Jersey.   The National Labor Relations Board ("NLRB"), on behalf of the Union, brought a claim against the Debtors before an Administrative Law Judge ("ALJ") asserting unfair labor practices and that the Debtors unlawfully imposed the Implemented Terms in the absence of a genuine,

lawful impasse.  The Federal District Court for the District of Connecticut, on request of the

NLRB, issued injunctive relief in favor of the Union pursuant to section 10(j) of the National

Labor Relations Act ("NLRA"), pending the outcome of the ALJ proceedings.  The section 10(j)

relief provided that the Debtors were required to reinstate all of the Union Employees and

provide the benefits and compensation set forth in the expired CBAs pending the outcome of the

unfair labor practice allegations (the "10(j) Injunctive Relief").  Debtors obtained an interim stay

pending appeal of that Order from the Second Circuit and now are in the process of complying

with the 10(j) Injunctive Relief after the stay pending appeal terminated and all efforts to

continue a stay were denied.

The Debtors certify that compliance with the 10(j) Injunctive Relief is the cause of their

inability to operate and precipitated their voluntary petitions for chapter 11 relief on February 24,

2013.  The Debtors seek an interim modification pursuant to § 1113(e) of the terms of the

expired CBAs continued upon them by the 10(j) Injunctive Relief.  Specifically, the Debtors

request the following modifications:

    1. DAILY WORK SCHEDULE.  The Daily work schedule change

    from 8 hours including a 30-minute paid meal period to 7.5 hours

    plus a 30-minute unpaid meal period

    2.  OVERTIME.  Paid at one and one half times the regularly

    hourly rate to be paid only after employee works 40 regular hours

    in a week as the law requires, and not on a daily basis anytime an

    employee works more than 8 hours a day

3.  SICK LEAVE.  Reduced from 12 days per year accruing at [sic] rate of one per month to an accrual rate of one hour of sick time for every 40 hours worked up to a total of 45 hours

4.  MEDICAL AND PRESCRIPTION DRUG PLAN AND OTHER INSURANCE BENEFITS.  Debtors seek to have unionized employees contribute towards the costs of medical and prescription drug plan and maintain the level of co-pays and co-insurance applicable to non-union employees

5.  PENSION PLAN.  Rather than contribute to the New England Health Care Employees Pension Fund, employees will be able to enroll in the 401(k) plan established after June 17, 2012 and Debtors will match 25% of employee contributions up to 3% of the annual salary

6.  TUITION REIMBURSEMENT.  Debtors will end contribution to the New England Health Care Training Fund

7.  UNIFORMS.  Discontinue uniform allowance of $300 per year

8.  PERSONAL DAYS.  Eliminate Personal Days

9.  PAY FREQUENCY.  Debtors want to maintain a bi-weekly payroll rather than revert to a weekly payroll because of the increased administrative and manpower costs associated with running twice as many payrolls in a year and developing the system functionality in moving back to a weekly payroll.

(Debtors' Application in Supp. of Mot., Ex. 8, p. 1) ("Consolidated Proposed Modifications

Table").  The Debtors contend that these modifications will amount to aggregate savings per

month of $802,000 and $2,600,000 in the aggregate over a 13-week period.  It is implementation

of these financial and operational modifications the Debtors are seeking.  Debtors emphasize it is

relevant what they are not seeking.  The Debtors are not seeking that this Court resolve the issues

of the New Jersey District Court Action or the unfair labor practice proceedings before the ALJ.

Furthermore, the Debtors are not seeking to overturn or modify the 10(j) Injunctive Relief

requiring reinstatement of the striking employees or that the modifications sought in the Motion

be permanent.

**Additional Facts of the Union and NLRB**

The Union introduced additional facts regarding the organizational structure of the

Debtors and related entities.  According to various state financial filings, the Union asserts that

the Debtors exist as part of a corporate network with principal ownership flowing to Daniel and

Moshael Straus (the "Straus Family").  The Debtors are wholly owned by Care Realty, LLC,

which is owned by a number of entities, the largest being the Straus family.  In addition,

Debtors' management company, HealthBridge, is wholly owned by Care One, LCC, which is

also owned primarily by the Straus Family.  The Union alleges that the Straus Family is the

principal owner of Partners HealthCare, LLC and that HealthBridge and Partners HealthCare

have received over $23 million from the Debtors over the past three years.  Finally, it is alleged

that HealthBridge had a profit margin of 17.7% in 2010 and a reported partnership draw of $47.5

million.

The NLRB points out the procedural posture surrounding the section 10(j) Injunction.

The Debtors appealed the ruling to the United States Court of Appeals for the Second Circuit

where it is now pending with briefing on an expedited schedule.  The Debtors also filed motions

seeking a stay of the 10(j) Injunctive Relief before the District Court, the Second Circuit, and

twice sought such relief from the United States Supreme Court which ultimately denied staying

the 10(j) Injunctive Relief pending the outcome of the appeal in the Second Circuit.

**Testimony at the Hearing**

The Debtors presented two witnesses in support of their Motion.  Victor Marcos testified

through Debtors' proffer, which included verification of the Debtors' Application in Support of

the Motion, as well as his Supplemental Affidavit, and cross-examination by counsel for the

Union and NLRB.  Mr. Marcos is the Vice President of each of the Chapter 11 Debtors and

Chief Financial Officer of Case One Management and HealthBridge.  He was previously a

Senior Director of Alvarez and Marsal, where he worked in the healthcare industry primarily on

financial and operational restructures.  He oversaw the preparation of the 13-week budgets upon

which the Motion's relief is based.

Mr. Marcos testified that without the interim modifications being sought, the Danbury

facility would have a negative net operating cash flow within two weeks and all other facilities

would operate at a net cash flow by the end of week five of the 13-week projected budget.  He

testified that the projections were based on Debtors' average cost over the last twelve months

and that without the interim modifications, the differential cost of requiring the Debtors to

reinstate the terms of the expired CBAs versus the cost requested in the § 1113(e) Motion would

be approximately $802,000 a month, with aggregate differential over the proposed 13-week

budget period of approximately $2,600,000.

Mr. Marcos further testified that one lender, Capital One, has shown interest in a debtor-

in-possession financing facility and recently commenced due diligence with respect to the

proposed budget.    He testified that Capital One has indicated it would only provide DIP financing provided the modifications being sought are granted.    Mr. Marcos testified that he knows of no lender prepared to propose DIP financing without the interim modifications and that without such modifications and/or DIP loan, the Debtors would be required to close.    When asked by the Court what the expected time period was before closure plans would need to be implemented, Mr. Marcos testified that without Court approval of the modifications being sought in the Motion, the Debtors would have no recourse but to immediately implement closure plans before going into a negative cash flow position and would commence relocating patients.

On cross-examination, Mr. Marcos acknowledged that Debtors' financial condition has not changed since January 2013 and that the Union has not had the benefit of the Debtors' financial statements and other information prior to the Debtors' Chapter 11 filings.    Finally, it was acknowledged that the Debtors' drastic financial condition was not disclosed in Mr. Marcos's Affidavit submitted in the 10(j) Injunction hearing before the District Court.

The Debtors' second witness was Mr. Paul Rundell, Managing Director of Alvarez and Marsal's Healthcare Industry Group for fifteen years with primary focus on restructuring, consulting, and financial advisory services.    Mr. Rundell testified that, in his professional opinion, the Debtors were not financially viable without immediate interim relief and DIP financing.    He viewed the Debtors' economic feasibility as a two-step process, the first step being interim modifications to the financial terms of the expired CBAs and, with that in place, a DIP borrowing facility would, he believed, be a possibility to ensure economic feasibility and the potential for reorganization under Chapter 11.    Mr. Rundell was clear in his testimony that the Debtors would be left with no alternative but to immediately commence closure of their Facilities and relocation of all patients if the § 1113(e) relief was not immediately granted.

9

On cross-examination, Mr. Rundell acknowledged that the 13-week projections did not contemplate other cost reductions but that such adjustments would routinely be part of the process undertaken by the Debtors in their reorganization process.  When questioned by the Court relative to the Union's contention that significant sums were upstreamed from each Debtor to related parties or affiliates in connection with rent and management fees which, the Union suggests, might be in excess of market rates, the Debtors, through counsel, represented that there would be no management fees or rent paid to related parties or affiliates during the interim modification period approved by the Court.  By way of Second Supplemental Affidavit of Mr. Marcos filed after the hearing, Debtors affirmed that in the event the Debtors' interim relief was granted, during the interim modifications, the Debtors' affiliated entities will waive payment of management fees (payable to HealthBridge) and rent to the Facilities' affiliated landlords where Debtors do not have a lender.  This would appear to equate to an approximate 13-week savings of $404,000.  (See Second Supplemental Affidavit of Victor Matthew Marcos dated March 1, 2013)

## DISCUSSION

The Debtors' sole basis for the interim modifications relies on § 1113(e) of the Bankruptcy Code.  That section provides:

> If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement.  Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee.  The implementation of such interim changes shall not render the application for rejection moot.

11 U.S.C. § 1113(e).  The purpose of subsection (e) is to provide the debtor with temporary economic relief in order to carry out its objectives under chapter 11 by granting the court sufficient flexibility to grant that relief.  *Beckley Coal Min. Co. v. United Mine Workers of America*, 98 B.R. 690 (D. Del. 1988); *In re Salt Creek Freightways*, 46 B.R. 347, 351 (Bankr. D. Wyo. 1985) ("The inclusion of the interim changes provision was a compromise by which Congress intended that a court would have the flexibility to effectuate the overriding objective of Chapter 11, the preservation of a failing business for the benefit of all, including the employees who would otherwise lose their jobs.") (citing 130 Cong. Rec. H7495 (daily ed. June 29, 1984) (remarks of Representative Lungren)).

The Third Circuit has acknowledged that "a court may grant interim relief under subsection (e) when, following a hearing, it finds that 'an interim change is essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate.'" *Wheeling-Pittsburgh Steel Co. v. United Steel Workers of Am.*, 791 F.2d 1074, 1085 (3d Cir. 1986) (subsection (e) recognizes that circumstances may require more immediate action, such that seeking court authorization to reject is not satisfactory considering the procedural hurdles that are implicated when invoking other subsections of § 1113).

As the Debtors highlight in their Motion, the procedural background giving rise to the emergent application makes it unique; first, that the CBAs between the Debtors and the Union each expired prior to the Motion and bankruptcy filing, meaning that the financial and work-condition terms from which they seek interim modification are those contained in expired CBAs but made effective and imposed under the 10(j) Injunctive Relief; and, second, that the Debtors have not and are not seeking to reject the CBAs.  There exists a threshold issue that the Court must resolve before it can determine if the Debtors have established grounds for relief under

either of the two prongs of § 1113(e):  whether § 1113(e) gives this Court authority to modify

terms of an expired CBA.

The Union and NLRB ("Objecting Parties"), in addition to asserting that the Debtors fail

to carry their burden for relief under § 1113(e) on the merits, also raise threshold arguments:

(1) whether the § 1113(e) relief is an improper attempt to modify the terms of an order of the

district court; and (2) whether the debtors are precluded from litigating the financial issues under

principles of collateral estoppel or claim preclusion.

**I.      Whether § 1113(e) permits this Court to modify terms of an expired CBA
continued in effect through Injunctive Relief granted by the District Court**

   **a.      Whether § 1113(e) may modify terms of an expired CBA**

The Debtors contend that the language "continues in effect" of § 1113(e), is satisfied

because the relevant financial terms and work issues of the expired CBAs are for all purposes "in

effect" by order of the 10(j) Injunctive Relief.  The NLRB points out that there is a split of

authority on this issue.

Congress enacted § 1113 in response to the Supreme Court's decision in *NLRB v.*

*Bildisco & Bildisco*, 465 U.S. 513 (1984), which found that 11 U.S.C. § 365(a) allowed a debtor

to reject a collective bargaining agreement.  *Id.* at 521-22.  The justification for the exception to

the National Labor Relations Act's strictures was Chapter 11's purpose of reorganization

balanced against oversight by an administrative agency.  Congress, when enacting § 1113 in

response to *Bildisco*, gave the bankruptcy court power to implement interim changes to the terms

provided by a collective bargaining agreement but only after complying with the procedures set

forth in § 1113(e).

In *In re Karykeion, Inc.*, 435 B.R. 663, 673 (Bankr. C.D. Cal. 2010), the court was

confronted with the issue of whether § 1113 provides that a debtor in possession may reject or

modify an expired CBA.  The court further stated that it recognized a split on the issue.  *Id.*

("Courts, however, are split on whether a bankruptcy [sic] may modify or reject a collective

bargaining agreement that has previously expired by its own terms."); *Compare In re Sullivan*

*Motor Delivery, Inc.*, 56 B.R. 28 (Bankr. E.D. Wis. 1985), *with AFL-CIO v. Ormet Corp.*, 2005

WL 2000704 (S.D. Ohio. Aug. 19, 2005).  The *Karykeion* court discussed the reasoning behind

§ 1113(e) and its application to expired CBAs and stated that,

> Specifically, § 1113(e) allows a debtor to modify a collective
> bargaining agreement during "the period that it continues in effect"
> when it finds that such modification is necessary for continuation
> of the debtor's business or to avoid irreparable harm to the estate.
> The phrase "continues in effect" is a term of art regularly used in
> labor law and decisions interpreting labor law. . . . The phrase
> refers to the time between the expiration of a CBA and the NLRB
> deciding that there is an impasse and the two parties are no longer
> bound by continuing effects of the agreement. . . . Such language is
> intended to give the debtors the authority to reject the continuing
> effects of expired collective bargaining agreements though
> compliance with § 1113 instead of the NLRA.

*Karykeion*, 435 B.R. at 674–75 (citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 200

(1991), for the proposition that "continues in effect" refers to the obligations to comply with

terms post expiration by operation of law); *see also In re Hoffman Brothers*, 173 B.R. 177, 184

(9th Cir. BAP 1994) (stating in *dicta* that § 1113 gives a bankruptcy court authority, even if a

CBA has expired, to modify or reject the CBA).

Also to support their position, the Debtors cite *In re Hostess Brands, Inc.*, 477 B.R. 378,

382 (Bankr. S.D.N.Y. 2012), where Judge Drain discusses the language of § 1113(e) and the

application of the section to expired CBAs to demonstrate a point of comparison to the

applicability of § 1113(a), which allows a debtor in possession to assume or reject a CBA, to

expired CBAs.  Judge Drain ultimately concluded that § 1113(a) is not applicable to expired

CBAs but noted that § 1113(e) is likely an exception based on the "continues in effect" language

contained only in that section.

Lastly, the Debtors direct the Court to *Accurate Die Casting Co.*, 292 N.L.R.B. 982

(1989) wherein the issue was addressed by the National Labor Relations Board when it stated:

> There is no reference in subdivision (e) or in any part of section 1113 to executory contracts. Reference is made to applications for rejection of "a collective bargaining agreement," and to "a period" when it "continues in effect." There is no reference to periods preceding the expiration date of an agreement nor to any period during the term of an agreement. The sole reference is to the period when it is effective, and that is a matter which is determined by the above-mentioned principles of labor law. The period when a collective-bargaining agreement "continues in effect" includes a period when its replacement is being negotiated and in which no impasse has been reached. (Emphasis added)

*Id.*, at 987-88.

Here, the terms of the expired CBA have been continued and are "in effect" due to the

10(j) Injunctive Relief. Because the terms sought to be modified are those of the expired CBAs,

and they have been continued in effect, the Court finds that it has the authority to modify

pursuant to § 1113(e). The fact that the terms are effective on the order of the Connecticut

District Court does not change this outcome. The 10(j) Injunctive Relief is only in effect while

the ALJ determines the unfair labor practice issues including whether the parties came to a

lawful impasse. Clearly, if the CBAs had not expired pre-petition, § 1113(e) would be available

to Debtors to seek modification of the terms. If the ALJ determines that after the CBAs expired,

the Debtors and the Union were still in negotiations and had not reached an impasse,

modification would be available because the terms of the expired CBAs would be in effect and

§ 1113(e) would be available. If the ALJ determines that the Debtors and Union had reached an

impasse, the Debtors would be permitted to continue with the Implemented Terms based on their

"Last, Best and Final" proposals pursuant to the NLRA.  While there is a dispute as to whether a legal impasse has been reached, and pending that determination the terms of the expired CBAs have been reinstituted through the 10(j) Injunction to keep the status quo, the Order of the Connecticut District Court should not preclude the Debtors from seeking an interim modification of the terms of the expired CBAs that continue to be in effect in order to avoid irreparable damage to the estate (i.e., closure of the Facilities) or if essential to the continuation of the Debtors' businesses.

In light of the underlying purpose of § 1113(e) and based on the authority cited, notwithstanding some dissension among the courts, this Court concludes that § 1113(e) provides authority to modify, on an interim basis, the terms of an expired CBA where those terms continue in effect.

**b.      Whether § 1113(e) may be used to modify a 10(j) injunction ordered by the District Court**

Both the Union and the NLRB contend that this Court lacks authority to modify a 10(j) Injunction issued by the District Court.  The NLRB argues that if this Court accepts the Debtors' argument and holds that § 1113(e) may be used to modify any restrictions on employment terms, whether by a CBA, court order, or NLRA bargaining obligations, then the first sentence of subsection (e) would be superfluous.  It argues that the Court may only modify terms arising from a contract or CBA, while excluding other kinds of employment restrictions.

The Debtors argue they do not seek, through § 1113(e), to modify the District Court's Order.  They seek instead to modify the CBA terms "continued in effect" by that Order as authorized by § 1113(e).

The Union additionally makes a jurisdictional argument citing *Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.*, 502 U.S. 32 (1991) and *In re Calpine Corp.*,

337 B.R. 27 (S.D.N.Y. 2006), for the position that bankruptcy courts may not exercise concurrent jurisdiction with respect to modifying agreements, prior to the issuance of a final order in the administrative proceeding.

Congress granted bankruptcy jurisdiction to the district courts so that they could "deal efficiently and expeditiously with all matters connected to the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995). Thus, the Bankruptcy Code grants exclusive jurisdiction over "all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e). There are exceptions, of course. Section 362(b)(4) exempts a federal agency from the automatic stay of the Bankruptcy Code to enforce governmental police or regulatory power. 11 U.S.C. § 362(b)(4). This is why the proceedings are continuing in the Second Circuit and before the ALJ. Debtors argue the Motion does not involve enforcement which is the province of the NLRB and thus this Court has jurisdiction over the matter at issue.

In *MCorp*, the debtors sought to enforce an injunction of the district court restraining enforcement of an administrative proceeding instituted by the Board of Governors of the Federal Reserve for alleged violations of securities regulations. 502 U.S. at 37–41. Debtors argued that the injunction was permissible pursuant to the automatic stay. *Id.* at 39. The Court concluded that the district court could not exercise concurrent jurisdiction over the administrative law proceedings, even though it was authorized by the Financial Institutions Advisory Act, and, further, that § 362(b)(4) expressly provides an exception to the automatic stay for the continuation of administrative proceedings. *Id.* The Court went on to state that the debtors' argument that the administrative proceedings should be stayed because it may affect property of the estate would render the exception of (b)(4) meaningless. *Id.* at 41. Furthermore, the Court

held that the bankruptcy courts' concurrent jurisdiction under 28 U.S.C. § 1334(d) may be available where the administrative proceeding results in a final order and enforcement of that order where it affects property of the estate. *Id.* at 42.

*MCorp*, while standing for the proposition that courts may not exercise concurrent jurisdiction with an administrative proceeding, does not necessarily preclude this Court's modification of the CBAs' terms re-imposed under the 10(j) Injunctive Relief. Here, the Debtors are not seeking to stay or in any way prohibit the judicial proceedings that are ongoing nor are they attempting to address the issues being adjudicated in that matter. The Union contends that by an interim modification of the terms of the 10(j) Injunctive Relief it would be frustrating the jurisdiction of the ALJ. However, the 10(j) Injunctive Relief also now affects property of the Debtors' estate such that it falls within this Court's jurisdiction. *MCorp* can be read to support both parties, but does not stand for the proposition that the Debtors cannot seek modification of the status quo terms imposed by the injunction upon the Debtors.

In *In re Calpine Corp.*, 337 B.R. 27 (S.D.N.Y. 2006), the debtor entered into long-term fixed energy supply contracts with third-parties. Just prior to filing its petition, the third-parties commenced proceedings against the debtor with the Federal Energy Regulatory Commission ("FERC"). The FERC, by statute, has exclusive authority to determine the reasonableness of wholesale energy rates. In bankruptcy, the debtor tried to modify the rates of its long-term agreements to more favorable market rates. The bankruptcy court held that it lacked jurisdiction to authorize the debtor to reject the agreements because it would directly interfere with the FERC's exclusive jurisdiction. The court noted that nothing in the Bankruptcy Code allowed the debtor to achieve its goal without seeking FERC approval. *Id.* at 36.

*Calpine* is readily distinguishable from the case at bar.  Here, the ALJ does not hold the exclusive authority to modify the terms of a CBA.  The Bankruptcy Code addresses such situations and section 1113(e) expressly grants the bankruptcy court authority to modify CBA terms on an interim basis.  Furthermore, the Debtors here are not seeking to reject or permanently modify the terms, but seek interim relief, as authorized by the statute.  Again, the relief sought by the Debtor does not affect the ongoing hearings or determination by the ALJ with regard to the allegations of unfair labor practices and, thus, *Calpine* is not instructive since Congress has statutorily addressed the balance between competing labor and bankruptcy concerns.

Lastly, the Objecting Parties make the argument that the District Court of Connecticut, in issuing the 10(j) Injunction, found reasonable cause to believe that the Debtors illegally modified the terms of the CBAs because no legal impasse was reached.  As a matter of equity, this Court is conscious of its obligation to not allow Debtors to abuse § 1113(e) relief, purposely violate the good faith bargaining process, and then seek modification of those terms in this Court.  By contrast, any relief sought here pursuant to § 1113(e) is only temporary and can be narrowly tailored to effect relief necessary to foster reorganization.  Allowing modification in these circumstances, if the Debtors carry their burden on the merits, will not open the floodgates to abuse as the Objecting Parties argue.

While the jurisdictional arguments of the Objecting Parties are not without merit, the language of the District Court order issuing the 10(j) Injunctive Relief states that it did so to return the parties to status quo.  Such status quo may be subject to interim relief under § 1113(e).  The modification sought by the Debtors here does not seek to affect the administrative proceeding or the 10(j) Injunction.  Thus, this Court has jurisdiction to proceed.

II.      **Whether the Debtors are collaterally estopped from asserting financial hardship**

The NLRB contends that, because the Debtors did not argue financial hardship in opposition to the imposition of the 10(j) Injunctive Relief or their appeals at the Circuit and Supreme Court levels seeking a stay, they are collaterally estopped from relitigating the issue here.

The test to determine whether collateral estoppel, or issue preclusion, bars the relitigation of an issue in the Third Circuit is well known:

> (1) The issue sought to be precluded must be the same as the one involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4 ) the determination must have been essential to the prior judgment.

*In re Docteroff*, 133 F.3d 210, 214 (3d Cir. 1997).

In applying the four factors necessary to preclude relitigation, consideration must obviously be given to what claims and defenses were before the prior court for determination. The District Court action was brought under section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), pending the final disposition of unfair labor practice charges contained in the complaint which was the subject of the ongoing proceedings before the ALJ.  Section 10(j) authorizes district courts to grant temporary injunctions pending the outcome of unfair labor practice proceedings before the NLRB.  29 U.S.C. § 160(j).  In reviewing a section 10(j) petition, the legal standard is two-pronged:  the court must determine (1) whether there is reasonable cause to believe unfair labor practices have been committed and, if so, (2) whether the requested relief is just and proper.  *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1030 (2nd Cir. 1980); *see Kreisberg v. HealthBridge Mgmt.,LLC,* Case No. 3:12-CV-1299 (RNC), slip. Op. at 15-16 (D. Conn. Dec. 11, 2012).  The Debtors offered defense on several fronts, but not specifically on

the economic feasibility of complying with the terms of the expired CBAs.  In fact, Debtors did not raise any financial concern to the NLRB during the 10(j) investigation or to the Union at the negotiating table.  *Id.* at 32.

The District Court carefully considered the issues of reasonable cause and whether the injunctive relief was just and proper before concluding there was reasonable cause these Debtors have failed and refused to bargain with the Union in good faith as alleged and the injunctive relief was just and proper.  *Id.* at 34.

The 10(j) Injunctive Relief ordered the Debtors to reinstate the strikers under the wages and other terms and conditions of employment in place on June 16, 2012 and also to bargain in good faith with the Union.  *Id.* at 4.  In its determination, the District Court returned the parties to the status quo of June 2012 and required good faith bargaining.  The Court did not, and was not asked to, determine the Debtors' financial ability to operate the Facilities.

Moreover, the finality requirement of issue preclusion has not been satisfied by the hearing before the District Court.  "For purposes of issue preclusion . . . 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.  Restatement (Second) of Judgments, § 13 (1982)."  *In re Docteroff*, 133 at 216.  Clearly, the financial issues argued before this Court are not the same as presented to the District Court in defense of the § 10(j) Injunction and finality on that issue was not sufficiently reached.

Since the District Court did not have before it issues as to modification of the CBAs being essential to the continuation of the Debtors' business or in order to avoid irreparable damage to the estate, as are before this Court on the § 1113(e) Motion, and thus was not called

upon to make such a determination, the Debtors are not precluded from litigating the financial

hardship they now assert.

**III.**    **Whether Debtors have satisfied the requirements for this Court to modify the terms under § 1113(e)**

The Third Circuit has plainly stated that "a court may grant interim relief under

subsection (e) [of 11 U.S.C. § 1113] when, following a hearing, it finds that 'an interim change is

essential to the continuation of the debtor's business, or in order to avoid irreparable damage to

the estate.'" *Wheeling-Pittsburgh Steel, Co.*, 791 F.2d at 1085.

**a.**    **Whether an interim change is essential to the continuation of the Debtors business**

The Debtors' evidence demonstrates that without relief, they will be unable to operate at

a break-even level.  Based on financial projections provided, the Debtors reveal that they will run

out of funds by mid-April 2013, if required to operate under the economic terms of the CBAs.

The Debtors cite a review conducted by third-party analysts that revealed the Debtors, in

comparison to other facilities and agreements in Connecticut,

- Spend 225% more on pension benefits than the state average;

- Spend 17% more on pension benefits than seven other facilities with District 119 contracts that went bankrupt or appointed a receiver;

- Have 24% higher benefit costs than other District 1199 union facilities;

- And had daily benefit costs 48% higher than average of all facilities.

The Debtors posit that these statistics, in combination with the financial projections over the

upcoming 13-week period, establish that interim modification is essential to the continuation of

the Debtors' business and to avoid irreparable damage.  Equally significant, the Debtors assert

that without the proposed interim modifications they will be unable to obtain post-petition DIP financing, a necessity to a successful reorganization.

In determining what level of modification is appropriate, if any, courts have noted that Congress recognizes that Bankruptcy Judges are not experts in labor law or collective bargaining and does not intend them to be a labor mediator or negotiator. *See In re United Press Intern., Inc.*, 134 B.R. 507, 515 (Bankr. S.D.N.Y. 1991). However, Congress did intend for Bankruptcy Judges to "evaluate dire economic illness and mold appropriate remedies until parties who know the situation best are able to evaluate the data. Hence, Congress, through § 1113(e), is clearly attempting to balance the conflicting demands of bankruptcy and labor policy." *Id.* Thus, in approaching whether to grant a modification, a court must determine what is "essential to the continuation of the debtor's business, such that it should be limited to the bare minimum, short-term requirements for the debtor's immediate survival. *Id.* at 514 (citing *In re Royal Composing Room, Inc.*, 62 B.R. 403, 418 (Bankr. S.D.N.Y. 1986)). Furthermore, "[t]he 'essential' changes proposed by a debtor must be scrutinized on a case by case basis measured against whether a debtor will collapse without the change." *Id.* "The correct standard is an evaluation of the proposals on a matrix that measures their qualitative and quantitative effect over a short period of time, but with their ultimate effect, if possible, to be resolved at the bargaining table." *Id.* at 515.

In *In re Almacs, Inc.*, 169 B.R. 279 (Bankr. D. R.I. 1994), the court was presented with a request of the debtors to extend the CBA modification reducing employee wages pursuant to § 1113(e). While the debtor introduced facts that the savings will amount to $350,000 for the next three months, it also conceded that denial to continue the reduced wages under the modification "[would] not put the Debtor out of business, but he maintains that the Debtor will need every dollar it can get its hands on in order to cover the costs associated with plan

confirmation ($2.5–$3.0 Million)." *Id.* at 280–281. Because of this need to ensure adequate funds for a successful reorganization, and notwithstanding the clear burden such relief placed on the employees, the court granted a portion of the modification extension as requested but denied other parts because the debtors could not show that it would collapse without such modification. *Id.* at 281.

The Bankruptcy Court has the authority to determine in its judgment the necessary relief to ensure the continued operation of the Debtors. Additionally, while it is not bound to wholly accept or reject the modifications as proposed by the Debtors, courts are reluctant to condition or modify the relief because such action may be construed as rewriting CBAs. *Almacs*, 169 B.R. 279; 7 COLLIER ON BANKRUPTCY ¶ 1113.07[5] (Alan N. Resnick & Henry J. Sommer eds. 16th ed.).

The Union, relying on *United Press International*, correctly argues that Debtors "bear the burden of proving the extraordinary circumstances warranting emergency relief under section 1113(e)." 134 B.R. at 514. The Court need only to determine, in its discretion, whether the proposed modifications are necessary to prevent the Debtor from collapse.

## CONCLUSION

The evidence before the Court is not refuted. The Facilities care for hundreds of patients, employ 1,100 Union and non-union workers and, if they comply with economic and work-related provisions of the expired CBAs, Debtors will be forced to immediately implement closure plans and begin relocating patients. Both witnesses for the Debtors tell the same economic story. The projections and assumptions contained in the Motion, as well as the testimony of both witnesses, evidence all Facilities will operate at a negative cash flow by the end of week five if the financial terms of the rejected CBAs go into immediate effect.

Reinstating the returning strikers at the expired CBA terms will result in an approximate $802,000 monthly loss and an aggregate differential of the Debtors' projected 13-week budget of approximately $2,600,000 ($2,200,000 when related party expenses are not paid). Debtors certify they cannot sustain such losses. The reality of the evidence is that the Debtors are not financially viable without the relief requested in the Motion and DIP financing which is being sought.

Section 1113(e) requires a finding that the relief sought must be "essential to the continuation of the debtor's business or in order to avoid irreparable damage to the estate." 11 U.S.C. § 1113(e). Based upon the documentary evidence and testimony before this Court, there can be no debate but that the interim modifications sought in the Motion are essential to the continuation of the Debtors' business and are essential to avoid irreparable damage to the estate. Denial of the Motion will result in immediate implementation of state-mandated closure plans, including the appointment of a receiver to effectuate relocation of patients and termination of operations.

Accordingly, in consideration of the authority contained in section 1113(e) and the reorganization purpose of the Bankruptcy Code, the continued care and safety of the patients and the continued employment of 1,100 workers in Connecticut, the Motion shall be granted authorizing the Debtors to implement the interim modifications as requested. The interim modifications shall be authorized for a period of six (6) weeks. Even with the modifications, the Debtors need DIP financing to operate profitably during Chapter 11 and attempt to negotiate a Plan of Reorganization. If a DIP facility cannot be obtained in such a timeframe, there is not the same justification for Debtors to continue with the interim modified terms and must instead recognize, as the testimony revealed, that closure may be necessary. If acceptable DIP financing

can be obtained on condition of implementation of interim modifications, Debtors are free to return to Court and seek continued interim modifications as necessary in addition to approval of DIP financing.

An Order in conformance with this Opinion has been entered by the Court and a copy attached hereto.


*s/ Donald H. Steckroth*

_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE


Dated:  March 4, 2013