LEVY RATNER, P.C.
Susan J. Cameron (033942006)
Suzanne Hepner (admitted pro hac vice)
80 Eighth Avenue, 8th Floor
New York, New York 10011-5126
Phone: (212) 627-8100
Facsimile: (212) 627-8182

JAMES & HOFFMAN, P.C.
Kathy L. Krieger (admitted pro hac vice)
Darin M. Dalmat (admitted pro hac vice)
1130 Connecticut Ave., NW, Suite 950
Washington, DC 20036-3975
Phone: (202) 496-0500
Facsimile: (202) 496-0555

*Attorneys for New England Health Care
Employees Union, District 1199, SEIU*

**UNITED STATES BANKRUPTY COURT
FOR THE DISTRICT OF NEW JERSEY**

| In re:  | Chapter 11 |
|---|---|
| 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, et al.,[1] | Case No. 13-13653 (DHS)<br>(Jointly Administered) |
| Debtors-in-Possession | **HEARING DATE AND TIME:**<br>July 11, 2013, at 10:00 a.m. |

**ORAL ARGUMENT REQUESTED**

**UNION'S OBJECTION TO DEBTORS' MOTION FOR AN ORDER EXTENDING THE
INTERIM MODIFICATIONS TO THE DEBTORS' COLLECTIVE BARGAINING
AGREEMENTS WITH THE NEW ENGLAND HEALTH CARE EMPLOYEES UNION,
DISTRICT 1199, SEIU PREVIOUSLY APPROVED BY THIS COURT'S ORDERS
PURSUANT TO 11 U.S.C. § 1113(e)**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal identification number are: 710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford (4809) ("Long Ridge"), 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center (4730) ("Newington"), 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center (4839) ("Westport"), 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center (4716) ("West River") and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center (4676) ("Danbury").

The New England Health Care Employees Union, District 1199, SEIU ("Union" or "SEIU"), by and through its attorneys Levy Ratner, P.C. and James & Hoffman, P.C., respectfully objects to the Debtors' June 28, 2013, Motion and Verified Application seeking an extension of interim relief pursuant to Section 1113(e) of the Bankruptcy Code ("Third 1113(e) Motion") [Docket No. 392].[2]

## INTRODUCTION

The basic principle underpinning all Section 1113(e) law, as recognized by this Court and others, is that interim, unbargained-for modifications to a CBA[3] may only be achieved where there is an actual crisis, the debtor employer's business is not expected to survive without the requested relief, and the modifications are narrowly tailored. [Docket No. 65]. This Third 1113(e) Motion differs starkly from the previous two, in that the Debtors must now make their case with actual post-petition financial results (rather than their financial advisors' myriad gloomy projections), and it turns out that the actual financial results are both much better than projected and included a positive net operating cash flow ... *without the need for a single operating draw on the DIP loan.* In fact, the Debtors' current cash position of $▓▓▓▓ indicates that, in hindsight, they didn't need any, or certainly all of, the projected $3.2 million in

---

[2] The Union incorporates by reference all of its arguments in opposition to the Debtors' Motion for an Order Authorizing Debtors to Implement Modifications to their Collective Bargaining Agreements with the Union ("First 1113(e) Motion") and the Debtors' Motion for an Order Authorizing Debtors to Continue to Implement Interim Modifications to their Collective Bargaining Agreements with the Union ("Second 1113(e) Motion") [Docket No. 197] (collectively, the "Prior Objections"). In addition, the Union appends its amicus brief in support of the NLRB's motion for contempt against HealthBridge Management, LLC and the Debtors et al., as well as the NLRB's reply to the HealthBridge objection, as Exhibits 1 and 2 respectively.

[3] Albeit the statute does not permit, in the Union's view, modification of an expired collective bargaining agreement.

2

labor cost savings in the first four months of these cases in order to survive.[4] Surely the Debtors do not "need" the $2.8 million in wage and benefit cuts over the next 13 weeks requested in their Third 1113(e) Motion filed ten days ago – nor their revised request of last night for approximately $2.3 million in cuts -- with $▓▓▓▓▓ of cash on hand and projections showing they would operate at a loss of only $0.5 million even if *all* of the CBA modifications were lifted. Therefore, the Debtors fall far short of meeting the standards for relief under Section 1113(e), and their Third 11113(e) Motion must be denied.

## RELEVANT FACTS

1.  On February 25, 2013, the Debtors filed their First 1113(e) Motion, justifying their request to cut the employees' wages and benefits by approximately 25% over a 13-week period with a budget projecting $114,037.00 in net operating losses, assuming requested CBA modifications and DIP financing. [Docket Nos. 15, 58-1]. The Court granted the Debtors six weeks of requested modifications, inviting them to return with a motion to approve DIP financing and an extension of the CBA modifications. [Docket No. 66].

2.  On March 22, 2013, the Debtors moved the Court to approve DIP financing in the amount of $5 million, with a budget covering the period March 22, 2013-July 12, 2013, projecting $1.3 million in net operating losses, assuming continuation of the requested CBA modifications. [Docket No. 164]. The Court approved the financing as proposed. [Docket No. 234].

3.  On March 29, 2013, the Debtors filed their Second 1113(e) Motion, justifying their request for the identical wage and benefit cuts for the period April 19, 2013-July 12,

---

[4] Though requested on July 1, 2013, the Debtors still have not provided the Union their actual savings from the interim modifications for the 17-week period.

3

2013, by projecting $6,276.00 in net operating losses, assuming continuation of the requested CBA modifications. [Docket No. 197]. The Court granted the Debtors' motion. [Docket No. 230].

4. On June 28, 2013, the Debtors filed their Third 1113(e) Motion, justifying their request for identical wage and benefit cuts for the period July 19, 2013-October 11, 2013, by projecting $2.3 million in operating *surplus*, assuming continuation of the requested CBA modifications. [Docket No. 392].

5. On July 8, 2013, the Debtors filed an affidavit with the Court revising down their request for wage and benefit cuts by $469,810.00, or 16.6%. [Docket No. 405-1].

6. The Debtors have not drawn down a penny on their DIP facility for operations, as of the week ending June 28, 2013. See Individual Debtor Variance Reports, attached hereto as Exhibit 3.

7. None of the Debtors have gone cash negative in any week since the Petition Date. Id.

8. The Debtors state that their cash position as of June 28, 2013 is $█████. See Debtors' Consolidated Actual to Forecast Report for the Week Ending Friday 6/28/13 ("Consolidated 6/28 Report"), attached hereto as Exhibit 4.

9. The DIP budget projects $1,487,137.00 of net positive cash flow for the two last weeks of the current 13-week budget (i.e., the weeks ending July 5 and July 12). See 17-Week Cash Flow Assuming Requested Interim Modifications and $5M DIP attached as Exhibit B to the Debtors' Verified Application in Support of Entry of a Final Order Authorizing the Debtors to Obtain Post-Petition Financing ("DIP Budget") [Docket No. 164-3].

## ARGUMENT

I.  **THE WAGE AND BENEFIT CUTS REQUESTED BY THE DEBTORS MUST BE DENIED BECAUSE THEY ARE UNNECESSARY DUE TO THE DEBTORS' IMPROVED POST-PETITION OPERATING RESULTS.**

10. The Debtors come before this Court in a much different posture than when they filed their First and Second 1113(e) Motions. The Debtors' First and Second 1113(e) Motions were supported primarily by their financial advisors' hypotheses about post-petition performance. Since then, actual data regarding the Debtors' post-petition performance has become available, which presents a far brighter picture of the Debtors' finances than their advisors imagined.

11. The law clearly requires an independent inquiry each time a debtor applies for an extension of interim modifications under Section 1113(e). In re Almac's, Inc., 169 B.R. 279, 280 (Bankr. D.R.I. 1994) ("[T]hree extensions later, that burden has not changed and thus, the Debtor still must demonstrate that the 'relief it seeks is 'essential to the continuation of the Debtor's business, or in order to avoid irreparable damage to the estate . . . .'").

12. A debtor seeking interim relief under Section 1113(e) must establish that an interim change is "essential" either (a) "to the continuation of the debtor's business" or (b) "in order to avoid irreparable damage to the estate." 11 U.S.C. § 1113(e). The language of the statute indicates that interim changes are to be permitted only under "emergency conditions, when the debtor would otherwise likely collapse." United Food & Commer. Workers Union, Local 328 v. Almac's, Inc., 90 F.3d 1, 6 (1st Cir. 1996); Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of America, 791 F.2d 1074, 1085 (3d Cir. 1986) (stating that 1113(e) was implemented to address Congress' concerns "that there might be immediate problems of an emergency nature in individual cases"). The emergency situations that

5

Section 1113(e) is meant to prevent are those of immediate closure of the debtor's business, liquidation, those that threaten the debtor's immediate survival, or that cause the "draining of estates beyond repair." 130 Cong. Rec. H7490 (daily ed. June 29, 1984); See also In re United Press Int'l, Inc., 134 B.R. 507. 514 (Bankr. S.D.N.Y. 1991); In re Almacs, Inc., 169 B.R. 279, 281 (Bankr. D.R.I. 1994).

13. While the Union maintains that no such emergency threat to the Debtors' business has existed since the inception of this case, it is beyond question that the Debtors cannot justify the modifications requested in their Third 1113(e) Motion given the indisputable evidence – put forth by the Debtors themselves -- of their positive operating performance since the Petition Date. Despite their dire predictions, the Debtors concede that, through the week ending June 21, 2013, they have experienced a positive net operating cash flow of $4,621,013.00, causing them to exceed their operating budgets by $4,412,511. See Motion at 12; Comparison of Debtors' Budgeted and Actual Post-Petition Cash Receipts & Disbursements ("Variance Schedule"), attached hereto as Exhibit 5.[5] During the same period, the Debtors' overall cash position increased from $▮▮▮▮ to $▮▮▮▮. See Debtors' Consolidated Actual to Forecast Report for the Week Ending Friday 6/21/13 ("Consolidated 6/21 Report"), attached hereto as Exhibit 6.

---

[5] The Variance Schedule compares the actual weekly operational data provided by the Debtors via a Merrill Data Room against projections in the 13-Week Cash Flow Assuming Requested Interim Modifications and $5M DIP attached as Exhibit A to the Second Supplemental Affidavit of Victor Matthew Marcos ("Forecast 1") [Docket No. 58-1] (for the weeks ending 3/1/13, 3/8/13 and 3/15/13) and the 17-Week Cash Flow Assuming Requested Interim Modifications and $5M DIP attached as Exhibit B to the Debtors' Verified Application in Support of Entry of a Final Order Authorizing the Debtors to Obtain Post-Petition Financing ("DIP Budget") [Docket No. 164-3] (for the weeks ending 3/22/13 onward). Note that Exhibit B to the Debtors' Third 1113(e) Motion shows operating disbursements $3,859.00 higher than the Variance Schedule – the Union cannot account for this difference at this time.

14. In April 2013, the Debtors represented to the Court that absent approval of a $5 million DIP loan and CBA modifications, they would be forced to liquidate and turn the residents out into the street. The Court approved the DIP based on its finding that the Debtors had an "immediate and critical need" for the financing. [Docket No. 234 at 9-10]. They return to the Court now singing the same tune. This time, however, the disingenuousness of their claims is readily apparent. They have not even drawn on the DIP to fund operations -- a fact which they failed to include in their moving papers. See Exhibit 3. Indeed, none of the Debtors have gone cash negative in any week since the Petition Date, another fact conspicuously missing from Debtors' submission to this Court. Id. On an operational basis, the Debtors' *own projections* show that they are in no danger of immediate liquidation or closure if the interim modifications are allowed to expire. Over the next 13-week period, the Debtors project that they will have negative net operating cash flow of $555,443.00 if the terms and conditions of the collective bargaining agreement are restored. See Consolidated Savings Summary attached as Exhibit C-1 to Debtors' Third 1113(e) Motion [Docket No. 392-2] ("Consolidated Savings Summary"). Given that the Debtors project a beginning cash position of $3,680,402.00[6] for the next 13-week period, this simply does not constitute an emergency sufficient to justify continued relief under Section 1113(e).[7]

---

[6] The available evidence suggests that the Debtors are understating their beginning cash position for the next 13-week period. The Debtors' actual ending cash balance for the week ending June 28, 2013 was $■■■■■■■ See Consolidated 6/28 Report, attached hereto as Exhibit 4. The Debtors' DIP Budget projects net cash flow of $1,487,137.00 in the weeks ending 7/5/13 and 7/12/13, which would leave the Debtors with a beginning cash position of $■■■■■■■ for the next 13-week period. The Debtors have not presented any evidence to support their lower projection.

[7] Given the wide swings in budget-to-actuals during this case, it is not clear the Court should accord much weight to this new set of projections.

7

Even if the Debtors' projected rent payments of $528,598.00 were considered to constitute operating disbursements, the Debtors would still only experience negative net operating cash flow of $1,084,041.00 from a starting cash position of $3,680,402.00. See Consolidated Savings Summary. Accordingly, there is no danger of liquidation or immediate closure, and the Debtors' requested relief should be denied.

15.    Moreover, in an attempt to justify the further extension of the interim modifications, it appears as if the Debtors have completely redefined what they consider to be necessary to avoid immediate closure or imminent liquidation. In their First 1113(e) Motion, the Debtors contended that in order to continue operating over the next 13-week period they required modifications to their collective bargaining agreements estimated to achieve savings of $2,610,000.00 -- which would yield a negative net operating cash flow of $114,037.00. See Forecast 1. In their Second 1113(e) Motion, the Debtors contended that in order to continue operating over the next 13-week period they required the extension of the modifications to their collective bargaining agreements, estimated to achieve labor cost savings of $2,026,241.00 -- which would yield a negative net operating cash flow of $6,276.00. See 13-Week Cash Flow Comparison attached as Exhibit D to the Debtors' Second 1113(e) Motion [Docket No. 197-5]. In their Third 1113(e) Motion, the Debtors now ask this court to continue the same modifications to their collective bargaining agreements (this time estimated by the Debtors to achieve labor cost savings of $2,819,300.00), in order to achieve a positive net operating cash flow of $2,269,483.00 over the next 13-week period. See Consolidated Savings Summary. No matter how the Debtors attempt to spin it, imposing cuts of more than $2.8 million – or $2.3 million under their revised scenario -- to their CBAs to ensure a positive net operating cash flow of nearly $2.3 million does not rise anywhere

near to the level of emergency necessary for interim relief under Section 1113(e). On that basis alone, this Court should deny the extraordinary relief requested in the Debtors' Third 1113(e) Motion.

II. **IN THE EVENT THAT THIS COURT DOES NOT DENY THE DEBTORS' MOTION, THE WAGE AND BENEFIT CUTS MUST BE SUBSTANTIALLY REDUCED AS THE DEBTORS HAVE REQUESTED RELIEF FAR BEYOND THE BARE MINIMUM NECESSARY FOR THEIR IMMEDIATE SURVIVAL.[8]**

16. The Debtors seek to cabin this Court's decision-making authority by presenting a set of projections suggesting an all-or-nothing reality – either: (i) the interim modifications are continued and the Debtors remain cash positive over the next 13-week period or (ii) the terms and conditions of the CBA are restored, the Debtors lose their DIP facility, and end the next 13-week period cash negative by $19,442.00. See Consolidated Savings Summary. However, this convenient fiction ignores the realities of the Debtors' improved operations and cash position since the Petition Date, as well as the scope of relief available under Section 1113(e).

17. The modifications a debtor seeks under Section 1113(e) must be limited to the bare minimum, short-term requirements necessary for its immediate survival. See In re Ionosphere Clubs, Inc., 139 B.R. 772, 781 (S.D.N.Y. 1992) (vacating bankruptcy judge's 1113(e) order upon finding that there was no danger of immediate liquidation and that the judge had inappropriately taken the Debtor's long-term prospects of reorganization into consideration in granting interim relief); In re Almacs, 169 B.R. 279 (reducing a pay cut of

---

[8] The Union proposes the following CBA modifications in the alternative, only as a compromise position to resolve the motion before this Court. In doing so, the Union *in no way* disavows its position, argued before this Court and in various other forums, that the Debtors (along with their joint employer, non-debtor HealthBridge Management, LLC) have no financial inability to pay for the terms and conditions of the CBA, as Debtors and HealthBridge repeatedly stated at the bargaining table.

9

15% to 9% of wages, and directing the debtor to pay pension fund increase under the collective bargaining agreement upon finding that doing so would not cause the debtor irreparable harm). To the extent that a court determines that a debtor's requested wage and benefit cuts, or the financial justifications underpinning them, are in excess of the bare minimum required for their immediate survival, the modifications should be reduced. See In re Almacs, 169 B.R. 279, 281 (in deciding to reduce the amount of relief the debtors sought upon a finding that the debtor's financial situation had improved markedly, to the point of requiring the debtor to pay a wage increase under the collective bargaining agreement, the court stated that "[w]hat was fair, reasonable and temporary [then], is no longer fair and reasonable, nor necessary to avoid irreparable damage.").

18. To the extent that it does not prove outright that further interim modifications are unnecessary, it strains credulity to the breaking point for the Debtors to argue that a positive net operating cash flow of $2,269,483.00 represents the bare minimum required for their immediate survival over the next 13-week period. This is particularly true when, after asserting that certain negative operating cash flows would suffice in their First and Second 1113(e) Motions, the Debtors have improved their cash position by $███████ on the strength of positive net operating cash flow of $4,621,013.00. To the extent that this Court does not deny the Debtors' Third 1113(e) Motion outright – which the Union contends that it should -- the requested modifications must be substantially reduced.

19. Specifically, at a minimum, the Debtors' requested modifications regarding their contributions to the New England Health Care Employees Pension Fund and SEIU bargaining unit employee contributions toward medical, prescription drug and other insurance benefits should be denied. According to the Debtors' estimates of savings, this

10

would reduce the requested modifications by $1,278,420.00 over the next 13-week period, leaving them with a projected positive operating cash flow of $991,063.00. See Consolidated Proposed Interim Modifications and Consolidated Savings Summary attached as Exhibits A and C-1 to the Third 1113(e) Motion [Docket No. 392-2].

20. Debtors seeking interim relief under 1113(e) must demonstrate that the proposed modifications are the most reasonable, just and cost-effective measures that they can take in order to avoid imminent liquidation. In re Almac's, Inc., 159 B.R. 665, 667 (Bankr. D.R.I. 1993). This alternate solution, reluctantly proposed by the Union, is significantly more just and reasonable than the relief requested in the Debtors' Third 1113(e) Motion. It relieves some of the inordinate financial burden that has been placed upon the Debtors' SEIU bargaining unit employees while providing the parties with the time and information necessary to determine whether the Debtors will continue to exceed their projections as the history of this case suggests. At the same time, it provides the Debtors with a substantial cushion against liquidation in the seemingly unlikely event that they fail to meet their projections over the next 13-week period.

III. **THE INITIAL LENDING CONDITIONS AND DEFAULT PROVISIONS IN THE DEBTORS' DIP FINANCING AGREEMENT DO NOT ALTER THE FACT THAT THE WAGE AND BENEFIT CUTS REQUESTED BY THE DEBTORS ARE NOT NECESSARY TO THEIR IMMEDIATE SURVIVAL.**

21. Regardless of the fact that no emergency exists that might serve to justify the further extension of interim modifications under Section 1113(e), the Debtors will undoubtedly argue that the relief requested in their Third 1113(e) Motion should be granted in order to avoid an event of default under their $5 million DIP facility from Capital One, N.A. However, the Debtors are required to satisfy their burden for relief under Section 1113(e) each time they apply for an extension of interim modifications. In re Almac's, Inc.,

169 B.R. at 280. In order for the Debtors to accomplish this, they need to show that the requested interim modifications are the bare minimum, short-term requirements necessary for their immediate survival. See In re Ionosphere Clubs, Inc., 139 B.R. 772, 781 (S.D.N.Y. 1992). Instead of proving their case anew, the Debtors seek to deny the Union a decision on the evolving merits of interim modifications on account of a DIP facility default provision negotiated in the context of financial realities that no longer exist and based upon financial projections that have proven to be wildly inaccurate.

22. Additionally, in light of the variance between the Debtors' pessimistic post-petition projections and successful post-petition performance, there is every reason to believe that Capital One, N.A. would consent to elimination or reduction of the interim modifications. As impressive as the Debtors' net operating cash flow has been since the Petition Date, it pales in comparison to the variance between the Debtors' projected and actual cash positions through the week ending June 21, 2013. Capital One, N.A. agreed to provide the Debtors with a DIP facility based upon DIP Budget projections indicating that the Debtors would have only $596,529.00 in cash on hand at the close of the week ending June 21, 2013, inclusive of a drawn balance on the DIP facility of $974,775.00. See DIP Budget. This means that Capital One, N.A. was willing to lend money to the Debtors provided that their natural cash position (adjusting for amounts drawn against the DIP facility) was no worse than -$378,246.00 in the week ending June 21, 2013, provided that the interim modifications were in place. Id. In comparison, the Debtors had $▇▇▇▇▇▇ in cash, with no draw against their DIP Facility, at the close of the week ending 6/21/13 – an improvement of $▇▇▇▇▇▇. See Consolidated 6/21 Report attached hereto as Exhibit 6. There is no doubt that, had the Debtors merely met the exact projections in their DIP Budget,

12

Capital One, N.A. would continue the DIP Facility as long as the interim modifications, with estimated labor savings of $2,819,300.00 during the next 13-week period, remained in place. See Consolidated Savings Summary. There is no logical reason that they would refuse to do so now where, even without the projected savings labor cost savings over the next 13-week period, the Debtors have realized a $███████ improvement against Capital One, N.A.'s expectations.

23.    The Union hopes that, under the circumstances, the DIP lender will consent to any changes in interim modifications the Court may order. However, in the event that the Court sustains the Union's objection, in whole or in part, and Capital One, N.A. does not consent to continue funding, the Debtors will have the advantage of their much improved cash position and positive post-petition operating results in seeking out new sources of financing.

## IV. THE COURT SHOULD DISCOUNT ALL OF THE DEBTORS' ATTEMPTS TO EXPLAIN AWAY THEIR POSITIVE POST-PETITION PERFORMANCE

24.    In their Third 1113(e) Motion, the Debtors admit that they exceeded operating budgets by $4,412,511.00 through the week ending June 21, 2013. In reality, the Debtors have exceeded their post-petition operating budgets by $███████ through the week ending June 21, 2013.[9] See Variance Schedule, attached hereto as Exhibit 5. Further, as

---

[9] Most of this difference stems from the fact that the Debtors used Forecast 1 instead of the DIP Budget for their baseline budgetary projection for the week ending 3/22/13. See Email correspondence with Ryan Jareck regarding variance assumptions ("Jareck Variance Email"), attached hereto as Exhibit 7. However, the Debtors revised their projections between filing Forecast 1 and the DIP Budget, increasing projected operating disbursements by $843,941.00 in the week ending 3/22/13. Thus, the Debtors' reliance upon Forecast 1 projections for week ending 3/22/13 significantly reduces the overall net operating variance.

It appears that the DIP Budget was updated to reflect the Debtors' actual receipts and disbursements through the week ending 3/15/13, and that this is how the Debtors' beginning cash balance for the week ending 3/22/13 increased from a projected $2,327,781.00 under Forecast 1 to $4,156,026 in the DIP Budget. Additionally, the DIP Budget, including its projections for the

13

against all operating and non-operating expenses, including rent payments, restructuring costs, financing costs and payments to the DIP lender, the Debtors have exceeded their budgets by $▮▮▮▮▮. See Variance Schedule, attached hereto as Exhibit 5.

25. The Court should view skeptically the Debtors' attempts to explain away and characterize as non-recurring their positive operating variances, particularly with respect to the alleged: (i) $1,200,000.00 of June 2013 Medicaid receipts originally forecast to be received in July 2013 and $200,000.00 of Medicare receipts originally forecast to be received in the pre-filing period, (ii) $776,000.00 of one-time accounts receivable settlements, (iii) negative variance of cash receipts of approximately $1,000,000.00 resulting from a negative variance in projected census of approximately 5%, (iv) $393,345.00 permanent variance based on higher health claims experience, and (v) $1,211,794.00 positive variance in staffing costs associated with census reductions and staffing efficiencies. See Consolidated Variance Summary attached as Exhibit B to the Debtors' Third 1113(e) Motion.

26. With respect to the Debtors' claims regarding the $1,200,000.00 of June 2013 Medicaid receipts originally forecast to be received in July 2013 and $200,000.00 of Medicare receipts originally forecast to be received in the pre-filing period, a cursory glance at the Debtors' actual to budgeted cash receipts clearly shows that they have limited ability to predict exactly when they will receive any of their receipts, and that their Medicaid receipts have been fairly similar month over month post-petition. See Cash Receipt Schedule, attached hereto as Exhibit 8. There is nothing unusual about the $▮▮▮▮▮ in Medicaid

---

week ending 3/22/13, represents the set of projections upon which Capital One, N.A. agreed to provide the Debtors with the $5 million DIP Facility. Finally, the Debtors have already relied upon their revised DIP Budget projections for the week ending 3/22/13 to their advantage in the Second 1113(e) Motion.

receipts that the Debtors collected during the week ending 6/14/13 (which, other than $█ in Medicaid receipts collected during the week ending 6/7/13, comprise all of the Debtors' June Medicaid receipts through the week ending 6/21/13). Id. In each month since the Petition Date, the Debtors have had one similarly large week of Medicaid receipts in the middle of each month ($█ in the week ending 3/15/13; $█ in the week ending 4/12/13; $█ in the week ending 5/10/13). Id. The Debtors' June Medicaid receipts were $█ higher than budgeted for the month. Id. But without additional information to support the Debtors' assertions, it is just as reasonable to assume that the positive June variance represents an adjustment due to under-collection in May 2013, when Medicaid receipts were $█ lower than the Debtors expected to receive. Id.

27. The Debtors also cite to $776,000.00 in one-time accounts receivable settlements as a reason to disregard the positive cash receipt variances. In explanation of these alleged one-time settlements, the Debtors merely provided the Union with a summary chart. See Accounts Receivable Settlement Chart ("Settlement Chart"), attached hereto as Exhibit 9. The Settlement Chart shows that the alleged one-time settlements resulted from the collection of accounts receivable that the Debtors had originally classified as owed by their Medicaid Pending payor, for services provided mostly during late 2012 and early 2013. Id. However, the Debtors' aging model for determining uncollectible accounts receivable clearly indicates that the Debtors expect to be able to collect receivables from their Medicaid Pending payor in the ordinary course, subject only to the normal reductions for older receivables. See Uncollectible AR Model attached hereto as Exhibit 10. In light of this, there appears to be no reason to consider these payments to constitute extraordinary one-time events.

28. The Debtors claim that their ordinary course cash receipts were reduced by approximately $1,000,000.00 through the week ending June 21, 2013, due to a negative 5% variance between actual and projected average daily census ("ADC"). The Debtors informed the Union that they used a baseline combined ADC of ▮ for all of their projections through the week ending July 12, 2013. See Jareck Email regarding census assumptions ("Jareck Census Email"), attached hereto as Exhibit 11. By the Debtors' own admission in the Third 1113(e) Motion, ADC numbers are not reflected in the Debtors' cash receipts until they are collected, which occurs approximately 45 to 90 days later. Based upon this, the relevant period to examine in evaluating the Debtors' post-petition cash receipts through the week ending June 21, 2013 reflects a 5% decrease in ADC runs roughly from the beginning of December 2012 through the end of April 2013. During this period, the Debtors had a combined ADC of ▮ See Consolidated Census Schedule, attached hereto as Exhibit 12. This represents a decline of only ▮% from the Debtors' projections. Even if the Debtors were correct about the decline in census, there is evidence to indicate that a 5% decline in census would not have translated directly to a 5% (or roughly $1,000,000.00) decline against projected receipts. Through the week ending June 28, 2013, the Debtors' negative variances in Medicare and Medicaid receipts were more than offset by their $▮ positive variance in private payor receipts, suggesting that the Debtors may also have experienced a much more favorable payor mix than they anticipated. See Cash Receipt Schedule attached hereto as Exhibit 8.

29. Even if the Debtors have experienced higher than expected post-petition employee benefit claims through the week ending June 21, 2013, the historical fluctuation of the Debtors' monthly employee benefit costs indicates that this negative variance may not

16

carry forward. In 2011[10], for example, monthly employee benefit costs at Danbury ranged from a low of $▮ to a high of $▮; monthly employee benefit costs at Long Ridge ranged from a low of $▮ to a high of $▮ monthly employee benefit costs at Newington ranged from a low of $▮ to a high of $▮; monthly employee benefit costs at West River ranged from a low of $▮ to a high of $▮ and monthly employee benefit costs at Westport ranged from a low of $▮ to a high of $▮. See 2011 Debtor Financials attached hereto as Exhibit 13.

30. The Union requested a detailed explanation and breakdown of the additional savings achieved as a result of the Debtors' alleged decreased census and more efficient staffing in an informal information request submitted to the Debtors' counsel on July 1, 2013. See Informal Information Request attached hereto as Exhibit 14. The Debtors have not yet responded to this request. To the extent that any of these savings arise from the interim modifications, including, but not limited to, the elimination of paid meal time and calculation of overtime on a weekly rather than daily basis, these efficiencies would simply increase the amount of savings the Debtors' have reaped from the interim modifications and, concomitantly, the burden they have placed on the SEIU bargaining unit employees.

31. Given the Debtors' poor budgeting track record so far in these cases, time will likely be the only reliable indicator of their success in forecasting for the July 17, 2013-October 11, 2013 period. However, the actual cash status of the Debtors should drive the decision whether to suspend the CBA modifications. The modifications have been permitted

---

[10] The last full year in which the Debtors incurred benefit costs for both Union and non-Union employees.

only on an interim basis, as the law provides, to deal with short-term cash problems, as they arise. The modifications should be suspended immediately, given the cash cushion the Debtors have accumulated post-petition – as the Debtors can always return to Court should their performance take a significant turn for the worse.

## CONCLUSION

For all the foregoing reasons, the Union urges this Court to deny the Debtors' Motion.

Respectfully submitted,

/s/ Suzanne Hepner
LEVY RATNER, P.C.
Susan J. Cameron (033942006)
Suzanne Hepner (admitted *pro hac vice*)
Ryan J. Barbur (*pro hac vice* pending)
80 Eighth Avenue, 8th Floor
New York, New York 10011-5126
Phone: (212) 627-8100
Facsimile: (212) 627-8182

JAMES & HOFFMAN, P.C.
Kathy L. Krieger (admitted *pro hac vice*)
Darin M. Dalmat (admitted *pro hac vice*)
1130 Connecticut Ave., NW, Suite 950
Washington, DC 20036-3975
Phone: (202) 496-0500
Facsimile: (202) 496-0555

Date: July 9, 2013