<u>NOT FOR PUBLICATION</u>

**FILED**
JAMES J. WALDRON, CLERK

**JULY 15, 2013**

U.S. BANKRUPTCY COURT
NEWARK, N.J.

BY: s/ *Ronnie Plasner*
JUDICIAL ASSISTANT

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

In Re:

**710 LONG RIDGE ROAD OPERATING
COMPANY, II, LLC, et al.,**

Debtors.

Case No.:   13-13653 (DHS)

Judge: Donald H. Steckroth, U.S.B.J.

<u>**OPINION**</u>

**APPEARANCES:**

Cole Schotz Meisel Forman & Leonard
Michael D. Sirota, Esq.
Gerald Gline, Esq.
David Bass, Esq.
25 Main Street
Hackensack, New Jersey  07601
*Counsel for Debtor*

Levy Ratner
Suzanne Hepner, Esq.
Ryan J. Barbur, Esq.
80 Eighth Avenue
New York, New York  10011
*Counsel for New England Health Care*
*Workers, District 1199 SEIU*

National Labor Relations Board
Special Litigation Branch
Mark Eskenazi, Esq.
1099 14th Street, NW, Suite 8600
Washington, D.C.  20570
*Counsel for National Labor Relations Board*

Office of the United States Trustee
Donald F. MacMaster, Esq.
One Newark Center, Suite 2100
Newark, New Jersey  07102
*United States Trustee*

**THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE**

Before the Court is a motion ("Motion") filed by the Debtors that seeks an order extending this Court's April 10, 2013 Order (the "Second 1113(e) Order"), which authorized the Debtors to continue to implement interim modifications to their collective bargaining agreements ("CBAs") with the New England Health Care Employees Union, District 1199, SEIU (the "Union") under 11 U.S.C. § 1113(e) that were originally approved by this Court's March 4, 2013 order (the "First Interim 1113(e) Order," and together with the Second 1113(e) Interim Order shall be referred to herein collectively as, the "1113(e) Interim Orders").

The Motion seeks to extend the interim modifications for an additional 13-week period from July 15, 2013 through and including October 11, 2013 (the "Third 1113(e) Period"), to enable the Debtors to (i) negotiate with the Union pursuant to Section 1113 of the Bankruptcy Code, (ii) propose a plan of reorganization, (iii) maintain their DIP Facility, and (iv) avoid immediate closure of their Facilities.

This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b). This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein is 11 U.S.C. § 1113(e) of title 11 of the United States Code (the "Bankruptcy Code").

The Debtors argue that, unless the interim modifications authorized by the 1113(e) Interim Orders are continued through October 11, 2013, the Debtors will: (i) incur an event of default under its post-petition financing facility entitling the DIP lender to (a) terminate its commitment to make the revolving loans available to the Debtors, and (b) exercise all rights and remedies available to the DIP lender under the loan documents, including any right of set-off, or

3

under the Uniform Commercial Code or any other applicable law; (ii) run out of cash, in some cases, as early as the week ending July 26, 2013; (iii) be forced to close down and liquidate their operations; and (iv) be unable to attempt to negotiate with the Union or, alternatively, reject the CBAs pursuant to 11 U.S.C. § 1113(c). In substance, Debtors state the continuation of the interim modifications pursuant to 11 U.S.C. § 1113(e) is essential to the Debtors' continued operations and to prevent irreparable damage to their estates.

The Union filed an Objection to the Motion arguing the wage and benefit cuts requested by the Debtors are unnecessary due to the Debtors' improved post-petition operating results. The National Labor Relations Board ("NLRB") also filed an objection. The Official Committee of Creditors (the "Creditors' Committee") supports the Debtors' Motion as revised after consultation with the Creditors' Committee.

## RELEVANT FACTS

Each Debtor operates a sub-acute and long-term nursing care facility (each a "Facility" and collectively, the "Facilities") for the elderly in Connecticut. The Facilities are: (i) Long Ridge of Stamford, (ii) Newington Health Care Center, (iii) Westport Health Care Center, (iv) West River Health Care Center, and (v) Danbury Health Care Center. The Facilities are managed by HealthBridge Management, LLC, a non-debtor national healthcare management company.

The Facilities are skilled nursing facilities that provide long-term care and short-term rehabilitation services. For long-term-care patients who have medical needs, the Facilities provide 24-hour-a-day nursing care, nutritional monitoring and planning, medication management and personal care. For individuals in need of nursing and/or rehabilitation services following a recent hospitalization for orthopedic surgery, stroke, oncology care, cardiac care, general surgery and other diagnoses, the Facilities offer medical and physical rehabilitation

including physical, occupational and speech therapy, rehabilitative nursing and physician directed rehabilitation plans, IV therapy, wound care, and other services.

Each Facility is supervised by a licensed administrator and the nursing staff is supervised by a director of nursing. Each Facility also engages the services of a Medical Director to oversee the delivery of care to patients. The Debtors receive revenue from Medicare and Medicaid, patients who pay privately, and from other third party payors. The sources and amounts of each Debtor's revenues are determined by, among other things, the census at the applicable Facility, the "case mix" of its patients, and reimbursement rates.

On February 25, 2013, the Debtors filed their First 1113(e) Motion, seeking modifications to the Union employees' wages and benefits by approximately 25% over a 13-week period, with a budget projecting $114,037.00 in net operating losses, assuming the requested CBA modifications. After an evidentiary hearing, the Court granted the Debtors six weeks of requested modifications, inviting them to return, if necessary, with a motion to approve DIP financing and an extension of the CBA modifications.

On March 22, 2013, the Debtors filed a verified application in support of the Debtors' motion, pursuant to Sections 363 and 364 of the Bankruptcy Code, and Rule 4001 of the Federal Rules of Bankruptcy Procedure: (a) authorizing the Debtors to enter into a debtor-in-possession post-petition financing facility (the "DIP Facility") with Capital One, N.A., (b) authorizing the continued use of cash collateral and providing adequate protection, and (c) granting other related relief [Docket No. 164] (the "DIP Motion"). Without objection from any party, the Court approved the requested DIP Facility.

Under the terms of the DIP Facility, the following is an "Event of Default:"

> (kk) *Section 1113(e) Order*: If the Section 1113(e) Order or any order extending the relief granted therein is stayed, modified, or

5

terminated, or the relief granted thereunder expires or is otherwise changed, amended, or altered in any manner without the prior written consent of the Lender.

Id. at ¶ 9.1(kk).

On March 29, 2013, the Debtors filed their Second 1113(e) Motion, seeking continued interim modifications for the period April 19, 2013-July 15, 2013, by projecting $6,276.00 in net operating losses, assuming continuation of the requested CBA modifications. After an evidentiary hearing, the Court issued an oral opinion on April 10, 2013 (the "Second 1113(e) Opinion") granting the 1113(e) continuation motion. (See Transcript of Oral Opinion, Docket No. 298) In that opinion, the Bankruptcy Court found, among other things: (i) the "testimony at [the April 9, 2013] hearing demonstrated in this Court's opinion that continued interim relief is essential to the debtor's immediate survival," see Hr'g Tr., 9:14-16 (April 10, 2013); (ii) the "continuation of the interim modifications is a condition to the debtor's ability to draw in [sic] the DIP facility," see Hr'g Tr., 9:16-18 (April 10, 2013); and (iii) "[u]nless the interim modifications are continued, each of the debtors will run out of funds and have to close." See Hr'g Tr., 9:18-20 (April 10, 2013). Thus, this Court found "the evidence compelling in support of the [1113(e) Continuation Motion]." Hr'g Tr., 12:19-20 (April 10, 2013). Consistent with its oral decision, the Bankruptcy Court, on April 10, 2013, entered the Second Interim 1113(e) Order extending the interim modifications through and including July 15, 2013.[1]

On June 28, 2013, the Debtors filed the Motion, seeking continuation for the period July 15, 2013-October 11, 2013, assuming continuation of the requested CBA modifications and

---

[1] The Union and the NLRB each filed a notice of appeal and a motion pursuant to Bankruptcy Rule 8003 for leave to appeal the 1113(e) Interim Orders and the Court's April 9, 2013 Order denying the Union's Motion For Reconsideration. The District Court granted the Motions For Leave To Appeal and on June 5, 2013, the District Court stayed briefing until either the District Court or the United States Court of Appeals for the Third Circuit denies the NLRB's request for a direct appeal to the Third Circuit pursuant to 28 U.S.C. § 158(d)(2) and Fed. R. Bankr. P. 8001(f). On June 6, 2013, the NLRB filed a motion for certification of a direct appeal of the Orders to the Third Circuit. On June 20, 2013, the Debtors filed opposition to the NLRB's request for a direct appeal to the Third Circuit.

the $5 million DIP Facility. On July 8, 2013, after consultation with the Creditors' Committee, the Debtors filed an affidavit revising downward their request for wage and benefit cuts by $469,810.00. This reduction provides for: (i) the Union employees to revert back to their daily work schedule of 8 hours (including a 30-minute paid meal period), compared to 7.5 hours with a 30-minute unpaid meal period, (ii) the Debtors to re-implement 12 sick days per year and reinstitute personal days, and (iii) contributions to the Union Training Fund ("Revised Interim Modifications").

The Debtors' cost savings associated with the Revised Interim Modifications during the Third 1113(e) Period is $1,573,226 on a consolidated basis compared to $2,043,036 as provided in the Motion. Further, Debtors assert that HealthBridge Management, LLC and the applicable Facilities' landlords will forego their *pro rata* share of the concessions in the amount of $183,285 in order to assure sufficient liquidity during the Third 1113(e) Period.

At the hearing, Debtors produced the testimony of Mr. Victor Matthew Marcos, Vice President and Chief Financial Officer of each Debtor, as well as its Verified Application in Support, with financial exhibits attached, and the Supplemental Affidavit of Mr. Marcos in support of the Revised Interim Modifications, with financial exhibits attached, each of which was marked into evidence. Neither the Union nor the NLRB offered a witness nor evidence in opposition to the relief sought. The Union filed an extensive opposition through counsel, albeit not in verified form, and the NLRB recited its legal opposition which is the subject of pending appeals of the 1113(e) Interim Orders.

## **TESTIMONY AT THE HEARING**

The only witness at the hearing was Mr. Victor Matthew Marcos, Vice President and Chief Financial Officer of the Debtors, who previously testified before the Court on the 1113(e)

Interim Motions. He testified through proffer of the Debtors' Verified Application in Support of the Motion (D-1 in Evidence) as well as his Supplemental Affidavit (D-2 in Evidence) and was cross-examined by counsel for the Union and NLRB.

Mr. Marcos's testimony is significant on several critical elements of the Motion, particularly in explaining the Debtors' Consolidated 13-Week Cash Flow Schedule (see Exhibit 3 to Supplemental Affidavit). First, with regard to projections, he explained the importance of timing of receipts and disbursements, emphasizing timing has little to do with improved operations yet is critical to cash flow and the necessity for the DIP Facility. For example, the Union makes much of the fact that at the time the Motion was filed, the Debtors showed a $4 million cash surplus – far in excess of its prior projections. Marcos explained this was caused, in part, through the receipt in June of the State of Connecticut Medicare payment reimbursement which, in each of the four prior years, had been received in July and thus was appropriately built into the Debtors' projections for July. The early receipt, a timing issue, skewed the June cash flow projections and illustrates the critical nature of timing of receipts and disbursements and the effect timing has on financial projections and planning.

Marcos stated he reluctantly agreed to the $469,800 Revised Interim Modifications requested by the Creditors' Committee but believed any further concessions would be risky and would increase the cash flow burn rate to unacceptable levels. As Chief Financial Officer, he testified he could not risk running short of cash when dealing with a fragile elderly patient population.

Marcos reiterated his previous testimony that the elderly patient population at the nursing homes represents a distinctly different challenge than a normal manufacturing operation. Here, closing of operations presents particular problems. In the event of closure, patients have to be

8

relocated to other care facilities, which could easily take several weeks, so those in charge must exercise a fiduciary duty to not take financial risks which might ordinarily occur in other type of businesses, where terminations can be immediate -- for example, simply shutting down a product line or sending workers home and closing the doors.  Here, Marcos emphasized, if finances turn negative or are projected to be negative, he would be required to advise Connecticut state officials and undertake a closure and relocation plan for the fragile elderly population.

Significantly, Marcos testified that: (1) he does not believe the Debtors can operate with further revisions to the interim relief in the Debtors' environment, (2) risks affecting cash flow cannot be taken when dealing with a nursing facility population (as the Union suggests should be done), (3) the DIP lender has advised (and confirmed by counsel at the hearing) that it would not consent to further modifications, and (4) the DIP Facility is essential to continued operations of Debtors' business.  In this regard, Marcos points to Exhibit 3, the Consolidated 13-Week Cash Flow Schedule – assuming continued 1113(e) relief and $5 million DIP financing, which demonstrates the Debtors will need to draw on the DIP loan for $89,692 in the second week (7/26/13), even starting the week with a cash balance of $4.5 million.  In fact, he pointed out for the week ended 9/6/13, Debtors will need to draw down $1.2 million in order to safely continue operations.  He was clear in his testimony that without the DIP Facility, the Debtors cannot safely continue to operate.

On cross-examination, Marcos emphasized the necessity to understand and appreciate the timing concerns he faces as Chief Financial Officer and the necessity for the DIP Facility.

## **DISCUSSION**

There is no doubt that the Court can extend Section 1113(e) interim relief as requested.  Section 1113(e) provides:

> If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the Court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.

11 U.S.C. § 1113(e).

The Third Circuit has acknowledged that "a court may grant interim relief under subsection (e) when, following a hearing, it finds that 'an interim change is essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate.'" *Wheeling-Pittsburgh Steel Co. v. United Steel Workers of Am.*, 791 F.2d 1074, 1085 (3d Cir. 1986).

Section 1113(e) "permit[s] a court to order further interim relief [under Section 1113(e)] if necessary," which can also alter the initial interim relief allowed. *In re Landmark Hotel & Casino*, 872 F.2d 857, 860 (9th Cir. 1989). In *Landmark*, the Ninth Circuit held that orders entered under Section 1113(e) are not final orders because, inter alia, Section 1113(e) enables a court to order further interim relief, which would alter the interim relief initially approved. See *Landmark*, 872 F.2d at 860. For example, in *Landmark*, while the order was being appealed to the Bankruptcy Appellate Panel, the bankruptcy court continued to address the collective bargaining agreements and several times extended the duration of the interim relief order under Section 1113(e). Id. at 859-60.

The Union relies upon *In re Almacs, Inc.*, 169 B.R. 279 (Bankr. D.R.I. 1994) for the statement of law that each application for an extension of interim modification under Section 1113(e) must demonstrate that the relief the Debtor seeks is essential to the continuation of the

10

Debtor's business, or in order to avoid irreparable damage to the estate. Certainly, that statement cannot be disputed. The facts in *Almacs* demonstrate how that case progressed to the bankruptcy court. See prior decision approving interim modifications. *In re Almacs, Inc.*, 159 B.R. 665 (Bankr. D.R.I. 1993). After the bankruptcy court had granted three extensions over nearly a year, the *Almacs* court was faced, on the fourth request, with a debtor whose president testified that the company was accruing reorganization costs and, in fact, was squirreling away "reorganization costs" at the rate of $100,000 per week (as the direct result of union wage reductions) which gave the debtor a much improved cash position over the prior year. Id. at 280. Thus, the court determined the debtor could not meet its continuing burden of demonstrating that the relief it sought was essential to the continuation of its business or in order to avoid irreparable damage to the estate and accordingly, while granting a fourth extension, reduced the wage reductions and required scheduled increases in pension fund contributions.

Here, the testimony is quite different from *Almacs*. After hearing, we are faced with uncontradicted and unimpeached testimony and documentary evidence establishing that the Revised Interim Modifications are essential to the continued operations of the Debtors and vital to any hope of a successful reorganization. While the opening cash balance of the 13-week projections shows $3,680,000, the Debtors demonstrate that in excess of $3 million are one-time or non-recurring variances that are a result of timing (for example, the $1.2 million Connecticut Medicare reimbursement) whereas only $865,000 (or $205,000 per month) reflects operational variances expected to be retained.

Most compelling is Exhibit 3, attached to the Supplemental Affidavit of Victor Matthew Marcos, the Consolidated 13-Week Cash Flow Schedule assuming continued 1113(e) relief and $5 million DIP financing. This demonstrates that the Debtors, although starting with a

11

$3,680,000 cash balance, will need to draw from the DIP Loan in the second and third weeks and, after repayment, make substantial drawdowns of $1,653,000 and $2,308,000 in weeks six and seven in order to safely operate. These drawdowns are required under the projections even with the Revised Interim Modification being sought. In fact, the individual Debtor projections show both Danbury and Westport will each run out of cash during week ending July 26, 2013 and Newington runs out week ending September 6. If this were to occur, liquidation would immediately follow.

Based upon the record before the Court, the Court finds that the Debtors cannot: (1) operate without continued interim relief, as modified, (2) accept the risk of eliminating the revised changes, as urged by the Union, which could be injurious to the fragile nursing home population (alarmingly, this does not seem to concern the Union and they offer no evidence this risk is contrived), and (3) operate without the DIP Facility and the DIP lender has not given consent to additional changes beyond proposed in the Revised Interim Modifications.

The above findings mandate the determination that the Revised Interim Modifications are essential to the continuation of the Debtors' business and necessary to avoid irreparable damage to the estate. See 11 U.S.C. § 1113(e).

For the above reasons, the Debtors' Motion, as revised after compromise with the Creditors' Committee, is granted.

An Order in conformance with this Opinion has been entered by the Court and a copy attached hereto.

*s/ Donald H. Steckroth*

DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated: July 15, 2013

12