LEVY RATNER, P.C.
Susan J. Cameron (033942006)
Suzanne Hepner (admitted pro hac vice)
80 Eighth Avenue, 8th Floor
New York, New York 10011-5126
Phone: (212) 627-8100
Facsimile: (212) 627-8182

JAMES & HOFFMAN, P.C.
Kathy L. Krieger (admitted pro hac vice)
Darin M. Dalmat (admitted pro hac vice)
1130 Connecticut Ave., NW, Suite 950
Washington, DC 20036-3975
Phone: (202) 496-0500
Facsimile: (202) 496-0555

*Attorneys for New England Health Care
Employees Union, District 1199, SEIU*

**UNITED STATES BANKRUPTY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, et al.,[1] | Case No. 13-13653 (DHS) (Jointly Administered) |
| Debtors-in-Possession | **HEARING DATE AND TIME:** November 21, 2013, at 10:00 a.m. |

**ORAL ARGUMENT REQUESTED**

**OBJECTION OF NEW ENGLAND HEALTH CARE EMPLOYEES UNION,
DISTRICT 1199, SEIU TO DEBTORS' MOTION FOR AN ORDER APPROVING THE
ADEQUACY OF THE DISCLOSURE STATEMENT**

The New England Health Care Employees Union, District 1199, SEIU ("Union"), by and

through its attorneys, Levy Ratner, P.C. and James & Hoffman, P.C., hereby submits this

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal identification number are: 710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford (4809) ("Long Ridge"), 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center (4730) ("Newington"), 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center (4839) ("Westport"), 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center (4716) ("West River") and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center (4676) ("Danbury").
79-014-00001: 10332819.doc

objection (the "Objection") to Debtors' Motion for an Order Approving the Adequacy of the Disclosure Statement (the "Disclosure Statement"") [Docket No. 605] for the Debtors' Joint Chapter 11 Plan of Reorganization [Docket No. 606] (the "Plan") filed by the above-captioned Debtors on October 22, 2013, and respectfully states as follows[2]:

**PRELIMINARY STATEMENT**

1.   The Plan described by the Disclosure Statement is entirely geared towards disenfranchising the employee creditors and completely nullifying the effects of their efforts to seek redress of labor law violations committed by the Debtors and their affiliates.

2.   The Union therefore objects to the adequacy of the Disclosure Statement on the following grounds:

- Approval of the Disclosure Statement must be denied because the Plan it describes is patently unconfirmable, having been proposed in bad faith and lacking fundamental fairness in the classification and estimation of the claims of the 700 Union-represented employees and creditors holding Backpay Claims.

- The Disclosure Statement fails to:

    - provide information as to why Secured Classes 2 and 3 are impaired;

    - describe the risks associated with litigation involving the Debtors, the Union, and the National Labor Relations Board ("NLRB") in bankruptcy and non-bankruptcy forums in sufficient detail to enable

---

[2] All capitalized terms herein have the meaning ascribed to them in the Debtors' Motion and/or Plan.
79-014-00001: 10332819.doc

2

the other creditors to make an informed judgment about the feasibility of the Plan and the likelihood of recovery of their claims;

- clearly inform creditors regarding the nature and size of the Backpay Claims or regarding the likelihood the Union employee backpay claimants will prevail in the validity and classification of their claims, should the Debtors file objections to the claims;

- provide detailed information concerning the funding of the Plan, including, specifically, regarding the financial resources of the Backstop Funders and the Plan Sponsor Group, to allow creditors to determine the likely recovery of their claims;

- explain to what extent new value is actually provided by the Parent Companies to justify an exception to the Absolute Priority Rule.

3. Unless the Disclosure Statement and Plan are modified to satisfy these objections, as set forth in more detail herein, the Disclosure Statement must not be approved.

## RELEVANT BACKGROUND FACTS

4.    On October 22, 2013, the Debtors filed their Motion for approval of the Disclosure Statement ("Motion")[Docket No. 609].

5.    The Union, on behalf of itself, and through the National Labor Relations Board is engaged in litigation with the Debtors and certain of their non-debtor affiliates before the

Bankruptcy Court and in numerous other venues ("Pending Litigation.") See Docket nos. 51, 52, and 464.

6.  On July 2, 2013, the Union timely submitted contingent, unliquidated proofs of claim for any and all pre-petition unpaid wages and benefits owed to Union bargaining unit employees related to the Pending Litigation, a portion of which is entitled to treatment as priority wages pursuant to 11 U.S.C. § 507(a)(4). The New England Health Care Employees Pension Fund and the New England Health Care Employees Training Fund timely submitted contingent, unliquidated proofs of claim for any and all pre-petition unpaid Funds contributions owed on behalf of Union bargaining unit employees related to the Pending Litigation, a portion of which is entitled to treatment as priority benefit fund contributions pursuant to 11 U.S.C. §507(a)(5).

7.  On October 10, 2013, the Union timely submitted contingent, unliquidated proofs of claim for any and all unpaid post-petition wages and benefits owed to 1199 bargaining unit employees related to all of the Pending Litigation. The New England Health Care Employees Pension Fund and the New England Health Care Employees Training Fund timely submitted contingent, unliquidated proofs of claim for any and all post-petition unpaid Funds contributions owed on behalf of Union bargaining unit employees related to the Pending Litigation. The NLRB submitted proofs of claim for the unpaid wages and benefits owed to the Debtors' Union employees related to the Pending Litigation, estimating the pre-petition Backpay Claims to be $14,306,201.00, and the post-petition administrative claims to be $1,136,273.00. See NLRB Proofs of Claims, Claim Nos. 218-222 and 257-261.

8.  The Disclosure Statement provides for treatment and classification of claims as follows:

79-014-00001: 10332819.doc

4

9. The Plan creates eight classes of claims. Four classes (Classes 2, 3, 5 and 6) are purported to be impaired, and, thus, entitled to vote on the Plan. D.S. at 12.

10. Class 2 consists of the claim of the United States Department of Housing and Urban Development ("HUD") and Housing and Healthcare Finance, LLC (collectively, the "HUD Lender"), as beneficiary of Heartland Bank, a federal savings bank, as mortgagee and servicer of loans ("HUD Loans") insured by HUD and made to Debtors 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center ("Newington") and 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center ("West River"), and non-Debtor affiliated entities 240 Church Street, LLC, and 245 Orange Avenue, LLC. Plan at 1.72-1.75. The allowed amount of Claim 2 is approximately $7,900,000.00 for Newington, and $6,200,000.00 at West River.[3] D.S. at 7.

11. Class 3 consists of the claim of M&T Bank ("M&T") in respect of the loan ("M&T Loan") made to Debtor 107 Osbourne Operating Company II, LLC d/b/a Danbury Health Care Center ("Danbury"), and non-Debtor affiliates 19301 Watkins Mill Road Operating Company, LLC d/b/a Montgomery Village Health Care Center; 1621 Route 22 West, LLC; 1621 Route 22 West Operating Company, LLC d/b/a Somerset Valley Rehabilitation & Nursing Center; 204 W. Main Street, LLC; and 204 W. Main Street Operating Company, LLC d/b/a The

---

[3] The HUD Loans are secured by a mortgage on each facility operated by the Debtors, including the facilities where Newington and West River operate, and by a security interest in the furniture, fixtures, equipment and other personal property owned by the Debtors at each facility, including the furniture, fixtures, and equipment at which Newington and West River operate. DIP Loan Motion [Docket 164] at 8-9.

79-014-00001: 10332819.doc

5

Rehabilitation and Nursing Center at Firelands (collectively, "M&T Borrowers"). Plan at 1.84-1.88. The allowed amount of Claim 3 is $16,650,000.00.[4] D.S. at 7.

12. The Disclosure Statement indicates that Classes 2 and 3 will receive a 100% recovery of their claims. D.S at 7-8 and 24. They further state that M&T and HUD will have their claims reinstated on the Effective Date of the Plan, and that the pre-petition liens with respect to their claims will survive the Effective Date and will continue in accordance with contractual or statutory terms until they have been paid in full. Id. The Disclosure Statement does not make clear how these classes are impaired; the Disclosure Statement suggests that "if applicable, such Liens shall be subject to the terms of the New Credit Agreement, if applicable (sic)." Id. at 24.

13. Class 5 consists of impaired Allowed Ongoing Trade Vendor Claims segregated into five subclasses by Debtor. These creditors are vendors holding unsecured claims which are conducting and will continue to conduct business with the Debtors as of the Effective Date and after the Effective Date for a period of no less than one year. Plan at 1.99. The total allowed aggregate amount of the Class 5 claims is $3,279,000.00.

14. The Class 6 claims consist of impaired Allowed Other General Unsecured Claims segregated into five classes by Debtor. These claims are unsecured claims against one or more of the Debtors, including "(i) Claims arising from the rejection of Executory Contracts (which includes any unexpired lease) to which a Debtor is a party pursuant to this Plan or otherwise, (ii)

---

[4] The M&T Loan is secured by a first lien financing arrangement in the amount of $20,000,000.00, consisting of a blanket security interest in and lien against all assets of the M&T Borrowers, including accounts receivable (including health care insurance receivables) and all other forms of obligations owing to the M&T Borrowers. DIP Loan Motion [Docket 164] at 6-7).

79-014-00001: 10332819.doc

Backpay Claims or claims, if any, arising from the rejection or termination of the Collective Bargaining Agreements, (iii) Claims of any Non-Ongoing Trade Vendor and (iv) Claims arising from any litigation or other court, administrative or regulatory proceeding, including, without limitation, damages or judgments entered against, or settlement amounts owing by a Debtor related thereto." Plan at 1.103. The Debtors have estimated the Backpay Claims at $0. The remaining claims in Class 6 are valued at $115,000.00.[5]

15. The Disclosure Statement estimates the amount of the Allowed Administrative Expense Claims to be $150,000.00. D.S. at 5. This amount excludes the estimated amount of the Backpay Claims stated in the proof of claim filed by the NLRB, which is deemed prima facie valid until an objection is filed. No objection has been filed to date.

16. The Disclosure Statement also contains no information concerning the priority wage claims filed by the Union, the NLRB, and the Funds.

17. Equity interests comprise Class 8, and are unimpaired under the Plan. Although the Holders of the Class 8 claims, THCI Company and THCI Mortgage ("Parent Companies") will not receive any distributions on account of their equity interests, the Plan provides that they are to retain those interests in the reorganized Debtors following Plan confirmation. D.S. at 26. This is justified in the Plan and Disclosure Statement based on new value to be provided in the form of forgiveness and cancellation of Intercompany claims and commitments by the Backstop

---

[5] The Disclosure Statement provides conflicting information concerning the treatment of these claims. On the one hand, the Disclosure Statement suggests that that these claims, excluding the Backpay Claims, will be paid at 100%. D.S. at 10. On the other, it indicates that these claims will be paid after fixing of all Allowed Other General Unsecured Claims, including the Backpay Claims, at their pro rata share of plan distribution amounts. Id.

Funder (Care Realty, LLC) and other members of the Plan Sponsor Group. D.S. at 50; Plan at p. 37, 1.11.

18. Plan Funding: The Disclosure Statement and Plan provide that an unspecified member or members of the Plan Sponsor Group will fund a Plan Distribution Contribution of "no less than" $500,000, which will be used only to pay the Class 6 unsecured claims. D.S. at 50; Plan at 1.109, 4.1. There is no statement regarding whether the Plan Distribution Contribution is unlimited, as only a minimum is mentioned. To the extent that the operations of the Debtors or Reorganized Debtor, or sale of assets, are insufficient to satisfy allowed claims of all the other classes, the Backstop Lender, or other members of the Plan Sponsor Group, will advance funds ("Backstop Funds") to the applicable Debtor. D.S. at 26-27; Plan at 4.1, 4.13. 4.2. The Backstop Funder will also provide funds to meet operating shortfalls to the extent identified in any CBA Rejection Order for as long as any Debtors continue to own and operate their facilities. D.S. at 27, 46.

19. Releases: the Disclosure Statement provides that each creditor that receives a distribution pursuant to the Plan will be deemed to have forever waived, released, and discharged all claims not only against the Debtors, but against unnamed non-Debtor Affiliates of the Debtors, including, but not limited to, members of the Plan Sponsor Group (i.e., Care Realty LCC, the Parent Companies, and HealthBridge). D.S. at 38.

## ARGUMENT

### I. Legal Standard

20. Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has "an affirmative duty to provide creditors with a disclosure statement containing adequate information" as defined by the Code. Kane v. Kane, 2009 U.S. Dist. LEXIS 91504, 14-15 (D.N.J. 2009). "Adequate information" is defined to mean:

> **information** of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records. . . **that would enable a hypothetical reasonable investor typical of holders of claims** or interests of the relevant class to **make an informed judgment about the plan**.

11 U.S.C. § 1125(a)(1) (emphasis added).

22. In enacting Section 1125, the "congressional concern was to require the debtor to furnish to the electorate to the confirmation process sufficient financial and operating information to enable each participant to make an "informed judgment" whether to approve or reject the proposed plan." In re Fierman, 21 B.R. 314 (Bankr. E.D. Pa. 1982) (citing In re Northwest Recreational Activities, Inc., 8 Bankr. 10, 11 (Bankr. N.D. Ga. 1980). Where the circumstances require, the Debtor must disclose "information relevant to the risks being taken by the creditors and interest holders" and "any financial information, valuations, or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan." Bank of N.Y. v. Becker (In re Lower Bucks Hosp.), 488 B.R. 303, 317 N.42 (E.D. Pa. 2013).

23. Furthermore, where a bankruptcy case is "so clearly directed at the impairment of one creditor, it is essential that the support of the other creditors be based on accurate information." In re Integrated Pet Foods, Inc., 2004 Bankr. LEXIS 1503 (Bankr. E.D. Pa. 2004).

24. In addition, the Third Circuit has ruled that, during a hearing on the Disclosure Statement, "a bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable." In re Am. Capital Equip., LLC, 688 F.3d 145, 154 (3d Cir. 2012). A plan is patently unconfirmable where (1) confirmation "defects [cannot] be overcome by creditor voting results" and (2) those defects "concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." Id., at 154-155. A plan is patently unconfirmable if it is not proposed in good faith. Id. at 156; 11 U.S.C. § 1129(a)(3).

25. In this case, the Debtors' Disclosure Statement must not be approved because it fails to provide adequate information to creditors concerning: (1) the risks to the funding of the Plan from pending litigation regarding the Debtors' violations of the NLRA; (2) the degree to which certain classes are truly impaired; (3) the financial wherewithal of the Plan Sponsor Group and the Backstop Funder, and (4) the nature of releases provided to non-debtor third parties. Above all, because the Disclosure Statement fails to disclose how the bad faith defects which make the Plan unconfirmable can be cured, it should not be approved.

**II. The Disclosure Statement Should Not Be Approved Because It Describes A Plan That Is Not Capable Of Being Confirmed Because It Has Been Filed In Bad Faith.**

26. The inquiry regarding good faith under 11 U.S.C. § 1129(a)(3) is whether a plan achieves results consistent with bankruptcy purposes and objectives, which are defined, in part, in the Third Circuit as being "maximiz[ing] property available to satisfy creditors, discourag[ing] debtor misconduct, and achiev[ing] fundamental fairness and justice." In re Jersey City Medical

Center, 817 F.2d 1055 (3d Cir. 1987). A plan that artificially impairs and unreasonably classifies creditors with the sole purpose of achieving the votes necessary to confirm a proposed reorganization plan under Section 1129(a) or Section 1129(b), and which has a disparate effect on similarly situated creditors is in bad faith and violates the principal of fundamental fairness. In re All Land Invs., LLC, 468 B.R. 676 (Bankr. D. Del. 2012)( ". . . artificial impairment of classes to manipulate voting implicates the good faith requirement of §1129(a)(3)"); Fairfield Executive Associates, V. Hyperion Credit Capital Partners, L.P., 1993 U.S. Dist. Lexis 16286, **14 (D.N.J. 1993) (stating that arbitrary classification schemes designed solely to secure acceptance of plan leads to abuse of creditors and fosters reorganizations that serve no broader public purpose); In re W.R. Grace & Co., 475 B.R. 34, 90 (D. Del. 2012)

27.     In this case, it is clear that the classification scheme detailed in the Disclosure Statement serves no purpose other than to gain acceptance of the Plan by gerrymandering voting classes and disenfranchising the holders of Backpay Claims, rendering the Plan patently unconfirmable. As the Debtors themselves admit, the motivation for the Debtors' Chapter 11 Petition and subsequent proceedings in this forum has been to avoid full compliance with the District Court's 10(j) Order, and obtain relief from its obligations to its employees that every other forum has denied them. See Affidavit of Victor Matthew Marcos, ECF No. 5 at ¶ 38 (describing the "purpose of the Chapter 11 filing" as to seek relief from the "Terms of Employment" imposed by the 10(j) Order, which the facilities deem to be the "primary, if not sole, reason" for their bankruptcy). The proposed Plan and Disclosure Statement is intended to finally and permanently accomplish this dubious goal. Furthermore, the Plan's classification of Class 6 claims separately from Class 5 claims, the misrepresentations made to Class 6 creditors

in the Disclosure Statement, and the disparate effect of the Plan on these creditors are further indications that the Plan has been filed in bad faith.

**A. The Disclosure Statement Should Not Be Approved Because it Fails To Provide Adequate Information Concerning the Justification For the Classification, Treatment, and Estimation Of the Employees' Backpay Claims, Rendering The Disclosure Statement Informationally Deficient and The Plan It Describes Patently Uncomfirmable**

**i.     The Disclosure Statement Fails to Provide Adequate Information Justifying the Classification of M&T and HUD as Impaired Claims**

28.    In order to obtain two voting classes, the Disclosure Statement and Plan classifies M&T and HUD, comprising Classes 2 and 3, as impaired, even though these creditors will receive 100% recovery of their claims and their liens will survive the effective date of the Plan. D.S. at 7-8 and 24. A creditor is artificially impaired when a plan "imposes an insignificant or de minimis impairment on a class of claims to qualify those claims as impaired under § 1124." In re All Land Invs., LLC, at 689-90. However, where a debtor has the ability to pay an impaired creditor in full on the effective date of a plan, or where the creditor will retain its liens, as in this case, the creditor is not impaired, and therefore not entitled to vote. Id., at 691 citing In re PPI Enters. (U.S.), Inc., 324 F.3d 197, 204 (3d Cir. 2003). It is not clear from the Disclosure Statement that the Debtor's classification of these creditors as impaired has any basis in fact, rendering the Disclosure Statement informationally deficient. In re Fierman, 21 B.R. 314 (Bankr. E.D. Pa. 1982). ("[O]pinions without factual support are not the proper content of a disclosure statement and do not provide the parties voting on the plan with adequate information.")

**ii.    The Classification of the Unsecured Claims is in Bad Faith and Unfairly Discriminates Against the Class 6 Creditors, Including the Holders of Backpay Claims.**

29. The Plan's division of general unsecured creditors into two separate classes is in bad faith, because the justification for doing so is patently false, and is, again, designed solely to manipulate acceptance of the Plan. The rule in the Third Circuit is, "Thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." <u>Fairfield Exec.Assoc., V. Hyperion Credit Capital Partners, L.P.</u>, 1993 U.S. Dist. Lexis 16286 (D.N.J. 1993). "Substantially similar claims" are those which share common priority status and which share the same legal rights against the debtor's assets. <u>Fairfield Exec. Assoc.</u>, 1993 U.S. Dist. Lexis 16286, **15 N.4. (D.N.J 1993); In re W. R. Grace & Co., 475 B.R. 34, 109-110 (D. Del. 2012). Similar claims may be classified separately only "for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." <u>FGH Realty Credit Corp. v. Newark Airport/Hotel Ltd. P'ship</u>, 155 B.R. 93 (D.N.J. 1993) (citing <u>In re U.S. Truck Co.</u>, 800 F.2d 581, 587 (6th Cir. 1986)).

30. In this case, the claims of the Class 5 and Class 6 creditors share the same priority, and they seek recovery from the same general assets of the Debtors, but are nonetheless segregated into separate classes. The Debtors' proffered justification for this, that one set of creditors will have an ongoing relationship with the Debtors, while the other will not, is belied by their inclusion of the Union employees' claims with the Non-Ongoing Trade Vendors in Class 6. The holders of the Backpay Claims will continue to have an interest in the ongoing business of the Debtors, as the Ongoing Trade Vendors will, and the future rights of both sets of creditors will continue to be negotiated in the course of their ongoing relationship. Thus there is no rational reason supporting the creation of these two separate unsecured classes.

79-014-00001: 10332819.doc

13

31. Furthermore, the Plan creates a disparate effect on the Class 6 creditors through the timing of the distribution of their claims. The Plan provides for the Class 5 creditors to be paid in twelve equal monthly installments commencing on the Effective Date, or "in the ordinary course of business . . . or in accordance with the historical course of dealings. . ." D.S. at 9, 25. The Class 6 creditors, on the other hand, will not be paid until the fixing of all the Class 6 claims at the conclusion of the Pending Litigation, a date which is indeterminable and potentially years in the future. D.S. at 26. This treatment of the Class 6 claims, as distinct from Class 5, and the Debtor's failure to provide adequate information concerning the effect a delay will have on these claims strongly implicate bad faith. In re W.R. Grace & Co., 475 B.R. 34 (D. Del. 2012) (indicating that differing treatment of creditors having a serious disparate effect on the parties constitutes bad faith). The Disclosure Statement provides a mere footnote stating that "Debtors are not able to predict how the court will rule in the context of the ALJ proceedings and cannot guarantee that the ultimate determination thereof will not have a material adverse effect on the recovery of those Holders of Claims in Class 6." D.S. at 10 N.7. The Disclosure Statement, therefore, provides inadequate information to allow the Class 6 creditors to make an informed choice regarding the treatment of their claims, and the Plan it describes has been filed in bad faith.

       iii. **By Valuing the Union's Claims at $0 and Ignoring the Priority Status of a Portion of these Claims, the Disclosure Statement Induces Voting in Favor of the Plan While Failing to Provide Adequate Information Concerning the Likelihood of Recovery of Creditors' Claims and the Risks Posed to the Plan by Ongoing Litigation.**

32. The Debtors' intention in creating these two separate unsecured classes is evident in the misrepresentations contained in the Disclosure Statement regarding payment in full of the Class 6 Claims, based on the mischaracterization of the Backpay Claims as worth $0. D.S. at 9-

10. The Debtors' misrepresentation regarding the value of the Unions and NLRB's claims prejudices the Class 6 non-Backpay claimants by failing to provide adequate information concerning potential risks to recovery of their claims. In the Third Circuit, a Debtor must disclose not only the existence of litigation, but also an "explanation of the effect these lawsuits may have on the disposition of property or on the claims of creditors." In re Fierman, 21 B.R. at 316. In this case, the NLRB's and the Union's chances of prevailing in the Pending Litigation and recovering the full amount of the Backpay Claims are more likely than not, given the fact that they have prevailed in every forum where the Debtors' labor law violations have been heard thus far.[6] In any case, the NLRB has filed presumptively valid proofs of claim stating the value of pre-petition Backpay Claims at $14,306,201.00 [7] Thus the Debtors cannot, in good faith, commit to the other creditors that these amounts will not be allowed in full following a hearing on the Debtors' anticipated objection to the NLRB's and the Union's proofs of claim,

33.    The Disclosure Statement is also informationally deficient because it fails to disclose that a portion of the pre-petition Backpay Claims is entitled to priority treatment under 11 U.S.C. §§ 507(a)(4)-(5), as indicated by proofs of claims filed by the Union and the NLRB. As noted above, these proofs of claim have not been objected to, and must be presumed valid. It is clear the amount of Backpay Claims entitled to priority treatment are substantial enough that, if properly classified, would affect the overall cost of the Plan.

---

[6] Footnotes 7 and 8 of the Disclosure Statement acknowledge the existence of further NLRB proceedings. Nevertheless, the Disclosure Statement fails to explain how the Debtors can "ascribe no value to the Backpay Claims," in the face of potential continued litigation success by the Union in other fora.

[7] A proof of claim executed and filed in accordance with § 501 of the Bankruptcy Code and applicable Bankruptcy Rules constitutes prima facie evidence of the amount and validity of the claim. Fed. R. Bankr. P. 3001(f);  See 11 U.S.C. §502(a) (providing that a claim is "deemed allowed " unless a party in interest objects). To date, these proofs of claim have not been objected to, and must therefore be presumed correct.

79-014-00001: 10332819.doc

34. It is clear that the misrepresentations to other creditors and the Debtors' valuation of the Backpay Claims serve no other purpose than to induce voting for the plan and to disenfranchise the 700 individual holders of these claims in Class 6 by rendering their votes a nullity towards the "two-thirds in amount" requirement of Section 1126(c) required for determining a class's acceptance or rejection of a plan. See 11 U.S.C. § 1126(c). The Disclosure Statement hides the extent to which the other Class 6 creditors are prejudiced by the separate classification of their claims and lack of information concerning the timing of their distribution and the effect of Pending Litigation. Because this classification scheme and valuation of the Union's claims are clearly intended to disenfranchise the holders of the Backpay Claims and create classes with the sole purpose of obtaining class acceptance, the Court must find the Plan unconfirmable on its face, and deny approval of the Disclosure Statement that describes it.

**III. The Disclosure Statement May Not Be Approved Because it Fails to Disclose Crucial Information Concerning the Funding of the Plan and its Funders.**

35. The Disclosure Statement may not be approved because it fails to provide vital information concerning the funding of the Plan and the funders. In re Monroe Well Serv., Inc., 80 B.R. 324, 332 (Bankr. E.D. Pa. 1987) (requiring that a disclosure statement detail matters affecting plan funding, including information on releases of plan funders by creditors and about the plan funders themselves). The lack of information regarding the ability of the Backstop Funder to fund distributions and operations of the Debtors, or the written commitments binding them to do so renders the creditors unable to make an informed judgment on whether the Plan satisfies the feasibility requirement under 29 U.S.C. § 1129(a)(11). This lack of completeness on the part of the Disclosure Statement deprives creditors of crucial information regarding risks to plan consummation. The Disclosure Statement and Plan also fail to provide assurances that a

reserve will be set aside for payment of the NLRB and Union's claims should the Debtors not prevail in Pending Litigation.

36. Under 1129(b)(2), to be fair and equitable, a Plan which violates the Absolute Priority Rule must provide new value to the reorganized entity in order for holders of equity interests to be permitted to retain their interests in the reorganized entity. In re PWS Holding Corp., 228 F.3d 224, 237 (3d Cir. 2000). It is clear that the Plan will not comply with the Absolute Priority rule, by permitting the holders of Class 8 equity claims, the Parent Companies, to retain their equity interests, even though the unsecured creditors in Class 5 and Class 6 are not receiving the full value of their claims. D.S. at 50. The Disclosure Statement states that the Plan Sponsor Group's funding of distributions and operating shortfalls, plus the waiver of Intercompany Claims, is justification for not observing the Absolute Priority rule with regard to the holders of equity claims in Class 8. D.S. at 50. However, it is clear that the Plan Sponsor Group includes multiple members, most of which do not hold equity interests in the Debtors. By not providing information concerning how much funding the Parent Companies will be providing, what the value of the claims they are waiving and what the value of the retained equities are, creditors cannot determine whether the Parent Companies are actually contributing equivalent new value, and thus whether the subordination of their claims is justified.

37. Finally, the Disclosure Statement provides that all creditors will be deemed to have waived, released, and discharged all claims against not only the Debtors, but also against unidentified Affiliates and members of the Plan Sponsor Group. D.S. at 38. However, the Disclosure Statement does not provide adequate information concerning the nature of the releases. Without information as to who the affiliates are, why the releases are justified, and

what effect such releases will have on the claims of the creditors, creditors cannot make an informed judgment concerning whether such releases are in their interests.

38. Absent provision of detailed financial information concerning the commitments, financial resources, and identities of the Plan Sponsor Group and the Affiliates of the Debtors, the Bankruptcy Court should not approve the Disclosure Statement.

## Conclusion

39. Based on the foregoing, Plaintiffs respectfully request that an order be entered 1) denying approval of the Debtors' Motion unless the Disclosure Statement and the Plan it describes are modified as set forth herein, and 2) granting such other and further relief as the Court deems just and proper.

Dated: November 14, 2013
New York, New York

/s/ Susan J. Cameron
LEVY RATNER, P.C.
Susan J. Cameron (033942006)
Suzanne Hepner (admitted *pro hac vice*)
Ryan J. Barbur (admitted *pro hac vice*)
80 Eighth Avenue, 8th Floor
New York, New York 10011-5126
Phone: (212) 627-8100
Facsimile: (212) 627-8182

JAMES & HOFFMAN, P.C.
Kathy L. Krieger (admitted *pro hac vice*)
Darin M. Dalmat (admitted *pro hac vice*)
1130 Connecticut Ave., NW, Suite 950
Washington, DC 20036-3975
Phone: (202) 496-0500
Facsimile: (202) 496-0555