**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for 710 Long Ridge Road
Operating Company II, LLC, *et al.*,
Debtors-in-Possession

| | |
|---|---|
| In re:<br><br>710 LONG RIDGE ROAD OPERATING<br>COMPANY II, LLC, *et al.*,[1]<br><br>Debtors-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>HONORABLE DONALD H. STECKROTH<br>CASE NO. 13-13653 (DHS)<br><br>Chapter 11<br>(Jointly Administered) |

**FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO
SECTION 1125 OF THE BANKRUPTCY CODE FOR THE FIRST
AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.***

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal identification number are:  710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford (4809), 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center (4730), 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center (4839), 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center (4716) and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center (4676).

## TABLE OF CONTENTS

Page

A.  Introduction .......................................................................................................... 1
B.  Disclaimers ........................................................................................................... 2
C.  Why You Are Receiving This Document ............................................................. 4
D.  Summary of Treatment of Claims and Equity Interests ...................................... 4
E.  Voting on the Plan ............................................................................................... 123
F.  Confirmation of the Plan .................................................................................... 134
A.  Description of The Debtors ................................................................................. 135
B.  The Debtor's Capital Structure .......................................................................... 146
C.  Events Precipitating these Chapter 11 Cases ..................................................... 167

II.   THE CHAPTER 11 CASE .................................................................................. 179
A.  Section 1113(e) Relief ....................................................................................... 179
B.  DIP Financing .................................................................................................... 1820
C.  Status of Appeals of Section 1113(e) Relief ..................................................... 219
D.  Section 1113(c) Motion ..................................................................................... 219

III.  SUMMARY OF THE PLAN OF REORGANIZATION ................................... 213
A.  Overview of Chapter 11 ..................................................................................... 214
B.  Classification and Treatment of Claims and Equity Interests ........................... 224
C.  Means for Implementation and Execution of Plan. ........................................... 269
D.  Provisions Governing Distributions ................................................................... 329
E.  Procedures for Resolving Disputed, Contingent and Unliquidated
    Claims. .............................................................................................................. 324
F.  Treatment of Executory Contracts and Unexpired Leases ................................ 335
G.  Conditions to Confirmation and Effectiveness of the Plan ............................... 358
H.  Retention of Jurisdiction .................................................................................... 362
I.  Releases and Related Provisions. ....................................................................... 3741
J.  Summary of Other Provisions of the Plan ......................................................... 404

IV.  VOTING AND CONFIRMATION PROCEDURES ......................................... 437
A.  Voting Instructions ............................................................................................. 437
B.  Proposed Procedure for Tabulating Votes ......................................................... 438
C.  Voting Record Date ............................................................................................ 448
D.  Confirmation Hearing ........................................................................................ 448
E.  Additional Information ....................................................................................... 459

V.   REQUIREMENTS FOR CONFIRMATION .................................................... 459
A.  Acceptances Necessary to Confirm Plan ........................................................... 459
B.  Feasibility of the Plan ........................................................................................ 4650
C.  Best Interests Test .............................................................................................. 4751
D.  Liquidation Analysis .......................................................................................... 4852
E.  Application of the "Best Interests Test" to the Liquidation Analysis ................ 4853
F.  Confirmation Without Acceptance of All Impaired Classes: The
    "Cramdown" Alternative .................................................................................... 4953
G.  Other Requirements of Section 1129 ................................................................. 5006

VI.    CERTAIN RISK FACTORS TO BE CONSIDERED ....................................................5~~1~~7
    A.    Certain Bankruptcy Considerations ............................................................5~~1~~7
    B.    Inherent Uncertainty in Claims Estimation.................................................5~~2~~7
    C.    Inherent Uncertainty of Projections ...........................................................5~~2~~8
    D.    Operational Risk Factors.............................................................................5~~3~~8
    E.    Satisfaction of Conditions to Effective Date ..............................................5~~3~~8
    F.    Leverage.......................................................................................................5~~3~~9
    G.    Litigation.....................................................................................................5~~4~~9
    H.    Certain Tax Considerations.........................................................................5~~4~~9

VII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...............~~54~~60
    A.    General ......................................................................................................~~54~~60
    B.    Certain U.S. Federal Tax Consequences to the Debtors .........................~~55~~60
    C.    Certain U.S. Federal Tax Consequences to the Holders of Claims and
        Equity Interests ......................................................................................~~55~~61
    D.    Importance of Obtaining Professional Tax Assistance ...........................~~56~~1

VIII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
    PLAN ......................................................................................................~~56~~62
    A.    Liquidation under Chapter 7 or Chapter 11 ...........................................~~56~~62
    B.    Alternative Plan(s) of Reorganization ....................................................~~57~~62

IX.    CONCLUSION AND RECOMMENDATION............................................................~~58~~64

## TABLE OF APPENDICES

APPENDIX A                          JOINT PLAN OF REORGANIZATION

APPENDIX B                          HISTORICAL FINANCIAL INFORMATION

APPENDIX C                          PROJECTIONS

APPENDIX D                          LIQUIDATION ANALYSIS

APPENDIX E                          ONGOING TRADE VENDOR TERMS

APPENDIX F                          ~~CURE SCHEDULE~~**PRELIMINARY LIST OF
                                    VENDORS ELIGIBLE FOR ELECTION AS
                                    ONGOING TRADE VENDOR**

**APPENDIX G**                          **PRELIMINARY LIST OF NON-ONGOING
                                    TRADE VENDORS**

51689/0001-9739776v~3~10

## I.     INTRODUCTION AND OVERVIEW

710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford, 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center, 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center, 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center, the within debtors and debtors-in-possession (the "**Debtors**"), submit this **first amended** disclosure statement (the "**Disclosure Statement**") pursuant to Section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "**Bankruptcy Code**"), for use in the solicitation of votes (the "**Solicitation**") on the Debtors' **First Amended** Joint Chapter 11 Plan of Reorganization dated ~~October 22~~**December 10**, 2013 (including all exhibits thereto and as may be amended from time to time, the "**Plan**").  A copy of the Plan is attached hereto as Appendix A.  Except as otherwise provided herein, capitalized terms used but not defined in this Disclosure Statement shall have the meanings ascribed to them in the Plan.

### A.     Introduction

On February 24, 2013 (the "**Commencement Date**"), the Debtors commenced these Chapter 11 cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**").  These Chapter 11 cases are assigned to the Honorable Donald H. Steckroth.  No trustee or examiner has been appointed in these Chapter 11 cases, and the Debtors have remained in possession of their assets and managed their business as debtors-in-possession in accordance with ~~S~~sections 1107 and 1108 of the Bankruptcy Code.  On March 7, 2013, the Office of the United States Trustee (the "**UST**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**") to serve in these Chapter 11 cases [Docket No. 80].

This Disclosure Statement, submitted in accordance with Section 1125 of the Bankruptcy Code, contains information regarding the Plan proposed by the Debtors.  This Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about whether to accept or reject the Plan.  The Debtors strongly urge you to review carefully the contents of this Disclosure Statement and the Plan (including the appendices and exhibits to each) before making a decision to accept or reject the Plan.

On ⸺, ⸺**December [__], 2013**, the Bankruptcy Court approved this Disclosure Statement as containing "adequate information" in accordance with ~~S~~sections 1125(a)(1) and 1125(b) of the Bankruptcy Code to enable a hypothetical, reasonable investor, typical of holders of Claim or Equity Interests receiving this Disclosure Statement, to make an informed judgment about whether to accept or reject the Plan.  Under Section 1125 of the Bankruptcy Code, this approval enabled the Debtors to send you this Disclosure Statement and to solicit your acceptance of the Plan.

Your vote on the Plan is important.  Absent acceptance of the Plan, there may be protracted delays, the confirmation of another plan, or a liquidation of the Debtors' assets.  These alternatives may not provide for distribution of as much value to holders of Allowed Claims and Allowed Equity Interests as does the Plan.  Accordingly, if you are entitled to vote, the Debtors urge you to accept the Plan by completing and returning the enclosed ballot no later than ⸺, ⸺**January 23, 2014**, at ⸺:⸺**5:00 p**.m. (Prevailing Eastern Time).

The Bankruptcy Court will consider confirmation of the Plan (the "Confirmation Hearing") on _____, _____ commencing on January 30, 2014, at ____:____ 10:00 a.m. (Prevailing Eastern Time).  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be filed and served so that they are received on or before _____, _____ January 20, 2014, at ____:____ 5:00 p.m. (Prevailing Eastern Time), in the manner described in Article IV, Section D of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

B.    **Disclaimers**

BY ORDER DATED _____, _____ DECEMBER [__], 2013, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION TO PERMIT THE HOLDERS OF CLAIMS AGAINST THE DEBTORS TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT TO VOTE ON THE PLAN.  HOWEVER, APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION ON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS SUBMITTED HEREWITH ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  THE BANKRUPTCY COURT HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS' BUSINESS OPERATIONS, THE VALUE OF THE DEBTORS' ASSETS OR THE VALUE OF ANY BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN.  THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTORS FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY OTHER GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR ON THE DECISION TO ACCEPT OR REJECT THE PLAN.  HOLDERS OF CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.  BEFORE SUBMITTING BALLOTS, HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THIS DISCLOSURE STATEMENT IN ITS ENTIRETY.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF

THE PLAN ARE CONTROLLING.  THE DISCLOSURE STATEMENT MAY NOT BE
RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE
TO ACCEPT OR REJECT THE PLAN.  NOTHING STATED HEREIN SHALL BE DEEMED
OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY,
OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY
OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER
LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS.
CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY
NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND
ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL
REFLECT ACTUAL OUTCOMES.  ALL HOLDERS OF CLAIMS SHOULD CAREFULLY
READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN ARTICLE VI OF
THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE
PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN
THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE
SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE
FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF
TERMS CONTAINED IN SUCH AGREEMENT.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE
HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.  THE DELIVERY OF THIS
DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE
ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE
STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS
DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR
TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS
OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH
MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS
CONTEMPLATED THEREBY.

ALTHOUGH THE DEBTORS' MANAGEMENT HAS USED ITS REASONABLE
BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION
PROVIDED IN THIS DISCLOSURE STATEMENT, SOME OF THE FINANCIAL
INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN
AUDITED AND IS BASED UPON AN ANALYSIS OF DATA AVAILABLE AT THE TIME
OF THE PREPARATION OF THE PLAN AND THIS DISCLOSURE STATEMENT.  WHILE
THE DEBTORS' MANAGEMENT BELIEVES THAT SUCH FINANCIAL INFORMATION
FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS, THE DEBTORS'
MANAGEMENT IS UNABLE TO REPRESENT OR WARRANT THAT THE
INFORMATION CONTAINED HEREIN AND ATTACHED HERETO IS WITHOUT
INACCURACIES.

THESE RISK FACTORS CONTAIN CERTAIN FORWARD-LOOKING
STATEMENTS THAT ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND
UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE

3

DEBTORS, INCLUDING, AMONG OTHERS, CURRENCY EXCHANGE RATE FLUCTUATIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, ACTIONS OF GOVERNMENTAL BODIES AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

### C.      Why You Are Receiving This Document

The Bankruptcy Code requires that the party proposing a Chapter 11 plan prepare and file with the Bankruptcy Court a document called a "disclosure statement."  The Bankruptcy Code requires a disclosure statement to contain information of a kind, and in sufficient detail, to enable parties who are affected by the plan to vote intelligently for or against the plan or object to the plan, as the case may be.  The Bankruptcy Court has determined that this Disclosure Statement contains adequate information and may be provided to you to solicit your vote on the Plan.  This Disclosure Statement describes the provisions of the Plan and contains information concerning, among other matters:  (1) the Debtors' prepetition operating and financial history, (2) the need to seek Chapter 11 protection, (3) the significant events that have occurred in these Chapter 11 cases, (4) the Chapter 11 voting procedures and the confirmation process, (5) certain effects of confirmation of the Plan, (6) risk factors associated with the Plan, (7) potential federal income tax consequences, and (8) the manner in which distributions will be made under the Plan.

In addition to the Appendices to this Disclosure Statement, a Ballot is enclosed enabling the Holders of Claims entitled to vote on the Plan to cast their vote.

### D.      Summary of Treatment of Claims and Equity Interests

#### 1.      Unclassified Claims

As contemplated by the Bankruptcy Code, the Administrative Expense Claims, Priority Tax Claims, Professional Compensation and Reimbursement Claims and the DIP Loan Claim are not classified under the Plan.

Unless the Holder of an Allowed Administrative Expense Claim agrees otherwise, Allowed Administrative Expense Claims shall be paid in Cash in full by the Reorganized Debtors on the Effective Date or as soon thereafter as is practicable, but not later than the later of: (a) twenty (20) days after the Effective Date; or (b) thirty (30) days from the date of entry of a Final Order determining and Allowing such Claim as an Administrative Expense Claim.  See Plan, Article II, Section 2.2(A).  Allowed Administrative Expense Claims representing Postpetition Administrative Trade Claims shall be paid in full and/or performed by the applicable Reorganized Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements or Bankruptcy Court Orders governing instruments evidencing or other documents relating to, such transactions.  See Plan, Article II, Section 2.2(A).

4

The Debtors' estimate of Allowed Administrative Expense Claims is approximately $150,000.[2]

Holders of Professional Compensation and Reimbursement Claims who properly file final Fee Applications that are approved by the Bankruptcy Court will be paid by the Reorganized Debtors in full in such amounts as are Allowed by the Bankruptcy Court either (a) seven (7) days after such Professional Compensation and Reimbursement Claim becomes an Allowed Professional Compensation and Reimbursement, or as soon thereafter as is

---

[2] The majority of the Allowed Administrative Expense Claims are being paid in the ordinary course of business during the Chapter 11 Cases. The Allowed Administrative Expense Claims are comprised primarily of the estimated amounts of Section 503(b)(9) Administrative Claims that will be Allowed. The ~~NLRB and~~ Union filed Administrative Expense Claims ~~for wages and benefits that they~~**in an unliquidated amount, and the NLRB filed Administrative Expense Claims in the amount of $1,136,273 for the period of time beginning on February 24, 2013 and ending on August 30, 2013. These Administrative Expense Claims represent the** wages and benefits that the NLRB and Union assert would be due based upon the Debtors' compliance with the terms of the 10(j) Injunction**, and the Debtors' alleged unlawful refusal to reinstate striking employees**. See Section ~~1(C), *infra.* However~~**II(C), p. 16. From the date the striking workers returned until March 5, 2013, the day after the entry of the first of the Bankruptcy Court's 1113(e) Interim Orders, the Debtors complied with the terms of the 10(j) Injunction. Thereafter**, the Debtors have been operating pursuant to the terms of the Bankruptcy Court's 1113(e) Interim Orders~~, which are law of the case and controlling on the question of salary and benefits due to Union employees~~. Accordingly, the Debtors contend that the ~~Union~~**portion of the NLRB** and ~~NLRB~~**Union** Administrative Expense Claims ~~are barred by doctrines of *res judicata,* collateral estoppel and issue preclusion~~**relating to their compliance with the 10(j) Injunction's mandate to restore the June 16, 2012 terms and conditions of employment is contrary to the law of the case and for that reason, among others, dispute that the Union and/or NLRB are entitled to any Administrative Expense Claims and will be objecting to Administrative Expense Claims filed by the Union and the NLRB. The Debtors also believe there exists claims or counterclaims against the Union based upon conduct of the Union that has damaged the Debtors. Thus, in addition to objecting to any alleged Administrative Expense Claim of the Union and NLRB, the Debtors will investigate and bring appropriate claims and counterclaims that may offset or serve to equitably subordinate any claims of the Union, including on account of the Backpay Claims. The NLRB and the Union assert, however, that any such counterclaims and/or affirmative claims against the Union will not affect the NLRB's Backpay Claim. The issue whether Section 1113 relief is available after a collective bargaining agreement has expired is currently being litigated, and the Bankruptcy Court's resolution of that issue is the subject of pending appeals by the NLRB and the Union to the New Jersey District Court and potentially to the Third Circuit. See Section II(C), p. 19. The separate question of whether the Debtors unlawfully refused to reinstate the striking employees is currently being litigated in the ALJ Proceedings. The Debtors have disputed this allegation in those proceedings**. In addition, the Bar Date for filing Administrative Expense Claims arising from the Commencement Date to and including August 31, 2013 under Section 503 of the Bankruptcy Code in the Debtors' bankruptcy cases was October 11, 2013. Based on the Debtors' books and records, certain proofs of Administrative Expense Claims~~, including those filed by the NLRB and the Union as described above,~~ are objectionable. As such, the Debtors' estimate of Allowed Administrative Expense Claims is based on those proofs of Administrative Expense Claims that have been filed and the Debtors' initial reconciliation based upon the Debtors' books and records. The actual Administrative Expense Claims that are Allowed may be greater or lower than estimated. Accordingly, there can be no assurances of the exact amount of Allowed Administrative Expense Claims at this time.

practicable, or (b) upon such other terms as may be mutually agreed upon between such Holder of an Allowed Professional Compensation and Reimbursement Claim and the Reorganized Debtors, on and after the Effective Date.  See Plan, Article II, Section 2.2(B).

The Debtors' estimate of Allowed Professional Compensation and Reimbursement Claims as of confirmation is approximately $980,000.

Each holder of an Allowed Priority Tax Claim shall receive in full satisfaction of such Allowed Priority Tax Claim (i) payment in Cash equal to the unpaid portion of such Allowed Priority Tax Claim on the Effective Date, (ii) over a period through the fifth anniversary of the Commencement Date, deferred cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, plus interest on such aggregate amount over such period or (iii) such other treatment as to which the applicable Debtor or the applicable Reorganized Debtor, as the case may be, and such Holder shall have agreed upon in writing.  See Plan, Article II, Section 2.2(C).

The Debtors' estimate of Allowed Priority Tax Claims is approximately $43,000, comprised of the following approximate Allowed Priority Tax Claims with respect to each Debtor: (i) $39,000 with respect to Danbury, (ii) $300 with respect to Long Ridge, (iii) $2,100 with respect to Newington, (iv) $0 with respect to West River, and (v) $1,500 with respect to Westport.

On the Effective Date, any and all DIP Loan Claims shall be (i) paid in full in Cash, (ii) assumed by the applicable Reorganized Debtors on terms and conditions acceptable to the DIP Lender, which terms and conditions may be evidenced by the New Credit Agreement or in some other manner acceptable to the DIP Lender with terms no less favorable in the aggregate for the Debtors and/or Reorganized Debtors than those in the New Credit Agreement, or (iii) satisfied in such other manner with terms no less favorable in the aggregate for the Debtors and/or Reorganized Debtors than those in the New Credit Agreement as the applicable Debtors or Reorganized Debtors and the DIP Lender shall have agreed in writing.  See Plan, Article II, Section 2.2(D).

2.   **Classified Claims**

The following table summarizes the classes of Claims and Equity Interests under the Plan (the "**Classes**" and each a "**Class**") as well as other Claims, estimated aggregate amounts of Allowed Claims, the treatment of certain Classes, and the estimated percentage recoveries on account of estimated Allowed Claims and Allowed Equity Interests.[3]  The estimated percentage

---

[3] The general bar date for filing proofs of Claim in the Debtors' bankruptcy cases was July 2, 2013.  The Debtors have commenced the process of reviewing the filed proofs of Claim and have determined that based on the Debtors' books and records, certain proofs of Claim are objectionable.  The Debtors, however, have not completed their analysis of the proofs of Claim in these Chapter 11 cases prior to the filing of this Disclosure Statement and there can be no assurances of the exact amount of the Allowed Claims at this time.  Accordingly, these amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by creditors in proofs of claim or otherwise.  Therefore, the actual amount of the Allowed Claims may be greater or lower than estimated.  The Debtors are aware that D.N.J. LBR 3016-2(a) requires Debtors' counsel to review all proofs of Claim filed as of the bar dates before filing a Disclosure Statement.  As stated above, the Debtors have commenced the process of reviewing all proofs of Claim to identify the Claims to which the Debtors may object, but have not (continued…)

recoveries[4] have been calculated based upon a number of assumptions, including the estimated amount of Allowed Claims in each Class:

| CLASS | DESCRIPTION | ESTIMATED ALLOWED CLAIMS | TREATMENT | VOTING RIGHTS | EST. % RECOVERY |
|---|---|---|---|---|---|
| 1 | Other Priority[5] Claims | $0-$5,000 | On or as soon as reasonably practicable after the later of (1) the Effective Date or (2) the Distribution Date immediately following the date on which an Other Priority Claim becomes an Allowed Priority Claim, the Holder of an Allowed Other Priority Claim shall receive (i) Cash equal to the amount of such Allowed Other Priority Claim, without interest or (ii) such other treatment as to which such applicable Debtor or Reorganized Debtor, as the case may be, and such Holder shall have agreed upon in writing. | Unimpaired. Conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. | 100% |

---

(…continued)
completed that process before filing this Disclosure Statement.  The Debtors are confident, however, that the amount of their Claims listed on their Schedules are accurate, so that to the extent a proof of Claim differs from the Debtors' Schedules, the Holder of the Claim should expect that the Debtors may object to that Claim.

[4] The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims in the Chapter 11 Case.  The actual recoveries may be higher or lower than projected depending upon, among other things, the amounts of Claims that are actually Allowed by the Bankruptcy Court.

[5] **The Union filed Section 507(a)(4) and Section 507(a)(5) Priority Claims in an unliquidated amount, and the NLRB filed estimated amended Section 507(a)(4) and Section 507(a)(5) Priority Claims in the amount of approximately $8.9 million.  These asserted Priority Claims represent the wages and benefits that the Union and the NLRB General Counsel asserts the Debtors owe on account of the alleged unfair labor practices currently being litigated in the ongoing ALJ Proceedings.  The Debtors dispute the allegations in the ALJ Proceedings and believe they will have no liability for the alleged unfair labor practices.  Accordingly, for present purposes the Debtors have designated the Allowed Amount owing on account of the Union's and the NLRB's Priority Claims to be $0.  Nevertheless, the Debtors cannot predict the final outcome of the ALJ Proceedings (and any right of appeal thereof).  Therefore, there can be no assurances of the exact amount of Allowed Other Priority Claims at this time.  If Allowed Other Priority Claims are greater than estimated, this may have a material adverse effect on the recovery of junior claim holders.  In addition to challenging the basis for any Backpay Claim, the Debtors will be objecting in the Bankruptcy Court to any portion of the Backpay Claim that the Union and/or the NLRB assert is entitled to priority treatment in accordance with section 507(a)(4) and/or section 507(a)(5) of the Bankruptcy Code, as the Debtors do not believe the Backpay Claims are entitled to such priority in** (continued…)

| CLASS | DESCRIPTION | ESTIMATED ALLOWED CLAIMS | TREATMENT | VOTING RIGHTS | EST. % RECOVERY |
|---|---|---|---|---|---|
| 2 | HUD Claim[5] | $7,900,000 (Newington) $6,200,000 (West River) | Subject to the Debtors or the Reorganized Debtors entering into the New Credit Agreement, the HUD Lender shall have its Claim Reinstated on the Effective Date unless the applicable Debtor or the applicable Reorganized Debtor, as the case may be, and the HUD Lender shall have agreed to other treatment in writing. Prepetition Liens with respect to such HUD Lender Claims shall survive the Effective Date and shall continue in accordance with contractual or statutory terms until such HUD Claim has been paid in full. | Impaired | 100% |
| 3 | M&T Claim[7] | $16,650,000 | Subject to the Debtors or the Reorganized Debtors entering into the New Credit Agreement, M&T shall have its Claim Reinstated on the Effective Date unless the applicable Debtor or the applicable Reorganized Debtor, | Impaired | 100% |

(…continued)

accordance with those sections because the Debtors assert that the benefits and wages that serve as the basis for the Backpay Claims were not earned in the 180-day period preceding the Commencement Date and that no services were rendered by the Union employees during that same period.  The NLRB and Union dispute that this is a valid basis to deny the Backpay Claims priority treatment.  The Debtors also cannot predict how the Bankruptcy Court will rule with respect to that objection.  However, even if such claims are entitled to priority treatment in accordance with section 507(a)(4) and/or section 507(a)(5), such claims will not be Allowed until the ALJ Proceedings (and any right of appeal thereof) are concluded, which the Debtors assert will be at least 2 years away, at which time the Debtors' obligations to creditors other than Class 6 under the Plan may have been satisfied.  The Debtors do not currently have the means to satisfy the NLRB's asserted Priority Claim if currently Allowed, and may not be able to satisfy such claims in the future when, and if, such claim is Allowed.  Notwithstanding the foregoing, the Debtors believe they have the means to satisfy all Other Priority Claims that will be Allowed as of the Effective Date.

[5] As of October 18 2013.

[6] As of October 18, 2013.

[6] As of October 31, 2013.

[7] As of October 31, 2013.

8

| CLASS | DESCRIPTION | ESTIMATED ALLOWED CLAIMS | TREATMENT | VOTING RIGHTS | EST. % RECOVERY |
|---|---|---|---|---|---|
| | | | as the case may be, and M&T shall have agreed to other treatment in writing. Prepetition Liens with respect to such M&T Claims shall survive the Effective Date and shall continue in accordance with contractual or statutory terms until the M&T Claim has been paid in full. | | |
| 4 | Other Secured Claims | $3,000 | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Other Secured Claim, Holders of Allowed Other Secured Claims shall receive one of the following treatments, in the sole discretion of the applicable Debtor, in full and final satisfaction of such Allowed Other Secured Claims:  (i) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claims in full in Cash including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (ii) the Debtors or the Reorganized Debtors shall deliver the Collateral securing any such Allowed Other Secured Claim; or (iii) the Debtors or the Reorganized Debtors shall otherwise treat any Allowed Other Secured Claim in any other manner such that the Claim shall be rendered Unimpaired, including having its Claim Reinstated. | Unimpaired. Conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. | 100% |
| Class 5 consists of 5 | Ongoing Trade Vendor Claims | Class 5A $1,0~~15~~**20**,000<br><br>Class 5B | Class 5 shall consist of the following subclasses: (i) Class 5A (Allowed Ongoing Trade Vendor Claims against Long | Impaired | 75% |

9

| CLASS | DESCRIPTION | ESTIMATED ALLOWED CLAIMS | TREATMENT | VOTING RIGHTS | EST. % RECOVERY |
|---|---|---|---|---|---|
| sub-classes, 5A, 5B, 5C, 5D and 5E[8] | | $73~~35~~**41**,000<br><br>Class 5C $70~~1~~**8**,000<br><br>Class 5D $9~~06~~**12**,000<br><br>Class 5E $6~~5~~**7**,000 | Ridge); (ii) Class 5B (Allowed Ongoing Trade Vendor Claims against Newington); (iii) Class 5C (Allowed Ongoing Trade Vendor Claims against Westport); (iv) Class 5D (Allowed Ongoing Trade Vendor Claims against West River); and (v) Class 5E (Allowed Ongoing Trade Vendor Claims against Danbury).<br><br>Except to the extent that a Holder of an Allowed Ongoing Trade Vendor Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Ongoing Trade Vendor Claim, each Holder of an Allowed Ongoing Trade Vendor Claim will be paid in Cash an amount equal to 75% of such Holder's Allowed Ongoing Trade Vendor Claim (i) in twelve (12) equal monthly installments commencing on the Effective Date or as soon as reasonably practicable thereafter or (ii) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed Ongoing Trade Vendor Claim or in accordance with the historical course of dealings between the Debtors and such Holder with respect to such Allowed Ongoing Trade Vendor Claim.  **If a creditor holds a Claim that becomes** | | |

---

[8] **The Debtors have made an initial determination regarding those vendors that they expect to do business with going forward.  Attached hereto as Appendix F is a listing of those vendors. The Debtors submit that such vendors would be eligible to elect treatment in Class 5.  The Debtors reserve the right to remove such vendors from this Appendix and treat such vendor as a Non-Ongoing Trade Vendor, provided that the Debtors remove a vendor from this Schedule up until 7 days prior to the Voting Deadline and so advise such vendor.  If the affected vendor has cast already Ballot, such vendor shall be permitted to revote.**

| CLASS | DESCRIPTION | ESTIMATED ALLOWED CLAIMS | TREATMENT | VOTING RIGHTS | EST. % RECOVERY |
|---|---|---|---|---|---|
| | | | **an Allowed Claim after the date in which these monthly installment payments commence, the Debtors shall pay such creditor a lump sum at the time that the subject Claim becomes Allowed equal to the monthly installments that such creditor would have received if he had been receiving payments as of the commencement date of the installment payments.** | | |
| Class 6 consists of 5 sub-classes, 6A, 6B, 6C, 6D and 6E.[9] | Other General Unsecured Creditors[9][10] | Class 6A $16~~1~~**1**,~~0~~**5**00  Class 6B $33~~3~~**26**,~~0~~**4**00  Class 6C $12~~1~~**1**,~~0~~**5**00  Class 6D $7~~1~~**1**,~~7~~**2**00 | Class 6 shall consist of the following subclasses: (i) Class 6A (Allowed Other General Unsecured Claims against Long Ridge); (ii) Class 6B (Allowed Other General Unsecured Claims against Newington); (iii) Class 6C (Allowed Other General Unsecured Claims against Westport); (iv) Class 6D (Allowed Other General Unsecured Claims against | Impaired | Class 6A 100%[9][11]  Class 6B 100%  Class 6C 100%  Class 6D 100% |

**[9] The Debtors have made an initial determination regarding those vendors that they believe are Non-Ongoing Trade Vendors and, thus, not eligible to elect treatment in Class 5. Attached hereto as Appendix G is a listing of those Non-Ongoing Trade Vendors. The Debtors reserve the right to remove any Non-Ongoing Trade Vendor from this list and move such Non-Ongoing Trade Vendor to Appendix F, permitting such vendor to elect treatment in Class 5. The Debtors shall be permitted to change the designation of a Non-Ongoing Trade Vendor up until 7 days prior to the Voting Deadline and shall so advise such vendor. If the affected vendor has cast already Ballot, such vendor shall be permitted to revote.**

~~[9] The Debtors dispute the Backpay Claims and are litigating same in the ALJ Proceedings, which in all likelihood will not be concluded prior to the Confirmation Date. The Debtors ascribe no value to the Backpay Claims and the Debtors have, therefore, estimated the Allowed Amount owing on account of such Backpay Claims in each subclass within Class 6 to be $0. Nevertheless, the Debtors are not able to predict how the court will rule in the context of the ALJ Proceedings and cannot guarantee that the ultimate determination thereof will not have a material adverse effect on the recovery of those Holders of Claims in Class 6.~~

**[10] The Debtors dispute the Backpay Claims of the NLRB and the Union and are litigating same in the ALJ Proceedings, which in all likelihood will not be concluded prior to the Confirmation Date. The Union has filed Proofs of Claim in an unliquidated amount for the general unsecured portion of its Backpay Claim, and the NLRB has filed Proofs of Claim indicating that the general unsecured portion of its Backpay Claim is now estimated at approximately $5.7 million.**

(continued…)

11

| CLASS | DESCRIPTION | ESTIMATED ALLOWED CLAIMS | TREATMENT | VOTING RIGHTS | EST. % RECOVERY |
|---|---|---|---|---|---|
| | | Class 6E $4~~36,3~~500 | West River); and (v) Class 6E (Allowed Other General Unsecured Claims against Danbury).<br><br>Except to the extent that a Holder of an Allowed Other General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other General Unsecured Claim, upon the fixing of all Allowed Other General Unsecured Claims (which in the case of the Backpay Claims shall mean the conclusion of the ALJ Proceedings and any right of appeal thereof), each Holder of an Allowed Other General Unsecured Claim shall receive their Pro Rata share of the Plan Distribution | | Class 6E 100% |

_____

(…continued)

**The Debtors dispute all allegations in the ALJ Proceedings and believe they will have no liability for the alleged unfair labor practices.  Accordingly, for present purposes, the Debtors have designated the Allowed General Unsecured Amount owing on account of such Backpay Claims in each subclass within Class 6 to be $0.  Nevertheless, the Debtors are not able to predict how the court will rule in the context of the ALJ Proceedings and cannot guarantee that the ultimate determination thereof will not have a material adverse effect on the recovery of those Holders of Claims in Class 6.**

[8][11] As noted above, the Debtors believe the Backpay Claims **of the NLRB and the Union** will receive no distribution under the Plan and that the Allowed Other General Unsecured Claims will not exceed the Plan Distribution Contribution Amount **of $500,000.00**.  As such, the Debtors estimate that the recovery on account of the Allowed Other General Unsecured Claims will be 100%.  ~~The~~**However, the** amount received on account of the Allowed Other General Unsecured Claims will be dependent upon the determination of the validity and amount of the Backpay Claims within the ALJ Proceedings.  As set forth in the Plan, the Reorganized Debtors will not make any distributions to Holders of Allowed Other General Unsecured Claims until ~~the ALJ Proceedings are complete and a Final Order has been entered in connection therewith~~**a final determination has been made in the ALJ Proceedings (including any right of appeal therefrom).  At this time, the Debtors cannot forecast when the ALJ Proceedings will be completed, but due to the nature of the nonbankruptcy litigation and the likelihood of appeals, distributions to Holders of Allowed Other General Unsecured Claims may not be made for several years.**

51689/0001-9739776v~~3~~10

| CLASS | DESCRIPTION | ESTIMATED ALLOWED CLAIMS | TREATMENT | VOTING RIGHTS | EST. % RECOVERY |
|---|---|---|---|---|---|
| | | | Contribution Amount. | | |
| Class 7 consists of 5 sub-classes, 7A, 7B, 7C, 7D and 7E. | Intercompany Claims | Class 7A $16,499,219.59<br><br>Class 7B $3,051,642.70<br><br>Class 7C $7,656,827.58<br><br>Class 7D $7,273,572.66<br><br>Class 7E $10,082,569.18 | Class 7 shall consist of the following subclasses: (i) Class 7A (Allowed Intercompany Claims in Long Ridge); (ii) Class 7B (Allowed Intercompany Claims in Newington); (iii) Class 7C (Allowed Intercompany Claims in Westport); (iv) Class 7D (Allowed Intercompany Claims in West River); and (v) Class 7E (Allowed Intercompany Claims in Danbury).<br><br>Class 7 is Impaired under the Plan. Because the Plan provides that the Holders of Class 7 Claims shall not receive or retain any property under the Plan on account of such claims, Holders of Class 7 Intercompany Claims are not entitled to vote to accept or reject the Plan and are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. | Impaired. Conclusively presumed to have rejected the Plan, and therefore, not entitled to vote. | 0% |
| Class 8 consists of 5 sub-classes, 8A, 8B, 8C, 8D and 8E. | Equity Interests | N/A | Class 8 shall consist of the following subclasses: (i) Class 8A (Allowed Equity Interests in Long Ridge); (ii) Class 8B (Allowed Equity Interests in Newington); (iii) Class 8C (Allowed Equity Interests in Westport); (iv) Class 8D (Allowed Equity Interests in West River); and (v) Class 8E (Allowed Equity Interests in Danbury).<br><br>In exchange for the forgiveness and cancellation of the Intercompany Claims including Claims that the Affiliated Landlords, the Management Company and/or the Parent Companies had or may have against a Debtor and its applicable Estate, and the commitments undertaken by | Unimpaired. Conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. | N/A |

13

| CLASS | DESCRIPTION | ESTIMATED ALLOWED CLAIMS | TREATMENT | VOTING RIGHTS | EST. % RECOVERY |
|---|---|---|---|---|---|
| | | | the Backstop Funder and other members of the Plan Sponsor Group under the Plan, the Holder of the Class 8 Equity Interests shall retain their Equity Interests in the Debtors but will not receive any Distributions on account of such Equity Interests. | | |

### E.    Voting on the Plan

#### 1.    Who May Vote

The Plan divides Allowed Claims and Equity Interests into multiple classes.  Pursuant to the provisions of the Bankruptcy Code, only classes that (a) are "impaired" by a plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote.  A class is impaired if the legal, equitable, or contractual rights attaching to the Claims or Equity Interests of the class are modified, other than by curing defaults and reinstating maturities.  See 11 U.S.C. § 1124.

Under the Plan, only Holders of Claims in Class 2 (HUD Claim), Class 3 (M&T Claim), Class 5 (Ongoing Trade Vendor Claims), and Class 6 (Other General Unsecured Claims) (collectively, the "**Voting Classes**") are entitled to vote on the Plan.  Claims in the other Classes are either (i) Unimpaired and their holders are deemed to have accepted the Plan, or (ii) Impaired, to receive nothing under the Plan and, thus, conclusively presumed to have rejected the Plan.

Holders of Claims in the Voting Classes may vote on the Plan only if they are Holders as of **December [         ], 2013** (the "**Voting Record Date**").

#### 2.    How to Vote

A form of Ballot is being provided to the members of the Voting Classes by which Holders of Claims in such Classes may vote to either accept or reject the Plan.  To vote on the Plan, please carefully review the instructions and complete the enclosed Ballot by (1) indicating that you either accept or reject the Plan and (2) signing your name and mailing the Ballot in the envelope provided for this purpose.  Further details on how to vote are found in Article IV(A) of this Disclosure Statement and directly on the Ballot.

The Debtors' counsel and the Debtors' claims and noticing agent, Logan & Company, Inc. ("**Logan**"), will process and tabulate the Ballots and will certify the results to the Bankruptcy Court.  The Debtors' counsel and Logan will answer general questions, provide additional copies of all materials, but will not provide specific legal advice concerning your Claim.  Subject to this limitation, you may contact Debtors' counsel at (201) 489-3000 or Logan at (973) 509-3190.

TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, SIGNED, AND MAILED SO AS TO BE RECEIVED BY LOGAN BY __:___ **5:00 P**.M. (PREVAILING EASTERN TIME) ON _____, ____ **JANUARY 23, 2014** (THE "**VOTING DEADLINE**") AT THE FOLLOWING ADDRESS:

> Logan & Company, Inc.
> Attention 710 Long Ridge Road Operating Company II, LLC
> 546 Valley Road, Upper Montclair, New Jersey 07043

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED, AND RECEIVED AS DESCRIBED ABOVE, IT WILL NOT BE COUNTED.  IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY SENDING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE.

### F.    Confirmation of the Plan

Holders of Claims in the Voting Classes will have accepted the Plan if (i) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each such Class have voted to accept the Plan, and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in each such Class have voted to accept the Plan.  **Assuming the requisite acceptances are obtained, the Debtors intend to seek confirmation of the Plan at the Confirmation Hearing scheduled for _____ January 30, _____ 2014, including confirmation with respect to any rejecting Class under Section 1129(b) of the Bankruptcy Code**.  If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.

Any objections to confirmation of the Plan must be in writing and must be filed with the Bankruptcy Court and served on Debtors' counsel on or before _____ **January 20**, _____ **2014** at __:___ **10:00 a**.m. (Prevailing Eastern Time).

## II.    GENERAL INFORMATION

### A.    Description of The Debtors

#### 1.    Business and History of the Debtors

A detailed description of each Debtor's business and the facts precipitating the filing of the Debtors' Chapter 11 cases are set forth in the Affidavit of Victor Matthew Marcos in support of the Debtors' various "First Day Motions" [Docket No. 5] (the "**Marcos Affidavit**").  Those facts are incorporated herein by reference.  As set forth in the Marcos Affidavit, each Debtor operates a sub-acute and long-term nursing care facility (each a "**Facility**" and collectively, the "**Facilities**") for the elderly in Connecticut.  The Facilities are: (i) Long Ridge of Stamford, (ii) Newington Health Care Center, (iii) Westport Health Care Center, (iv) West River Health Care Center, and (v) Danbury Health Care Center.  The Facilities are managed by HealthBridge Management, LLC, a non-debtor national healthcare management company.

The Facilities are skilled nursing facilities that provide long-term care and short-term rehabilitation services.  For long-term-care patients who have medical needs, the Facilities provide 24-hour-a-day nursing care, nutritional monitoring and planning, medication

management and personal care.  For individuals in need of nursing and/or rehabilitation services following a recent hospitalization for orthopedic surgery, stroke, oncology care, cardiac care, general surgery and other diagnoses, the Facilities offer medical and physical rehabilitation including physical, occupational and speech therapy, rehabilitative nursing and physician directed rehabilitation plans, IV therapy, wound care and other services.

Each Facility is supervised by a licensed administrator, and the nursing staff is supervised by a director of nursing.  Each Facility also engages the services of a Medical Director to oversee the delivery of care to patients.  The Debtors receive revenue from Medicare and Medicaid, patients who pay privately and from other third party payors.  The sources and amounts of each Debtor's revenues are determined by, among other things, the census at the applicable Facility, the "case mix" of its patients and reimbursement rates.

### 2.   Organizational Structure

Each Debtor is a Delaware limited liability company with its principal place of business and office located at 173 Bridge Plaza North, Fort Lee, New Jersey 07024.  Care Realty, LLC ("**Care Realty**") is the 100% owner (sole member) of THCI Holding Company, LLC, which in turn, is the 100% owner (sole member) of THCI Mortgage Holding Company, LLC ("**THCI Mortgage**") and THCI Company LLC ("**THCI Company**").  THCI Mortgage is the 100% owner (sole member) of 710 Long Ridge Road, LLC.  THCI Company is the 100% owner (sole member) of each of 240 Church Street, LLC, 1 Burr Road Company LLC, 245 Orange Avenue, LLC and 107 Osborne Street, LLC (and together with 710 Long Ridge Road, LLC shall be referred to herein collectively as, the "**Landlords**").  The applicable Landlords lease each of the Facilities to the Debtors, which are also wholly owned by THCI Mortgage and are the operating entities of each of the Facilities.

### 3.   Historical Financial Information

The Debtors' Historical Financial Information is attached as <u>Appendix B</u> to this Disclosure Statement.  The Debtors report for financial purposes on a calendar year basis.  For the year ended December 31, 2012, the Debtors generated unaudited gross income from operations on a combined basis of approximately $65 million.

### B.   The Debtor's Capital Structure

The Debtors' principal capital structure consists of secured debt, unsecured debt and equity interests.  As of the Commencement Date, the Debtors had approximately $33 million of secured indebtedness.  As more particularly described below, as of the Commencement Date, the Debtors and various non-debtor affiliates are parties to separate financing agreements with M&T Bank ("**M&T**") and Housing & Healthcare Finance LLC insured by the U.S. Department of Housing and Urban Development Federal Housing Administration ("**HUD**") under the provisions of section 232 of the National Housing Act, and the regulations thereunder.[9][12]

---

[9][12] Certain of the Debtors were also party to revolving credit facilities with Capital Source Bank ("**CapSource**").  Those facilities were undrawn and, shortly before the Commencement Date, were terminated.  The Debtors were, as a result, no longer indebted to CapSource as of the Commencement Date.

1.    **M&T Bank**

Prior to the Commencement Date, Debtor 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center ("**Danbury**"), among other non-debtor related entities, entered into a secured first lien financing arrangement in the amount of $20 million (the "**M&T Loan**") with M&T.  The M&T Loan is governed by, *inter alia*, that certain loan and security agreement, term note, and deposit account control agreement, all dated September 15, 2010 (collectively, the "**M&T Loan Documents**").  In addition, non-debtor 107 Osborne Street LLC, the landlord for Danbury, entered into an absolute assignment of leases, rents, income and profits dated September 15, 2010 with M&T.

To secure repayment of the M&T Loan and all other obligations of Danbury incurred in connection with the M&T Loan and the M&T Loan Documents, Danbury granted M&T a blanket security interest in and lien against ~~substantially~~ all assets of Danbury including accounts receivable (which term includes health-care-insurance receivables) and all other forms of obligations owing to Danbury, claims, deposits and deposit accounts, goods, instruments, inventory and all other contract rights or rights to the payment of money, insurance claims and proceeds.

As of January 31, 2013, the total amount outstanding under the M&T Loan and M&T Loan Documents was approximately $18,887,268

2.    **HUD**

As described briefly above in the Organizational Structure section, THCI Company owns 100% interests in certain of the Landlords and the Debtor operating companies.  Prior to the Commencement Date, various Landlords refinanced certain facilities with a loan from HUD under the provisions of section 232 of the National Housing Act, and the regulations thereunder (each, a "**HUD Loan**" and collectively, the "**HUD Loans**").  In that regard, two (2) of the Landlords – 240 Church Street, LLC and 245 Orange Avenue, LLC – refinanced the Newington Health Care Center and West River Health Care Center with HUD Loans.

The applicable HUD Loans are secured by ~~certain collateral, and~~**security interests in certain collateral, including all of the assets of Newington and West River (which as of the Commencement Date were senior to any other Lien), and certain collateral owned by Affiliated Landlords,** 240 Church Street, LLC and 245 Orange Avenue, LLC ~~have granted to HUD a security interest in certain collateral~~.  As of January 31, 2013, the total amount outstanding under the HUD Loan associated with Newington Health Care Center was approximately $7,991,965.  As of January 31, 2013, the total amount outstanding under the HUD Loan associated with West River Health Care Center was approximately $6,254,977.

C.    **Events Precipitating these Chapter 11 Cases**

The Debtors and New England Health Care Employees Union, District 1199, SEIU (the "**Union**") are parties to five separate, but similar, collective bargaining agreements (the "**CBAs**"), effective from December 31, 2004 through March 16, 2011, covering the unionized employees at each of the five Facilities.  After the CBAs expired, the Debtors **assert that they** continued to comply with those provisions of the CBAs, which continued in place under the National Labor Relations Act, 29 U.S.C. § 160(j) (the "**NLRA**"), ~~and~~**which the NLRB and the**

17

**Union dispute.  During this time, the Debtors** attempted to negotiate new agreements with the Union (the "**Terms of Employment**").  After more than 16 months of negotiations, in June 2012, good faith negotiation for new agreements between the Debtors and the Union reached an impasse.  As the Debtors are legally permitted to do at impasse[13], they informed the Union they would implement modified terms of employment that were consistent with the terms set forth in the Debtors' "Last, Best and Final" proposals (the "**Implemented Terms**") to the Union.  The Debtors imposed the Implemented Terms, effective June 17, 2012, and on July 3, 2012, approximately 700 Union workers walked off the job and participated in a strike to protest the new terms and conditions of employment.

To ensure the safety of the patients and to continue operating, the Debtors hired replacement workers and have operated with the Implemented Terms in place since June 17, 2012.

On July 6, 2012, Jonathan B. Kreisberg, Regional Director of Region 34 (the "**Regional Director**") of the National Labor Relations Board (the "**Board**" or "**NLRB**") amended a complaint in a consolidated action already pending in proceedings before an Administrative Law Judge ("**ALJ Proceedings**") to include allegations that the Debtors imposed the Implemented Terms in the absence of a genuine, lawful impasse.  In mid-July 2012, the Regional Director sought authorization from the Board and its Acting General Counsel to initiate temporary injunction proceedings pursuant to Section 10(j) of the NLRA, pending the final disposition of unfair labor practice charges in the ALJ Proceedings.  After receiving such authorization, on September 7, 2012, the Regional Director filed a Petition for Section 10(j) relief in the United States District Court for the District of Connecticut ("**District Court of Connecticut**").  The Board maintained that the petition was necessary to restore the status quo ante (*i.e.*, the Terms of Employment) while the Board continued to prosecute the unfair labor practice charges in the pending ALJ Proceedings.

In a December 11, 2012 telephone conference with counsel, the District Court of Connecticut granted the Board its requested injunction and subsequently issued an order granting the petition (the "**10(j) Injunction**").  Pursuant to the 10(j) Injunction, the District Court, *inter alia*, ordered that the Debtors: (a) reinstate the striking workers, (b) reinstate the previous wages, benefits and other terms and conditions of employment for the employees that were in place on June 16, 2012 (*i.e.*, the Terms of Employment), and (c) bargain in good faith with the Unions.[14]

---

[13]  As discussed below, the NLRB General Counsel and the Union dispute that Debtors bargained in good faith and reached a lawful impasse.  Whether a lawful impasse was reached is an issue being litigated in the ongoing administrative proceeding before Administrative Law Judge Kenneth Chu, case nos. 34-CA-070823, 34-CA-072875, 34-CA-075226, 34-CA-083335, 34-CA-08471.  In addition, there are two other ALJ decisions finding the Debtors' violation of the NLRA.  These decisions also underlie the NLRB's and Union's Claims.  These decisions are disputed by the Debtors and the Debtors have or will file exceptions thereto with the NLRB.

[14]  It is important to note that the District Court of Connecticut decision is not ~~an~~ **a final** adjudication of any of the alleged unfair labor practices.  The Debtors dispute the contentions of the allegations in the ALJ Proceedings, which are ongoing.  In particular, the Debtors assert ~~and will establish~~, *inter alia*, that they bargained in good faith, the parties reached a lawful impasse, and the Debtors were therefore entitled under the NLRA to implement the Implemented Terms.  Therefore, the (continued…)

See 10(j) Injunction at p. 4.  The Debtors appealed the 10(j) Injunction to the Second Circuit Court of Appeals, which granted a temporary stay of the 10(j) Injunction.  That temporary stay ended by order of a motions panel of the Second Circuit dated January 30, 2013.

On February 4, 2013, the Debtors filed an emergency application with the United States Supreme Court for partial stay of the 10(j) Injunction pending the appeal before the Second Circuit, or in the alternative, petition for writ of certiorari and partial stay of the 10(j) Injunction pending resolution of the petition.  The Supreme Court denied the emergency request for partial stay on February 6, 2013.  As a result, the Debtors complied with the 10(j) Injunction and reinstated the striking employees.

On October 15, 2013, the Second Circuit affirmed the decision of the District Court of Connecticut.  **In its decision, the Second Circuit stated that sufficient evidence was not presented to demonstrate how HealthBridge Management, LLC would be adversely affected financially by the 10(j) Injunction because the terms of the expired CBAs imposed upon the Debtors by the 10(j) Injunction "may be modified as necessary by the Bankruptcy [sic] Court."  See Second Circuit Decision, 28:14 (emphasis added).  The Union and the NLRB disagree with the Debtors' reading and characterization of the Second Circuit's decision and assert that the language of the Second Circuit's decision is not properly read as a ruling on the merits of section 1113(e).  The Debtors believe that the Second Circuit's decision makes clear that the Second Circuit explicitly recognized the authority of the Bankruptcy Court to modify the expired CBAs subject to the 10(j) Injunction, which the Union and NLRB have appealed and challenged in the United States District Court for the District of New Jersey.**

## II.    THE CHAPTER 11 CASE

The following is a brief description of certain major events that have occurred during these Chapter 11 cases.

### A.    Section 1113(e) Relief

Shortly after the Commencement Date, the Debtors filed a motion [Docket No. 15] (the "**First 1113(e) Motion**") to implement interim modifications (the "**Interim Modifications**") to their CBAs with the Union under Section 1113(e) of the Bankruptcy Code.  The Court held an evidentiary hearing and heard extensive argument on March 1, 2013.  After careful consideration, the Bankruptcy Court entered a memorandum opinion [Docket No. 65] (the "**First 1113(e) Opinion**") and the first interim order [Docket No. 66] (the "**First 1113(e) Interim Order**") granting the First 1113(e) Motion on March 4, 2013.  Although the Debtors requested interim relief under Section 1113(e) for a period of thirteen (13) weeks, the First 1113(e) Interim Order provided for relief for only a period of six (6) weeks through April 12, 2013.  See First Interim 1113(e) Order, p 2.

---

(…continued)
Debtors contend they had no obligation to reinstate the striking Union employees or the terms and conditions of the employment existing prior to June 16, 2012.

On March 29, 2013, the Debtors filed a motion [Docket No. 197] (the "**Second 1113(e) Motion**") for an order extending the Bankruptcy Court's First 1113(e) Interim Order. On April 5, 2013, the Union filed an opposition to the Second 1113(e) Motion [Docket No. 216]. On April 5, 2013, the **Creditors'** Committee (of which the Union is a member),[15] filed, among other things, a statement in support of the Second 1113(e) Motion. On April 9, 2013, the Bankruptcy Court conducted an evidentiary hearing on, among other things, the Second 1113(e) Motion and the Union's motion to amend or make additional findings of fact and for reconsideration of the First 1113(e) Opinion and First 1113(e) Interim Order (the "**Reconsideration Motion**"). After careful consideration, the Bankruptcy Court denied the Reconsideration Motion. In addition, on April 10, 2013, the Bankruptcy Court issued an oral opinion and the second interim Section 1113(e) order [Docket No. 230] (the "**Second 1113(e) Interim Order**") approving the Second 1113(e) Motion. The Second 1113(e) Interim Order extending the Interim Modifications through and including July 15, 2013.

On June 28, 2013, the Debtors filed a motion [Docket No. 392] (the "**Third 1113(e) Motion**") for an order extending the Bankruptcy Court's Second 1113(e) Interim Order. On July 8, 2013, the Debtors filed a Supplemental Affidavit of Victor Matthew Marcos in connection with the Third 1113(e) Motion [Docket No. 405]. The purpose of that Supplemental Affidavit was to advise the Bankruptcy Court that, after further discussions with the **Creditors'** Committee's advisors, the Debtors reluctantly decided, and were prepared to take the calculated risk, subject to the consent of the DIP lender, to reduce the requested Interim Modifications during the period associated with the Third 1113(e) Motion in the amount of approximately $470,000. In addition, the Debtors advised the Bankruptcy Court that non-debtor HealthBridge Management LLC and the applicable Facilities' landlords would agree to forego their *pro rata* share of certain concessions in the amount of approximately $183,000 in order to assure sufficient liquidity during the period associated with the Third 1113(e) Motion.

Despite those concessions and favorable reductions to the Union, on July 9, 2013, both the Union and the NLRB filed objections to the Third 1113(e) Motion [Docket Nos. 411 and 412]. The Bankruptcy Court conducted an evidentiary hearing on July 11, 2013. On July 15, 2013, the Bankruptcy Court issued an opinion [Docket No. 423] and third interim Section 1113(e) order [Docket No. 424] (the "**Third 1113(e) Interim Order**") approving the Third 1113(e) Motion.

On September 25, 2013, the Debtors filed a motion [Docket No. 563] (the "**Fourth 1113(e) Motion**") for an order extending the Bankruptcy Court's Third 1113(e) Interim Order. The Bankruptcy Court scheduled a hearing regarding the Fourth 1113(e) Motion on October 15, 2013. However, prior to that date, the Debtors, the Union and the NLRB entered into that certain Consent Order Scheduling Hearings on Debtors' Motions (I) to Reject the Continuing Economic Terms of the Expired Collective Bargaining Agreements with the New England Health Care Employees Union, District 1199, SEIU Pursuant to 11 U.S.C. § 1113(c), and (II) to Extend the Revised Interim Modifications to the Debtors' Collective Bargaining Agreements Pursuant to 11 U.S.C. § 1113(e), which was entered by the Court on October 8, 2013 [Docket No. 590] (the

---

[15] **The members of the Creditors' Committee are: (a) the Union, (b) Healthcare Services Group, (c) Culinary Depot, Inc. (d) Joerns Healthcare, LLC, and (e) WB Mason Company.**

"**Standstill Order**").  Under the terms of the Standstill Order, the hearing regarding the Fourth 1113(e) Motion has been was adjourned to November 21, 2013, at which time the Bankruptcy Court conducted an evidentiary hearing.  At the conclusion of that hearing on November 21, 2013, the Bankruptcy Court advised the parties that it was granting the Fourth 1113(e) Motion, but that it would provide an oral decision setting forth the reasons why it was granting the Fourth 1113(e) Motion the following day, pending which the Bankruptcy Court issued a bench order temporarily extending the Bankruptcy Court's Third 1113(e) Interim Order.  On November 22, 2013, the Bankruptcy Court entered a fourth interim Section 1113(e) order [Docket No. 706] (the "Fourth 1113(e) Interim Order") approving the Fourth 1113(e) Motion.  On November 22, 2013, the Bankruptcy Court also conducted a telephone conference, during which it issued its opinion explaining the reasons approving the Fourth 1113(e) Motion.

## B.    DIP Financing

Having obtained the First 1113(e) Interim Order, the Debtors were able to secure debtor-in-possession financing.  On March 22, 2013, the Debtors filed a verified application in support of the Debtors' motion for entry of a final Order, pursuant to Ssections 363 and 364 of the Bankruptcy Code, and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"): (a) authorizing the Debtors to enter into a debtor-in-possession post-petition financing facility (the "**DIP Facility**") with Capital One, N.A., (b) authorizing the continued use of cash collateral and providing adequate protection, and (c) granting other related relief [Docket No. 164] (the "**DIP Motion**").  The DIP Motion was uncontested and approved by entry of a final order on April 11, 2013.

During the Chapter 11 Cases, certain Events of Default have occurred under the DIP Credit Agreement (collectively, the "DIP Defaults").  See Docket Nos. 617, 634.  As a result of those DIP Defaults, the Debtors have entered into two amendments to the DIP Credit Agreement, each of which has been authorized and approved by the Court, and the DIP Defaults have been waived.  See, e.g., Docket Nos. 619 and 637.

## C.    Status of Appeals of Section 1113(e) Relief

On April 23, 2013, the Union and the NLRB each filed a notice of appeal and a motion pursuant to Bankruptcy Rule 8003 for leave to appeal (the "**Motions For Leave To Appeal**") the 1113(e) Interim Orders and the April 9, 2013 order [Docket No. 228] denying the Union's Motion For Reconsideration (the "**Order Denying Reconsideration**," and together with the 1113(e) Interim Orders shall be referred to herein collectively as, the "**Orders**").

On May 21, 2013, the District Court granted the Motions For Leave To Appeal.  On May 21, 2013, the Bankruptcy Court transmitted the record on appeal, see Case No. 13-13653 (DHS), Docket No. 335, and the District Court docketed the appeal, see Case Nos. 13-CV-03247-DMC, 13-CV-03248-DMC.

On June 5, 2013, the District Court stayed briefing until either the District Court or the United States Court of Appeals for the Third Circuit ("**Third Circuit**") denies the NLRB's request for a direct appeal to the Third Circuit pursuant to 28 U.S.C. § 158(d)(2) and Fed. R. Bankr. P. 8001(f).  On June 6, 2013, the NLRB filed a motion for certification of a direct appeal

of the Orders to the Third Circuit.  On June 20, 2013, the Debtors filed opposition to the NLRB's request for a direct appeal to the Third Circuit.

On July 29, 2013, the Union and the NLRB each filed a notice of appeal and a motion pursuant to Bankruptcy Rule 8003 for leave to appeal (the "**Second Motions For Leave To Appeal**") the Third 1113(e) Interim Order.  On August 12, 2013, the Debtors opposed the Second Motions For Leave To Appeal and cross-moved to vacate the Order granting the First Motions For Leave To Appeal.  As of the date of this memorandum of law, the District Court has yet to rule on the Second Motions For Leave To Appeal.

In addition, the parties agreed to stay briefing as to the Third 1113(e) Interim Order until either the District Court or the Third Circuit denies the NLRB's request for a direct appeal to the Third Circuit of the Third 1113(e) Interim Order.  On September 12, 2013, the NLRB filed a motion for certification of a direct appeal of the Third 1113(e) Interim Order.

**In light of the Second Circuit's October 15, 2013 decision, as discussed above, on November 25, 2013, the Debtors wrote to the United States District Court for the District of New Jersey advising that Court of the Second Circuit's decision and requested that that Court grant the Debtors' cross-motion vacating the Order granting the First Motions For Leave To Appeal, deny the Second Motions For Leave To Appeal and deny the Appellants' requests for a direct appeal to the Third Circuit pursuant to 28 U.S.C. § 158(d)(2) and Fed. R. Bankr. P. 8001(f). The following day, the NLRB wrote to the Court in response, expressing its disagreement with the Debtors' reading of the decision.  The District Court has not yet ruled on the request set forth in the Debtors' November 25, 2013 letter.**

###    D.    Section 1113(c) Motion

The Bankruptcy Code provides a process for modification and/or rejection of CBAs.  In particular, Section 1113 of the Bankruptcy Code permits a debtor to reject a CBA if the debtor satisfies a number of statutorily prescribed substantive and procedural prerequisites and obtains Bankruptcy Court approval.  The Debtors commenced the Section 1113(c) process with the Union shortly after the commencement of these Chapter 11 cases, provided the Union with significant amounts of discovery, and attempted to negotiate in good faith toward consensual agreements that would achieve the necessary level of labor cost reductions.

On June 13, 2013, the Debtors presented the Union with a proposal (the "**1113(b) Proposal**") under Section 1113(b) of the Bankruptcy Code that requested savings from Union labor in the amount of $7,525,000 per year over the proposed six (6) year period.  Along with the 1113(b) Proposal, the Debtors again advised the Union their negotiating team would meet with the Union at any convenient time and at any place.  Further, in addition to the tens of thousands of pages of documents provided to the Union for its review, the Debtors enclosed the following with the 1113(b) Proposal: (a) a forecast for 2013 comparing results with the proposed modifications to the results if the terms of the expired CBAs were to remain in place; (b) details of the savings calculated for the proposed changes; and (c) the benefit summary guide.

On June 26, 2013, the Union responded to the 1113(b) Proposal with a request for twenty (20) categories of additional information (the "**June 26th Request**").  In response to the June 26th Request, on August 13, 2013, the Debtors responded with additional information and data for the Union to review (the "**August 13th Response**").  In connection with preparing the

August 13th Response and enclosed therewith, the Debtors and their financial advisors, Alvarez & Marsal ("**A&M**"), developed a comprehensive, six-year detailed, long-term financial forecast for the Debtors' operations (the "**Six-Year Forecast**").  The Six-Year Forecast contains assumptions regarding potential savings from all areas of the Debtors' business, including savings with respect to employee labor.

The Union did not respond to the 1113(b) Proposal and/or the August 13th Response, and has refused to meet and negotiate.  On September 13, 2013, and thereafter, the Debtors held meetings and conducted conference calls with the financial and legal advisors to the **Creditors'** Committee concerning the 1113(b) Proposal.  Based on those discussions, the Debtors decided to include the following modifications to the 1113(b) Proposal (the "**Modified 1113(b) Proposal**"):

(1)    Reduce the period of the 1113(b) Proposal from six years to four years (2014-2017).

(2)    Inclusion of a "snap-back" provision in the event the Debtors perform more favorably than anticipated and any of the Debtors' Facilities exceed $500,000.00 in EBITDA during any particular calendar year during the period 2014-2017 (the "**Period**").  For purposes of apportioning the "snap-back" for any particular Facility that exceeds $500,000.00 in EBITDA (the "**Threshold**") during the Period, the Union shall be entitled to the product of the amount of dollars that exceed the Threshold (the "**Snap-Back Amount**") and a fraction, the numerator of which is the amount of the Union concessions for that particular year and prior years during the Period, and the denominator of which is the sum of the amount of the Union concessions for that particular year and prior years during the Period plus the operating shortfalls funded by Care Realty, LLC for that particular year and prior years during the Period (the "**Union Share**").  The Union Share shall be paid to Union employees as a bonus.  The modified terms shall, nevertheless, continue as approved in the Order (the "**1113(c) Order**") approving the Debtors' motion to reject the continuing economic terms of the expired CBAs under Section 1113(c) of the Bankruptcy Code.  Care Realty, LLC shall be entitled to the Snap-Back Amount minus the Union Share.  Provided, however, if in any year subsequent to the distribution of the Union Share, Care Realty, LLC is required to fund operating shortfalls for any particular Facility that exceed the amounts set forth in the Debtors' projections annexed as Exhibit A to the 1113(c) Order, then such amount shall be added to the Threshold for such Facility.

On September 25, 2013, the Debtors filed a motion pursuant to 11 U.S.C. § 1113(c) for an Order: (1) authorizing the Debtors to reject the continuing economic terms of the expired CBAs with the Union; and (2) implementing the terms of the Debtors' Modified 1113(b) Proposal [Docket No. 560] (the "**1113 Motion**").

The Bankruptcy Court scheduled a hearing regarding the 1113 Motion, to commence on October 15, 2013.  In accordance with ~~the~~**a** Standstill Order, ~~pursuant to which the~~

Debtor**entered October 8, 2013, the hearing on the 1113 Motion was adjourned to November 21, 2013 to permit the Debtors**, the Union and the NLRB ~~agreed to, among other things,~~**to** mediate the various disputes among them, ~~the~~**. The Union and the NLRB timely filed objections to the 1113 Motion, arguing, *inter alia*, that the Debtors could not seek relief under 1113(c) to reject their continuing obligations under their expired collective bargaining agreements, had not conferred in good faith over modifications to the expired collective bargaining agreements. The Union further argued that the Debtors had failed to provide sufficient information concerning the Debtors' Affiliates.**

**The** hearing on the 1113 Motion ~~has been adjourned to November~~**was subsequently held and concluded on November 21, 2013. The Bankruptcy Court's decision on the 1113 Motion is pending; a decision is expected by December** 21, 2013.

### III.    SUMMARY OF THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, TO THE EXHIBITS ATTACHED THERETO, AND THE PLAN SUPPLEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES-IN-INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

### A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders.  Upon the filing of a petition for relief under Chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the Chapter 11 cases.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan.

## B.    Classification and Treatment of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires the Plan to place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.

The Debtors believe that the Plan has classified all Claims and Equity Interests (other than Administrative Expense Claims, Priority Tax Claims, Professional Compensation and Reimbursement Claims and the DIP Loan Claim which, pursuant to ~~S~~section 1123(a)(1) of the Bankruptcy Code, do not need to be classified) in compliance with the provisions of ~~S~~section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a holder of a Claim or Equity Interest may challenge the Debtors' classification of Claims and Equity Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is allowed by the Bankruptcy Court may vary from any estimated allowed amount of such Claim and, accordingly, the total Claims ultimately allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the value of the property that ultimately will be received by a particular holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable

25

contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets.

### 1. Treatment of Unclassified Claims

Certain types of Claims are not placed into voting classes; instead they are unclassified. Such Claims are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided under the Bankruptcy Code. As such, the Debtors have not placed Administrative Expense Claims, Priority Tax Claims, Professional Compensation and Reimbursement Claims and the DIP Loan Claim in a Class. The treatment of these Claims is set forth above and in Article II, Sections 2.2 of the Plan.

### 2. Treatment of Classified Claims and Equity Interests

Except for the Administrative Expense Claims, Priority Tax Claims, Professional Compensation and Reimbursement Claims and the DIP Loan Claim, discussed above, all Claims against, and Equity Interests in, the Debtors and with respect to all property of the Debtors and their Estates, are defined and hereinafter designated in respective Classes. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class, and is classified in another Class or Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Class or Classes. A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released or otherwise satisfied or waived before the Effective Date. Notwithstanding anything to the contrary contained in the Plan, no distribution will be made on account of any Claim that is not an Allowed Claim.

The Plan is intended to deal with all Claims against and Equity Interests in the Debtors, of whatever character, whether known or unknown, whether or not with recourse, whether or not contingent or unliquidated, and whether or not previously Allowed by the Bankruptcy Court pursuant to Section 502 of the Bankruptcy Code. However, only Holders of Allowed Claims and Allowed Equity Interests will receive any distribution under the Plan. For purposes of determining Pro Rata distributions under the Plan and in accordance with the Plan, Disputed Claims will be included in the Class in which such Claims would be included if Allowed, until such Claims are finally disallowed:

### a. Class 1 – Other Priority Claims

(i)  *Impairment and Voting.* Class 1 Other Priority Claims are Unimpaired under the Plan. Therefore, Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject the Plan and are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

(ii)  *Treatment.* On or as soon as reasonably practicable after the later of (1) the Effective Date or (2) the Distribution Date immediately following the date on which an Other Priority Claim becomes an Allowed Priority Claim, the Holder of an Allowed Other Priority Claim shall receive (i) Cash equal to the amount of such Allowed Other Priority Claim, without interest or (ii) such other treatment as to which such applicable Debtor or Reorganized Debtor, as the case may be, and such Holder shall have agreed upon in writing.

**b.     Class 2 – HUD Claim**

(i)     Impairment and Voting.   ~~Class 2 is~~**As of the Commencement Date, the HUD Lender held first priority Liens with respect to all of the assets of Newington and West River.  Under the terms of the Exit Financing (through the New Credit Agreement), the HUD Lender's Liens and Claims will be expressly subordinate to the Liens and Claims of the Exit Lender with respect to Newington and West River, thereby impairing the HUD Lender.  Class 2 is, therefore,** Impaired under the Plan.  Therefore, the Holders of the Class 2 HUD Claim are entitled to vote to accept or reject the Plan.

(ii)     Treatment.   ~~Subject~~**Unless** *the applicable Debtor or the applicable Reorganized Debtor, as the case may be, and the HUD Lender shall have agreed to other treatment in writing***, subject** to the Debtors or the Reorganized Debtors entering into the New Credit Agreement, the HUD Lender shall have its Claim Reinstated on the Effective Date ~~*unless the applicable Debtor or the applicable Reorganized Debtor, as the case may be, and the HUD Lender shall have agreed to other treatment in writing*~~**, subject to the terms of the Exit Financing (through the New Credit Agreement) and any applicable intercreditor agreement with the Exit Lender, which shall, among other things, subordinate the HUD Lender's Liens on Newington and West River to those to be held by the Exit Lender**.  Prepetition Liens with respect to such HUD Lender Claims shall survive the Effective Date**,** and shall continue in accordance with contractual or statutory terms until such HUD Claim has been paid in full; provided, however, that, if applicable, such Liens shall be subject to the terms of the New Credit Agreement~~, if applicable.~~

**c.     Class 3 – M&T Claim**

(i)     Impairment and Voting.   ~~Class 3 is~~**As of the Commencement Date, M&T held first priority Liens with respect to all of the assets of Danbury.  Under the terms of the Exit Financing (through the New Credit Agreement), M&T's Liens and Claims will be expressly subordinate to the Liens and Claims of the Exit Lender with respect to Danbury, thereby impairing M&T.  Class 3 is, therefore,** Impaired under the Plan.  Therefore, M&T is entitled to vote to accept or reject the Plan.

(ii)     Treatment.   ~~Subject~~**Unless** *the applicable Debtor or the applicable Reorganized Debtor, as the case may be, and M&T shall have agreed to other treatment in writing***, subject** to the Debtors or the Reorganized Debtors entering into the New Credit Agreement, M&T shall have its Claim Reinstated on the Effective Date ~~*unless the applicable Debtor or the applicable Reorganized Debtor, as the case may be, and M&T shall have agreed to other treatment in writing*~~**, subject to the terms of the Exit Financing (through the New Credit Agreement) and any applicable intercreditor agreement with the Exit Lender, which shall, among other things, subordinate M&T's Liens on Danbury to those to be held by the Exit Lender**.  Prepetition Liens with respect to such M&T Claims shall survive the Effective Date**,** and shall continue in accordance with contractual or statutory terms until ~~the~~**such** M&T Claim has been paid in full; provided, however, that, if applicable, such Liens shall be subject to the terms of the New Credit Agreement~~, if applicable.~~

27

> **d.    Class 4 – Other Secured Claims**

(i)    <u>Impairment and Voting</u>.  Class 4 is Unimpaired by the Plan. Therefore, the Holders of the Class 4 Other Secured Claims are conclusively presumed to have accepted the Plan and, therefore, not entitled to vote to accept or reject the Plan.

(ii)    <u>Treatment</u>.  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Other Secured Claim, Holders of Allowed Other Secured Claims shall receive one of the following treatments, in the sole discretion of the applicable Debtor, in full and final satisfaction of such Allowed Other Secured Claims:  (i) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claims in full in Cash including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (ii) the Debtors or the Reorganized Debtors shall deliver the Collateral securing any such Allowed Other Secured Claim; or (iii) the Debtors or the Reorganized Debtors shall otherwise treat any Allowed Other Secured Claim in any other manner such that the Claim shall be rendered Unimpaired, including having its Claim Reinstated.

> **e.    Class 5 – Allowed Ongoing Trade Vendor Claims**

(i)    <u>Impairment and Voting</u>.  Class 5 consists of all Allowed Ongoing Trade Vendor Claims against a Debtor, as applicable, segregated into the following subclasses: (i) Class 5A (Allowed Ongoing Trade Vendor Claims against Long Ridge); (ii) Class 5B (Allowed Ongoing Trade Vendor Claims against Newington); (iii) Class 5C (Allowed Ongoing Trade Vendor Claims against Westport); (iv) Class 5D (Allowed Ongoing Trade Vendor Claims against West River); and (v) Class 5E (Allowed Ongoing Trade Vendor Claims against Danbury).  Class 5 is Impaired under the Plan.  Therefore, the Holders of Class 5 Ongoing Trade Vendor Claims are entitled to vote to accept or reject the Plan.  To qualify for treatment in Class 5, Holders of Claims must supply goods, materials and/or render services (other than as an employee) to one or more of the Debtors and must meet the following requirements: (i) the Debtors are conducting, and will continue to conduct, business as of the ~~Effective Date~~**<u>Voting Deadline</u>** with such Holder; and (ii) such Holder agrees, by election on such Holder's Ballot, to provide Ongoing Trade Vendor Terms to each Debtor with which it transacted business with prior to the Commencement Date from and after the Effective Date for a period of no less than one year.  A Holder of Claims that would otherwise qualify for treatment as a Ongoing Trade Vendor, but elects not to provide Ongoing Trade Vendor Terms, shall be classified as an Other General Unsecured Claim and receive treatment as described under Class 6.

(ii)    <u>Treatment</u>.  Except to the extent that a Holder of an Allowed Ongoing Trade Vendor Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Ongoing Trade Vendor Claim, each Holder of an Allowed Ongoing Trade Vendor Claim will be paid in Cash an amount equal to 75% of such Holder's Allowed Ongoing Trade Vendor Claim (i) in twelve (12) equal monthly installments commencing on the Effective Date or as soon as reasonably practicable thereafter or (ii) ~~in the ordinary course of business~~ in accordance with the terms of any agreement ~~that governs such Allowed Ongoing Trade Vendor Claim or in accordance with the historical course of dealings~~ between the Debtors and such Holder with respect to such Allowed Ongoing Trade Vendor Claim**<u>.  If a creditor holds a Claim that becomes an Allowed Claim after the date in which these monthly installment payments commence, the Debtors shall pay such creditor</u>**

<center>28</center>

**a lump sum at the time that the subject Claim becomes Allowed equal to the monthly installments that such creditor would have received if he had been receiving payments as of the commencement date of the installment payments.**  The Debtors reserve all rights to challenge the legal basis and amount of any asserted Ongoing Trade Vendor Claim, and each such Holder reserves all rights and defenses with respect to any such challenge.  If a Holder of an Ongoing Trade Vendor Claim fails to provide the Ongoing Trade Vendor Terms**, and the Debtors have not defaulted under the Plan or otherwise failed to make the payments to such Holder as described herein,** such Holder shall be subject to the disgorgement of its Distribution on account of its Ongoing Trade Vendor Claim and the reclassification of its Allowed Ongoing Trade Vendor Claim to an Other General Unsecured Claim.

### f.    Class 6 – Other General Unsecured Claims

(i)    <u>Impairment and Voting</u>.  Class 6 consists of all Allowed Other General Unsecured Claims against a Debtor, as applicable, segregated into the following subclasses: (i) Class 6A (Allowed Other General Unsecured Claims against Long Ridge); (ii) Class 6B (Allowed Other General Unsecured Claims against Newington); (iii) Class 6C (Allowed Other General Unsecured Claims against Westport); (iv) Class 6D (Allowed Other General Unsecured Claims against West River); and (v) Class 6E (Allowed Other General Unsecured Claims against Danbury).  Class 6 is Impaired under the Plan.  Therefore, the Holders of Class 6 Other General Unsecured Claims are entitled to vote to accept or reject the Plan.

(ii)    <u>Treatment</u>.  Except to the extent that a Holder of an Allowed Other General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other General Unsecured Claim, upon the fixing of all Allowed Other General Unsecured Claims (which in the case of the Backpay Claims shall mean the conclusion of the ALJ Proceedings and any right of appeal thereof), each Holder of an Allowed Other General Unsecured Claim shall receive their Pro Rata share of the Plan Distribution Contribution Amount.

### g.    Class 7 – Intercompany Claims

(i)    <u>Impairment and Voting</u>.  Class 7 consists of all Allowed Intercompany Claims against a Debtor, as applicable, segregated into the following subclasses: (i) Class 7A (Allowed Intercompany Claims in Long Ridge); (ii) Class 7B (Allowed Intercompany Claims in Newington); (iii) Class 7C (Allowed Intercompany Claims in Westport); (iv) Class 7D (Allowed Intercompany Claims in West River); and (v) Class 7E (Allowed Intercompany Claims in Danbury).  Class 7 is Impaired under the Plan.  Because the Plan provides that the Holders of Class 7 Claims shall not receive or retain any property under the Plan on account of such claims, Holders of Class 7 Intercompany Claims are not entitled to vote to accept or reject the Plan and are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

(ii)    <u>Treatment</u>.  All Intercompany Claims shall be cancelled and no distribution shall be made on account of such Claims.

h.     **Class 8 – Equity Interests**

(i)     <u>Impairment and Voting</u>.  Class 8 consists of all Allowed Equity Interests in a Debtor, as applicable, segregated into the following subclasses: (i) Class 8A (Allowed Equity Interests in Long Ridge); (ii) Class 8B (Allowed Equity Interests in Newington); (iii) Class 8C (Allowed Equity Interests in Westport); (iv) Class 8D (Allowed Equity Interests in West River); and (v) Class 8E (Allowed Equity Interests in Danbury).  Class 8 is Unimpaired under the Plan.  Therefore, the Holders of the Class 8 Equity Interests are conclusively presumed to have accepted the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

(ii)     <u>Treatment</u>.  In exchange for the forgiveness and cancellation of the Intercompany Claims including Claims that the Affiliated Landlords, the Management Company and/or the Parent Companies had or may have against a Debtor and its applicable Estate, and the commitments undertaken by the Backstop Funder and other members of the Plan Sponsor Group under the Plan, the Holder of the Class 8 Equity Interests shall retain their Equity Interests in the Debtors but will not receive any Distributions on account of such Equity Interests.

C.     <u>**Means for Implementation and Execution of Plan.**</u>

In addition to the provisions set forth elsewhere in the Plan, the following will constitute the means for implementation of the Plan:

1.     **Sources of Cash for Plan Distributions**.  Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan may be obtained from existing Cash balances (which as of the Effective Date shall include the Plan Distribution Contribution Amount), the operations of the Debtors or the Reorganized Debtors, sales of assets or the exit financing pursuant to the New Credit Agreement, <u>provided</u> that, to the extent of any insufficiency **for Allowed Claims as of the Effective Date (or thereafter solely as may be necessary to make Distributions on account of Allowed Class 5 Claims)**, funds shall be advanced to the applicable Debtor by the Backstop Funder **solely to the extent provided for in the Backstop Funding Agreement (which shall be consistent with this provision and not subject to material conditions not identified herein including, but not limited to, any future determination(s) by the Debtors to sell or discontinue their respective businesses)** or, as determined by the Debtors in their sole discretion, any member of the Plan Sponsor Group at the option of the advancing Debtor, as applicable~~.~~**, so long as such member(s) of the Plan Sponsor Group can advance such funds and is agreeable to advancing such funds to satisfy any insufficiency.  Notwithstanding anything herein or in the Plan to the contrary, nothing herein shall require the Backstop Funder or any member of the Plan Sponsor Group to fund any portion of the Backpay Claim except with respect to the funding of the Plan Distribution Contribution Amount. Without limiting the foregoing, neither the Backstop Funder nor any member of the Plan Sponsor Group shall be responsible for any portion of the Backpay Claim to the extent such Backpay Claim is entitled to priority in right of payment under sections 503(b) or 507(a) of the Bankruptcy Code.[16]  The Backstop Funder's contribution and commitment**

_____

**[16]  As noted _supra_, the Union filed estimated Section 507(a)(4) and Section 507(a)(5) Priority Claims in an unliquidated amount, and the NLRB filed estimated Section 507(a)(4) and Section** (continued…)

**under this Plan with respect to Claims held by Other General Unsecured Claims Holders, whether on account of Distributions to be made in accordance with Class 6 or otherwise (*e.g.*, on account of any Priority Claim or Administrative Expense Claim) shall be limited to the funding of the Plan Distribution Contribution Amount.  The Plan Distribution Contribution Amount shall be held in escrow by Debtors' counsel as of the commencement of the Confirmation Hearing.**

2.    **Funding of Ongoing Operating Losses**.  For so long as each applicable Debtor or Reorganized Debtor shall continue to own and operate a Facility, and subject to the terms of the CBA Rejection Order, the Backstop Funder shall make such funds available to the applicable Debtor to meet operating shortfalls solely to the extent identified in the **projections attached to the** CBA Rejection Order **and subject to the Backstop Funding Agreement**.

3.    **Continued Corporate Existence.**  After the Effective Date, each Reorganized Debtor shall continue to exist in accordance with applicable law and pursuant to its organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended, restated or replaced under the Plan.

4.    **Members and Officers.**  On or after the Effective Date, the current members, managers and officers of the Debtors will serve as managers, officers and members of the Reorganized Debtors.

5.    **Exit Financing.**  On the Effective Date, the Reorganized Debtors shall be authorized to enter into the New Credit Agreement, as well as execute, deliver, file, record and issue any notes, documents, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by the New Credit Agreement).

6.    **Effectiveness of Securities, Instruments and Agreements.**  On the Effective Date, all documents set forth in the Plan, the Plan Supplement, and all other agreements entered into or documents issued pursuant to the Plan including, without limitation, any agreement entered into or instrument issued in connection with any of the foregoing shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto and shall be deemed to become effective simultaneously.  **All unsecured creditors are thereafter obliged to pursue their individual rights and interests due to the disbandment of the Committee upon occurrence of the Effective Date.**

7.    **Corporate Action; Effectuating Documents; Further Transactions.**  On the Effective Date, all matters and actions provided for under the Plan that would otherwise

---

(…continued)

**507(a)(5) Priority Claims in the amount of approximately $8.9 million.  These Priority Claims represent the wages and benefits that the Union and the NLRB General Counsel assert the Debtors owe on account of the alleged unfair labor practices currently being litigated in the ongoing ALJ Proceedings.  Although the Debtors have estimated the Allowed Amount owing on account of the Union's and the NLRB's Priority Claims to be $0, no assurances can be made as to the exact amount of these claims that will be Allowed until the conclusion of the ALJ Proceedings.**

31

require approval of the member or managers of the applicable Debtor or the applicable
Reorganized Debtor or their successors-in-interest under the Plan including, without limitation,
the issuance of all Plan Documents, shall be deemed to have been authorized and effective in all
respects as provided herein and shall be taken without any requirement for further action by the
member and managers of each applicable Debtor and Reorganized Debtor.  Each of the Debtors
is authorized to execute, deliver, file or record such contracts, instruments, releases, and other
agreements or documents and to take such actions as may be necessary or appropriate to
effectuate and further evidence the terms and conditions of the Plan and any securities issued
pursuant to the Plan.

        8.    **Approval of Agreements.**  The solicitation of votes on the Plan also shall
be deemed as a solicitation for the approval of the Plan Supplement, the Plan Documents and all
transactions contemplated by the Plan.  Entry of the Confirmation Order shall constitute approval
of the Plan, the Plan Supplement, the Plan Documents and all transactions contemplated thereby.

        9.    **Operation of the Debtor-in-Possession Between the Confirmation
Date and the Effective Date.**  Each of the Debtors shall continue to operate as a Debtor-in-
Possession, subject to the supervision of the Bankruptcy Court, pursuant to the Bankruptcy Code,
during the period from the Confirmation Date through and until the Effective Date, and any
obligation incurred by a Debtor during that period shall, to the extent it would qualify as
Allowed Administrative Expense Claims under section 503(b) of the Bankruptcy Code,
constitute an Administrative Expense Claim.

        10.    **Vesting of Property of the Estates.**  On or after the Effective Date, all
property of the Estates, all Causes of Action, and any property acquired by the Debtors, as
applicable, under or in connection with the Plan, shall vest in the applicable Reorganized Debtor
on the Effective Date free and clear of all Liens, Claims, Interests, charges and other
encumbrances, except as provided in the Plan or the Confirmation Order.  Additionally, all
employees and employee health and benefit plans, except and to the extent that such plans have
been previously rejected or modified by an order of the Bankruptcy Court on or before the
Confirmation Date, shall be transferred to the applicable Reorganized Debtor on the Effective
Date or as soon as practicable thereafter.  All employee policies in effect for each of the Debtors
as of the Confirmation Date shall be in effect for each of the Reorganized Debtors as of the
Effective Date, but may be amended thereafter ~~at such Reorganized Debtor's~~**in the Debtors'**
sole discretion **subject to applicable law**.

        11.    **Preservation of Causes of Action.**  Except as otherwise provided in the
Plan, the Confirmation Order or in any document, instrument, release or other agreement entered
into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code,
the Reorganized Debtors will retain all of the Causes of Action, including the RICO Action and any
other Causes of Action against the Union; provided, however, that the Reorganized Debtors shall
~~assign all Avoidance Actions against any holder of an Ongoing Trade Vendor Claim to the
Creditors' Committee on the Effective Date.  The Creditors' Committee shall~~ not pursue **and
shall waive** any Avoidance Actions ~~against any holder of an Ongoing Trade Vendor Claim
unless there is a default under the Plan~~**(except to the extent such Claims or Causes of Action
that the Debtors have preserved against the Union, including the RICO Action, constitute
an Avoidance Action)**.  The Reorganized Debtors may enforce, sue on, settle or compromise (or
decline to do any of the foregoing) any and all of such Causes of Action, including the RICO
Action.  The failure of the Debtors to specifically list any claim, right of action, suit, proceeding

or other Cause of Action in the Plan does not, and will not be deemed to, constitute a waiver or release by the Debtors or the Reorganized Debtors of such claim, right of action, suit, proceeding or other Cause of Action and the Reorganized Debtors will retain the right to pursue such claims, rights of actions, suits, proceedings or other Causes of Action in their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit, proceeding or other Cause of Action upon or after the Confirmation or consummation of the Plan.

12.    **Exemption from Certain Transfer Taxes.**  Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

13.    **Non-Substantive Consolidation.**  Although the Plan is presented as a joint plan of reorganization, the Plan does not provide for the substantive consolidation of the Debtors' estates, and on the Effective Date, the Debtors' estates shall not be deemed to be substantively consolidated for any reason.  Allowed Claims held against one Debtor will be satisfied solely from the Cash and assets of such Debtor and its Estate, provided that, to the extent of any insufficiency, ~~funds may~~ **for Allowed Claims as of the Effective Date (or thereafter solely as may be necessary to make Distributions on account of Allowed Class 5 Claims), funds shall** be advanced to the ~~relevant~~**applicable** Debtor by the Backstop Funder **solely to the extent provided for in the Backstop Funding Agreement (which shall be consistent with this provision and not subject to material conditions not identified herein including, but not limited to, any future determination(s) by the Debtors to sell or discontinue their respective businesses)** or, as determined by the Debtors in their sole discretion, any member of the Plan Sponsor Group at the option of the advancing Debtor, as applicable**, so long as such member(s) of the Plan Sponsor Group can advance such funds and is agreeable to advancing such funds to satisfy any insufficiency**.  Except as specifically set forth herein, nothing in the Plan or this Disclosure Statement shall constitute or be deemed to constitute an admission that any one or all of the Debtors is subject to or liable for any Claims against any other Debtor or that any member of the Plan Sponsor Group is subject to or liable for any Claims against any Debtor.  A Claim against multiple Debtors will be treated as a separate Claim against each Debtor's Estate for all purposes including, but not limited to, voting and distribution; provided, however, that no Claim will receive value in excess of 100% of the Allowed amount of such Claim.  Notwithstanding anything to the contrary in the Plan, except solely to the extent applicable with respect to the M&T Claims and the HUD Claims to the extent the Debtors enter in the New the New Credit Agreement, the Reinstated Claims and Impaired Claims and Equity Interests of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or Reorganized Debtor by virtue of the Plan, the Chapter 11 Case, or otherwise.

33

D.    **Provisions Governing Distributions**

1.    **Disbursing Agent.**  The Disbursing Agent shall make all distributions required under the Plan (subject to the provisions of the Plan, including Article II, Article IV and Article V of the Plan).

2.    **Application of Distribution Record Date.**  As of the close of business on the Distribution Record Date, the claim registers for all Claims shall be deemed closed, and there shall be no further changes in the record holders of such Claims.  Neither the Debtors, the Reorganized Debtors or the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring on or after the Distribution Record Date.  The Debtors, the Reorganized Debtors and the Disbursing Agent shall be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the claims registers as of the close of business on the Distribution Record Date, to the extent applicable.

3.    **Compliance with Tax Requirements.**  In connection with the Plan and all Distributions thereunder, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  For tax purposes, Distributions received in respect of Allowed Claims will be allocated first to the principal amount of Allowed Claims with any excess allocated, if applicable, to unpaid interest that accrued, on such Claims.

4.    **Means of Cash Payment.**  Cash payments under the Plan will be in U.S. funds by checks drawn on a bank selected by the Reorganized Debtors, or by wire transfer from a bank, at the option of the Reorganized Debtors.

5.    **Delivery And Distributions And Undeliverable Or Unclaimed Distributions.**

(i)    Delivery of Distributions in General.  Distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as indicated on the records of the applicable Debtor, or a filed proof of Claim, as applicable.

(ii)    Undeliverable Distributions.

(a)    Holding of Undeliverable Distributions.  If any Allowed Claim Holder's distribution is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Debtors or Reorganized Debtors are notified in writing of such Holder's then-current address.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable.  Undeliverable Cash shall not be entitled to any interest, dividends or other accruals of any kind.

(b)    After Distributions Become Deliverable.  Within 20 days after the end of each Quarter following the Distribution Date, the Disbursing Agent shall make all distributions that become deliverable during the preceding Quarter, except as otherwise provided herein.

(c)    Failure to Claim Undeliverable Distributions.  In an effort to ensure that all Holders of valid Claims receive their allocated distributions, the Disbursing

34

Agent will file with the Bankruptcy Court a listing of unclaimed distribution Holders. Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable distribution within three months after the first attempted delivery shall have its Claim for such undeliverable distribution discharged and shall be forever barred from asserting any such Claim against the Debtors, the Reorganized Debtors, or their respective property. In such cases, any Cash held for distribution on account of such Claims shall be property of the applicable Reorganized Debtor, free of any restrictions thereon, and shall revert to the account from which such payment was originally issued to be distributed pursuant to the Plan. Nothing contained in the Plan shall require the Reorganized Debtors or the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

      6.    **De Minimus Distributions.** Any Holder of an Allowed Claim whose aggregate distribution under the Plan is less than twenty-five dollars ($25) shall forfeit, at the option of the Disbursing Agent, such amount to, and such amount shall vest in, the Reorganized Debtors for distribution in accordance with the terms of the Plan.

      7.    **Fractional Dollars.** Any other provision of the Plan notwithstanding, payments of fractions of dollars shall not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded up.

      8.    **Allocation Of Plan Distributions Between Principal and Interest.** To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

      9.    **Setoffs and Recoupments.** The Debtors and the Reorganized Debtors, as applicable, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, exercise any right of setoff or recoupment against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before distribution is made or account of such Claim), the claims, rights and causes of action of any nature that any of the Debtors may hold against the Holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claims, rights and causes of action that the Debtors or Reorganized Debtors may possess against such Holder.

      10.    **Prepayments.** Except as otherwise provided in the Plan or the Confirmation Order, the Debtors shall have the right to prepay, without penalty, all or any portion of an Allowed Claim upon authorization of the Bankruptcy Court; provided, however, that any such prepayment shall not be violative or, otherwise prejudice, the relative priorities and parities among Classes of Claims.

    E.    **Procedures for Resolving Disputed, Contingent and Unliquidated Claims.**

      1.    **Prosecution of Objections to Claims.** Except as set forth in the Plan or any applicable Order of the Bankruptcy Court with respect to Administrative Expense Claims and Professional Compensation and Reimbursement Claims, all objections to Claims must be

filed and served on the Holders of such Claims by the Claims Objection Deadline, as the same may be extended by the Bankruptcy Court.  After the Effective Date, only the Reorganized Debtors shall have the authority to file objections to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims regardless of whether the Claims were filed before or after the Effective Date, including Administrative Expense Claims, and Professional Compensation and Reimbursement Claims.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

2.    **Allowance Of Claims; No Distribution Pending Allowance.**  Except as expressly provided herein or in any order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed, unless and until such Claim is deemed Allowed under the Bankruptcy Code or the Bankruptcy Court enters a Final Order in the Chapter 11 Case allowing such Claim.  Except as expressly provided in the Plan or in any Order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), each Reorganized Debtor on and after the Effective Date will have and retain any and all rights and defenses such applicable Debtor had with respect thereto as of the Commencement Date.

Notwithstanding anything to the contrary contained herein, no payments or distributions, if any contemplated by the Plan, will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

3.    **Distributions After Allowance.**  To the extent that a Disputed Claim ultimately becomes an Allowed Claim, a distribution, if any, will be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court or other applicable court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, or the date upon which other final resolution has been reached to Allow such Claim, the Disbursing Agent shall provide to the holder of such Claim the distribution to which such holder is entitled under the Plan.  Notwithstanding the foregoing, and except as otherwise provided with respect to Ongoing Trade Vendor Claims, the Disbursing Agent shall not be required to make distributions more frequently than once every 90 days.

4.    **Controversy Concerning Impairment.**  If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy at or before the Confirmation Date.

5.    **Reservation of Rights to Object to Allowance or Asserted Priority of Claims.**  Nothing herein will waive, prejudice or otherwise affect the rights of the Debtors, the Reorganized Debtors to object at any time, including after the Effective Date, to the allowance or asserted priority of any Claim.

F.    **Treatment of Executory Contracts and Unexpired Leases**

1.     **Assumption and Assignment of Executory Contracts and Unexpired
Leases.**  Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, each Lease
Agreement and each Management Agreement shall be deemed assumed by the applicable Debtor
and assigned to the applicable Reorganized Debtor as of the Effective Date.  On the Effective
Date, the Affiliated Landlords and the Management Company shall be deemed to have waived
any right to payment of a Cure amount.  The Debtors reserve the right, at any time prior to the
Confirmation Date, to seek to assume or reject any Executory Contract or unexpired lease to
which any of the Debtors is a party.  The Confirmation Order shall constitute an Order of the
Bankruptcy Court approving the assumption and assignment of the contract and lease
assumptions described above as of the Effective Date.  Upon the Effective Date, the Affiliated
Landlords and the Management Company, respectively, shall be deemed to have consented to
the assumption of the Lease Agreements and the Management Agreement, respectively,
contemplated by Bankruptcy Code section 365(c)(1)(B), to the extent such consent is necessary
for such assumption.

     **Each of the Debtors participate in the Medicare program pursuant to a Medicare
provider agreement with the Centers for Medicare & Medicare Services ("CMS"), which
provider agreement is considered to be an executory contract under 11 U.S.C. § 365.  On
the Effective Date, each of the Debtors shall assume each of their respective Medicare
provider agreements (collectively, "Assumed Medicare Provider Agreements").  With
respect to the Assumed Medicare Provider Agreements, the Cure amount pursuant to 11
U.S.C. § 365 shall include the agreement by each of the Debtors to continue its
participation in the Medicare program** *in the ordinary course of business* **and to be governed
by, and subject to, the terms and conditions of its Assumed Medicare Provider Agreements
and the incorporated Medicare statutes, regulations, policies and procedures, including the
recoupment of overpayments, if any.  Notwithstanding any language to the contrary,
nothing in the Disclosure Statement, Plan or the Confirmation Order shall release (or
operate to enjoin) CMS's right to recover any Medicare overpayment or claim against any
of the Debtors, if any, whether prepetition or post petition, including through recoupment
or setoff.  Notwithstanding anything in the Disclosure Statement, Plan, or Confirmation
Order to the contrary, the Cure Amount for assumption of the Medicare provider
agreements shall not be a sum certain set by the Debtors or the Bankruptcy Court, and
Bankruptcy Court shall not have jurisdiction to determine the nature or amount of any
required Cure of the Medicare provider agreements.**

     2.     **Cure of Defaults Under Assumed Executory Contracts and Unexpired
Leases.**  Except as set forth in Section 7.1 of the Plan or as may otherwise be agreed to by the
parties, within ninety days after the Effective Date, or as due in the ordinary course of business,
the applicable Reorganized Debtor shall cure any and all undisputed defaults under any assumed
Executory Contracts and unexpired leases in accordance with section 365(b)(1) of the
Bankruptcy Code.  Notice of the Cure amount for the Executory Contracts and unexpired leases
~~is~~**will be** set forth ~~on Appendix F hereto~~**in an applicable Assumption Notice (as defined
below)**.  Notwithstanding the foregoing, in the event of a dispute regarding (i) the nature or
amount of any cure obligation, (ii) the ability of a Debtor or any assignee to provide "adequate
assurances of future performance" (within the meaning of section 365 of the Bankruptcy Code)
under the Executory Contracts and unexpired leases, or (iii) any other matter pertaining to any
such assumption, the cure obligation shall be satisfied no later than thirty (30) days of the entry
of a Final Order determining the obligation, if any, of the applicable Debtor with respect thereto,
or as may otherwise be agreed to by the parties.

37

3.     **Cure Procedure.**  ~~The Plan and Appendix F hereto shall constitute notice to~~ *the non-Debtor counterparty to* **No later than 14 calendar days prior to the Confirmation Hearing, the Debtors will file and serve a notice (the "Assumption Notice") to assume** any Executory Contract ~~or unexpired lease of the applicable Debtor's intention to assume~~ **(which shall include any unexpired lease) pursuant to section 365 of the Bankruptcy Code, which shall set forth the following information, to the best the Debtors' knowledge, as applicable: (i) the Executory Contract to be assumed; (ii) the name and address of** *the non-Debtor counterparty to* such Executory Contract ~~or unexpired lease and of~~**; (iii)** the **proposed cure** amount ~~of any Cure owed, if any, under any Executory Contracts and unexpired leases~~**, if any; and (iv) the deadlines and procedures for filing objections to the Assumption Notice (as set forth below).  Parties objecting to a proposed assumption, including to the proposed cure amount, must file and serve a written objection so that such objection is filed with the Court and is actually received by the Debtors no later than seven (7) calendar days after the date the Debtors serve the relevant Assumption Notice.**  If said non-Debtor counterparty fails to **timely** respond or object ~~on or before the deadline scheduled by the Bankruptcy Court for objections to the Plan~~, it shall be deemed to have consented to such proposed Cure amount for all purposes in the Chapter 11 Case.

4.     **Insurance Policies.**  All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto (collectively, the "**Insurance Policies**"), are treated as Executory Contracts under the Plan.  On the Effective Date, the applicable Reorganized Debtor shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of Claims covered by those insurance policies, subject to all rights, remedies and defenses of the Debtors under any agreements, insurance policies and applicable law.  Nothing in the Plan, or in any Order confirming the Plan, shall preclude plaintiffs in pending litigation matters from pursuing their claims against the applicable Debtor solely to the extent of available insurance coverage and proceeds.  Claims against any applicable Debtor, to the extent of available insurance, are preserved, solely to the extent necessary to pursue available coverage and proceeds, but any right to collect directly from the Debtors shall be discharged by the Plan.  Nothing contained in this Article shall constitute or be deemed a waiver of any Cause of Action that the Debtors may hold against any entity including, without limitation, the insurer under any of the Debtors' Insurance Policies.

5.     **Indemnification Obligations.**  For purposes of the Plan, the obligations of a Debtor to defend, indemnify, reimburse or limit the liability of any present member, manager, director, officer or employee who is or was a member, manager, director, officer or employee, respectively, on or after the Commencement Date against any Claims or obligations pursuant to each applicable Debtors' operating agreement, certificate of formation or similar corporate governance documents, applicable state law, or specific agreement, or any combination of the foregoing (collectively, the "**Indemnification Obligations**"), shall: (i) survive confirmation of the Plan; (ii) remain unaffected thereby; and (iii) not be discharged, irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on or after the Commencement Date.  To the extent provided in Section 7.4 of the Plan, such obligations shall be deemed and treated as Executory Contracts to be assumed by the applicable Reorganized Debtor hereunder on the Effective Date and shall continue as obligations of the applicable Reorganized Debtor following the Effective Date.

6.     **Compensation and Benefit Plans.**  Except as otherwise expressly provided in the Plan or in any contract, instrument, release, indenture or other agreement or

38

document entered into in connection with the Plan or otherwise rejected or modified prior to the Effective Date, all of the Debtors' programs, plans, agreements and arrangements relating to employee compensation and benefits, including programs, plans, agreements and arrangements, subject to sections 1113 and 1129(a)(13) of the Bankruptcy Code, entered into before the Commencement Date and not since terminated (collectively, the "**Compensation and Benefit Plans**"), will be deemed to be, and will be treated as though they are, executory contracts that are assumed under Article VII of the Plan, and the Debtors' obligations under such programs, plans, agreements and arrangements will survive confirmation of the Plan, except for executory contracts or plans that previously have been rejected, are the subject of a motion to reject or have been specifically waived by the beneficiaries of any plans or contracts. .

7.      **Rejection of Executory Contracts and Unexpired Leases.**  On the Effective Date, all Executory Contracts and unexpired leases will be deemed rejected, other than: (i) the Lease Agreements, (ii) the Management Agreements, (iii) the Insurance Policies, (iv) the Indemnification Obligations, (v) the Compensation and Benefit Plans and (vi) any other Executory Contracts and unexpired leases that a Debtor seeks to assume prior to the Confirmation Date or under the Plan.  The Confirmation Order shall constitute an order approving such rejection as of the Effective Date.

8.      **Deadline for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan**.  If the rejection by a Debtor, pursuant to the Plan or otherwise, of an Executory Contract or unexpired leases gives rise to a Claim, a Proof of Claim must be filed in accordance with the Claims and Noticing Order and served upon the Debtors' counsel or as otherwise may be provided in the Confirmation Order, by no later than thirty (30) days after the later of (i) notice of entry of the Confirmation Order and (ii) other notice that the Executory Contract or unexpired lease has been rejected.  Any Proofs of Claim not filed and served within such time periods will be forever barred from assertion against the Debtors, the Reorganized Debtors, the Estates and their property.  Unless otherwise Ordered by the Bankruptcy Court, all Claims arising from the rejection of Executory Contracts and unexpired leases shall be treated as General Unsecured Claims under the Plan.

**G.      Conditions to Confirmation and Effectiveness of the Plan**

1.      **Conditions to Confirmation.**

The following are conditions precedent to the occurrence of the Confirmation Date, each of which must be waived or satisfied in accordance with Article X of the Plan:

a.      An Order shall have been entered finding that:

i.      the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy shall have been issued by the Bankruptcy Court; and

ii.      the Debtors, the Creditors' Committee and their respective principals, officers, directors, attorneys, accountants, financial advisors, advisory affiliates, employees, and agents solicited acceptance or rejection of the Plan in good faith pursuant to 11 U.S.C. § 1125(e); and

iii.      the Confirmation Order confirming the Plan, as the Plan may have been modified in accordance with the terms hereof, shall conform to the Plan in all

39

respects and shall have been entered by the Bankruptcy Court in form and substance satisfactory to the Debtors and the Plan Sponsor Group in their sole discretion.

2. **Conditions Precedent to the Effective Date.** The following are conditions precedent to the Effective Date, each of which must be satisfied or waived in accordance with Article X of the Plan:

a. The Confirmation Order shall authorize and direct that the Debtors and the Creditors' Committee take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases and other agreements or documents created in connection with the Plan, including the Plan Documents and the transactions contemplated thereby.

b. The Confirmation Order shall have become a Final Order.

c. The ~~Debtors shall obtain relief from the Bankruptcy Court under section 1113(c) of the Bankruptcy Code rejecting and/or otherwise modifying the Debtors' obligations under or relating to the Collective Bargaining Agreements pursuant to a Final Order on such terms as are acceptable to the Debtors and the Plan Sponsor Group.__CBA Rejection Order shall have become a Final Order.__

d. The Statutory Fees owing to the United States Trustee shall have been paid in full.

e. All other actions, authorizations, consents and regulatory approvals required (if any) and all Plan Documents necessary to implement the provisions of the Plan shall have been obtained, effected or executed in a manner acceptable to the Debtors or, if waivable, waived by the Person or Persons entitled to the benefit thereof.

## H.    Retention of Jurisdiction

The Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, and related to, these Chapter 11 cases and the Plan pursuant to, and for the purposes of, ~~S~~sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a) To hear and determine all matters with respect to the assumption or rejection of any Executory Contract or unexpired lease to which the Debtors are a party or with respect to which the Debtors may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

(b) To hear and determine any and all adversary proceedings, applications, motion and contested or litigated matters arising out of, under or relate to, these Chapter 11 cases;

(c) To hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

40

(d)      To enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(e)      To issue such Orders in aid of execution and consummation of the Plan, to the extent authorized by Ssection 1142 of the Bankruptcy Code;

(f)      To consider any amendments to or modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)      To hear and determine all Professional Compensation and Reimbursement Claims and other Administrative Expense Claims;

(h)      To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(i)      Except as otherwise limited herein, to recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

(j)      To hear and determine matters concerning state, local and federal taxes in accordance with Ssections 346, 505 and 1146 of the Bankruptcy Code;

(k)      To hear any other matter not inconsistent with the Bankruptcy Code;

(l)      To enter a final decree closing these Chapter 11 cases;

(m)      To ensure that Distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

(n)      To decide or resolve any motions, adversary proceedings, contested or litigated matters pending in the Bankruptcy Court and any other matters pending in the Bankruptcy Court and grant or deny any applications involving the Debtors that may be pending in the Bankruptcy Court on the Effective Date;

(o)      To issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, except as otherwise provided herein;

(p)      To determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Plan Documents;

(q)      To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with these Chapter 11 cases (whether or not the Chapter 11 Case has been closed);

41

(r)    To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof; and

(s)    To resolve any disputes concerning whether a Person or Entity had sufficient notice of these Chapter 11 cases, the General Bar Date, the hearing on the approval of the Disclosure Statement as containing adequate information, the hearing on the confirmation of the Plan for the purpose of determining whether a Claim or Equity Interest is discharged hereunder or for any other purpose.

**Notwithstanding any language in the Disclosure Statement or Plan to the contrary, nothing herein is intended to confer jurisdiction on the Bankruptcy Court to the extent it does not exist under the Bankruptcy Code or other applicable law.**

**The NLRB asserts that notwithstanding any language in the Disclosure Statement or Plan to the contrary, the Bankruptcy Court cannot adjudicate or liquidate the National Labor Relations Board's Claims or any portion thereof, or enjoin or otherwise restrain any proceeding involving Debtors' liability, or their affiliates' liability, under the National Labor Relations Act, as amended, except that, insofar as any proceeding is commenced against a Debtor, and insofar as that proceeding seeks to collect, recover or offset a debt discharged under the Plan that is owed to the National Labor Relations Board or the Union, it is enjoined pursuant to 11 U.S.C. § 524(a)(2). The Debtors do not necessarily agree with the NLRB's assertions in this paragraph.**

## I.    Releases and Related Provisions

1.    **Releases by the Debtors.** Upon substantial consummation, as defined in section 1101(2) of the Bankruptcy Code, and then effective *nunc pro tunc* to the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors and any Entity seeking to exercise the rights of each Debtor's estate, including, without limitation, any successor to a Debtor or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under chapter 5 of the Bankruptcy Code), and liabilities whatsoever in connection with or related to the Debtors, the conduct of the Debtors' businesses, the Chapter 11 Case or the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' businesses, the Reorganized Debtors, the Chapter 11 Case, or the Plan, and that may be asserted by or on behalf of the Debtors, the Estates, or the Reorganized Debtors against (i) any of the Debtors, (ii) any of the present or former shareholders, members, directors, officers, employees or advisors of the Debtors, (iii) any Professionals of the Debtors, and (iv) the Creditors' Committee, its members, and its and their advisors, respectively (but not its members in their individual capacities); provided, however, that, nothing in Section 9.01 of the Plan shall be construed to release any party from actual fraud or gross negligence as determined by a Final Order; and provided, further, however, that nothing in Section 9.01 of the Plan shall be deemed

42

to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee (other than any director or officer) that is based upon an alleged breach of a confidentiality, non-compete, or any other contractual or fiduciary obligation owed to any of the Debtors or the Reorganized Debtors.

2. **Releases by Holders of Claims and Equity Interests.** Upon substantial consummation, as defined in section 1101(2) of the Bankruptcy Code, and then effective *nunc pro tunc* to the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim and/or Equity Interest that ~~receives a~~**is entitled to receive** Distribution pursuant to the Plan shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against any Affiliate of any Debtor, including the Plan Sponsor Group/Backstop Funder and any of the present or former shareholders, members, managers, directors, officers, employees or advisors of any of the Debtors or their respective Affiliates, including the Plan Sponsor Group/Backstop Funder (collectively, the "Releasees"), in connection with or related to the Debtors, the conduct of the Debtors' businesses, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' businesses, the Chapter 11 Case, or the Plan; provided, however, that, nothing in Section 9.2 of the Plan shall be construed to release any party from actual fraud or gross negligence as determined by a Final Order.

Each of the Releasees shall be deemed to forever release, waive, and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever arising on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' businesses, the Chapter 11 Case, or the Plan, that such Releasees may hold in their individual capacities against each Holder of a Claim and/or Equity Interest that ~~receives~~**is entitled to receive** a Distribution pursuant to the Plan; provided, however, that until the conclusion of the RICO Action, the Union shall not be released by the Releasees on any claim raised or which could have been raised **in the RICO Action and nothing herein is intended nor shall limit the right of the Releasees to recover against any defendant** in the RICO Action.

3. **Injunctions or Stays.** All injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code and in the Plan, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. Except as otherwise expressly provided in the Plan, under applicable law or to the extent necessary to enforce the terms and conditions of the Plan, the Confirmation Order or a separate Order of the Bankruptcy Court, all entities, creditors and equity and/or interest holders who have held, hold, or may hold Claims against or Equity Interests in any of the Debtors, are permanently enjoined, on and after the Confirmation Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or Order against any of the Debtors on account of any such Claim or Equity

43

Interest, (iii) creating, perfecting or enforcing any encumbrance of any kind against any of the Debtors or against the property or interests in property of any of the Debtors on account of any such Claim or Equity Interest, and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Debtors, or against the property or interests in property of any of the Debtors on account of any such Claim or Equity Interest. Such injunction shall extend to the Reorganized Debtors.

        4.    **Injunction.**  On and after the Confirmation Date, all entities, creditors and equity and/or interest holders who have held, hold or may hold Claims against or Equity Interests in any of the Debtors, shall be enjoined, pursuant to section 105 of the Bankruptcy Code, from proceeding against any of the Releasees, for the collection of all or any portion of their Claim or Equity Interest or pursuing any Claim that is released pursuant to Article IX of the Plan, said injunction to remain in effect only for so long as such applicable Debtor complies with the terms of the Plan. Any violation of the Plan that remains uncured for thirty (30) days after receipt by the Debtors of written notice from any party affected by such violation, shall automatically and without order of the Bankruptcy Court result in the dissolution of the injunction granted hereunder as to said affected party.

        Notwithstanding the foregoing, the injunction granted hereunder shall not affect the claims and rights of any creditor to proceed against a Releasee for collection on any applicable guaranty; provided, however, so long as such applicable Debtor is not in default under the Plan on any required payment beyond any relevant grace period, such creditor is enjoined hereunder from proceeding against a Releasee for collection of any amounts paid or to be paid under any applicable guaranty or by such applicable Debtor or Reorganized Debtor under the Plan.

        Notwithstanding anything contained herein to the contrary, the exclusive remedy for payment of any claim or debt so long as the Plan is not in default shall be the Plan.

        5.    **Exculpation.**  The Debtors, the Reorganized Debtors, the Plan Sponsor Group, the Creditors' Committee, each of the members of the Creditors' Committee, and their respective members, partners, officers, directors, employees and agents (including any attorneys, financial advisors, investment bankers and other professionals retained by such Persons) shall have no liability to any Holder of any Claim or Equity Interest, or any other party-in-interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, the formulation, negotiating, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omission that are the result of gross negligence or actual fraud and, in all respects, shall be entitled to rely on the advice of counsel with respect to their duties and responsibilities under the Plan.

        **6.    Release Disclosure.  The Debtors believe that the releases of the Releasees by the Debtors and each Holder of a Claim and/or Equity Interest that is entitled to receive a Distribution pursuant to the Plan (collectively, the "Releasing Parties") and the corresponding injunctions are critically important to the success of the Debtors' Plan and implements the concessions, compromises and commitments made by the Backstop Funder and the other members of the Plan Sponsor Group.**

<div align="center">44</div>

Each of the Releasees, whether directly or indirectly through the concessions, compromises and commitments made by the Backstop Funder and the other members of the Plan Sponsor Group, afforded value to the Debtors and have aided in the reorganization process. The Releasees have played an integral role in the formulation of the Plan, have expended and will continue to expend significant time and resources analyzing and negotiating the issues presented by the Debtors' capital structure and, in exchange for receiving the Releases and injunctions set forth in the Plan, are making critical financial contributions to Plan that are necessary to make the Plan feasible. The Backstop Funder and the other members of the Plan Sponsor Group will not make any of the concessions, compromises and commitments outlined in the Plan unless the releases, including those that are required from the Holders of Claims and Interests (whether consensual or non-consensual), are approved. Accordingly, the Releases and related injunctions are an integral part of the consideration to be provided in exchange for the concessions, compromises and commitments embodied in a plan of reorganization that the Debtors believe maximizes recoveries to the Debtors' creditors and affords the Reorganized Debtors the opportunity to restructure their businesses to compete effectively post-emergence. Absent the expeditious implementation of the Plan (which preserves trade relationships and, therefore, the enterprise value of the Debtors), the Debtors could face a longer, costlier and uncertain Chapter 11 process mired with contentious litigation, which could materially delay and reduce distributions to creditors.

The Debtors believe that "Debtor Release" (embodied in Section 9.1 of the Plan) to the Releasees is a sound exercise of their business judgment and that the Debtors' release of third parties pursuant to the Plan is appropriate and reasonable under the circumstances, particularly where, as here, the relative strength of the claims being released are more than offset by the significant benefits the Debtors' are receiving under the Plan from the Releasees. In light of the foregoing, the Debtors believe, in their sound business judgment, that the "Debtor Release" falls well within the range of reasonableness and, thus, satisfies the applicable provisions of the Bankruptcy Code and Bankruptcy Rules relating to the approval of settlements.

Accordingly, the Plan provides that entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019 and Section 105 of the Bankruptcy Code, of the Releases, which includes by reference each of the related provisions and definitions contained in the Plan, and related injunctions and further, shall constitute the Bankruptcy Court's finding that the Releases are: (i) in exchange for the good and valuable consideration provided by the Releasees, (ii) a good faith settlement and compromise of the claims released by the Releasees; (iii) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (iv) fair, equitable, reasonable and necessary for the Debtors' reorganization as, among other things, the concessions, compromises and commitments provided by or on behalf of the Releasees constitute critical financial contributions to Plan that are necessary to make the Plan feasible; (v) given and made after notice and opportunity for hearing; and (vi) a bar to Releasing Parties or any of the Debtors or the Reorganized Debtors or any party on their behalf asserting any claim released by the Releases against any of the Releasees.

### J.    Summary of Other Provisions of the Plan

1.    **Administrative Claims Bar Date.**  All Administrative Expense Claims, other than (i) those Administrative Expense Claims that were required to be filed pursuant to the First Administrative Expense Claim Bar Date Order or the Section 503(b)(9) Administrative Claim Bar Date Order, (ii) Professional Compensation and Reimbursement Claims, which are subject to the provisions of Section 2.2(B) of the Plan, (iii) all fees payable and unpaid pursuant to 28 U.S.C. § 1930, (iv) a liability incurred and payable in the ordinary course of business by a Debtor (and not past due or otherwise Disputed by one or more of the Debtors); and (v) any Administrative Expense Claims that have already been paid by one or more of the Debtors, shall be filed with the Bankruptcy Court and served on counsel for the Debtors no later than the Administrative Expense Claims Bar Date.  In the event that the Debtors or Reorganized Debtors object to an Administrative Expense Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense Claim.  Notwithstanding the foregoing, (a) no application seeking payment of Postpetition Administrative Trade Claim need be filed with respect to an undisputed postpetition obligation which was paid or is payable by a Debtor in the ordinary course of business; provided, however, that in no event shall a postpetition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; and (b) no application seeking payment of an Administrative Expense Claim need be filed with respect to Cure owing under an Executory Contract or unexpired lease if the amount of Cure is fixed by Order of the Bankruptcy Court.

2.    **Amendment or Modification of the Plan.**  The Debtors may alter, amend or modify the Plan or any exhibits or schedules hereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.  The Debtors reserve the right to include any amended exhibits or schedules in the Plan Supplement.  After the Confirmation Date and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, the Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and to accomplish such matters as may be necessary to carry out the purposes and effects of the Plan so long as such proceedings do not adversely affect the treatment of holders of Claims under the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

3.    **Termination of Creditors' Committee.**  The appointment of the Creditors' Committee shall terminate on the Effective Date for all purposes other than making a motion to reopen the Chapter 11 Case ~~to pursue Avoidance Actions~~, if necessary.

4.    **Corporate Action.**  Prior to, on or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the interest holders or managers of the applicable Debtor shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable state law without any requirement of further action by the interest holders or managers of the applicable Debtor.

5.    **Post-Effective Date Fees and Expenses.**  From and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court pay the reasonable fees and expenses of Professionals thereafter incurred by the Debtors and the Reorganized Debtors, as the case may be, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

6.    **Payment of Statutory Fees.**  All fees payable pursuant to section 1930 of the title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in Cash equal to the amount of such fees on the Effective Date.  The applicable Reorganized Debtor shall timely pay post-confirmation quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) until such time as the Bankruptcy Court enters a final decree closing the Chapter 11 Case, or enters an Order either converting this Chapter 11 Case to a case under chapter 7 or dismissing this Chapter 11 Case.

7.    **Severability of Plan Provisions.**  If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, solely at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

8.    **Revocation or Withdrawal of the Plan.**  The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date.  If the Debtors revoke or withdraw the Plan before the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against, or any Equity Interests in, any of the Debtors, or any Avoidance Actions or Causes of Action or other claims by or against any of the Debtors, the Creditor's Committee, or any Person or Entity or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

9.    **Successors and Assigns and Binding Effect.**  The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such Person or Entity, including, but not limited to, the Reorganized Debtors and all other parties-in-interest in the Chapter 11 Case.

10.    **Substantial Consummation.**  Upon the Debtors making the payments required on the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

11.    **Notices.**  All notices, requests and demands to or upon the Debtors to be effective will be in writing and, unless otherwise expressly provided herein or in the Plan, will be

51689/0001-9739776v310

deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| | |
|---|---|
| If to the Debtor: | 710 Long Ridge Road Operating Company II, LLC, *et al.*, 173 Bridge Plaza North Fort Lee, New Jersey 07024 Attention:  Mr. Victor Matthew Marcos |
| with copies to: | Cole, Schotz, Meisel, Forman & Leonard, P.A. 25 Main Street P.O. Box 800 Hackensack, New Jersey 07602-0800 Attention:  Michael D. Sirota, Esq. |
| If to the Creditors' Committee: | Porzio Bromberg & Newman P.C. 100 Southgate Parkway Morristown, NJ 07960-6465 Attention:  Warren Martin, Esq. |

12.     **Governing Law.**  Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New Jersey, without giving effect to the principles of conflicts of law of such jurisdiction.

13.     **Plan Supplement.**  Forms of all material agreements or documents related to the Plan, if any, including but not limited to those identified in the Plan, shall be contained in the Plan Supplement.  The Plan Supplement, if applicable, shall be filed by the Debtors with the Clerk no later than five (5) days before the Voting Deadline and may be modified thereafter. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk during normal court hours.  Holders of Claims, or Equity Interest may obtain a copy of the Plan Supplement upon written request to the Debtors' counsel.

14.     **Section 1145 Exemption.**  Pursuant to section 1145(a) of the Bankruptcy Code, the offer, issuance, transfer or exchange of any security under the Plan, or the making or delivery of an offering memorandum or other instrument of offer or transfer under the Plan, shall be exempt from Section 5 of the Securities Act of 1933 or any similar state or local law requiring the registration for offer or sale of a security or registration or licensing of an issuer or a security.

## IV.     VOTING AND CONFIRMATION PROCEDURES

The following is a brief summary regarding the acceptance and confirmation of the Plan.  Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.  Additional information regarding voting procedures is set forth in the notice accompanying this Disclosure Statement.

A.    **Voting Instructions**

A Ballot to be used for voting on the Plan is being distributed to Holders of Claims in the Voting Classes.  Only Holders in the Voting Classes are entitled to vote to accept or reject the Plan and may do so by completing the Ballot and returning to the address provided below.  **Please carefully review the instructions enclosed with the Ballot prior to voting.**  It is important for all Creditors that are entitled to vote on the Plan to exercise their right to vote to accept or reject the Plan.  Even if you do not vote to accept the Plan, you may be bound by the Plan if it is accepted by the requisite Holders of Claims and confirmed by the Bankruptcy Court.

BALLOTS CAST BY HOLDERS IN THE VOTING CLASSES MUST BE RECEIVED BY THE DEBTORS' CLAIMS AND NOTICE AGENT BY 5:00 P.M. (PREVAILING EASTERN TIME) ON ———— **JANUARY 23**, ——**2014** AT THE FOLLOWING ADDRESS:

> Logan & Company, Inc.
> Attention: 710 Long Ridge Road Operating Company II, LLC
> 546 Valley Road, Upper Montclair, New Jersey 07043

ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED.

By signing and returning a Ballot, each Holder of a Claim in a Voting Class also will be acknowledging and/or certifying to the Debtors and to the Bankruptcy Court that, among other things that (i) he/she/it has been provided with a copy of the Disclosure Statement, (ii) as of the Record Date, he/she/it is the holder of a Claim in the applicable Class or the authorized agent of such a holder and (iii) he/she/it has full power and authority to vote to accept or reject the Plan.

B.    **Proposed Procedure for Tabulating Votes**

Solely for the purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, a claim, and without prejudice to the rights of the Debtors in any other context, the Debtors will propose that each holder of a claim that is entitled to vote to accept or reject the Plan be entitled to vote the liquidated, non-disputed, non contingent amount of such claim as set forth on the Schedules unless such holder has timely filed a proof of claim, in which event such holder would be entitled to vote the amount of  such claim as set forth in such proof of claim.  The foregoing general procedure will be subject to the following exceptions:

(a)    if a claim for which a proof of claim has been timely filed is marked as, or is by its terms, contingent, unliquidated or disputed on its face, or the claim for which a proof of claim has been timely filed is listed as contingent, unliquidated or disputed on the Schedules, either in whole or in part, such claim shall be temporarily disallowed for voting purposes;*the Debtors have filed and served an objection to a claim,* **the Holder of such claim shall have the opportunity to file a Rule 3018(a) Motion seeking temporary allowance of its claims for voting purposes;**

49

(b)      if a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim shall be temporarily allowed in the amount so estimated or allowed by the Court;

(c)      ~~if *the Debtors have filed and served an objection to a claim,* such claim shall be temporarily disallowed for voting purposes;~~

**(c)**      ~~(d)~~ each entity that holds or has filed more than one (1) unsecured claim against the Debtors shall not be entitled to aggregate such unsecured claims for purposes of voting, classification and treatment under the Plan; and

**(d)**      ~~(e)~~ if an individual files a claim covering the same claim filed by a class, association or other representative, only the class representative, association or other purported representative shall be entitled to vote and the individual claim shall be disallowed for voting purposes;

## C.      **Voting Record Date**

The Voting Record Date for purposes of determining which Holders of Claims are entitled to vote on the Plan is **December [    ], 2013**.  As of the close of business on the Voting Record Date, the claims' register will be closed, and there will be no further changes in the record Holders of any Claims.  The Debtor will not have any obligation to recognize any transfer of any Claims occurring after the Voting Record Date.  The Debtors will instead be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the claims' register as of the close of business on the Voting Record Date.

## D.      **Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing.  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing ~~for_____,____~~ **to commence January 30, 2014**, at ~~__:___~~ **10:00 a**.m. (Prevailing Eastern Time) before the Honorable Donald H. Steckroth, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of New Jersey, Martin Luther King, Jr. Federal Building, 50 Walnut Street, 3rd Floor, Newark, New Jersey 07102, Courtroom 3B.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.

Objections to confirmation of the Plan must be filed and served on or before ~~_____~~ **January 20,** ~~____~~ **2014**, at ~~__:___~~ **5:00 p**.m. (Prevailing Eastern Time) (the "**Plan Objection Deadline**") in accordance with the Confirmation Hearing notice served on you.  Any objection must, among other things,  (i) be made in writing; (ii) specify in detail the name and address of the objector, (iii) specify all grounds for the objection and (iv) specify the amount of the Claim or Equity Interest held by the objector.  Any such objection must be filed with the Bankruptcy Court and served on the Debtors' counsel and all parties who have filed a notice of appearance by ~~__:___.m. (Prevailing Eastern Time) on _____, ____~~ **the Plan Objection Deadline**.

50

UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE PROCEDURES SET FORTH IN THE CONFIRMATION HEARING NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### E.   Additional Information

Any questions regarding voting procedures or a request for an additional copy of the Disclosure Statement, the Plan, or any exhibits to such documents should be directed to (i) Logan & Company, Inc., Attention 710 Long Ridge Road Operating Company II, LLC, 546 Valley Road, Upper Montclair, New Jersey 07043, or (ii) the Debtors' counsel (a) via e-mail at fpisano@coleschotz.com; (b) via mail at Court Plaza North, 25 Main Street, Hackensack, NJ 07601; (c) via telephone at (201) 489-3000; or (d) via facsimile at (201) 489-1536.

## V.   REQUIREMENTS FOR CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan, in which event the Bankruptcy Court will enter an order confirming the Plan.

The Debtors believe that the Plan satisfies all of the statutory requirements for confirmation and, prior to the Confirmation Hearing, will submit pleadings and evidence demonstrating that the Plan complies with such requirements. The following subsections discuss some of the most important requirements of Section 1129(a) of the Bankruptcy Code.

### A.   Acceptances Necessary to Confirm Plan

As a condition to confirmation of the Plan, the Bankruptcy Code requires each Class of Impaired Claims to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, holders of Claims in each of the Voting Classes will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number of the Claims actually voting in each Class cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a Plan.

Holders of Claims in Classes 1, 4 and 8 are conclusively presumed to have accepted the Plan and thus are not entitled to vote.

### B.   Feasibility of the Plan

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to confirmation, that confirmation of the Plan is not likely to be followed by the liquidation or the need for further reorganization of the Debtors. This requirement is commonly referred to as "feasibility."

To support its belief in the feasibility of the Plan, the Debtors have relied upon the Projections, which are annexed to this Disclosure Statement as Appendix C, and the

commitments of, among others, the Backstop Funder.  The Projections were reviewed by the Debtors' financial advisor, Alvarez & Marsal.  **The Backpay Claim, to the extent ultimately Allowed will be paid from the Plan Distribution Contribution Amount and, therefore, is not required to be addressed in the Projections.  These Projections also do not reflect any Allowed Priority Backpay Claim.**

As set forth in the Projections, the Reorganized Debtors' cash flows from the operations of their businesses will be utilized to satisfy their debt service obligations and to fund their operations.  To the extent those operations result in shortfalls for which a Reorganized Debtor is unable to meet its obligations, as is projected, the Backstop Funder has agreed**, under certain conditions,** that to the extent of any insufficiency, funds shall be advanced to the applicable Debtor by the Backstop Funder or, as determined by the Debtors in their sole discretion, any member of the Plan Sponsor Group at the option of the advancing Debtor, as applicable**, provided such member of the Plan Sponsor Group is agreeable**.  Specifically, for so long as each applicable Debtor or Reorganized Debtor shall continue to own and operate a Facility, and subject to the terms of the CBA Rejection Order, the Backstop Funder shall make such funds available to the applicable Debtor to meet operating shortfalls solely to the extent identified in **projections attached to** the CBA Rejection Order.  Accordingly, the Debtors believe the Plan satisfies the feasibility requirement.

The Projections cover the operations of the Reorganized Debtors through calendar year 2018.  The Projections are based on numerous assumptions, including the entry of ~~the~~ the CBA Rejection Order, confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtors; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtors' retention of key management and other key employees; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors.  Accordingly, the Projections are only estimates and are necessarily speculative in nature.  It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time.  In light of the foregoing, readers are cautioned not to place undue reliance on the Projections.  The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts.  The Projections have not been, audited, reviewed, or compiled by the any independent public accountants.  The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors, or any other Person that the Projections can or will be achieved.

The Projections should be read together with the information in Article VI of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Projections.

The Debtors do not intend to update or otherwise revise the Projections, including any revisions to reflect, events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Projections to reflect changes in, general economic or industry conditions.

The Debtors will face a number of risks with respect to their continuing business operations upon emergence from Chapter 11, including but not limited to, the following: the Debtors' ability to improve profitability and generate positive operating cash flow; the overall condition of the managed care industry; potential changes in federal, state or local laws or regulations; and changes in accounting standards, taxation requirements and bankruptcy laws.

C.   **Best Interests Test**

As noted above, even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 cases and the Chapter 11 cases. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtors in its Chapter 11 Case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of these Chapter 11 cases. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of executory

contracts and unexpired leases and thereby enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

1.      **Liquidation Analysis**

A liquidation analysis prepared with respect to the Debtors is attached as Appendix D to this Disclosure Statement. The Debtors believe that any liquidation analysis is speculative. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims. This estimate is based solely upon the Debtors' review of the Debtors' books and records and Claims filed as of the date of the Disclosure Statement. As of the preparation and filing of this Disclosure Statement, the Debtors have not been able to complete their analysis of all of the Claims in these Chapter 11 cases. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

The Debtors believe the methodology used to prepare the liquidation analysis attached hereto as Appendix D is appropriate and that the assumptions and conclusions set forth therein are fair and reasonable under the circumstances and represent a reasonable exercise of the Debtor's business judgment with respect to such matters.

2.      **Application of the "Best Interests Test" to the Liquidation Analysis**

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtors believe that taking into account the liquidation analysis, the Plan meets the "Best Interests Test" of Section 1129(a)(7) of the Bankruptcy Code. The Debtors believe that the holders of Claims in Impaired Classes will receive at least as much under the Plan than they would in a liquidation in a hypothetical Chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Debtors as a going concern rather than a forced liquidation will allow realization of more value for the Debtors' assets. Moreover, as a result of the reorganization of the Debtors, creditors such as the Debtors' employees and service providers would retain their jobs and relationships with the Debtors, as applicable, and most likely make few, if any, other claims against the estate. Lastly, in the event of liquidation, the aggregate amount of unsecured claims which would receive no distribution would no doubt increase significantly. All of these factors lead to the conclusion that recoveries under the Plan would be at least as much, and indeed significantly greater, than the recoveries available in a Chapter 7 liquidation.

D.    **Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative**

The Plan may be confirmed, even if it is not accepted by all of the Impaired Classes, if the Debtors show that the Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to each Impaired Class that has rejected the Plan and at least one Impaired Class has accepted the Plan.  Provision for such confirmation is set forth in section 1129(b) of the Bankruptcy Code and is commonly referred to as "cramdown."  The cramdown provisions are complex and this summary is not intended to be a complete statement of the law in this area.  The Debtors will seek to confirm the Plan notwithstanding the nonacceptance or deemed nonacceptance of the Plan by any Impaired Class of Claims.

1.    **No Unfair Discrimination**

A plan "does not discriminate unfairly" if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class.

The Debtors believe that under the Plan: (i) all Impaired Classes of Claims are treated in a manner that is consistent with the treatment of other Classes of Claims with which their legal rights are similar, if any, and (ii) no Class of Claims will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims in such Class.  Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class.

2.    **Fair and Equitable Test**

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims, and interests as follows:

a.    **Secured Claims**

The fair and equitable test for secured claims, which is applicable to Classes 2, 3 and 4, is that the plan provides: (i) that the holders of secured claims retain the liens in the property securing such claims to the extent of the allowed amount of such claims, and receive on account of such claims deferred cash payments totaling at least the allowed amount of such claims, of a value, as of the effective date of the plan, of at least the value of such holders' interest in the estate's interest in such property; (ii) for the sale of any property subject to the liens securing such claims, free and clear of such liens, with the liens attaching to the proceeds of such sale, and such liened proceeds being treated either pursuant to (i) or (iii); or (iii) for the realization by such holders of the indubitable equivalent of such claims.

The treatment proposed for Classes 2, 3 and 4 satisfies the fair and equitable test and can be crammed down, if necessary.

b.    **Unsecured Claims**

The fair and equitable test for unsecured claims, which is applicable to Classes 1, 5, 6 and 7, is that the plan provides: (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of

55

the plan, equal to the allowed amount of such claim or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.  The latter requirement is known as the "absolute priority rule" and a plan that violates the absolute priority rule *per se* is not "fair and equitable" and cannot be confirmed.

However, courts recognize a "new value" exception to the absolute priority rule, which provides that even if unsecured creditors are not paid in full, equity may receive or retain property under the plan if it makes a contribution of "new value."  A contribution sufficient to overcome the absolute priority rule must be: (i) in the form of money or money's worth; (ii) reasonably equivalent to the interest retained or received by the equity holders; and (iii) necessary for the debtor's reorganization.

**As described herein, the Backstop Funder has agreed to make significant contributions necessary for the Debtors' reorganization, subject to the terms set forth in the Backstop Funding Agreement.  Those commitments – for which the Backstop Funder has no legal obligation to undertake – include (i) the funding of the Plan Distribution Contribution Amount (which totals $500,000), (ii) such funding as is necessary to meet operating shortfalls as described above (which are projected to exceed $8 million over the 4-year period set forth in the Proposed CBA Rejection Order), and (iii) consistent with Section III.  C.1 above, advancing such funds to the Debtors, as necessary, to meet the Debtors' obligations under the Plan, which shall include the Backstop Funder's agreement to back stop the Distributions due to the Holders of Allowed Class 5 Claims (which the Debtors estimate will require payments in the 12 months following the Effective Date of approximately $3 million).[17]  Moreover, the Debtors are negotiating the terms of a supplemental debtor-in-possession financing arrangement with the Backstop Funder and another related party, for which the Debtors intend to seek approval shortly.  Under the terms of that proposed financing, the related lenders (including the Backstop Funder) will agree to provide a $2 million subordinate, unsecured administrative expense priority revolving credit facility to the Debtors to supplement the current borrowings permitted under the DIP Loan.  The Debtors anticipate that they will be required to draw upon that facility up to the entire $2 million available thereunder.  It is contemplated that upon the Effective Date, the lenders thereunder (which includes the Backstop Funder) will forego payment and instead agree to convert these potential Administrative Expense Claims into membership or other equity interests of the Debtors, thereby relieving the Debtors' estate of the obligation to pay a potential $2 million Administrative Expense Claim.**

**Moreover, as was described in detail in the 1113 Motion, members of the Plan Sponsor Group have substantial Claims that will be waived as of the Effective Date.  As set forth in the Declaration of Victor Matthew Marcos, dated September 25, 2013, submitted with the 1113 Motion (the "Marcos 1113(c) Decl."), in response to the significant pre-Commencement Date losses discussed above, Care Realty, LLC advanced funds to**

---

**[17]  The Backstop Funder's agreement to back stop the Distributions due to Holders of Allowed Class 5 Claims shall not be subject to material conditions not identified herein, including, but not limited to, any future determination(s) by the Debtors to sell or discontinue their respective businesses.**

cover operating losses.  (Marcos 1113(c) Decl. ¶ 10.)  In addition, other members of the Plan Sponsor Group agreed to forgo rent and management fees.  (Id.)  Specifically, as set forth in the 1113 Motion, the below chart highlights that certain members of the Plan Support are owed $44,293,802 for non-payment of rent, management and information technology fees and working capital advances made to the Debtors:

| Creditor | Long Ridge | Newington | Westport | West River | Danbury | Total |
|---|---|---|---|---|---|---|
| Affiliated Landlords (rent) | $3,853,402 | $2,017,416 | $1,400,986 | $1,410,012 | $4,707,622 | $13,389,438 |
| Care Realty, LLC (working capital advances) | $11,610,759 | $0 | $5,046,527 | $4,520,064 | $3,982,768 | $25,160,118 |
| HealthBridge Management, LLC (management and IT fees) | $1,112,786 | $935,024 | $1,147,993 | $515,955 | $2,032,488 | $5,744,246 |
| Total | $16,576,947 | $2,952,440 | $7,595,506 | $6,446,031 | $10,722,878 | $44,293,802 |

(Marcos 1113(c) Decl. ¶ 10.).

While the waiver of these Claims is significant and will substantially increase Distributions for other Holders of Allowed General Unsecured Claims, of particular note is the agreement of the Affiliated Landlords to waive more than $13 million to which they would be entitled on account of a "cure" payment.  Section 365 of the Bankruptcy Code requires that upon the assumption of a lease, the debtor is required to promptly "cure" in full all defaults existing under that lease.  Thus, upon the assumption of the Lease Agreements, which of course is necessary to continue the Debtors' operations, the Affiliated Landlords would be entitled to payment of the $13 million "cure" payment.  In other words, this cure obligation is not one that is treated like other General Unsecured Claims that are to receive Distributions over time (and in many cases at fractional pennies on the dollar).  The Debtors simply do not have $13 million to "cure" the defaults under the Lease Agreements.  Thus, the waiver of this cure payment is necessary for the Debtors to reorganize.

Here, in light suffice it to say, the value of the substantial new value contribution by the Holder of Class 8 Equity Interests Backstop Funder and the other members of the Plan Sponsor Group, including the Parent Companies, the Management Company, the Backstop Funder and the Affiliated Landlords in the form of a waiver of claims and cure amounts, funding of the Plan Distribution Contribution Amount and the agreement to fund operating shortfalls going forward is, by any objective means, considerable.  In light of these substantial new value contributions, the new value exception to the absolute priority rule is satisfied.  Therefore, the treatment proposed for Class 8 satisfies the fair and equitable test and can be crammed down, if necessary.

E.    Other Requirements of Section 1129

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied.  If so, the Bankruptcy

Court will enter the Confirmation Order.  The Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

• The Plan complies with the applicable provisions of the Bankruptcy Code.

• The Debtors, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

• The Plan has been proposed in good faith and not by any means forbidden by law.

• Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, these Chapter 11 cases, or in connection with the Plan and incident to the Chapter 11 cases, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after the confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

• With respect to each Class of Impaired Claims, either each Holder of a Claim of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code.

• Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to Section 1129(b) of the Bankruptcy Code.

• Except to the extent that the Holder of a particular Claim will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as soon thereafter as practicable.

• At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class.

• All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

The Debtors believe that (a) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (b) the Debtors have complied or will have complied with all of the requirements of Chapter 11, and (c) the Plan has been proposed in good faith.

## VI.    CERTAIN RISK FACTORS TO BE CONSIDERED

The following is intended as a summary of certain material risks associated with the Plan.  The holders of Claims against the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement and the Plan before deciding whether to vote to accept or reject the Plan.  Furthermore, these risk factors

should not be regarded as constituting the only risks associated with the Plan and its implementation.

A.    **Certain Bankruptcy Considerations**

The Debtors cannot guarantee that it will secure confirmation of the Plan.  Even if all voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan.  Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting holders of Claims will not be less than the value such holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Debtors' future results are dependent upon the successful confirmation and implementation of a plan of reorganization.  Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results, as the Debtors' ability to obtain financing to fund its operations and its relations with service providers may be harmed by protracted bankruptcy proceedings.  Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for its liabilities that will be subject to a plan of reorganization.  Once a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and service providers to do business with a company that recently emerged from a bankruptcy proceeding.

Furthermore, any objection to the Plan by a party-in-interest could either prevent, or delay for a significant period of time, confirmation of the Plan.

B.    **Inherent Uncertainty in Claims Estimation**

There can be no assurance that any estimated Claim amounts in this Disclosure Statement are correct.  The number and amount of Claims estimated under the Plan could increase.  The Debtors and their advisors have estimated a certain dollar value of the Debtors' liabilities for purposes of allocating distributions to Holders of Claims under the Plan.  Although these are good faith estimates as of the date of the Plan, there can be no certainty that either unknown liabilities may arise or the aggregate value of liabilities may increase.  **In particular, the amount of the Backpay Claims, if Allowed, may affect the recovery of other Class 6 Claims.**  If the estimated value assumed by the Debtors underestimate actual liabilities or claims arise that result in an increase in the dollar value of the Debtors' aggregate liabilities, the level of recovery for Holders of Claims could be negatively impacted.

C.    **Inherent Uncertainty of Projections**

The Projections set forth in the attached <u>Appendix C</u> cover the operations of the Reorganized Debtors through calendar year 2018.  These Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtors; industry performance; no

59

material adverse changes in applicable legislation or regulations, or the administration thereof, no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtors' retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors.  Accordingly, the Projections are only estimates and are necessarily speculative in nature.  It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time.  In light of the foregoing, readers are cautioned not to place undue reliance on the Projections.  The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants.  The Projections have not been audited, reviewed, or compiled by an independent public accountants.  The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors, or any other Person that the Projections can or will be achieved.

## D.    Operational Risk Factors

The Debtors face a number of risks with respect to their continuing business operations, including but not limited to the following:  the overall condition of the managed care industry; potential changes in federal, state or local laws or regulations; and changes in accounting standards, taxation requirements and bankruptcy laws.

## E.    Satisfaction of Conditions to Effective Date

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

## F.    Leverage

The Debtors believe that they will emerge from Chapter 11 with a reasonable level of debt that can be effectively serviced in accordance with their business plan.  Circumstances, however, may arise which might cause the Debtors to conclude that they are overleveraged, which could have significant negative consequences, including:  (1) it may become more difficult for the Reorganized Debtors to satisfy their obligations; (2) the Reorganized Debtors may be vulnerable to a prolonged downturn in the market in which it operates or a prolonged downturn in the economy in general; (3) the Reorganized Debtors may be required to dedicate a substantial portion of its cash flow from operations to fund working

capital, capital expenditures, and other general corporate requirements; and (4) the Reorganized Debtors may be limited in borrowing additional funds.

Additionally, there may be factors beyond the control of the Reorganized Debtors that could impact their ability to meet debt service requirements.  The ability of the Reorganized Debtors to meet debt service requirements will depend on their future performance. The Debtors can provide no assurance that the business of the Reorganized Debtors will generate sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable the Reorganized Debtors to satisfy their indebtedness or to fund other liquidity needs (to the extent necessary in addition to the commitments of the Backstop Funder).  Moreover, the Reorganized Debtors may need to refinance all or a portion of their indebtedness on or before maturity.  The Debtors cannot make assurances that the Reorganized Debtors will be able to refinance any of their indebtedness on commercially reasonable terms or at all.  If the Reorganized Debtors are unable to make scheduled debt payments or comply with the other provisions of their debt instruments, their lenders will be permitted under certain circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

### G.    Litigation

The Reorganized Debtors will be subject to various claims and legal actions arising in the ordinary course of their businesses**, including litigation involving the Backpay Claims of the Union and the NLRB before the National Labor Relations Board, the Bankruptcy Court and other Federal Courts**.  The Debtors are not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Reorganized Debtors.

### H.    Certain Tax Considerations

There are a number of income tax considerations, risks, and uncertainties associated with consummation of the Plan.  Interested parties should read carefully the discussions set forth in Section VII of this Disclosure Statement regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtors and the Reorganized Debtors and to certain holders of Claims who are entitled to vote to accept or reject the Plan.

51689/0001-9739776v310

## VII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**IRS Circular 230 disclosure:  To ensure compliance with requirements imposed by the IRS, you are hereby notified that: (a) any discussion of U.S. federal tax issues in this Disclosure Statement (including all appendices thereto) is not intended or written be relied upon, and cannot be relied upon, by creditors for the purpose of avoiding penalties that may be imposed on such creditors under the Internal Revenue Code; (b) such discussion is not written in connection with the promotion or marketing of the transactions or matters addressed herein; and (c) each creditor should seek advice based on its particular circumstances from an independent tax advisor.**

### A.   General

The following discussion addresses certain United States federal income tax consequences of the consummation of the Plan.  This discussion is based upon the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), existing and proposed regulations thereunder, current administrative rulings, and judicial decisions as in effect on the date hereof, all of which are subject to change, possibly retroactively.  No rulings or determinations by the Internal Revenue Service have been obtained or sought by the Debtors with respect to the Plan.

An opinion of counsel has not been obtained with respect to the tax aspects of the Plan.  This discussion does not purport to address the federal income tax consequences of the Plan to particular classes of taxpayers (such as foreign persons, S corporations, mutual funds, small business investment companies, regulated investment companies, broker-dealers, insurance companies, tax-exempt organizations and financial institutions) or the state, local or foreign income and other tax consequences of the Plan.

NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST.  SUBSTANTIAL UNCERTAINTY EXISTS WITH RESPECT TO THE TAX ISSUES DISCUSSED BELOW.  EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

### B.   Certain U.S. Federal Tax Consequences to the Debtors

The Debtors' businesses are operated through limited liability companies (the "**LLCs**") which are owned by related entities.  Based upon discussions with the Debtors, the LLCs are "disregarded entities" for income tax purposes and therefore, it pays no income tax and the income or loss passes through and is reported entirely on the 100% owner's tax returns.  To the best of our knowledge and upon information and belief, the LLCs do not owe any income taxes, and there are no past due employment taxes or other ancillary taxes.  As a result of this structure, the Debtors do not anticipate any federal or state tax consequences associated with implementing the Plan.

C.      **Certain U.S. Federal Tax Consequences to the Holders of Claims and Equity Interests**

A Holder of an Allowed Claim or Equity Interest will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on a Claim but was not previously paid by the Debtors or included in income by the Holder of the Allowed Claim or Equity Interest. A Holder of an Allowed Claim or Equity Interest will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Claim and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest. The amount realized will equal the sum of Cash and the fair market value of other consideration received (or to be received). The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the Holder of the Claim, the nature of the Claim or Equity Interest in its hands, whether the Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the Claim, and the creditor's holding period of the Claim or Equity Interest. If the Claim or Equity Interest in the creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Holder of the Claim is a non-corporate taxpayer and held such Claim or Equity Interest for longer than one year or short-term capital gain or loss if the Holder of the Claim held such Claim or Equity Interest for less than one year.

A Holder of an Allowed Claim or Equity Interest who receives, in respect of its Claim, an amount that is less than its tax basis in such Claim or Equity Interest may be entitled to a bad debt deduction if either: (i) the Holder is a corporation; or (ii) the Claim or Equity Interest constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the Holder or (b) a debt the loss from the worthlessness of which is incurred in the Holder's trade or business. A Holder that has previously recognized a loss or deduction in respect of its Claim or Equity Interest may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Claim or Equity Interest. Holders of Claims or Equity Interests who were not previously required to include any accrued but unpaid interest with respect to in their gross income on a Claim or Equity Interest may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. Holders previously required to include in their gross income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

D.      **Importance of Obtaining Professional Tax Assistance**

The foregoing is intended to be only a summary of certain of the United States federal income tax consequences of the Plan and not a substitute for careful tax planning with a tax professional. Holders of Claims or Equity Interests are strongly urged to consult with their own tax advisors regarding the federal, state, local and foreign income and other tax consequences of the Plan, including, in addition to the issues discussed above, whether a bad debt deduction may be available with respect to their Claims and, if so, when such deduction or loss would be available.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING DISCUSSION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

The Debtors believe that the Plan affords holders of Claims and Equity Interests the greatest opportunity for recovery on account of their Claims and Equity Interests and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the hypothetical alternatives include (a) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code, or (b) an alternative plan of reorganization.

### A.    Liquidation under Chapter 7 or Chapter 11

If no plan can be confirmed, these Chapter 11 cases could be converted to cases under Chapter 7 of the Bankruptcy Code, in which a Chapter 7 trustee would be appointed to liquidate the remaining assets of the Debtors for distribution to the creditors in accordance with the priorities established by the Bankruptcy Code.  The trustee would retain professionals and liquidate the Debtors' remaining assets, and if necessary, investigate and pursue causes of action.  The Debtors believe that the conversion of these cases to Chapter 7 would increase the costs of administration, and reduce and delay the distribution to holders of Allowed Claims.  Further, any proceeds available to satisfy Claims would be paid in the priority established in the Bankruptcy Code – Secured Claims, Administrative Claims, Priority Claims, Priority Tax Claims, and General Unsecured Claims.  Under a Chapter 7 liquidation, the Debtors believe that any recovery to Allowed Claims in a Chapter 7 case would be less than that provided for under the Plan.  For the reasons noted above, the Debtors have concluded that holders of Allowed Claims are more likely than not to receive an amount under the Plan that is more than the amount such holder would receive under a Chapter 7 liquidation.

### B.    Alternative Plan(s) of Reorganization

If the Plan is not confirmed, the Debtors or any other party-in-interest could attempt to formulate a different plan.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of assets, or a combination of both.

The Debtors' business could suffer from increased costs and further liquidity difficulties if they remain as debtors-in-possession during a lengthy Chapter 11 process while trying to negotiate a plan.  The Debtors believe that the Plan enables holders of Claims and Equity Interests to realize the greatest possible value under the circumstances and that, compared

to any later alternative plan of reorganization, the Plan has the greatest chance to be confirmed and consummated.

## IX.    <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives above because it will result in the greatest recoveries to holders of Claims and Interests.  Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.

Consequently, the Debtors urge all holders of Claims entitled to vote to <u>ACCEPT</u> the Plan, and to evidence their acceptance by duly completing and returning their Ballots so that they are actually received by Logan & Company, Inc. on or before ~~__:__~~ **5:00 p**.m. (Prevailing Eastern Time) on ~~_____, _____~~**January 23, 2014**.


Dated: ~~October 22~~**December 10**, 2013

<div style="margin-left:40%">

710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*


By:____*/s/ Victor Matthew Marcos*_____
    Name:  Victor Matthew Marcos

**Counsel:**

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.

By: ____*/s/ Michael D. Sirota*_____
    Michael D. Sirota
    Court Plaza North
    25 Main Street
    P.O. Box 800
    Hackensack, NJ 07602-0800
    (201) 489-3000
    (201) 489-1536 (Fax)

*Attorneys for 710 Long Ridge Road Operating Company II, LLC, et al.*

</div>

66