ABBY PROPIS SIMMS
Nancy E. Kessler Platt
Dawn L. Goldstein
Paul A. Thomas
Marissa A. Wagner
Edward D. Swidriski III
Julie Kaufman
1099 14th Street, NW
Washington, DC 20570
(202) 273-2930
Counsel for the National Labor Relations Board

| | |
|---|---|
| In re: | ) UNITED STATES BANKRUPTCY COURT |
| | ) FOR THE DISTRICT OF NEW JERSEY |
| 710 LONG RIDGE ROAD OPERATING | ) CASE NO. 13-13653 (DHS) |
| COMPANY II, LLC, et al.,[1] | ) |
| | ) Hearing Date and Time: |
| | ) January 30, 2013, at 10:00 a.m. |
| | ) |
| Debtors-in-Possession. | ) |
| | ) |

**OBJECTIONS OF THE NATIONAL LABOR RELATIONS BOARD
TO DEBTORS' FIRST AMENDED PLAN OF REORGANIZATION AND TO
DEBTORS' MOTION TO CONFIRM AMENDED PLAN OF REORGANIZATION**

The National Labor Relations Board (the "NLRB" or the "Agency")[2] hereby objects to

the proposed Amended Plan of Reorganization of 710 Long Ridge Road Operating Company II,

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal
identification number are: 710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge
of Stamford (4809), 240 Church Street Operating Company II, LLC d/b/a Newington Health
Care Center (4730), 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center
(4839), 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center
(4716) and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center
(4676).

[2] Hereinafter, any reference to the "NLRB" or the "Agency" shall mean the National Labor
Relations Board as an institutional whole, including the Board, the General Counsel, and their
delegees.  Any reference to the "Board" shall mean the five-member body created by Section
3(a) of the National Labor Relations Act("NLRA"), 29 U.S.C. § 153(a). Any reference to the

LLC d/b/a Long Ridge of Stamford, et al. (the "Debtors") filed on October 22, 2013 (Dkt. No.

605) and amended on December 10, 2013(Dkt. No. 759) and January 17 (Dkt. No. 848) and 18

(Dkt. No. 851), 2014, and opposes Debtors' motion dated October 23, 2013 (Dkt. No. 609).

## SUMMARY OF ARGUMENT

The proposed Plan of Reorganization is a barely-concealed scheme by Debtors and their

corporate parents to insulate themselves from paying significant amounts of backpay to their

employees. As set forth below, the NLRB objects to Debtors' Plan because it fails to comply

with numerous provisions of the Bankruptcy Code.  Specifically, the Plan should not be

confirmed because it:

- Violates 11 U.S.C. § 1129(a)(2) because it contains nonconsensual nondebtor releases which are beyond the Bankruptcy Court's jurisdiction, and that, in any event, are impermissible because they fail to meet the minimum standards of fairness and necessity that are required for such releases;
- Fails to satisfy the best interest of creditors test under 11 U.S.C. § 1129(a)(7) because the nondebtor release provisions would prohibit the NLRB from pursuing monetary remedies from jointly liable third parties, leaving the NLRB worse off than under a liquidation;
- Violates 11 U.S.C. § 1129(b)(1) because it provides materially different recoveries for the Class 5 and Class 6 general unsecured creditors that are not in proportion to any reasonable basis that may allow some level of preferential treatment, and thus discriminates unfairly against Class 6;
- Violates the absolute priority rule under 11 U.S.C. § 1129(b)(2)(B)(ii) since old equity holders are retaining their equity interests in the reorganized Debtors while senior creditors remain impaired and the Debtors have failed to satisfy the requirements of the invoked "new value" exception;
- Fails to include reasonable measures that would ensure full payment of the NLRB's contingent administrative and priority claims should they eventually be allowed, in violation of 11 U.S.C. § 1123(a)(4), and for this reason, is also not feasible in violation of 11 U.S.C. § 1129(a)(11); and
- Violates 11 U.S.C. § 1129(a)(3) because it is proposed in bad faith, and appears to have been filed as a litigation tool to insulate nondebtor third parties (i.e. Debtors' parent companies) from liability.

---

"General Counsel" shall mean the officer created by Section 3(d) of the NLRA, 29 U.S.C. §
153(d), and his subordinates.

## STATEMENT OF FACTS

### I.   BACKGROUND

The factual background of the underlying unfair labor practice cases and this bankruptcy

case is treated more fully in the NLRB's Opposition to Debtors' Motion To Reject The

Continuing Economic Terms Of The Expired Collective Bargaining Agreements, Dkt. No. 675,

at 3-9 and Memorandum Of Law In Support Of Opposition To Debtors' Motion For Entry Of An

Order Granting Debtors' Omnibus Objections To The NLRB's Claims, Dkt. No. 844-1, at 2-7,

11-16.

### A.  Debtors





**B.  Unfair Labor Practice Cases**

The NLRB's claims against Debtors are premised upon three unfair labor practice proceedings now pending before the Agency.  The unfair labor practice cases stem from a longstanding labor dispute between Debtors and the New England Health Care Employees Union, District 1199, SEIU (the "Union") that began in 2010. In response to a series of unfair labor practice charges filed by the Union, the NLRB's Regional Office in Hartford, Connecticut issued a consolidated administrative complaint against the Debtors and Healthbridge

Management, LLC (Healthbridge) in case 34-CA-012715 et al. On August 1, 2012, NLRB

Administrative Law Judge ("ALJ") Steven Fish issued a decision finding that Healthbridge and

one or more of the Debtors had committed various violations of the NLRA. *HealthBridge Mgmt.*,

2012 WL 3144346, slip op. at 57 (Aug. 1, 2012 NLRB Div. of Judges). Debtors and

Healthbridge have filed exceptions to ALJ Fish's decision, which are currently fully briefed and

pending before the five-member Board in Washington, D.C.

In January 2011, the parties began negotiating a new collective bargaining agreement

(CBA) to replace the existing agreement that was set to expire in March 2011.  In connection

with these negotiations, the Union filed additional unfair labor practice charges. The Regional

Director issued a consolidated administrative complaint in Case 34-CA-070823 et al., alleging

that Debtors, Healthbridge, Care One LLC ("Care One"), and Care Realty, violated the NLRA.

An administrative hearing was opened on September 10, 2012, and remains ongoing.

Additionally, the NLRB filed a petition for temporary injunctive relief against Debtors and

Healthbridge under Section 10(j) of the NLRA (29 U.S.C. § 160(j)) in the United States District

Court for the District of Connecticut. *See* Dkt. No. 1, *Kreisberg v. HealthBridge Mgmt. LLC*, No.

3:12-CV-1299 (RNC) (D. Conn.). The Connecticut District Court granted the NLRB's 10(j)

petition. *Kreisberg v. HealthBridge Mgmt. LLC*, 2012 WL 6553103 at *10-12 (D. Conn. Dec. 14,

2012) (the "10(j) Order"). On October 15, 2013, the Second Circuit affirmed the decision of the

Connecticut District Court. *Kreisberg v. HealthBridge Mgmt. LLC*, 732 F.3d 131 (2d Cir. 2013).

On December 23, the Connecticut District Court then held Healthbridge in contempt of its order

for its deliberate refusal to restore terms and conditions of employment at the Debtor facilities.

Ruling and Order on Motion for Contempt, Case No. 3:12-cv-01299-RNC, Dkt. No. 111 (D.

Conn. Dec. 23, 2012).

Subsequently, two additional unfair labor practice charges were filed in this case. On September 28, 2012, the Regional Director issued another consolidated administrative complaint against Debtor Long Ridge and Healthbridge in Case 34-CA-073303 et al. By order dated November 1, 2013,[6] NLRB ALJ Raymond Green concluded that those entities terminated an employee for engaging in protected concerted activities in violation of the NLRA. *HealthBridge Mgmt.*, 2013 WL 5913968, slip op. at 6 (Nov. 1, 2013 NLRB Div. of Judges). Respondents filed exceptions to this decision on December 10, and the Acting General Counsel filed cross-exceptions on January 6, 2014, which are currently being briefed to the Board.

### C.  The Bankruptcy Case

On February 24, 2013, eight days prior to the date Debtors were expected to reinstate the striking employees under the pre-implementation terms and conditions of employment, as required by the 10(j) Order, Debtors filed the underlying Chapter 11 Petition. Dkt. No. 1. The next day, Debtors filed a Motion for temporary relief under 11 U.S.C. § 1113(e), seeking interim modifications of certain terms and conditions of employment for a 13-week period. Dkt. No. 15. This Court granted Debtors interim relief, Dkt. No. 65, and subsequently issued three additional orders extending the interim relief through January 10. Dkt. Nos. 230, 424, 706.[7] On September 25, the Debtors filed a Motion under 11 U.S.C. § 1113(c), seeking permanent "rejection" of terms of employment, which is currently pending before the Court. Dkt. No. 560. On December 18, the Debtors, the NLRB, and the Union agreed to extend Section 1113(e) interim relief

---

[6] Hereinafter all dates are in 2013, unless otherwise indicated.

[7] The NLRB and Union filed Motions for Leave to Appeal these orders. The first motion was granted by the District Court of Connecticut, but later vacated. Dkt. No. 822. The second motion was denied. *Id.* The NLRB intends to seek reconsideration of these orders. The third motion remains pending.

through January 30, 2014, to permit the Court more time to rule on the Debtors' 1113(c) Motion. Dkt No. 774.

The NLRB timely filed Proofs of Claim in order to protect its right to recover from Debtors if they are found to have violated the NLRA by final decision of the Board, or appropriate Court of Appeals. The NLRB filed claim numbers 218-222, which were timely received by the Claims Agent on August 22. The NLRB filed amended Proofs of Claim on November 21 (Claim Nos. 328-332).[8]. As of that date, the NLRB's total estimated pre-petition claim against all five Debtors is $14,636,536, of which $8,990,829 are wage and benefit priority claims pursuant to Sections 507(a)(4) and 507(a)(5), and the remaining amount is a general unsecured claim. The NLRB filed separate Proofs of Administrative Expense Claims (Claim Nos. 257-261) in the amount of $1,136,273, for the portion of Debtors' liability that is entitled to administrative priority pursuant to Section 503(b)(1)(A)(ii) of the Bankruptcy Code (11 U.S.C. § 503(b)(1)(A)(ii)), which were timely received by the Claims Agent on October 2.

## II.    THE PLAN

On October 22, Debtors filed a proposed Disclosure Statement and Plan of Reorganization. Dkt. Nos. 605, 606. On December 10, Debtors filed a First Amended Disclosure Statement and Plan of Reorganization ("the Plan"). Dkt. Nos. 758, 759. A First Amended Disclosure Statement was approved by the Court on December 11. Dkt. No. 763. Debtors made "non-material" modifications on January 17 and filed a Plan Supplement on January 18. Dkt. Nos. 848, 851. In pertinent part, the Plan provides as follows.

---

[8] The Board filed a first amended set of Proofs of Claim on November 18, 2013 (Claim Nos. 323-327) (the "First Amended Proofs of Claim"). Subsequent to filing the First Amended Proofs of Claim, the Board realized that some of the figures contained in those documents were inaccurate. Accordingly, the Board filed the Second Amended Proofs of Claim to correct those inaccuracies.

Sections 2.3-G, -H and -I of the Plan differentiate general unsecured claims into three categories. Plan at p. 35-38. Section 2.3-G provides that the Debtors will pay 75% of all claims (approximately $3 million) classified as "Ongoing Trade Vendor" claims in twelve monthly installments, or upon such other terms as the parties may agree to (Class 5). ██████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

██████

Section 2.3-H provides that Other General Unsecured Claims (Class 6) will be paid only a pro rata share of a fund of $500,000, to be provided by Care One. Plan at p.37; First Non-Material Modification, Dkt. No. 848. ████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

Such payment will be made only following the conclusion of the NLRB cases noted above.

Section 2.3-I provides that Intercompany Claims will be extinguished without payment.[9]

Section 2.3-J of the Plan provides that Equity Interests, currently held by parent companies of the

---

[9] ████████████████████████████████

████████████████████████████████

████████████████████████

Debtors, will be fully retained in exchange for forgiveness of Intercompany Claims and the

commitments contained in the Plan. Plan at p.38. Section 3.3 of the Plan indicates that Debtors

intend to "cram down" the plan under 11 U.S.C. § 1129(b) of the Bankruptcy Code if any

impaired class dissents from the Plan. *Id.* at p.39.[10]

Section 4.1 of the Plan indicates that the sole sources of funding for the plan are: assets of

the Debtors; funding from Care Realty under an agreement known as the "Backstop Funding

Agreement"; and voluntary contributions from certain affiliated entities known as the "Plan

Sponsor Group." *Id.* at p.41. ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████. Section 4.2 provides that Care Realty will fund any ongoing

operating losses up to only the amount specified in the Backstop Funding Agreement. Plan at

p.42. Care One will backstop payment of approximately $150,000 in administrative claims and

approximately $980,000 in professional expense claims if the Debtors are unable to pay. First

Amended Disclosure Statement, Dkt. No. 758, at pp.5-6. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ Section 7.1 provides that on the Plan Effective Date, the Debtors will assume their

lease contracts and the Landlords (a group of identically owned companies which hold the real

property that the Debtors operate from) will waive any right to require the Debtors to cure unpaid

rent amounts. Plan at 52.

---

[10] While voting has not yet taken place, it is a formality that this provision will be invoked as to
Class 6. The parties stipulated that the NLRB's claim will be temporarily allowed for voting
purposes in an amount sufficient to cause Class 6 to reject the plan, and the NLRB will be voting
to reject it. *See* Dkt. No. 838.

Section 9.2 of the Plan states that upon consummation of the Plan:

"for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim and/or Equity Interest that is entitled to receive a Distribution pursuant to the Plan shall be deemed to forever release . . . all claims, . . . causes of action, and liabilities whatsoever against any Affiliate of any Debtor . . . and any of the present or former shareholders, members, managers, directors, officers, employees or advisors of any of the Debtors or their respective Affiliates . . . in connection with or related to the Debtors, the conduct of the Debtors' businesses, the Chapter 11 Case, or the Plan (other than the rights under the Plan . . . ), whether liquidated or unliquidated . . . then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' businesses, the Chapter 11 Case, or the Plan . . ."

*Id.* at 61-62. Section 9.4 of the Plan provides that "On and after the Confirmation Date, all entities, creditors and equity and/or interest holders who have held, hold or may hold Claims against or Equity Interests in any of the Debtors, shall be enjoined, pursuant to section 105 of the Bankruptcy Code, from proceeding against any of the Releasees, for the collection of all or any portion of their Claim or Equity Interest or pursuing any Claim that is released pursuant to this Article IX . . ."[11] ███████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

## LEGAL STANDARD

Bankruptcy Code Section 1129 contains the standards for confirmation of a plan under Chapter 11. 11 U.S.C. § 1129; *see In re Sound Radio, Inc.,* 93 B.R. 849, 852 (Bankr. D.N.J.

---

[11] These Plan provisions will be generally referred to as the "nondebtor releases." or "third party releases."

1988).  In order for a plan of reorganization to be confirmed by the Court, it must generally

comply with each and every one of the thirteen requirements set forth in Section 1129(a).[12]  *See*

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 648 (2d Cir. 1988).

The burden of establishing these requirements lies with the proponents of the plan. *In re Greate*

*Bay Hotel & Casino, Inc.,* 251 B.R. 213, 221 (Bankr. D.N.J. 2000).  Further, while a plan's

proponent must satisfy its duty by proving compliance, "[t]he Code imposes an independent duty

upon the court to determine whether a plan satisfies each element of § 1129, regardless of the

absence of valid objections to confirmation." *Id.* (citing *In re Bolton,* 188 B.R. 913, 915 (Bankr.

D.Vt.1995)). In making this determination, the bankruptcy court "must consider the entire plan

in the context of ... the particular facts and circumstances [of the case]." *In re D & F*

*Construction, Inc.,* 865 F.2d 673, 675 (5th Cir.1989).

## ARGUMENT

## I.    THE PLAN OF REORGANIZATION IS UNCONFIRMABLE BECAUSE IT CONTAINS INVALID NONDEBTOR RELEASES

Section 9.2 of the Plan would release every affiliate, shareholder, officer or even

employee of the Debtors from any liability as a result of the NLRB's action against them.

Moreover, Section 9.4 of the Plan would enjoin the NLRB even from continuing to prosecute its

unfair labor practice case. This Court has neither subject matter jurisdiction nor statutory power

to issue any such order. Moreover, even if such authority existed, this Plan fails to satisfy the

well-settled bare minimum standards for such extraordinary relief. It does not even satisfy the

basic minimum requirement in Section 1129(a)(7) of the Bankruptcy Code that creditors not be

made worse off with reorganization than they would be if the debtor was liquidated, much less

---

[12] One of those prerequisites, 11 U.S.C. § 1129(a)(8), need not be satisfied if the requirements of
Section 1129(b) are met.

the far more demanding minimum standards for granting a nondebtor release as set forth by the Third Circuit. Accordingly, the releases in sections 9.2 and 9.4 of the Plan must be stricken (as well as any corresponding language in the remainder of the Plan).██████████████

██████████████████████████████

████████████

### A. The Nondebtor Releases Contained In The Plan Are Beyond This Court's Jurisdiction

nondebtorUnder Section 10(a) of the NLRA, the NLRB holds the exclusive power to prevent any person from engaging in unfair labor practices, a power which "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise." 29 U.S.C. § 160(a). The NLRB also holds exclusive power to order affirmative remedies where it has found an unfair labor practice to have been committed.[13] Jurisdiction to review NLRB decisions is vested exclusively in the Courts of Appeals. 29 U.S.C. § 160(f); *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959); *Nathanson v. NLRB*, 344 U.S. 25, 29 (1952); *see also Board of Governors of the Federal Reserve System v. MCorp Financial, Inc.*, 502 U.S. 32, 41-42 (1991) (holding that 28 U.S.C. § 1334(b) does not extend to administrative proceedings); *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 48 (1938), citing H.R. Rep. 1147, 74th Cong., 1st Sess., p. 24 (emphasis added) (NLRB's judicial review provision is intended to provide any aggrieved party "a full, expeditious, and <u>exclusive</u> method of review in one proceeding after a final order is made").

---

[13] *See* 29 U.S.C. § 160(c) (if the Board, after notice and hearing, is of the opinion that an unfair labor practice has been committed, it "shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action . . . as will effectuate the policies of [the NLRA]").

Consequently, the power of bankruptcy courts to affect unfair labor practice cases is strictly cabined. "The jurisdiction of a United States District Court in bankruptcy does not embrace the power to treat with a debtor's unfair labor practices which affect commerce. . . . [T]hat power is exclusive in the Board and unaffected 'by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise.'" *NLRB v. Baldwin Locomotive Works*, 128 F.2d 39, 44 (3d Cir. 1942). An NLRA case is brought by the United States enforcing its regulatory power to require a respondent to cease and desist from violating generally applicable federal labor law and to compensate affected parties for the unlawful acts.[14] Actual collection of money from a debtor is within a bankruptcy court's jurisdiction through its exclusive control over the *res* of the estate.[15] But bankruptcy courts otherwise have no authority over the NLRB's exercise of its exclusive jurisdiction to adjudicate NLRA violations and to fix the remedies for such violations. *See Nathanson*, 344 U.S. at 29 ("The fixing of back pay is one of the functions confided solely to the Board."); *In re Tucson*

---

[14] *NLRB v. Edward Cooper Painting, Inc.*, 804 F.2d 934, 939 (6th Cir. 1986).

[15] 28 U.S.C. § 1334(e)(1). Congress's intent to preserve the *res* of the estate against collection proceedings, but not to bar other law enforcement proceedings, is codified at 11 U.S.C. § 362(b)(4) (stay does not apply to government action "to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power") (emphasis added). Courts interpret this section to hold that NLRB proceedings are not subject to the automatic stay, much less to permanent termination. *Edward Cooper Painting*, 804 F.2d at 942; *NLRB v. Evans Plumbing Co.*, 639 F.2d 291, 293 (5th Cir. 1981). NLRB cases may be enjoined even *temporarily* only where a court determines that the proceeding would "threaten" the bankruptcy estate. This exception applies only to attempts by the NLRB to enforce a monetary judgment directly against the estate of a debtor in bankruptcy. 2 *Developing Labor Law* 2621-22 (John E. Higgins, Ed., 6th Ed. 2012). It is not a threat to the assets of a debtor's estate that the administrative proceedings may be costly for the debtor to defend against, nor even that a large priority liability against the estate may result. *In re Tucson Yellow Cab Co.*, 27 B.R. 621, 623 (B.A.P. 9th Cir. 1983). It follows that the possibility that such an expense may be incurred by a nondebtor certainly does not empower the Bankruptcy Court to give a nondebtor a release from liability under the NLRA.

14

*Yellow Cab*, 27 B.R. 621, 623 (B.A.P. 9th Cir. 1983) (emphasis added) ("[T]he award of back pay to the victims of unfair labor practices, while possibly becoming a monetary claim against a debtor's estate in bankruptcy, is more specifically aimed at rectifying the type of past employer or union misconduct over which the NLRB has been given <u>exclusive jurisdiction</u> by Congress").

Had Congress intended to create an exception to the bedrock principle set forth in Section 10(a) of the NLRA, and thereby permit bankruptcy courts to dictate what unfair labor practice allegations the NLRB can adjudicate and seek to remedy, it would have said so in explicit terms. In fact, the opposite is true. Congress has expressly required that a trustee or debtor-in-possession must operate its business in accordance with generally applicable law.[16] Two well-established canons of statutory construction weigh against finding in the Bankruptcy Code any jurisdiction to interfere with the NLRB's prosecutions. First, courts lack jurisdiction to hear cases against the United States or its agencies except where it has waived sovereign immunity. 11 U.S.C. § 106(a)waives sovereign immunity as to orders issued under 11 U.S.C. § 105. Section 105 provides that a bankruptcy court may issue orders "necessary or appropriate to carry out the provisions of" the Bankruptcy Code. But sovereign-immunity waivers are to be narrowly construed. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34 (1992). Thus, the § 106(a) waiver must be limited to permitting orders based upon express statutory authority granted by the Code. Nothing in the plain language of Section 105, or anywhere else in the Code, purports to authorize bankruptcy courts to terminate prosecutions under the NLRA. Second, "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general

---

[16] 28 U.S.C. § 959 (b) ("[A] debtor in possession, shall manage and operate the property in his possession . . . according to the requirements of the valid laws of the State . . ."); *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 502 (1986) (filing of bankruptcy petition does not give the court "carte blanche to ignore nonbankruptcy law"); *Yorke v. NLRB*, 709 F.2d 1138, 1142-43 (7th Cir. 1983), citing, *inter alia*, *In re Bildisco*, 682 F.2d 72, 82-83 (3d Cir. 1982) (NLRA obligations continue for entities in bankruptcy).

one . . ." *Morton v. Mancari,* 417 U.S. 535, 550–51 (1974). The NLRA's specific prohibition on the adulteration of the Board's powers in Section 10(a) accordingly controls over any implied power that might be found under Bankruptcy Code Section 105 to permanently enjoin NLRA actions. Thus, bankruptcy courts lack jurisdiction to terminate unfair labor practice cases <u>even against a debtor</u>.

Such jurisdiction is even more plainly lacking when it comes to terminating actions against a nondebtor third party (or excusing such a party from liability, financial or otherwise). The determination of whether particular interrelated entities are to be subject to liability under labor law for their participation in unfair labor practices is specifically for the Board and reviewing Courts of Appeals, not bankruptcy courts, to decide. *In re Bel Air Chateau Hosp., Inc.*, 611 F.2d 1248, 1251 (9th Cir. 1979) ("Whether a new employer is an "alter ego" or a "successor" to an earlier employer is a question of substantive federal labor law, the resolution of which is committed to the Board and the courts that review its determinations.").

It is thus beyond the jurisdiction of this Court to release NLRB claims against nondebtors, because "preventing claimants from pursuing their claims is equivalent to issuing a final adjudication of the merits of such claims." *In re Digital Impact*, 223 B.R. 1, 12 (Bankr. N.D. Okla. 1998), citing *In re Western Real Estate Fund*, 922 F.2d 592, 600 (10th Cir. 1990); *see also In re Market Square Inn, Inc.*, 163 B.R. 64, 67 (Bankr. W.D. Pa. 1994) (stating, in response to request for nondebtor release, that "we know of nothing which gives the bankruptcy court jurisdiction to adjudicate claims between two nondebtor third parties"); *cf. Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 153-54 (2009) (confirmation of plan enjoining certain litigation has *res judicata* effect, precluding subsequent collateral attack). Confirmation of the instant proposed Plan would be tantamount to an adjudication that the Co-Owned Respondents are excused from

16

potential liability for unfair labor practices, as to which they may have been co-liable with the

Debtors even before the commencement of this bankruptcy proceeding. Such an adjudication

would be plainly improper. *Baldwin Locomotive Works*, 128 F.2d at 44; *Bel Air Chateau*, 611

F.2d at 1251. The authority bankruptcy courts have to halt government proceedings aimed at

collection of estate assets is cabined to their *in rem* jurisdiction over the property and distribution

of the bankruptcy estate. Where the "estate" of a third party is not in bankruptcy and the

Bankruptcy Court has no power to control its assets, no such authority can be exercised.

The third-party releases in this proposed Plan would oust the Board of its exclusive

jurisdiction to determine in the first instance a party's liability under the NLRA, and accordingly

must be stricken from the Plan. Since the Debtors will refuse to sever these provisions, the Plan

is unconfirmable.[17]

### B.  Bankruptcy Courts Lack Statutory Power To Approve Nonconsensual Third Party Releases

Even assuming that this Court has jurisdiction, it lacks the power to grant the requested

nondebtor releases. Those releases render the Plan invalid under the precedent of both the

Supreme Court and the Fifth, Ninth and Tenth Circuit Courts of Appeals. The general equitable

power of bankruptcy courts is limited, and does not extend to discharging the debts of nondebtor

entities that have not themselves satisfied the requirements to obtain a discharge in the

Bankruptcy Code.

---

[17] Moreover, even if this Court could be found to have subject matter jurisdiction over the NLRB's proceedings against the Co-Owned Respondents, such jurisdiction would be, at best, "related to" jurisdiction. *In re Combustion Eng'g*, 391 F.3d 190, 226 (3d Cir. 2004) ("Proceedings 'related to' a title 11 case include . . . <u>suits between third parties</u> that conceivably may have an effect on the bankruptcy estate.") In "related to" proceedings, a bankruptcy court has no power to issue a final adjudication, but must issue proposed findings of fact and conclusions of law. 28 U.S.C. § 157(c)(1). For avoidance of doubt, the NLRB <u>does not consent</u> to have these issues decided by this Court rather than the District Court.

The Supreme Court has rejected nondebtor releases under the Bankruptcy Act of 1898, the statute which preceded the current Bankruptcy Code. In *Callaway v. Benton*, 336 U.S. 132 (1949), shareholders of a nondebtor brought a state-court action aimed at preventing the nondebtor from consenting to sell all of its assets to the debtor under a plan of reorganization and based upon a state statute that required unanimous consent of shareholders before a corporation could sell all assets. Sitting in bankruptcy, the district court found that majority acceptance of the offer under the plan of reorganization was adequate to override state law and that an injunction against the minority shareholders was necessary to consummate the plan of reorganization. Based on these findings, it enjoined the minority shareholders from continuing their lawsuit (just as Debtors seek to do under Section 9.4 of the Plan). The Fifth Circuit reversed, and the Supreme Court affirmed the reversal. The Court saw no reason why ordinary nonbankruptcy law would not be applicable in determining whether the plan's offer of purchase would be accepted or not. *Id.* at 138. It noted that nothing in the Bankruptcy Act provided a court the authority to compel acceptance of an offer by a party not in bankruptcy, even if rejection of such an offer would interfere with a reorganization plan. *Id.* at 141. Though this case arose under the Bankruptcy Act rather than the Code, it remains valid precedent. *Dewsnup v. Timm*, 502 U.S. 410, 419 (1992) ("[T]his court has been reluctant to accept arguments that would interpret the code . . . to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history"). Likewise, here the ordinary law of enterprise liability under the NLRA applies, regardless of whether it might be convenient to disregard it for purposes of confirming the Plan.

The leading modern case holding that nonconsensual nondebtor releases are impermissible is the Ninth Circuit's decision in *In re American Hardwoods, Inc.*, 885 F. 2d 621,

624-26 (1989). In that case, the debtor's confirmation plan sought to obtain a release of its

individual shareholders from personal liability for a debt upon which they were jointly and

severally liable with the debtor. The alleged source of power for this discharge was 11 U.S.C. §

105, already noted above. But the Ninth Circuit concluded that the releases, as a practical matter,

sought the equivalent of a discharge under 11 U.S.C. § 524. The court found this flatly

impermissible under subsection (e) of that section, which provides that with one exception not

pertinent there or here, "discharge of a debt of the debtor does not affect the liability of any other

entity on, or the property of any other entity for, such debt." It held that "Section 524(e),

therefore, limits the court's equitable power under section 105 to order the discharge of the

liabilities of nondebtors, such as the Keelers." *Id.* at 626.

   The Fifth and Tenth Circuits agree. The Tenth Circuit concurred with *American*

*Hardwoods* in *In re Western Real Estate Fund, Inc.*, 922 F. 2d 592, 600-02 (1990). The court

discussed the policy of Section 524, determining that "[o]bviously, it is the debtor, who has

invoked and submitted to the bankruptcy process, that is entitled to its protections. Congress did

not intend to extend such benefits to third-party bystanders." *Id.* at 600, citing 3 Collier on

Bankruptcy ¶ 524.01[3] at 524-16 (1st ed. 1990); S. Rep. No. 989, 95th Cong., 2d Sess. 80-81.

The court identified a "basic principle" permitting "creditors [like the NLRB] whose claims have

been discharged vis-à-vis the bankrupt to recover on the same claims from third parties." *Id.; see*

*also Edward Cooper Painting*, 804 F.2d at 944 (finding partnership liable under the NLRA for

discharged debt of individual). Moreover, the Tenth Circuit agreed with the Ninth that Section

105's grant of equitable powers did not authorize bankruptcy courts to exercise such powers in a

manner inconsistent with the Bankruptcy Code's specific provisions. *Id.* at 601. Finally, the court

found nondebtor injunctive relief unjustifiable as a matter of bankruptcy policy, because it does

nothing to protect debtors (who are already protected against attempts by third-party defendants

to obtain indemnification from the debtor). *Id.* at 602. The Fifth Circuit subsequently joined the

Ninth and Tenth in *Feld v. Zale Corp.*, 62 F.3d 746, 759-61 (1995), although the issue in that

case was a settlement agreement rather than a reorganization plan.

The Second, Fourth, Sixth and Seventh Circuits disagree and have held nonconsensual

third-party releases to be valid in extraordinary circumstances.[18] They hold that the language of

Section 524(e), referenced above, does not constitute an explicit limitation on the equitable

authority of bankruptcy courts. While each of those opinions made a commendable effort to

cabin its approval of nonconsensual nondebtor releases to unique situations, they are not

persuasive as to the fundamental question of whether such releases are authorized by the

Bankruptcy Code at all. None of these opinions addresses the Supreme Court's prior prohibition

on nondebtor injunctions in *Callaway*,[19] none directly addresses the legislative purpose of

Section 524 to limit exculpation to parties that have submitted to the bankruptcy process, and

---

[18] *In re Airadigm Communications, Inc.*, 519 F.3d 640, 655-57 (7th Cir. 2008) (approving third-party exculpations under 11 U.S.C. § 105 and 1123(b)(6) when "necessary for the reorganization and narrowly tailored", but noting that this would not extend to "'blanket immunity' for all times, all transgressions, and all omissions" and that it did not impact upon regulatory powers of objecting government agency); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005) (determining that 11 U.S.C. § 105(a) permits courts to approve third-party releases in "unique" circumstances, but rejecting the bankruptcy court's findings that such circumstances were satisfied; appeal dismissed as equitably moot); *In re Dow Corning Corp.*, 280 F.3d 648, 657-58 (6th Cir. 2002) (approving third-party releases under 11 U.S.C. § 1123(b)(6) where six-factor test is satisfied, but reversing and remanding because of lack of evidence that test elements were satisfied); *In re A.H. Robins Co., Inc.*, 880 F.2d 694, 701-02 (4th Cir. 1989) (approving third-party release under 11 U.S.C. § 105(a)).

[19] The Seventh Circuit's opinion in *Airadigm* does not cite *Callaway*, but does imply that it no longer controls. That court interpreted a minor change in wording between Section 524(e) and its legislative predecessor to remove any legislative obstacle to the granting of third-party releases. *Airadigm*, 519 F.3d at 656. It erred. As noted, minor variances in wording between Code and pre-Code law should not be deemed to work a change to settled understandings of bankruptcy law unless the legislative history discloses that the change was intentional. *Dewsnup*, 502 U.S. at 419.

none adequately explains why Section 105's general equity power is not superseded by the more specific requirements to obtain discharge injunctions under Section 524.

The Third Circuit has expressly declined to weigh in on this issue. *In re Continental Airlines*, 203 F.3d 203, 214 n.11 (2000) ("*Continental*") ("Because the release and permanent injunction . . . are so clearly invalid under any standard, we need not speculate on whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration.").[20] But both before and since *Continental*, numerous bankruptcy courts in the Third Circuit, including this Court, have held that nonconsensual nondebtor releases are impermissible.[21] This Court should follow the better authority finding nonconsensual nondebtor releases to be invalid, and deny confirmation.

## C. IN ANY EVENT, THIS COURT CANNOT AND SHOULD NOT GRANT NONDEBTOR RELEASES HERE

Even aside from questions of jurisdiction and statutory authority, this Court should refuse to grant these nondebtors releases against the NLRB. The maximum recovery that the NLRB could receive under the Plan is so small that it does not even satisfy the "best interests of creditors" test, the point of which is to ensure against precisely this scenario: a plan targeted to render a creditor worse off than it would be under liquidation. Nor do the third-party releases

---

[20] It has, however, indicated in dicta that it (like the Fifth, Ninth and Tenth Circuits) reads Section 524(e) as an implicit limitation upon the power of courts to grant discharge-like releases to entities that are not debtors in bankruptcy. *See In re Combustion Engineering, Inc.*, 391 F.3d 190, 236 n.48 (3d Cir. 2004).

[21] *In re Washington Mut., Inc.*, 442 B.R. 314, 352 (D. Del. 2011); *In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (D. Del. 2004); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (D.N.J. 1999); *In re Arrowmill Dev. Corp.,* 211 B.R. 497, 506 (Bankr.D.N.J.1997); *In re Elsinore Shore Assocs.,* 91 B.R. 238, 252 (Bankr.D.N.J.1988); *In re Monroe Well Serv., Inc.,* 80 B.R. 324, 334 (Bankr.E.D.Pa.1987); *see also, e.g.*, *In re Quincy Medical Ctr.*, Case No. 1-16394-MSH, 2011 WL 5592907, at *4 (Bankr. D. Mass. Nov. 16, 2011)*; In re Digital Impact, Inc.,* 223 B.R. 1, 14 (Bankr.N.D.Okla.1998).

comport with the bare minimum equitable requirements that the Third Circuit set forth in

*Continental*. Confirmation of the releases must be denied.

> 1. <u>The Releases Cause The Plan To Violate The "Best Interests of Creditors" Test</u>

11 U.S.C. § 1129(a)(7)(ii) requires a plan proponent to prove that every dissenting

creditor in a plan of reorganization will receive at least as much from the reorganization as it

would from a liquidation. *In re American Family Enterprises*, 256 B.R. 377, 403 (D.N.J. 2000).

In a corporate liquidation, there is no discharge. 11 U.S.C. § 727(a)(1). All creditors remain free

to pursue discharged debts of a liquidating corporate debtor from third parties which are jointly

liable on such debts. Moreover, and crucially, "[i]n a case where claims are being released under

the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims

must be considered as part of the analysis in deciding whether creditors fare at least as well

under the chapter 11 plan as they would in a chapter 7 liquidation." *In re Washington Mut., Inc.*,

442 B.R. 314, 359-60 (Bankr. D. Del. 2011). This provision applies as fully to NLRA claims as

it does to claims against the co-signer of a debtor's loan. In comparison to the Plan as written,

liquidation of the Debtors would not impair the rights of the NLRB to pursue the Co-Owned

Respondents for unfair labor practice liability. The liquidation analysis proffered by the Debtors,

however, makes absolutely no allowance for the NLRB's (or, for that matter, any other

creditor's) ability to obtain relief directly from the Co-Owned Respondents.

The value of the NLRB's causes of action against the Co-Owned Respondents is equal to

the product of the probability of success on the merits and the amount of the judgment that can

be successfully collected from them. So long as that value is greater than $500,000, the Plan

violates the "best interests of creditors" test, because $500,000 is the maximum possible NLRB

recovery under the Plan. ████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████ Litigation is uncertain, but it

is not that uncertain. Historically, the General Counsel's Office has a compelling track record of

winning the unfair labor practice cases it prosecutes.[22] In FY 2012, the General Counsel's Office

won 90.1% of NLRB and Administrative Law Judge decisions in whole or in part.  Over the last

10 years, the percentage of wins, in whole or in part, has ranged between 78% and 91%.  NLRB,

*Summary of Operations, Litigation Results*, http://www.nlrb.gov/reports-

guidance/reports/summary-operations, at 4.

By granting a preliminary injunction against the Debtors, the District Court of

Connecticut has already determined that the General Counsel is likely to succeed on the merits

portion of the unfair labor practice case.[23] The General Counsel's Office is historically even

more successful where, as here, it seeks and obtains such preliminary injunctive relief. In Fiscal

Year 2012, the General Counsel's Office won 21 such federal injunctions.[24] Of those 21 cases, it

won 15 of the ULP cases, 3 were settled prior to the Board issuing a decision, and 3 are sti ll in

---

[22] In 2012, the General Counsel instituted formal proceedings on only 36.5% of cases where
unfair labor practice charges were filed.  NLRB, *Summary of Operations, Merit Factor*,
http://www.nlrb.gov/reports-guidance/reports/summary-operations, at 4.

[23] Those decisions did not involve litigation of the General Counsel's allegations that Debtors
and Care Realty are a single employer and/or joint employers.

[24] *See* Declaration of Margaret Hamrick in Support of National Labor Relations Board's
Opposition to Debtors' Motion for Entry of an Order Granting Debtors' Omnibus Objections to
the NLRB's Claims, Dkt. No. 844-2, at ¶ 6.

litigation.[25] Similarly, in 2011, the General Counsel's Office won 22 such federal injunctions.[26]

It ultimately won 15 of those ULP cases, 6 were settled prior to issuance of a Board decision, and

1 remains in litigation.[27] And in 2010, 15 injunctions were obtained, the General Counsel won 13

of those 15, and 2 were settled prior to issuance of a Board order.[28] In other words, in these

years, the General Counsel has had a very high success rate in ULP proceedings in cases where it

first obtains a preliminary injunction. There is no reason to believe this case will be any different.

Thus, the Agency's claim against Care Realty is, at the very least, worth more to it in liquidation

than could be recovered under the Plan.[29]

Accordingly, the release provisions of the Plan cause it to fail the requirements of Section

1129(a)(7). The NLRB would obtain a far greater recovery from liquidation than from this Plan.

### 2.   The Plan Fails to Satisfy Even The "Most Flexible" Test For Third-Party Releases

Even if this Plan could clear the minimal bar of the "best interests of creditors" test, it

would fail to satisfy the far more rigorous minimum requirements for obtaining a nonconsensual

nondebtor release. In *In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000), the Third

---

[25] *Id.* at ¶ 8.

[26] *Id.*

[27] *Id.* at ¶ 9.

[28] *Id.*

[29] 

Circuit declined to approve or disapprove the practice of nonconsensual nondebtor releases

generally, but rather set forth three absolute minimum requirements for such releases to be

upheld. "The hallmarks of permissible non-consensual releases [are] fairness, necessity to the

reorganization, and specific factual findings to support these conclusions." *Id.* at 214. Lower

courts have elaborated on the elements required to find necessity and fairness. In *In re South*

*Canaan Cellular Investments, Inc.*, the bankruptcy court held that the following elements must

be satisfied for a third-party release to pass even the "most flexible" test for granting such

releases:

> (1) whether the third party who will be protected by the injunction or release has
> made an important contribution to the reorganization; (2) whether the requested
> injunctive relief or release is "essential" to the confirmation of the plan; (3)
> whether a large majority of the creditors in the case have approved the plan; (4)
> whether there is a close connection between the case against the third party and
> the case against the debtor; and (5) whether the plan provides for payment of
> substantially all of the claims affected by the injunction or release.

427 B.R. 44, 72 (Bankr. E.D. Pa. 2010).[30]

Moreover, the *Continental* court also found that even the "more flexible" approach of

circuit courts permitting nonconsensual nondebtor releases had been limited to the context of

"extraordinary cases" involving the "global settlement of massive liabilities against the debtors

and co-liable parties." *Id.* at 212-13. Thus, even where the minimal requirements set forth in

*Continental* for the granting of a nondebtor release are satisfied, it is clear that the court must

separately find that those releases are equitably justified as an "extraordinary judicial act." *In re*

*Saxby's Coffee Worldwide, LLC*, 436 B.R. 331, 337 (Bankr. E.D. Pa. 2010); *see also In re*

---

[30] This test, or slight variations thereof, has been widely approved in this circuit. *In re Medford Crossings North, LLC*, Case No. 07-25115 et al., 2011 WL 182815, at *15-16 (Bankr. D.N.J. 2011); *In re Spansion, Inc.*, 426 B.R. 114, 143-44 (Bankr. D. Del. 2010); *In re Saxby's Coffee Worldwide, LLC*, 436 B.R. 331, 336 (Bankr. E.D. Pa. 2010); *In re Congoleum Corp.*, 362 B.R. 167, 192 (Bankr. D.N.J. 2007); *In re Am. Family Enterprises*, 256 B.R. 377, 407 (D.N.J. 2000).

*Genesis Health Ventures, Inc.*, 266 B.R. 591, 608 (Bankr. D. Del. 2001) ("even if the threshold *Continental* criteria . . . were marginally satisfied by these facts, the broader context of the *Continental* discussion of such releases requires rejection").

Debtors do not even come close to satisfying this test. The first *South Canaan* factor is that the parties being released must have made an important contribution to the reorganization. 427 B.R. at 72. This requires a close nexus between the release and the contribution of the particular third party receiving it. For instance, in *Airadigm*, the Seventh Circuit found that releasing claims against the plan's primary funder for its role in promulgating the plan was "necessary" because the funder would not proceed without those releases. 519 F.3d at 657. The court, however, took care to note that the release was only appropriate because it was "appropriately tailored" and did not constitute "blanket immunity for all times, all transgressions, and all omissions." *Id.* By contrast, in *Continental* itself, the release was not necessary, because there was no evidence that the nondebtor releasees had made any significant financial contribution to the reorganization. 203 F.3d at 215; *see also Metromedia*, 416 F.3d at 143 (noting that even though one releasee had made a financial contribution to the estate, the release covered numerous other parties, and there was no inquiry made as to why the release needed to be so broad).

This case implicates precisely the same concerns that led the *Metromedia* court to declare nondebtor releases "a device that lends itself to abuse." *Id.* at 142. Notwithstanding the Debtors' risible claim in their Omnibus Reply To Objections To Disclosure Statement that the releases are "narrowly tailored," Dkt. No. 723, at 15 ¶29. ██████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████.[31] The

releases are grossly overbroad as to scope as well as beneficiary, releasing all "claims,

obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities

whatsoever . . . in connection with or related to the Debtors, the conduct of the Debtors'

businesses, the Chapter 11 Case, or the Plan . . . that are based in whole or in part on any act . . .

taking place on or prior to the Effective Date." Plan at 61-62 ("Releases by Holders of Claims

and Equity Interests"). This provision is so broad that it could arguably hamper the NLRB from

obtaining even *injunctive* relief in the form of an order to cease and desist from committing

unfair labor practices and to prospectively restore unilaterally changed terms and conditions of

employment.[32] Even if these releases were eventually struck down on appeal, the cases against

the Debtors and their affiliates could not proceed in the meantime, because Sections 9.3 and 9.4

of the Plan would enjoin prosecution of the NLRB's claim against the Debtors and their

affiliates, thereby forcing NLRB prosecutors to risk contempt of court. *Id.* at 59-60. The third-

party releases in this case are monumentally overbroad and cannot be sustained, because there is

no evidence of what contribution most of the releasees made to the Plan (or even, in large part,

who they are).

---

[31] With respect to the release of employees of the Debtors and their affiliates, it is well settled that an employee or corporate director is not entitled to claim that he has "contributed" to a reorganization by merely performing his duties. *In re National Heritage Foundation, Inc.*, 478 B.R. 216, 229 (E.D. Va. 2012); *In re SL Liquidating, Inc.*, 428 B.R. 799, 804 (S.D. Ohio 2010); *In re Genesis Health Ventures*, 266 B.R. 591, 606-07 (D. Del. 2001).

[32] The NLRB's enforcement action, to the extent that it seeks prospective injunctive relief in the form of a cease and desist order, is not even a "claim" under the Bankruptcy Code. Prospective regulatory injunctions are not "claims" dischargeable in bankruptcy, at least outside of the unusual case where such an injunction is functionally reducible to a money judgment. *In re Torwico Electronics, Inc.*, 8 F.3d 146, 150 (3d Cir. 1993); *In re Chateaugay Corp.*, 944 F.2d 997, 1008 (2d Cir. 1991). Yet the Plan defines released actions so broadly as to encompass actions seeking injunctive relief. In other words, the Plan release is so overbroad that it would discharge liability that is not even dischargeable by a debtor in bankruptcy.

*South Canaan*'s second factor, which overlaps to a degree with the first, requires the plan

proponent to show that nondebtor releases are "essential" to the success of the plan. 427 B.R. at

72. █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████. This behavior is perhaps unsurprising as a matter of pure self-interest, but

insufficient to show that a release of Care Realty is necessary to the reorganization. "If an

owner's refusal to fund a plan based upon her own self-interest amounted to a good reason to

grant the release of third-party liability in violation of Section 524(e) then such releases would be

permitted in every case. . . . [T]he proffered justification falls far short of an acceptable showing

and seems better calculated to inspire the appointment of a trustee rather than the confirmation of

---

[33] The Plan was amended just four days ago, to provide that Care One, not Care Realty, will provide the $500,000 Plan Distribution Contribution Amount and may fund approximately $1 million in administrative expenses and professional expenses. First Non-Material Modification to Plan, Dkt. No. 848; Backstop Funding Agreement, Dkt. No. 851, Exhibit 1 at ███████████ ██████████████████████ The late timing of these reallocations of liability among two affiliates of the Debtors, and the lack of any apparent consideration for the changes, make them appear to be a tactical maneuver intended to justify a release of Care One, rather than the result of an arm's length negotiation among creditors (particularly since Care One is not itself a creditor).█████ █████████████████████████████████████████████████ ████████████████████

a plan." *In re Robert's Plumbing and Heating, LLC*, Case No. 10-23221, 2011 WL 2972092, at *

3 (Bankr. D. Md. July 20, 2011).

The third *South Canaan* factor, requiring that a "large majority" of the affected class

accept the plan, needs no elaboration. 427 B.R. at 72. It is stipulated that Class 6 will vote to

reject the plan. Stipulation and Consent Order, Dkt. No. 838, at 4. Thus, the Plan is not even

approved by the relevant constituency, much less approved by a "large majority." In fact, for

distributional rather than voting purposes, it is clear that the "overwhelming" majority of claims

reject the plan. As Debtors have constructed the Plan, the NLRB's claim is approximately 99.5%

of all Class 6 claims. Forcing these nonconsensual third-party releases through by the

"cramdown" provisions of 11 U.S.C. § 1129(b)(2)(B) is utterly inappropriate. *Saxby's Coffee*

436 B.R. at 336 (rejecting such a request and noting that the court had found <u>no</u> cases which had

ever approved third-party releases under § 1129(b)(2)(B)); *In re Master Mortgage Invest. Fund,

Inc.*, 168 B.R. 930, 938 (Bankr. W.D. Mo. 1994) (deeming overwhelming creditor acceptance

the "single most important" factor in determining whether to grant a third-party release).

*South Canaan* factor four requires a "close relationship" between the action against the

debtor and the action against the third party. 427 B.R. at 72. Literally speaking, this proposition

is clearly true, inasmuch as the NLRB actions against the Co-Owned Respondents are

consolidated with those against the Debtors and arise out of the same course of conduct. But it

appears that *South Canaan*'s phrasing is a corruption of earlier case law. The *South Canaan*

court adopted this element from *In re MAC Panel*, Nos. 98–10952C–11G, 2000 WL 33682394,

at *7 (M.D.N.C. Feb. 24, 2000). A close reading of *MAC Panel* discloses that the court in fact

assessed whether there was an "identity of interest" between the debtor and the third party

releasee, such that a judgment against the releasee would increase the amount of claims against

29

the bankruptcy estate, not merely whether the two cases were topically related. *See In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 935 (W.D. Mo. 1994) (setting forth nearly identical 5-part test including "identity of interest" criterion).

So framed, this factor is not met. The estate has no direct interest in the outcome of the NLRB litigation against the Co-Owned Respondents. The General Counsel alleges that Care One, Care Realty, and Healthbridge are each jointly and severally liable with the Debtors.[34]

 The liability of the estate remains identical either way.[35] Since a judgment against the Co-Owned Respondents will have no impact on the estate, the "close relationship" element is not satisfied.

As bad as all of the above problems with the releases are – and they are more than sufficient to find the Plan unconfirmable – they pale in comparison to the abject failure of the Plan to meet *South Canaan*'s fifth and final requirement, that any plan containing releases

---

[34] In seeking to hold Care Realty, Care One and Healthbridge liable, the General Counsel alleges that those entities are either a single employer, or joint employers, with the Debtors. A finding that two entities are a single employer, or that they are joint employers each of whom knew of and acquiesced in unfair labor practices, will cause those entities to be jointly and severally liable. *Dahl Fish Co.*, 299 NLRB 413, 418 (1990) (single employer); *Hobbs & Oberg*, 316 NLRB 542, 545 (1995) (joint employers).

[35] The situation would be very different if the NLRB's claim ran only against the Co-Owned Respondents. In that case, a judgment against them would potentially increase the dollar amount of claims against the estate, because they could then make new claims for indemnification under their contracts with the Debtors.

provide for payment of "substantially all of the claims affected by the injunction or release." 427
B.R. at 72; *see also Continental*, 203 F.3d at 214 n.11 (any nonconsensual nondebtor release
must be "given in exchange for fair consideration").[36] This element should not be confused with
the requirement that parties receiving releases make an important contribution.[37] The
consideration required to satisfy the claims affected must be provided by the party actually
receiving the release; it is not sufficient that some creditors receive some extra value from
another party. *See In re Lower Bucks Hosp.*, 488 B.R. 303, 325 (E.D. Pa. 2013) (nondebtor
release disallowed because all consideration paid to creditors came from a different party than
the releasee). A plan proponent's mere belief that a nondebtor action is meritless does not
support a release of that claim, particularly where the plaintiff in the third-party action has
already been successful in another forum. *Saxby's Coffee*, 436 B.R. at 336 (debtor's assertion
that releases should be granted to "stop the lunacy" disregarded; third-party plaintiff had already
obtained a judgment in state court). ████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

---

[36] Many courts have gone further, requiring that any *dissenting* creditors must be given an
opportunity to recover in full. *See, e.g.*, *In re Dow Corning Corp.*, 280 F.3d 648, 659 (6th Cir.
2002); *In re Friedman's, Inc.*, 356 B.R. 758, 761 (Bankr. S.D. Ga. 2005); *In re Transit Group,
Inc.*, 286 B.R. 811, 817-18 (Bankr. M.D. Fla. 2002). We agree. The *South Canaan* test represents
the floor of the rights of dissenting third-party plaintiffs, not the ceiling.

[37] The "important contribution" is <u>often</u> the same thing as the "fair consideration" where it is
used to set up a settlement fund to which nondebtor lawsuits are channeled. *See, e.g., Dow
Corning*, 280 F.3d at 655; *In re A.H. Robins, Inc.*, 880 F. 2d 694, 701 (4th Cir. 1989). That need
not be the case, however. Here, much of what Debtors claim to be "important contributions" (the
roughly $8 million in obligations to fund operating losses and the forgiveness of intercompany
claims) is at best a conditional guarantee of equity for the Debtors, not consideration for
settlement of third-party claims.

The Plan is unconfirmable because it fails to give <u>any</u> consideration to the NLRB, much

less provide for payment of "substantially all" of the NLRB's claims, in exchange for stripping it

of its claims against the Co-Owned Respondents. The $500,000 that Care One would contribute

under the Plan to pay general unsecured claims against the Debtors is both legally irrelevant and

grossly insufficient. It is irrelevant because, as the Third Circuit made clear in *Continental*,

money used to pay claims against the debtor cannot be "double counted" as consideration for

releases granted to nondebtors. 203 F.3d at 215 n.11 ("[D]istribution was on behalf of

[claimants'] "creditor" status with regard to Continental Airlines Holdings, not in exchange for

the release of their claims against nondebtors.") And it is insufficient because the NLRB's claim

is for approximately $15 million. Even assuming that the NLRB received the entire $500,000

allotment, it would at best amount to a payment of about 3.3% of the NLRB's claim,

disregarding any additional liability (for example, if there are any continuing violations) that may

have accrued in the meantime.

Unsurprisingly, we have not found a single example in the law of this Circuit in which a

court confirmed a plan over the timely objection of a party receiving only three cents on the

dollar for the release of its claims against a third-party. The stingiest third-party release that we

have located in an opinion confirming a contested plan paid nondebtor plaintiffs approximately

90% of their claims (and was approved by over 99.99% of voting plaintiffs in the affected class).

*In re American Family Enterprises*, 256 B.R. 377, 392 (2000). The fact that the NLRB's claims

are contingent upon the General Counsel prevailing in the underlying ULP case does not change

this analysis. The tort claims in *American Family Enterprises, Dow Corning,* and *Robins* were

also contingent upon proof of liability, and in some instances had <u>not even accrued</u> at the time of

decision. Nevertheless, those courts required that sufficient assets be placed in trust to make it

feasible that the trust could cover all claimants who could prove liability (including, where appropriate, future claimants whose injuries had not accrued at the time of the settlement). We ask for nothing more.



Conversely, if the homes are truly doomed to fail, then expropriating the property of the Debtors' employees to keep the homes on the business equivalent of life support cannot be justified. Either way, Care Realty's refusal to fund operating losses without being bribed with a nondebtor release is tantamount to holding the homes (and their vulnerable population) hostage in the hopes of receiving a ransom payout from its employees. The Bankruptcy Code favors the preservation of struggling businesses, but surely it does not condone stripping employees of their statutory rights for the supposedly greater good of others.[38]

---

[38] Yet another reason to find the releases unfair is that they would prevent the Agency from bringing an unfair labor practice case even upon the filing of a new charge alleging unlawful post-petition (but pre-confirmation) conduct. Under Section 10(b) of the NLRA, a charge is

3.   <u>Nothing About This Case is "Extraordinary," Except The Debtors' Demands</u>

Moreover, these releases cannot be justified as an "extraordinary judicial act," which

requires extraordinary circumstances to justify it. *Saxby's Coffee*, 436 B.R. at 337. As stated

above, the Courts of Appeals that have approved broad nondebtor releases have repeatedly stated

that such releases should be granted only in rare circumstances. *Behrmann v. National Heritage

Foundation*, 663 F.3d 704, 712 (4th Cir. 2011) ("approval of nondebtor releases in this context

should be granted cautiously and infrequently"); *In re Metromedia Fiber Network, Inc.*, 416 F.3d

136, 142-43 (2d Cir. 2005) ("But this is not a matter of factors and prongs. No case has tolerated

nondebtor releases absent the finding of circumstances that may be characterized as unique . . . A

nondebtor release in a plan of reorganization should not be approved absent . . . truly unusual

circumstances . . ."); *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002) ("[E]njoining

a non-consenting creditor's claim is only appropriate in 'unusual circumstances.'"); *see also

Continental Airlines*, 203 F.3d at 213 n.9 (approving the decisions of numerous bankruptcy

courts requiring extraordinary circumstances to grant nondebtor releases). The Second Circuit's

decision in *Metromedia*, while not going so far as to overrule its own precedent, expressed

palpable distaste toward nondebtor releases, finding them to be both unsupported by statutory

authority and a "device that lends itself to abuse." *Metromedia*, 416 F.3d at 142.

---

timely if it is filed within six months of an unfair labor practice. 29 U.S.C. § 160(b). Thus, as of
the plan's Effective Date, the General Counsel would be preemptively enjoined from prosecuting
any unfair labor practice charges against the Debtors and their affiliates, notwithstanding that
those charges have not even been filed yet. For obvious reasons, the NLRB cannot file a proof of
claim for a "claim" that has yet to even be the subject of a charge. The Plan releases would
effectively shorten the NLRA's six-month statute of limitations and excuse all unfair labor
practices committed by the Debtors and their affiliates (but not yet brought to the NLRB's
attention) within the six-month period proceeding the Effective Date. This violates the basic due
process rights of charging parties, many of whom (such as individual employees) will not
necessarily receive any notice whatsoever that their ordinary charge-filing rights under Section
10(b) are to be terminated by the Plan, and would thwart congressional intent expressed in the
NLRA.

The defining feature of the circuit-court cases in which broad nondebtor releases have been approved is that they involved settlements – not erasures – of massive and administratively unmanageable tort liability. *Dow Corning* involved breast implant litigation involving "hundreds of thousands" of claimants and settlement liability in the billions of dollars. *Dow Corning*, 280 F.3d at 653. *SEC v. Drexel Burnham Lambert Group*, 960 F.2d 285, 288 (2d Cir. 1992), involved mass securities fraud claims settled for a total value of at least $800 million. *In re A.H. Robins Co., Inc.,* 880 F.2d 694, 698 (4th Cir. 1989), was similar in scale, involving 195,000 unliquidated medical-device personal injury claims estimated at approximately $2.475 billion. *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 641 (2d Cir. 1988), involved 52,440 unliquidated personal injury claims, and while the court did not estimate a dollar figure for the claims, the Supreme Court, 21 years later, noted that payments under the Manville trust had reached $3.2 billion. *Travelers Indem. Co. v. Bailey*, 129 S. Ct. 2195, 2199 (2009). The fact that collateral litigation in the Manville case reached the Supreme Court 21 years after the Second Circuit's initial decision somewhat speaks for itself in terms of the complexity of that case.[39] The toxic tort cases that make up the majority of the third-party release cases have a key feature in common[40] – in such cases, it is virtually impossible to come up with a defined universe of potential claimants, or estimate the injuries that those claimants will suffer, until (quite literally) decades have passed. If

---

[39] Even the Seventh Circuit's *Airadigm* decision – which involved a much narrower, transactional exculpation of a financier for its acts in connection with the plan of reorganization – involved total claims of approximately $220 million. *In re Airadigm Communications*, 519 F.3d 640, 657 (7th Cir. 2008). However, it is worth clarifying that the NLRB raises no objection to the *Airadigm*-like exculpation of the Co-Owned Respondents in Section 9.5 of the Plan for acts other than gross negligence related to the creation and promulgation of the Plan, as that provision merely codifies the existing legal standard. *In re PWS Holding Corp.*, 228 F. 3d 224, 246 (3d Cir. 2000).

[40] Apart from being two to three orders of magnitude larger than this case in terms of both number of victims and total dollar value of claims.

not excusable, it is at least understandable that courts confronted with such intractable cases have tweaked ordinary bankruptcy rules to come up with "rough justice."

This case is far more similar on its facts to *In re American Hardwoods*, 885 F.2d 621 (9th Cir. 1989). In that case, the Ninth Circuit addressed a situation strikingly similar to this one, apart from the identity of the creditor (the federal government as opposed to Deutsche Bank). There, as here, the motive behind the bankruptcy was to discard a single past claim upon which both the debtor and the nondebtor beneficiary were jointly and severally liable. *Id.* at 622. The Ninth Circuit had no truck with this maneuver. As noted above, the court first found nonconsensual nondebtor releases impermissible in all circumstances. *Id.* at 626. However, it went on to observe that even if it were inclined to permit nondebtor releases, it would not do so in a case where the nondebtor injunction was not approved by creditors and where the injunction would block the most significant creditor's claim rather than a mere fraction of outlier claims as in *Robins*. *Id.* at 627. Just like *American Hardwoods*, the NLRB's backpay claimants in this case are a fixed universe. Those claims can be and have been estimated using well-established compliance criteria (as opposed to the largely conjectural expert estimates used in *Robins* and its progeny). *See* Memorandum Of Law In Support Of [NLRB's] Opposition To Debtors' Motion For Entry Of An Order Granting Debtors' Omnibus Objections To The NLRB's Claims, Dkt. No. 844-1, at 2. The NLRB's claim comprises the vast majority of all non-insider unsecured claims asserted against the Debtors. The similarity to *American Hardwoods* is striking.

Ironically, the Debtors' own statements demonstrate that far from being "extraordinary," this case is little more than a garden-variety bankruptcy filed in an effort to rid themselves of a single adverse judgment. *See, e.g.*, Memorandum Of Law In Opposition To Motions . . . For Leave To Appeal, Dkt. No. 305, at 39 n. 17 (May 7, 2013) (arguing that "[t]here is nothing

unique at all about a Chapter 11 proceeding being filed after an adverse ruling and, in fact, most

Chapter 11 proceedings are filed to address such adverse rulings," and citing eight different cases

where debtors filed bankruptcy in response to a single adverse judgment); Memorandum Of Law

In Opposition To The National Labor Relations Board's Request For Certification For Direct

Appeal, Case No. 13-cv-3247-DMC, Dkt. No. 12, at 23-24 n.9 (again referring to the decision to

file bankruptcy as "nothing unique" and citing fourteen different cases where debtors filed

bankruptcy in response to a single adverse judgment). As the very cases the Debtors cite

demonstrate, it is routine for companies to undergo Chapter 11 reorganization after a major

defeat in court. What is not routine is for those companies to preemptively seek a "lockstep

discharge of nondebtor liability," *Continental*, 203 F.3d at 217, for every single conceivably

related entity or individual.

Summing up, we cannot improve upon the reaction of Judge Gordon of the Bankruptcy

Court of Maryland to a similar request for an exculpatory release in the *Robert's Plumbing* case:

"As far as complexity goes, this case and *Robins* have about as much in common as a Stealth Jet

and a Piper Cub – they both fly (so far) but that is where the similarity ends." Case No. 10-

23221, 2011 WL 2972092, at * 3 (July 20, 2011). There are no "extraordinary" circumstances

here – merely some unreasonable and illegitimate tactics by Debtors to assist co-owned, asset

rich entities to secure what amounts to an undeserved, judicially unsupervised bankruptcy

discharge. Confirmation should, for yet another reason, be denied absent Debtors' willingness to

sever the nondebtor releases from the Plan.

## II.    THE PLAN MAY NOT BE "CRAMMED DOWN" UNDER SECTION 1129(b)

Pursuant to Section 1129(a)(8), a plan may only be confirmed if each class of creditors is

unimpaired or has accepted the plan.  However, if this requirement is not met, under certain

circumstances a plan may be "crammed down" and confirmed nonetheless if it satisfies all of the

other confirmation requirements set forth in Section 1129(a), including the requirement that if a

class of creditors is impaired, at least one impaired class accepts the plan, 11 U.S.C.

§ 1129(a)(10).[41]  Section 1129(b) sets out the requirements for "cram down" on a dissenting

impaired class.  11 U.S.C. § 1129(b).

Because the NLRB intends to reject the Plan, which will be determinative for Class 6,[42]

the "cram down" provisions of the Bankruptcy Code will apply.  The two "cram down"

requirements are that a plan (i) does not "discriminate unfairly," and (ii) is "fair and equitable"

with respect to each dissenting class.  11 U.S.C. § 1129(b)(1).

### A.  The Debtors' Plan Discriminates Unfairly Against Class 6

The issue of discrimination between two classes which have claims with equal priority

and identical legal attributes typically must be considered for two purposes under the Code: (i) to

---

[41] The requirement of an impaired accepting class must be met with respect to each debtor covered by a joint plan.  *See, e.g., In re Tribune Co.,* 464 B.R. 126, 141-42 (Bankr. D. Del. 2011)("I find nothing ambiguous in the language of § 1129(a)(10), which absent substantive consolidation or consent, must be satisfied by each debtor in a joint plan"); *In re JER/Jameson Mezz Borrower II LLC*, 461 B.R. 293, 302-03 (Bankr. D. Del. 2011).  Under the proposed Plan, Classes 2, 3, 5(A)-(E), 6(A)-(E) and 7(A)-(E) are impaired.  Class 7 (Intercompany Claims) represents claims held by insiders and therefore does not count towards the requirements of Section 1129(a)(10). Therefore, each Debtor must have at least one of the remaining impaired classes – i.e. Class 2, Class 3, Class 5(A)-(E) or Class 6(A)-(E) vote in favor of the Plan. Because this objection was required to be filed before the Voting Deadline, the NLRB could not determine whether each Debtor had an impaired accepting class.  Therefore, the NLRB reserves its right to object to confirmation on this basis.

[42] Debtors, the NLRB, and the Union stipulated that the NLRB will vote its general unsecured claims in each of the Class 6 subclasses in an amount that is equivalent to 34% of the creditors' total claims in each of those subclasses, in order to ensure that the NLRB vote to reject the Plan will prevail for Class 6.  The Court approved this Stipulation and Consent Order on January 15, 2014 (Dkt. No. 838).

determine whether discriminatory classification is for impermissible voting purposes in contravention of Section 1122; and (ii) to determine whether discriminatory treatment of classes for purposes of distribution is unfair pursuant to Section 1129(b). *See In re 222 Liberty Assocs.*, 108 B.R. 971, 989 (Bankr. E.D. Pa. 1990) (noting that the issues of "classification" and "unfair discrimination" are distinct). Courts have found that while separate classification of similar claims may be acceptable in certain circumstances for voting purposes, disparate treatment of such claims is not. *See, e.g., In re 222 Liberty Assoc.,* 108 B.R. at 990-93 (confirmation denied where separate classification of unsecured deficiency claim was reasonable, but payment of only 2% of that claim versus 100% for other unsecured creditors was unfairly discriminatory); *In re Graphic Communications, Inc,* 200 B.R. 143, 147-49 (Bankr. E.D. Mich. 1996) (confirmation denied where separate classification of competitor's claim from trade vendors' claims was permissible, but debtor could offer no valid justification for "alleged necessity" of 100% distribution to those trade vendors and only 10% payout to competitor).

The NLRB does not object to the separate classification of Classes 5 and 6 for voting purposes, but it does object to Debtors' disparate treatment of these classes. The Plan proposes to pay Class 5 general unsecured "Ongoing Trade Vendors" 75% of the allowed amount of their claim in twelve equal monthly installments. Plan § 2.3-(G)(b) at 36. Furthermore, Care Realty LLC has agreed to back stop the distributions due to holders of allowed Class 5 claims. *See* Dkt. No. 758, Amend. D.S. at 54. The only requirements for this treatment are (1) that Debtors designate the creditor as an Ongoing Trade Vendor with whom Debtors will continue to conduct business, and (2) that the creditor agrees to provide "Ongoing Trade Vendor Terms" to Debtors for a period of one year. Plan § 2.3-(G)(a) at 35-36. Per the new "Ongoing Trade Vendor Terms," a creditor is essentially required to maintain its pre-existing terms, as well as to provide

an additional 30 days for payment of invoices (the "Extended Terms") and a 1% discount on the

total invoiced amount for payment within the Extended Terms.[43]  *See* Dkt. No. 758-1, Appendix

E. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████

In contrast, Class 6 general unsecured creditors are to share a pro-rata distribution of

$500,000, which represents only a 3.4% recovery.[44]  Plan § 2.3-(H)(b) at 37.  Debtors have

alleged that they are justified in treating Class 5 more favorably because it is comprised of

creditors whose "continued cooperation is critical to the Debtors' ability to reorganize

successfully and conduct viable, competitive operations," while Class 6 represents creditors

"with which the Debtors will not do business going forward."  *See* Debtors' "Omnibus Reply to

Objections to Disclosure Statement," Dkt. No. 723 at 13-14.  Therefore, according to Debtors,

the repayment of the Class 6 creditors is "not essential to ensuring the Debtors' reorganization or

future viability."  *Id.* at 14.  Debtors' purported justification for this disparate treatment makes

little sense given that the NLRB holds its claim on behalf of Debtors' employees, who

undisputedly have an ongoing relationship with Debtors and whose "good will" is just as critical

to the success of the reorganized Debtors' businesses as their ongoing trade vendors.  *See In re*

*Chateaugay Corp.,* 155 B.R. 625, 635 (Bankr. S.D.N.Y. 1993) (upholding separate classification

of individual workers' compensation claims on the basis that, *inter alia*, workers' continued

---

[43]If a creditor's pre-existing terms already provide for a more favorable discount, then that discount will continue to apply.

[44]This calculation assumes that the NLRB's approximate $14.6 million pre-petition claim is classified solely as a general unsecured claim (as proposed by Debtors), and that the claims of all other creditors in Class 6 will be allowed in the full amount stated in the Amended Disclosure Statement.  *See* Dkt. No. 758 at 11.

cooperation and goodwill was necessary to ensure successful reorganization).  Therefore, as

discussed below, Debtors have not met their burden of proving a reasonable basis for the extreme

discrimination in treatment contemplated by their Plan.

"Equality of distribution among creditors" is a vital and central policy of the Bankruptcy

Code."  *In re Combustion Eng'g Inc.,* 391 F.3d 190, 239 (3d Cir. 2004); *see also Howard*

*Delivery Serv. v. Zurich American Ins. Co.*, 547 U.S. 561, 655 (2006)(courts must be "mindful

that the Bankruptcy Code aims in the main, to secure equal distribution among creditors"); *In re*

*Sentry Operating Co. of Texas, Inc.,* 264 B.R. 850, 863 (Bankr. S.D. Tex. 2001)("In general, the

Bankruptcy Code is premised on the rule of equality of treatment.  Creditors with equal rank are

entitled to equal distribution").  Section 1129(b)(1) permits confirmation of a plan despite

rejection by an impaired class, but only if, among other things, the plan does not discriminate

unfairly.  "Unfair discrimination is not defined in the Bankruptcy Code, nor does the statute's

legislative history provide guidance as to its interpretation. 'Generally speaking, this standard

ensures that a dissenting class will receive <u>relative value</u> equal to the value given to all other

similarly situated classes.'"  *In re Armstrong World Industries*, 348 B.R. 111, 121 (D. Del.

2006)(internal citations omitted)(emphasis added).  The burden is on Debtors to prove that their

proposed Plan does not discriminate unfairly.  *Id.* at 122.

In determining whether unfair discrimination exists, courts in this Circuit have adopted

the test employed by the court in *In re Dow Corning Corp.,* 244 B.R. 696 (Bankr. E.D.Mich.

1999)(referred to as the "Markell Test").[45]  *E.g., In re Tribune Co.,* 472 B.R. 223, 241 (Bankr. D.

---

[45] Traditionally, Courts applied a four factor-test to determine whether unfair discrimination
exists: (1) whether the discrimination is supported by a reasonable basis; (2) whether the debtor
could consummate the plan without the discrimination; (3) whether the discrimination is
proposed in good faith; and (4) whether the degree of discrimination is in direct proportion to its
rationale.  *See In re Dow Corning,* 244 B.R. at 700.  However, there has been movement away

41

Del. 2012); *In re Unbreakable Nation,* 437 B.R. 189, 202 (Bankr. E.D.Pa. 2010); *In re Greate*

*Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228-29 (Bankr. D.N.J. 2000). Under the Markell test, a

rebuttable presumption of unfair discrimination arises when there is: "(1) a dissenting class; (2)

another class of the same priority; and (3) a difference in the plan's treatment of the two classes

that results in either (a) a materially lower percentage recovery for the dissenting class (measured

in terms of the net present value of all payments), or (b) regardless of percentage recovery, an

allocation under the plan of materially greater risk to the dissenting class in connection with its

proposed distribution." *In re Dow Corning,* 244 B.R. at 710. If a disparity of recovery or

disparity of risk is established, the plan proponent can rebut the presumption of unfairness only

"by showing that, outside of bankruptcy, the dissenting class would similarly receive less than

the class receiving a greater recovery, or that the alleged preferred class had infused new value

into the reorganization which offset its gain." *Id.; In re Tribune,* 472 B.R. at 242.

It is clear that minor differences in a plan's treatment of separate classes will not

constitute unfair discrimination. On the other hand, courts have "roundly rejected plans

proposing grossly disparate treatment to similarly situated creditors," such as the case here. *See*

*In re Tribune*, 472 B.R. at 242. In *Greate Bay Hotel & Casino, Inc.,* the court explained, "there

is no bright line test which establishes whether a given difference in percentage recovery results

in unfair discrimination," however:

> Courts which have rejected confirmation on the basis of unfair discrimination
> have confronted plans proposing grossly disparate treatment (50% or more) to
> similarly situated creditors. *See, e.g., In re Tucson Self–Storage, Inc.,* 166 B.R.
> 892 (9th Cir. BAP 1994) (providing for 100% for unsecured trade creditor and

from the traditional four-factor test in favor of the rebuttable presumption Markell test because,
as the court in *Greate Bay Hotel & Casino* explained, "the [Markell] test effectively targets the
kind of discrimination or disparate treatment that is commonly understood as being 'unfair',
namely that which causes injury or that unjustly favors one creditor over another." 251 B.R. at
231.

> 10% to deficiency claim was unfair discrimination); *In re Barney & Carey Co.,*
> 170 B.R. 17 (Bankr.D.Mass.1994) (denying confirmation where deficiency claim
> was to receive 100% and general unsecured 15%); *In re Caldwell,* 76 B.R. 643,
> 646 (Bankr.E.D.Tenn.1987) (confirmation denied where 100% of credit card debt
> was proposed to be paid but only 22.7% of all other unsecured debt would be
> paid).

251 B.R. at 231 (emphasis added); *see also In re Tribune*, 472 B.R. at 242 (and cases cited

therein finding unfair discrimination based on grossly disparate treatment).

As the facts set forth above demonstrate, the proposed Plan here undeniably provides the

Class 5 ongoing trade vendors with a materially-better recovery than the Class 6 general

unsecured creditors.  Class 5 and Class 6 are both general unsecured claims of the same priority

and Class 6 objects to the Plan.  Therefore, under the Markell test, a presumption of unfair

discrimination has been established which Debtors must rebut.  For the following reasons,

Debtors cannot do so.

The NLRB anticipates that Debtors will continue to claim that they have a valid business

justification for the discrimination, namely that the discrimination is necessary to maintain the

"continued cooperation" and "good will" of the ongoing trade vendors.  However, this is not a

reasonable basis for the proposed level of discrimination, (i) because, as noted above, equally

important is the necessary good will of Debtors' employees on whose behalf the NLRB has filed

these claims and (ii) for the same reasons outlined by the court in *In re Snyder's Drug Stores*,

307 B.R. 889 (Bankr. N.D.Oh. 2004).  There, the debtor argued that discriminating in favor of

trade creditors was reasonable because its relationship with those creditors was ongoing and

relationship-driven. *Id.* at 895.  While noting that "[a] plan may reasonably discriminate if the

'proposed discrimination protect[s] a relationship with specific creditors that the debtor need[s]

to reorganize successfully,'" the court nonetheless determined that the debtor had failed to meet

this test because there was no evidence that trade vendors "would refuse to deal with [it] going

forward" absent preferential treatment, and because the class was not "reasonably tailored to

foster only those relationships [ ] critical to the success of the organized debtor." *Id.*

Also instructive is the decision in *In re Eisenbarth,* 77 B.R. 228 (Bankr.D.N.D.1987).

There, the court was confronted with a plan which proposed to pay unsecured trade creditors

claims in full while paying the unsecured claim of lenders only ten percent. *Id.* at 235. In

denying confirmation of the plan, the court rejected the debtor's "attempt to draw a distinction

between sophisticated institutions ... as contrasted to unsecured local trade creditors," and stated:

> While the Debtors prefer to pay local businesses in full . . . at the expense of banks and
> other lenders, this treatment is not sanctioned by the Bankruptcy Code. The focus on a
> particular claim should not be the claimholder, but rather the legal nature of the claim.
> An unsecured claim is simply that, an unsecured claim. No valid reason exists for treating
> the unsecured claims of [the lenders] different than the unsecured claims of the trade
> creditors.

*Id.* at 235 (citations omitted); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr.

D. Del. 2004) ("separate classification and treatment of trade claims is acceptable if the separate

classification is justified because they are *essential* to a reorganized debtor's ongoing

business")(emphasis added). Thus, while Debtors may prefer to pay trade vendors with whom

they intend to continue doing business over the Class 6 NLRB claims on behalf of employees,

this is not a proper basis for the extreme level of discriminatory treatment found in the Plan.

In their Omnibus Reply to Objections to Disclosure Statement, Debtors cite in a footnote

several cases which they believe support their position that "the separate classification and

treatment of Class 5 Claims under the Plan is fair." Dkt. No. 723 at 14, n. 11. To the extent

these cases address unfair discrimination in the treatment of claims, they are distinguishable.[46]

---

[46] Several of the cases are inapplicable because they deal only with the classification issue and/or
there was no materially different treatment of creditors. *E.g., In re Adelphia Commcn's's Corp.*,
368 B.R. 140, 247 (Bankr. S.D.N.Y. 2007); *In re Georgetown Ltd. P'ship*, 209 B.R. 763 (Bankr.
M.D. Ga. 1997); *In re J.L. French Auto. Castings, Inc.*, No. 06-10119 (Bankr. D. Del. June 21,

For instance, Debtors rely on *In re Kliegl Bros. Universal Stage Lighting Co.,* 149 B.R. 306 (Bankr. E.D.N.Y. 1992).  In that case, a seventy-five percent distribution on union member wage claims versus a fifteen percent distribution on other unsecured claims was not found to be unfairly discriminatory.  *Id.* at 309.  However, the court found that a reasonable basis for the difference in treatment existed in that case because debtor had established it "could not survive" without operating a union shop.  *Id.*  In this regard, the evidence showed that virtually all of the debtor's on-site electrical work was performed by the union and the union would not install or service non-union manufactured products.  Therefore, if debtor did not have a union shop, it would be disqualified from bidding on many of the contracts upon which its business depended. *Id.*  Likewise, in *In re Richard Buick, Inc*., 126 B.R. 840, 852 (Bankr. E.D. Pa. 1991), the court held that it was permissible for a debtor's plan to pay its dealer-trade creditors in full while paying other unsecured creditors just five percent.  Again, the debtor was able to establish in that case that there would be no continued operations otherwise.  Specifically, the court found that full payment of the dealer-trade claims was necessary for the debtor to establish good relations with other car dealers, who would supply the vehicles the debtor would sell.  *Id.*  Additionally, the debtor's franchisors required full payment of the dealer-trade claims as a prerequisite to their future relationship with debtor.  *Id.*  Thus, in both *In re Kliegl Bros* and *In re Richard Buick*, the debtors operated in a unique market where the trade vendors had a direct and immediate impact

---

2006).  In three of the cases, disparate treatment was at issue and found to be *unacceptable*. *E.g., In re Coram Healthcare Corp.,* 315 B.R. 321 (Bankr. D. Del. 2004)(finding separate classification and favorable treatment of insiders' claims over trade vendor's claims to be improper); *In re Graphic Communications, Inc,* 200 B.R. 143, 147-49 (Bankr. E.D. Mich. 1996)(providing 100% distribution to trade vendors and 10% to claimholder that was a competitor was unfair discrimination); *In re 222 Liberty Assoc.,* 108 B.R. 971, 990-93 (Bankr. E.D. Pa. 1990)(providing 100% for unsecured creditors and 2% for deficiency claim was unfair discrimination).  For the reasons discussed above, the remaining cases cited by Debtors are distinguishable.

on their ability to continue operations. Debtors have not, and cannot, make such a showing in this case because they do not operate in such a unique and specialized market where only a limited number of vendors are available to provide the services necessary for continued operations. In this regard, Debtors will be hard pressed to show that paying *all of the100-some trade vendors (per Debtor) listed in Class 5* at seventy-five cents on the dollar is essential to Debtors' immediate survival. Despite their "lip service"[47] to the contrary, Debtors simply have not established that Class 5 is reasonably tailored to foster only those relationships essential to their immediate its survival.

The NLRB anticipates that Debtors will also try to argue that the disparate treatment of Class 5 and Class 6 is justified by the ongoing trade vendors' contributions to the reorganization via their agreement to provide the aforementioned "Ongoing Trade Vendor Terms" for a period of one year following the effective date of the Plan. This argument does not hold weight because it fails to account for the fact that the NLRB's claims are held on behalf of Debtors' allegedly aggrieved employees who have also made substantial contributions to the reorganization via the 1113(e) modifications granted by this Court. Debtors vigorously maintain these modifications were necessary to the reorganization, and proper, notwithstanding the expiration of the union agreements. Even given the NLRB's opposing view – that the 1113(e) modifications are not permitted for terms of expired agreements or where Debtors have allegedly dealt unfairly with the employees – it remains that the employees are now living under the "necessary" reduced terms of employment. Additionally, a motion for permanent relief under Section 1113(c) is currently pending before this Court, and Debtors estimate that the modifications provided for by

---

[47] ██████████████████████████████████████████████████████████████████

their 1113(c) Motion would result in additional **reductions** to wages and benefits of

approximately $7 million per year over a four year period. *See* Dkt. No. 561 at pp. 6, 10.

Regardless of whether the employees have agreed to or resisted these reductions in their benefits,

Debtors maintain the reductions are necessary to their survival and, if the Court approves the

1113(c) relief, it will presumably be based in part on the Court's agreement that the employee

givebacks are necessary.  It would be disingenuous for Debtors to argue that the contributions

made by Class 5 in asserted "Ongoing Trade Vendor Terms" justify the grossly disparate

treatment provided when the employees have also been required to make substantial

contributions to the reorganization.  Debtors simply have not demonstrated why the Plan cannot

provide for more equal treatment of Classes 5 and 6.

　　　　For all of these reasons, the Debtors cannot rebut the presumption of unfair

discrimination that exists in this case.  The Plan proposes to pay nearly all of its non-insider

general unsecured creditors at 75%, while paying only a few cents on the dollar to the

handpicked group of other general unsecured creditors included in Class 6.  The general

unsecured claims held by the Class 6 creditors are of equal priority and legal status as those held

by Class 5 creditors, and Debtors have failed to establish that the materially different recoveries

provided for Class 5 and Class 6 in the Plan are in proportion to any reasonable rationale.  Both

the Class 5 ongoing trade vendors and the Class 6 represented employees are critical to Debtors'

continued operations, and both are making substantial contributions towards the reorganization.

The apparent "antipathy toward a creditor is not proper basis for discrimination." *In re Graphic*

*Communications, Inc.,* 200 B.R. 143, 149 (Bankr. E.D. Mich. 1996).  This disparate treatment

exemplifies the kind of "unfair" discrimination which is prohibited by the Code.

### B.  The Plan Violates the Absolute Priority Rule

The Plan is also not "fair and equitable" to Class 6 under Section 1129(b)(1) and

1129(b)(2)(B)(ii) because Debtors propose to limit recovery on the NLRB's claim to $500,000,

while leaving unimpaired Class 8 (Equity Interests), a class plainly junior to Class 6. This

proposal violates the absolute priority rule, and therefore Debtors' Plan is not confirmable.

As stated above, Section 1129(b)(1) provides that a plan may be "crammed down" if it

does not discriminate unfairly and is fair and equitable with respect to each dissenting, impaired

class. For a reorganization plan to be considered "fair and equitable" to an impaired class of

dissenting unsecured creditors, it is necessary that "the holder of any claim or interest that is

junior to the claims of such class will not receive or retain under the plan on account of such

junior claim or interest any property. . . ." 11 U.S.C. § 1129(b)(2)(B)(ii). This requirement, also

known as the "absolute priority rule," prohibits equity holders from retaining their equity

interests under a plan of reorganization unless all senior creditors are paid in full. *See, e.g., Bank

of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. Pshp.,* 526 U.S. 434, 451 (1999) ("An old

equity holder simply cannot take property under a plan if creditors are not paid in full.").

In their First Amended Disclosure Statement, Debtors invoke a "new value" exception to

the absolute priority rule.[48] *See* Dkt. No. 758 at 54. The Third Circuit, however, has never

recognized this exception, *see, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 237 n.10 (3d Cir.

2000) (noting split of authority); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park

Associates*, 987 F.2d 154, 162 & n.12 (3d Cir. 1993) (reversing, on different grounds, decision of

district court recognizing "new value" exception, and declining to pass on the issue), and this

court should decline to do so for the reasons expressed in *In re Winters*, 99 B.R. 658, 663

---

[48] Briefly put, the "new value" exception "allows the equity owners of a debtor in bankruptcy to
obtain an interest in the reorganized debtor in exchange for new capital contributions[.]" *In re
Tucson Self-Storage, Inc.*, 166 B.R. 892, 899 (B.A.P. 9th Cir. 1994).

(Bankr. W.D. Pa. 1989) (concluding that the exception did not survive enactment of Bankruptcy

Code).[49]

Moreover, even assuming *arguendo* that the "new value" exception is a valid doctrine in

this circuit,[50] Debtors' Plan utterly fails to meet its exacting requirements.

> A Chapter 11 plan proponent calling upon the new value exception has the burden
> of proving that the equity holders' capital contribution is: (1) "in the form of
> money or money's worth"; (2) "necessary to the reorganization"; (3) "reasonably
> equivalent to the value of the interest being retained"; (4) "up front"; and (5)
> "substantial."

*In re Torgro Atl. City, LLC*, No. 08-13458 (GMB), 2009 WL 1288367, at *14 (Bankr. D.N.J.

May 7, 2009) (citing *In re Haskell Dawes*, 199 B.R. 867, 872 (Bankr. E.D. Pa. 1996)).  "A

rigorous showing as to these requirements is necessary in order to ensure that a debtor's equity

holders do not eviscerate the absolute priority rule by means of contrived infusion." *Id.* (internal

quotation marks omitted) (citing *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 301

(D.N.J. 1996)).  Debtors' Plan is fatally deficient on this score, in the following respects.

1. Plan fails the "new value" exception on its face because entities that would retain
   equity in Debtors contribute nothing in exchange for that interest.

---

[49] In *Winters*, the court determined that the words "fair and equitable," as used in Section
1129(b), did not incorporate the judicially-created "infusion-of-money-or-money's worth" (or
"new value") exception to the absolute priority rule. 99 B.R. at 660–63.  Having carefully
reviewed the legislative history, the court concluded that "Congress, with apparent deliberation,
did not mention the 'infusion of capital' as a consideration in applying the fair and equitable test
. . . [and t]herefore . . . there is no [such] exception." *Id.* at 662–63.  *Winters*' rejection of pre-
Code practice relating to the "new value" exception is thus firmly based on clearly-expressed
legislative intent. *Cf. Dewsnup*, 502 U.S. at 419.

[50] The argument that follows relies in part on *In re Torgro Atl. City, LLC*, No. 08-13458 (GMB),
2009 WL 1288367, at *14 (Bankr. D.N.J.  May 7, 2009), a decision in which the "new value"
exception was applied by this court; however, that case should not be read as accepting the
validity of the exception, as that issue does not appear to have been raised at all.

Because none of the various proposed contributions is to be made by the entities that would retain their equity interests in the reorganized Debtors (i.e., THCI Mortgage Holding Co., LLC and THCI Co., LLC), the plan fails the "new value" test on its face. *See In re U.S. Truck Co,, Inc.*, 800 F.2d 581, 588 (6th Cir. 1986) (noting that the question is whether the party retaining its equity in the reorganized entity "paid a fair price for *its* interest" (emphasis supplied)).  Indeed, there is probably no clearer example of a prepetition owner retaining something "on account" of its prepetition ownership, in violation of the Code, than when it contributes nothing in exchange for retaining its equity.

> 2.  <u>Proposed forgiveness or cancellation of Intercompany Claims does not constitute a contribution "in the form of money or money's worth" and is not "necessary to the reorganization."</u>

Debtors' Plan would entail the waiver of alleged Intercompany Claims held against Debtors by nondebtor related entities. *See* Dkt. No. 758 at 13, 55.   This does not constitute a contribution "in the form of money or money's worth" because "forgiveness of debt is only an accounting entry which affects just the liability side of the balance sheet and creates no new funds." *In re Snyder*, 105 B.R. 898, 901 (Bankr. C.D. Ill. 1989), *aff'd*, 967 F.2d 1126 (7th Cir. 1992); *see also, e.g., In re Creekside Landing, Ltd.*, 140 B.R. 713, 717 (Bankr. M.D. Tenn. 1992) ("Forgiveness of debt by itself is not sufficient.").  Thus, assuming that the claims are even genuine debts,[51]

---

[51] Debtors have not provided sufficient information  to show that the Intercompany Claims are genuine debt obligations whose extinguishment would create new value, and this Court should reject them as such on that basis alone. *See In re Future Energy Corp.*, 83 B.R. 470, 502 (Bankr. S.D. Ohio 1988) (plan did not meet fair and equitable standard because debtors failed to provide sufficient information).   For example. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*See* Exhibit H.  *Cf. In re SubMicron Sys. Corp.*, 432 F.3d 448, 456 (3d Cir. 2006) ("[C]haracterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent

these waivers "ha[ve] no place in the asset column of the balance sheet," *In re Snyder*, 967 F.2d at 1131 (quoting *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 122–23 (1939)), and do not constitute "new value." *See, e.g.*, *In re Sun Valley Newspapers, Inc.*, 171 B.R. 71, 78 (B.A.P. 9th Cir. 1994) ("[C]ontributions through the cancellation of the alleged debt owed to the insiders is not "up-front[.]").

In addition, Debtors have failed to show that the waiver of these claims is "necessary to the reorganization." This element of the "new value" test requires that the contribution be "necessary for the *continued operations* of the business." *In re Mortgage Inv. Co. of El Paso, Tex.*, 111 B.R. 604, 620 (Bankr. W.D. Tex. 1990) (emphasis in original); *see also In re Haskell Dawes*, 199 B.R. at 873; *In re Albrechts Ohio Inns, Inc.*, 152 B.R. 496, 502 (Bankr. S.D. Ohio 1993). Here, there has been no showing that the waivers are necessary for the Debtors to continue operations—on the contrary, the scant evidence provided by Debtors shows that

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████ Even if true, such a purpose would not satisfy the "new value" exception. *See In re Mortgage Inv. Co. of El Paso, Tex.*, 111 B.R. at 620 (plan violated absolute priority rule where there was "no showing by the Debtors that the capital infusion . . . [was] going to be used for any purpose other than the payment of the unsecured creditors"); *In re Wynnefield Manor Associates, L.P.*, 163 B.R. 53, 58 (Bankr. E.D. Pa. 1993).

3.  <u>Proposed "backstop funding" is not "up front."</u>

---

may be inferred from what the parties say in their contracts, *from what they do through their actions, and from the economic reality of the surrounding circumstances.*" (emphasis supplied)).

Debtors' Amended Disclosure Statement references the Backstop Funder's purported

"commitments" to provide "such funding as is necessary to meet operating shortfalls" and to

advance "such funds to the Debtors, as necessary, to meet Debtors' obligations under the Plan[.]"

Dkt. No. 758, at 54.  The Amended Disclosure Statement speculates that operating shortfalls may

exceed $8 million over a 4-year period and estimates that distributions due to Allowed Class 5

Claims will amount to $3 million "in the 12 months *following* the Effective Date." *Id.* (emphasis

supplied).  However, to satisfy the "up front" prong of the "new value" exception:

> A new capital contribution . . . must be a present contribution, taking place at or
> before the effective date of the plan, not a contribution in the future, and is
> essential so that it may be liquidated by the creditors should the reorganization
> effort fail.

*In re Torgro*, 2009 WL 1288367, at *16 (internal quotation marks omitted) (quoting *In re

Sovereign Group,* 142 B.R. 702, 709 (E.D. Pa. 1992)).  The backstop funding proposal clearly

does not satisfy this requirement: it is "too amorphous to be properly included as part of the new

value contribution."[52]  *In re Sovereign Group*, 142 B.R. at 709; *see also, e.g.*, *In re 47th and

Belleview Partners,* 95 B.R. 117, 119 (Bankr. W.D. Mo. 1988) (general partner's guarantee of

cash shortfalls lacked "certainty, at the time of approval of the plan"); *In re Future Energy

Corp.*, 83 B.R. 470, 499 (Bankr. S.D. Ohio 1988) ("promise of a future contribution is not

properly included as an element of its proposed capital contribution").

    4.  <u>The remaining proposed contribution is neither "reasonably equivalent to the
value of the interest being retained" nor "substantial."</u>

Since the waiver of Intercompany Claims and proposed backstop funding do not

constitute "new value" (for the reasons above), the only remaining proposed contribution that

---

[52] The "supplemental debtor-in-possession financing arrangement," *see* Dkt. No. 758, Amend.
D.S. at 54–55, which has not even been entered into, is similarly amorphous and contingent on
future events and therefore also fails to constitute "new value."

might is the $500,000 funding of the Plan Distribution Contribution Amount.  *See* Dkt. No. 758,

Amend. D.S. at 54.  This amount, however, fails both the "reasonably equivalent" and the

"substantial" prongs of the "new value" exception.

> a.  Not *"reasonably equivalent."*

To constitute "new value," a capital contribution must be "reasonably equivalent to the

value of the [equity] interest being retained."  *In re Haskell Dawes*, 199 B.R. at 877.  "This is

because if a plan purports to give the debtor's prepetition owners the equity interests in the

reorganized debtor at a bargain price, the prepetition owners will be receiving something 'on

account' of their prepetition ownership," in violation of Section 1129(b)(2)(B)(ii).  *Id.* (internal

quotation marks omitted) (quoting *In re SM 104 Ltd.*, 160 B.R. 202, 226–27 (Bankr. S.D. Fla.

1993)).  To meet this requirement, "a debtor needs to establish the value of the reorganized

entity," *In re Torgro*, 2009 WL 1288367, at *15, and that entails establishing the enterprise value

and the value of any other benefits "retained by equity through the continued ownership of [the]

debtor[.]" *Id.*  Once this value is established, it must then be shown to be less than or equal to

the proposed capital contribution.  *E.g.*, *In re Sawmill Hydraulics, Inc.*, 72 B.R. 454, 458 (Bankr.

C.D. Ill. 1987) (finding that "plan should not be confirmed, because the [d]ebtor failed to

establish the capital contribution equals or exceeds the value of the shareholders' retained

interest in the reorganized [d]ebtor").

Debtors fail the first part of this analysis because they have not properly established the

entities' reorganized value.  *See In re Torgro*, 2009 WL 1288367, at *16 ("reasonably

equivalent" element not met where debtor presented future earnings projections but failed to

appropriately discount them); *see also, e.g.*, *In re Haskell Dawes*, 199 B.R. at 879 (same); *In re*

*Future Energy Corp.*, 83 B.R. 470, 502 (Bankr. S.D. Ohio 1988) (holding that plan did not meet

fair and equitable standard where proponents failed to satisfy burden of proving the value of the

retained interest); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 935–36 (Bankr. S.D.N.Y. 1994);

*In re Spansion, Inc.*, 426 B.R. 114, 133 n.30 (Bankr. D. Del. 2010).  Nor have Debtors complied

with the requirement that they account for the various other benefits that equity will retain under

the plan, such as the plan's liability releases, Dkt. No. 758, Amend. D.S. at 41–43, the

management fees and rent to be received by affiliated entities going forward, and the right to

control and manage the entities after a reorganization.  *See In re Haskell Dawes, Inc.*, 199 B.R. at

879–80 (collecting cases in which courts have considered various benefits, such as releases, the

right to control and manage, dividends, distributions, potential tax benefits, and even salaries to

family members, as additional value to equity holders); *Northwest Bank Worthington v. Ahlers*,

485 U.S. 197, 207–08 (1988) (rejecting argument that ownership of entity with no net worth and

minimal going concern is worthless).[53]  Debtors' failure to properly establish the reorganized

entities' value necessarily precludes a complete and accurate evaluation of whether the proposed

capital contribution equals or exceeds the value of the retained equity interest, and therefore is

fatal to confirmation of the proposed Plan.  However, it appears likely that Debtors would still

fail the "reasonably equivalent" analysis, even if the numbers provided were not otherwise

defective.  Putting the deficiencies in Debtors' projections to one side, and taking the numbers at

face value, the enterprise value together with the value of other benefits retained by equity might

---

[53] Furthermore, since the exclusivity period is still in effect, Dkt. No. 704 (extending period
during which Debtors may solicit acceptances to their joint plan of reorganization through April
20, 2014), Debtors' plan falls squarely within the Supreme Court's holding that "plans providing
junior interest holders with exclusive opportunities free from competition and without benefit of
market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)." *Bank of Am. Nat. Trust &
Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 458 (1999); *In re Red Mountain Mach.
Co.*, 448 B.R. 1, 16–18 (Bankr. D. Ariz. 2011), *aff'd*, 471 B.R. 242 (D. Ariz. 2012) ("[A]
retention of value that violates the absolute priority rule even when that value does not appear on
a . . . balance sheet . . . exists in the option value of the exclusive right to propose a new value
plan.").

be approximated by the "EBITDARM" (earnings before interest, taxes, depreciation,

amortization, rent and management fees) entries in the Debtors' projections, which total

approximately $20,052,954 between years 2014 and the end of 2017.[54]  *See* Dkt. No. 758-1,

Appendix C, at p. 88.  Adding to this the value of the proposed third-party releases (another

benefit to equity under the plan), Dkt. No. 758, at 41–43, whose value is approximately $15

million, the entities' reorganization value is at least $35,052,954.  The $500,000 Plan

Distribution Contribution Amount is approximately 1.4% of this amount and is therefore in no

way "reasonably equivalent."  *See, e.g.*, *In re Wynnefield Manor Associates, L.P.*, 163 B.R. 53,

58 (Bankr. E.D. Pa. 1993) (contribution of $25,000 in exchange for property worth at least

$590,000—a 4.2% contribution—failed "reasonably equivalent" test).

> b.  *Not "substantial."*

The $500,000 proposed contribution is also not "substantial."

> [T]he "substantiality" of the contribution is measured by considering its size, its
> relation to the plan's distribution to unsecured creditors, its relation to unsecured
> claims against the estate, and its relation to a normal market contribution.

*In re Sovereign Grp. 1985-27, Ltd.*, 142 B.R. 702, 710 (E.D. Pa. 1992) (citing *In re Sherwood*

*Square Assoc.,* 107 B.R. 872 (Bankr. D. Md. 1989)).  While "[t]here is no mathematical formula

for resolving the substantiality issue . . . [a] contribution that is a merely nominal, or gratuitous,

---

[54] "[E]nterprise value based on a multiple of the projected EBITDA [is] another common method
of valuing an operating business based on its projected earnings . . . [and] is probably more
sound than determining value of the new equity interests simply based on a reorganized balance
sheet." *In re Red Mountain Mach. Co.*, 448 B.R. 1, 18 (Bankr. D. Ariz. 2011), *aff'd*, 471 B.R.
242 (D. Ariz. 2012).  Here, because the significant management fees and rent payments that
affiliated entities will continue to receive upon reorganization are properly counted as benefits to
equity, use of EBITDARM (that is, EBITDA with rent and management fees included) is
appropriate.  *See* Robert T. Miller, *Canceling the Deal: Two Models of Material Adverse Change
in Business Combination Agreements*, 31 CARDOZO L. REV. 99, 150 n.188 (2009) (noting
EBITDARM is an appropriate measure).

token cash infusion . . . proposed primarily to buy cheap financing does not qualify as

substantial." *In re Torgro*, 2009 WL 1288367, at *16 (citations and internal quotations marks

omitted).  Thus, in *In re Sovereign Group*, the court found that a contribution representing 3.6%

of an unsecured claim was not substantial. 142 B.R. at 710 (citing *In re Pullman Constr. Inds.,*

*Inc.*, 107 B.R. 909, 946–48 (Bankr. N.D. Ill. 1989) (contribution of 2% to 4% not substantial); *In*

*re Ashton,* 63 B.R. 244 (Bankr. D.N.D. 1986) (4.3% ratio not substantial)).

Here, unsecured claims total at least $18,771,636 (the sum of the Board's estimated

$8,935,062.00 priority claim, the $4,048,000.00 in Class 5 general unsecured claims, the Board's

estimated $5,701,474.00 general unsecured claim, and the $87,100.00 claim held by non-

ongoing trade vendors in Class 6).  The $500,000 contribution represents less than 2.7% of this

amount and is therefore clearly not substantial.[55]

*            *            *

The proposed Plan unfairly discriminates against Class 6 creditors.  It also is not fair and

equitable to Class 6 because it violates the absolute priority rule, and Debtors have not satisfied

the requirements of the "new value" exception.  Accordingly, the Plan may not be crammed

down under Section 1129(b).

## III.    THE PLAN FAILS TO PROVIDE FOR FULL PAYMENT OF THE NLRB'S ADMINISTRATIVE AND PRIORITY CLAIMS UPON THE EFFECTIVE DATE OF THE PLAN

[55] In assessing the substantiality of a contribution, some courts also consider "whether the payment proposed represents the Debtor's best effort" and whether "creditors will share in the potential growth of the newly capitalized debtor, or whether the shareholder's new equity position will have the potentiality of only benefitting the shareholders under the plan."  *In re Torgro*, 2009 WL 1288367, at *16 (citations and internal quotation marks omitted).  Debtors fail both criteria, as they (1) have not established that the plan contributions represent "best efforts," and (2) the plan "does not include in its treatment of unsecured creditors the potential for the unsecured creditors to receive increased future payments or benefits from the Debtor[s] even if the Debtor[s] ha[ve] a significant growth in business."  *Id.* at *17 (finding capital contribution failed to meet "substantiality" requirement).

Section 1129(a)(9)(A) of the Code requires that unless the holder of a 507(a)(2) administrative claim agrees to a different treatment, "on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim . . . ."  Similarly, Section 1129(a)(9)(B) provides that unless the holder of a 507(a)(4) wage priority claim or 507(a)(5) benefit priority claim agrees otherwise, the holder will receive:

> (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim . . . .

Here, Debtors' Plan purports to pay all administrative and priority claims in full, as is required by the Code.  *See* Plan §§ 2.2(A) and 2.3(C) at 27, 32.  However, the Plan ascribes zero value to the NLRB's asserted Section 502(b) administrative claims (Claim Nos. 257-261), and Section 507(a) wage and benefit priority claims (Claim Nos. 328-332), and makes no provision for their payment should they ultimately be allowed.  In fact, Debtors explicitly state in their Amended Disclosure Statement that they "do not currently have the means to satisfy the NLRB's asserted Priority Claim if currently Allowed, and may not be able to satisfy such claims in the future when, and if, such claim is Allowed."  *See* Dkt. No. 758 at 7-8, n.5.

Debtors do not believe that any portion of the NLRB's claims are entitled to priority and have filed an Omnibus Objection to the NLRB's claims ("Omnibus Objection"), Dkt. No. 765-1, seeking to either entirely disallow the NLRB's claims or to classify them solely as Class 6 general unsecured claims.  *Id.* at 2, n.3.  On January 16, 2014, the NLRB filed an Opposition to Debtors' Omnibus Objection, Dkt. No. 844.  A hearing on that matter is currently scheduled for January 23, 2014.  As is more fully explained in that Opposition, the NLRB submits that its claims must be allowed because there is no valid basis under Code Section 502(b) for their disallowance.  *Id.* at 8-16.  Furthermore, contrary to Debtors' assertions, administrative and

priority treatment for the NLRB's claims is well grounded in legal precedent and recent

legislative changes.  *Id.* at 16-36.  Therefore, the NLRB believes that this Court will find that it

holds valid, contingent administrative and priority claims against Debtors.

While these disputed claims need not be paid until they are actually due (which would

generally be after the conclusion of the underlying unfair labor practice proceedings),

"reasonable measures must be taken to ensure that the required same treatment [mandated by

Code Section 1123(a)(4)] is received if and when they're allowed."  *See In re Motors*

*Liquidation Co., et al.*, 447 B.R. 198, 215 (Bankr. S.D.N.Y. 2011).  A plan that fails to provide

the same treatment to all claims in a class violates Section 1123(a)(4) and cannot be confirmed.

11 U.S.C. § 1123(a)(4) ("a plan shall . . . provide the same treatment for each claim or interest of

a particular class . . . .).

That Debtors continue to dispute the merits of the underlying administrative proceedings

does not relieve them of their duty to properly safeguard funds for the NLRB's contingent

administrative and priority claims in the event liability is ultimately found by the Board and

reviewing circuit courts.[56]   In this case, Debtors' Plan does not contemplate any kind of reserve

for these asserted administrative and priority claims.[57]   Therefore, the NLRB is required to

---

[56] There is no question, and Debtors do not dispute, that the NLRB has exclusive authority to
adjudicate the merits of unfair labor practices and liquidate its claims.  *See, e.g., Myers v.
Bethlehem Shipbuilding Corp.,* 303 U.S. 41 (1938); *Nathanson v. NLRB*, 344 U.S. 25, 30 (1952)
("It is the Board, not the referee in bankruptcy nor the court, that has been entrusted by Congress
with authority to determine what measures will remedy the unfair labor practices.  We think wise
administrative therefore demands that the bankruptcy court accommodate itself to the
administrative process").

[57] Courts in this and other jurisdictions have required debtors to establish sufficient reserves in
order for a plan to be confirmable.  *See, e.g., In re Chemtura Corp*., 448 B.R. 635, 668-69
(Bankr. S.D.N.Y.  2011) (estimating claims for purposes of establishing reserve*); In re Spansion,
Inc.,* 426 B.R. 114, 146 (Bankr. D.Del. 2010) (to satisfy confirmation requirement providing for
payment of administrative claim holders on plan's effective date, debtors had to set aside reserve

assume the risk that if and when Debtors are required to pay these priority claims, there may not

be funds available to do so even though all other priority claimants will have received full

satisfaction of their claims.  The Plan's failure to include "reasonable measures" ensuring that

the NLRB's claims receive the same treatment as other administrative and priority claims (i.e.

full payment), if and when allowed, accordingly violates Sections 1129(a)(9)(A), 1129(a)(9)(B),

and 1123(a)(4) of the Bankruptcy Code.

Since Debtors do not anticipate being able to reserve sufficient funds to pay the NLRB

upon allowance of its administrative and priority claims, which may not be for several years, the

NLRB is amenable to negotiating a more flexible payment plan with distributions over time to

commence only after liability is finally liquidated.  In its current form, however, the proposed

Plan provides for unequal treatment between the NLRB's disputed administrative and priority

claims and uncontested administrative and priority claims because no reserves or payment plan

have been agreed upon that would permit distribution on account of the NLRB's contingent

administrative and priority claims should they eventually be allowed.  Accordingly, Debtors'

Plan cannot be confirmed.

## IV.    THE PLAN IS NOT FEASIBLE AND THUS FAILS TO SATISFY 1129(a)(11)

---

in amount of creditor's estimated alleged administrative expense claim);  *In re Linens Holding Co.*, No. 08-10832, 2009 WL 2163235 at *9 (Bankr. D. Del. June 12, 2009)(confirming plan requiring establishment of disputed claims reserve that contained sufficient cash or property to pay the full asserted amount of disputed administrative and priority claims); *In re Northwestern Corp.*, 362 B.R. 131, 134-35 (D. Del. 2007)(remanding to bankruptcy court to determine whether claims reserve contained sufficient assets to allow creditors to recover fully and ensure equal treatment for similarly situated creditors).  *Cf. In re Charis Hosp., LLC,* 360 B.R. 190, 200-01 (Bankr. M.D. La. 2007)(ordering chapter 11 liquidator to disgorge fees because, among other things, the liquidator "failed to set aside a reserve for disputed claims, ensuring that similarly situated administrative priority creditors would not be paid if their claims eventually were allowed").

Pursuant to Section 1129(a)(11), a plan cannot be confirmed unless a debtor proves that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan."  11 U.S.C. § 1129(a)(11).  Known as the feasibility test, the standard by which courts measure the feasibility of a plan is whether it offers a "reasonable assurance" of success.  *In re Indianapolis Downs, LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013).  The purpose of the feasibility test "is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."  *In re Sound Radio, Inc.,* 103 B.R. 521, 522 (D.N.J.1989).  Inasmuch as the feasibility test protects against "speculative plans,"  it is "firmly rooted in predictions based on objective fact." *Id.*  Moreover, in considering a plan's feasibility for purposes of Section 1129(a)(11), a court must evaluate the possibility and effect of potential future judgments on implementation of a plan.  *In re Harbin*, 486 F.3d 510, 518 (9th Cir. 2007); *see also In re WR Grace & Co*., 729 F.3d 332, 348-49 (3d Cir. 2013)(stating that a plan is not feasible "if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely")(quoting *In re American Capital Equip., 688 F.3d 145, 156 (3d Cir. 2012)).*

Casting a large shadow over the feasibility of Debtors' Plan is, again, the fact that they ascribe zero value to the NLRB's asserted administrative and priority claims.  Debtors' projection that the NLRB's claims are worthless cannot be taken seriously, or viewed as being based on any "objective fact," in light of the preliminary decisions to date against Debtors regarding the NLRB General Counsel's likelihood of success in the underlying litigation.  *See* NLRB's Memorandum Of Law In Support Of Opposition To Debtors' Motion For Entry Of An Order Granting Debtors' Omnibus Objections To The NLRB's Claims, Dkt. No. 844-1.  While

Care Realty and other affiliates have agreed to make certain contributions in order to ensure

implementation of Debtors' Plan, these entities have explicitly disavowed any responsibility for

payment of the NLRB's claims should they be entitled to priority under Sections 503(b) or

507(a) of the Code.  Plan § 4.1 at 41-42.  Thus, the Plan makes no provision whatsoever for the

possibility of a final judgment being entered against them in connection with the underlying

unfair labor practice proceedings.  This flaw in Debtors' Plan is fatal.  Because Debtors' ability

to successfully implement the Plan and avoid liquidation or further reorganization hinges on this

unreasonable assumption that they will owe no money on account of the NLRB's asserted

administrative and priority claims, the Plan cannot be confirmed.

## V.    THE PLAN WAS NOT PROPOSED IN GOOD FAITH

Section 1129(a)(3) of the Bankruptcy Code provides, in relevant part, that "[t]he court

shall confirm a plan only if . . . the plan has been proposed in good faith." 11 U.S.C. §

1129(a)(3).  Although the Code does not define "good faith" in Section 1129(a)(3), "the term has

been defined alternatively as requiring: (1) that the proposed plan foster a result consistent with

the Code's objectives, (2) that the plan have been proposed with honesty and good intentions and

with a basis for expecting that reorganization can be effected, or (3) that there was a fundamental

fairness in dealing with the creditors." *In re Lernout & Hauspie Speech Products, N.V.,* 301 B.R.

651, 657 (Bankr. D. Del. 2003)(internal citations omitted).

The Third Circuit has explained that for purposes of determining good faith, a court must

"determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose

for which it was not intended." *In re PPI Enterprises, Inc.,* 324 F.3d 197, 211 (3d Cir.

2003)(internal quotations omitted).  In making this determination, a factual inquiry of the

"totality of circumstances" is required.  *Id.; see also In re SGL Carbon Corp.,* 200 F.3d 154, 165

(3d Cir. 1999).  An important factor that courts consider is a debtor's pre-filing conduct.  *See In*

*re Quigley,* 437 B.R. 102, 125, 127 n.34 (Bankr. S.D.N.Y. 2010).  The filing of a petition to

obtain tactical litigation advantages is not "within the legitimate scope of bankruptcy laws."

*SGL Carbon Corp.,* 200 F.3d at 165. (quoting *In re Marsch*, 36 F.3d 825 (9th Cir. 1994)); *see*

*also In re Cedar Shore Resort, Inc.,* 235 F.3d 380-82 (8th Cir. 2000)(affirming dismissal of case

filed to dispose of lawsuit); *In re HBA East, Inc.,* 87 B.R. 248,  259-60 (Bankr. E.D.N.Y. 1988)

(dismissal of case in which bankruptcy petition was filed on eve of debtor's answer being due in

state court action).  The debtor bears the burden of establishing good faith.  *SGL Carbon Corp.,*

200 F.3d at 162 n.10.

Here, evidence suggests that Debtors' Plan was not filed in good faith.  The NLRB does

not dispute that potential future liability or a large judgment may, in certain circumstances,

require a company to legitimately seek out the protections provided by Chapter 11.  However,

the Court should not ignore the "totality of circumstances" here.  Based on all of the

circumstances surrounding Debtors' Chapter 11 filing, it appears that Debtors' primary purpose

in filing for bankruptcy was not to reorganize all of its financial obligations, but rather, to gain a

litigation advantage in the underlying unfair labor practice proceedings by structuring the Plan to

insulate Debtors' corporate parents from any liability for the disputed backpay claims.

First, as discussed at length above, the Plan provides for extremely broad releases for

Care Realty and numerous other affiliates without the obligations these companies would have if

they filed their own bankruptcy cases.  The timing of Debtors' Chapter 11 filing is also suspect.

*See HBA East,* 87 B.R. at 259-60 ("As a general rule where, as here, the timing of the filing of a

Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the

filing was a litigation tactic, the petition may be dismissed as not being filed in good faith.").

Notably, Care Realty abruptly decided to stop funding the Debtors' operating losses sometime in

February 2013, despite having funded these losses since at least 2010. *See* Tr. of Nov. 21, 2013

Hearing at 86: 6-8, 87:9-17, 89:9-11, 94:17-21. Care Realty's decision to discontinue its practice

of covering the Debtors' operating losses predictably resulted in Debtors filing for Chapter 11

relief on February 24, 2013. The filing of that petition was just on the heels of the Supreme

Court's denial of Debtors' motion to stay the 10(j) Order, *see HealthBridge Mgmt. LLC v.*

*Kreisberg*, 133 S.Ct. 1002 (Feb. 6, 2013), and only eight days prior to the date Debtors were

expected to reinstate the striking employees under the pre-implementation terms and conditions

of employment. With respect to their motivation for filing for bankruptcy, as previously noted, it

was expressly stated that Debtors filed for bankruptcy because of the costs of complying with the

pre-implementation terms and conditions. *See* Dkt. No. 5 at 3-4, 15-17 (Affidavit of Victor

Matthew Marcos in Support of Debtors' "First Day Motions"). Furthermore, the Amended

Disclosure Statement, in a section entitled "Events Precipitating these Chapter 11 Cases,"

discusses only the litigation surrounding the underlying unfair labor practice charges and 10(j)

proceedings. *See SGL Carbon Corp.,* 200 F.3d at 157, 167 (finding statements made by debtor's

representatives in public and in disclosure statement regarding the company's motivation for

filing for bankruptcy relevant to the good faith analysis).

   That is not the end of it. These factors must also be viewed in light of the various

provisions in the Plan reflecting Debtors' apparent antipathy toward their represented employees,

including for instance, the Plan's discriminatory treatment of the disputed backpay claims. *See*

*id.* at 158 (expressing concern about plan's treatment of antitrust judgment creditors, stating:

"[t]he plan's differing treatment of creditors suggests [debtor's] petition was not filed to

reorganize the company but rather to put pressure on antitrust plaintiffs to accept the company's

settlement terms."). Moreover, while Care Realty has gone to great lengths to ensure the

feasibility of Debtors' reorganization, by guaranteeing funding of administrative and other

priority claims in full and the ongoing trade vendors' claims at 75% of their allowed amount, it

has expressly disavowed any responsibility for payment of the NLRB's administrative and

priority claims should they be entitled to priority under Sections 503(b) or 507(a) of the Code.

Plan, at 41-42.  All of this suggests that the bankruptcy case has been filed with an improper

motive

In an analogous case, a plan involving a debtor facing significant asbestos liability was

denied for lack of good faith where the debtor's parent company was found to have

manufactured the bankruptcy case for its own benefit.  *Quigley*, 437 B.R. at 125-129.  There, as

here, the nondebtor parent company provided the bulk of the plan funding and "conceived and

executed the global strategy."  *Id.* at 126.  Based on the totality of the circumstances, the court

found that the plan was designed to free the nondebtor parent company, Pfizer, from its

derivative liability for the asbestos claims, "and only incidentally, to reorganize Quigley [the

subsidiary-debtor] to the extent necessary to confirm the plan."  *Id.*  Indeed, the court held that

the chapter 11 case was "a Quigley bankruptcy in name only," and that Pfizer was "the real

proponent of the plan." *Id.*

The same appears to be true here, namely, the evidence suggests that Debtors' Chapter 11

case has  been filed for the benefit of Debtors' parent companies in order to circumvent the

Board's proceedings and, while choosing not to file bankruptcy relief themselves, to insulate

themselves from any liability for the alleged unfair labor practices.  As the Third Circuit has

recognized, "filing a Chapter 11 petition merely to obtain tactical litigation advantages" is not a

valid purpose for reorganization.  Accordingly, the Plan is not proposed in "good faith" and

should not be confirmed.

## CONCLUSION

Based on the foregoing objections, the NLRB respectfully submits that the Plan does not

meet the requirements of 11 U.S.C. § 1129.  Accordingly, the NLRB requests that this Court

deny confirmation of Debtors' First Amended Plan.


Respectfully submitted,


_____/s/ Julie L. Kaufman_____
JULIE L. KAUFMAN
New Jersey Bar No.: 162974
Deputy Regional Attorney
Region 22, National Labor Relations Board
20 Washington Place
5th Floor
Newark, NJ  07102-3110


ABBY PROPIS SIMMS
Assistant General Counsel
Contempt, Compliance, and Special
   Litigation Branch
National Labor Relations Board
1099 14th Street, NW
Washington, DC 20570
(202) 273-2930


NANCY E. KESSLER PLATT
DAWN L. GOLDSTEIN (*pro hac vice*)
Supervisory Attorneys


PAUL A. THOMAS (*pro hac vice*)
MARISSA A. WAGNER (*pro hac vice*)
EDWARD D. SWIDRISKI III
Attorneys


Date: January 20, 2014
      Newark, NJ