FILED
JAMES J. WALDRON, CLERK

FEB 0 3 2014

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY _____ DEPUTY

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

In Re:

**710 LONG RIDGE ROAD OPERATING
COMPANY, II, LLC, et al.,**

                    Debtors.

Case No.:   13-13653 (DHS)

Judge: Donald H. Steckroth, U.S.B.J.

OPINION

**APPEARANCES:**


Cole Schotz Meisel Forman & Leonard
Michael D. Sirota, Esq.
Gerald Gline, Esq.
David Bass, Esq.
Ryan T. Jareck, Esq.
25 Main Street
Hackensack, New Jersey  07601
***Counsel for Debtor***


Levy Ratner
Suzanne Hepner, Esq.
Ryan J. Barbur, Esq.
80 Eighth Avenue
New York, New York  10011
***Counsel for New England Health Care
Workers, District 1199 SEIU***


National Labor Relations Board
Special Litigation Branch
Abby Propis Simms, Esq.
Julie L. Kaufman, Esq.
Nancy E. Kessler Platt, Esq.
Dawn L. Goldstein, Esq.
Paul Thomas, Esq.
John McGrath, Esq.
1099 14th Street, NW, Suite 8600
Washington, D.C.  20570
***Counsel for National Labor Relations Board***


Porzio, Bromberg & Newman, P.C.
Robert M. Schechter, Esq.
Rachel Segall, Esq.
100 Southgate Parkway
Morristown, New Jersey 07962
***Counsel for the Official Committee of
Unsecured Creditors***

**THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE**

The Court is presented with a motion ("Motion") filed by the Debtors that seeks an order (i) rejecting the continuing economic terms of the expired collective bargaining agreements ("CBAs") with the New England Health Care Employees Union, District 1199, SEIU (the "Union") under 11 U.S.C. § 1113(c); and (ii) implementing the terms of the Debtors' proposal under 11 U.S.C §1113(b) (the "1113(b) Proposal" or the "Proposal"). Each of the five Debtors operates a nursing care facility for the elderly (collectively, the "Debtors").

This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b) and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984 as amended September 18, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought is 11 U.S.C. § 1113(b) and 11 U.S.C. § 1113(c) of title 11 of the United States Code (the "Bankruptcy Code"). The following shall constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

As a threshold issue, the Debtors argue that this Court has jurisdiction to modify the continuing economic terms of the CBAs which previously expired by their own terms. The Union argues that the Court may not rely on 11 U.S.C. § 1113(c) to modify an expired CBA and that jurisdiction over the Motion lies with the National Labor Relations Board ("NLRB"). The Debtors assert the Union's position produces an absurd result, inconsistent with the purpose of the Bankruptcy Code to permit an orderly reorganization, as the National Labor Relations Act ("NLRA") process is lengthy and uncertain. Alternatively, the Union argues that the Debtors'

prior unilateral modifications to the CBAs preclude them from bringing the Motion under 11 U.S.C. § 1113(f).

The Debtors assert that they have satisfied the requirements for implementation of their Proposal under 11 U.S.C § 1113(b) because: (i) they have based their Proposal on a comprehensive six-year forecast and have provided details of the calculated savings associated with each modification; (ii) they have provided the Union with extensive relevant information to evaluate the Proposal through the production of thousands of documents and access to a voluminous data room; (iii) the Proposal treats all parties equitably and fairly through implementing cuts to non-Union wages and benefits, providing for a snap-back provision, and receiving claims waivers from the Debtors' landlords and non-debtor affiliates; (iv) without the modifications, the Debtors would incur millions of dollars in negative operational cash flow and would be forced to close down and liquidate their operations; (v) the balance of equities weigh in favor of the Proposal because the alternative is liquidation and loss of employment for hundreds; (vi) the Debtors attempted to confer in good faith by proposing numerous dates for negotiation meetings; and (vii) the Union rejected the Proposal without good cause by refusing to negotiate with the Debtors and failing to make a counterproposal.

The Union filed objections to the Motion arguing: (i) the financial forecasts lacked comprehensive information; (ii) the proposed modification to the Proposal was not presented to the Union before the Motion was filed and the Debtors failed to provide information regarding its non-debtor affiliates; (iii) the modifications are unfair because they propose a 15% payroll cut to Union workers as opposed to a 2% payroll cut to non-Union employees; (iv) the modifications are not necessary to reorganization because they have a minimal impact on Debtors' operations; (v) the Union never received the modified Proposal and thus had good cause to reject; (vi) the

balance of the equities weigh in favor of denying the Proposal because there is a strong possibility that rejection of the CBAs will trigger a strike; and (vii) the Debtors' prior unilateral modifications render good-faith bargaining an impossibility.

The NLRB also filed an objection that paralleled the Union's arguments. The Official Committee of Creditors (the "Creditors' Committee") supports the Debtors' Motion as modified after consultation with the Creditors' Committee and acceptance of the Committee's modification.

**RELEVANT FACTS**

**Debtors' Facts**

Each Debtor operates a sub-acute and long-term nursing care facility (each a "Facility" and collectively, the "Facilities") for the elderly in Connecticut. The Facilities are: (i) Long Ridge of Stamford, (ii) Newington Health Care Center, (iii) Westport Health Care Center, (iv) West River Health Care Center, and (v) Danbury Health Care Center. The Facilities are managed by HealthBridge Management, LLC ("HealthBridge"), a non-debtor national healthcare management company.

The Facilities are skilled nursing facilities that provide long-term care and short-term rehabilitation services. For long-term-care patients who have medical needs, the Facilities provide 24-hour-a-day nursing care, nutritional monitoring and planning, medication management, and personal care. For individuals in need of nursing and/or rehabilitation services following a recent hospitalization for orthopedic surgery, stroke, oncology care, cardiac care, general surgery, and other diagnoses, the Facilities offer medical and physical rehabilitation

5

including physical, occupational and speech therapy, rehabilitative nursing, and physician directed rehabilitation plans, intravenous therapy, wound care, and other services.

Each Facility is supervised by a licensed administrator and the nursing staff is supervised by a director of nursing. Each Facility also engages the services of a medical director to oversee the delivery of care to patients. The Debtors receive revenue from Medicare and Medicaid, patients who pay privately, and from other third-party payors. The sources and amounts of each Debtor's revenues are determined by, among other things, the census at the applicable Facility, the "case mix" of its patients, and reimbursement rates.

The Facilities are staffed by service and maintenance employees, 700 represented by the Union ("Union Employees") and 432 non-union. Each Debtor Facility entered into a separate CBA with its employees. The terms of the CBAs were similar between the Facilities and the Union and required the Debtors to make payments to employees for wages and benefits, including, but not limited to, accrued sick and vacation time, and to make payments for health coverage, pensions, and other benefits. The CBAs were effective from December 31, 2004 through March 16, 2011 and have expired.

At the time for renegotiation of the CBAs, the Debtors contend they were faced with the need to make cost saving benefit reductions to both Union and non-union employees. During a 16-month period and 36 bargaining sessions, the Debtors and Union negotiated but came to no resolution. After the Debtors felt that they had reached an impasse in June of 2012, the Debtors implemented their "Last, Best and Final" proposals as new terms ("Implemented Terms"). Following the Implemented Terms, the Union Employees organized a strike, walked out, and the Debtors hired replacement workers. The Debtors have operated the Facilities since June 2012 under the Implemented Terms.

The failed negotiations, strike, and replacement of the workforce led to a variety of actions by both the Union and the Debtors. The Debtors instituted an action for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO Act") for the Union Employees' alleged wrongdoing in disrupting treatment of patients and damaging the Facilities in protest. The action is pending in the United States District Court for the District of New Jersey. The NLRB, on behalf of the Union, brought a claim against the Debtors in the Office of Administrative Law before an Administrative Law Judge ("ALJ") asserting unfair labor practices and unlawful imposition of the Implemented Terms in the absence of a genuine, lawful impasse (the "ALJ Proceedings"). The hearing in the ALJ Proceedings began on September 10, 2012, and has continued post-petition. Thus far, there have been twenty-seven days of testimony. Nineteen additional days of testimony were scheduled through December 2013.

Pending the outcome of the ALJ proceedings, the United States District Court for the District of Connecticut, on request of the NLRB, issued injunctive relief in favor of the Union pursuant to section 10(j) of the NLRA. The section 10(j) relief provided that the Debtors were required to reinstate all of the Union Employees and provide the benefits and compensation set forth in the expired CBAs pending the outcome of the unfair labor practice allegations (the "10(j) Injunctive Relief"). The Debtors appealed the 10(j) Injunction to the United States Court of Appeals for the Second Circuit (the "Appeal"). The Debtors obtained an interim stay pending appeal of that Order by the Second Circuit. They were in the process of complying with the 10(j) Injunctive Relief following termination of the stay pending appeal and denial of all efforts to continue a stay when they filed their voluntary petition for chapter 11 relief on February 24, 2013. The Debtors assert that compliance with the 10(j) Injunctive Relief is the cause of their inability to operate and precipitated their bankruptcy filing.

**Additional Facts of the Union and NLRB**

The Union introduced additional facts regarding the organizational structure of the Debtors and related entities. According to various state financial filings, the Union asserts that the Debtors exist as part of a corporate network with principal ownership flowing to Daniel and Moshael Straus (the "Straus Family"). The Debtors are wholly owned by Care Realty, LLC ("Care Realty"), which is owned by a number of entities, the largest being the Straus family. In addition, Debtors' management company, HealthBridge, is also wholly owned by Care One, LCC. The Union alleges that the Straus Family is the principal owner of Partners HealthCare, LLC and that HealthBridge and Partners HealthCare have received over $23 million from the Debtors over the past three years.

The NLRB elaborated on the procedural posture of the section 10(j) Injunction. The Debtors appealed the ruling to the United States Court of Appeals for the Second Circuit where it was briefed on an expedited schedule. The Debtors also filed motions seeking a stay of the 10(j) Injunctive Relief before the District Court, the Second Circuit, and twice sought such relief from the United States Supreme Court, which denied a stay of the 10(j) Injunctive Relief pending the outcome of the appeal in the Second Circuit. On October 15, 2013, the Second Circuit released its decision affirming the District Court's grant of the 10(j) Injunctive Relief. *Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131 (2d Cir. 2013).

**Interim Modifications under 11 U.S.C. § 1113(e)**

On February 25, 2013, the Debtors filed a motion seeking relief under section 1113(e), providing for modifications to the Union Employees' wages and benefits by approximately 25% over a 13-week period, with a budget projecting $114,037.00 in net operating losses, assuming the requested CBA modifications ("First 1113(e) Motion"). After an evidentiary hearing, this

Court granted the Debtors six weeks of requested modifications, inviting them to return, if necessary, with a motion to approve debtor-in-possession financing and an extension of the CBA modifications. *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 13-13653 DHS, 2013 WL 796721 (Bankr. D.N.J. Mar. 4, 2013).

On March 22, 2013, the Debtors filed a verified application in support of their motion, pursuant to Sections 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure: (a) authorizing the Debtors to enter into a debtor-in-possession post-petition financing facility (the "DIP Facility") with Capital One, N.A., (b) authorizing the continued use of cash collateral and providing adequate protection, and (c) granting other related relief [Docket No. 164] (the "DIP Motion"). Without objection from any party, the Court approved the requested DIP Facility.

On March 29, 2013, the Debtors filed their Second 1113(e) Motion, seeking continued interim modifications for the period April 19, 2013-July 15, 2013, by projecting $6,276.00 in net operating losses, assuming continuation of the requested CBA modifications. Following an evidentiary hearing, the Court issued an oral opinion on April 10, 2013 (the "Second 1113(e) Opinion") granting the 1113(e) continuation motion. (See Transcript of Oral Opinion, Docket No. 298) In that opinion, the Bankruptcy Court determined that "testimony at [the April 9, 2013] hearing demonstrated in this Court's opinion that continued interim relief is essential to the Debtors' immediate survival." (See Hr'g Tr. 9:14-16, April 10, 2013). Consistent with its oral decision, the Bankruptcy Court, on April 10, 2013, entered the Second Interim 1113(e) Order extending the interim modifications through and including July 15, 2013.

On June 28, 2013, the Debtors filed their Third 1113(e) Motion, seeking continuation of interim modifications for the period July 15, 2013-October 11, 2013, assuming continuation of

the requested CBA modifications and the $5 million DIP Facility. On July 8, 2013, after consultation with the Creditors' Committee, the Debtors filed an affidavit reducing their request for wage and benefit cuts by $469,810.00. Based on this reduction and the testimony of Victor Matthew Marcos ("Marcos"), Vice President and Chief Financial Officer of each Debtor, the Bankruptcy Court, on July 15, 2013, entered the Third Interim 1113(e) Order extending the interim modifications through and including October 11, 2013.

On September 25, 2013, the Debtors filed their Fourth 1113(e) Motion, seeking continuation of interim modifications for the period October 11, 2013-January 10, 2004. The Union opposed the motion by incorporating all objections raised in the prior 1113(e) motions and appellate briefs. Marcos proffered testimony from his verified application and supplemental declaration, which was unrefuted by the Union. In fact, neither the Union nor the NLRB offered any affirmative evidence in objection to the Debtors' case. In its oral opinion, the Court found that without continued relief, the Debtors would "not be able to meet their ordinary operating expenses, would incur an event of default under the DIP facility . . . [and] would not be afforded the opportunity to seek permanent modifications to the collective bargaining agreements, towards their efforts to reorganize." (Oral Op. Tr. 7:11-15, November 22, 2013) Thus, the Court held that the revised interim modifications to the Debtors' CBAs with the Union were essential to both the continuation of the Debtors' businesses and to avoid irreparable damage to the Debtors' estates under Section 1113(e) of the Bankruptcy Code. On November 22, 2013, the Bankruptcy Court entered the Fourth Interim 1113(e) Order extending interim modifications through and including January 10, 2014.[1]

The Union and the NLRB each filed a notice of appeal and a motion pursuant to Bankruptcy Rule 8003 for leave to appeal the first two 1113(e) Interim Orders and the Court's

---

[1] This relief has been extended pending the issuance of this Opinion and accompanying Order.

April 9, 2013 Order denying the Union's Motion For Reconsideration ("First Motions for Leave to Appeal).  The District Court granted the First Motions for Leave to Appeal and on June 5, 2013, stayed briefing until either the District Court or the United States Court of Appeals for the Third Circuit denies the NLRB's request for a direct appeal to the Third Circuit pursuant to 28 U.S.C. § 158(d)(2) and Federal Rule of Bankruptcy Procedure 8001(f).  On June 6, 2013, the NLRB filed a motion for certification of a direct appeal of the Orders to the Third Circuit.  On June 20, 2013, the Debtors filed opposition to the NLRB's request for a direct appeal to the Third Circuit.  The Debtors filed opposition and cross-moved to vacate the Order granting the First Motions for Leave to Appeal.  On January 9, 2014, the District Court granted the Debtors' cross-motion to vacate the order granting the First Motions for Leave to Appeal.

On July 29, 2013, the Union and the NLRB each filed a notice of appeal and a motion for leave to appeal the Third 1113(e) Order dated July 15, 2013 ("Second Motions for Leave to Appeal"). On September 12, 2013, the NLRB filed a motion for certification of a direct appeal of the Third 1113(e) Order.  On January 9, 2014, the District Court entered an order denying the Second Motions for Leave to Appeal and the Motion for Certificate of Appealability.  The Union and the NLRB's motions for leave to appeal the Fourth Interim Order were filed on December 5, 2013.  On January 28, 2014, the District Court denied the motions for leave to appeal.

**The 1113(b) Proposal**

On June 13, 2013, the Debtors' counsel presented the Union's counsel with the Proposal pursuant to 11 U.S.C. § 1113(b) requesting savings from Union labor in the amount of $7,525,000 per year over the proposed six-year period.  (Decl. of Victor Matthew Marcos in Supp. of Debtors' Mot. ("Marcos Decl.") ¶¶ 12, Ex. C, ECF No. 561)  Specifically, the Debtors' Proposal includes terms regarding new hire rates, annual wage increases of 2% in the first two

contract years and 1.5% for contract years three through six, and a one-time wage increase of 4% for CBA Changes and 3% for ending pension contributions. The Proposal includes various changes to work hours, overtime, layoff and staffing. The modifications also propose to eliminate paid time for Union orientation, eliminate the bank of paid release time for Union delegates, and require Union delegates to conduct Union business on their own time.

The Proposal discusses both benefit eligibility and benefits including shift differentials, holidays, personal days, and vacation days. The Proposal states that employees will continue to receive shift and weekend differentials, but those employees hired after June 17, 2012 will not receive shift or weekend differentials. Employees will receive seven paid holidays and will accrue vacation days in proportion to their years of service. The Debtors propose a bi-weekly pay day, and to provide employees with two uniforms in lieu of the annual $300 uniform allowance. Finally, the Proposal addresses different types of leave, medical and prescription drug plans, insurance benefits, pension plans, the training fund, and work-related disabilities. (Debtors' Mem. of Law in Supp. of Mot. 23-28). [2]

Beginning on September 13, 2013, the Debtors met with the financial and legal advisors to the Creditors Committee concerning the 1113(b) Proposal. Based on those discussions, the Debtors submitted a second proposal (the "Modified 1113(b) Proposal" or "Modified Proposal") that adds two changes to the 1113(b) Proposal:

> (1) Reduce the period of the 1113(b) Proposal from six years to four years (2014-2017).
>
> (2) Inclusion of a "snap-back" provision in the event the Debtors perform more favorably than anticipated and any of the Debtors' Facilities exceed $500,000.00 in EBITDA[3] during any particular calendar year during the period 2014-2017 (the "Period"). For purposes of apportioning the "snap-back" for any particular

---

[2] The modifications as set forth in Debtors' Memorandum of Law are attached as Exhibit 1 to this Opinion.
[3] Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA").

Facility that exceeds $500,000.00 in EBITDA (the "Threshold") during the Period, the Union shall be entitled to the product of the amount of dollars that exceed the Threshold (the "Snap-Back Amount") and a fraction, the numerator of which is the amount of the Union concessions for that particular year and prior years during the Period, and the denominator of which is the sum of the amount of the Union concessions for that particular year and prior years during the Period plus the operating shortfalls funded by Care Realty, LLC for that particular year and prior years during the Period (the "Union Share"). The Union Share shall be paid to Union employees as a bonus. The modified terms shall, nevertheless, continue as approved in the Order (the "1113(c) Order") approving the Debtors' motion to reject the continuing economic terms of the expired CBAs under Section 1113(c) of the Bankruptcy Code. Care Realty, LLC shall be entitled to the Snap-Back Amount minus the Union Share. Provided, however, if in any year subsequent to the distribution of the Union Share, Care Realty, LLC is required to fund operating shortfalls for any particular Facility that exceed the amounts set forth in the Debtors' projections annexed as Exhibit A to the 1113(c) Order, then such amount shall be added to the Threshold for such Facility.

(Debtors' Mem. of Law in Supp. of Mot. 31).

## TESTIMONY AT THE HEARING

At the hearing, the Debtors presented two witnesses. First, Marcos testified through proffer of his Declaration in Support of the Motion (D-1 in Evidence). Marcos is the Vice President of each of the Chapter 11 Debtors and Chief Financial Officer of Case One Management and HealthBridge. He was previously a Senior Director of Alvarez and Marsal, where he worked in the healthcare industry primarily on financial and operational restructures. Jonathan A. Kaplan, Esq. ("Kaplan"), lead negotiator on behalf of the Debtor regarding its CBAs with the Union, also testified through proffer of his Declaration in Support of the Motion (D-2 in Evidence) as well as his Supplemental Declaration in Support of the Motion (D-3 in Evidence). Marcos was cross-examined by counsel for the Union and Kaplan was cross-examined by

counsel for both the Union and NLRB.  Neither the Union nor the NLRB offered a witness or affirmative evidence in opposition to the Motion.

The testimony of Marcos and Kaplan is significant on several critical elements before this Court.  Kaplan testified that the Debtors made numerous attempts to arrange meetings to negotiate with the Union for renewal of the CBAs both before and after the Debtors filed their Chapter 11 petitions.  (Decl. of Jonathan E. Kaplan, Esq. in Supp. of Debtors' Mot. ("Kaplan Decl.")  ¶ 12, ECF No. 562)    Before they presented their 1113(b) Proposal, the Debtors offered approximately thirty-five dates to meet with the Union.    (Kaplan Decl. ¶ 12)  Attached as exhibits to Kaplan's certification are emails he sent to various Union representatives requesting to resume negotiations in February 2013. (Kaplan Decl. ¶¶ 13-15, Exs. A-C)   The Union indicated it would not meet until it received five years' worth of financial statements for each of the Facilities and related entities. (Kaplan Decl. ¶ 16)   Kaplan informed the Union he was amenable to providing financial information for each Debtor (the "Financial Information") for the five-year period requested by the Union subject to mutually agreeable confidentiality agreements, and again offered several dates to meet to resume negotiations in March 2013. (Kaplan Decl. ¶ 18)  The Union responded by stating it would soon be providing another list of more specific information it would be requesting from the Debtors.  (Kaplan Decl. ¶ 20, Ex. H)   On March 12, 2013, the Union sent a letter (the "March 12 Request") to Kaplan containing numerous new information requests.  (Kaplan Decl.  ¶ 22, Ex. J)

After receiving the signed confidentiality agreements, Kaplan produced the Financial Information.  (Kaplan Decl. ¶ 26)  On March 30, 2013, the Debtors created an easily accessible web-based data room (the "Data Room") that was made available to fourteen of the Union's attorneys, officials, and financial consultants.  (Kaplan Decl. ¶¶ 26-27)  The Debtors posted more

than 670 financial records and 17,500 pages of information to the Data Room. (Kaplan Decl. ¶ 27) On March 31, 2013, Kaplan sent a letter which contained significant information in response to the Union's March 12 Request. (Kaplan Decl. ¶ 28) Within the three weeks following the date that the Debtors provided the Financial Information, the Union had not contacted the Debtors to resume negotiations. (Kaplan Decl. ¶ 29) On April 19, 2013, the Debtors once again renewed their request to meet with the Union to resume negotiations. (Kaplan Decl. ¶ 29) At that time, Union attorney John Creane responded that "the union is not prepared to meet and bargain until your client has complied with Judge Chatigny's injunction and restored the terms and conditions of employment in effect on June 16, 2012." (Kaplan Decl. ¶ 30, Ex. Q) Debtors' counsel subsequently sent a letter to counsel for the Union requesting that the Union reject Mr. Creane's statements and participate in good-faith bargaining with the Debtors. (Kaplan Decl. ¶ 31) Ms. Hepner, Union's counsel, replied by asking "whether [the Debtors were] requesting negotiations with the Union pursuant to the National Labor Relations Act and the 10(j) injunction. If so – as Mr. Creane's letter stated – the Union's response is that no good faith negotiations can take place until the terms and conditions in effect on June 16, 2012 are restored." (Kaplan Decl. ¶ 32, Ex. S)

On cross-examination, counsel for the Union inquired into the fact that the Debtors did not provide financial information for the Debtors' affiliates both before and after the bankruptcy filing. (Hr'g Tr. 133:4-18) Additionally, the Union questioned Kaplan about the fact that the Modified Proposal was not presented to the Union prior to the hearing. (Hr'g Tr. 95:21-23, 134:4-9) Counsel for the Union did not, however, undermine the credibility of Kaplan, who testified to the Debtors' sharing of relevant information and willingness to negotiate.

Marcos also testified regarding the data upon which the Proposal was based. Marcos certified that the 1113(b) Proposal was prepared by the Debtors' management under his direct supervision, following consultation with the Debtors' labor and bankruptcy counsel and financial advisors, Alvarez and Marsal ("A&M"). (Marcos Decl. ¶¶ 12, 14)  Included with the detailed Proposal were (a) a forecast for 2013 comparing the Debtors' financial projections assuming the proposed modifications to the projections as they would appear if the terms of the expired CBAs were to remain in place; (b) specific details regarding the savings calculated for the proposed changes; and (c) the benefit summary guide.  (Marcos Decl. ¶ 14)

Marcos testified further that after the Debtors submitted the Proposal on June 13, 2013, the Union responded with a request for twenty categories of additional information. (Marcos Decl.  ¶ 16)  The Debtors' management worked with its financial advisors to prepare responses to the requests, along with a long term financial forecast projecting the Debtors' operations over the six-year period from 2013-2018 (the "Six-Year Forecast").  (Marcos Decl. ¶ 17)  Marcos certified that the Six-Year Forecast contains assumptions regarding the potential savings that would result from the enactment of the Proposal, and accurately reflects the Debtors' anticipated post-confirmation finances. (Marcos Decl. ¶ 17)

On cross-examination, the Union's counsel stressed that the potential savings projected in the Six-Year Forecast were developed after the original proposal and thus were not a basis for forming the proposal. (Hr'g Tr. 73:20-25, 74:1-19)  Marcos responded that while the final Six-Year Forecast was developed in response to the Proposal, the Proposal had "factored in what was needed to bring the facilities closer to break even." (Hr'g Tr. 74:20-23)  The credibility of Marcos, who testified as to basis for the savings projected in the Proposal, was not refuted by the Union.  (See Marcos Decl. ¶ 18)

Additionally, Marcos testified that the Debtors imposed cost-cutting reductions upon their non-Union workforce that were substantially similar to those imposed upon the Union employees. His certification lists those benefit reductions as follows:

> the 30-minute paid meal break was eliminated reducing the compensable workweek from 40 hours to 37.5 hours; aggregate paid sick time and vacations were reduced by 5 days; the number of paid holidays was reduced from 8 to 7; shift and weekend premiums were eliminated for new hires; uniform allowances were replaced by the Facilities providing uniforms; employee contributions for health benefits were increased and the coverage provided was reduced; and the payroll was changed from weekly to bi-weekly.

(Marcos Decl. ¶ 17) Marcos further noted that the Debtors' landlords, 710 Long Ridge Road, LLC, 1 Burr Road, LLC, 107 Osborne Street, LLC, 240 Church Street, LLC, and 245 Orange Avenue, LLC (collectively, the "Landlord Entities"), agreed to waive cure claims in the total amount of $13,389,438 due and owing as a result of the Debtors' assumption of their real property leases under Section 365 of the Bankruptcy Code. Further, HealthBridge and Care Realty agreed to waive their claims in the amounts of $5,744,246[4] and $25,160,118, respectively. (Marcos Decl. ¶ 22) Marcos added that in response to significant losses suffered by the Debtors from 2010-2012, Care Realty, a non-debtor affiliate, had advanced funds in excess of $25 million to the Debtors to cover operating losses. (Marcos Decl. ¶ 10)

On cross-examination, counsel for the Union pointed out that the Proposal's cost-cutting provision reduced Union employees' payroll by 15% (Hr'g Tr. 71:6-8) as compared to a 2% cut for non-Union employees, (Hr'g Tr. 70:2-12). Counsel also pointed out that Marcos could not assign a numerical value to the Debtors' aggregate cash savings generated from the non-Union

---

[4] In correspondence dated January 9, 2014, Debtors' counsel informed the Court that the Debtors unintentionally disclosed that HealthBridge held $5,744,246 in claims against the Debtors when such claims were, in fact, held by Care Realty. Thus, Care Realty's total claim against the Debtors is $30,904,364. The Landlord entities and Care Realty collectively are owed the same $44,293,802 as disclosed in the Motion and have agreed to waive these claims.

cost cuts. (Hr'g Tr. 75:4-19, 76:14-23, 80:9-25) Union counsel inquired as to the corporate structure of the Debtors, revealing that many members of the Debtors shared ownership interests in the affiliated non-debtor entities. (Hr'g Tr. 59-69) The Union clarified that it was not, however, asserting that the affiliates had any legal duty to fund the Debtors. (Hr'g Tr. 92:4-25, 93:1-17) Finally, the Union pointed out that the related entities are not now advancing funds in response to the significant losses by the Debtors, despite having advanced funds to the Debtors in years prior. (Hr'g Tr. 130:6-8) Marcos testified that Care Realty would not continue to fund the Debtors' operations absent the section 1113(c) relief Debtors seek. (Hr'g Tr. 94:17-24)

Significantly, Marcos testified to the challenging nature of the nursing home market in Connecticut: "[i]n addition to the deep cuts in Medicare reimbursements for nursing homes implemented by the federal government, along with a Medicaid system that is underfunded, the Debtors have been (and continue to be) plagued with unworkably high labor costs under the CBAs covering their unionized workforce, primarily in the form of free pensions and free medical benefits, negatively impacting the Debtors' ability to service their patients." (Marcos Decl. ¶ 7) In support, Marcos referred to a cost study of Connecticut nursing homes that was conducted by an outside accounting firm, Marcum, LLP (the "Marcum Report") illustrating that the Debtors' costs far exceed that of other Connecticut nursing homes. (Marcos Decl. ¶ 8) Specifically, the Marcum Report indicates the Debtors had spent 225% more on pension benefits per resident than the statewide average, 17% more on pensions per day than seven other facilities with District 1199 contracts that experienced bankruptcy or receivership during 2012, and had daily benefit costs that were 24% higher than other District 1199 union facilities in Connecticut and 48% higher than the average of all union and non-union facilities statewide. (Marcos Decl.

¶ 8)  The Union neither refuted nor offered evidence to contradict this comparative financial information.

As a result of labor costs under the CBAs, the Debtors suffered significant losses between 2010 and 2012, prior to their bankruptcy filing. (Marcos Decl. ¶ 9)  In 2010, the Debtors' EBITDA was negative $2,224,005. In 2011 and 2012, the Debtors suffered negative EBITDA in the amount of $5,099,596 and $19,532,351 respectively. (Marcos Decl. ¶ 9)  Marcos testified that the changes set forth in the 1113(b) Proposal provide for essential operational changes necessary for the Debtors to operate going forward.  (Marcos Decl. ¶ 15)  If the terms of the expired CBAs were to continue in force, "the Debtors would incur negative EBITDA in the amounts of $9.8 million in 2013, $10.8 million in 2014, $10.3 million in 2015, $9.8 million in 2016, $9.5 million in 2017, and $9.1 million in 2018." (Marcos Decl. ¶ 24)  Thus, the testimony concluded that should the Motion be denied, the Debtors would be forced to shut down the Facilities and all of the Debtors' employees—both Union and non-union—would lose their jobs. (Marcos Decl. ¶ 10)  Moreover, the closing of operations would present particular health care related problems.  In the event of closure, elderly patients would have to be relocated to other care facilities, which is disruptive to their lives and could easily take several weeks.  Even with the modifications set forth in the 1113(b) Proposal, the Debtors require assistance from Care Realty in funding operating costs as they will continue to suffer negative EBITDA through 2018. (Marcos Decl. ¶ 25)

On cross-examination, the Union questioned Marcos about the annual cost savings associated with several of the Debtors' proposals.  (Hr'g Tr. 75-78)  The Union suggested that the Debtors failed to calculate the cost savings for specific aspects of the Proposal but Marcos testified those savings were insignificant and thus, unnecessary. (Hr'g Tr. 78:16-20)  Throughout

the hearing, the Union also made several insinuations that the underlying purpose of the Debtors' bankruptcy cases is to gain litigation advantage against the Union and the NLRB and to avoid the consequences of unfair labor practice violations. Neither the Union nor the NLRB presented any substantive evidence to support this contention.

Finally, Kaplan testified to a projected timeline regarding the NLRA adjudication process outside of bankruptcy's section 1113 procedures. He asserted that once the NLRB hearing concludes, the parties have a thirty-day period to submit post-hearing briefs. (Kaplan Decl. ¶ 8) Upon a showing of cause, this thirty-day period can be extended to sixty or ninety days, potentially carrying the due date for submission of briefs until March 2014. (Kaplan Decl. ¶ 8) Given the size and complexity of the ALJ hearings, the ALJ could take longer than six months to render an opinion. (Kaplan Decl. ¶ 8) Once the ALJ issues his opinion, the parties are entitled to appeal by filing an exception with the NLRB. (Kaplan Decl. ¶ 9) Kaplan predicted that because there are approximately 200 ALJ decisions where exceptions have been filed and thirty to thirty-five ALJ decisions where the time to file an exception has not expired, an NLRB decision on appeal would likely not be decided until 2015. (Kaplan Decl. ¶ 10)

During the Union's cross-examination, Kaplan acknowledged that NLRB policy requires expedited proceedings when a 10(j) injunction is in place. (Hr'g Tr. 128: 8-11) However, neither the NLRB nor the Union presented evidence contradicting Kaplan's proposed timeline, and did not refute or challenge Kaplan's credibility.


**DISCUSSION**

Assumption or rejection of a collective bargaining agreement is governed by 11 U.S.C. § 1113. Section 1113(a) provides that "[t]he debtor in possession may assume or reject a

collective bargaining agreement only in accordance with the provisions of this section." 11 U.S.C. § 1113(a) (West 2013). A debtor is permitted to reject its collective bargaining agreements if its proposed modifications comply with subsections (b) through (d) of Section 1113. *See* 11 U.S.C. § 1113. As a threshold matter in this case, the Court must determine whether the language of section 1113(a) gives Debtors the authority to reject an *expired* collective bargaining agreement. If this threshold issue is answered in the affirmative, the Court may enter an order approving the Debtors' application for rejection of their collective bargaining agreements only if the Debtors' Modified Proposal has satisfied the criteria listed in sections 1113(b) and 1113(d) of the Bankruptcy Code. *See* 11 U.S.C. § 1113.

I. <u>**This Court's Jurisdiction under Section 1113(c) to Modify the Terms of an Expired CBA**</u>

There is a split of authority with respect to whether Section 1113(c) applies to expired collective bargaining agreements. *Compare In re Karykeion, Inc.*, 435 B.R. 663, 675 (Bankr. C.D. Cal. 2010), *and In re Ormet Corp.,* 2005 WL 2000704, at *2 (S.D. Ohio 2005), *and In re Hoffman Bros. Packing Co. Inc*., 173 B.R. 177 (9th Cir. BAP 1994), *and Accurate Die Casting Co.*, 292 N.L.R.B. 982 (1989) (all holding that section 1113(c) applies to expired collective bargaining agreements), *with In re Hostess Brands, Inc.,* 477 B.R. 378, 379; (Bankr. S.D.N.Y. 2012); *and In re Sullivan Motor Delivery, Inc*., 56 B.R. 28, 29, 31 (Bankr. E.D. Wis. 1985); *and In re San Rafael Baking Co.,* 219 B.R. 860, 866 (B.A.P. 9th Cir. 1998) (all holding that section 1113 is only applicable where a collective bargaining agreement exists at the time the Chapter 11 case is filed).

The Union and the NLRB (collectively the "Objecting Parties") argue that because section 1113(a) of the Bankruptcy Code only gives Debtors the authority to "assume or reject a collective bargaining agreement . . . ." the statute does not grant the authority to reject the

continuing economic terms of expired collective bargaining agreements. The Union asserts that collective bargaining agreements are executory contracts which create a set of agreed upon obligations between the parties that exist only during the term of a contract and, when the collective bargaining agreements expire, they are no longer viewed under the law as contractual agreements. The Union argues that upon expiration, the NLRA requires employers to maintain the existing terms and conditions of employment until lawful impasse is reached, 29 U.S.C. § 158 (West 2013); *Saunders House v. NLRB,* 719 F.2d 683, 686 (3d Cir. 1983), and the continuing economic terms of the expired collective bargaining agreement remain in force only by virtue of their status as a statutory obligation under the NLRA.

The Debtors argue that the Bankruptcy Court has authority to reject the continuation of the economic terms of a post-expiration collective bargaining agreement. The Debtors view the language in section 1113(a) that refers to "collective bargaining agreements" as inclusive of those collective bargaining agreements which continue in effect by virtue of the NLRA, or in this case, a 10(j) injunction. The Debtors assert that the period in which the CBAs continue in effect does not solely refer to the contractual time period of the CBA, but to all the obligations during the time period between the CBAs' expiration and negotiation to a lawful impasse. Because the Debtors are required to continue to comply with the economic terms of a CBA even after expiration, they argue that common sense dictates they should be allowed to avail themselves of section 1113(c) in order to reject the continuing economic terms of the expired CBAs when the terms continue in effect during the period between expiration and bargaining to a lawful impasse. *See Karykeion*, 435 B.R. 663.

The Objecting Parties argue that there is a clear difference between the plain meaning of "collective bargaining agreement" and "the continuing economic terms of expired collective

bargaining agreements."  The Union additionally asserts that the period when a collective

bargaining agreement "continues in effect" does not refer to a time period between the

expiration of a CBA and negotiation to lawful impasse. The phrase that allows debtors to

propose interim modifications "during a period when the collective bargaining agreement

continues in effect" in Section 1113(e) of the Bankruptcy Code appears to be taken almost

verbatim from Section 8(d) of the NLRA, which applies only during the period when "there is

in effect a collective-bargaining contract."  Thus, the Objecting Parties assert that because upon

expiration there is no collective bargaining *contract* which continues in effect, the Debtors have

nothing to reject.

      The Union relies on *Hostess Brands,* 477 B.R. 378, where the court held that section

1113 did not apply to collective bargaining agreements that expired pre-petition, despite the

fact that certain terms of the CBA continued in effect pursuant to the NLRA provisions.  The

court's plain-language analysis rejected the debtor's proposition that the phrase "collective

bargaining agreement" does not refer to the mere contractual obligations of the CBA, but rather

is inclusive of the continuing obligations under the agreement imposed by the NLRA:

> I believe if I were to extend the language of "collective bargaining
> agreement" to "collective bargaining agreement in effect" or
> "collective bargaining agreement as it covers the relations between
> the parties," I would be basing that conclusion on, first, a policy
> that is not well-articulated or found in the statute itself. Secondly,
> I'm of a view that as a factual matter I do not believe it has been
> established that the post-expiration regime would so interfere with
> whatever the congressional policy is behind Section 1113 as to the
> negate, Congress's policy. This result might be different if the
> CBAs were governed by the RLA. And, finally, I believe it would
> stretch the statute's language too far.

*Hostess Brands,* 477 B.R. at 382-83 (internal citations omitted). Thus, the court rejected the

debtor's policy concerns and found that the language of the statute required a determination that

Section 1113(c) does not apply to an expired CBA. *See also Sullivan Motor Delivery*, 56 B.R. at 31 ("[Section] 1113 is therefore only germane where a collective bargaining agreement exists at the time the Chapter 11 case is filed."); *San Rafael Baking,* 219 B.R. at 866 (The CBA "did not continue in effect after its termination on September 30, 1996. No proceedings were initiated under § 1113 prior to the expiration of the [CBA] on September 30, 1996. Consequently, § 1113 does not allow the bankruptcy court to impose noncontractual obligations on a chapter 11 debtor.").

*Hostess Brands* also focused on the distinction between Section 1113(e)[5] and the other subsections of § 1113, noting that because section 1113(e) is the only subsection in Section 1113 that contains the "continues in effect" language, it is the only subsection that applies to expired CBAs. It was ultimately concluded that § 1113(a) is not applicable to expired CBAs, reasoning that § 1113(e) is likely an exception to the statute based on the "continues in effect" language contained only in that section. *Hostess Brands,* 477 B.R. at 382-83. This aspect of the court's analysis that the Union relies on, however, is dicta and contains analysis not essential to the Court's final determination. *See United States v. Ricks*, 5 F.3d 48, 50 (3d Cir. 1993). Clearly, the conclusion that section 1113(e) is an exception to section 1113 when viewed as a whole was not essential to the court's holding that it lacked subject matter jurisdiction to authorize a debtor to reject an expired CBA under 1113(c).

---

[5] Section 1113(e) provides: "If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot." 11 U.S.C. § 1113(e).

The *Hostess Brands* determination was based partially on the fact that the debtor had presented no evidence to demonstrate the length of the NLRA bargain process or that continuing the CBA provisions in effect would present a burden or financial risk:

> intuitively, [the court] feel[s] that the bargain to impasse process outside of the 1113 process, under the NLRA, could well be more lengthy or create more risk of uncertainty for prospective investors or acquirers of the debtors as a going concern. But it is at this level only an intuition. The debtor has not offered evidence on this issue.

*Hostess Brands,* 477 B.R. at 381. Significantly, the *Hostess Brands* court noted that the debtor had offered no evidence to support its argument that "uncertainty of a subsequent NLRB determination and an inevitable litigation . . . would so chill the debtor's reorganization efforts and, in particular, the debtor's efforts to raise exit financing or close a transaction necessary to preserve the debtor's going concern value." *Id.* It is as to this finding that the present case is clearly distinguishable as the Debtors here have presented substantial evidence demonstrating that the length of the NLRA process is burdensome and will pose a financial risk to their reorganization. In the instant matter, Debtors offered uncontroverted testimony that due to the ALJ's docket, an NLRB decision on appeal would likely not be decided until 2015. (Kaplan Decl. ¶ 10) This, coupled with the Debtors' uncontroverted testimony that Care Realty, the non-debtor affiliate which previously funded operating shortfalls, would not continue to fund the Debtors' operation absent section 1113(c) relief and that if the Debtors are required to reinstate all prior CBA terms and proceed solely under the NLRA without continued interim relief under section 1113(e) or permanent relief under section 1113(c), the Debtors risked closure, distinguishes the factual record from that in *Hostess Brands.* (Hr'g Tr. 94:17-24); (Kaplan Decl. ¶ 11) Thus, the Debtors in the present case offer factual evidence not challenged by the

Objecting Parties which addressed the concerns of the court in *Hostess Brands.  See Hostess Brands,* 477 B.R. at 381.

This Court finds the rationale presented by the Debtors and supported by the *Karykeion* decision to be more appropriate.  The *Karykeion* court based its conclusions on statutory language, legislative history, and Bankruptcy Code policy.

In *Karykeion,* 435 B.R. at 673, the court first determined that § 1113(e)'s language indicates "that it allows a debtor to terminate or modify its ongoing obligations to its organized workforce, whether those arise as a result of a current or expired CBA."  The court recognized that section 1113(e) allows a debtor to propose interim modifications to a CBA "during the period that it continues in effect" when the court finds it is essential to the debtor's business or to avoid irreparable harm to the estate.  *Karykeion,* 435 B.R. at 674; 11 U.S.C. § 1113(e).  In discussing the reasoning behind § 1113(e) and its application to expired CBAs, the court stated that:

> The phrase "continues in effect" is a term of art regularly used in labor law and decisions interpreting labor law . . . . The phrase refers to the time between the expiration of a CBA and the NLRB deciding that there is an impasse and the two parties are no longer bound by continuing effects of the agreement . . . . Such language is intended to give the debtors the authority to reject the continuing effects of expired collective bargaining agreements though compliance with § 1113 instead of the NLRA.

*Karykeion,* 435 B.R. at 674-75 (citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 200 (1991), for the proposition that "continues in effect" refers to the obligations to comply with terms post expiration by operation of law); *see also Hoffman Brothers*, 173 B.R. at 184 (stating in *dicta* that § 1113 gives a bankruptcy court authority, even if a CBA has expired, to modify or reject the CBA).

The congressional history leading to enactment of the statute supports the interpretation that Debtors may employ § 1113(c) to terminate or modify the residual effects of an expired collective bargaining agreement. Section 1113 was enacted in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984), which found that 11 U.S.C. § 365(a)[6] allowed a debtor to reject a collective bargaining agreement. *Bildisco & Bildisco*, 465 U.S. at 521-22. The Supreme Court found that the Bankruptcy Code prevented the NLRB from finding the debtor committed an unfair labor practice if the debtor unilaterally changed a CBA before reaching impasse, where the debtor had not yet assumed the contract. *Id.* at 532-534. The Court held that where a debtor had not assumed the collective bargaining agreement, there was no enforceable contract. It followed from this reasoning that a debtor's failure to maintain the continuing economic terms of a collective bargaining agreement was not an actionable unfair labor practice under the NLRA. The justification for the exception to the NLRA's strictures was Chapter 11's purpose of reorganization balanced against oversight by an administrative agency. *Karykeion,* 435 B.R. at 675. Thus, when enacting § 1113 in response to *Bildisco*, Congress gave the bankruptcy court power to implement the rejection of a collective bargaining agreement but only after complying with the procedures set forth in § 1113. Because the Supreme Court's reasoning in *Bildisco* provided the debtor with the "authority to reject or modify the residual obligations of a collective bargaining agreement, it would be an odd result to find that § 1113, enacted specifically to codify and modify *Bildisco,* did not allow a debtor to modify its residual obligations if it followed § 1113's procedures." *Id.*

---

[6] 11 U.S.C.§ 365 (West 2013) provides: "Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

Stated differently, this Court finds no logic to support Congressional intent allowing interim modifications to an expired CBA if essential to a Debtor's business or to avoid irreparable harm to the estate as permitted by 1113(e) but not allowing the rejection of the expired CBA terms if necessary to further the purpose of reorganization provided the conditions of § 1113(c) are satisfied.

Significantly, the NLRB itself has held that a debtor may avail itself of section 1113(c) to reject an expired collective bargaining agreement. In *Accurate Die Casting Co.,* 292 N.L.R.B. 982, the debtor failed to comply with its obligations under an expired collective bargaining agreement by enacting unilateral changes. The court noted that the debtor had never filed an application for rejection of the collective bargaining agreement with the bankruptcy court. *Id.* at 987. The debtor argued that, "[a]n examination of that section indicates that it speaks to only collective bargaining agreements in effect during the bankruptcy proceeding [and] . . . . At no juncture does the section apply to the case of a trustee or debtor in possession operating without a collective bargaining agreement." *Accurate Die Casting Co.,* 292 N.L.R.B. at 987. The NLRB set out the appropriate course of action for a debtor wishing to modify or reject the terms of its expired CBA:

> in order to make the changes that it sought in a lawful manner, [it] was required by the provisions of section 1113 to propose them to the Union, as the authorized representative of the employees in the unit, and, failing to obtain agreement by the Union to such changes, to make application to the bankruptcy court.

*Accurate Die Casting Co*., 292 N.L.R.B. at 988. Thus, the NLRB itself has held that a debtor may terminate its obligation to honor the residual effects of its expired CBA by complying with Section 1113(c).

This result falls in line with the legislative history of Section 1113, which reveals the statute was enacted to provide bankruptcy courts with the ultimate authority to modify or

terminate a debtor's collective bargaining obligations in order to permit an effective reorganization. *See* 130 Cong. Rec. 8899-900 at 20094 (daily ed. June 29, 1984) (statement of Sen. Daniel Moynihan) ("The conference report [of the debate preceding the passage of Section 1113] in my view, is a sound and entirely reasonable compromise between the goals Congress articulated in the National Labor Relations Act, and the bankruptcy proceedings under chapter 11, which allow companies to lower costs, when necessary, in order to reorganize."). Given this purpose, it follows that Congress could not have intended to limit such authority only to unexpired CBAs:

> Holding that § 1113 does not allow a debtor [to] reject the residual effects of an expired contract would greatly impede th[e] overriding goal [of section 1113 and the Bankruptcy Code]. If a debtor filed for bankruptcy one day after its labor contract expired, the debtor would be locked into these labor rates until the NLRB declared an impasse . . . . A debtor with current labor agreements, however, could modify all of its labor agreements without going to the NLRB. This difference makes little sense when . . . the purpose of bankruptcy is to allow a debtor to modify its ongoing obligations so that it does not have to liquidate.

*Karykeion,* 435 B.R. at 675-76.

This Court concludes that a CBA's status as either expired or unexpired has no effect on a debtor's need to modify or reject the continuing economic terms in order to ensure its survival as a going concern. A contrary holding would prevent debtors whose collective bargaining agreements expired prior to or during their pending chapter 11 case from availing themselves of Section 1113 to modify onerous continuing economic conditions of expired CBAs. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *see also In re Phila. Newspapers*, LLC, 599 F.3d

298, 317 (3d Cir. 2010); *In re Kaiser Aluminum Corp.,* 456 F.3d 328, 330 (3d Cir. 2006); *United States v. Barel*, 939 F.2d 26, 34 (3d Cir. 1991).

In the present case, strict adherence to the Union's interpretation of the statute would result, under the evidence before this Court, in the Debtors' closure, liquidation, and loss of employment for hundreds of workers. Conversely, the Debtors' interpretation is consistent with the clear legislative purpose of section 1113, which aims to allow debtors to lower labor costs if necessary to reorganize successfully. A statutory interpretation that leads to a determination that this Court has jurisdiction to allow the Debtors to reject the terms of their expired CBAs avoids an absurd result and promotes consistency with the legislative purpose of the statute and the Bankruptcy Code as a whole.

Finally, the Second Circuit in *Kreisberg ex rel. NLRB v. HealthBridge Mgmt., LLC et al.*, recently stated that "HealthBridge failed to present sufficient evidence indicating how it would be further adversely affected financially by this temporary order enforcing the prior CBA, under which the parties operated for half a decade *and which may be modified as necessary by the Bankruptcy Court*," 732 F.3d 131, 143 (2d. Cir. 2013) (emphasis added), suggesting that this Court has jurisdiction to modify the CBAs at issue. This determination by the Second Circuit was the rationale for the district court's denial of the Objecting Parties' request for leave to appeal the prior § 1113(e) decisions of this Court. (Order Denying the Second Mots. for Leave to Appeal and Mot. for Certificate of Appealability at 2, *NLRB and New England Health Care Employees Union, District 1199, SEIU v. 710 Long Ridge Road Operating Co. II, LLC, et al.*, Nos. 2: 13-cv-03247,13-05320, 13-05319, 13-03248 (D.N.J. Jan. 9, 2014)) (Order Denying Mots. for Leave to Appeal at 2, *NLRB and New England Health Care Employees Union, District*

*1199, SEIU v. 710 Long Ridge Road Operating Co. II, LLC, et al.,* Nos. 14-00381, 14-00397

(D.N.J Jan. 28, 2014)).

In light of the underlying purpose of § 1113(c) and based on the authority cited, this Court finds that § 1113(c) provides authority to reject and modify the terms of an expired collective bargaining agreement while those terms continue in effect during the Chapter 11 proceeding.

**II.     Whether Debtors' Prior Unilateral Modification of the Expired CBA Terms Estops Debtors from Rejecting the Agreement under § 1113(f)**

11 U.S.C. § 1113(f) states that "[n]o provision of this title shall be construed to permit a [debtor-in-possession] to unilaterally terminate or alter any provision of a CBA prior to compliance with the provisions of [§ 1113]." While Section 1113(f) does not prescribe a specific remedy for a debtor's unilateral alteration of terms of a collective bargaining agreement, the NLRB asserts the court has two options available: it can either treat pre-filing "self-help" as *per se* stripping a debtor of the right to reject a CBA or it can simply take it into account in determining whether a debtor has satisfied the requirements of Section 1113(b)(2). The Objecting Parties look to *In re Alabama Symphony Ass'n*, 211 B.R. 65, 70 (N.D. Ala. 1996), in which the court noted that "if a debtor is free to breach the [collective bargaining agreement] without impairing its ability to reject the contract later, then § 1113 provides no incentive to abide by the terms of the [collective bargaining agreement] in the interim."

*Alabama Symphony*, 211 B.R. at 69, held rejection of a collective bargaining agreement under Section 1113(c) is improper where the debtor has unilaterally modified terms and conditions of employment, thereby ceasing to perform its obligations under the collective bargaining agreement, prior to seeking court permission to reject the collective bargaining

agreement.  The unilateral change doctrine of *NLRB v. Katz,* 369 U.S. 736 (1962), extends to cases in which an existing agreement has expired and negotiations on a new agreement have yet to be completed. *See, e.g., Laborers Health and Welfare Trust Fund v. Advanced Lightweight Concrete Co.,* 484 U.S. 539, 544 (1988); *Litton Fin. Printing Div.,* 501 U.S. at 191.

The Debtors distinguish *Alabama Symphony* by arguing that Section 1113(f) was only meant to apply to post-petition conduct.  *See In re Jones Truck Lines, Inc*., 130 F.3d 323, 330 (8th Cir. 1997) (Section 1113(f) refers to post-petition conduct by the debtor in a Chapter 11 reorganization).  More specifically, Section 1113(f) was designed to prevent employers "from using bankruptcy as an offensive weapon to rid themselves of burdensome collective bargaining agreements." *See In re Ionosphere Clubs, Inc.*, 22 F.3d 403, 408 (2d Cir. 1994).

In *Alabama Symphony,* the debtors stopped making payments of compensation and benefits post-bankruptcy prior to asking the bankruptcy court for relief from its obligations under the collective bargaining agreement and without seeking the permission of the court for interim relief as provided in Section 1113(e).  *Id.* at 67-68, 70. Thus, the debtor breached the collective bargaining agreement post-petition and the court found that the breach constituted a unilateral termination or alteration in violation of section 1113(f).

The court in *In re Ind. Grocery Co., Inc.,* 138 B.R. 40, 47-47 (Bankr. S.D. Ind. 1990) found that pre-petition modifications were not a basis to conclude that a debtor had violated Section 1113, holding:

> The modifications made prepetition are the subject of an NLRB unfair labor practice action, over which this Court has no jurisdiction, see <u>In re Carib-Inn of San Juan Corp.</u>, 905 F.2d 561 (1st Cir. 1990), and on which the Court expresses no opinion.  If the union prevails in that action, it may assert a claim against IGC. The modifications may be found to have been an unfair labor practice, *but they cannot be violations of section 1113, since prior to filing for relief in bankruptcy, that section had no application to*

> *IGC's actions*.  On filing, IGC became a DIP, an entity different,
> for many purposes, than it was prepetition.  IGC, as DIP, has made
> no unilateral changes in the CBA, but has made a proposal to the
> union to modify the terms of the CBA, as the union contends them
> to be.

(emphasis added).

In this case, the Debtors' unilateral modifications—which the Debtors note have not been
found to be unlawful in a final ruling—go back in time to 2009.  Since the Debtors' bankruptcy
filing in 2013, they complied with the terms of the 10(j) Injunction until modification under
§ 1113(e) was sought and authorized.  The Objecting Parties have not asserted that the Debtors
unilaterally terminated or altered the collective bargaining agreements post-petition, and
accordingly, the prior pre-petition unilateral modifications do not preclude the Debtors' motion
to reject.

### III.  Whether the Court Shall Approve the Motion for Rejection of the CBAs under § 1113(c)

Section 1113(c) of the Bankruptcy Code provides that

> [t]he court shall approve an application for rejection of a collective
> bargaining agreement only if the court finds that (1) the trustee has,
> prior to the hearing, made a proposal that fulfills the requirements
> of subsection (b)(1); (2) the authorized representative of the
> employees has refused to accept such proposal without good cause;
> and (3) the balance of the equities clearly favors rejection of such
> agreement.

11 U.S.C. § 1113(c) (West 2013).  The reference to subsection 1113(b)(1) incorporates into
1113(c) the Debtors' burden to:

> (A) make a proposal to the authorized representative of the
> employees covered by such agreement, based on the most
> complete and reliable information available at the time of such
> proposal, which provides for those necessary modifications in the
> employees benefits and protections that are necessary to permit the
> reorganization of the debtor and assures that all creditors, the
> debtor and all of the affected parties are treated fairly and
> equitably; and (B) provide, subject to subsection (d)(3), the

representative of the employees with such relevant information as
is necessary to evaluate the proposal.

11 U.S.C. § 1113. Thus, a Section 1113 proposal must be "based on the most complete and reliable information available." 11 U.S.C. § 1113(b)(l)(A). The debtor must have supplied the union with "such relevant information as is necessary to evaluate the proposal." 11 U.S.C. § 1113(b)(l)(A). The proposal modifications must treat all parties "fairly and equitably," 11 U.S.C. § 1113(b)(l)(A), and must be "necessary to permit the reorganization of the debtor." 11 U.S.C. § 1113(b)(l)(A); *Wheeling-Pittsburgh Steel Corp. v. United Steelworkers of America*, 791 F.2d 1074, 1088 (3d Cir. 1986); *see also United Food & Commercial Workers Union, Local 211 v. Family Snacks, Inc.* (*In re Family Snacks, Inc.*), 257 B.R. 884, 892-93 (8th Cir. B.A.P. 2001). The union must have rejected the proposal without "good cause," 11 U.S.C. § 1113(c)(2), and the "balance of the equities" must favor rejection. 11 U.S.C. § 1113(c)(2); *see also Wheeling-Pittsburgh*, 791 F.2d at 1088; *Family Snacks*, 257 B.R. at 892 (citing *In re Am. Provision Co.*, 44 B.R. 907, 909 (Bankr. D. Minn. 1984)). Finally, between the time of the proposal and the hearing, the debtor must meet with the union "at reasonable times" and must "confer in good faith" in an attempt to agree on modifications to the collective bargaining agreements. 11 U.S.C. § 1113(b)(2).

### A. Whether the Proposal was Based on the Most Complete and Reliable Information Available at the Time of the Proposal

A Section 1113(b) proposal must be "based on the most complete and reliable information available at the time of such proposal." § 1113(b)(1)(A). "[This] requirement goes to the comprehensiveness of the underlying factual support for a debtor's projections under § 1113(a)—its breadth, depth, and objective credibility." *Karykeion,* 435 B.R. at 677. "The debtor is simply required to gather the most complete information available at the time and to base its

proposal on the information it considers reliable." *Karykeion,* 435 B.R. at 678. Section 1113 proposals do not need to be perfect, but the debtor must make "an honest effort to compile all data relevant to making its proposal." *Ass'n of Flight Attendants-CWA, AFL-CIO v. Mesaba Aviation, Inc*., 350 B.R. 435, 454 (D. Minn. 2006) (quoting *In re U.S. Truck Co. Holdings, Inc*., Case No. 99-59972-WS, 2000 WL 1580098, 2000 Bankr. LEXIS 1376, at *39 (Bankr. E.D. Mich. Sept.29, 2000)).

In the present case, the Debtors supported the 1113(b) Proposal with (a) a forecast for 2013 comparing their financial projections with the proposed modifications in effect to the projections that would appear if the terms of the expired CBAs were to remain in place; (b) specific details as to each of the facilities regarding the savings calculated for the proposed changes; and (c) the benefit summary guide. (Marcos Decl. ¶ 14) Following the Union's request for more information, the Debtors compiled the Six-Year Forecast. The Modified 1113(b) Proposal follows significant data productions and several contested evidentiary hearings in the context of the Debtors' motions to seek relief under Section 1113(e) of the Bankruptcy Code. All of this information and data was provided and available to the Union.

Marcos also responded to Union counsel's inquiry regarding the timing of the Six-Year Forecast, by explaining that while the final Six-Year Forecast was developed in response to the 1113(b) Proposal, the Proposal had "factored in what was needed to bring the facilities closer to break even." (Hr'g Tr. 74:20-23) The Union did not undermine the credibility of the Debtors' Chief Financial Officer and offered no evidence, financial or otherwise, challenging the financial information and projections or showing they were in any way unreliable or lacked credibility. Thus, the Proposal is found to be based on the most complete and reliable information available at the time it was proffered.

**B.** **Whether the Debtors Supplied the Union with the Relevant Information Necessary to Evaluate the Proposal**

The debtor is to "provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal." 11 U.S.C. § 1113(b)(1)(B). "The debtor bears the initial burden of producing evidence of the information that it has provided to the union. The burden then shifts to the union to rebut the debtor's explicit or implicit assertion that such evidence is sufficient to enable an evaluation of the proposal." *Karykeion,* 435 B.R. at 680. "The breadth and scope of the information depends on the circumstances of the debtor and severity of the modifications." *Id.* at 680-81.

The Union asserts that the Modified Proposal was first presented to the Union in the Motion, in violation of section 1113(b)(1)(A)'s requirement that prior to filing an application seeking rejection, the Debtor must make its proposal for modifications to the authorized representative of the employees covered by such agreement. The Objecting Parties also assert that the Debtors have failed and refused to provide the Union with information regarding its non-debtor affiliates which the Union needs in order to evaluate the viability of any proposal, as well as whether the proposal is necessary for reorganization, and whether it is fair and equitable. (Hr'g Tr. 133:4-18) The Debtors assert they had good reason to reject the Union's request for information regarding non-debtor affiliates asserting it is irrelevant to the Debtors' reorganization or the Union's evaluation of the Modified Proposal.

While the Debtors did not present the Modified Proposal to the Union until this Motion was filed, the Modified Proposal is essentially identical to the Proposal which was timely presented to the Union. In fact, counsel for the Union asserted during her cross examination of Kaplan that the Modified Proposal was so substantially similar to the 1113(b) Proposal that the Debtors could not have expected the Union to accept it. (See Hr'g Tr. 110:7-12) The Modified

Proposal, which adopted changes requested by the Creditors' Committee, simply changes the effective period from six years to four years, while providing for a snap-back period, both changes beneficial to the Union members and creditors of the estate. Thus, the changes are not negative to the Union's consideration. While technically the Debtors did not present the Modified Proposal to the Union, they did present the Proposal and underlying financial information in a timely manner and thus the Union's objection is overruled.[7]

It is important to note the record demonstrates the Debtors provided the Union with relevant information by providing thousands of documents and setting up a data room. (Kaplan Decl. ¶¶ 26-27) In addition, the Debtors responded to every relevant information request. (Kaplan Decl. ¶ 12-32) This type of extensive information sharing satisfies the requirements of section 1113(b). *See, e.g., In re AMR Corp.*, 477 B.R. 384, 439-43 (Bankr. S.D.N.Y. 2012) (debtor supplied necessary information through extensive policy of information sharing, giving high priority to union requests, facilitating information sharing through a web-based data room, and sharing its valuations of proposed work rule changes, although it did not perform new analyses at union's request or provide a live business plan model). Thus, because the Debtors gave high priority to satisfying the Union requests, responded to all relevant queries, and provided a broad scope of information more than sufficient to enable the Union to evaluate the Proposal, the Debtors have satisfied this element.

C.    **Whether the Modifications in the Proposal Treat All Parties Fairly and Equitably**

The Third Circuit instructs that "the focus of inquiry as to 'fair and equitable' treatment should be whether the [debtor's] proposal would impose a disproportionate burden on the

---

[7] At times in the Opinion, "Proposed" and "Modified Proposed" are used interchangeably because of their almost identical terms.

employees." *Wheeling-Pittsburgh*, 791 F.2d at 1091. The burden must be spread fairly and equitably among all affected parties. *Id.* "[E]quity means fairness under the circumstances," and does not require the proposal to give every constituency the very same treatment. *In re Ind. Grocery Co., Inc.*, 138 B.R. 40, 48 (Bankr. S.D. Ind. 1990).

Significantly, the Third Circuit has recognized that while "it may be possible to compare the amount or percentage of its cost reduction from various sources during reorganization . . . . when examining the fairness and equity to the parties who are making concessions, as section 1113 also requires us to do, we are uncertain of the basis for comparison in either dollar or percentage terms." *Wheeling-Pittsburgh*, 791 F.2d at 1092. The court should focus on "whether the proposed sacrifices will be borne exclusively by members of the bargaining unit or will be spread among all affected parties. The concessions sought from various parties must be examined from a realistic standpoint." *In re Bowen Enters.*, 196 B.R. 734, 743 (Bankr. W.D. Pa. 1996) (internal citation omitted). The Second Circuit has also noted that a "debtor is not required to prove, in all instances, that managers and non-union employees will have their salaries and benefits cut to the same degree that union workers' benefits are to be reduced." *Truck Drivers Local 807, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Carey Transp. Inc.*, 816 F.2d 82, 90 (2d Cir. 1987). The Second Circuit went on to note that it is sufficient for a debtor to rely on proof that those other than union employees are bearing some sacrifice, such as assuming increased responsibilities. *Id.* "Fairness and equity do not require that the proposed treatment of employees belonging to the bargaining unit be identical to the anticipated treatment of other affected parties." *Bowen Enters.*, 196 B.R. at 743.

The Objecting Parties argue that the Proposal is unfair because its cost-cutting provision reduced Union employees' payroll by 15% as compared to the 2% reduction endured by non-

Union employees. However, the inquiry should not be focused solely on percentage of cost reduction. *See Wheeling-Pittsburgh*, 791 F.2d at 1092.

The testimony revealed that while the Debtors have reduced non-Union wages and benefits by only 2%, these wages and benefits were already significantly less than those given to Union employees. The Union employee reductions thus closed that gap and bring fairness to all employees. The Debtors also are implementing a snap-back provision to provide for a sharing by Debtors with all employees if profits are obtained beyond a minimum threshold. Moreover, it cannot be ignored the Landlord Entities have waived $13,389,438 in cure amounts, and Care Realty has waived its prepetition claims in the amount of $30,904,364, all items effecting fairness and equitable treatment. *Accord Bowen Enters.,* 196 B.R. at 743 (facts supporting the fairness and equity of the proposed modifications included pre-petition creditors agreeing to reduce their claims by 20% and supplier making significant concessions including foregoing payment of interest on credit extended, reduction of "upcharge" on delivering of goods, and reduction in rent compared to market). In this case, the Debtors have received concessions from various parties including very substantial claims waivers from related entities, and have implemented reductions to non-union wages and benefits already below Union member benefits and wages under the expired CBAs. The cost-cutting provisions are not identical, but the legal standard does not necessitate that requirement. Here, the Proposal is fair and equitable under the circumstances of this case.

**D.**     **Whether the Modifications in the Proposal are Necessary to Reorganization**

The Third Circuit further instructs that "necessary" modifications to collective bargaining agreements include only those that are essential to the debtor's short-term survival or absolutely necessary to prevent the debtor from being forced to liquidate. *See Wheeling-Pittsburgh*, 791

F.2d at 1092. This inquiry focuses on "the short-term goal of avoiding liquidation, not upon the long-term goal of making debtor 'whole' once it emerges from reorganization." *Bowen Enters.*, 196 B.R. at 742. A proposal is "necessary" under § 1113(b)(1)(A) only if it contains the minimum modifications that are essential to prevent a debtor's liquidation. *See Wheeling-Pittsburgh*, 791 F.2d at 1092. One relevant factor in determining whether a proposal's modifications are truly necessary for reorganization is whether the proposal contains a snap-back provision. "Snap-back provisions in modification proposals are favored because they ensure that once a company is profitable enough for successful reorganization, further profits not 'necessary' for reorganization are returned to the employees who made the concessions." *In re Ind. Grocery Co., Inc.,* 136 B.R. at 192.

The Objecting Parties argue that the Debtors' proposed modifications are not necessary for reorganization; rather, they are an impermissible attempt by the Debtors to cure themselves of "union indigestion." The Union asserts the Proposal includes modifications that restrict employees' union activity while having little or no financial impact on Debtors' operations, revealing the Debtors' true motivation to obtain relief not from purportedly onerous labor costs, but from their employees' chosen labor representative. However, the Union offers no evidence to support this allegation, and the record reveals the Union made no counter proposal whatsoever to address its concerns, financial or otherwise, nor sought to negotiate away the very terms it finds restrictive.

Here, the Debtors have confirmed that they suffered negative EBITDA in the amount of $2.2 million, $4.3 million and $19.5 million in 2010, 2011, and 2012, respectively. Marcos testified regarding the challenging nature of the nursing home market in Connecticut, referring to a cost study of Connecticut nursing homes for the proposition that the Debtors' costs far exceed

that of other Connecticut nursing homes.  Marcos certified that the changes listed in the 1113(b)

Proposal provide for essential operational changes necessary for the Debtors to operate going

forward.   As noted previously, if the terms of the expired CBAs continue in force, "the Debtors

would incur negative EBITDA in the amounts of $9.8 million in 2013, $10.8 million in 2014,

$10.3 million in 2015, $9.8 million in 2016, $9.5 million in 2017, and $9.1 million in 2018."

(Marcos Decl. ¶ 24)  These conclusions have gone unchallenged by the Objecting Parties in this

reorganization proceeding.

The Debtors' Chief Financial Officer further provided uncontroverted testimony that

without 1113(c) relief, the Debtors would be forced to liquidate, shut down all facilities, and the

Debtors' employees—both Union and non-union—would all lose their jobs.  The Union offered

no real challenge to this conclusion, it seems to favor such a result.  Additionally, the Modified

Proposal contains a snap-back provision in order to afford balance to the Proposal and limit any

profit beyond that necessary to ensure the Debtors' financial survival. Even with the

modifications set forth in the 1113(b) Proposal, the Debtors require assistance from Care Realty

in funding operating costs as they will continue to suffer negative EBITDA through 2018. Thus,

the record reflects the Debtors' 1113(b) modifications are less than those necessary to account

for the Debtors' operating shortfalls and financial feasibility.  The only alternative before the

Court to liquidation is the Proposal, and thus, the modifications are essential to the Debtors'

short-term survival.

### E.   Whether the Union Rejected the Proposal Without Good Cause

Section 1113(c)(2) of the Bankruptcy Code provides that an application to reject a

collective bargaining agreement may be approved only if "the authorized representative of the

employees has refused to accept such proposal without good cause." *See Bowen Enters.*, 197

B.R. at 745. "[O]nce the debtor has shown that the [u]nion has refused to accept its proposal the [u]nion must produce evidence that it was not without good cause." *Am. Provision,* 44 B.R. at 910; *see also In re Valley Steel Prods. Co., Inc*., 142 B.R. 337, 342 (Bankr. E.D. Mo. 1992) (holding that union refused to accept the proposals without good cause because, in part, it failed to offer any evidence or examples to substantiate its assertion of good cause). Although the debtor has the ultimate burden of persuasion on the matter, the union is required to supply "its reason for declining to accept the debtor's proposal in whole or in part." *Carey Transp*., 816 F.2d at 92. When the debtor is in need of relief, "intransigence by the union, in the pre-petition negotiations, may also warrant rejection." *In re Garofalo's Finer Foods, Inc.,* 117 B.R. 363, 371 (Bankr. N.D. Ill. 1990). When the union fails to explain its reasons for declining to accept the debtor's proposal in whole or in part during pre-hearing negotiations, rejection is without good cause. *Id.* A Union's refusal to negotiate and delayed response to the Proposal has been found to be sufficient lack of good cause for rejection. *See In re Sierra Steel Corp.,* 88 B.R. 337, 340-41 (Bankr. D. Colo.1988). Nevertheless, a mere counterproposal during negotiations can constitute rejection of a debtor's proposal with good cause. *In re Royal Composing Room, Inc.*, 848 F.2d 345, 347 (2d Cir.1988).

In this case, the Debtors have established that the Union has refused to even meet regarding negotiations let alone present a counterproposal to the Modified Proposal. Counsel for the Union indicated the Union would not negotiate so long as the interim modifications remained in place. (See Kaplan Decl. ¶ 30, Ex. Q) ("[T]he union is not prepared to meet and bargain until your client has complied with Judge Chatigny's injunction and restored the terms and conditions of employment in effect on June 16, 2012."). These are the interim modifications approved by Orders of this Court under section 1113(e). While the Union did engage in limited cross-

examination of Debtors' witnesses regarding the Proposal, it never presented the Debtors with these concerns prior to the hearing, nor offered any constructive proposal or evidence to suggest the Proposal should be rejected. The Union's position has been intransigent. The Court considers this refusal to negotiate precisely the type of intransigence that warrants a finding of rejection without good cause. *See Garofalo's Finer Foods,* 117 B.R. 363, 371. No other finding can fairly be made in judging the Union's conduct in these proceedings.

Thus, the Debtors have satisfied their burden under section 1113(c)(2) through showing that the Union has refused to accept its Proposal without good cause.

### F.  Whether the Balance of the Equities Favors Rejection

Section 1113(c)(3) of the Bankruptcy Code provides that a collective bargaining agreement may be rejected if "the balance of the equities clearly favor rejection of such agreement." *See Bowen Enters.,* 197 B.R. at 747. In determining whether the balance of the equities favors rejection, courts consider the following six factors:

> (1) the likelihood and consequences of liquidation if rejection is not permitted; (2) the likely reduction in the value of creditors' claims if the bargaining agreement remains in force; (3) the likelihood and consequences of a strike if the bargaining agreement is voided; (4) the possibility and likely effect of any employee claims for breach of contract if rejection is approved; (5) the cost-spreading abilities of the various parties, taking into account the number of employees covered by the bargaining agreement and how various employees' wages and benefits compare to those of others in the industry; and (6) the good or bad faith of the parties in dealing with the debtor's financial dilemma.

*In re Mesaba Aviation, Inc.,* 341 B.R. 693, 757 (Bankr. D. Minn. 2006) (citing *Carey Transp*., 816 F.2d at 93). The Objecting Parties assert that there is a strong possibility of a strike given the acrimonious history between the parties.

The Debtors assert that because its only alternative to the Proposal is liquidation, the balance of equities weigh in favor of rejection. *See Bowen Enters.,* 196 B.R. at 745 (the balance of equities clearly favored rejection when the "debtor unquestionably [would] have to undergo liquidation in the very near future unless it [was] relieved of the high labor costs imposed by the collective bargaining agreement"). It cannot be ignored that the Debtors have offered evidence illustrating their high labor costs as compared to other nursing homes in Connecticut, even nursing homes which have been forced into receivership because of labor costs. Finally, the Debtors have illustrated their willingness (and repeated efforts) to negotiate while the Union has refused to meet or even to articulate its reasons for failing to respond to the Debtors' Proposal.[8] In this case, the imminent likelihood of the Debtor's liquidation (not disputed by the Union) far outweighs the Objecting Parties' asserted possibility of a strike, and thus, the balance of the equities favors rejection of the collective bargaining agreements.

### G. Whether the Debtors Met with the Union at Reasonable Times to Confer in Good Faith

Under 1113(b)(2), the debtor must "confer in good faith in attempting to reach mutually satisfactory modifications" of the CBA. "[O]nce the debtor has shown that it has met with the union representatives, it is incumbent upon the union to produce evidence that the debtor did not confer in good faith." *Am. Provision*, 44 B.R. at 909.

Here, the evidence demonstrates that since filing Chapter 11, Debtors proposed thirty-five dates for meetings and invited the Union to suggest other available dates. Further, since making the 1113(b) Proposal, the Debtors suggested fifteen additional meeting dates. The Objecting Parties refused to meet and assert that the prior unilateral modification to the terms

---

[8] The Union never responded or defended the Debtors' statements that this same Union (District 1199) is party to CBAs with other Connecticut nursing homes containing wage and benefit terms far less than those imposed in the Debtors' expired CBAs. Debtors suggested that comparable terms would be acceptable to them but the Union's refusal to meet and negotiate prevents these discussions from being considered.

and conditions makes good faith bargaining a legal impossibility. Here, while the Code requires a showing that the Debtors conferred in good faith to attempt mutually satisfactory modifications, it is the Union's refusal to confer which presents the difficulty. Without meetings being held, the Debtors cannot be said to have failed to confer in good faith.

While the Objecting Parties urge the Court to find bad faith based upon the prior prepetition conduct of the Debtors, they do dispute the fact that the unfair labor proceedings are still pending. The good faith requirement in Section 1113(b)(2) applies to the time period when the Debtors made the Proposal until the date of the hearing. *See* 11 U.S.C. § 1113(b)(2). All of the Union's allegations regarding the Debtors' bad faith occurred prior to the petition and the evidence establishes the Union's absolute intransigence since the Chapter 11 filing. The Union has presented no evidence suggesting the Debtors failed to confer in good faith; in fact, the opposite is true. The Union's refusal demonstrates its lack of understanding of the rehabilitation purpose of the Bankruptcy Code and the provisions of § 1113.

## CONCLUSION

The Court finds that it has jurisdiction to modify the terms of an expired CBA under section 1113(c). Based upon the record before it, the Court also finds that: (i) the Debtors have based their Proposal on reliable and credible information and provided details of the calculated savings associated with each modification; (ii) the Debtors have provided the Union with relevant information to evaluate the Proposal through production of thousands of documents and access to a data room; (iii) the Proposal treats all parties equitably and fairly through implementing cuts to non-Union wages and benefits, adding a snap-back provision, and receiving claims waivers from the Debtors' landlords and non-debtor affiliates; (iv) without the

modifications, the Debtors would incur millions of dollars in negative operational cash flow and would be forced to immediately liquidate their Facilities; (v) the Union rejected the Proposal without good cause because it refused to negotiate with the Debtors; (vi) the balance of equities weigh in favor of the Proposal because the alternative is liquidation and the loss of hundreds of jobs; and (vii) the Debtors attempted to confer in good faith by proposing numerous dates for negotiations meetings, all of which have been rejected by the Objecting Parties. *See* 11 U.S.C. § 1113(b)-(c).

For the above reasons, the Debtors' Motion is granted.

An Order in conformance with this Opinion has been entered by the Court and a copy attached hereto.

DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated: February 3, 2014

EXHIBIT 1

• <u>Duration</u>: The Debtor proposes to enter into a six (6) year CBA.

• <u>New Hire Rates</u>: Employees hired on or after June 17, 2012 may be hired at or above the following minimum wage rates:

> Recreation Aide - 11.00
> Housekeeping, Laundry and Dietary Aide - 11.00
> Receptionist - 11.00
> Certified Nursing Assistant - 12.00
> Rehabilitation Aide - 12.00
> Maintenance Assistant - 12.00
> Payroll Clerk - 12.00
> Cook - 13.00
> Therapeutic Recreation Director - 15.00
> LPN - 22.00
> RN - 27.00

• <u>Annual Wage Increases</u>: All bargaining unit employees will receive the following percentage increases to their current base wage rates.

> Contract Year 1 - 2%
> Contract Year 2 - 2%
> Contract Year 3 - 1.5%
> Contract Year 4 - 1.5%
> Contract Year 5 - 1.5%
> Contract Year 6 - 1.5%

• <u>One-Time Wage Increase for CBA Changes</u>: All bargaining unit employees will receive a one-time wage increase of 4% of their current base wage rates effective with the new pay period after the date the new CBA is executed.

• <u>One-Time Wage Increase for Ending Pension Contributions</u>: All bargaining unit employees who regularly work more than 20 hours per week and on whose behalf the Debtor previously was making contributions to the New England Health Care Employees Pension Fund as of June 16, 2012, will receive a one-time wage increase of 3% of their current base wage rates effective with the new pay period after the date the new CBA is executed.

• <u>Hours of Work, Overtime, Layoffs, Staffing</u>: The following changes were made with respect to hours of work, overtime, layoffs and staffing:

Daily work schedule will change from 8 hours including a 30-minute paid lunch to 7.5 hours plus a 30-minute unpaid lunch.

Employees are not guaranteed any specified number of hours to be worked per day or per week.

The times of all rest periods and meal breaks will be determined by the Debtor according to its operational needs.

The Debtor will have sole discretion on staffing needs and the provisions of Article 7 of the Expired CBA will be eliminated.

The Debtor may use a maximum of eight (8) per diem bargaining unit employees per shift unless the Union consents to a larger number, which consent may be granted permanently or temporarily, provided that there is no limit on the number of per diem bargaining unit employees that the Debtor may hire and have in a pool available to work.

The Debtor shall have the right to lay off any employee when it determines that business conditions require such layoff, provided that it notifies the Union seven (7) days in advance, unless the need for a layoff results from unforeseen circumstances.

Employees will be paid one and one-half (1 1/2) times their regular straight-time hourly rate for all hours actually worked over 40 in a week. There will not be any daily overtime after 8 hours worked.

Delete the provisions in Article 14, Sections I, K, M, N, and 0 of the Expired CBA.

• Union Rights: the CBA will eliminate paid time for Union orientation, eliminate the bank of paid release time for Union delegates, and require Union delegates to conduct all Union business on their own time.

• Employment Status and Benefit Eligibility: Employment status (full-time, part-time, etc.), benefit eligibility, probationary period, and pro-rating of benefits will be based on the control hours that the Debtor commits to give each employee on the weekly schedule instead of hours actually worked. Full time employees scheduled

for 37.5 or more control hours per week will receive full benefits. Part-time employees scheduled for a minimum of 22.5 Control Hours to less than 37.5 control hours per week will be eligible for pro-rated benefits.

• <u>Shift and Weekend Differentials</u>: Bargaining unit employees hired prior to June 17, 2012 will keep their same shift and weekend differentials. Employees hired on or after June 17, 2012 will not receive any shift or weekend differentials.

• <u>Holidays</u>: Employees will receive full or prorated holiday pay for the following seven (7) paid holidays: New Years' [sic] Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day. Employees who work on Thanksgiving, Christmas, and New Years' [sic] Day will be paid one and one-half (1 1/2) times their regular straight-time hourly rate for all hours worked on those three holidays, plus their holiday pay. Employees who work on the other four (4) holidays will be paid their regular straight-time rate plus their holiday pay.

• <u>Personal Days</u>: Accrual of Personal Days will end as of June 16, 2013, and there will not be any more Personal Days earned. Employees who have any earned but unused Personal Days under the Expired CBA will have until December 31, 2013 to use them up.

• <u>Vacations</u>: Starting with the new pay period that begins on June 17, 2012, employees will accrue vacation hours according to the following new schedule.

| **Years of Service** | **Vacation Accrual Rate Per Control Hour** | **Annual Maximum Vacation Accrual** |
| --- | --- | --- |
| 3 months - <5 | .0384 | Up to 75 hours |
| 5+ | .0576 | Up to 112.5 hours |
| 10+ | .0769 | Up to 150 hours |

• <u>Sick Leave</u>: Employees will earn 1 hour of paid sick leave for every 40 hours of work up to a maximum of 45 hours of paid sick leave per year. At the end of each calendar year, employees may carry over a maximum of forty (40) hours of accrued sick leave into the next calendar year. There is no payment for accrued sick

time upon termination. Any contrary provisions in the Expired CBA will be deleted.

• Bereavement Leave: Employees will receive full or prorated bereavement leave of three (3) days for the death of the following immediate family members: mother, father, brother, sister, spouse, and child. Employees will receive full or prorated bereavement leave of one (1) day for the death of the following other family members: grandchild, grandparent, mother-in-law, father-in-law, daughter-in-law, son-in-law, brother-in-law and sister-in-law.

• Jury Duty: Employees who work in a position that normally requires 30 hours or more of service per week and who have been employed for more than ninety (90) days will be paid their regular wages for the first five (5) days, or part thereof, of jury service.

• Unpaid Leave: The provisions of Article 20 of the Expired CBA will be replaced with the provisions of Article 20 of the Debtor's April 24, 2012 Last, Best, and Final Proposals.

• Medical and Prescription Drug Plan: Full-time and benefit eligible part-time employees are eligible to enroll in one of two new medical and prescription drug plans. Employees who enroll in either of these plans will pay the employee contribution rates for the plan.

• Other Insurance Benefits: Full-time and benefit eligible part-time employees are eligible to enroll in the Debtor's Dental Plans, Vision Plan, Short Term Disability Plan, Long Term Disability Plan, and Supplemental Life Insurance Plans. Employees who enroll in any of these plans will pay the employee contribution rates for the plan.

• Pension Plan: The Debtor has ended all contributions to the New England Health Care Employees Pension Fund for all hours worked. The Debtor proposes to eliminate Article 22 of the Expired CBA and replace it with a new 401k Savings Plan. All eligible employees will be able to enroll in the new 401k Savings Plan with a 25% match on all dollars that employees contribute up to 3% of their wages.

• Training Fund: The Debtor has ended all contributions to the New England Health Care Employee's Training Fund. The Debtor proposes to eliminate Article 23 of the Expired CBA and replace it with a Tuition Reimbursement program. All eligible employees

will be able to use the Debtor's Tuition Reimbursement program which provides up to $2,500 per year in tuition reimbursement.

• <u>Uniforms</u>: The Debtor proposes to eliminate the annual $300 uniform allowance in Article 23 of the Expired CBA. Instead, employees who work in positions that require uniforms will be given 2 complete sets of uniforms upon hire and each June.

• <u>Work Related Disabilities</u>: The Debtor will continue to pay its share of the premiums or self-insure premium equivalent rates for the Medical Plan and Dental Plan for an employee out on workers' comp leave for the duration of the FMLA/CFMLA leave period such employee is entitled to.

• <u>Pay day/Pay Checks</u>: Employees will be paid every two weeks on a Friday at 3:00 p.m. rather than weekly. The work week for payroll purposes and for determining overtime shall begin 7:00 a.m. Sunday and shall consist of seven consecutive days. The Debtor may change the starting point of the work week at any time.