

FILED
JAMES J. WALDRON
FEB 0 6 2014
U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY _____ DEPUTY

In Re:

**710 LONG RIDGE ROAD OPERATING
COMPANY, II, LLC, et al.,**

Debtors.

Case No.:  13-13653 (DHS)

Judge: Donald H. Steckroth, U.S.B.J.

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

**<u>OPINION</u>**

**APPEARANCES:**

Cole Schotz Meisel Forman & Leonard
Michael D. Sirota, Esq.
Gerald Gline, Esq.
David Bass, Esq.
Ryan T. Jareck, Esq.
25 Main Street
Hackensack, New Jersey  07601
***Counsel for Debtor***

Levy Ratner
Suzanne Hepner, Esq.
Ryan J. Barbur, Esq.
80 Eighth Avenue
New York, New York  10011
***Counsel for New England Health Care***
***Workers, District 1199 SEIU***

National Labor Relations Board
Special Litigation Branch
Abby Propis Simms, Esq.
Julie L. Kaufman, Esq.
Nancy E. Kessler Platt, Esq.
Dawn Goldstein, Esq.
Marissa Wagner, Esq.
Laura Bandini, Esq.
Nina Schichor, Esq.
1099 14th Street, NW, Suite 8600
Washington, D.C.  20570
***Counsel for National Labor Relations Board***

Porzio, Bromberg & Newman, P.C.
Robert M. Schechter, Esq.
Rachel Segall, Esq.
100 Southgate Parkway
Morristown, New Jersey 07962
***Counsel for the Official Committee of***
***Unsecured Creditors***

## THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE

The Court is presented with a motion ("Motion") filed by the Debtors that seeks an order pursuant to 11 U.S.C. § 502(b) and Rules 2019, 3001, and 3007 of the Federal Rules of Bankruptcy Procedure granting the Debtors' omnibus objection to the claims filed by the New England Health Care Employees Union, District 1119, SEIU (the "Union") (the "Union Claims") and the National Labor Relations Board (the "NLRB" or "Board") (collectively, the "Claimants") (the "Board Claims") (collectively, the "Claims") on the grounds that the Claims are not entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(1)(A) or wage priority pursuant to either 11 U.S.C. § 507(a)(4) or 11 U.S.C. § 507(a)(5).[1]

This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b) and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984 as amended September 18, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought are Sections 503(b)(1)(A), 507(a)(4), and 507(a)(5) of title 11 of the United States Code (the "Bankruptcy Code"). The following shall constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

The Debtors first argue that the administrative expense claims attributable to the time period in which they were in full compliance with the injunction ordered by the United States District Court for the District of Connecticut should be expunged, and the administrative expense

---

[1] Originally, the Debtors sought to disallow the Claims pending final determination of the validity and amount of such claims, if any, in the proceedings filed by the NLRB. The issues of allowance and enforceability before the Court were agreed upon at the January 23, 2014 hearing. (*See* Mot. Tr. 22:20 – 23:2, Jan 23, 2014) ("[W]e do agree I think collectively that those claims will be adjudicated in another forum. And the final adjudication of the merits and amount of the claims will ultimately be determined in the NLRB proceedings. And while the validity and amounts of the claims are generally to be determined in the NLRB proceedings, the question of priority status of any claim is for this Court to determine.").

claims attributable to the period during which the interim relief ordered by this Court pursuant to 11 U.S.C. § 1113(e) was in effect should be expunged pursuant to the law of the case doctrine.

The Debtors contend that the Claims are not entitled to priority status because the claims being adjudicated before the NLRB have not yet been awarded and because the claims will substantially increase the probability of layoff or termination of employees. Additionally, the Debtors argue that the prepetition back pay Claims are not entitled to wage priority because they were not earned within the statutory 180-day period prior to February 24, 2013 (the "Filing Date"). Because the claims for back pay arose from an alleged unfair labor practice ("ULP") committed by the Debtors on June 17, 2012, Debtors assert the Claimants' rights to wages arose on that date; and thus, their Claims accrued prior to the 180-day statutory period for priority claims. Thus, the Debtors seek to classify the Claims as general unsecured claims.

The Claimants assert they are unaware of whether the Debtors complied with the injunction ordered by the United States District Court for the District of Connecticut, and thus, they may have a claim for one or two days. In addition, the Claimants assert that the law of the case doctrine is inapplicable because the Claimants plan to file a motion for reconsideration of the District Court's decisions denying leave to appeal this Court's 1113(e) interim relief orders.

The Claimants argue further that because they have a pending claim in a NLRB proceeding which may be awarded in the future, the Claims should be given administrative priority at this time. They also assert that their cooperation in organizing a payment plan with the Debtor will prevent any concerns about the probability of layoffs or termination of employees. The Claimants additionally assert that the prepetition back pay Claims accrued during the 180-day period prior to the Filing Date because a Union employee incurs a right to payment for every day that the employer fails to reinstate the employee.

## RELEVANT FACTS

### Debtors' Facts

Each Debtor operates a sub-acute and long-term nursing care facility (each a "Facility" and collectively, the "Facilities") for the elderly in Connecticut. The Facilities are: (i) Long Ridge of Stamford, (ii) Newington Health Care Center, (iii) Westport Health Care Center, (iv) West River Health Care Center, and (v) Danbury Health Care Center. The Facilities are managed by HealthBridge Management, LLC ("HealthBridge"), a non-debtor national healthcare management company.

The Facilities are skilled nursing facilities that provide long-term care and short-term rehabilitation services. For long-term-care patients who have medical needs, the Facilities provide 24-hour-a-day nursing care, nutritional monitoring and planning, medication management, and personal care. For individuals in need of nursing and/or rehabilitation services following a recent hospitalization for orthopedic surgery, stroke, oncology care, cardiac care, general surgery, and other diagnoses, the Facilities offer medical and physical rehabilitation including physical, occupational and speech therapy, rehabilitative nursing, and physician directed rehabilitation plans, IV therapy, wound care, and other services.

Each Facility is supervised by a licensed administrator and the nursing staff is supervised by a director of nursing. Each Facility also engages the services of a medical director to oversee the delivery of care to patients. The Debtors receive revenue from Medicare and Medicaid, patients who pay privately, and from other third-party payors. The sources and amounts of each Debtor's revenues are determined by, among other things, the census at the applicable Facility, the "case mix" of its patients, and reimbursement rates.

5

The Facilities were staffed by service and maintenance employees, 700 represented by the Union ("Union Employees") and 432 non-union.  Each Debtor Facility entered into a separate collective bargaining agreement ("CBA") with its employees.  The terms of the CBAs were similar between the Facilities and the Union and required the Debtors to make payments to employees for wages and benefits, including, but not limited to, accrued sick and vacation time, and to make payments for health coverage, pensions, and other benefits.  The CBAs were effective from December 31, 2004 through March 16, 2011 and are expired.

Upon time for renegotiation of the CBAs, the Debtors contend they were faced with the need to make cost saving benefit reductions to both Union and non-union employees.  During a 16-month period and 36 bargaining sessions, the Debtors and Union negotiated but came to no resolution.  After the Debtors felt that they had reached an impasse in June of 2012, the Debtors implemented their "Last, Best and Final" proposals as new terms ("Implemented Terms") on June 17, 2012.  Following the Implemented Terms, the Union Employees went on strike on July 3, 2012, and the Debtors hired replacement workers.  The Debtors have operated the Facilities since June 2012 under the Implemented Terms.

The failed negotiations, strike, and replacement of the workforce led to a variety of actions by both the Union and the Debtors.  The Debtors instituted an action for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO Act") for the Union Employees' alleged wrongdoing in disrupting treatment of patients and damaging the Facilities in protest.  The action is pending in the United States District Court for the District of New Jersey.  The NLRB, on behalf of the Union, brought a claim against the Debtors in the office of Administrative Law before Administrative Law Judge Kenneth Chu ("ALJ Chu") asserting unfair labor practices and unlawful imposition of the Implemented Terms in the absence of a

genuine, lawful impasse (the "ALJ Proceedings"). The hearing in the ALJ Proceedings began on September 10, 2012, and has continued post-petition. There have been twenty-eight days of testimony. Ten additional days of testimony were scheduled through January 2014. It is not anticipated that a decision will be rendered before late 2014.

Additionally, there were ULPs relating to some of the Debtors tried before Administrative Law Judge Steven Fish ("ALJ Fish"). On August 1, 2012, ALJ Fish rendered a decision (the "ALJ Fish Decision"), which the Debtors have appealed by filing exceptions to the Board.

Pending the outcome of the ALJ proceedings, the United States District Court for the District of Connecticut, on request of the NLRB, issued injunctive relief in favor of the Union pursuant to section 10(j) of the National Labor Relations Act ("NLRA"). The section 10(j) relief provided that the Debtors were required to reinstate all of the Union Employees and provide the benefits and compensation set forth in the expired CBAs pending the outcome of the unfair labor practice allegations (the "10(j) Injunctive Relief" or "10(j) Injunction"). The Debtors appealed the 10(j) Injunction to the Second Circuit Court of Appeals (the "Appeal"). The Debtors obtained an interim stay pending appeal of that Order from the Second Circuit. They were in the process of complying with the 10(j) Injunctive Relief following termination of the stay pending appeal and denial of all efforts to continue a stay when they filed their voluntary petition for chapter 11 relief on February 24, 2013. The Debtors assert that compliance with the 10(j) Injunctive Relief is the cause of their inability to operate and precipitated their bankruptcy filing. On October 15, 2013, the Second Circuit released its decision affirming the District Court's ruling grant of the 10(j) Injunctive Relief. *Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131 (2d Cir. 2013).

**Union and NLRB Claims**

On July 2, 2013, the Union filed fifteen claims (the "Union Claims"). On August 22, 2013, the NLRB filed five claims (the "NLRB Claims," and collectively with the Union Claims shall be referred to as the "Back Pay Claims"). The Union and NLRB each assert an unknown portion of the Back Pay Claims is entitled to priority for wages, salaries, or commission under § 507(a)(4) and/or contributions to an employee benefit plan under § 507(a)(5). The Back Pay Claims total approximately $9,000,000. The Back Pay Claims represent retroactive wages and benefits which seek to remedy the alleged ULPs committed by the Debtor.

On October 11, 2013, the Union filed fifteen Administrative Expense Claims (the "Union Administrative Expense Claims"). On October 2, 2013, the NLRB filed five Administrative Expense Claims (the "NLRB Administrative Expense Claims" and together with the Union Administrative Expense Claims, the "Administrative Expense Claims"). The Administrative Expense Claims, which represent "the estimated potential post-petition liability for unpaid wages, pension contributions, medical expenses, and other benefits arising out of unfair labor charges against the Debtor" beginning on the Filing Date, total $1,136,273. (NLRB's Br. 25)

**Interim Modifications under 11 U.S.C. § 1113(e)**

Soon after filing Chapter 11, the Debtors filed a 1113(e) Motion, seeking interim modifications to the Union Employees' wages and benefits by approximately 25% over a 13-week period, with a budget projecting $114,037.00 in net operating losses, assuming the requested modifications ("First 1113(e) Motion"). After an evidentiary hearing, this Court granted the Debtors six weeks of requested modifications, inviting them to return, if necessary, with a motion to approve DIP financing and an extension of the CBA modifications. *In re 710*

*Long Ridge Rd. Operating Co., II, LLC*, 13-13653 DHS, 2013 WL 796721 (Bankr. D.N.J. Mar. 4, 2013).

Thereafter, the Debtors filed a verified application in support of their motion, pursuant to Sections 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure: (a) authorizing the Debtors to enter into a debtor-in-possession post-petition financing facility (the "DIP Facility") with Capital One, N.A., (b) authorizing the continued use of cash collateral and providing adequate protection, and (c) granting other related relief (the "DIP Motion"). Without objection from any party, the Court approved the requested DIP Facility.

On March 29, 2013, the Debtors filed their second 1113(e) motion ("Second 1113(e) Motion"), seeking continued interim modifications for the period April 19, 2013-July 15, 2013, while projecting $6,276.00 in net operating losses, assuming continuation of the requested CBA modifications. Following an evidentiary hearing, the Court issued an oral opinion on April 10, 2013 (the "Second 1113(e) Opinion") granting the Second 1113(e) Motion. (*See* Tr. of Oral Op., Docket No. 298) In that opinion, the Bankruptcy Court determined that "testimony at [the April 9, 2013] hearing demonstrated in this Court's opinion that continued interim relief is essential to the debtor's immediate survival." (*See* Hr'g Tr. 9:14-16, April 10, 2013). Consistent with its oral decision, the Bankruptcy Court, on April 10, 2013, entered the Second Interim 1113(e) Order extending the interim modifications through and including July 15, 2013.

On June 28, 2013, the Debtors filed another 1113(e) motion ("Third 1113(e) Motion"), seeking continued interim modifications for the period July 15, 2013-October 11, 2013, assuming continuation of the requested CBA modifications and the $5 million DIP Facility. On July 8, 2013, after consultation with the Creditors' Committee, the Debtors filed an affidavit

reducing their request for wage and benefit cuts by $469,810.00. Based on this reduction and the testimony of Victor Matthew Marcos ("Marcos"), Vice President and Chief Financial Officer of each Debtor, the Bankruptcy Court, on July 15, 2013, entered the Third Interim 1113(e) Order extending the interim modifications through and including October 11, 2013.

On September 25, 2013, the Debtors filed their fourth 1113(e) motion ("Fourth 1113(e) Motion"), seeking continuation of the interim modifications for the period October 11, 2013-January 10, 2004. The Union opposed the motion by incorporating all objections in the prior 1113(e) motions. Marcos proffered testimony from his verified application and supplemental declaration, which was unrefuted by the Union. Neither the Union nor the NLRB offered any affirmative evidence in objection to the Debtors' case. In its oral opinion, the Court found that without continued relief, the Debtors would "not be able to meet their ordinary operating expenses, would incur an event of default under the DIP facility . . . [and] would not be afforded the opportunity to seek permanent modifications to the collective bargaining agreements, towards their efforts to reorganize." (Tr. of Oral Op. 7:11-15, November 22, 2013) Thus, the Court held that the revised interim modifications to the Debtors' CBAs were essential to both the continuation of the Debtors' businesses and to avoid irreparable damage to the Debtors' estates under Section 1113(e) of the Bankruptcy Code. On November 22, 2013, the Bankruptcy Court entered the Fourth Interim 1113(e) Order extending the interim modifications through and including January 10, 2014.[2]

The Union and the NLRB each filed a notice of appeal and a motion pursuant to Bankruptcy Rule 8003 for leave to appeal the First and Second 1113(e) Interim Orders and the Court's April 9, 2013 Order denying the Union's Motion For Reconsideration ("First Motions for Leave to Appeal). The District Court granted the First Motions for Leave to Appeal and on

---

[2] This was later extended by the Court, through agreement of all counsel, through February 3, 2014.

June 5, 2013, stayed briefing until either the District Court or the United States Court of Appeals for the Third Circuit denies the NLRB's request for a direct appeal to the Third Circuit pursuant to 28 U.S.C. § 158(d)(2) and Fed. R. Bankr. P. 8001(f). On June 6, 2013, the NLRB filed a motion for certification of a direct appeal of the Orders to the Third Circuit. On June 20, 2013, the Debtors filed opposition to the NLRB's request for a direct appeal to the Third Circuit. The Debtors filed opposition and cross-moved to vacate the Order granting the First Motions for Leave to Appeal. On January 9, 2014, the District Court granted the Debtors' cross-motion to vacate the order granting the First Motions for Leave to Appeal, and remanded the matter back to the Bankruptcy Court.

On July 29, 2013, the Union and the NLRB each filed a notice of appeal and a motion for leave to appeal the Third 1113(e) Order dated July 15, 2013 ("Second Motions for Leave to Appeal"). On September 12, 2013, the NLRB filed a motion for certification of a direct appeal of the Third 1113(e) Order. On January 9, 2014, the District Court entered an order denying the Second Motions for Leave to Appeal and the Motion for Certificate of Appealability. The Union and the NLRB's motions for leave to appeal the Fourth Interim Order were filed on December 5, 2013. On January 28, 2014, the District Court denied those motions for leave to appeal.

**Permanent Modifications under 11 U.S.C. § 1113(c)**

On June 13, 2013, the Debtors' presented the Union with a proposal pursuant to 11 U.S.C. § 1113(b) requesting savings from Union labor in the amount of $7,525,000 per year over a proposed six-year period. (Decl. of Victor Matthew Marcos ("Marcos Decl.") ¶¶ 12, Ex. C, ECF No. 561)    On September 25, 2013, the Debtors filed a motion pursuant to 11 U.S.C. § 1113(c) for an Order: (i) rejecting the continuing economic terms of the expired CBAs with the Union under 11 U.S.C. 1113(c); and (ii) implementing the terms of the Debtors' proposal under

11 U.S.C § 1113(b) (the "1113(b) Proposal" or the "Proposal") (the "1113(c) Motion").  On November 14, 2013, both the Union and the NLRB filed objections to the § 1113(b) Proposal. The Bankruptcy Court conducted an evidentiary hearing on November 21, 2013 with respect to the 1113(c) Motion.

At the hearing, the Debtors presented two witnesses: the Vice President of each of the Chapter 11 Debtors and the Debtors' lead negotiator of CBAs with the Union regarding the expired CBAs.  Neither the Union nor the NLRB offered a witness or affirmative evidence in opposition to the Motion.

The record revealed that, as a result of labor costs under the CBAs, the Debtors suffered significant losses between 2010 and 2012, prior to their bankruptcy filing. (Marcos Decl. ¶ 9)  In 2010, the Debtors' earnings before interest, taxes, depreciation, and amortization ("EBITDA") was negative $2,224,005. In 2011 and 2012, the Debtors suffered negative EBITDA in the amount of $5,099,596 and $19,532,351 respectively. (Marcos Decl. ¶ 9)  Additionally, the changes set forth in the 1113(b) Proposal provided for essential operational changes necessary for the Debtors to operate going forward.  (Marcos Decl. ¶ 15)  If the terms of the expired CBAs continue in force, "the Debtors would incur negative EBITDA in the amounts of $9.8 million in 2013, $10.8 million in 2014, $10.3 million in 2015, $9.8 million in 2016, $9.5 million in 2017, and $9.1 million in 2018." (Marcos Decl. ¶ 24)  Thus, the testimony concluded that should the permanent modifications be denied, the Debtors would be forced to shut down the Facilities and all of the Debtors' employees—both Union and non-union—would lose their jobs. (Marcos Decl. ¶ 10)  Moreover, the closing of operations would present particular health care related problems. In the event of closure, elderly patients would have to be relocated to other care facilities, which could easily take several weeks.  Even with the modifications set forth in the 1113(b) Proposal,

the Debtors require assistance in funding operating costs as they will continue to suffer negative EBITDA through 2018. (Marcos Decl. ¶ 25)

On February 3, 2014, this Court entered an Order granting the Debtors motion pursuant to 11 U.S.C. § 1113(c) rejecting the continuing economic terms of the expired collective bargaining agreements and implementing the terms of the Debtors' proposal under 11 U.S.C §1113(b). (Order Granting 1113(c) Relief Feb. 2, 2014, ECF No. 898). That Order was amended by Order dated February 6, 2014.

## DISCUSSION

### I.    Whether the Administrative Expense Claims Should be Expunged

The Claimants and the Debtors are in agreement regarding the three periods into which the Administrative Expense Claims can be divided: (1) Filing Date (February 24, 2013) – March 2, 2013 (the "First Period"), during which the employees were not reinstated; (2) March 3, 2013 (the "Second Period"), the date on which the employees were reinstated; and (3) March 4, 2013- February 3, 2014 (the "Third Period"), during which the Debtors operated under this Court's four orders granting interim relief modifications pursuant to Section 1113(e).

The Debtors argue that they fully complied with the 10(j) Injunction during the Second Period, and the Administrative Expense Claims arising from that period should be expunged. The Debtors also assert that because they were operating under the terms of employment authorized by the interim relief ordered by this Court pursuant to the several 1113(e) Orders, the law of the case doctrine requires that the NLRB's Administrative Expense Claims for the Third Period be expunged. The Claimants assert they are unaware of whether the Debtors complied with the 10(j) Injunction during the Second Period and as such, they may have a claim. In addition, the Claimants assert that the law of the case doctrine is inapplicable because the

Claimants plan to file with the District Court a motion for reconsideration of this Court's 1113(e)

relief, but offer no support of that supposition.

A proof of claim generally constitutes *prima facie* evidence of the validity and amount of

the claim. 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f). If a claim objection is filed, the Court,

after notice and hearing, shall determine the allowed amount of the claim. See 11 U.S.C.

§ 502(b). "Claim objectors carry the initial burden to produce some evidence to overcome the

rebuttable presumption of validity." *In re Koontz*, 2010 WL 5625883, 7-8 (Bankr. N.D. Ind.

2010). "Once the objecting party produces evidence rebutting the claim, the burden of proof

shifts to the claimant to produce evidence establishing the validity of the claim. Thus, once an

objection is made to the proof of claim, the ultimate burden of persuasion as to the claim's

validity and amount rests with the claimant." *In re Consumers Realty & Dev. Co., Inc.,* 238 B.R.

418, 423 (B.A.P. 8th Cir. 1999) (citing *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173-74 (3d

Cir.1992)).

Courts have established demanding criteria for determining whether a claim should be

afforded an administrative priority. *In re Interstate Grocery Distribs. Sys.,* Inc., 267 B.R. 907,

913 (Bankr. D.N.J. 2001). Allowances for administrative expenses are "narrowly construed for

[the] proper protection of other creditors." *In re Molnar Bros.*, 200 B.R. 555, 558 (Bankr. D.N.J.

1996); *In re Grant Broad. of Phila., Inc.,* 71 B.R. 891, 897-98 (Bankr. E.D. Pa. 1987)

("administrative claims should be narrowly construed to minimize prioritizing of a debtor's

scarce resources to certain favored creditors"). A claimant must carry the burden of proving

entitlement to an administrative expense by preponderance of the evidence. *In re Grand Union

Co.,* 266 B.R. 621, 628 (Bankr. D.N.J. 2001). To sustain its burden of proof and thus qualify for

administrative treatment under Section 503 of the Bankruptcy Code, a claimant must

demonstrate: (a) the claim arises from a post-petition transaction with the estate and (b) the claim benefits the bankruptcy estate.  11 U.S.C. § 503; *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976); *In re Jartan*, 732 F.2d 584, 586 (7th Cir.1984).

A back pay order is a reparation order designed to vindicate the public policy of the statute by making the employees whole for losses suffered on account of an unfair labor practice. *Phelps Dodge Corp. v. Labor Bd.*, 313 U.S. 177, 197 (1941); *Republic Steel Corp. v. Labor Bd.*, 311 U.S. 7, 11, 12 (1940) ("a worker's loss in wages and in general working conditions must be made whole").   Liquidation of the back pay claims is a function that only the Board may perform. *Nathanson v. NLRB*, 344 U.S. 25, 29 (1952) ("[T]he fixing of back pay is one of the functions confided solely to the Board.").

Here, on March 3, 2013, the Union employees retuned to work. The Claimants do not dispute this fact, and have not offered any evidence to the contrary. In fact, the Claimants agree that the Debtors reinstated the employees during the Second Period. Therefore, no Claim, administrative or otherwise, should be made for that period.   Thus, the Administrative Expense Claims for wages and benefits attributable to the Second Period should be expunged.

As to the Third Period during which Debtors operated under interim modifications to the expired CBAs pursuant to Orders of this Court, the Third Circuit has stated that "[t]he law of the case doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation." *Pub. Interest Research Grp. of N. J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997) (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988); *see also In re Martin's Aquarium, Inc.*, 98 Fed. App'x. 911, 912 (3d Cir. 2004).   From March 4, 2013 until the present, the Debtors have been operating under the terms of employment

authorized by this Court in orders granting four successive interim modifications, and, most recently, an order granting permanent relief from the Debtors' CBAs with the Union. Thus, the Claims attributable to the Third Period should be expunged.

## II.    Whether the First Period Claims are Entitled to Administrative Priority Status Under 11 U.S.C. § 503 (b)(1)(A)

Bankruptcy Code Section 507 defines the expenses and claims against a bankrupt estate that are entitled to priority in a bankruptcy proceeding. Administrative expenses allowed under Section 503(b) have priority over most other claims in the distribution process. 11 U.S.C. § 507(a)(2). Section 503(b)(1)(A)(ii) provides that wages and benefits constitute actual, necessary costs and expenses of preserving the estate only if they meet the following four requirements:

> (1) they were awarded pursuant to a judicial proceeding or a proceeding of the National Labor [Relations Board]; (2) they were awarded as back pay attributable to a period of time occurring after commencement of the debtor's bankruptcy case; (3) they were awarded as a result of a violation of Federal or State law by the debtor; and (4) the court determines that payment of the wages and benefits will not substantially increase the probability of layoff or termination of current employees, or of nonpayment of domestic support obligations, during the debtor's bankruptcy case.

*In re Phila. Newspapers, LLC,* 433 B.R. 164, 175 (Bankr. E.D. Pa. 2010) (quoting 11 U.S.C. § 503(b)(1)(A)(ii)). "Allowances for administrative expenses are narrowly construed for proper protection of other creditors." *In re Molnar Bros.*, 200 B.R. at 558; *In re Lease–A–Fleet*, 140 B.R. 840, 844 (Bankr. E.D. Pa.1992). "The policy behind giving priority to administrative claimants is to encourage creditors to supply necessary resources to debtors post-petition, and to keep administrative costs to a minimum to preserve the debtor's estate." *Molnar Bros.,* 200 B.R. at 559 (citation omitted). The party seeking the payment of an administrative expense claim has the burden of proving entitlement to administrative expense. *Phila. Newspapers,* 433 B.R. at

175. (internal citations omitted). The movant must prove entitlement to an administrative

expense priority by a preponderance of the evidence. *Matter of TransAmerican Natural Gas*

*Corp.,* 978 F.2d 1409, 1416 (5th Cir. 1992); *Grand Union,* 266 B.R. at 628.

The Debtors assert that the remaining Administrative Expense Claims do not satisfy the

first or fourth elements set forth in *Philadelphia Newspapers* because they were not awarded

pursuant to a judicial proceeding or a proceeding of the NLRB, and because affording the

Administrative Expense Claims priority status would increase the probability of layoff or

termination of current employees. *See Phila. Newspapers,* 433 B.R. at 175. The Claimants argue

that the Administrative Expense Claims satisfy all four requirements.

### A. Whether the Administrative Claims Were Awarded Pursuant to a Judicial Proceeding of the National Labor Relations Board

The Debtors argue that because the Claims being tried before ALJ Chu will likely not be

decided until late 2014, and a final judgment by the Circuit Court of Appeals is years away, the

wages and benefits have not yet been awarded. The Debtors primarily rely on *In re Tristar Fire*

*Prot., Inc.,* 466 B.R. 392 (Bankr. E.D. Mich. 2012), for the proposition that administrative

expense status should be denied when there has been no final award of wages and benefits for

back pay. *See Tristar Fire Prot., Inc.,* 466 B.R. at 403 ("Although [the Union] filed an unfair

labor practice charge with the NLRB on December 20, 2011, no award has been made in that

proceeding."). The *Tristar* court went on to estimate the value of the Union's claim at $0.00 for

the purposes of confirmation.

The Claimants point to *Philadelphia Newspapers,* which held that the word "awarded"

should be construed to apply to claims currently being adjudicated. 433 B.R. at 175. While the

*Philadelphia Newspapers* court did rule that the claims were entitled to administrative expense

priority because the Union could potentially file a proceeding pursuant to Section 301 of the

Federal Labor Relations Act, this ruling was made when an arbitration award had already been granted. *Id.* at 175-76. The court's ruling was that although it was unclear whether an arbitration award was an award pursuant to a judicial proceeding, the award could be *enforced* by means of the Federal Labor Relations Act. *See id.*

Several courts within the Third Circuit have interpreted the plain meaning of the word "awarded" in different contexts. In *In re Taylor*, 388 B.R. 115, 119 (Bankr. M.D. Pa. 2008), the court discussed the meaning of the term "awarded" in the context of Section 1328(a)(4), which grants a chapter 13 debtor a discharge for any debt except "for restitution, or damages, awarded in a civil action against the debtor as a result of willful or malicious injury by the debtor that caused personal injury to an individual or the death of an individual." 11 U.S.C.    § 1328.  In *Taylor*, the debtor argued the exception to discharge only applies when a judgment in favor of the creditor has been entered before the petition is filed. *Taylor*, 388 B.R. 115 at 118.  In deciding the issue of whether the term "awarded" precluded the plaintiff from asserting his claim was nondischargeable because the state court action had not yet proceeded to judgment, the court held that "[i]t is a past participial phrase that serves as an adjective modifying the nouns 'restitution' and 'damages.' A past participle is simply the form of the verb used in the phrase and does not suggest past action." The court went on to hold that "it is plain that the statute does not intend to differentiate between a judgment entered before and one entered after a bankruptcy petition is filed. *Id.* at 120.  This Court has expressed agreement with the *Taylor* court. *See In re Schaub*, 2012 WL 1144424 (Bankr. D.N.J. Apr. 4, 2012) ("This Court, too, is reluctant to insulate a debtor's wrongful conduct based solely on the vagaries of timing.").

Similarly, in § 503, the word "awarded" is a past participial phrase that serves as an adjective modifying the nouns "wages" and "benefits" and thus does not indicate the award must

have been entered prior to moving for administrative expense priority. Thus, the Claimants have satisfied the first prong of the test for administrative priority.

### B. Whether Affording the Claims Administrative Priority Will Not Substantially Increase the Probability of Layoff or Termination of Current Employees

The Debtors assert that evidence provided to this Court leading to its Section 1113(e) Interim Orders and the 1113(c) Opinion and Order demonstrates that the Debtors would be forced to shut down and terminate all employees if they were forced to adhere to the economic terms of the CBAs. That may be true but it does not address the economic effect upon Debtors' compliance with the terms of the expired CBAs for the limited First Period.

The Claimants assert that affording administrative priority to the Claims would have little or no financial impact on Debtors' operations during Debtors' First Period because the Claimants are amenable to organizing a payment plan with the Debtors. Additionally, Claimants argue that the Debtors have provided no evidence of future insolvency, and their act of filing bankruptcy illustrates the Debtor's intention to be fiscally solvent in the near future.

Here, the fourth prong of Section 503(b)(1)(A) was not directly addressed by affirmative evidence from Debtors. While the Debtors' evidence indicated that the terms of the expired CBAs could not be sustained and were the cause for the Chapter 11 filings, there was no demonstration that layoffs or termination of employees would occur if the Union Employees are awarded back pay in the NLRB proceeding for the limited 7 days of the First Period. Accordingly, the Claims attributable to the First Period are an administrative expense when and if a final judgment is awarded in the NLRB proceedings.

### III. Whether the Back Pay Claims are Entitled to Priority Status

Section 507(a)(4) gives priority status to "allowed unsecured claims . . . for each individual or corporation, as the case may be, earned within 180 days before the date of the filing

of the petition or the date of the cessation of the debtor's business, whichever occurs first, for . . . wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual . . . ." 11 U.S.C. § 507(a)(4).  Section 507(a)(5) grants priority status to "allowed unsecured claims for contributions to an employee benefit plan . . . arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first . . . ." 11 U.S.C. § 507(a)(5).

In determining whether a general unsecured claim is afforded priority status under Section 507, courts are "guided by the Bankruptcy Code's objective of securing equal distribution among creditors." *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 653 (2006).  Because "preference for claims not intended by Congress to have priority would dilute the value of the intended priority and thus frustrate the intent of Congress," *Mammoth Mart*, 536 F.2d at 953, "priority should not be afforded unless it is founded on a clear statutory purpose . . . ." *Jartran*, 732 F.2d at 586.  It is widely accepted that statutory priorities are narrowly construed.  *Joint Indus. Bd. v. United States*, 391 U.S. 224, 228 (1968); *Trs. of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 100 (2d Cir. 1986); *Mammoth Mart*, 536 F.2d at 953.

The Debtors argue that the prepetition Back Pay Claims are not entitled to wage priority because they are not for wages earned or services rendered within the statutory 180-day period prior to the Filing Date.  First, the Debtors contend that the Union employees were on strike during the 180-day period prior to the Filing Date and thus did not render services or earn compensation in the nature of wages in that time period.  In addition, the Debtors argue that the Back Pay Claims arose from an alleged ULP committed by the Debtors on June 17, 2012, and therefore the Claimants' wages were earned on that date.  The Debtors assert that because the

20

Back Pay Claims accrued <u>prior</u> to the 180-day statutory period for priority claims, those Claims must be classified as general unsecured claims.

The Claimants contend that the Back Pay Claims are entitled to wage priority because they were based on wages earned and services rendered within the statutory period. First, the Claimants argue that despite the fact that Union employees were on strike during the statutory period, the Back Pay Claims for an NLRA violation are wages constructively earned for services rendered. Next, the Claimants assert that the prepetition Back Pay Claims accrued during the statutory period because the Debtors' failure to reinstate striking employees constitutes a continuing actionable violation of the NLRA which allows the Union employees to earn the remedy of back pay for each day the Debtors failed to reinstate them. Thus, Claimants seek to have the Back Pay Claims classified as priority wage and benefit claims for the full 180-day period prior to the chapter 11 filing pursuant to 11 U.S.C. § 507(a)(4) and 11 U.S.C. § 507(a)(5).

### A. Whether the Back Pay Claims are In the Nature of Wages

Courts have consistently held that back pay claims under the NLRA are "in a practical and sound legal sense, nothing more or less than wages." *NLRB v. Killoren*, 122 F.2d 609, 613 (8th Cir. 1941). The Third Circuit has defined back pay "as a label to describe the daily rate of damages payable" and not as "lost wages." *United Steelworkers of Am., AFL-CIO-CLC v. N. Star Steel Co., Inc.*, 5 F.3d 39, 43 (3d Cir. 1993) (WARN Act[3] context). Notwithstanding the Third Circuit's definition, the compensatory nature of back pay has been described by several courts as remedial, and not punitive. The Bankruptcy Court for the District of Delaware has

---

[3] Worker Adjustment and Retraining Notification Act (WARN) 29 U.S.C. §§ 2101–2109. This Act requires that employees receive notice of termination at least sixty days prior to closing. The WARN Act is relevant because bankruptcy courts have accorded wage priority status to back pay claims resulting from a violation of this statute. See *In re Sher-Del Foods, Inc.*, 186 B.R. 358, 362 (Bankr. W.D.N.Y. 1995).

stated that, "given this compensatory nature, [back pay claims] must be in the nature of wages under the Code. As such, they are governed by the same priority classifications as are all other wage claims." *In re Powermate Holding Corp.*, 394 B.R. 765, 771 (Bankr. D. Del. 2008) (internal quotations omitted).

The District of New Jersey has stated that, "[i]n attempting to define wages, various courts have concluded that backpay is part and parcel of wages." *NLRB v. Riverview 5 P's Inc.,* 782 F. Supp. 32, 34 (D.N.J. 1991); *see also In re Hanlin Grp., Inc.,* 176 B.R. 329, 333 (Bankr. D.N.J. 1995); *In re Riker Indus., Inc.*, 151 B.R. 823 (Bankr.N.D.Ohio 1993); *In re Cargo*, 138 B.R. 923 (Bankr. N.D. Iowa 1992). Back pay claims "constitute[ ] wages which a workman has constructively earned by reason of his continued status as an employee." *Killoren*, 122 F.2d 609 at 614. As such, the fact that the Union employees were on strike during the entirety of the 180-day statutory period does not preclude the designation of their Back Pay Claims as "wages earned."

While the Back Pay Claims are in the nature of wages earned, the Claims must still satisfy the remaining requirements of Sections 507(a)(4) or 507(a)(5) in order to be classified as priority wage claims. Thus, the threshold issue here is whether the Back Pay Claims were earned during the 180-day period preceding the filing date (the "Priority Period").

**B. Whether the Back Pay Claims Were Earned During the Priority Period**

The Claimants contend that the Debtors' failure to reinstate the Union employees is a continuing actionable violation of the NLRA. *See NLRB v. Killoren*, 122 F.2d 609 (8th Cir. 1941); *see also Nathanson v. NLRB,* 344 U.S. 25 (1952).  In *Killoren*, the Eighth Circuit's categorization of the claim as a "cumulating one" was in the context of responding to the trustee's assertion that the back pay order was not determinable, and thus not provable in

bankruptcy. The court explained that even if the ordered reinstatement became impossible, "the back pay obligation is nevertheless enforcible [sic] for the period during which the right to reinstatement existed." *Id* at 613. It appears the court was not opining on whether the employees earned the remedy of back pay on each individual day the Debtors failed to reinstate, but rather was explaining that the computation of back pay includes a calculation of the relevant time period during which back pay damages were accruing. This is the same argument that was addressed by the court in *Belson v. Olson Rug Co.*, 483 B.R. 660, 665-66 (N.D. Ill. 2012), to which it responded that the "argument confuses the calculation of damages with the right to payment of damages."

Similarly, the Claimants rely on *Nathanson* for the holding that employees incur a right to payment for every day that that an employer fails to reinstate its employees. However, the Claimants' reliance on *Nathanson* in asserting that a failure to reinstate is a continuing actionable violation of the NLRB is misplaced. The Court explained:

> The computation of the amount due may not be a simple matter. It may require, in addition to the projection of earnings which the employee would have enjoyed had he not been discharged and the computation of actual interim earnings, the determination whether the employee wilfully incurred losses, whether the back pay period should be terminated because of offers of reinstatement or the withdrawal of the employee from the labor market, whether the employee received equivalent employment, and the like.

*Id.* at 29-30. Again, the *Nathanson* Court was referring to the liquidation of the back pay award, and the calculation of the back pay damages. In this calculation, courts look first to the back pay period to determine the daily rate of wages owed. Here, the Claimants have confused the right to payment of damages with the calculation of damages if the right exists. *See Belson*, 483 B.R. at 666.

In *Nathanson*, the Court's discussion regarding back pay was in response to the NLRB's argument that "the interest of the United States in eradicating unfair labor practices is so great that the back pay order should be given the additional sanction of priority in payment." *Nathanson*, 344 U.S. at 28. Before *Nathanson* reached the Supreme Court, the lower court had held that because the Board is an agency of the United States, all debts owed to the Board are "debt[s] due to the United States within the meaning of R.S. s 3466, 31 U.S.C. s 191" and therefore entitled to priority. *Id.* at 27. Significantly, Revised Statutes section 3466 ("Section 3466") gave the federal government an unqualified priority for any claim due to the United States if the debtor becomes involved in certain types of insolvency proceedings.[4] Thus, the NLRB was arguing that because the debtor owed money to the United States by virtue of its debt owed to the Union, the back pay claim was entitled to an additional and unqualified priority pursuant to Section 3466. The Court responded that within the Bankruptcy Act, it could find "no warrant for giving these back pay awards any different treatment than other wage claims enjoy." *Id.* In light of the statutory language of Section 3466, it is clear that the Court's remarks regarding the time of the claim's accrual were not meant to determine the time the back pay claim arose; but rather, were meant to preclude the classification of all Union back pay claims as claims owing to the United States, which were, at that time, entitled to priority regardless of the time they accrued.

In both *Nathanson* and *Killoren*, the question addressed was whether a back pay order pursuant to the NLRA would receive the same treatment as other wage claims. The only issue decided in those cases that is relevant to the present case, is whether back pay is in the nature of

---

[4] *See U. S. v. Moore*, 423 U.S. 77, 79 (1975) (quoting 31 U.S.C. § 191) ("Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied . . . .").

wages earned. *See In re Sher-Del Foods, Inc.*, 186 B.R. 358, 361 (Bankr. W.D.N.Y. 1995) ("The

essential conclusion of the Court in *Nathanson* and *Killoren* is that a back pay award under the

National Labor Relations Act is in the nature of wages earned."). In making its determination,

however, neither Court addressed the issue whether the back pay claims were earned during a

relevant statutory period prior to the filing date. In fact, neither Court mentioned when the

wages had been earned for the purposes of assessing wage priority which must be done under

Section 507(a)(4) or (a)(5). The Claimants' interpretation of both *Nathanson* and *Killoren* as

being dispositive is misplaced, except to the extent that the cases establish that back pay is in the

nature of wages.

     The Debtors argue that the Back Pay Claims arose on the date the Debtors allegedly

committed the unfair labor practice. *See In re Eagle Bus Mfg., Inc.*, 158 B.R. 421, 423 (S.D.

Tex. 1993); *Belson,* 483 B.R. 660. In *Eagle Bus Manufacturing*, the court considered when a

claim for back pay wages arose for the purposes of determining whether the claim was entitled to

administrative priority. 158 B.R. 421. In the bankruptcy court, the NLRB argued that the

debtor's "failure to reinstate striking employees constituted a continuing actionable violation of

the NLRA which in turn gave rise to a post-petition unfair labor practice pursuant to [the

Debtor's] refusal to reinstate striking employees" *Id.* at 433. In rejecting the NLRB's argument,

the Southern District of Texas explained:

> The events giving rise to any potential unfair labor practices
> liability on the part of [the debtor] all occurred prior to [the
> debtor's] filing for bankruptcy protection. Despite the fact that the
> damages arising from the alleged unfair labor practices continue to
> accrue post-petition, the claim itself arises from Greyhound's pre-
> petition conduct and as such is a pre-petition claim. The mere fact
> that the alleged damages continue to accrue post-petition does not
> alter the character of the claim itself.

*Id.* at 433-34.  Accordingly, the character of a claim is fixed at the time the claim arises.  The mere fact that the alleged damages accrued during the Priority Period does not alter the character of the claim itself.  *See id.*

In *Sher-Del Foods*, 186 B.R. 358, the court determined when a back pay award for the debtor's unfair labor practice was earned.  There, "the back pay award arose from the debtor's failure to bargain over the effects of the closing . . . ." *Id.* at 361.  The court ruled that "[T]he employees of [the debtor] earned their back pay award upon the debtor's failure to negotiate the effects of termination. The determination of priority status must follow from the <u>occurrence</u> of that failure." *Id.* at 362 (emphasis added).  In *Sher-Del Foods*, the alleged unfair labor practice was committed within the relevant statutory period, and thus, was entitled to wage priority.  In the present case, the alleged unfair labor practice occurred prior to the 180-day Priority Period, and is not entitled to be accorded a wage priority.

Similarly, statutory damages in connection with termination of employment are deemed to be earned upon the date of termination.  *Belson,* 483 B.R. 660 at 665. In *Belson*, the court decided the issue of when a judgment creditor's back pay award was earned for the purposes of Section 507(a)(4). *Id.* at 668.  In holding that back pay based on a retaliatory discharge claim was earned on the date of the employee's termination, the *Belson* court relied upon various cases that decided this issue in the context of WARN Act damages. These cases consistently hold that notwithstanding the fact that back pay under the WARN Act is calculated based upon compensation that would have been earned during the 60-day priority period, but for the Debtor's violation of the statute, the claim is classified as a general unsecured claim if the termination date is outside the priority period. *See In re Kitty Hawk, Inc.*, 255 B.R. 428, 438 (Bankr. N.D. Tex 2000); *Hanlin Grp.,* 176 B.R. at 333-34; *Cargo*, 138 B.R. at 928.

The Debtors also assert that there is a relevant comparison in the context of severance pay in WARN Act cases. The District of New Jersey has noted that the WARN Act is a statutory form of severance pay.

> WARN gives the employer a choice—it may provide 60 days' notice of closing or layoff to its employees, keeping the business open and incurring operating expenses during that period; or it may shut down its operations with little or no notice to its employees, saving operating expenses, but providing back pay to its employees, in compensation for the lack of notice, in accordance with a statutory formula. Thus, the purpose of WARN is to provide a statutory form of severance pay.

*Hanlin Grp.,* 176 B.R. at 334. Likewise, in *In re Gen. Info. Servs., Inc.,* 68 B.R. 419, 421 (Bankr. E.D. Pa. 1986), the court denied priority status to a severance claim for an employee that was terminated prior to the relevant priority period. In so holding, the court noted that "[t]he fact that payments, 'as a matter of accounting,' were to continue over a three months [sic] period following his termination is irrelevant for the purpose of determining priority status under § 507." *Id.* at 421. *See In re Thomaston Mills, Inc.,* 329 B.R. 780, 783 (Bankr.M.D.Ga.2005) (severance payment owed to employee prior to the wage priority period was earned upon termination and was not entitled to priority status); *In re Murray Indus., Inc.,* 114 B.R. 749, 751 (Bankr. M.D. Fla. 1990) (employee's claim against employer was classified a general unsecured claim because the claim arose from termination which occurred outside the statutory priority period). Thus, cases that have dealt with the issue of when wages are earned under Section 507 in various contexts consistently rule that the mere fact wages would continue to accrue during the 180-day statutory period does not affect the nature or the fixing of the claim itself.

While the Claimants argue that WARN Act and severance pay cases decided under Sections 507(a)(4) and 507(a)(5) are inapplicable in the context of NLRA back pay claims, several courts have rejected this distinction. *See, e.g., Sher-Del Foods,* 186 B.R. at 362 (stating

that back pay awards and WARN damages are similar because they arise from a failure to negotiate the effects of a termination); *Belson,* 483 B.R. at 665-66 (noting an argument distinguishing severance pay and WARN Act damages from NLRA back pay claims confuses the calculation of damages with the right to payment of damages).  It appears to this Court that the analogy to WARN Act and severance cases decided under § 507(a)(4) and § 507 (a)(5) is appropriate and compelling.

*Eagle Bus Manufacturing* further observed that the NLRB's continuing actionable violation argument was impracticable when read in conjunction with the NLRA.  The National Labor Relations Act provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board."  29 U.S.C. § 160(b).  The court stated that, "[l]ogically, if [the debtor's] refusal to reinstate Union employees post petition constituted a continuing actionable violation under the NLRA then the six month limitation period pursuant to Title 29 U.S.C. § 160(b) would never begin to run." *Eagle Bus Mfg.,* 158 B.R. at 433.  It is well-settled law that "a court should avoid an interpretation of a statute that would lead to absurd or unreasonable results." *United Steelworkers,* 5 F.3d at 42 (quoting *Robert T. Winzinger, Inc. v. Mgmt. Recruiters, Inc.,* 841 F.2d 497, 500 (3d Cir. 1988)).  Claimants' continuing accrual argument leads to an unreasonable result, and this Court does not find back pay to be a continuously accruing claim from the date of the alleged ULP. That is the date the claim arose and here it falls outside the Priority Period and is not accorded priority status.  If and when a final ULP award is determined to exist, the Claim shall be treated as a general unsecured claim.

This outcome is consistent with the goals of Section 507 of the Bankruptcy Code. Employees are awarded fourth and fifth priority status pursuant to Congress' recognition that the

continued contribution of its employees' labor is integral to debtors experiencing financial difficulty. *See Belson,* 483 B.R. at 668 (quoting 4 Collier on Bankr.§ 507.05[1] (15th ed. 2005)) ("stating that one of the purposes of the wage priority provisions is 'to encourage employees to stand by an employer in financial difficulty'"). In this case, the Union Employees' Back Pay Claims arose prior to the Priority Period and are therefore not priority claims under § 507(a)(4) and § 507(a)(5). The Back Pay Claims are to be treated as general unsecured claims in this proceeding.

## CONCLUSION

The Court finds that the Back Pay Claims are not entitled to wage claim priority status under 11 U.S.C. § 507(a)(4) or 11 U.S.C. § 507(a)(5) and are classified as general unsecured claims, if and when awarded in an NLRB proceeding.

The Court finds that, to the extent they are awarded in a NLRB proceeding, the Claims attributable to the First Period following the Debtors' Filing Date are entitled to administrative expense status under 11 U.S.C. § 503(b).

The Claims that relate to the Second and Third Periods following the Debtors' Filing Date are hereby expunged in their entirety.

An Order in conformance with this Opinion has been entered by the Court and a copy attached hereto.

s/

_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated: February 6, 2014