**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street, P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
Gerald H. Gline, Esq.
David M. Bass, Esq.
Ryan T. Jareck, Esq.
Attorneys for 710 Long Ridge Road
Operating Company II, LLC, *et al.*,
Debtors-in-Possession

| | |
|---|---|
| In re:<br><br>710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*,[1]<br><br>          Debtors-in-Possession. | UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY HONORABLE DONALD H. STECKROTH CASE NO. 13-13653 (DHS)<br><br>        Chapter 11<br>    (Jointly Administered) |

**SECOND SUPPLEMENT TO PLAN SUPPLEMENT TO DEBTORS'**
**FIRST AMENDED JOINT PLAN OF REORGANIZATION**

This second supplement (the "Second Supplement") to the Plan Supplement to Debtors'

First Amended Joint Plan of Reorganization [Docket No. 851] (the "Plan Supplement") is being

filed in connection with the First Amended Joint Chapter 11 Plan of Reorganization of 710 Long

Ridge Road Operating Company II, LLC, *et al.* (as it may be amended, the "Plan") [Docket No.

759] (the "Plan").[2]  The documents contained in this Second Supplement are integral to, and are

---

[1]  The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal identification number are:  710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford (4809), 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center (4730), 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center (4839), 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center (4716) and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center (4676).

[2] All capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to them in the Plan.

part of, the Plan, and if the Plan is confirmed, such documents will be approved in the order confirming the Plan.  The hearing to consider confirmation of the Plan is currently scheduled for February 7, 2014, at 10:00 a.m., before the Honorable Donald H. Steckroth, United States Bankruptcy Judge, at the United States Bankruptcy Court, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Third Floor, Newark, New Jersey 07102.  The Debtors reserve the right to alter, amend, modify, withdraw, or supplement any document in this First Supplement or in the Plan Supplement; provided that if any document in this First Supplement or the Plan Supplement is altered, amended, modified or supplemented in any material respect, such document will be filed with the Bankruptcy Court.

Any party that wishes to obtain copies of the Plan, the Plan Supplement documents (including those) referred to on the attached list, or the Disclosure Statement related to the Plan may download copies from the website maintained by Debtors' claims, noticing and balloting agent, Logan & Company, at http://www.loganandco.com or on the Bankruptcy Court's internet website at http://www.njb.uscourts.gov.  A login and password to the Bankruptcy Court's Public Access to Electronic Court Records ("PACER") are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for 710 Long Ridge Road
Operating Company II, LLC, *et al.*

By:    */s/ David M. Bass*
      Michael D. Sirota, Esq.
      Gerald H. Gline, Esq.
      David M. Bass, Esq.
      Ryan T. Jareck, Esq.

DATED:  February 6, 2014

51689/0001-10292393v1

### PLAN SUPPLEMENT DOCUMENTS (SECOND SUPPLEMENT)

**Exhibit 2 (Revised)** –     Exhibit 2 filed with the Plan Supplement and the First Supplement to the Plan Supplement (draft Backstop Funding Agreement) has been revised and finalized.  The executed copy of the Backstop Funding Agreement is attached as Exhibit 2 and replaces and supersedes Exhibit 2 filed with the Plan Supplement and the First Supplement to the Plan Supplement.  A redlined version reflecting the changes from the previously filed version is also attached.

51689/0001-10292393v1

# EXHIBIT 2

## BACKSTOP FUNDING AGREEMENT

This BACKSTOP FUNDING AGREEMENT (the "Agreement") is made and entered into as of February ___, 2014, by and among (i) 710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford, 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center, 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center, 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center and 107 Osbourne Street Operating Company II, LLC d/b/a Danbury Heath Care Center (collectively, the "Debtors"), (ii) HealthBridge Management, LLC (the "Management Company" or "Healthbridge") (iii) Care Realty, LLC ("Care Realty" or "Backstop Funder"), (iv) Care One, LLC ("Care One"), and (v) 710 Long Ridge Road, LLC, 240 Church Street, LLC, 1 Burr Road Company LLC, 245 Orange Avenue, LLC and 107 Osborne Street, LLC (collectively, the "Affiliated Landlords", and together with the Backstop Funder, the Management Company, Care One and the Affiliated Landlords, the "Plan Sponsor Group").

## RECITALS

**WHEREAS**, on February 24, 2013 (the "Petition Date"), each of the Debtors commenced a case (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), and each of the Debtors has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its business as a debtor-in-possession; and

**WHEREAS,** the Debtors have filed with the Bankruptcy Court a First Amended Joint Chapter 11 Plan of Reorganization of 710 Long Ridge Road Operating Company II, LLC, *et al.*, in the form attached hereto as **Exhibit A**, as amended pursuant to (i) a First Non-Material Modification and (ii) a Second Non-Material Modification, in the forms attached hereto collectively as **Exhibit B** (collectively, the "Plan of Reorganization"); and

**WHEREAS,** capitalized terms not otherwise defined herein shall have the meanings set forth in the Plan of Reorganization; and

**WHEREAS**, the Debtors are indebted to various members of the Plan Sponsor Group in an aggregate amount of approximately $44,293,802 for non-payment of rent, management and information technology fees and working capital advances made to or on behalf of the Debtors; and

**WHEREAS**, to assist the Debtors in being able to propose and confirm a plan of reorganization (as embodied in the Plan of Reorganization), without which the Debtors could not confirm and consummate the Plan of Reorganization, the Debtors have asked the members of the Plan Sponsor Group to provide support and accommodations to the Debtors as set forth in the Plan of Reorganization, including asking (a) each member of the Plan Sponsor Group to waive any claims that such member may hold against one or more of the Debtors, which would include the right of the Affiliated Landlords to require the Debtors to "Cure" such defaults as exist under each Lease Agreement pursuant to section 365(b) of the Bankruptcy Code; and (b) the Backstop Funder or other members of the Plan Sponsor Group to (i) fund the Plan Distribution

Contribution Amount, (ii) make payments on account of Allowed Claims and/or provide a back stop to ensure such payments, solely as provided in Section 4.1 of the Plan of Reorganization and this Agreement, are made, and (iii) to provide such funding as is necessary under Section 4.2 of the Plan of Reorganization, i.e., the Operating Loss Backstop Amount and, if applicable, the Operating Loss Backstop Distribution Amount toward Distributions on account of Allowed Class 6 Claims; and

**WHEREAS**, without the necessary funding and commitments of the members of the Plan Sponsor Group as set forth herein, the Debtors would be unable to reorganize and would be forced to cease operations; and

**WHEREAS,** subject to the terms and conditions of this Agreement, the members of the Plan Sponsor Group have agreed to provide the necessary consideration without which consummation of the Plan of Reorganization could not occur; and

**WHEREAS**, the Debtors believe that prompt Bankruptcy Court approval, confirmation, and consummation of the Plan of Reorganization is in the best interests of the Debtors' business operations, the Debtors' creditors, and other parties in interest; and

**WHEREAS**, the Debtors intend to use commercially reasonable efforts to obtain Bankruptcy Court approval of the Plan of Reorganization in accordance with terms consistent with this Agreement and, in that regard, the members of the Plan Sponsor Group intend to use commercially reasonable efforts to cooperate with and support the Debtors in accordance with the terms hereof; and

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Debtors and each of the members of the Plan Sponsor Group hereby agree, as applicable, as follows:

## AGREEMENT

1.    <u>Agreement to Implement and Provide Support for Acceptable Plan</u>.

(a)    <u>Agreements of the Debtors</u>.  Subject to each of the Debtors' fiduciary duties as a debtor-in-possession and on the terms and subject to the conditions set forth herein, the Debtors shall use commercially reasonable efforts to:

(i)    obtain Bankruptcy Court approval of the Plan of Reorganization (an "<u>Acceptable Plan</u>"), which shall be acceptable to each of the members of the Plan Sponsor Group in each such member's sole discretion;[1]

---

[1] The members of the Plan Sponsor Group acknowledge that the Plan of Reorganization is an Acceptable Plan.

51689/0001-10219790v2

(ii)    solicit the requisite acceptances of an Acceptable Plan in accordance with Section 1125 of the Bankruptcy Code and the Bankruptcy Court order approving the Disclosure Statement;

(iii)    move the Bankruptcy Court to confirm an Acceptable Plan as expeditiously as practicable under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Court's local rules;

(iv)    not withdraw an Acceptable Plan, or file any exhibit, amendment, modification or supplement to an Acceptable Plan that contains any term that is not acceptable to the members of the Plan Sponsor Group;

(v)    not encourage any other person or entity to, object, oppose, delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance, implementation, confirmation and consummation of an Acceptable Plan; and

(vi)    take all other actions reasonably necessary and appropriate to consummate an Acceptable Plan at the earliest practicable date.

(b)    Agreements of the Plan Sponsor Group.  On the terms and subject to the conditions set forth herein, including, without limitation, the confirmation of an Acceptable Plan, the members of the Plan Sponsor Group, as applicable, agree to the following, as of the Effective Date:

(i)    Agreements of Care Realty.  On the terms and subject to the conditions set forth herein, Care Realty agrees to the following, as of the Effective Date:

(1)    Satisfaction of Claims.  If a Debtor is unable to pay or otherwise satisfy a Claim solely to the extent Allowed as of the Effective Date (or thereafter solely as may be necessary to make Distributions on account of Allowed Class 5 Claims), subject to Section 1(b)(v) below, Care Realty shall advance funds to such applicable Debtor(s) solely to the extent necessary to enable such Debtor to satisfy such Claim, and such Debtor shall be required to use those funds in order to satisfy such Claim.

(2)    Funding of Ongoing Operating Losses.  For so long as each applicable Debtor or Reorganized Debtor shall continue to own and operate a Facility, and subject to the terms of the CBA Rejection Order, the Backstop Funder shall make such funds available to the applicable Debtor to meet operating shortfalls solely to the extent identified in the projections attached to the CBA Rejection Order (the "Operating Loss Backstop Amount").  In the event, but only to the extent, that the Backstop Funder is not required to advance the Operating Loss Backstop Amount (on an aggregate, consolidated basis), the Backstop Funder shall

3

advance to the Reorganized Debtors on account of the Plan Distribution Contribution Amount the aggregate amount of such unfunded Operating Loss Backstop Amount (the "Operating Loss Backstop Distribution Amount") on the later of (a) December 31, 2018, and (b) the date upon which the period covered by the CBA Rejection Order expires (the "Operating Loss Backstop Amount Distribution Date").  Nothing herein or in the Plan shall require the Backstop Funder to any amount on account of the Operating Loss Backstop Distribution Amount or otherwise that will result in any Holder of an Allowed Other General Unsecured Claim receiving a Distribution in an amount greater than 75% of such Holder's Allowed Other General Unsecured Claim.

(3)   Waiver of Claims.  On the Effective Date, Care Realty shall be deemed to waive all Intercompany Claims held against any of the Debtors.

(ii)   Agreements of Care One.  On the terms and subject to the conditions set forth herein, Care One agrees to the following, as of the Effective Date:

(1)   Plan Distribution Contribution Amount.  No later than the commencement of the Confirmation Hearing, Care One shall deposit in an escrow account to be maintained by Cole, Schotz, Meisel, Forman & Leonard, P.A., the sum of $500,000 on account of the Plan Distribution Contribution Amount.  In addition, and subject to Section 2.3.H.(b) of the Plan, upon the conclusion of the ALJ Proceedings and entry of a final non-appealable order of judgment, the effectiveness of which has not been stayed, by either the United States Court of Appeals for the D.C. Circuit or the United States Court of Appeals for the Second Circuit (the "Backpay Claim Adjudication Date"), if any, Care One shall advance to the Reorganized Debtors on account of the Plan Distribution Contribution Amount, the additional sum of $4,500,000 (the "Backpay Claim Adjudication Date Distribution Advance") as follows: (i) $500,000 on the Backpay Claim Adjudication Date and (ii) in five (5) equal annual installments in amounts totaling the balance of the Backpay Claim Adjudication Date Distribution Advance, commencing on the first anniversary of the Backpay Claim Adjudication Date and payable on each anniversary date thereafter.  Notwithstanding the foregoing, the Backpay Claim Adjudication Date Distribution Advance shall be reduced on a dollar for dollar basis to the extent of the Operating Loss Backstop Distribution Amount received by

4

the Reorganized Debtors in accordance with Section 1(b)(i)(2) hereof and Section 4.2 of the Plan.  Nothing herein or in the Plan shall require Care One to fund any amount on account of the Plan Distribution Contribution Amount or otherwise that will result in any Holder of an Allowed Other General Unsecured Claim receiving a Distribution in an amount greater than 75% of such Holder's Allowed Other General Unsecured Claim.

(2)    Satisfaction of Allowed Administrative Claims.  If a Debtor is unable to pay or otherwise satisfy an Administrative Expense Claim that is Allowed as of the Effective Date and/or a Professional Compensation and Reimbursement Claim when Allowed, subject to Section 1(b)(v) below, Care One shall advance funds to such applicable Debtor(s) solely to the extent necessary to satisfy such Administrative Expense Claim and/or Professional Compensation and Reimbursement Claim.

(iii)    Agreements of the Affiliated Landlords.  On the terms and subject to the conditions set forth herein, the Affiliated Landlords agree to the following, as of the Effective Date:

(1)    Waiver of Claims.  On the Effective Date, the Affiliated Landlords shall be deemed to waive all Intercompany Claims held against any of the Debtors.

(2)    Waiver of the Right to Cure and Consent to Assumption of Lease Agreements.  On the Effective Date, the Affiliated Landlords (A) consent to the applicable Debtor's assumption of such applicable Lease Agreement and assignment to such applicable Reorganized Debtor and (B) waive any right to a "Cure" of such defaults as exist under each Lease Agreement pursuant to section 365(b) of the Bankruptcy Code.

(iv)    Agreements of the Management Company.  On the terms and subject to the conditions set forth herein, the Management Company agrees to the following, as of the Effective Date:

(1)    "Ride Through" of Management Agreements.  So long as the Debtors are pursuing confirmation of an Acceptable Plan, HealthBridge agrees not to move the Bankruptcy Court to compel the Debtors to assume or reject the Management Agreement.  HealthBridge further agrees to a modification of the Plan of Reorganization, such that HealthBridge agrees that the Debtors may permit the

5

Management Agreements to "ride through" the Chapter 11 Case without being assumed or rejected.

(2)    <u>Waiver of Claims</u>.  On the Effective Date, and notwithstanding the above Section 1(b)(iv)(1), HealthBridge shall be deemed to waive all Intercompany Claims, if any, held against any of the Debtors and any Claims for indemnification.

(v)    <u>Express Limitations on Payments Made By Members of the Plan Sponsor Group</u>.  The parties incorporate by reference Section 4.13 of the Plan of Reorganization (Non-Substantive Consolidation).  Without otherwise modifying the agreements of the members of the Plan Sponsor Group as set forth herein or obligating such members to pay any Claim or obligation of the Debtors that is not otherwise expressly set forth herein, nothing herein or in an Acceptable Plan shall require any member of the Plan Sponsor Group to fund any portion of the Backpay Claim except with respect to the funding of the Plan Distribution Contribution Amount and the Operating Loss Backstop Distribution Amount, if applicable.  Without limiting the foregoing, no member of the Plan Sponsor Group shall be responsible for any portion of the Backpay Claim to the extent such Backpay Claim is entitled to priority in right of payment under sections 503(b) or 507(a) of the Bankruptcy Code.  The contribution and commitment of the Plan Sponsor Group under an Acceptable Plan with respect to Claims held by Other General Unsecured Claims Holders, whether on account of Distributions to be made in accordance with Class 6 or otherwise (<u>e.g.</u>, on account of any Priority Claim or Administrative Expense Claim) shall be limited to the funding of the Plan Distribution Contribution Amount and the Operating Loss Backstop Distribution Amount, if applicable.

(c)    <u>Right to Participate in Chapter 11 Case</u>.  Notwithstanding anything herein to the contrary, this Agreement shall not be construed to prohibit any party hereto from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Case, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of hindering or delaying (or reasonably likely to hinder or delay) implementation of the transactions and other matters contemplated by this Agreement.

(d)    <u>New Membership Interests</u>.  In exchange for the consideration identified in this Agreement and in the Plan, including the forgiveness and cancellation of the Intercompany Claims including Claims that the Backstop Funder, the Management Company and the Affiliated Landlords had or may have against a Debtor and its applicable Estate (and each of the Affiliated Landlords' corresponding right to a "Cure"), and the commitments undertaken by the Backstop Funder and other members of the Plan Sponsor Group under the Plan (which include, without limitation, the payment of each of the Plan Distribution Contribution Amount, the Operating Loss Backstop Amount and the Operating Loss Backstop Distribution Amount, if applicable), on the Effective Date, each Reorganized Debtor shall issue and deliver to Care Realty the New Membership Interests, representing one hundred percent of the equity interest in each Reorganized Debtor, and all instruments, certificates, and other documents required to be issued or distributed pursuant to this Agreement and the Plan without further act or action under applicable law, regulation, order or rule.  In accordance with the foregoing, the Debtors

6

shall obtain approval of the Bankruptcy Court in the Confirmation Order that the issuance of the New Membership Interests shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.

2.      Condition to Each Party's Obligations.  Each party's obligations under this Agreement are subject to the prior execution of this Agreement by all other parties.  In no event shall this Agreement be effective with respect to any party until the condition set forth in this Section 2 is satisfied.

3.      Termination.

(a)      The occurrence of each of the following events shall constitute a "Termination Event":

(i)      all parties agree in writing, prior to entry of an order of the Bankruptcy Court confirming an Acceptable Plan, to terminate this Agreement, and notice of such agreement is provided to the Creditors' Committee and filed with the Court prior to entry of an order of the Bankruptcy Court confirming an Acceptable Plan;

(ii)      the failure of the Debtors to obtain an order, the effectiveness of which has not been stayed, from the Bankruptcy Court confirming an Acceptable Plan by February 11, 2014;[2]

(iii)      the failure to consummate an Acceptable Plan by February 26, 2014;

(iv)      entry of an order confirming an Acceptable Plan where the revisions that would be necessary to an Acceptable Plan for approval by the Bankruptcy Court would not be acceptable to any member of the Plan Sponsor Group;

(v)      the entry of an order by the Bankruptcy Court (A) dismissing the Chapter 11 Case, (B) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (C) appointing a trustee or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code);

(vi)      an Event of Default under the DIP Loan pursuant to which the DIP Lender declared the indebtedness thereunder to be due and payable;

(vii)      any court (including the Bankruptcy Court) shall declare that an Acceptable Plan or any material portion thereof to be unenforceable as determined in the Plan Sponsor Group's sole discretion;

---

[2] The Debtors acknowledge, without otherwise limiting this provision, that the Debtors' failure to obtain approval of the releases, exculpations and injunctions as set forth in Article IX of the Plan of Reorganization shall invoke this provision and be deemed a Termination Event.

(viii)   any court (including the Bankruptcy Court) shall vacate or reverse the order confirming an Acceptable Plan or vacate, reverse or strike any material portion thereof as determined in the Plan Sponsor Group's sole discretion;[3]

(ix)   any court (including the Bankruptcy Court) shall vacate or reverse any order authorizing relief under Section 1113 of the Bankruptcy Code or vacate, reverse or strike any material portion thereof as determined in the Plan Sponsor Group's sole discretion; or

(x)   any court (including the Bankruptcy Court) shall declare this Agreement or any material portion hereof to be unenforceable as determined in the Plan Sponsor Group's sole discretion.

(b)   Upon the occurrence of any Termination Event specified in Section 3(a) hereof, written notice thereof shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, whereupon this Agreement shall terminate unless such Termination Event is waived or the Agreement is modified, amended or supplemented in accordance with Section 5; provided, however, that notwithstanding the foregoing, no party that is the cause of the Termination Event shall be entitled to terminate the Agreement.

4.   Effect of Termination. Upon termination of this Agreement, all obligations hereunder shall terminate and shall be of no further force and effect; provided, however, that any claim for breach of this Agreement shall survive termination and all rights and remedies with respect to such claims shall not be prejudiced in any way; but provided further, that the breach of this Agreement by one or more of the parties hereto shall not create any rights or remedies against any non-breaching party unless such non-breaching party has participated in or aided and abetted the breach by the breaching party.  Except as set forth above in this Section 4, upon such termination, any obligations of the non-breaching parties set forth in this Agreement shall be null and void *ab initio* and all claims, causes of action, remedies, defenses, setoffs, rights or other benefits of such non-breaching parties shall be fully preserved without any estoppel, evidentiary or other effect of any kind or nature whatsoever.

5.   Amendment or Waiver.  Except as otherwise specifically provided herein, this Agreement may not be modified, waived, amended, restated or supplemented unless such modification, waiver, amendment or supplement is in writing and has been signed by the Debtors and such applicable member(s) of the Plan Sponsor Group.

6.   Fiduciary Duties.  Notwithstanding anything to the contrary contained in this Agreement, each Debtor's obligations hereunder are subject at all times to the fulfillment of its fiduciary duties.  The Debtors may terminate their obligations under this Agreement by written notice to counsel for the members of the Plan Sponsor Group if the Debtors reasonably

---

[3] The Debtors acknowledge, without otherwise limiting this provision, that any order or judgment that vacates, reverses or strikes the releases, exculpations and injunctions as set forth in Article IX of the Plan of Reorganization shall invoke this provision and be deemed a Termination Event.

determine that with respect to the Debtors' estates, that the Plan of Reorganization is not in the best interests of the Debtors' estates.  Upon a termination of this Agreement by the Debtors pursuant to this Section 6, all obligations of any member of the Plan Sponsor Group hereunder shall immediately terminate without further action or notice by any member of the Plan Sponsor Group.

7.    Time of the Essence.  Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Agreement.

8.    Agreement Not a Plan.  This Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code.  Any plan will not become effective unless and until the Bankruptcy Court enters a Confirmation Order and such plan becomes effective in accordance with its terms.

9.    Notices.  Any notice required or desired to be served, given or delivered under this Agreement shall be in writing, and shall be deemed to have been validly served, given or delivered if provided by personal delivery, or upon receipt of fax or email delivery.

10.    Governing Law: Jurisdiction.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW JERSEY, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  By its execution and delivery of this Agreement, the Debtors and each member of the Plan Sponsor Group hereby (a) irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the Bankruptcy Court, and (b) irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding, and waives any objection it may have to venue or the convenience of the forum.

11.    **Waiver of Jury Trial.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT, THE PLAN OF REORGANIZATION, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF ANY PARTY IN CONNECTION HEREWITH AND THEREWITH. EACH OF THE PARTIES ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR PARTIES ENTERING INTO THIS AGREEMENT.**

12.    Headings.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

51689/0001-10219790v2

13.    Interpretation.  This Agreement is the product of negotiations of the Debtors and each of the members of the Plan Sponsor Group, and in the enforcement or interpretation hereof is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against Debtors or any of members of the Plan Sponsor Group by reason of that party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

14.    Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of the Debtors and the members of the Plan Sponsor Group and their respective successors, assigns, heirs, executors, administrators and representatives.

15.    No Third-Party Beneficiaries.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the parties hereto and no other person or entity shall be a third-party beneficiary hereof.  Notwithstanding the foregoing, or anything herein to the contrary, the Debtors, Care Realty and Care One, as applicable, acknowledge and agree that the agreements set forth above in Sections 1(b)(i)(1), 1(b)(i)(2) and 1(b)(ii)(1), respectively, and the obligations that Care Realty and/or Care One, respectively, have agreed to satisfy thereunder, if necessary, shall be, if not otherwise satisfied in accordance with an Acceptable Plan, (a) with respect to Section 1(b)(i)(1), directly enforceable against Care Realty by a Holder of an Ongoing Trade Vendor Claim, and (b) with respect to the Operating Loss Backstop Distribution Amount and the Plan Distribution Contribution Amount, directly enforceable against Care Realty and Care One, as applicable, by a Holder of an Allowed Class 6 Claim.

16.    No Waiver of Participation and Reservation of Rights.  Except as expressly provided in this Agreement and in any amendment hereto, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each, of the parties hereto to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other parties (or their respective affiliates or subsidiaries) or its full participation in the Chapter 11 Case.  If the transactions contemplated by this Agreement and an Acceptable Plan are not consummated, or if this Agreement is terminated for any reason, the Debtors and each of the members of the Plan Sponsor Group fully reserve any and all of their rights, remedies and interests.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

17.    No Admissions.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of the Debtors or any of the members of the Plan Sponsor Group of any claim or fault or liability or damages whatsoever.  Each of the parties hereto denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.  Neither the Debtors nor any of the members of the Plan Sponsor Group shall have, by reason of this Agreement, a fiduciary relationship in respect of any other party hereto, or any party in interest in the Chapter 11 Case, and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon the Debtors and the members of the Plan Sponsor Group any obligations in respect of this Agreement except as expressly set forth herein.

18.     Specific Performance.  It is understood and agreed by the Debtors and the members of the Plan Sponsor Group that money damages would be an insufficient remedy for any breach of this Agreement by any party hereto, and each non-breaching party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any party to comply promptly with any of its obligations hereunder.

19.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Delivery of an executed signature page of this Agreement by facsimile or electronic mail transmission shall be effective as delivery of a manually executed signature page of this Agreement.

20.     Entire Agreement.  This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous agreements, representations, warranties and understandings of the Debtors and the members of the Plan Sponsor Group, whether oral, written or implied, as to the subject matter hereof.

21.     Several Not Joint.  The agreements, representations and obligations of the Debtors and the members of the Plan Sponsor Group under this Agreement are, in all respects, several and not joint.  Any breach of this Agreement by any party hereto shall not result in liability for any other non-breaching party.

22.     Consideration.  It is hereby acknowledged by the parties hereto that, other than the agreements, covenants, representations and warranties of the parties, as more particularly set forth herein, no consideration shall be due or paid to the Debtors for their agreement to use commercially reasonable efforts to obtain approval for an Acceptable Plan and related Disclosure Statement in accordance with the terms and conditions of this Agreement.

23.     Further Assurances.  Subject to the terms of this Agreement, the Debtors and the members of the Plan Sponsor Group agree to execute and deliver such other instruments and perform such other acts in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate an Acceptable Plan.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

51689/0001-10219790v2

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective representatives thereunto duly authorized as of the date set forth in the initial caption of this Agreement.

710 LONG RIDGE ROAD OPERATING COMPANY II, LLC

BY: _____
        Name:
        Title:

240 CHURCH STREET OPERATING COMPANY II, LLC

BY: _____
        Name:
        Title:

1 BURR ROAD OPERATING COMPANY II, LLC

BY: _____
        Name:
        Title:

245 ORANGE AVENUE OPERATING COMPANY II, LLC

BY: _____
        Name:
        Title:

107 OSBOURNE STREET OPERATING COMPANY II, LLC

BY: _____
        Name:
        Title:

12

**HEALTHBRIDGE MANAGEMENT, LLC**

BY: _Lugo_____
Name: A. Alberto Lugo
Title: EVP & General Counsel

**CARE REALTY, LLC**

BY: _Lugo_____
Name: A. Alberto Lugo
Title: EVP & General Counsel

**CARE ONE, LLC**

BY: _Lugo_____
Name: A. Alberto Lugo
Title: EVP & General Counsel

**710 LONG RIDGE ROAD, LLC**

BY: _Lugo_____
Name: A. Alberto Lugo
Title: EVP & General Counsel

**240 CHURCH STREET, LLC**

BY: _Lugo_____
Name: A. Alberto Lugo
Title: EVP & General Counsel

**1 BURR ROAD COMPANY LLC**

BY: _Lugo_____
Name: A. Alberto Lugo
Title: EVP & General Counsel

13

245 ORANGE AVENUE, LLC

BY:_____

Name: A. Alberto Lugo

Title: EVP & General Counsel

107 OSBORNE STREET, LLC

BY:_____

Name: A. Alberto Lugo

Title: EVP & General Counsel

14

## EXHIBIT A

## PLAN OF REORGANIZATION

## EXHIBIT B

## FIRST AND SECOND NON-MATERIAL MODIFICATIONS TO FIRST
## AMENDED PLAN OF REORGANIZATION

## BACKSTOP FUNDING AGREEMENT

This BACKSTOP FUNDING AGREEMENT (the "Agreement") is made and entered into as of February ___, 2014, by and among (i) 710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford, 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center, 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center, 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center and 107 Osbourne Street Operating Company II, LLC d/b/a Danbury Heath Care Center (collectively, the "Debtors"), (ii) HealthBridge Management, LLC (the "Management Company" or "Healthbridge") (iii) Care Realty, LLC ("Care Realty" or "Backstop Funder"), (iv) Care One, LLC ("Care One"), and (v) 710 Long Ridge Road, LLC, 240 Church Street, LLC, 1 Burr Road Company LLC, 245 Orange Avenue, LLC and 107 Osborne Street, LLC (collectively, the "Affiliated Landlords", and together with the Backstop Funder, the Management Company, Care One and the Affiliated Landlords, the "Plan Sponsor Group").

## RECITALS

**WHEREAS**, on February 24, 2013 (the "Petition Date"), each of the Debtors commenced a case (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), and each of the Debtors has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its business as a debtor-in-possession; and

**WHEREAS,** the Debtors have filed with the Bankruptcy Court a First Amended Joint Chapter 11 Plan of Reorganization of 710 Long Ridge Road Operating Company II, LLC, *et al.*, in the form attached hereto as **Exhibit A**, as amended pursuant to (i) a First Non-Material Modification and (ii) a Second Non-Material Modification, in the forms attached hereto collectively as **Exhibit B** (collectively, the "Plan of Reorganization"); and

**WHEREAS,** capitalized terms not otherwise defined herein shall have the meanings set forth in the Plan of Reorganization; and

**WHEREAS**, the Debtors are indebted to various members of the Plan Sponsor Group in an aggregate amount of approximately $44,293,802 for non-payment of rent, management and information technology fees and working capital advances made to or on behalf of the Debtors; and

**WHEREAS**, to assist the Debtors in being able to propose and confirm a plan of reorganization (as embodied in the Plan of Reorganization), without which the Debtors could not confirm and consummate the Plan of Reorganization, the Debtors have asked the members of the Plan Sponsor Group to provide support and accommodations to the Debtors as set forth in the Plan of Reorganization, including asking (a) each member of the Plan Sponsor Group to waive any claims that such member may hold against one or more of the Debtors, which would include the right of the Affiliated Landlords to require the Debtors to "Cure" such defaults as exist under each Lease Agreement pursuant to section 365(b) of the Bankruptcy Code; and (b) the Backstop Funder or other members of the Plan Sponsor Group to (i) fund the Plan Distribution

Contribution Amount, (ii) make payments on account of Allowed Claims and/or provide a back stop to ensure such payments, solely as provided in Section 4.1 of the Plan of Reorganization and this Agreement, are made, and (iii) to provide such funding as is necessary under Section 4.2 of the Plan of Reorganization, i.e., the Operating Loss Backstop Amount and, if applicable, the Operating Loss Backstop Distribution Amount toward Distributions on account of Allowed Class 6 Claims; and

**WHEREAS**, without the necessary funding and commitments of the members of the Plan Sponsor Group as set forth herein, the Debtors would be unable to reorganize and would be forced to cease operations; and

**WHEREAS,** subject to the terms and conditions of this Agreement, the members of the Plan Sponsor Group have agreed to provide the necessary consideration without which consummation of the Plan of Reorganization could not occur; and

**WHEREAS**, the Debtors believe that prompt Bankruptcy Court approval, confirmation, and consummation of the Plan of Reorganization is in the best interests of the Debtors' business operations, the Debtors' creditors, and other parties in interest; and

**WHEREAS**, the Debtors intend to use commercially reasonable efforts to obtain Bankruptcy Court approval of the Plan of Reorganization in accordance with terms consistent with this Agreement and, in that regard, the members of the Plan Sponsor Group intend to use commercially reasonable efforts to cooperate with and support the Debtors in accordance with the terms hereof; and

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Debtors and each of the members of the Plan Sponsor Group hereby agree, as applicable, as follows:

## AGREEMENT

1.      <u>Agreement to Implement and Provide Support for Acceptable Plan</u>.

(a)      <u>Agreements of the Debtors</u>.  Subject to each of the Debtors' fiduciary duties as a debtor-in-possession and on the terms and subject to the conditions set forth herein, the Debtors shall use commercially reasonable efforts to:

(i)      obtain Bankruptcy Court approval of the Plan of Reorganization (an "<u>Acceptable Plan</u>"), which shall be acceptable to each of the members of the Plan Sponsor Group in each such member's sole discretion;[1]

---

[1] The members of the Plan Sponsor Group acknowledge that the Plan of Reorganization is an Acceptable Plan.

51689/0001-10219790v2

(ii)    solicit the requisite acceptances of an Acceptable Plan in accordance with Section 1125 of the Bankruptcy Code and the Bankruptcy Court order approving the Disclosure Statement;

(iii)    move the Bankruptcy Court to confirm an Acceptable Plan as expeditiously as practicable under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Court's local rules;

(iv)    not withdraw an Acceptable Plan, or file any exhibit, amendment, modification or supplement to an Acceptable Plan that contains any term that is not acceptable to the members of the Plan Sponsor Group;

(v)    not encourage any other person or entity to, object, oppose, delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance, implementation, confirmation and consummation of an Acceptable Plan; and

(vi)    take all other actions reasonably necessary and appropriate to consummate an Acceptable Plan at the earliest practicable date.

(b)    <u>Agreements of the Plan Sponsor Group</u>.  On the terms and subject to the conditions set forth herein, including, without limitation, the confirmation of an Acceptable Plan, the members of the Plan Sponsor Group, as applicable, agree to the following, as of the Effective Date:

(i)    <u>Agreements of Care Realty</u>.  On the terms and subject to the conditions set forth herein, Care Realty agrees to the following, as of the Effective Date:

(1)    <u>Satisfaction of Claims</u>.  If a Debtor is unable to pay or otherwise satisfy a Claim solely to the extent Allowed as of the Effective Date (or thereafter solely as may be necessary to make Distributions on account of Allowed Class 5 Claims), subject to Section 1(b)(v) below, Care Realty shall advance funds to such applicable Debtor(s) solely to the extent necessary to enable such Debtor to satisfy such Claim, and such Debtor shall be required to use those funds in order to satisfy such Claim.

(2)    <u>Funding of Ongoing Operating Losses</u>.  For so long as each applicable Debtor or Reorganized Debtor shall continue to own and operate a Facility, and subject to the terms of the CBA Rejection Order, the Backstop Funder shall make such funds available to the applicable Debtor to meet operating shortfalls solely to the extent identified in the projections attached to the CBA Rejection Order (the "Operating Loss Backstop Amount").  In the event, but only to the extent, that the Backstop Funder is not required to advance the Operating Loss Backstop Amount (on an aggregate, consolidated basis), the Backstop Funder shall

3

advance to the Reorganized Debtors on account of the Plan Distribution Contribution Amount the aggregate amount of such unfunded Operating Loss Backstop Amount (the "Operating Loss Backstop Distribution Amount") on the later of (a) December 31, 2018, and (b) the date upon which the period covered by the CBA Rejection Order expires (the "Operating Loss Backstop Amount Distribution Date").  Nothing herein or in the Plan shall require the Backstop Funder to any amount on account of the Operating Loss Backstop Distribution Amount or otherwise that will result in any Holder of an Allowed Other General Unsecured Claim receiving a Distribution in an amount greater than 75% of such Holder's Allowed Other General Unsecured Claim.

(3)    Waiver of Claims.  On the Effective Date, Care Realty shall be deemed to waive all Intercompany Claims held against any of the Debtors.

(ii)    Agreements of Care One.  On the terms and subject to the conditions set forth herein, Care One agrees to the following, as of the Effective Date:

(1)    Plan Distribution Contribution Amount.  No later than the commencement of the Confirmation Hearing, Care One shall deposit in an escrow account to be maintained by Cole, Schotz, Meisel, Forman & Leonard, P.A., the sum of $500,000 on account of the Plan Distribution Contribution Amount.  In addition, and subject to Section 2.3.H.(b) of the Plan, upon the conclusion of the ALJ Proceedings and entry of a final non-appealable order of judgment, the effectiveness of which has not been stayed, by either the United States Court of Appeals for the D.C. Circuit or the United States Court of Appeals for the Second Circuit (the "Backpay Claim Adjudication Date"), if any, Care One shall advance to the Reorganized Debtors on account of the Plan Distribution Contribution Amount, the additional sum of $4,500,000 (the "Backpay Claim Adjudication Date Distribution Advance") as follows: (i) $500,000 on the Backpay Claim Adjudication Date and (ii) in five (5) equal annual installments in amounts totaling the balance of the Backpay Claim Adjudication Date Distribution Advance, commencing on the first anniversary of the Backpay Claim Adjudication Date and payable on each anniversary date thereafter.  Notwithstanding the foregoing, the Backpay Claim Adjudication Date Distribution Advance shall be reduced on a dollar for dollar basis to the extent of the Operating Loss Backstop Distribution **Amount** received by

4

the Reorganized Debtors in accordance with Section 1(b)(i)(2) hereof and Section 4.2 of the Plan.  Nothing herein or in the Plan shall require Care One to fund any amount on account of the Plan Distribution Contribution Amount or otherwise that will result in any Holder of an Allowed Other General Unsecured Claim receiving a Distribution in an amount greater than 75% of such Holder's Allowed Other General Unsecured Claim.

(2)    Satisfaction of Allowed Administrative Claims.  If a Debtor is unable to pay or otherwise satisfy an Administrative Expense Claim that is Allowed as of the Effective Date and/or a Professional Compensation and Reimbursement Claim when Allowed, subject to Section 1(b)(v) below, Care One shall advance funds to such applicable Debtor(s) solely to the extent necessary to satisfy such Administrative Expense Claim and/or Professional Compensation and Reimbursement Claim.

(iii)    Agreements of the Affiliated Landlords.  On the terms and subject to the conditions set forth herein, the Affiliated Landlords agree to the following, as of the Effective Date:

(1)    Waiver of Claims.  On the Effective Date, the Affiliated Landlords shall be deemed to waive all Intercompany Claims held against any of the Debtors.

(2)    Waiver of the Right to Cure and Consent to Assumption of Lease Agreements.  On the Effective Date, the Affiliated Landlords (A) consent to the applicable Debtor's assumption of such applicable Lease Agreement and assignment to such applicable Reorganized Debtor and (B) waive any right to a "Cure" of such defaults as exist under each Lease Agreement pursuant to section 365(b) of the Bankruptcy Code.

(iv)    Agreements of the Management Company.  On the terms and subject to the conditions set forth herein, the Management Company agrees to the following, as of the Effective Date:

(1)    "Ride Through" of Management Agreements.  So long as the Debtors are pursuing confirmation of an Acceptable Plan, HealthBridge agrees not to move the Bankruptcy Court to compel the Debtors to assume or reject the Management Agreement.  HealthBridge further agrees to a modification of the Plan of Reorganization, such that HealthBridge agrees that the Debtors may permit the

5

Management Agreements to "ride through" the Chapter 11 Case without being assumed or rejected.

(2)   <u>Waiver of Claims</u>.  On the Effective Date, and notwithstanding the above Section 1(b)(iv)(1), HealthBridge shall be deemed to waive all Intercompany Claims, if any, held against any of the Debtors and any Claims for indemnification.

(v)   <u>Express Limitations on Payments Made By Members of the Plan Sponsor Group</u>.  The parties incorporate by reference Section 4.13 of the Plan of Reorganization (Non-Substantive Consolidation).  Without otherwise modifying the agreements of the members of the Plan Sponsor Group as set forth herein or obligating such members to pay any Claim or obligation of the Debtors that is not otherwise expressly set forth herein, nothing herein or in an Acceptable Plan shall require any member of the Plan Sponsor Group to fund any portion of the Backpay Claim except with respect to the funding of the Plan Distribution Contribution Amount and the Operating Loss Backstop Distribution Amount, if applicable.  Without limiting the foregoing, no member of the Plan Sponsor Group shall be responsible for any portion of the Backpay Claim to the extent such Backpay Claim is entitled to priority in right of payment under sections 503(b) or 507(a) of the Bankruptcy Code.  The contribution and commitment of the Plan Sponsor Group under an Acceptable Plan with respect to Claims held by Other General Unsecured Claims Holders, whether on account of Distributions to be made in accordance with Class 6 or otherwise (<u>e.g.</u>, on account of any Priority Claim or Administrative Expense Claim) shall be limited to the funding of the Plan Distribution Contribution Amount and the Operating Loss Backstop Distribution Amount, if applicable.

(c)   <u>Right to Participate in Chapter 11 Case</u>.  Notwithstanding anything herein to the contrary, this Agreement shall not be construed to prohibit any party hereto from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Case, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of hindering or delaying (or reasonably likely to hinder or delay) implementation of the transactions and other matters contemplated by this Agreement.

(d)   <u>New Membership Interests</u>.  In exchange for the consideration identified in this Agreement and in the Plan, including the forgiveness and cancellation of the Intercompany Claims including Claims that the Backstop Funder, the Management Company and the Affiliated Landlords had or may have against a Debtor and its applicable Estate (and each of the Affiliated Landlords' corresponding right to a "Cure"), and the commitments undertaken by the Backstop Funder and other members of the Plan Sponsor Group under the Plan (which include, without limitation, the payment of each of the Plan Distribution Contribution Amount, the Operating Loss Backstop Amount and the Operating Loss Backstop Distribution Amount, if applicable), on the Effective Date, each Reorganized Debtor shall issue and deliver to Care Realty the New Membership Interests, representing one hundred percent of the equity interest in each Reorganized Debtor, and all instruments, certificates, and other documents required to be issued or distributed pursuant to this Agreement and the Plan without further act or action under applicable law, regulation, order or rule.  In accordance with the foregoing, the Debtors

51689/0001-10219790v2

shall obtain approval of the Bankruptcy Court in the Confirmation Order that the issuance of the New Membership Interests shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.

2.    <u>Condition to Each Party's Obligations</u>.  Each party's obligations under this Agreement are subject to the prior execution of this Agreement by all other parties.  In no event shall this Agreement be effective with respect to any party until the condition set forth in this Section 2 is satisfied.

3.    <u>Termination</u>.

(a)    The occurrence of each of the following events shall constitute a "Termination Event":

(i)    all parties agree in writing, prior to entry of an order of the Bankruptcy Court confirming an Acceptable Plan, to terminate this Agreement, and notice of such agreement is provided to the Creditors' Committee and filed with the Court prior to entry of an order of the Bankruptcy Court confirming an Acceptable Plan;

(ii)    the failure of the Debtors to obtain an order, the effectiveness of which has not been stayed, from the Bankruptcy Court confirming an Acceptable Plan by February 11, 2014;[2]

(iii)    the failure to consummate an Acceptable Plan by February 26, 2014;

(iv)    entry of an order confirming an Acceptable Plan where the revisions that would be necessary to an Acceptable Plan for approval by the Bankruptcy Court would not be acceptable to any member of the Plan Sponsor Group;

(v)    the entry of an order by the Bankruptcy Court (A) dismissing the Chapter 11 Case, (B) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (C) appointing a trustee or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code);

(vi)    an Event of Default under the DIP Loan pursuant to which the DIP Lender declared the indebtedness thereunder to be due and payable;

(vii)    any court (including the Bankruptcy Court) shall declare that an Acceptable Plan or any material portion thereof to be unenforceable as determined in the Plan Sponsor Group's sole discretion;

---

[2] The Debtors acknowledge, without otherwise limiting this provision, that the Debtors' failure to obtain approval of the releases, exculpations and injunctions as set forth in Article IX of the Plan of Reorganization shall invoke this provision and be deemed a Termination Event.

(viii)   any court (including the Bankruptcy Court) shall vacate or reverse the order confirming an Acceptable Plan or vacate, reverse or strike any material portion thereof as determined in the Plan Sponsor Group's sole discretion;[3]

(ix)   any court (including the Bankruptcy Court) shall vacate or reverse any order authorizing relief under Section 1113 of the Bankruptcy Code or vacate, reverse or strike any material portion thereof as determined in the Plan Sponsor Group's sole discretion; or

(x)   any court (including the Bankruptcy Court) shall declare this Agreement or any material portion hereof to be unenforceable as determined in the Plan Sponsor Group's sole discretion.

(b)   Upon the occurrence of any Termination Event specified in Section 3(a) hereof, written notice thereof shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, whereupon this Agreement shall terminate unless such Termination Event is waived or the Agreement is modified, amended or supplemented in accordance with Section 5; provided, however, that notwithstanding the foregoing, no party that is the cause of the Termination Event shall be entitled to terminate the Agreement.

4.   Effect of Termination. Upon termination of this Agreement, all obligations hereunder shall terminate and shall be of no further force and effect; provided, however, that any claim for breach of this Agreement shall survive termination and all rights and remedies with respect to such claims shall not be prejudiced in any way; but provided further, that the breach of this Agreement by one or more of the parties hereto shall not create any rights or remedies against any non-breaching party unless such non-breaching party has participated in or aided and abetted the breach by the breaching party.  Except as set forth above in this Section 4, upon such termination, any obligations of the non-breaching parties set forth in this Agreement shall be null and void *ab initio* and all claims, causes of action, remedies, defenses, setoffs, rights or other benefits of such non-breaching parties shall be fully preserved without any estoppel, evidentiary or other effect of any kind or nature whatsoever.

5.   Amendment or Waiver.  Except as otherwise specifically provided herein, this Agreement may not be modified, waived, amended, restated or supplemented unless such modification, waiver, amendment or supplement is in writing and has been signed by the Debtors and such applicable member(s) of the Plan Sponsor Group.

6.   Fiduciary Duties.  Notwithstanding anything to the contrary contained in this Agreement, each Debtor's obligations hereunder are subject at all times to the fulfillment of its fiduciary duties.  The Debtors may terminate their obligations under this Agreement by written notice to counsel for the members of the Plan Sponsor Group if the Debtors reasonably

---

[3] The Debtors acknowledge, without otherwise limiting this provision, that any order or judgment that vacates, reverses or strikes the releases, exculpations and injunctions as set forth in Article IX of the Plan of Reorganization shall invoke this provision and be deemed a Termination Event.

51689/0001-10219790v2

determine that with respect to the Debtors' estates, that the Plan of Reorganization is not in the best interests of the Debtors' estates.  Upon a termination of this Agreement by the Debtors pursuant to this Section 6, all obligations of any member of the Plan Sponsor Group hereunder shall immediately terminate without further action or notice by any member of the Plan Sponsor Group.

7.    Time of the Essence.  Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Agreement.

8.    Agreement Not a Plan.  This Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code.  Any plan will not become effective unless and until the Bankruptcy Court enters a Confirmation Order and such plan becomes effective in accordance with its terms.

9.    Notices.  Any notice required or desired to be served, given or delivered under this Agreement shall be in writing, and shall be deemed to have been validly served, given or delivered if provided by personal delivery, or upon receipt of fax or email delivery.

10.    Governing Law: Jurisdiction.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW JERSEY, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  By its execution and delivery of this Agreement, the Debtors and each member of the Plan Sponsor Group hereby (a) irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the Bankruptcy Court, and (b) irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding, and waives any objection it may have to venue or the convenience of the forum.

11.    **Waiver of Jury Trial.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT, THE PLAN OF REORGANIZATION, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF ANY PARTY IN CONNECTION HEREWITH AND THEREWITH. EACH OF THE PARTIES ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR PARTIES ENTERING INTO THIS AGREEMENT.**

12.    Headings.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

9

13.     <u>Interpretation</u>.  This Agreement is the product of negotiations of the Debtors and each of the members of the Plan Sponsor Group, and in the enforcement or interpretation hereof is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against Debtors or any of members of the Plan Sponsor Group by reason of that party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

14.     <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of the Debtors and the members of the Plan Sponsor Group and their respective successors, assigns, heirs, executors, administrators and representatives.

15.     <u>No Third-Party Beneficiaries</u>.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the parties hereto and no other person or entity shall be a third-party beneficiary hereof.  Notwithstanding the foregoing, **or anything herein to the contrary,** the Debtors ~~and~~**,** Care Realty **and Care One, as applicable,** acknowledge and agree that the agreements set forth above in Sections 1(b)(i)(1) ~~and~~**,** 1(b)(i)(2**) and 1(b)(ii)(1**), respectively, and the obligations that Care Realty ~~has~~**and/or Care One, respectively, have** agreed to satisfy thereunder, if necessary, shall be*, if not otherwise satisfied in accordance with an Acceptable Plan***, (a) with respect to Section 1(b)(i)(1),** directly enforceable against Care Realty~~, as applicable, by~~ **by a Holder of** an Ongoing Trade Vendor ~~or~~**Claim, and (b) with respect to the Operating Loss Backstop Distribution Amount and the Plan Distribution Contribution Amount, directly enforceable against Care Realty and Care One, as applicable, by** a Holder of an Allowed Class 6 Claim~~, respectively~~*, if not otherwise satisfied in accordance with an Acceptable Plan*.

16.     <u>No Waiver of Participation and Reservation of Rights</u>.  Except as expressly provided in this Agreement and in any amendment hereto, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each, of the parties hereto to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other parties (or their respective affiliates or subsidiaries) or its full participation in the Chapter 11 Case.  If the transactions contemplated by this Agreement and an Acceptable Plan are not consummated, or if this Agreement is terminated for any reason, the Debtors and each of the members of the Plan Sponsor Group fully reserve any and all of their rights, remedies and interests.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

17.     <u>No Admissions</u>.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of the Debtors or any of the members of the Plan Sponsor Group of any claim or fault or liability or damages whatsoever.  Each of the parties hereto denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.  Neither the Debtors nor any of the members of the Plan Sponsor Group shall have, by reason of this Agreement, a fiduciary relationship in respect of any other party hereto, or any party in interest in the Chapter 11 Case, and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon the Debtors and the members of the Plan Sponsor Group any obligations in respect of this Agreement except as expressly set forth herein.

10

18.    <u>Specific Performance</u>.  It is understood and agreed by the Debtors and the members of the Plan Sponsor Group that money damages would be an insufficient remedy for any breach of this Agreement by any party hereto, and each non-breaching party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any party to comply promptly with any of its obligations hereunder.

19.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Delivery of an executed signature page of this Agreement by facsimile or electronic mail transmission shall be effective as delivery of a manually executed signature page of this Agreement.

20.    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous agreements, representations, warranties and understandings of the Debtors and the members of the Plan Sponsor Group, whether oral, written or implied, as to the subject matter hereof.

21.    <u>Several Not Joint</u>.  The agreements, representations and obligations of the Debtors and the members of the Plan Sponsor Group under this Agreement are, in all respects, several and not joint.  Any breach of this Agreement by any party hereto shall not result in liability for any other non-breaching party.

22.    <u>Consideration</u>.  It is hereby acknowledged by the parties hereto that, other than the agreements, covenants, representations and warranties of the parties, as more particularly set forth herein, no consideration shall be due or paid to the Debtors for their agreement to use commercially reasonable efforts to obtain approval for an Acceptable Plan and related Disclosure Statement in accordance with the terms and conditions of this Agreement.

23.    <u>Further Assurances</u>.  Subject to the terms of this Agreement, the Debtors and the members of the Plan Sponsor Group agree to execute and deliver such other instruments and perform such other acts in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate an Acceptable Plan.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

51689/0001-10219790v2

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective representatives thereunto duly authorized as of the date set forth in the initial caption of this Agreement.

710 LONG RIDGE ROAD OPERATING COMPANY II, LLC


BY:_____
       Name:
       Title:

240 CHURCH STREET OPERATING COMPANY II, LLC


BY:_____
       Name:
       Title:

1 BURR ROAD OPERATING COMPANY II, LLC


BY:_____
       Name:
       Title:

245 ORANGE AVENUE OPERATING COMPANY II, LLC


BY:_____
       Name:
       Title:

107 OSBOURNE STREET OPERATING COMPANY II, LLC


BY:_____
       Name:
       Title:

12

HEALTHBRIDGE MANAGEMENT, LLC


BY:_____
       Name:
       Title:

CARE REALTY, LLC


BY:_____
       Name:
       Title:

CARE ONE, LLC


BY:_____
       Name:
       Title:

710 LONG RIDGE ROAD, LLC


BY:_____
       Name:
       Title:

240 CHURCH STREET, LLC


BY:_____
       Name:
       Title:

1 BURR ROAD COMPANY LLC


BY:_____
       Name:
       Title:

13

245 ORANGE AVENUE, LLC


BY:_____
      Name:
      Title:

107 OSBORNE STREET, LLC


BY:_____
      Name:
      Title:

14

## EXHIBIT A

## PLAN OF REORGANIZATION

## EXHIBIT B

**FIRST AND SECOND NON-MATERIAL MODIFICATIONS TO FIRST
AMENDED PLAN OF REORGANIZATION**

Document comparison by Workshare Professional on Thursday, February 06, 2014
2:01:20 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\DOCUME~1\dmb\LOCALS~1\Temp\Workshare\wmtemp884\10219790_2.DOC |
| Description | 10219790_2 |
| Document 2 ID | interwovenSite://CSDMS/CSDOCS/10219790/2 |
| Description | #10219790v2<CSDOCS> - 710 Long Ridge - Backstop Funding Agreement |
| Rendering set | Unsaved rendering set |

| Legend: | |
|---|---|
| **Insertion** | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 14 |
| Deletions | 6 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 22 |