**FILED**

JAMES J. WALDRON, CLERK

**MARCH 5, 2014**

U.S. BANKRUPTCY COURT
NEWARK, N.J.

BY: s/ *Ronnie Plasner*

JUDICIAL ASSISTANT

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re:<br><br>**710 LONG RIDGE ROAD OPERATING COMPANY, II, LLC, et al.,**<br><br>               Debtors. | Case No.:   13-13653 (DHS)<br><br>Judge: Donald H. Steckroth, U.S.B.J. |

<u>**OPINION**</u>

**APPEARANCES:**

Cole Schotz Meisel Forman & Leonard
Michael D. Sirota, Esq.
Gerald Gline, Esq.
David Bass, Esq.
Ryan T. Jareck, Esq.
25 Main Street
Hackensack, New Jersey  07601
***Counsel for Debtors***


Levy Ratner
Suzanne Hepner, Esq.
Ryan J. Barbur, Esq.
80 Eighth Avenue
New York, New York  10011
***Counsel for New England Health Care
Workers, District 1199 SEIU***


National Labor Relations Board
Special Litigation Branch
Paul Thomas, Esq.
Marissa Wagner, Esq.
Diana Embree, Esq.
1099 14th Street, NW, Suite 8600
Washington, D.C.  20570
***Counsel for National Labor Relations Board***


Porzio, Bromberg & Newman, P.C.
Robert M. Schechter, Esq.
Rachel Segall, Esq.
100 Southgate Parkway
Morristown, New Jersey 07962
***Counsel for the Official Committee of
Unsecured Creditors***

## THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE

The Court is asked to confirm the First Amended Joint Plan of Reorganization filed by 710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford, 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center, 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center, 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center (the "Debtors"),  and determine that Debtors have satisfied the requirements for confirmation contained within 11 U.S.C. 1129. The New England Health Care Employees Union, District 1119, SEIU (the "Union") and the National Labor Relations Board (the "NLRB" or "Board") (collectively, the "Objecting Parties"), along with the United States Trustee (the "UST"), filed objections to confirmation. The Official Committee of Unsecured Creditors (the "Committee") filed a statement in support of confirmation.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicate for the relief sought is Section 1129 of title 11 of the United States Code (the "Bankruptcy Code").

The Objecting Parties and the UST argue that the plan violates Section 1129(a)(2) because it contains nonconsensual third-party releases ("Third-Party Releases"). The Objecting Parties assert the plan also violates Section 1129(b) because it provides materially different recoveries for the Class 5 and Class 6 general unsecured creditors, violates the absolute priority rule, and is not feasible in violation of Section 1129(a)(11). Additionally, the Objecting Parties assert that the plan violates Section 1129(a)(3) contending it is proposed in bad faith, and fails to satisfy the best interest of creditors test under Section 1129(a)(7).

The Debtors assert that they have satisfactorily met their burden under Section 1129 of the Bankruptcy Code because the nonconsensual Third-Party Releases are permissible under the extraordinary circumstances of this case.   Additionally, there is a reasonable basis for the different recoveries by general unsecured creditors in Classes 5 and 6, and the Debtors' financial projections demonstrate the plan is feasible. The Debtors also assert the plan was proposed in good faith in order to prevent liquidation, and that all creditors will receive more under the plan than they would in a liquidation.   For the reasons set forth, the plan is confirmed if modified as required by this ruling.

## **RELEVANT FACTS**

Each Debtor operates a sub-acute and long-term nursing care facility (each a "Facility" and collectively, the "Facilities") for the elderly in Connecticut. The Facilities are: (i) Long Ridge of Stamford, (ii) Newington Health Care Center, (iii) Westport Health Care Center, (iv) West River Health Care Center, and (v) Danbury Health Care Center.   The Facilities are managed by HealthBridge Management, LLC ("HealthBridge"), a non-debtor national healthcare management company, related to Debtors through mutual ownership.   Each Facility operates on premises owned by an affiliated landlord (the "Affiliated Landlords").[1]

The Facilities were staffed by service and maintenance employees, 700 represented by the Union ("Union Employees") and 432 non-union.[2]   Each Debtor Facility entered into a separate collective bargaining agreement ("CBA") with its employees.   The terms of the CBAs

---

[1] 710 Long Ridge Road, LLC, 1 Burr Road, LLC, 107 Osborne Street, LLC, 240 Church Street, LLC, and 245 Orange Avenue, LLC are collectively the Affiliated Landlords.

[2] The scope of services offered by Debtors and the sources of revenue are set forth in prior decisions and are not repeated here but incorporated by reference. *See In re 710 Long Ridge Rd. Operating Co., II, LLC*, 13-13653 DHS, 2013 WL 796721 (Bankr. D.N.J. Mar. 4, 2013); Oral Op. Tr., April 10, 2013;  *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 13-13653 DHS, 2013 WL 796721 (Bankr. D.N.J. July 15, 2013); Oral Op. Tr., November 22, 2013.

were similar for each Facility and required the Debtors to make payments to employees for wages and benefits, including, but not limited to, accrued sick and vacation time, and to make payments for health coverage, pensions, and other benefits.   The CBAs were effective from December 31, 2004 through March 16, 2011 and are expired.

Upon time for renegotiation of the CBAs, the Debtors contend they were faced with the need to make cost saving benefit reductions to both Union and non-union employees.   During a 16-month period and 36 bargaining sessions, the Debtors and Union negotiated but came to no resolution.   After the Debtors felt that they had reached an impasse in June of 2012, the Debtors implemented their "Last, Best and Final" proposals as new terms ("Implemented Terms") on June 17, 2012.   Following the Implemented Terms, the Union Employees went on strike in July, 2012, and the Debtors hired replacement workers.   The Debtors have operated the Facilities since June 2012 under the Implemented Terms.

The acrimony between the Union and Debtors was pervasive. The failed negotiations, strike, and replacement of the workforce led to a variety of actions by both the Union and the Debtors.   The Debtors instituted an action for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO Act") for the Union Employees' alleged wrongdoing in disrupting treatment of patients and damaging the Facilities in protest.   The action is pending in the United States District Court for the District of New Jersey.   The NLRB, on behalf of the Union, brought a claim against the Debtors in the Office of Administrative Law before Administrative Law Judge Kenneth Chu ("ALJ Chu") asserting unfair labor practices and unlawful imposition of the Implemented Terms in the absence of a genuine, lawful impasse (the "ALJ Proceedings"). The hearing in the ALJ Proceedings began on September 10, 2012, and has continued post-petition. There have been twenty-eight days of testimony. Ten additional days of testimony were

scheduled through January 2014.  It is not anticipated that a decision will be rendered before late 2014.

According to various state financial filings, the Union asserts that the Debtors exist as part of a corporate network with principal ownership flowing to Daniel and Moshael Straus (the "Straus Family").  The Debtors are wholly owned by Care Realty, LLC ("Care Realty"), which is owned by a number of entities, the largest being the Straus family.  In addition, Debtors' management company, HealthBridge, is wholly owned by Care One, LCC ("Care One").

The NLRB's claims against Debtors are premised upon unfair labor practice proceedings now pending before the agency.  In response to a series of unfair labor practice charges filed by the Union, the NLRB's Regional Office in Hartford, Connecticut issued a consolidated administrative complaint in Case 34-CA-070823 et al., alleging that Debtors, HealthBridge, Care One,  and Care Realty, violated the National Labor Relations Act ("NLRA"). An administrative hearing was commenced on September 10, 2012, and remains ongoing.

Pending the outcome of the ALJ proceedings, the United States District Court for the District of Connecticut, on request of the NLRB, issued injunctive relief in favor of the Union pursuant to Section 10(j) of the NLRA.  The Section 10(j) relief provided that the Debtors and HealthBridge were required to reinstate all of the Union Employees and provide the benefits and compensation set forth in the expired CBAs pending the outcome of the unfair labor practice allegations (the "10(j) Injunctive Relief" or "10(j) Injunction").  The Debtors appealed the 10(j) Injunction to the Second Circuit Court of Appeals (the "Appeal") and obtained an interim stay pending appeal. They were in the process of complying with the 10(j) Injunctive Relief following termination of the stay pending appeal and denial of efforts to continue a stay when they filed their voluntary petition for chapter 11 relief on February 24, 2013 ("Filing Date").  The

Debtors assert that compliance with the 10(j) Injunctive Relief and implementation of the expired CBAs is the cause of their inability to operate and precipitated their bankruptcy filing. On October 15, 2013, the Second Circuit affirmed the District Court's ruling grant of the 10(j) Injunctive Relief. *Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131 (2d Cir. 2013).

**Interim Modifications under 11 U.S.C. § 1113(e)**

Soon after filing Chapter 11, the Debtors filed a 1113(e) Motion, seeking interim modifications to the Union Employees' wages and benefits by approximately 25% over a 13-week period, with a budget projecting $114,037.00 in net operating losses, assuming the requested modifications ("First 1113(e) Motion"). After an evidentiary hearing, this Court granted the Debtors six weeks of requested modifications, inviting them to return, if necessary, with a motion to approve DIP financing and an extension of the CBA modifications. *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 13-13653 DHS, 2013 WL 796721 (Bankr. D.N.J. Mar. 4, 2013).

On April 9, 2013, the Court approved a DIP facility and the Debtors filed their second 1113(e) motion ("Second 1113(e) Motion"), seeking continued interim modifications for the period April 19, 2013-July 15, 2013, while projecting $6,276.00 in net operating losses, assuming continuation of the requested CBA modifications. Following an evidentiary hearing, the Court issued an oral opinion on April 10, 2013 (the "Second 1113(e) Opinion") granting the Second 1113(e) Motion. (*See* Tr. of Oral Op., Docket No. 298)  The Court determined that "testimony at [the April 9, 2013] hearing demonstrated in this Court's opinion that continued interim relief is essential to the debtors' immediate survival." (*See* Hr'g Tr. 9:14-16, April 10, 2013).  Consistent with the oral decision, the Court entered the Second Interim 1113(e) Order extending the interim modifications through and including July 15, 2013.

On July 15, 2013, the Third Interim 1113(e) Order was entered extending the interim modifications through and including October 11, 2013.  In response to a further fourth request for interim modifications, the Court found that without continued relief, the Debtors would "not be able to meet their ordinary operating expenses, would incur an event of default under the DIP facility . . . [and] would not be afforded the opportunity to seek permanent modifications to the collective bargaining agreements, towards their efforts to reorganize." (Tr. of Oral Op. 7:11-15, November 22, 2013)  Thus, it was determined that the continued interim modifications to the Debtors' CBAs were essential to both the continuation of the Debtors' businesses and to avoid irreparable damage to the Debtors' estates under Section 1113(e) of the Bankruptcy Code. On November 22, 2013, the Bankruptcy Court entered the Fourth Interim 1113(e) Order extending the interim modifications through and including January 10, 2014.[3]

The Union and the NLRB each filed a notice of appeal and motion pursuant to Bankruptcy Rule 8003 for leave to appeal the 1113(e) Interim Orders.  The District Court, in January 2014, remanded the matters back to the Bankruptcy Court.

## Permanent Modifications under 11 U.S.C. § 1113(c)

On June 13, 2013, the Debtors presented the Union with a proposal pursuant to 11 U.S.C. § 1113(b) requesting savings from Union labor in the amount of $7,525,000 per year over a proposed six-year period. (Decl. of Victor Matthew Marcos ("Marcos Decl.") ¶¶ 12, Ex. C, ECF No. 561)   On September 25, 2013, the Debtors filed a motion pursuant to 11 U.S.C. § 1113(c) for an Order: (i) rejecting the continuing economic terms of the expired CBAs with the Union under 11 U.S.C. § 1113(c); and (ii) implementing the terms of the Debtors' proposal under 11 U.S.C § 1113(b) (the "1113(b) Proposal" or the "Proposal") (the "1113(c) Motion").

---

[3] This was later extended by the Court, by agreement of all counsel, through the Court's ruling on permanent modifications under 11 U.S.C. § 1113(c).

At the hearing on the 1113(c) Motion, the Debtors presented two witnesses: the Vice President of each of the Chapter 11 Debtors and the Debtors' lead negotiator of CBAs with the Union regarding the expired CBAs.   Neither the Union nor the NLRB offered a witness or affirmative evidence in opposition to the Motion.

The record revealed that, as a result of labor costs under the CBAs, the Debtors suffered significant losses between 2010 and 2012, prior to their bankruptcy filing. (Marcos Decl. ¶ 9)  In 2010, the Debtors' earnings before interest, taxes, depreciation, and amortization ("EBITDA") was negative $2,224,005. In 2011 and 2012, the Debtors suffered negative EBITDA in the amount of $5,099,596 and $19,532,351, respectively. (Marcos Decl. ¶ 9)   Additionally, the changes set forth in the 1113(b) Proposal provided for essential operational changes necessary for the Debtors to operate going forward.  (Marcos Decl. ¶ 15)  If the terms of the expired CBAs continue in force, "the Debtors would incur negative EBITDA in the amounts of $9.8 million in 2013, $10.8 million in 2014, $10.3 million in 2015, $9.8 million in 2016, $9.5 million in 2017, and $9.1 million in 2018."  (Marcos Decl. ¶ 24)   Thus, the testimony concluded that should the permanent modifications be denied, the Debtors would be forced to shut down the Facilities and all of the Debtors' employees—both Union and non-union—would lose their jobs. (Marcos Decl. ¶ 10)  Moreover, the closing of operations would present particular health care-related problems. In the event of closure, elderly patients would have to be relocated to other care facilities, which could easily take several weeks.  Even with the modifications set forth in the 1113(b) Proposal, the Debtors require assistance in funding operating costs as they will continue to suffer negative EBITDA through 2018.   (Marcos Decl. ¶ 25)

On February 3, 2014, this Court entered an Order granting the Debtors' motion pursuant to 11 U.S.C. § 1113(c) rejecting the continuing economic terms of the expired CBAs and

implementing the terms of the Debtors' 1113(b) Proposal.  (Order Granting 1113(c) Relief Feb. 2, 2014, ECF No. 898).  That Order was amended by Order dated February 6, 2014.

**Union and NLRB Claims**

On July 2, 2013, the Union filed fifteen claims (the "Union Claims"). On August 22, 2013, the NLRB filed five claims (the "NLRB Claims," and collectively with the Union Claims shall be referred to as the "Back Pay Claims").  The Union and NLRB each asserted an unknown portion of the Back Pay Claims is entitled to priority for wages, salaries, or commission under § 507(a)(4) and/or contributions to an employee benefit plan under § 507(a)(5). The Back Pay Claims total approximately $9,000,000.  The Back Pay Claims represent retroactive wages and benefits which seek to remedy the alleged unfair labor practices committed by the Debtors.

On October 2, 2013, the NLRB filed five Administrative Expense Claims (the "NLRB Administrative Expense Claims").  On October 11, 2013, the Union filed fifteen Administrative Expense Claims (the "Union Administrative Expense Claims" and together with the NLRB Administrative Expense Claims, the "Administrative Expense Claims").  The Administrative Expense Claims, which represent "the estimated potential post-petition liability for unpaid wages, pension contributions, medical expenses, and other benefits arising out of unfair labor charges against the Debtor" beginning on the Filing Date, total $1,136,273.

On February 6, 2014, this Court entered an Opinion ruling on the Debtors' objections to the Objecting Parties' proof of claims for their contingent, unliquidated claims (the "Claims") in connection with the various ALJ proceedings. The Court found that the Claims were not entitled to wage claim priority status under 11 U.S.C. § 507(a)(4) or 11 U.S.C. § 507(a)(5) and are to be classified as general unsecured claims, if and when awarded in the NLRB proceeding. Additionally, to the extent they are awarded in a NLRB proceeding, the Claims attributable to

the one-week period following the Filing Date until the 1113(e) interim modifications were approved are entitled to administrative expense status under 11 U.S.C. § 503(b). All other Claims were expunged in their entirety.  The parties are in agreement that the estimated value of the Objecting Parties' administrative priority claims is $300,000 to $400,000. The remainder of their Claims for back pay, if and when allowed, are general unsecured claims. Both parties are in agreement that the Claims will not be fully litigated under the NLRA for several years.

**The Plan**

The Debtors filed their disclosure statement and first plan of reorganization on October 22, 2013.  The First Amended Disclosure Statement was approved by this Court on December 11, 2013. The Debtors filed first modifications to the plan on January 17, 2014.   They filed a plan supplement on January 18, 2014, and two further supplements on February 4, and February 6, 2014.  Second modifications to the plan were filed on February 3, 2014 (the "Plan").

The Plan proposes to pay 75% of all allowed Class 5 claims (approximately $3 million). Class 5 claims are general unsecured claims classified as "Ongoing Trade Vendor" claims in 12 monthly installments. Class 6 includes general unsecured claims made up of the Objecting Parties' claims and general creditors not receiving Ongoing Trade Vendor status.  The Debtors originally agreed to provide Class 6 claims when allowed, with a pro rata share of a $500,000 fund advanced by Care One. The second modifications to the Plan changed this payment to include the same $500,000 commitment, triggered upon the entry of a non-appealable order regarding the Back Pay Claims (the "Back Pay Claim Adjudication Date"), plus an additional amount up to $4.5 million (for a total of $5 million) toward payment of Class 6 claims also to be funded by Care One.

Care Realty has agreed:  (1) to provide the funding to Class 5 claims in the approximate amount of $3 million, (2)  to provide $8 million to meet operating shortfalls post-effective date or to fund a further distribution to Class 6, and (3) to waive $31 million in claims against the Debtors and the estates. In addition, Care One and Care Realty have agreed to fund approximately $2-$3 million in allowed administrative expense claims, including professional compensation and reimbursements claims, in order to satisfy the Debtors' Chapter 11 administrative obligations.

The Plan provides that intercompany claims are to be extinguished without payment.  The Plan also provides that Care Realty will purchase the equity interests of THCI Mortgage and THCI Company in the Debtors upon the Effective Date, with these companies not retaining an equity interest in the Debtors.

Thus, the sources of funding for the Plan are the Debtors' current assets together with funds from Care Realty and Care One. The Plan also proposes contributions from affiliated entities known as the Plan Sponsor Group, which includes Care One, HealthBridge, Care Realty, and the Affiliated Landlords.  In addition, the Affiliated Landlords have agreed to waive cure amounts for defaults in the sum of $13 million as a condition to assumption of the leases and HealthBridge has agreed to waive $2.6 million in post-petition administration expense claims for its management services to the Debtors during the Chapter 11.

In summary, the economics of the Plan include:

1. Debtors' cash on hand
2. Waiver by Care Realty of $31 million in general unsecured claims (otherwise includable in Class 6)
3. Waiver by the Affiliated Landlords of $13 million in cure payments
4. $500,000 contribution by Care One for Class 6 creditors

5. Up to $4,500,000 additional contribution to Class 6 by Care One in the event the NLRB obtains a final judgment on back pay claims in the ALJ Proceedings
6. $3 million by Care Realty to pay Class 5 claims
7. $8 million by Care Realty as backstop to fund operating losses over life of Plan
8. $2-$3 million from Care Realty/Care One to fund allowed administrative expenses, including professional compensation and expense reimbursement
9. Waiver of $1.1 million administrative expense claim for rent during chapter 11 by Affiliated Landlords
10. Waiver of $2.6 million administrative expense claim for Management Fees by HealthBridge

The Plan provides for Third-Party Releases as follows:

Upon substantial consummation, as defined in section 1101(2) of the Bankruptcy Code, and then effective nunc pro tunc to the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim and/or Equity Interest that is entitled to receive a Distribution pursuant to the Plan shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against Care One, LLC, Care Realty, LLC, the Management Company, the Affiliated Landlords and the managers, directors, officers or employees of any of the Debtors or of any of Care One, LLC, Care Realty, LLC, the Management Company and the Affiliated Landlords, including but not limited to Victor Matthew Marcos, A. Alberto Lugo and Daniel E. Straus (collectively, the "Releasees"), in connection with or related to the Debtors, the conduct of the Debtors' businesses, the Chapter 11 Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' businesses, the Chapter 11 Case, or the Plan; provided, however, that, nothing in this Section 9.2 shall be construed to release any party from actual fraud or gross negligence as determined by a Final Order and/or (ii) their obligations under the HUD Loan and related documents and/or M&T Loan and related documents. Unless otherwise ordered by

the Bankruptcy Court, the failure by a Reorganized Debtor and/or a member of the Plan Sponsor Group to make any payment as required under the Plan that remains uncured for thirty (30) days after receipt by the Debtors of written notice from any party(ies) affected by such failure, shall automatically and without order of the Bankruptcy Court result in the release granted hereunder being deemed vacated solely as to such affected party(ies) in such applicable Estate(s).

Each of the Releasees shall be deemed to forever release, waive, and discharge any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever arising on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' businesses, the Chapter 11 Case, or the Plan, that such Releasees may hold in their individual capacities against each Holder of a Claim and/or Equity Interest that is entitled to receive a Distribution pursuant to the Plan; provided, however, that until the conclusion of the RICO Action, the Union shall not be released by the Releasees on any claim raised or which could have been raised in the RICO Action and nothing herein is intended nor shall limit the right of the Releasees to recover against any defendant in the RICO Action. (Emphasis added)

(Plan Article 9.2); Thus, under the Plan, "Releasees" include Care One, Care Realty, HealthBridge, the Affiliated Landlords and the managers, directors, officers or employees of any of the Debtors or of any of Care One, Care Realty, HealthBridge, and the Affiliated Landlords, including but not limited to Victor Matthew Marcos, A. Alberto Lugo and Daniel E. Straus. (*See* Plan Article 9.2) All non-debtor Third-Party Releases are objected to by the Objecting Parties and the UST.

The Plan also contains an exculpation clause as follows:

The Debtors, the Reorganized Debtors, the Creditors' Committee, each of the members of the Creditors' Committee, and their respective officers, directors, employees and agents (including any attorneys, financial advisors, investment bankers and other professionals retained by such Persons) shall have no liability to any Holder of any Claim or Equity Interest, or any other party-in-interest, or any of their respective agents, employees,

14

representatives, advisors, attorneys, or affiliates, or any of their
successors or assigns, for any act or omission in connection with,
relating to, or arising out of the Chapter 11 Case, the formulation,
negotiating, or implementation of the Plan, the solicitation of
acceptances of the Plan, the pursuit of confirmation of the Plan, the
confirmation of the Plan, the consummation of the Plan, or the
administration of the Plan or the property to be distributed under
the Plan, except for acts or omission that are the result of gross
negligence or actual fraud and, in all respects, shall be entitled to
rely on the advice of counsel with respect to their duties and
responsibilities under this Plan.

(Plan Article 9.5).

The Plan, after the second modifications, also provides that the Debtors' injunction

provision under Article 9 shall not operate as an injunction with respect to limit or enjoin the

NLRB's rights under the NLRA and any exclusive jurisdiction thereunder to fix a claim against

any released party.

Care Realty, Care One, HealthBridge, and the Affiliated Landlords will not make any of

the concessions, compromises, and funding commitments outlined in the Plan unless the releases

are approved.   Substantial consummation of the Plan will be upon the Debtors making the

required Effective Date payments.

**<u>The Record at the Hearing</u>**

At the confirmation hearing, the Debtors presented two witnesses: the Vice President of

each of the Chapter 11 Debtors, Victor Matthew Marcos ("Marcos"), and Paul Rundell

("Rundell"), the Managing Director of Alvarez & Marsal Healthcare Industry Group, LLC, a

national restructuring advisory services firm retained by the Debtors.   Marcos submitted a

Declaration in Support of Confirmation of the Debtors' Plan of Reorganization (Decl. of Victor

Matthew Marcos, ECF No. 901 ("Marcos Confirmation Decl.")) (D-6 in Evidence).   Rundell

also submitted a Declaration in Support of Confirmation of the Debtors' Plan of Reorganization

("Rundell Decl.") (D-7 in Evidence).   Each was cross-examined. In addition, the NLRB called

Marcos as its only witness under Federal Rule of Evidence 611(c).

The testimony of Marcos and Rundell addressed several critical issues. Marcos testified

as to the corporate structure of the Debtors.   Each of the Debtors' facilities operate on a premises

owned by an Affiliated Landlord. (Marcos Confirmation Decl. ¶ 9)    The Debtors are the

operating entity, hold the nursing home license, and lease the real estate. (Confirmation Hr'g Tr.

28:11-13 February 10, 2014) The Debtors are owned by THCI Company and THCI Mortgage

(the "Parent Companies"). The Parent Companies are owned by Care Realty. Each of the

Debtors has a management agreement with HealthBridge, which is owned by Care One. (Marcos

Confirmation Decl. ¶ 9)  He asserted that "[i]t's fairly typical in the nursing home industry to

organize the facilities this way.  I think lenders prefer it because they can isolate their collateral.

And it's a very common practice in the industry." (*Id*. 29:22-25)

Rundell further provided testimony regarding the ownership structure.  He opined that:

"In my experience in the healthcare and senior housing industry, it is common for owners to

separate their operating companies and real estate assets into separate companies — referred to

as an "OpCo/PropCo" structure — often to obtain financing for the PropCo assets.  It is also

common for owners of multiple facilities to utilize one management company, even when the

ownership interests vary in size or person, and to centralize certain accounting and other

administrative functions including transfer of revenue and payment of accounts payables and

other operating expenses so as to take advantage of economies of scale.  (Rundell Decl. ¶ 6)

Marcos testified with respect to the intercompany transactions. Under the Debtors' cash

management system, certain accounting and administrative functions are centralized at Care

Realty, including transfer of revenue and payment of accounts payables and other operating

expenses. Each of the entities is separate and distinct, and thus, all receipts and disbursements are accounted for on the general ledger as intercompany transfers. The intercompany transfers are tracked so each Debtor's revenues and expenditures can be separately identified.    (Marcos Confirmation Decl. ¶ 10)   He stated that all intercompany transactions are recorded on the general ledger every day, as the transaction occurs. (*Id.* 32:4-15)   He testified that prior to the bankruptcy filing, the Debtors owed $31 million to Care Realty and $13.6 million to the Affiliated Landlords.  (*Id.* 33:3-4)   The $31 million dollars owed to Care Realty is on account of monies that Care Realty paid on behalf of the Debtors for payroll, vendor payments, and other working capital needs when funds were needed by the Debtor. This sum would be an unsecured general creditor in Class 6 if not waived. (*Id.* 33:7-11)   Care Realty funded these operating shortfalls to make sure the Debtors were able to meet their obligations.  (*Id.* 33:15-18)  The $13.6 million owed to Affiliated Landlords was on account of unpaid rents by the Debtors during the Chapter 11 case, and would be an administrative cure expense if repayment was required to reorganize. (*Id.* 33:19-24)   Marcos testified the rents were unpaid because the Debtors did not have sufficient cash flow from operating revenue to cover the rents. (*Id.* 34:1-2)

Counsel for the NLRB elicited evidence that certain Debtors had not paid rent for years, some as long as eight years (*Id.* 70:13-21) and that Care Realty never undertook any legal efforts to collect the past due rent nor demanded a security interest in collateral in exchange for these payments. (*Id.* 74:13-18) Marcos acknowledged interest was never charged and penalties were never assessed. (*Id.* 74:19-24)

The $44 million collectively owed to Care Realty and the Affiliated Landlords was fully reflected in the accounting of the intercompany transfers. (*Id.* 34:3-9)  Marcos opined that the $44 million was not a capital contribution because there was an expectation they would be repaid

to Care Realty or the Affiliated Landlords once Debtors retained profitability. (*Id.*. 34:19-24)

Marcos stated that Care Realty did not charge the Debtors interest because it was not normal

accounting practice in dealing with intercompany payables. (*Id.* 35:1-6) Marcos further testified

that Care Realty decided to stop funding these Facilities in January 2013 because it realized the

Debtors' operations were not sustainable and there was no clear path to restructuring the business

successfully absent relief on labor costs. (*Id.* 35:16-25 - 36:1-3)   When the Debtors filed their

bankruptcy petitions, Care Realty agreed to provide funding to the Facilities if they were granted

interim relief under § 1113(e) so they would have several weeks' worth of expenses in order to

allow Debtors time to obtain a debtor-in-possession lender.  (*Id.* 37:15-22)   Marcos stated that

he was not aware of any agreements between the Debtors and an affiliated entity that requires the

affiliated entities to fund the Debtors. (*Id.* 37:23-25 - 38:1)

Marcos confirmed that the $8 million backstop funding proposed by Care Realty to fund

operating losses for the Facilities or to fund Class 6 was a "hard commitment." (*Id.* 38:14-17)

and clarified that this $8 million was different from the snap-back provision in the 1113(b)

proposal, because the snap-back provision provides that if Facilities outperform projections, a

portion of the profits will be shared with the Union Employees. (*Id.* 39:13-21)

Marcos also testified regarding the money allocated to Class 6. He stated that because of

a total $5 million contribution from Care One, there would be approximately a 30% dividend to

Class 6 if the NLRB is 100% successful on its claim of $9 million. (*Id.* 40:18-26 – 41:1-7)

Marcos further noted, however, that this percentage assumes the intercompany allocation to Care

Realty of $31 million is waived.  Thus, the range in the dividend to the NLRB under Class 6

could be anywhere from 30% to 100%, dependent upon the extent of the claim when fixed. (*Id.*

41:10-17)  If the $31 million was not waived by Care Realty (as part of the consideration for a

release), the claim would fall into Class 6 and have the effect of diluting recovery to the NLRB by 65%.  (*Id.* 43:4-9)

Marcos also stated that the new value contributions total $32 million. (*Id.* 43:20-23) Even under the Plan, if confirmed, the Debtors are projected to lose about $8 million over four years. (*Id.* 45:3-10)  Finally, over that same four-year period, $95 million would be paid to Union labor and $80 million would be paid to non-union labor. (*Id.* 45:11-15)  If the Plan is not confirmed, the Facilities would be closed and 1,100 employees would lose their jobs.

Marcos testified in support of the Plan feasibility saying: "[a]lthough the Debtors project operating losses going forward, they have a commitment by Care Realty to fund those operating losses" to the extent of $8 million. (*Id.* 47:2-9) and an exit facility that has been arranged with Capital One, which is substantially similar to the existing debtor-in-possession financing currently in place. (*Id.* 47:10-15)  Marcos testified that he is knowledgeable of Care Realty and Care One's financial affairs, and is assured that Care Realty and Care One can afford the commitments under the Plan. (*Id.* 47:19-25) Marcos then testified that the Union's administrative claim is estimated to be about $300,000 to $400,000 and will be paid under the Plan. (*Id.* 48:4-15)

Marcos acknowledged the Debtors' options if the Plan is not approved. He stated that "[i]f the Plan is not approved, the Debtors will need to close. They'll apply [to] the State to close the Facilities down. And then there will be an orderly wind down." (*Id.* 48:19-22)  He asserted that the elderly residents would have to be transferred to other facilities and 1,100 employees would be terminated.  (*Id.* 48:22-25 - 9:1-5) When questioned by the NLRB if the Facilities could be sold if the Plan is not approved, Marcos stated that he did not believe buyers would take on the financial risk considering the way the Facilities are operating and the fact that the Debtors

do not own the real estate. (*Id.* 49:12-18) He testified that although it is not likely that the Debtors would be sold post-confirmation, if they were sold, the $8 million commitment from Care Realty would still be paid to Class 6 to fund that recovery. (*Id.* 50:13-20)

Finally, Marcos testified that the treatment of Class 5 claims was negotiated with the Creditors' Committee, which ultimately led to the terms in the Plan. (*Id.* 51:7-14) In exchange for receiving $3 million from Class 5, the Class 5 vendors agreed to commit to their existing credit terms, and, in addition, to providing additional 30 day trade terms, which will result in a one time working capital pickup of $2 million. (*Id.* 51:8-23)  This is a direct benefit to the Debtors.  Finally, he stated that payment of the claims asserted by the NLRB in Class 6 provide no going-forward benefit to the estate and is one of the reasons they are treated differently under the Plan. (*Id.* 52:6-12)

Rundell testified as an expert in healthcare bankruptcy matters. He echoed the testimony of Marcos regarding the organizational structure of the Debtors and agreed that the Debtors' structure is the customary way that senior living and nursing home facilities are structured and operate. (*Id.* 118:7-10)  He opined that the intercompany advances were properly listed as liabilities on the Debtors' balance sheets, and were not capital contributions. (*Id.* 119:7-24 - 120:10-12)

On cross-examination, the NLRB attempted to undermine Rundell's testimony that it was typical for intercompany debts to build over several years. (*Id.* 128:14-15)  However, Rundell's statements were unrefuted and the NLRB offered no expert testimony to refute Rundell's testimony regarding industry customs and standards as well as accepted accounting practices.

Next, Rundell testified to the Debtors' liquidation analysis. He testified that "[i]t shows the creditors and the Court that in comparison to a chapter 11 reorganization this is a chapter 7

liquidation where the assets would be shut down and monetized and whatever proceeds would go to the creditors." (*Id.* 121:10-13) The purpose of the liquidation analysis is to show the creditors are better off under a chapter 11 reorganization than a chapter 7 shut down and wind down. (*Id.* 121:16-18)  Rundell oversaw and reviewed the liquidation analysis, and stated that if the cases are converted to chapter 7, the unsecured creditors would not receive anything. (*Id.* 125:19-25 – 126:1) He further testified that the assumptions under which the projections were prepared are reasonable and consistent with the methodology and assumptions utilized in other senior care bankruptcy cases. (*Id.* 126:12-23)

On cross-examination, the NLRB sought to discredit the liquidation analysis because it failed to take into account the possibility of negative post-confirmation occurrences, such as a strike or a fire. (*Id.* 149:20-21) Rundell stated that those occurrences were not foreseeable or imminent, and thus were not outlined in the Plan. (*Id.* 150:3-5) Overall, Rundell's testimony was credible and unrefuted.  The Objecting Parties offered no expert testimony to support their arguments.

During Marcos's 611(c) testimony, the NLRB emphasized all of the same issues. The NLRB asked about the different payroll and accounts receivable accounts of the affiliates, illustrating that Care Realty pays the bills regardless of whether the Debtors have put in enough money to cover their part of the bills. (*Id.* 166:8-16) The NLRB asked Marcos if this practice was considered Care Realty's infusion of new money into the account. (*Id.* 166:18-23) Marcos explained that it was not the infusion of new money, because such practice was common in the senior living facility industry. (*Id.* 167:6-7) Finally, he noted that the rent charged pursuant to the leases was below the market price. (*Id.* 110:23-25)

Classes 2, 3, 5, and 6 are impaired under the Plan.  Each impaired class, other than Class 6, has voted to accept the Plan.  Class 6 voted to reject the Plan.  Class 7 (Intercompany Claims) and Class 8 (Equity Interests) are deemed to have rejected the Plan.  Because Class 6 is a non-consenting impaired class, the cramdown requirements of Section 1129(b) of the Bankruptcy Code must be satisfied.

## DISCUSSION

At a confirmation hearing, the court must determine whether the plan as presented is confirmable.  The requirements for confirmation of a proposed Chapter 11 Plan are listed in 11 U.S.C. § 1129.   The plan proponent bears the burden of proof in establishing the plan's compliance with each of these requirements. *See In re Genesis Health Ventures,* 266 B.R. 591 (Bankr. D. Del. 2001); *In re Greate Bay Hotel and Casino, Inc.*, 251 B.R. 213, 221 (Bankr. D.N.J. 2000).  Creditors objecting to the proposed plan bear the burden of producing evidence to support their objection.  *Id.  In re Shortridge*, 65 F.3d 169 (6th Cir. 1995).  *In re Goddard*, 212 B.R. 233, 239 n.7 (D.N.J. 1997). In addition, the Bankruptcy Code imposes an independent duty upon the court to determine whether a plan satisfies each element of § 1129, regardless of the absence of valid objections to confirmation.  *In re Greate Bay Hotel and Casino, Inc.*, 251 B.R. at 221.

Acceptance of a plan is governed by § 1126.  All classes not impaired under the plan, and each holder of a claim or interest in such class, are conclusively presumed to have accepted the plan and voting is not required.   § 1126(f).  All impaired classes have accepted the plan if creditors holding at least 2/3 in amount and more than 1/2 in number of allowed claims vote to accept, without regard to insiders.  § 1126(c).

A non-consensual plan requires the proponent to prove all but one of the 13 elements, the provision in (a)(8) requiring that all classes either accept or be unimpaired, plus the additional requirements of § 1129(b), including the requirements that the plan does not unfairly discriminate against dissenting classes and that treatment of such dissenting classes is fair and equitable.

11 U.S.C. § 1129(a) enumerates the requirements governing confirmation of a plan.  The court is required to confirm a plan if and only if all of the requirements are met.  Here, the requirements of § 1129(a) have been met and satisfied by the Debtors and were not the subject of substantive objections except for the several issues discussed hereinafter.  Specific findings of fact will be included in the Confirmation Order, in the event one is entered, if the modifications to the Plan contained in this Opinion are acceptable to Debtors.

## I.    Third-Party Releases

### A.    Subject Matter Jurisdiction

The Objecting Parties argue that this Court does not have subject matter jurisdiction to approve the Plan's Third-Party Releases because the NLRB has exclusive jurisdiction to determine a party's liability under the NLRA.

Section 10(a) of the NLRA provides that the NLRB has the exclusive power to prevent any person from engaging in unfair labor practices.  29 U.S.C. § 160(a).  This power "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise." *Id.*  The Objecting Parties assert it is beyond this Court's jurisdiction to resolve NLRB claims against non-debtors because "preventing claimants from pursuing their claims is equivalent to issuing a final adjudication of the merits of such claims." *See In re Digital Impact*, 223 B.R. 1, 12 (Bankr. N.D. Okla. 1998).

While the Plan in its original form may have been read to enjoin the NLRB's rights to fix a claim against any Releasee in the ALJ proceedings, the Debtors' second modifications to the Plan clarify that the Third-Party Releases are not meant to function in this manner. The Debtors' Plan states that

> [s]ubject to all provisions of this Article IX, including the releases, neither Section 9.4 of the Plan nor any Confirmation Order shall operate as an injunction with respect to, or otherwise limit or enjoin, the NLRB's rights under the NLRA and any exclusive jurisdiction thereunder to fix a claim against any Releasee in the ALJ Proceedings.[4]

Thus, this portion of the Objecting Parties' argument appears resolved except to the extent third-party releases are permitted which would affect the NLRB's claim of joint and several liability against non-debtors.[5]

The Debtors assert that this Court has jurisdiction over this matter that arise as part of the plan confirmation process, which is considered a core proceeding. Additionally, the Debtors emphasize that the issue of whether a third-party release is permissible is substantive, not jurisdictional.

Pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334(b), the bankruptcy court may enter orders and judgments in all cases which arise in or arise under a case under title 11 ("Core Proceedings"). *In re Mullarkey*, 536 F.3d 215, 220 (3d Cir. 2008). At a minimum, bankruptcy judges may hear and determine a proceeding related to a case under title 11. *See* 28 U.S.C. § 157(a)-(b), and the Code specifies that core proceedings include the confirmation of plans. *See*

---

[4]   The Plan defines "ALJ Proceedings" as those various proceedings pending before the National Labor Relations Board and presided over by an Administrative Law Judge, including the following matters: Case Nos. 34-CA-12715, 34-CA-12732, 34-CA-12765, 34-CA-12766, 34-CA-12768, 34-CA-12769, 34-CA-12770, 34-CA-12771, 34-CA-070823, 34-CA-072875, 34-CA-075226, 34-CA-08335, 34-CA-08471, 34-CA-073303, and 34-CA-080215." (Debtors' Plan at 5).

[5] The NLRB must prevail on its single and/or joint employer claim before any of the non-Debtor releasees could be held independently liable.

28 U.S.C. § 157(b)(2)(L). Clearly, bankruptcy courts may enter orders and judgments to confirm a plan. "Arising under" jurisdiction refers to those causes of action specifically created by the bankruptcy statute. "Arising in" cases involve the administration of the bankruptcy estate. *See, e.g., In re Marcus Hook Dev. Park, Inc*., 943 F.2d 261, 267 (3d Cir. 1991).

Whether third-party releases are permissible plan provisions is governed by substantive bankruptcy law and is often litigated. Referring to third-party releases, the Bankruptcy Court for the District of New Jersey has noted that "such injunctions and releases are customary and ordinary in large Chapter 11 cases." *In re Am. Family Enters.*, 256 B.R. 377, 406 (D.N.J. 2000). In *American Family Enterprises*, the district court sitting on a bankruptcy matter first recognized that Section 105 of the Bankruptcy Code grants the Court broad equitable power to issue any order, process or judgment that is necessary or appropriate to carry out the provisions of title 11. Additionally, it noted Section 1123(b)(6) provides that a plan may include any appropriate provision not inconsistent with the applicable provisions of title 11. In ruling on the court's jurisdiction to consider third-party releases, the court noted it "unquestionably has jurisdiction to consider and confirm the plan pursuant to 28 U.S.C. § 1334(b). That statute also confers upon the Court jurisdiction to issue the [ ] Injunction that will result upon confirmation of the plan, as that injunction arises in and/or is related to these Chapter 11 Cases." *In re Am. Family Enters.*, 256 B.R. at 405. The court entered the third party injunction pursuant to its power under Section 105 of the Bankruptcy Code. *Id*. at 408; *see also In re Airadigm Commc'ns, Inc*., 519 F.3d 640, 657 (7th Cir. 2008) ("In light of [11 U.S.C. § 105(a) and 11 U.S.C. § 1123(b)(6)], we hold that this 'residual authority' permits the bankruptcy court to release third parties from liability to participating creditors if the release is 'appropriate' and not inconsistent with any provision of the bankruptcy code.").

The Third Circuit and trial courts in this circuit have routinely held that bankruptcy courts have jurisdiction to grant third-party releases in a plan of reorganization. *See In re PWS Holding Corp.*, 228 F.3d 224, 245-47 (3d Cir. 2000) (in approving a third-party release, the Third Circuit recognized that it was within the jurisdiction and authority of a bankruptcy court to approve releases in favor of non-debtor third parties' post-petition conduct during the bankruptcy case); *see also In re Saxby's Coffee Worldwide, LLC*, 436 B.R. 331, 337-38 (Bankr. E.D. Pa. 2010) (recognizing that a court may have both the subject matter jurisdiction and the general legal authority under 11 U.S.C. § 105(a) to confirm a plan that includes a third-party release). *In re Medford Crossings North, LLC,* Case No. 07-25115, 2011 WL 182815 at *9 (Bankr. D.N.J. Jan. 20, 2011) (Court determined it had both subject matter jurisdiction and general legal authority under § 105(a) to confirm plan with a third-party release). As noted above, in *In re American Family Enterprises*, the district court approved a release which provided for a permanent injunction against the pursuit of any creditor's claims against funding parties and other released third parties. *In re Am. Family Enters.,* 256 B.R. at 407; *See also In re Metromedia Fiber Network, Inc*., 416 F.3d 136, 141 (2d Cir. 2005) ("We have previously held that "[i]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan.") (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992)).

The Debtors have said the NLRB not only has to establish a Back Pay Claim against the Debtors, but also prevail on its single and/or joint employer claim before any of the Third-Party Releasees could be held independently liable. Notwithstanding, in order to preserve the viability of the Debtors, third parties are contributing significant dollars to fund the potential for a Back Pay Claim award. These funds will be available to satisfy such a claim against the Debtors

without the NLRB ever having to prove its case that any of the third parties is liable as a single and/or joint employer.

The bankruptcy court's jurisdiction to adjudicate core proceedings, including those in the process of plan confirmation, includes granting releases and injunctions in appropriate circumstances. The troubling question to be addressed is the validity of the Third-Party Releases proposed in the Plan before the Court.  This must be carefully considered even though the Plan clarifies that the Non-Debtor Releases and Injunctions will not operate to enjoin the ALJ Proceedings, which was, at one point, the principal focus of the NLRB's objection.

### B.    Validity of Third-Party Releases

#### 1.    Validity under Section 524(e)

Section 524(e) of the Bankruptcy Code provides that "[e]xcept as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e).  The Objecting Parties argue that the Third-Party Releases violate Section 524(e), because they affect the liability of parties other than the Debtors.  The Objecting Parties point out the Courts of Appeal for the Fifth, Ninth, and Tenth Circuits have held that non-debtor releases and permanent injunctions are impermissible, except in asbestos cases where third-party injunctions are permitted pursuant to Section 524(g).  *See, e.g., Resorts Int'l, Inc. v. Lowenschuss,* 67 F.3d 1394, 1401-02 (9th Cir. 1995); *In re Zale Corp.,* 62 F.3d 746, 760 (5th Cir. 1995); *In re W. Real Estate Fund, Inc.*, 922 F.2d 592 (10th Cir. 1990) *modified sub nom. Abel v. W.*, 932 F.2d 898 (10th Cir. 1991).  Other courts have adopted a more flexible approach approving non-consensual releases. *See, e.g., In re Metromedia Fiber Network, Inc.*, 416 F.3d at 141 (holding third-party releases may be granted if important to the chapter 11 plan but only in rare cases); *In re Dow Corning*

*Corp.,* 280 F.3d 648, 657-58 (6th Cir. 2002) (concluding such relief is a dramatic measure to be used cautiously).

The Third Circuit has discussed the issue in *In re Continental Airlines*, where the court did not formulate a rule whether non-debtor releases are permissible. ("Given the manner in which the issue has been presented to us, we need not establish our own rule regarding the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible.")  *In re Cont'l Airlines*, 203 F.3d 203, 214 (3d Cir. 2000).  While the *Continental Airlines* court did not set out its own test, it did evaluate the basis on which bankruptcy and district courts formed their opinions.  *See Cont'l Airlines*, 203 F.3d at 217 ("the Bankruptcy Court and District Court [below] lacked a sufficient evidentiary and legal basis to authorize the release and permanent injunction of Plaintiffs' claims under any of the standards adopted by courts that have evaluated non-debtor releases and permanent injunctions."). The court did opine that: "The hallmarks of permissible non-consensual releases—fairness, necessity to the reorganization, and specific factual findings to support these conclusions—are all absent here." *Cont'l Airlines*, 203 F.3d at 214. Thus, non-debtor, non-consensual releases that are fair, necessary for reorganization, and supported by specific factual findings may be permitted in our circuit, although it is recognized that they are the exception, not the rule.  *Id.* at 212.

Courts ruling on broad releases to third-party creditors or equity security holders since *Continental Airlines* have recognized that the *Continental Airlines* court envisioned certain circumstances under which a third-party release is permissible.  *See In re Genesis Health Ventures, Inc.,* 266 B.R. at 607 ("Such a release must be examined in light of the Third Circuit's reservation in *Continental Airlines* that 'there are circumstances under which [the court] might

validate a non-consensual release that is both necessary and given in exchange for fair consideration.'"  (citing *Cont'l Airlines*, 203 F.3d at 214 n.11).

Since the Third Circuit did not set out a specific test in *Continental Airlines*, several courts within the Third Circuit have continued to apply a five-factor test cited in *In re Zenith Electrics Corporation*, 241 B.R. 92, 110 (Bankr. D. Del. 1999), and derived from the case of *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994), (the "Master Mortgage Factors").  The *Zenith* court set forth several factors to consider in determining whether a non-debtor release is permissible:

> (1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;
> (2) substantial contribution by the non-debtor of assets to the reorganization;
> (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;
> (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and
> (5) provision in the plan for payment of all or substantially all of the class or classes affected by the injunction.

*Zenith Elecs. Corp*, 241 B.R. at 110 (citing *Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 937). These factors are not considered requirements for the approval of third-party releases, but they may be instructive to the court.  *See In re Washington Mut., Inc*., 442 B.R. 314, 346 (Bankr. D. Del. 2011) ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness.").

To determine whether or not the releases are fair and necessary to the reorganization, the plan's proponent must demonstrate that (1) there is a relationship between the debtors' successful reorganization and the non-consensual parties' release, and (2) "the releasees have

provided a critical financial contribution to the debtors' plan that is necessary to make the plan feasible in exchange for receiving a release of liability." *In re Nickels Midway Pier, LLC*, 2010 WL 2034542, at *13 (Bankr. D.N.J. May 21, 2010) (citing *In re Genesis Health Ventures*, 266 B.R. at 608).

Two elements are almost universally determinative, that is, approval of a non-debtor release "requires demonstration that the success of the debtors' reorganization bears a relationship to the release of the non-consensual parties," and that "the releasees have provided a critical financial contribution to the debtors' plan that is necessary to make the plan feasible in exchange for receiving a release of liability." *See In re Genesis Health Ventures, Inc.,* 266 B.R. at 607. Clearly, the Court must undergo an analysis of each of the Releasees to determine validity.

1.      Care One and Care Realty

There is a direct relationship between the Debtors' successful reorganization and the requested releases as to Care One and Care Realty. In *In re Genesis Health Ventures, Inc.*, 266 B.R. at 608, the court noted that "[t]he relationship between the success of the [Debtor's] reorganization and the release of claims against the Senior Lenders is premised on the insistence by the Senior Lenders of the inclusion of the releases of third party claims . . . as partial consideration for their contribution." Similarly, in this case, the Debtors' unrefuted testimony is that Care One and Care Realty are not prepared to contribute in excess of $29 million in new consideration without the Third-Party Releases. (*See* Marcos Confirmation Decl. ¶ 35) Without the contributions of Care One and Care Realty funding and waiving claims, there will be no reorganization. This is undisputed.

Care One and Care Realty have provided critical financial contributions, which are necessary to make the Plan feasible, in exchange for receiving a release of liability of non-debtors. Care Realty has agreed to waive $31 million in claims against the Debtors and the estates, to provide funding to Class 5 Claims in the approximate amount of $3 million, and to provide $8 million to meet operating shortfalls after the Effective Date, or to fund a further distribution to Class 6.  Care One has agreed to fund the Plan Distribution Contribution Amount for Class 6 in the amount of $500,000 and, in the event the NLRB obtains a final non-appealable judgment against the Debtors regarding the Claims in the ALJ Proceedings, will contribute additional funds `such that the Plan Distribution Contribution Amount can grow to $5 million. Finally, Care One and Care Realty have agreed to fund approximately $2-$3 million in allowed administrative expense claims, including professional compensation and reimbursements claims. It is undisputed that absent these contributions and waivers, a Plan cannot be confirmed and that absent the requested releases, the funds will not be provided.

In *In re Airadigm Communications, Inc*., 519 F.3d at 658, the Seventh Circuit found that releasing claims against the plan's primary funder for its role in promulgating the plan was necessary because the funder would not proceed without the releases.  Likewise, in this case, Care One and Care Realty are the primary funders of the Plan, and their substantial financial contribution is necessary to make the plan feasible.  Unequivocally, they will not proceed without the requested releases.  (*See* Marcos Confirmation Decl. ¶ 35)

In addition, the non-consenting creditors are given reasonable consideration in exchange for the release. In *In re Genesis Health Ventures, Inc*., 266 B.R. at 608, the court determined that "the non-consenting creditors here . . . will receive fair consideration for their claims under the plan as proposed, at the level of a dividend of approximately 7.34%, particularly because their

claims were out of the money otherwise." In the present case, the Plan proposes to provide the Class 6 General Unsecured Creditors with at least a 33% recovery of their contingent and unliquidated claims if they are fully allowed in the ALJ Proceedings and subject to final judgment in the appropriate court of appeal. Significantly, the 33% recovery drops to 11% if Care Realty does not waive its $31 million general unsecured claim and is included in Class 6. As such, a substantial benefit flows to the Objecting Parties by this waiver.

Additionally, most of the instructive Master Mortgage Factors have been met as well. There is no question that there is an identity of interest between the Debtors and Care One and Care Realty. Care One and Care Realty undoubtedly "share the common goal" of confirming the Amended Plan and implementing the transactions contemplated thereunder. *See In re Tribune Co.,* 464 B.R. 126, 187, *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011) (noting an identity of interest between the debtors and the settling parties where such parties "share[d] the common goal of confirming the [ ] Plan and implementing the [ ] Plan Settlement"). The Debtors also share a unity of identity with the other Releasees because their claims may be of such a nature that they are indemnifiable by the Debtors and therefore would implicate the Debtors and further deplete estate assets. The Objecting Parties acknowledge that actions against the non-debtor affiliates are consolidated with those against the Debtor and arise out of the same alleged conduct.

Master Mortgage Factors two and three are established since the substantial contributions by Care One and Care Realty are absolutely necessary to a successful reorganization.

Regarding factor four, the Objecting Parties stipulated that Class 6 will vote to reject the Plan, and under the Stipulation, those claims control the vote. Class 6 is an impaired non-consenting class rejecting the Plan. Thus, it is clear that the "impacted class" as to the Third-

Party Releases is Class 6, which has voted to reject the Plan. That said, the Third-Party Releases have not met the fourth Master Mortgage Factor.

The Objecting Parties argue that the non-debtor releases are impermissible because they do not provide for the payment of all or substantially all of the claims held by the NLRB and the Union.  The Debtors contend that the Plan provides for payments to all classes of claims in excess of the liquidation value of those claims.  Additionally, the Objecting Parties' claims in Class 6 are contingent, unliquidated, and will not be finally determined for several years, and it is therefore unclear what amount of their claims, if any, will be paid. Thus, it is determined the Third-Party Releases meet the fifth Master Mortgage Factor.

The Third-Party Releases as to Care One and Care Realty satisfy the *Continental Airlines* standard of fairness and necessity, and meet four of the five Master Mortgage Factors, and therefore, they are permissible.  Simply put, without the releases, there is no chance of reorganization or recovery for any creditor.  The proposed releases are necessary, essential, and fair under the circumstances.

2.   HealthBridge and the Affiliated Landlords

There is also a direct relationship between the Debtors' reorganization and the non-consensual releases given in consideration for the contributions by HealthBridge and the Affiliated Landlords.  Much of the same reasoning applicable to Care Realty and Care One applies to the management company and the landlords.

HealthBridge and the Affiliated Landlords have each agreed to give substantial concessions and contributions toward the Plan. The Affiliated Landlords have agreed to waive cure amounts (an administrative cost) in the sum of $13 million for arrearages as a condition to assumption of the leases and HealthBridge has agreed to waive $2.6 million in post-petition

administration expense priority.[6]  Although the Objecting Parties assert that a waiver of claims is essentially valueless because of the manner in which the Debtors and their affiliates previously operated, HealthBridge and the Affiliated Landlords are waiving valid and enforceable post-petition obligations of the Debtors. Without the waivers, Plan confirmation is impossible and the Facilities would be closed, liquidated, and 1,100 jobs lost, including 700 Union Employees. Although each of the Debtors accumulated increasing rent obligations in recent years, their failure to pay rent does not prejudice the Affiliated Landlords' rights to recover the obligation. Thus, the amounts forgiven or waived by HealthBridge and the Affiliated Landlords allow for an enhanced distribution to general unsecured creditors.

In *In re Airadigm Communications, Inc.,* 519 F.3d at 657, the court found that the lenders' contribution was essential when absent the contribution, the Debtor would be "on the hook" for a substantial amount of money and that another financier would be unlikely to pay in light of the Debtor's financial situation. Similarly, without the substantial contribution from HealthBridge and the Affiliated Landlords, the Debtors would be "on the hook" for over $15 million. Courts within our circuit have found releases were "necessary to the continued success of the reorganized [debtor] because they assure[d] that the [releasees] are not distracted by litigation by the estate." *Zenith Elecs.*, 241 B.R. at 111. Here, the Debtors assert that HealthBridge would only forego its rights to payment if it would be able to continue to provide critical services without the distraction and financial harm of the potential liability for the alleged Back Pay Claims.

Finally, it must not be overlooked that the Objecting Parties are receiving reasonable consideration in exchange for the release, as they are receiving more than they would in

---

[6] 11 U.S.C. § 365(b)(1) requires lease defaults be cured as a condition to assumption and assignment of the leases and HealthBridge was not paid management fees during the Chapter 11 case, another administrative expense priority.

liquidation, in large part because of the contributions by HealthBridge and the Affiliated

Landlords. *See In re Genesis Health Ventures, Inc.*, 266 B.R. at 608.

With respect to HealthBridge and the Affiliated Landlords, four of the five Master

Mortgage factors have also been met. For the reasons previously stated, the Individual Releasees

share an identity of interest with the Debtors.  Factor two has been met, because there has been a

substantial contribution by the Releasees. Factor three has been met because the releases are

essential, as the Plan funders are not willing to offer their contributions without the non-debtor

releases.  Finally, again as previously stated, Master Mortgage factor four is not met because

Class 6 has voted to reject the Plan, while factor five is met because the nonconsensual parties

are receiving more than they would in a liquidation.  The Court finds that under the unique

circumstances of this reorganization, these non-debtor releases are fair, and absolutely necessary

in order to effect reorganization.  Without them, the Debtors will be liquidated and all will suffer.

> 3.    Managers, Directors, Officers, or Employees

The Plan also proposes to release the managers, directors, officers, or employees of any

of the Debtors, Care One, Care Realty, HealthBridge, and the Affiliated Landlords, including but

not limited to Victor Matthew Marcos, A. Alberto Lugo, and Daniel E. Straus (*See* Debtors' Plan

¶ 1.123) (the "Releasees").   The Objecting Parties and UST assert that these Third-Party

Releases are far too broad and therefore impermissible.

 The objections essentially argue that the individuals have provided no financial

consideration in exchange for non-consensual releases. The Debtors argue that the Third-Party

Releases should be extended to the individuals irrespective of their lack of providing identifiable

economic consideration because the funders (Care One and Care Realty) have required their

inclusion in exchange for millions of dollars being contributed.  It is asserted that a financial

contribution need not be made by each and every Debtor releasee in order to receive a release under the Plan, and that their contribution to the reorganization has been and will remain substantial.

Courts have upheld similar releases in determining that contributions may be made by one party on behalf of another. *See Kane v. Johns–Manville Corp.*, 843 F.2d 636, 640 (2nd Cir. 1988) (debtor's non-debtor operating affiliates and certain other "specified" persons not identified in the opinion were protected by the injunction notwithstanding no contribution)). In *In re American Family Enterprises*, 256 B.R. at 407, the district court approved a release that provided for a permanent injunction against the pursuit of any creditor's claims against funding parties and numerous other released third parties.

Other courts have noted that it is impermissible to release numerous parties beyond the primary plan funders, especially when there is no inquiry as to why the blanket immunity is necessary. *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 143. See also *In re Washington Mut., Inc., et al.*, 442 B.R. at 349-50 (where the bankruptcy court held, *inter alia,* that under applicable law, there was no basis whatsoever for the debtors to grant releases to the directors and officers or any professionals, current or former, because no evidence was presented with respect to, among other things, a substantial contribution having been made to the case by the parties seeking such releases).

In *Continental Airlines*, the court held that third-party releases were impermissible when it "found no evidence that the non-debtor D&Os provided a critical financial contribution to the [ ] Debtor's plan that was necessary to make the plan feasible in exchange for receiving a release of liability." *Cont'l Airlines*, 203 F.3d at 215. *See In re Genesis Health Ventures, Inc.*, 266 B.R. at 606 (declaring releases impermissible because "as to the debtor's management personnel here,

there is no showing that the individual releasees have made a substantial contribution of assets to the reorganization"). It is only fair and logical that the consideration required to satisfy the claims affected must be provided by the party actually receiving the release; it is not sufficient that some creditors receive some extra value from another party. *See In re Lower Bucks Hosp.*, 488 B.R. 303, 325 (E.D. Pa. 2013) (third-party release disallowed because all consideration paid to creditors came from a different party than the releasee). Here, there is really no showing that the individuals have made a substantial contribution necessary for Plan confirmation. Granting Third-Party Releases to the individuals in this case is precisely the type of blanket immunity that courts have warned against.

The Debtors argue that these individuals have contributed to the Plan through initiating an open dialogue with their stakeholders, continuing to operate their businesses throughout the course of the Debtors' restructuring, and cooperating with the Debtors toward Plan confirmation. However, it is well settled that an employee or corporate director is not entitled to claim that he has "contributed" to a reorganization by merely performing his duties. *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 229 (E.D. Va. 2012); *In re SL Liquidating, Inc.*, 428 B.R. 799, 804 (S.D. Ohio 2010); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606-07. The nonconsensual parties' receipt of contributions such as open dialogue and the continuation of operations is not sufficient consideration for the individual releases in this case.

Simply put, the record is devoid of proof the individuals seeking to be released have made a necessary contribution toward funding the Plan and, even under the extreme circumstances of this case, without such demonstration, the proposed releases to managers, director, officers, or employees is not warranted and cannot be approved. The Plan as currently filed cannot be confirmed if nonconsensual third-party releases are given to the defined

individuals.  The Plan must be modified to eliminate the individuals from the entities being

released if Debtors wish to have their Plan confirmed by the Court.

## II.    Section 1129(a)(11) Feasibility Test

Section 1129(a)(11) of the Bankruptcy Code imposes a "feasibility" requirement for

confirmation.  It requires that the court find that confirmation of a plan is not likely to be

followed by the liquidation or need for further financial reorganization of the debtor or any

successor to the debtor, unless the plan so contemplates, such as under a liquidation plan.

Although the standards for determining feasibility are not rigorous, the court is obligated to

independently evaluate the plan and determine whether it offers a reasonable probability of

success.  *In re Greate Bay Hotel and Casino*, 251 B.R. at 226; *In re Monnier Bros.*, 755 F.2d

1336, 1341 (8th Cir. 1985).  In determining that a plan is feasible, the bankruptcy court need find

only a reasonable assurance of commercial viability, and not that the plan is guaranteed to

succeed.  *Kane v. Johns-Manville Corp.*, 843 F.2d at 649.  The court should consider several

factors in determining whether a plan is feasible, including: "the adequacy of the debtor's capital

structure, the earning power of the business, economic conditions, the ability of management, the

probability of the continuation of the same management and any other related matters which

determine the prospects of a sufficiently successful operation to enable performance of the

provisions of the Plan."  *In re Georgetown Ltd. P'ship*, 209 B.R. 763, 770 (Bankr. N.D. Ga.

1997) (citing *In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653, 659 (Bankr. D.N.J. 1980)).

The Objecting Parties initially argued that the Debtors fail the feasibility test because the

Plan ascribes zero value to the NLRB's asserted administrative and priority claims.  The Court

addressed this concern in its Opinion fixing the NLRB's administrative claim to the gap period

between the Filing Date and the First Interim Modifications Order under § 1113(e), a period of

about seven days.  At the confirmation hearing, the Debtors stipulated that the Objecting Parties' administrative claims, estimated to amount to $300,000 to $400,000, would be satisfied under the Plan and the Back Pay Claims, classified as general unsecured claims, satisfied through Class 6 treatment.

The Debtors assert the Plan is feasible based upon the multi-year financial projections (the "Financial Projections") in support of the 1113(c) motion, which demonstrate that with the CBA modification in place pursuant to § 1113(c) of the Bankruptcy Code, confirmation is not likely to be followed by liquidation. The Financial Projections were prepared in good faith utilizing a reasonable process and consideration of relevant risk factors.  Rundell's testimony is credible and was not challenged by expert testimony from the Objecting Parties.  Additionally, the Objecting Parties question the adequacy and fairness of the Debtors' capital structure; however, the record illustrates that the structure is usual and common to the healthcare industry. The substance of Rundell's testimony went unchallenged, and his assertions about the commonality of the Debtors' corporate structure went unrefuted by the Objecting Parties.  Again, the record in this case is without support for the Objecting Parties' position.  On the record before the Court, the Plan meets the feasibility standard required by § 1129(a)(11).  There is ample reason to believe the Plan offers a reasonable probability of success and will not be followed by a liquidation.

## III.    Section 1129(b) Cramdown

When at least one impaired class of claims has not consented to the Plan, the "cramdown" provisions of 11 U.S.C. § 1129(b)(1) come into play.  The cramdown provisions require a finding "that the Plan does not discriminate unfairly and is fair and equitable" with respect to each impaired, non-consenting class. The concept of unfair discrimination is not

defined under the Bankruptcy Code.  The hallmarks of the various standards have been whether there is a reasonable basis for the discrimination and whether the debtor can confirm and consummate a plan without the proposed discrimination.  *See In re Greate Bay Hotel and Casino, Inc.*, 251 B.R. at 227; *In re Ambanc La Mesa, L.P.*, 115 F.3d 650, 656 (9th Cir. 1990) *cert. denied* 252 U.S. 1110 (1998).

Unlike the concept of unfair discrimination, Congress's use of the phrase "fair and equitable" is partially defined in the statute.  The statute offers illustrative ways to satisfy the fair and equitable standard for classes of secured and unsecured creditors, as well as for a class of interests.  With respect to unsecured claims, § 1129(b)(2)(B) provides that a dissenting class of unsecured creditors may be crammed down if the plan does not offer a junior claimant or interest holder any property before each unsecured claimant receives full satisfaction of its allowed claim.  This portion of § 1129(b) is often referred to as the absolute priority rule."  *See Bank of Am. Nat'l. Trust and Sav. Assoc. v. 203 N. LaSalle Street P'ship*, 526 U.S. 434 (1999).  Specifically, the absolute priority rule bars retention of debtors' equity interest in property over the objections of senior unsecured claims.  The debtors' labor and experience, past or future, is not money or money's worth for purposes of cramdown.  *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 197 (1988).

### A.  Unfair Discrimination

Section 1129(b) of the Bankruptcy Code does not prohibit discrimination in treatment between classes, but rather it prohibits only discrimination that is "unfair.*" See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177-78 (Bankr. S.D.N.Y. 1989).

As between two classes of claims, there is no unfair discrimination if (a) there is a reasonable basis for discriminating, (b) the debtor cannot consummate the plan without

discrimination, (c) the discrimination is proposed in good faith, and (d) the degree of discrimination is in direct proportion to its rationale. *In re Buttonwood Partners, Ltd.,* 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990).

The Objecting Parties argue that the Plan unfairly discriminates against Class 6 general unsecured creditors because the Plan only provides for a 33% recovery of their claims, assuming the claim as asserted is fixed at the alleged amount.[7]  They contend that the Debtors' assertion that Class 5's preferential treatment is because it is comprised of creditors whose continued support and improved credit terms are critical to the Debtors' ability to reorganize successfully is not a reasonable basis because the Class 6 creditors are also necessary to reorganization.

Different treatment of general creditor claims exists between Classes 5 and 6.  The question is whether it is unfair under the circumstances. The testimony during confirmation spoke to a reasonable basis for the differing treatment accorded the necessary ongoing trade vendors since the trade vendors will provide a fresh and real benefit to the estate through the negotiated improvement in credit terms in their ongoing business relationships with the Debtors. The treatment is also necessary because Care Realty has made funding available for the purpose of preserving the enterprise value of the company. The Debtors assert the classifications are proposed in good faith, and the amount of discrimination is proportionate to the differentiation. Debtors also note that at this point, it is impossible to determine the differential payment to Class 6 versus Class 5 claimants because the hotly contested ALJ Proceedings are a long way from being decided.  In fact, testimony showed that if the allowed Class 6 claims are determined to be less than $6 million, the claimants will receive the same 75% distribution as Class 5.

---

[7] Before the second modifications, Class 6 was to share a pro-rata distribution of $500,000, which represents only a 3.4% recovery. While the second modifications substantially increase the Class 6 recovery, the Objecting Parties maintain their position that the Plan unfairly discriminates against Class 6.

In this case, there is a reasonable basis for the Debtors' different treatment and classification. The Debtors estimate the ongoing vendor trade terms will generate a "one-time pickup" of $1-$2 million in savings. This is substantial new value and fresh consideration from this class of unsecured creditors helping to ensure the Debtors' reorganization. In contrast, payment of the general unsecured Class 6 claims provides no economic value or fresh consideration to the Debtors on a going-forward basis. *See In re Kliegl Bros. Universal Elec. Stage Lighting Co., Inc.*, 149 B.R. 306, 309 (Bankr. E.D.N.Y. 1992) (reasonable basis exists for separate classification and treatment because payment of one class of claims is necessary to debtor's ability to continue to operate business).

Additionally, there is no evidence before the Court that the Debtors proposed the treatment in bad faith because the treatment is "reasonably tailored to foster [ ] those relationships that are critical to the success of the reorganized Debtor." *See In re Snyders Drug Stores, Inc.*, 307 B.R. 889, 895 (N.D. Ohio 2004). The focus of the good faith requirement in proposing a plan is whether it advances a result consistent with the Bankruptcy Code's objectives, is proposed with honest intentions, and can be supported by the circumstances of the case. *In re Greate Bay Hotel and Casino,* 251 B.R. at 237-38. More than mere speculation and innuendo is necessary to establish a lack of good faith. The Court finds no evidence of lack of good faith in Debtors' filing Chapter 11 or in their separate classification of Classes 5 and 6.

During the evidentiary hearing, Marcos testified that the different treatment of claims in Class 5 and Class 6 was carefully constructed after consultation with the Creditors' Committee and financial advisors. The Debtors openly negotiated treatment of the Class 5 and 6 Claims with the Committee and the Union is a member of the Committee. This testimony was unrefuted by the Objecting Parties and no evidence is in the record to the contrary or that the classification

42

is so unfair or unusual as to make it unlawful.  Finally, Debtors assert that the discrimination is proportionate to the underlying rationale, which is to pay the claims that would yield value to the estate, and Class 5 creditors subjected themselves to negotiations leading to compromise and agreed to add value to the Debtors' estate.

Furthermore, under the Plan, should the Facilities perform better than projected, any unfunded portion of the operating loss backstop amount shall increase the Plan contribution distribution amount for the benefit of Class 6, assuring the estate of the full $8 million commitment from Care Realty.  Thus, Debtors argue valid business, factual, and legal reasons exist for separately classifying the creditors in Classes 5 and 6.

The Plan proposes that the Class 6 creditors will receive 33% of their claims (if the claims are fully upheld), while Class 5 will receive 75%.  There is at most a 42% difference in the treatment of the claims.  It may be substantially less if the NLRB claims are not totally upheld and/or the Facilities operate better than projected and additional funds are available for Class 6 over the term of the Plan.  In any event, the classification difference is reasonable because of the valuable trade credit ($1-$2 million) being given by Class 5 creditors which justifies the payment differences in this case.  On balance, the Court finds the Plan should not be rejected for such disparate treatment under the circumstances of this case.

### B.  Absolute Priority Rule

The Objecting Parties originally asserted that the Plan violates the absolute priority rule because it does not provide for the full payment of claims held by Classes 5 and 6.  Under the Plan as modified, THCI Company and THCI Mortgage will not be maintaining their equity interest in the Debtors, but rather, Care Realty will receive the equity in partial consideration for

its substantial contributions to the Plan. With this change, the Plan does not violate the absolute priority rule.

## CONCLUSION

The Court is mindful of the unique nature and circumstances surrounding this case. Debtors are five long-term nursing facilities caring for hundreds of elderly residents. They are staffed by 1,100 employees, 700 of whom are Union Employees. The Plan proposes a reasonable opportunity to reorganize Debtors' finances, pay creditors a meaningful distribution and, importantly, in my view, continued employment for 1,100 workers who care for the elderly and will receive $175 million in wages and benefits over the four years of the Plan. What is required to reorganize are Third-Party Releases for those entities who are contributing financially to make the reorganization and payment to creditors possible. Make no mistake, without these contributions and concessions, there is no Plan and Debtors' reorganization is impossible. In reality, Plan failure dictates Debtors will cease operations, close the Facilities, and liquidate. The elderly will be relocated and suffer the stress related to such physical move. Clearly, their health will be compromised. Creditors, trades and all others will receive nothing. 1,100 employees supporting themselves and families will lose their jobs. The objections to confirmation, if successful, inevitably lead to that conclusion. No benefit can come from the objections but liquidation and unemployment. It is these facts which compel this equity court to approve the non-debtor, Third-Party Releases and injunctions under the unique circumstances of this case.

Accordingly, the Court finds that the Plan meets and satisfies the requirements for confirmation mandated by Section 1129 of the Bankruptcy Code except for the third-party non-Debtor releases and injunctions accorded to managers, directors, or employees of any of the Debtors, Care One, Care Realty, HealthBridge, and the Affiliated Landlords, including but not

limited to Victor Matthew Marcos, A. Albert Lugo, and Daniel E. Straus.  (*See*  Plan Articles 9.2 and 9.4)

The Plan may be confirmed if modified as required by this Opinion.  Counsel for Debtors is to revise Debtors' Plan and its Proposed Findings of Fact, Conclusions of Law, and Order Confirming First Amended Joint Chapter 11 Plan of Reorganization consistent with the modifications required herein, provided such changes are acceptable to Debtors.

*s/  Donald H. Steckroth*

_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated:  March 5, 2014