UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-2(c)**

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
Gerald H. Gline, Esq.
David M. Bass, Esq.
Ryan T. Jareck, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for 710 Long Ridge Road Operating
Company II, LLC, *et al.*, Debtors-in-Possession

In re:

710 LONG RIDGE ROAD OPERATING COMPANY II,
LLC, *et al.*,[1]

                              Debtors-in-Possession.



Case No. 13-13653 (DHS)

Judge:  Donald H. Steckroth

Chapter 11

(Jointly Administered)

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED**

The relief set forth on the following pages, numbered two (2) through fifty (50), is hereby **ORDERED**

**DATED: 3/6/2014**

Honorable Donald H. Steckroth
United States Bankruptcy Judge

---

[1]  The Debtors in these Chapter 11 cases, along with the last four digits of each Debtors' federal identification number are:  710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford (4809), 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center (4730), 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center (4839), 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center (4716) and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center (4676).

(Page 2)
Debtor:                  710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.                 13-13653 (DHS)
Caption of Order:        FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                         CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                         REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                         COMPANY II, LLC, *et al.*, AS MODIFIED

---

THIS MATTER having been opened to the Court by 710 Long Ridge Road Operating

Company II, LLC d/b/a Long Ridge of Stamford, 240 Church Street Operating Company II, LLC

d/b/a Newington Health Care Center, 1 Burr Road Operating Company II, LLC d/b/a Westport

Health Care Center, 245 Orange Avenue Operating Company II, LLC d/b/a West River Health

Care Center and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care

Center, the within debtors and debtors-in-possession (the "**Debtors**"), by and through their

counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A., upon the filing of a *First Amended Joint*

*Chapter 11 Plan of Reorganization of 710 Long Ridge Road Operating Company II, LLC, et al.*

dated December 10, 2013 [Docket No. 759], as modified by the *First Non-Material*

*Modifications to Debtors' First Amended Joint Plan of Liquidation* [sic] [Docket No. 848] (the

"**First Modifications**") and the *Second Non-Material Modifications to Debtors' First Amended*

*Joint Plan of Reorganization* [Docket No. 899] (the "**Second Modifications**"), and as may be

amended and/or modified (the "**Plan**") at or in connection with the hearing on confirmation

thereof (the "**Confirmation Hearing**") or pursuant to the terms of this order confirming the Plan

(the "**Confirmation Order**"); and upon the *First Amended Disclosure Statement Pursuant to*

*Section 1125 of the Bankruptcy Code for the First Amended Joint Chapter 11 Plan of*

*Reorganization of 710 Long Ridge Road Operating Company II, LLC, et al.*, dated December 10,

2013 [Docket No. 758] (the "**Disclosure Statement**"); and upon the record of the hearing before

the Bankruptcy Court on December 5, 2013, whereupon the Bankruptcy Court approved the

Disclosure Statement and subsequently thereafter entered the *Order: (A) Approving the First*

(Page 3)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

---

*Amended Disclosure Statement Pursuant to 11 U.S.C. § 1125(b); (B) Fixing a Record Date for Voting and Procedures for Filing Objections to the First Amended Plan and Temporary Allowance or Disallowance of Claims for Voting Purposes; (C) Scheduling a Hearing and Approving Notice and Objection Procedures in Respect of Plan Confirmation; (D) Approving Solicitation Packages and Procedures for Distribution Thereof; and (E) Approving the Form of Ballot and Establishment of Procedures for Voting on the First Amended Plan*, dated December 11, 2013 [Docket No. 763] (the "**Disclosure Statement Order**"); and the Bankruptcy Court, through the Disclosure Statement Order, having, *inter alia*: (i) authorized the Debtors to solicit acceptances or rejections of the Plan; (ii) approved the forms of Ballots to be transmitted with the Disclosure Statement and the Plan for voting purposes; (iii) set the deadline for objections to the Plan and voting thereon; and (iv) scheduled the Confirmation Hearing to commence on January 30, 2014, at 10:00 a.m. (prevailing Eastern Time); and the Confirmation Hearing having been adjourned from January 30, 2014, to February 7, 2014, at 10:00 a.m. (prevailing Eastern Time) as reflected in the *Notice of Adjournment of Hearing on Confirmation of the First Amended Joint Plan of Reorganization of 710 Long Ridge Road Operating Company II, LLC, et al. and Extending Voting Deadline*, dated January 27, 2014 [Docket No. 881], and the Confirmation Hearing having been further adjourned in open Court on February 7, 2014, to February 10, 2014, at 10:00 a.m.; and the Confirmation Hearing having been conducted on February 10, 2014 and February 19, 2014; and it appearing that due notice of the Confirmation Hearing has been given to holders of Claims against the Debtors and all other parties-in-interest in accordance with the

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 4)
Debtor:              710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.             13-13653 (DHS)
Caption of Order:    FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                     CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                     REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                     COMPANY II, LLC, *et al.*, AS MODIFIED

---

Disclosure Statement Order, the Bankruptcy Code and the Bankruptcy Rules; and affidavits,

sworn to on December 30, 2013 [Docket Nos. 798-804] (collectively, the "**Affidavits of**

**Mailing**"), having been filed by Logan & Company, Inc., the balloting agent (the "**Balloting**

**Agent**"), attesting to the mailing to the parties identified therein of the Plan, the Disclosure

Statement, the applicable Ballot(s), and related solicitation materials and/or a notice of the

Confirmation Hearing (the "**Solicitation Package**"), as appropriate, in accordance with the

Disclosure Statement Order; and the *Notice of (1) Approval of Disclosure Statement; (2)*

*Establishment of Record Date; (3) Hearing on Confirmation of the Plan and Procedures for*

*Objecting to Confirmation of the Plan; and (4) Procedures and Deadline for Voting on the Plan*

having been published in the Hartford Courant, in accordance with the Disclosure Statement

Order [Docket No. 922] (the "**Publication Notice**") and an affidavit having been sworn to by a

representative of the Hartford Courant on January 10, 2014, attesting to the publication of the

Publication Notice in the Hartford Courant on January 2, 2014 [Docket No. 924] (the "**Affidavit**

**of Publication**"); and the Debtors having filed the *Plan Supplement to Debtors' First Amended*

*Joint Plan of Reorganization* [Docket No. 851] (the "**Plan Supplement**"), the *First Supplement*

*to the Plan Supplement to Debtors' First Amended Joint Plan of Reorganization* [Docket No.

909] (the "**First Supplement**") and the *Second Supplement to the Plan Supplement to Debtors'*

*First Amended Joint Plan of Reorganization* [Docket No. 923] (the "**Second Supplement**" and,

together with the Plan Supplement and the First Supplement, the "**Plan Supplements**"); and a

representative of the Balloting Agent having executed that certain *Declaration of Kathleen M.*

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 5)
Debtor:               710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.              13-13653 (DHS)
Caption of Order:     FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                      CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                      REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                      COMPANY II, LLC, *et al.*, AS MODIFIED

---

*Logan Certifying Voting On, and Tabulation of, Ballots Accepting and Rejecting First Amended*

*Joint Chapter 11 Plan of Reorganization of 710 Long Ridge Operating Company II, LLC, et al.*,

dated February 6, 2014 [Docket No. 918], certifying the Ballots accepting or rejecting the Plan

(the "**Vote Certification**"); and objections to the Plan (the "**Objections**") having been filed by

the National Labor Relations Board (the "**NLRB**") [Docket No. 854], the New England Health

Care Employees Union, District 1199, SEIU (the "**Union**") [Docket No. 855] and by the United

States Trustee (the "**UST**") [Docket No. 857]; and upon the *Declaration of Victor Matthew*

*Marcos in Support of Confirmation of the Debtors' First Amended Joint Plan of Reorganization*

*Under Chapter 11 of the Bankruptcy Code*, dated February 3, 2014 [Docket No. 901] (the

"**Marcos Declaration**") and the *Declaration of Paul Rundell in Support of Confirmation of the*

*Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy*

*Code*, dated February 3, 2014 [Docket No. 902] (the "**Rundell Declaration**" and together with

the Marcos Declaration, the "**Confirmation Declarations**"); and upon the *Brief in Support of*

*Confirmation of the Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of*

*the Bankruptcy Code and in Response to Objections Thereto*, dated February 3, 2014 [Docket

No. 900] (the "**Confirmation Brief**"); and upon the *Statement of the Official Committee of*

*Unsecured Creditors in Support of Confirmation of the Debtors' First Amended Joint Plan of*

*Reorganization*, dated February 6, 2014 [Docket No. 919] (the "**Committee Confirmation**

**Support**"); and the Objections having been overruled; and the Bankruptcy Court having

reviewed the Plan, the Disclosure Statement, the Disclosure Statement Order, the Vote

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 6)
Debtor:                710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.               13-13653 (DHS)
Caption of Order:      FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                       CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                       REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                       COMPANY II, LLC, *et al.*, AS MODIFIED

---

Certification, the Affidavits of Mailing, the Affidavit of Publication, the Plan Supplements, the

Confirmation Declarations, the Confirmation Brief and the Objections; and upon all of the

evidence adduced including, but not limited to, the testimony of Victor Matthew Marcos and

Paul Rundell and the arguments of counsel made at the Confirmation Hearing; and upon the

entire record of the Debtors' Chapter 11 Case, including all exhibits introduced into evidence at

the Confirmation Hearing; and the Bankruptcy Court having taken judicial notice of the papers

and pleadings on file in the Chapter 11 Case; and after due deliberation; and sufficient cause

appearing therefor, the Bankruptcy Court hereby makes the following Findings of Fact,

Conclusions of Law and Order.

I.      **FINDINGS OF FACT.**

     A.      **DEFINITIONS.**

All capitalized terms used but not defined herein shall have the meanings ascribed to such

terms in the Plan.

     B.      **NOTICE OF CONFIRMATION HEARING.**

Notice of the Confirmation Hearing and the relevant deadlines for submission of

objections and ballots, as prescribed by this Court in the Disclosure Statement Order, has been

provided, as more fully reflected in the Affidavits of Mailing and the Affidavit of Publication,

and such notice is adequate and sufficient pursuant to section 1128 of the Bankruptcy Code,

Bankruptcy Rules 2002(b) and 3020(b) and other applicable law and rules.

*Approved by Judge Donald H. Steckroth March 06, 2014*

(Page 7)

Debtor:              710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*

Case No.             13-13653 (DHS)

Caption of Order:    FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
COMPANY II, LLC, *et al.*, AS MODIFIED

---

### C.    TRANSMISSION OF BALLOTS.

Ballots were transmitted to holders of Claims in Classes eligible to vote on the Plan in accordance with the Disclosure Statement Order.

### D.    GOOD FAITH SOLICITATION.

The Debtors solicited votes for the Plan in good faith and in a manner consistent with the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

### E.    SERVICE OF ASSUMPTION NOTICES.

In addition to the Solicitation Packages, on January 16, 2014, the Debtors also timely and properly served upon all counterparties to certain of the Debtors' Executory Contracts (which includes unexpired leases) (as listed on that certain *Notice of Possible Assumption of Certain Executory Contracts and Unexpired Leases* and an exhibit thereto [Docket No. 842] (the "**Assumption Notice**")) notifying such counterparties of the Debtors' intent to assume such Executory Contract pursuant to section 365 of the Bankruptcy Code and the amount, if any, that will be paid to Cure all defaults and arrearages under such Executory Contract (the "**Cure Amount**").  The Assumption Notice provided all counterparties of the Debtors' Executory Contracts with notice of the Debtors' intent to assume such Executory Contract, the proposed Cure Amount, and the deadline to object to either the proposed assumption of an Assumed Contract (as defined below) and/or the Cure Amount.

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 8)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

---

### F.    RELIANCE ON CONFIRMATION.

Based upon the evidence in the record, the Court hereby finds that the Plan Sponsor Group is relying on this Order, including the findings of fact, conclusions of law, and the continuing validity of the foregoing, in consummating the transactions contemplated by the Plan and the Backstop Funding Agreement.

### G.    COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.

#### 1.    Section 1129(a)(1) - Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.

The Plan complies with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(1) of the Bankruptcy Code, including, without limitation, sections 1122 and 1123 of the Bankruptcy Code.  Therefore, the Plan satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

##### a.    Sections 1122 and 1123(a)(1)-(4) - Classification and Treatment of Claims and Equity Interests.

Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article II of the Plan designates Classes of Claims and Equity Interests, other than Administrative Expense Claims, Professional Compensation and Reimbursement Claims, Priority Tax Claims, and the DIP Loan Claim.  As required by section 1122(a) of the Bankruptcy Code, each Class of Claims or Equity Interests contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within that Class.  Pursuant to sections 1123(a)(2) and

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 9)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

1123(a)(3) of the Bankruptcy Code, Article II and Article III of the Plan specify all Classes of

Claims and Equity Interests that are impaired or not impaired under the Plan and Article II of the

Plan specifies the treatment of all Classes of Claims and Equity Interests that are impaired under

the Plan.  Pursuant to section 1123(a)(4) of the Bankruptcy Code, Article II of the Plan also

provides the same treatment for each Claim or Equity Interest within a particular Class, unless

the holder of a Claim or Equity Interest agrees to less favorable treatment or its Claim or Equity

Interest.  Therefore, the Plan satisfies the requirements of sections 1122 and 1123(a)(1) through

(4) of the Bankruptcy Code.

> **b.    Section 1123(a)(5) - Adequate Means for Implementation of the Plan.**

Article IV, Article V and Article VII of the Plan and various other provisions of the Plan

provide adequate means for the Plan's implementation including the enumeration of the means

for implementation of the Plan as required by section 1123(a)(5).  Article IV of the Plan

describes, among other things: (a) the sources of cash for plan distribution (*e.g.*, from existing

Cash balances, the Plan Distribution Contribution Amount, the operations of the Debtors or the

Reorganized Debtors, the exit financing pursuant to the New Credit Agreement, and/or funds to

be advanced by the Backstop Funder and Care One, LLC to the extent provided for in the

Backstop Funding Agreement); (b) the funding of ongoing operating losses by the Backstop

Funder; (c) continued corporate existence; (d) the members and officers following the Effective

Date; (e) the Exit Financing from Capital One, N.A. as Exit Lender; (f) effectiveness of

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 10)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

---

securities, instruments and agreements; (g) approval of certain agreements, assumption of leases and waiver of cure obligations; (h) operation of the Debtors between the Confirmation Date and the Effective Date; (i) vesting of property of the Estates in the Reorganized Debtors; (j) preservation of Causes of Action; (k) exemption from certain transfer taxes; and (l) non-substantive consolidation.  Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

**c.    Section 1123(a)(6) - Prohibition Against the Issuance of Nonvoting Equity Securities and Adequate Provisions for Voting Power of Classes of Securities.**

No non-voting equity securities will be issued pursuant to the Plan.  Following the Effective Date, all Equity Interests in the Debtors, including any securities possessing voting power will be cancelled, and the New Membership Interests will be issued to Care Realty, LLC.  Accordingly, the Plan complies with the requirements of section 1123(a)(6) of the Bankruptcy Code.

**d.    Section 1123(a)(7) - Selection of Directors and Officers in a Manner Consistent with the Equity Interests of Creditors and Equity Security Holders and Public Policy.**

Section 4.4 of the Plan provides that, on or after the Effective Date, the current managers and officers of the Debtors will serve as managers and officers of the Reorganized Debtors.  Pursuant to the Second Modifications, subject to the consent of HUD with respect to the Newington and West River, Care Realty, LLC will become the sole member of each of the Debtors.  The manner of selection of the officers of the Reorganized Debtors is consistent with

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 11)

Debtor:              710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.             13-13653 (DHS)
Caption of Order:    FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                     CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                     REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                     COMPANY II, LLC, *et al.*, AS MODIFIED

---

the interests of the Debtors' Creditors and Equity Interest holders and with public policy.

Therefore, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

> **e.      Section 1123(b)(1)-(2) - Impairment of Claims and Equity Interests and Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases.**

In accordance with section 1123(b)(1) of the Bankruptcy Code, Articles II and III impair

or leave unimpaired, as the case may be, each Class of Claims or Equity Interests.  In accordance

with section 1123(b)(2) of the Bankruptcy Code, Article VII of the Plan provides for the

rejection of executory contracts and unexpired leases of the Debtors that have not been

previously assumed or rejected pursuant to section 365 of the Bankruptcy Code and appropriate

authorizing orders of the Bankruptcy Court or assumed under the Plan and this Confirmation

Order.  Therefore, the Plan complies with section 1123(b)(1) and (2) of the Bankruptcy Code.

> **f.      Section 1123(b)(3) - Retention, Enforcement and Settlement of Claims and Causes of Action Held by the Debtors.**

In accordance with section 1123(b)(3) of the Bankruptcy Code, Section 11.21 of the Plan

provides for the settlement or adjustment of claims belonging to the Debtors or their Estates.

Moreover, Section 4.11 of the Plan provides for the Debtors' retention and enforcement of

certain Causes of Action.  Therefore, the Plan satisfies section 1123(b)(3) of the Bankruptcy

Code.

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 12)
Debtor:            710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.         13-13653 (DHS)
Caption of Order:   FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                            CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                            REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                            COMPANY II, LLC, *et al.*, AS MODIFIED

---

      **g.**      **Section 1123(b)(4) – Sale of Substantially All Assets.**

The Plan does not provide for the sale of substantially all the Debtors' assets.  Section

1123(b)(4) of the Bankruptcy Code is, thus, not applicable.

      **h.**      **Section 1123(b)(5) - Modification of the Rights of Holders of
Claims.**

In accordance with section 1123(b)(5) of the Bankruptcy Code, Article II of the Plan

modifies or leaves unaffected, as the case may be, the rights of holders of each class of Claims.

      **i.**      **Section 1123(b)(6) - Other Provisions Not Inconsistent with
Applicable Provisions of the Bankruptcy Code.**

In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes

additional appropriate provisions that are not inconsistent with the applicable provisions of the

Bankruptcy Code.  The releases, exculpations and injunctions set forth in the Plan, including, but

not limited to, the releases set forth in Article IX of the Plan, as modified by this Order, shall be,

and hereby are, approved as fair, equitable, reasonable and in the best interests of the Debtors,

creditors, and equity holders.  The releases of and by non-Debtors under the Plan, as modified by

this Order, are fair to holders of Claims and Equity Interests and are the product of negotiations

among the Debtors, the Plan Sponsor Group and their creditor constituents to facilitate a

confirmable plan.  Based upon the record of the Chapter 11 Case and the evidence adduced at or

prior to, or in Confirmation Declarations filed in connection with, the Confirmation Hearing, the

releases, exculpations and injunctions set forth in the Plan, as modified by this Order, provide

protection to those interested parties who were essential to, who have made substantial

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 13)
Debtor:            710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.           13-13653 (DHS)
Caption of Order:  FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                   CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                   REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                   COMPANY II, LLC, *et al.*, AS MODIFIED

---

contributions in connection with, the Plan and who exercised good faith in overseeing the Plan

process and negotiating and participating in matters immediately preceding and throughout the

Chapter 11 Case.  Based upon the record of the Chapter 11 Case and the evidence proffered or

adduced at or prior to, or in Confirmation Declarations filed in connection with, the

Confirmation Hearing, the Court finds and concludes that all parties released under the Plan, as

modified by this Order, have provided valuable consideration to the Debtors' estates in exchange

for such releases and would not have provided such consideration absent such releases or, in

some limited circumstances, have had substantial contributions made on their behalf.  Moreover,

the Plan contains no provision that is inconsistent with the applicable provisions of the

Bankruptcy Code and, therefore, satisfies section 1123(b)(6) of the Bankruptcy Code.

### j.       Section 1123(d) - Cure of Defaults.

In accordance with section 1123(d) of the Bankruptcy Code, the Plan proposes to

Reinstate and Cure the Claims of M&T and the HUD Lender (collectively, the "**Prepetition**

**Lenders**"), including the payment of such reasonable attorneys' fees as provided in the M&T

Security Agreement and the security agreements governing the HUD Loan, as applicable.  In

addition, the Plan provides for certain executory contracts that will be assumed, subject to the

provisions of Article VII.  On January 16, 2014, the Debtors filed and served an Assumption

Notice [Docket No. 842] in accordance with Section 7.2.A. of the Plan.  As set forth on the

schedule attached to the Assumption Notice the Debtors identified the proposed Cure amount, if

any, due to the counterparty to such Executory Contract.  No parties have objected to the

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 14)

Debtor:                710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.               13-13653 (DHS)
Caption of Order:      FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                       CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                       REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                       COMPANY II, LLC, *et al.*, AS MODIFIED

---

Debtors' assertion of such Cure amount or to the assumption by the Debtors and, as necessary,

the assignment of such Executory Contract to the Reorganized Debtors.  The Affiliated

Landlords are deemed to have waived any right to payment of a Cure amount.[2]  With the consent

of the Management Company, as set forth in the Backstop Funding Agreement, the Management

Agreements will "ride through" the Chapter 11 Case and no Cure shall be due thereon.  The

Insurance Policies are fully paid to date.  With respect to the Insurance Policies and/or the

Provider Agreements being assumed, the Debtors have asserted that there are no outstanding

defaults to Cure by the Debtors.

### 2.    Section 1129(a)(2) - Compliance with Applicable Provisions of the Bankruptcy Code.

The Debtors have complied with the applicable provisions of the Bankruptcy Code with

respect to the Plan as required by section 1129(a)(2) of the Bankruptcy Code.  The Disclosure

Statement and the procedures by which the Ballots for acceptance or rejection of the Plan were

solicited and tabulated were fair, properly conducted and in accordance with sections 1125 and

1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018 and the Disclosure Statement

Order.  Therefore, the Debtors have satisfied the requirements of section 1129(a)(2) of the

Bankruptcy Code.

---

[2] In accordance with the requirements of the HUD Loan, THCI Master Tenant I LLC is the tenant of the Affiliated Landlords with respect to the Newington and West River Facilities and the Debtors are subtenants of THCI Master Tenant I LLC.  All references in the Plan and this Confirmation Order (and in the Backstop Funding Agreement) to Affiliated Landlords, and all consents required from the Affiliated Landlords to the assumption of the applicable Lease Agreement and waiver of Cure amounts, shall apply with full force and effect to THCI Master Tenant I LLC, and THCI Master Tenant I LLC shall be deemed for all purposes an "Affiliated Landlord."

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 15)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

---

### 3.     Section 1129(a)(3) - Proposal of the Plan in Good Faith.

The Plan has been negotiated at arms' length and was formulated and proposed in good faith and not by any means forbidden by law, as evidenced by, among other things, the totality of the circumstances surrounding the formulation of the Plan and the reasonable likelihood that the Plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code. The Debtors, the Plan Sponsor Group, and the Debtors' professionals, the Creditors' Committee, the Creditors' Committee members and the Creditors' Committee's professionals, have acted in "good faith" in connection with the Plan within the meaning of section 1125(e) of the Bankruptcy Code. Therefore, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

### 4.     Section 1129(a)(4) - Bankruptcy Court Approval of Certain Payments as Reasonable.

Any payments made or to be made by the Debtors under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, have been approved by, or will be subject to the approval of the Bankruptcy Court as reasonable. Pursuant to the interim compensation procedures established in these Chapter 11 cases, the Bankruptcy Court approved the payment of certain fees and expenses of retained professionals, subject to final review for reasonableness by the Bankruptcy Court under section 330 of the Bankruptcy Code. Furthermore, the Plan provides that the Bankruptcy Court shall retain jurisdiction to hear and determine all Fee Applications. Under the terms of the

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 16)

Debtor:            710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.           13-13653 (DHS)
Caption of Order:  FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                   CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                   REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                   COMPANY II, LLC, *et al.*, AS MODIFIED

---

Plan, the Bankruptcy Court has jurisdiction to review any dispute with respect to the reasonableness of such fees.  Therefore, the Plan satisfies the requirements of section 1129(a)(4) of the Bankruptcy Code.

> **5.      Section 1129(a)(5) - Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Equity Interests of Creditors and Public Policy.**

Section 4.4 of the Plan provides that, on or after the Effective Date, the current members, managers and officers of the Debtors will serve as managers, officers and members of the Reorganized Debtors.  Under the Plan, Care Realty, LLC will, in exchange for its and related entities' significant contributions, acquire the Equity Interests in the Debtors and will, thus, become the new member of each Debtor.  The existing managers', officers' and members' institutional knowledge of the Debtors' business is critical to maximizing the value of the Debtors' estates pursuant to the Plan, and their appointment is consistent with the interests of holders of Claims against the Debtors and with public policy.  No insider will receive compensation from the Reorganized Debtors.  Therefore, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

> **6.      Section 1129(a)(6) - Approval of Rate Changes.**

Section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Plan because, after the Effective Date, there are no rate changes provided for in the Plan for which a governmental regulatory commission will have jurisdiction over the Reorganized Debtors after confirmation of the Plan.

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 17)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

---

7.    **Section 1129(a)(7) - Best Interests of Holders of Claims and Equity Interests.**

With respect to each impaired Class of Claims or Equity Interests, each holder of a Claim or Equity Interest in such impaired Class (i) has accepted the Plan; (ii) will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date; or (iii) agreed to receive less favorable treatment.  Therefore, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

8.    **Section 1129(a)(8) - Acceptance of the Plan by Each Impaired Class.**

Class 1 and Class 4 are Unimpaired under the Plan and, therefore, are not entitled to vote to accept or reject the Plan and are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  As reflected in the Vote Certification, Classes 2, 3, 5 and 6 are impaired by the Plan and entitled to vote.  Each such Class other than Class 6 has voted to accept the Plan.  Because the holders of the Class 7 Intercompany Claims will receive no Distribution on account of such Intercompany Claims and the holders of Class 8 Equity Interests will not receive or retain any property on account of such Equity Interests, pursuant to section 1126(g) of the Bankruptcy Code, Class 7 and Class 8 are deemed to have rejected the Plan. Notwithstanding the lack of compliance with section 1129(a)(8) of the Bankruptcy Code with

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 18)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

respect to Class 6, the Plan is confirmable because, as described below, the Plan satisfies the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to such Class.

**9.      Section 1129(a)(9) - Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

Except to the extent that the holder of a particular Allowed Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Administrative Expense Claims, Priority Tax Claims, Professional Compensation and Reimbursement Claims, the DIP Loan Claim and Other Priority Claims will be treated in accordance with section 1129(a)(9) of the Bankruptcy Code.  Therefore, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

**10.      Section 1129(a)(10) - Acceptance By at Least One Impaired, Non-Insider Class.**

As indicated in the Vote Certification, Class 2, Class 3 and Class 5 are each impaired Classes of Claims that have voted to accept the Plan and such Classes of Claims are not comprised of any insider of the Debtors.  Accordingly, at least one of the Classes of Claims that is impaired under the Plan has voted to accept the Plan, which acceptance has been determined without including any acceptance of the Plan by any insider of the Debtors.  Therefore, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**11.      Section 1129(a)(11) - Feasibility of the Plan.**

The Debtors will have Cash, including through the contributions of the members of the Plan Sponsor Group, in an amount necessary to ensure that the holders of Allowed

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 19)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

---

Administrative Expense Claims, Priority Tax Claims and Professional Compensation and Reimbursement Claims and Allowed Claims in Classes 1, 2, 3, 4, 5 and 6 receive the Distributions required under the Plan.  Moreover, the Backstop Funder has agreed to make such funds available to the applicable Reorganized Debtor to meet certain operating shortfalls, *i.e.*, the Operating Loss Backstop Amount.  Accordingly, confirmation of the Plan is not likely to be followed by the Reorganization, or the need for further financial reorganization, of the Debtors, except as contemplated by the Plan.  Therefore, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

## 12.    Section 1129(a)(12) - Payment of Bankruptcy Fees.

Section 11.6 of the Plan provides that all fees payable pursuant to section 1930 of Title 28 of the United States Code shall be paid on the Effective Date (if due) or by the Reorganized Debtors when otherwise due.  Therefore, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

## 13.    Section 1129(a)(13) - Continuation of Retiree Benefits.

The Debtors do not have any "retiree benefits" programs, as such term is defined in section 1114 of the Bankruptcy Code and, therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan.

## 14.    Section 1129(a)(14) - Domestic Support Obligations.

The Debtors are not obligated to pay any domestic support obligations.  Section 1129(a)(14) of the Bankruptcy Code is, thus, not applicable.

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 20)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

---

### 15. Section 1129(a)(15) - Payment of Unsecured Claims In Case of Individual Debtor.

The Debtors are not individuals.  Section 1129(a)(15) of the Bankruptcy Code is, thus, not applicable.

### 16. Section 1129(a)(16) - Restrictions on Transfers of Property of Nonprofit Entities.

The Debtors are not a corporation or trust that is not a moneyed, business, or commercial corporation or trust.  Section 1129(a)(16) of the Bankruptcy Code is, thus, not applicable.

### 17. Section 1129(b) - Confirmation of the Plan over the Non-Acceptance of Impaired Classes.

Pursuant to section 1129(b)(1) of the Bankruptcy Code, the Plan may be confirmed notwithstanding that Class 6, Class 7 and Class 8 are impaired and/or are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Other than the failure to satisfy the requirement in section 1129(a)(8) of the Bankruptcy Code with respect to Class 6, all of the requirements of section 1129(a) of the Bankruptcy Code have been met.  The Plan does not discriminate unfairly and is fair and equitable with respect to Class 6.  For the reasons set forth in paragraphs 18-23 of the Marcos Declaration, there is a reasonable basis for separately classifying the holders of Claims in Class 6 and for the difference in treatment under the Plan. Accordingly, the Plan does not discriminate unfairly.  In addition, the Plan is fair and equitable as to Class 6 because no holders of Claims or Equity Interests junior to the Claims in Class 6 will receive or retain any property under the Plan.  As set forth in the Second Modifications, the

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 21)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

Equity Interests, *i.e.*, the "old equity," TCHI Company LLC and TCHI Mortgage Holding Company, LLC, is not receiving the "new equity" in the Reorganized Debtors.  Rather, the Plan, as amended, provides that, Care Realty, LLC, as the Backstop Funder, shall receive the New Membership Interests in the Debtors upon the Effective Date in exchange for its or other members of the Plan Sponsor Group's significant contributions under the Plan.  Accordingly, the holders of Class 8 Equity Interests are not retaining anything under the Plan.  Therefore, the Plan satisfies the requirements of section 1129(b).

## 18. Section 1129(d) - Principal Purpose of the Plan.

No party in interest that is a governmental unit has requested that the Plan not be confirmed on the grounds that the primary purpose of the Plan is the avoidance of taxes or the avoidance of application of section 5 of the Securities Act of 1933, and the primary purpose of the Plan is not avoidance of taxes or avoidance or the requirements or section 5 or the Securities Act of 1933.  Therefore, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

## 19. Bankruptcy Rule 3016(a).

The Plan is dated and identifies the Debtors as the entity submitting the Plan.

## 20. Compliance with Bankruptcy Rule 3016(c).

In accordance with Bankruptcy Rule 3016(c), Sections 9.3 and 9.4 of the Plan describe in specific and conspicuous bold language all acts to be enjoined and identifies the entities that would be subject to the injunction.

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 22)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

---

### H.    EXIT FINANCING.

The incurrence of indebtedness and granting of collateral under the Exit Financing and the New Credit Agreement are in the best interests of the Reorganized Debtors, and are necessary and appropriate for the consummation of the Plan and the operations of the Reorganized Debtors.  The Exit Financing was negotiated at arm's length, and in good faith, without the intent to hinder, delay or defraud any creditor of the Debtors.  The terms and conditions of the Exit Financing, as set forth in the New Credit Agreement, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are approved.

### I.    NEED FOR CONSUMMATION OF PLAN.

The Debtors have made an overwhelming and uncontroverted showing of the very substantial cost, harm, risk and prejudice to these Estates and their creditors that would result if the Plan is not consummated.

### J.    SATISFACTION OF CONDITIONS PRECEDENT TO CONFIRMATION.

The conditions precedent to confirmation of the Plan have been satisfied.

## II.   CONCLUSIONS OF LAW.

### A.    JURISDICTION AND VENUE.

This Bankruptcy Court has jurisdiction over the Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334.  The Confirmation Hearing is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2), and this Bankruptcy Court has jurisdiction to grant the relief herein and enter a Final

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 23)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

Order with respect thereto.  Venue of the Chapter 11 Case in this Bankruptcy Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtors each constitute an entity eligible for relief under section 109 of the Bankruptcy Code.

### B.    MODIFICATION OF THE PLAN - SECTION 1127(a).

The Debtors have submitted modifications to the Plan, including those set forth in the First Modifications, the Second Modifications and in paragraph III.A.8 of this Order (collectively, the "**Plan Modifications**").[3]  In accordance with Bankruptcy Rule 3019, the Plan Modifications do not (i) affect the classification of Claims or Equity Interests or adversely affect the treatment afforded holders of Claims or Equity Interests; (ii) constitute material modifications of the Plan under section 1127 of the Bankruptcy Code; (iii) cause the Plan to fail to meet the requirements of sections 1122 or 1123 of the Bankruptcy Code; (iv) adversely change the treatment of holders of Claims who have accepted the Plan; or (v) require re-solicitation of acceptances or rejections from any such holders nor do they require that any holders be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

### C.    GOOD FAITH SOLICITATION.

The Debtors have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, pursuant to section 1125(e) of the Bankruptcy Code, with respect to the

---

[3] Attached hereto collectively, as **Exhibit A**, is the Plan together with the First Modifications and the Second Modifications.

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 24)
Debtor:             710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.            13-13653 (DHS)
Caption of Order:   FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                    CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                    REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                    COMPANY II, LLC, *et al.*, AS MODIFIED

---

formulation of the Plan, the solicitation of acceptances with regard thereto and the other property

to be distributed thereunder.  Pursuant to section 1125(e) of the Bankruptcy Code, the transmittal

of solicitation materials, the solicitation of acceptances of the Plan and the offering, issuance and

distribution of consideration pursuant to the Plan are not, and will not be, governed by or subject

to any otherwise applicable law, rule or regulation governing the solicitation of acceptance of a

plan of reorganization or the offer, issuance or purchase of securities.

### D.    PLAN SUPPLEMENTS.

The provisions of, and the documents included in, the Plan Supplements, including

without limitation the Backstop Funding Agreement, are necessary and appropriate to implement

the Plan and are incorporated within the Plan and approved hereby.

### E.    EXEMPTIONS FROM SECURITIES LAWS.

The offer, sale, and issuance of the New Membership Interests is exempt from section 5

of the Securities Act and from any other state or local law requiring registration for offer or sale

of a security or registration or licensing of an issuer of a security, pursuant to section 1145 of the

Bankruptcy Code, because the New Membership Interests will be offered, sold, and issued

principally in connection with and pursuant to the Plan.

### F.    EXEMPTIONS FROM TAXATION.

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange

of a security, or the making or delivery of an instrument of transfer, under the Plan, including

sales occurring on or after the date hereof or the issuance and delivery of the New Membership

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 25)
Debtor:            710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.           13-13653 (DHS)
Caption of Order:  FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                   CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                   REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                   COMPANY II, LLC, *et al.*, AS MODIFIED

Interests on the Effective Date, shall be entitled to the tax treatment provided by section 1146(a)

of the Bankruptcy Code and each recording or other agent of any governmental office shall

record any such documents of issuance, transfer, or exchange without any further direction or

order from the Bankruptcy Court.

### G.    COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE.

As set forth above, the Plan complies in all respects with the applicable requirements of

section 1129 of the Bankruptcy Code.

### H.    ASSUMPTION AND REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

The assumption of the contracts listed on **Exhibit B** hereto, the Insurance Policies and the

Provider Agreements (the "**Assumed Contracts**") and of the Lease Agreements and the

Assumed Medicare Provider Agreements, subject to the provisions of Section 7.1 of the Plan, the

rejection of all other Executory Contracts and the determination to permit the Management

Agreements to "ride through" the Chapter 11 Case, are each (i) a sound and reasonable exercise

of the Debtors' business judgment, (ii) in the best interests of the Debtors, their estates, holders

of Claims, and Equity Interests, and (iii) necessary for the implementation of the Plan.  The

respective amounts on the list filed as "Exhibit A" to the Assumption Notice and/or as included

on Exhibit B hereto, are the maximum amounts necessary under section 365(b)(1)(A) and (B) of

the Bankruptcy Code to Cure all defaults under the Assumed Contracts and to pay all actual

pecuniary losses to the respective counterparties to the Assumed Contracts resulting from all

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 26)

Debtor:              710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.             13-13653 (DHS)
Caption of Order:    FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                     CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                     REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                     COMPANY II, LLC, *et al.*, AS MODIFIED

such defaults.  Payment of such Cure amounts will be made as set forth herein, and the

Reorganized Debtors have provided adequate assurance of future performance under the

Assumed Contracts.  The solicitation and notice of the Plan and the Assumption Notice that

included the Assumed Contracts and the proposed amounts to Cure all defaults to the respective

counterparties in connection with the assumption of the Assumed Contracts is adequate and

sufficient notice to all such counterparties of the assumption and vesting of the Assumed

Contracts and satisfies, without limitation, section 365 of the Bankruptcy Code and Bankruptcy

Rule 6006.

## I.    RELEASES.

The Court has jurisdiction under sections 157(b)(2)(L), 1334(a) and (b) of title 28 of the

United States Code and sections 105, 524, and 1141 of the Bankruptcy Code to approve the

releases of the Releasees, the exculpation, and the injunction set forth in Article IX of the Plan.

Section 105(a) of the Bankruptcy Code permits issuance of the injunction and approval of the

releases set forth in Article IX of the Plan, as modified by this Order, if, as has been established

here based upon the record in the Chapter 11 Case, the Confirmation Declarations, and the

evidence proffered at the Confirmation Hearing, such provisions (i) were integral to the

agreement among the various parties in interest and are essential to the implementation of the

Plan, as provided in section 1123 of the Bankruptcy Code, (ii) confer substantial benefits on the

Debtors' Estates and creditors, (iii) are fair, equitable, and reasonable, and (iv) are in the best

interests of the Debtors, their Estates, and parties in interest.  Each of the Releasees have made

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 27)
Debtor:              710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.             13-13653 (DHS)
Caption of Order:    FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                     CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                     REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                     COMPANY II, LLC, *et al.*, AS MODIFIED

substantial contributions toward the reorganization of the Debtors or have had substantial

contributions made on their behalf, which are integral to the effectuation of the Plan and the

consummation of the transactions contemplated therein including, without limitation, the funding

or waiver of certain distributions, waiver of Claims and the agreement reflected in the Backstop

Funding Agreement.

Creditors in all of the voting Classes that have voted, other than Class 6, have

overwhelmingly supported the Plan and the releases have enabled diverse constituencies to reach

a consensus that substantially increases value available to the holders of Claims.  Further, the

releases and exculpation provisions in the Plan, as modified by this Order, do not relieve any

party of liability for an act or omission to the extent such act or omission is determined by a

Final Order to have constituted actual fraud or gross negligence.  All holders of Claims and

Equity Interests received adequate notice of the releases and injunctions and have had sufficient

opportunity to object to such provisions.  Based upon the record of the Chapter 11 Case and the

evidence proffered, adduced, and/or presented at the Confirmation Hearing, this Court finds that

the releases of the Releasees, the exculpation, and the injunctions set forth in Article IX of the

Plan, as modified by this Order, are consistent with the Bankruptcy Code and applicable law.

## J.    EXCULPATION.

The evidence presented in connection with the Confirmation Hearing and the record of

the Chapter 11 Case establishes that the exculpation described and contained in Section 9.5 of

the Plan is fair and necessary to the effective reorganization of the Debtors, and that the parties

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 28)

Debtor:              710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.             13-13653 (DHS)
Caption of Order:    FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                     CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                     REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                     COMPANY II, LLC, *et al.*, AS MODIFIED

---

receiving the benefit of the exculpation described and contained in Section 9.5 of the Plan either

have made substantial contributions toward the reorganization of the Debtors or have had

substantial contributions made on their behalf, which are integral to the effectuation of the Plan

and the consummation of the transactions contemplated therein.  All holders of Claims and

Equity Interests received adequate notice of the exculpation described in the Plan and had

sufficient opportunity to object to such provision.

## III.    ORDER.

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as

follows:

### A.    CONFIRMATION OF THE PLAN.

1.    The Plan, as modified by the Plan Modifications, is confirmed in each and every

respect pursuant to section 1129 of the Bankruptcy Code; provided, however, that if there is any

direct conflict between the terms of either the Plan, the First Modifications, the Second

Modifications and the terms of this Confirmation Order, the terms of this Confirmation Order

shall control.

2.    The Plan and any amendments, modifications (including the Plan Modifications)

and supplements thereto and all documents and agreements introduced into evidence at the

Confirmation Hearing (including all exhibits and attachments thereto), and the execution,

delivery and performance thereof by the Debtors, are authorized and approved, including the

documents included in the Plan Supplements.

51689/0001-10292265v5

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 29)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

3.    The terms of the Plan, as modified by the Plan Modifications, are an integral part of this Confirmation Order and hereby are incorporated herein by reference and "So Ordered" in their entirety.  In accordance with Section 11.2 of the Plan, the Debtors shall be permitted to make additional conforming or non-material modifications to the Plan.

4.    The Plan satisfies section 1125 of the Bankruptcy Code without the need for re-solicitation.

5.    The treatment of Claims and Equity Interests as provided in the Plan is approved.

6.    To the extent that any objection to confirmation of the Plan has not been withdrawn prior to entry of this Confirmation Order, all such objections, including the Objections, are hereby overruled.

7.    Objections to confirmation of the Plan, including those that were raised informally, that have been withdrawn shall be, and they hereby are, deemed withdrawn with prejudice.

8.    In order to make certain technical corrections, to make corrections to resolve ambiguities raised by the Creditors' Committee, and to address the Court's ruling set forth in its Opinion dated March 5, 2014, the Plan is modified as follows:

(a)    Article I of the Plan is amended to replace the following defined terms in their entirety and all references in the Plan thereafter are adjusted accordingly:

1.14    "Backstop Funding Agreement" means that certain agreement, a copy of which has been filed with the *Second Supplement to the Plan Supplement to Debtors' First Amended*

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 30)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

*Joint Plan of Reorganization* [Docket No. 923], between and among the Debtors and the members of the Plan Sponsor Group, pursuant to which, among other things, (i) the Backstop Funder and Care One, LLC shall agree to fund, as applicable, certain of the obligations set forth in this Plan and (ii) the members of the Plan Sponsor Group shall waive their Claims.  The Backstop Funding Agreement shall be consistent with the provisions of this Plan and, with respect to the back stop of Class 5 Claims, not be subject to material conditions not identified herein including, but not limited to, any future determination(s) by the Debtors to sell or discontinue their respective businesses.

1.23    "CBA Rejection Order" means that certain *Amended Order Granting Debtors' Motion to Reject the Continuing Economic Terms of the Expired Collective Bargaining Agreements with The New England Health Care Employees Union, District 1199, SEIU Pursuant to 11 U.S.C. § 1113(c)* entered by the Bankruptcy Court on February 6, 2014 [Docket No. 917].

1.59    "Effective Date" means the date upon which all conditions to the Effective Date as set forth in Section 10.2 of this Plan have been satisfied or, if waivable, waived.

1.138.    "Voting Deadline" means February 3, 2014, the date fixed by the Bankruptcy Court pursuant to the Solicitation Procedures Order, as extended by the Bankruptcy Court.

(b)    All references in Sections 9.2 and 9.4 of the Plan to the term "Releasee"

shall be deemed revised to exclude reference, and not apply to, "the managers, directors, officers

or employees of any of the Debtors or of any of Care One, LLC, Care Realty, LLC, the

Management Company and the Affiliated Landlords, including but not limited to Victor

Matthew Marcos, A. Alberto Lugo and Daniel E. Straus."

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 31)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

(c)    All references in the Plan to the undefined term "DIP Order" shall be deleted and replaced by the defined term "DIP Financing Order."

(d)    The definition of "Operating Loss Backstop Distribution Amount" set forth in Section 4.2 of the Plan (as amended by the Second Modifications) is amended to remove the word "Amount" and all references in the Plan thereafter are adjusted accordingly.

(e)    Section 4.1 of the Plan (as amended by the Second Modifications) is amended and replaced in its entirety with the following:

> 4.1.    <u>Sources of Cash for Plan Distributions</u>.  Except as otherwise provided in this Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to this Plan may be obtained from existing Cash balances (which as of the Effective Date shall include the initial $500,000 of the Plan Distribution Contribution Amount advanced by Care One, LLC to the Debtors), the operations of the Debtors or the Reorganized Debtors, sales of assets or the exit financing pursuant to the New Credit Agreement, <u>provided</u> <u>that</u>, to the extent of any insufficiency for Allowed Claims as of the Effective Date (or thereafter solely as may be necessary to make Distributions on account of Allowed Class 5 Claims), funds shall be advanced to the applicable Debtor by the Backstop Funder solely to the extent provided for in the Backstop Funding Agreement or, as determined by the Debtors in their sole discretion, any member of the Plan Sponsor Group at the option of the advancing Debtor, as applicable, so long as such member(s) of the Plan Sponsor Group can advance such funds and is agreeable to advancing such funds to satisfy any insufficiency and such Reorganized Debtor shall be required to use those funds in order to satisfy such Claims. Notwithstanding anything herein or in the Disclosure Statement to the contrary, nothing herein shall require the Backstop Funder or any member of the Plan Sponsor Group to fund any portion of the Backpay Claim except with respect to the funding of the Plan Distribution Contribution Amount (which includes the Operating

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 32)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

Loss Backstop Distribution, if applicable) and that portion of the Backpay Claim constituting an Administrative Expense Claim solely to the extent and in accordance with the Bankruptcy Court's Order dated February 6, 2014 [Docket No. 921]. Without limiting the foregoing, neither the Backstop Funder nor any member of the Plan Sponsor Group shall be responsible for any portion of the Backpay Claim to the extent such Backpay Claim is entitled to priority in right of payment under sections 503(b) or 507(a) of the Bankruptcy Code. The contribution and commitment under this Plan by any member of the Plan Sponsor Group with respect to Claims held by Other General Unsecured Claims Holders, whether on account of Distributions to be made in accordance with Class 6 or otherwise (*e.g.*, on account of any Priority Claim or Administrative Expense Claim) shall be limited to the funding of the Plan Distribution Contribution Amount (which includes the Operating Loss Backstop Distribution, if applicable) and that portion of the Backpay Claim constituting an Administrative Expense Claim solely to the extent and in accordance with the Bankruptcy Court's Order dated February 6, 2014 [Docket No. 921]. Upon the Effective Date, the initial $500,000 of the Plan Distribution Contribution Amount advanced by Care One, LLC to the Debtors shall be deemed delivered to the Disbursing Agent, to be held in escrow by the Debtors' counsel, subject to and disbursed solely in accordance with and when permitted by Section 2.3(H)(b) of this Plan. In addition, when and if applicable, the following amounts shall be delivered to the Disbursing Agent (by wire to the Debtors' counsel) and held in escrow by the Debtors' counsel, subject to and disbursed solely in accordance with and when permitted by Section 2.3(H)(b) of this Plan: (a) the Operating Loss Backstop Distribution by the Backstop Funder and/or, if applicable, (b) the Backpay Claim Adjudication Date Distribution Advance by Care One, LLC.

## B.   EFFECTS OF CONFIRMATION.

9.   <u>Binding Nature of Plan Terms.</u>   Immediately upon the entry of the Confirmation

Order, the Plan and this Confirmation Order shall be binding upon and inure to the benefit of the

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 33)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

Debtors, the Reorganized Debtors, any heirs, executors, administrators, successors and assigns thereof, the members of the Plan Sponsor Group and all holders of Claims or Equity Interests, and their respective successors and assigns, whether or not they voted to accept the Plan.

10.     Cancellation and Surrender of Instruments, Securities and Other Documentation. Except as provided in any contract, instrument or other agreement or document created, entered into or delivered in connection with the Plan, on the Effective Date, all notes, instruments, agreements, certificates and other documents evidencing all Equity Interests in the Debtors and any and all guarantees or obligations in respect of the foregoing shall be deemed cancelled and of no further force and effect, without any further action on the part of the Debtors, and any and all collateral in respect thereof shall be deemed released.  The holders of or parties to such cancelled instruments, securities and other documentation shall have no rights arising from or relating to such instruments, securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan.  On the Effective Date, all Equity Interests in the Debtors will be cancelled.

**C.     TERMINATION, RELEASE AND INJUNCTION.**

11.     Satisfaction and Termination of Equity Interests.  Except as otherwise expressly provided for in the Plan or in this Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be in exchange for and in complete satisfaction and release of such Claims and Equity Interests of any nature whatsoever, including

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 34)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

---

any interest accrued on such Claims and Equity Interests against the Debtors and their Estates,

the Reorganized Debtors, or any of their assets or properties.

12.    <u>Release.</u>  Except as otherwise provided in the Plan, pursuant to Sections 9.1 and

9.2 of the Plan (and without otherwise limiting the terms thereof), on the Effective Date, in

consideration for, among other things, (a) the Backstop Funder's waiver of $31 million in claims

against the Debtors and the Estates, (b) the Affiliated Landlords' waiver of $13 million in cure

payments, (c) Care One, LLC's funding of the Plan Distribution Contribution Amount in the

amount of $500,000 and, in the event the NLRB obtains a final non-appealable judgment against

the Debtors on the Backpay Claims in the ALJ Proceedings, contributing additional funds to the

Plan Distribution Contribution Amount such that the Plan Distribution Contribution Amount

equals $5 million, (d) the Backstop Funder's back-stop obligations as set forth in the Plan,

including distributions to Allowed Class 5 Claims in the approximate amount of $3 million and

making such funds available to the applicable Debtor to meet certain operating shortfalls post

Effective Date (or fund a further distribution to Class 6 as set forth above) in the amount of

approximately $8 million; and (e) Care One/Care Realty agreement to backstop approximately

$2 - $3 million in Allowed Administrative Expense Claims, including Professional

Compensation and Reimbursement Claims, and for other consideration and reasons, the

Releasees (as defined in the Plan and modified by the Second Modifications), shall, except as

otherwise modified by this Order, be deemed forever released by the Debtors and the Debtors'

Estates, the Reorganized Debtors, and by each Holder of a Claim and/or Equity Interest that is

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 35)
Debtor:              710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.             13-13653 (DHS)
Caption of Order:    FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                     CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                     REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                     COMPANY II, LLC, *et al.*, AS MODIFIED

---

entitled to receive a Distribution pursuant to the Plan from all claims, obligations, suits,

judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever in

connection with or related to the Debtors, the conduct of the Debtors' businesses, the Chapter 11

Case, or the Plan (other than the rights under the Plan and the contracts, instruments, releases,

indentures, and other agreements or documents delivered thereunder), whether liquidated or

unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or

unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in

whole or part on any act, omission, transaction, event, or other occurrence taking place on or

prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors'

businesses, the Chapter 11 Case, or the Plan.  This release provision shall be self-executing and

enforceable on the Effective Date without any further action by any Entity.

13.    <u>Injunction.</u>  Except as otherwise provided in the Plan or this Order, including with

respect to the NLRB's rights under the NLRA and any exclusive jurisdiction thereunder to fix a

claim against any Releasee in the ALJ Proceedings, on and after the Confirmation Date, all

entities, creditors and equity and/or interest holders who have held, hold, or may hold Claims

against or Equity Interests in any of the Debtors, shall be (a) permanently enjoined, on and after

the Confirmation Date, from (i) commencing or continuing in any manner any action or other

proceeding of any kind with respect to any such Claim or Equity Interest, (ii) the enforcement,

attachment, collection or recovery by any manner or means of any judgment, award, decree or

Order against any of the Debtors on account of any such Claim or Equity Interest, (iii) creating,

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 36)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

perfecting or enforcing any encumbrance of any kind against any of the Debtors or against the

property or interests in property of any of the Debtors on account of any such Claim or Equity

Interest, and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any

obligation due from any of the Debtors, or against the property or interests in property of any of

the Debtors on account of any such Claim or Equity Interest and such injunction shall extend to

the Reorganized Debtors; and (b) enjoined, pursuant to section 105 of the Bankruptcy Code,

from proceeding against any of the Releasees, for the collection of all or any portion of their

Claim or Equity Interest or pursuing any Claim that is released pursuant to Article IX of the Plan

and this Order, said injunction to remain in effect only for so long as such applicable Debtor

complies with the terms of the Plan.

### D.    LENDER RELEASES

14.    <u>Release of Capital One</u>.  In consideration for Capital One's consent to the

treatment of the DIP Loan Claim pursuant to the Plan, and other good and valuable

consideration, including Capital One's agreement to provide the Exit Facility, upon the Effective

Date, each of the Debtors and any entity seeking to exercise the rights of the Debtors, including,

without limitation, any successor to the Debtors or any representative appointed or selected

pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to forever release,

waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights,

causes of action (including claims or causes of action arising under chapter 5 of the Bankruptcy

Code), and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent,

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 37)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter

arising, in law, equity, or otherwise, that are based in whole or part on any act, omission,

transaction, event, or other occurrence taking place on or prior to the Effective Date that may be

asserted by or on behalf of the Debtors against (i) Capital One, (ii) any of the present or former

shareholders, members, directors, officers, employees or advisors of Capital One and (iii) any

advisors or counsel to Capital One; provided, however, that, nothing herein shall be construed to

release any party from actual fraud or gross negligence as determined by a Final Order.

15.    Release of M&T.  In consideration for M&T's consent to the treatment of the

M&T Claim pursuant to the Plan, and other good and valuable consideration, upon the Effective

Date, each of the M&T Borrowers and each guarantor of the M&T Loan and any entity seeking

to exercise the rights of each M&T Borrower and/or applicable guarantor, including, without

limitation, any successor to a M&T Borrower or guarantor or, with respect only to 107 Osborne

Street Operating Company II, LLC d/b/a Danbury Health Care Center, 710 Long Ridge Road

Operating Company II, LLC d/b/a Long Ridge of Stamford, and 1 Burr Road Operating

Company II, LLC d/b/a Westport Health Care Center, any representative appointed or selected

pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to forever release,

waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights,

causes of action (including claims or causes of action arising under chapter 5 of the Bankruptcy

Code), and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent,

matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 38)
Debtor:        710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.      13-13653 (DHS)
Caption of Order:   FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
COMPANY II, LLC, *et al.*, AS MODIFIED

---

arising, in law, equity, or otherwise, that are based in whole or part on any act, omission,

transaction, event, or other occurrence taking place on or prior to the Effective Date that may be

asserted by or on behalf of the M&T Borrowers and/or applicable guarantors against (i) M&T,

(ii) any of the present or former shareholders, members, directors, officers, employees or

advisors of M&T and (iii) any advisors or counsel to M&T; provided, however, that, nothing

herein shall be construed to release any party from actual fraud or gross negligence as

determined by a Final Order.

      16.    Release of the HUD Lender.  In consideration for the HUD Lender's consent to

the treatment of the HUD Claim pursuant to the Plan, and other good and valuable consideration,

upon the Effective Date, each of the HUD Borrowers and each guarantor of the HUD Loan and

any entity seeking to exercise the rights of each HUD Borrower and/or applicable guarantor,

including, without limitation, any successor to a HUD Borrower or guarantor or, with respect

only to 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center, 245

Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center, 710 Long

Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford, and 1 Burr Road

Operating Company II, LLC d/b/a Westport Health Care Center, any representative appointed or

selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to forever

release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts,

rights, causes of action (including claims or causes of action arising under chapter 5 of the

Bankruptcy Code), and liabilities whatsoever, whether liquidated or unliquidated, fixed or

*Approved by Judge Donald H. Steckroth March  06, 2014*

Debtor:             710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.            13-13653 (DHS)
Caption of Order:   FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                    CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                    REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                    COMPANY II, LLC, *et al.*, AS MODIFIED

---

contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or

thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act,

omission, transaction, event, or other occurrence taking place on or prior to the Effective Date

that may be asserted by or on behalf of the HUD Borrowers and/or applicable guarantors against

(i) the HUD Lender, (ii) any of the present or former shareholders, members, directors, officers,

employees or advisors of the HUD Lender and (iii) any advisors or counsel to the HUD Lender;

provided, however, that, nothing herein shall be construed to release any party from actual fraud

or gross negligence as determined by a Final Order.

### E.     MATTERS RELATING TO IMPLEMENTATION OF THE PLAN.

17.     Pursuant to Section 4.3 of the Plan, on the Effective Date, subject to the approval

and consent of HUD with respect to Newington and West River and upon execution of all HUD

required forms, each Reorganized Debtor shall issue and deliver to Care Realty the New

Membership Interests, representing one hundred percent (100%) of the equity interest in each

Reorganized Debtor.

18.     The approvals and authorizations specifically set forth in this Confirmation Order

are nonexclusive and are not intended to limit the authority of the Debtors or the Reorganized

Debtors to take any and all actions necessary or appropriate to implement, effectuate and

consummate the Plan or this Confirmation Order.  The Debtors and the Reorganized Debtors are

authorized and empowered to take all actions and perform all acts as they may determine are

necessary or appropriate to effectuate the consummation and implementation of the Plan

(Page 40)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

---

consistent with the terms thereof and to implement the transactions contemplated by the Plan and this Confirmation Order, all without further corporate action or action of the managers or members of the Debtors or the Reorganized Debtors.

19.     Pursuant to Section 4.10 of the Plan, except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, without any further action, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Debtors, their properties, and their interests in property and their operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the Estates of the Debtors shall vest in the Reorganized Debtors free and clear of all Claims, Liens and Equity Interests.  The vesting of such assets in the Reorganized Debtors does not constitute a voidable transfer under the Bankruptcy Code or applicable nonbankruptcy law.

20.     The discharge and release of Claims, indemnification, and exculpation provisions contained in the Plan are deemed incorporated herein by reference, as if set forth herein in full and, except as otherwise expressly limited by this Order, are approved in all respects and shall be effective as provided for in the Plan.

21.     Notwithstanding any provision contained herein or in the Plan to the contrary, no Executory Contract or unexpired lease of the Debtors shall be deemed assumed, assumed and assigned, or rejected by operation of the Plan or this Confirmation Order unless and until the Effective Date shall have occurred, and confirmation of the Plan shall not be deemed to have occurred with respect to such Executory Contracts and leases until the Effective Date.

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 41)
Debtor:            710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.           13-13653 (DHS)
Caption of Order:  FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                   CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                   REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                   COMPANY II, LLC, *et al.*, AS MODIFIED

---

22.    The treatment and release of Claims against the Debtors, as provided under the

Plan, shall not diminish or impair the enforceability or any insurance policies that may cover

Claims against the Debtors or any other Person or Entity.

23.    Notwithstanding that the Allowed amount of any particular Disputed Claim is

reconsidered under the applicable provisions or the Bankruptcy Code and Bankruptcy Rules or is

Allowed in an amount for which after application of the payment priorities established by the

Plan there is insufficient value to provide a recovery equal to the amount received by other

holders of Allowed Claims in those respective Classes, no holder shall have recourse against the

Debtors, the Reorganized Debtors, the Creditors' Committee, the Plan Sponsor Group or any of

their respective professional consultants, attorneys, advisors, officers, directors, members,

affiliates or their successors or assigns, or any or their respective property.

24.    So long as such action does not materially and adversely affect the treatment of

holders of Claims or Equity Interests pursuant to the Plan, the Debtors and/or the Reorganized

Debtors may institute proceedings in this Bankruptcy Court to remedy any defect or omission or

reconcile any inconsistencies in the Plan or this Confirmation Order, with respect to such matters

as may be necessary to carry out the purposes and effects of the Plan.

25.    Given the expiration of the DIP Loan on March 7, 2014, cause exists to modify,

the provisions of Rule 62 of the Federal Rules of Civil Procedure made applicable pursuant to

Bankruptcy Rule 7062, and Bankruptcy Rule 3020(e), such that the 14 days set forth therein

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 42)
Debtor:              710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.             13-13653 (DHS)
Caption of Order:    FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                     CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                     REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                     COMPANY II, LLC, *et al.*, AS MODIFIED

shall be and hereby is reduced, and the Debtors are authorized, but not directed, to consummate

the Plan on or after March 7, 2014.

26.     To the extent the Confirmation Order conflicts with the Disclosure Statement, the

Plan, the First Modifications, the Second Modifications or any other agreement entered into

between the Debtors and any party or other orders of the Bankruptcy Court, this Confirmation

Order shall control, provided, however, that to the extent the Confirmation Order conflicts with

the Backstop Funding Agreement, the Backstop Funding Agreement shall control.

27.     Failure specifically to include or reference particular sections or provisions of the

Plan or any related agreement in this Confirmation Order shall not diminish or impair the

effectiveness of such sections or provisions, it being the intent of the Bankruptcy Court that the

Plan be confirmed and such provisions and related agreements be approved in their entirety.

28.     From the Confirmation Date up to and including the Effective Date, the members

of the Creditors' Committee, appointed pursuant to section 1102 of the Bankruptcy Code, and

their duly appointed successors shall continue to serve.  On the Effective Date, the Creditors'

Committee shall be dissolved and the members thereof and the professionals retained by the

Creditors' Committee in accordance with section 1103 of the Bankruptcy Code (including,

without limitation, attorneys, investment advisors, accountants and other professionals) shall be

released and discharged from their respective fiduciary obligations, duties and responsibilities,

provided that the Creditors' Committee and each member thereof shall retain standing to appear

and be heard on issues relating to the Professional Compensation and Reimbursement Claims

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 43)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

---

and to reopen the Chapter 11 Case.  After the Effective Date, the professionals currently employed by the Creditors' Committee shall no longer represent the Creditors' Committee unless otherwise agreed to between the Creditors' Committee and the respective professional(s).  Upon the Effective Date, holders of Unsecured Claims are obliged to pursue their rights and interests without the presence of the Creditors' Committee due to the disbandment of the Creditors' Committee upon the occurrence of the Effective Date.

### F.    EXIT FINANCING; INCURRENCE OF NEW INDEBTEDNESS.

29.    The Reorganized Debtors' entry on the Effective Date into the Exit Financing subject to the terms and conditions in the New Credit Agreement, substantially in the form attached to hereto as **Exhibit C**, and the incurrence of the indebtedness thereunder, the granting of collateral and other security interests in accordance therewith, and all other actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors (including, without limitation, the payment of all fees, expenses, losses, damages, indemnities and other amounts provided for in the New Credit Agreement) shall be authorized and approved in all respects by virtue of entry of this Confirmation Order, in accordance with the Bankruptcy Code and applicable state law, to the extent applicable, and any analogous provision of the applicable business organizations law or code of each other state in which the Reorganized Debtors are incorporated or organized) and without the need for any further corporate action or any further action by holders of Claims or Interests in the Debtors or the Reorganized Debtors or

(Page 44)
Debtor:            710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.           13-13653 (DHS)
Caption of Order:  FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                   CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                   REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                   COMPANY II, LLC, *et al.*, AS MODIFIED

---

directors, members or partners of the Debtors or the Reorganized Debtors, and with like effect as if such actions had been taken by unanimous actions thereof.

30.     Each of the Reorganized Debtors, without any further action by the Court or each respective Reorganized Debtors' officers, directors, members or managers, is hereby authorized and directed to enter into, and take such actions as necessary to perform under, the Exit Financing and the New Credit Agreement, as well as any notes, documents or agreements in connection therewith, including, without limitation, any documents required in connection with the creation or perfection of Liens or other security interests in connection therewith.

31.     Upon consummation of the Exit Financing, the Exit Lender thereunder shall have legal, valid, binding and enforceable Liens and other security interests on the collateral specified in the New Credit Agreement.  The pledges, Liens and other security interests granted pursuant to or in connection with the Exit Financing are granted in good faith, for good and valuable consideration and for legitimate business purposes as an inducement to the Exit Lender to extend credit thereunder and are reasonable and shall be, and hereby are, deemed not to constitute a preferential transfer, fraudulent conveyance, fraudulent transfer or other voidable transfer and shall not otherwise be subject to avoidance, recharacterization or subordination.  The priorities of such Liens and other security interests shall be as set forth in and subject to the Intercreditor Agreement (with the Debtors and the Prepetition Lenders), such other documents entered into in connection with the Exit Financing and applicable law.

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 45)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

32.     The Reorganized Debtors, the Exit Lender (and the Prepetition Lenders, as applicable) and their respective designees and agents are hereby authorized to make all filings and recordings, and to obtain all governmental approvals and consents to evidence, establish and perfect such Liens and other security interests under the provisions of the applicable state, provincial, federal or other law that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection of the Liens and other security interests granted under the Exit Financing shall occur automatically by virtue of the entry of this Confirmation Order and consummation of the Exit Financing, and any such filings, recordings, approvals and consents shall not be necessary or required as a matter of law to perfect such Liens and other security interests), and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and other security interests to third parties.

### G.     ASSUMPTION AND REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

33.     On the Effective Date, the Assumed Contracts identified on Exhibit B to this Confirmation Order shall be assumed by the Debtors and vested in the Reorganized Debtors. The Cure Amount identified on the list attached hereto as Exhibit B shall be paid by the Reorganized Debtors as a Cure in accordance with Article VII of the Plan.  Each Assumed Contract assumed pursuant to this Confirmation Order shall vest in and be fully enforceable by the Reorganized Debtors, except as modified by the provisions of the Plan.  The amounts

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 46)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

identified on Exhibit B are in full and final satisfaction of all obligations and are full

compensation to the counterparties for any pecuniary losses under such contracts or leases

pursuant to section 365(b)(1) of the Bankruptcy Code under the respective Assumed Contracts as

of the Effective Date.  On the Effective Date, with respect to the Assumed Contracts, all

applicable requirements of section 365 of the Bankruptcy Code have been met, including the

requirement that all defaults be cured and that adequate assurance of future performance be

provided.  As of the Effective Date, the Debtors and the Reorganized Debtors (as applicable)

shall be relieved and discharged from any liability whatsoever, whether arising before or on the

Effective Date, under the Assumed Contracts other than the Reorganized Debtors' obligation to

satisfy Cure Amounts listed in Exhibit B in accordance with Article VII of the Plan.

34.     Any provisions in any Assumed Contract that prohibit or condition the

assignment of such Assumed Contract or allow the counterparty to such Assumed Contract to

terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term

or condition upon the assignment of such Assumed Contract constitute unenforceable anti-

assignment provisions that are void and of no force or effect.  On the Effective Date, (a) the

Assumed Contracts shall remain in full force and effect in accordance with their respective terms

for the benefit of the Reorganized Debtors, and (b) no default shall exist under the Assumed

Contracts nor shall there exist any event or condition which, with the passage of time or giving

of notice or both would constitute such a default.

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 47)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

35. There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Reorganized Debtors as a result of the assumption and vesting of the Assumed Contracts. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all parties to the Assumed Contracts are forever barred and enjoined from raising or asserting against the Reorganized Debtors or the Assets any assignment fee, default, breach, or claim or pecuniary loss, or condition to assignment, arising under or related to the Assets prior to the Effective Date.

36. Except to the extent (a) the Debtors assume an executory contract or unexpired lease pursuant to this Confirmation Order, (b) the Debtors previously assumed, and (if applicable) assigned, or rejected an executory contract or unexpired lease, or (c) prior to the Effective Date, the Bankruptcy Court has entered an Order authorizing the assumption, and (if applicable) assignment, of an executory contract or unexpired lease, all of the Debtors' executory contracts and unexpired leases shall be deemed rejected on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code. Notwithstanding the foregoing, the Management Agreements are neither assumed nor rejected and shall "ride through" the Chapter 11 Case.

**H.     SUBSTANTIAL CONSUMMATION.**

37. The substantial consummation of the Plan, within the meaning of sections 1101 and 1127 of the Bankruptcy Code, is deemed to occur on the Effective Date.

**I.     CLAIMS BAR DATES AND OTHER CLAIMS MATTERS.**

38. <u>Bar Date for Administrative Claims.</u> Except as otherwise provided in the Plan or this Confirmation Order, and except for the payment or reimbursement of reasonable attorneys'

(Page 48)
Debtor:            710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.           13-13653 (DHS)
Caption of Order:  FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                   CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                   REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                   COMPANY II, LLC, *et al.*, AS MODIFIED

fees and related expenses of the Prepetition Lenders that are required to be paid in connection

with the Debtors' Reinstatement under the applicable loan documents, unless previously filed,

requests for payment of Administrative Claims that have arisen or will arise in the period from

September 1, 2013 through and including the Effective Date must be filed and served on the

Debtors and their counsel no later than sixty (60) days after the Effective Date.  Any Person that

is required to file and serve a request for payment of an Administrative Claim and fails to timely

file and serve such request, shall be forever barred, estopped and enjoined from asserting such

Claim or participating in distributions under the Plan on account thereof.  Objections to requests

for payment of Administrative Claims (except for Professional Compensation and

Reimbursement Claims) must be filed and served within one hundred twenty (120) days after the

Effective Date, unless extended by the Bankruptcy Court.  In connection with the Reinstatement

of the Debtors' obligations, and without the need for application or motion therefore, on or about

the Effective Date, the Debtors and the Reorganized Debtors shall pay the reasonable attorneys'

fees and expenses of the Prepetition Lenders' professionals, including such fees and expenses

incurred in connection with the Chapter 11 Case through the Effective Date.

 39. <u>Bar Date for Professional Compensation and Reimbursement Claims.</u>  Any and all

parties requesting allowance and/or payment of a Professional Compensation and

Reimbursement Claim for any period ending on or before the Effective Date from the Debtors,

shall file and serve a final Fee Applications therefor not later than the date that is sixty (60) days

after the Effective Date.  A Fee Application shall be filed and served on the Reorganized

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 49)
Debtor:             710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*
Case No.            13-13653 (DHS)
Caption of Order:   FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
                    CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF
                    REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING
                    COMPANY II, LLC, *et al.*, AS MODIFIED

---

Debtors, counsel to the Reorganized Debtors, counsel to the Creditors' Committee and the

United States Trustee.  Any Person that is required to file and serve a request for payment of a

Professional Compensation and Reimbursement Claim and fails to timely file and serve such

request, shall be forever barred, estopped and enjoined from asserting such Professional

Compensation and Reimbursement Claim or participating in distributions under the Plan on

account thereof.  Objections to Professional Compensation and Reimbursement Claims must be

filed and served on the Debtors, counsel to the Debtors, counsel to the Creditors' Committee, the

United States Trustee and the requesting party on or before thirty (30) days of the filing of the

applicable request for payment of a Professional Compensation and Reimbursement Claim.

### J.    RETENTION OF JURISDICTION.

40.    Except as otherwise set forth in the Plan, the Bankruptcy Court hereby retains

exclusive jurisdiction of the Chapter 11 Case (a) pursuant to and for purposes of sections 105 and

1127 of the Bankruptcy Code, and (b) as set forth in Article VIII of the Plan, which is

incorporated herein by reference as if set forth in full herein.

41.    The determinations, findings, judgments, decrees and orders set forth herein

constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy

Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  Each finding

of fact set forth herein, to the extent it is or may he deemed a conclusion of law, also shall

constitute a conclusion of law.  Each conclusion of law set forth herein, to the extent it is or may

be deemed a finding of fact, also shall constitute a finding of fact.

*Approved by Judge Donald H. Steckroth March  06, 2014*

(Page 50)

| | |
|---|---|
| Debtor: | 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.* |
| Case No. | 13-13653 (DHS) |
| Caption of Order: | FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER CONFIRMING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*, AS MODIFIED |

42.    The headings contained within this Confirmation Order are used for the convenience of the parties and shall not alter or affect the meaning of the text of this Confirmation Order.

*Approved by Judge Donald H. Steckroth March  06, 2014*

# EXHIBIT A

*Approved by Judge Donald H. Steckroth March  06, 2014*

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
Gerald H. Gline, Esq.
David M. Bass, Esq.
Ryan T. Jareck, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for 710 Long Ridge Road
Operating Company II, LLC, *et al.*,
Debtors-in-Possession

| | |
|---|---|
| In re:<br><br>710 LONG RIDGE ROAD OPERATING<br>COMPANY II, LLC, *et al.*,[1]<br><br>Debtor-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>HONORABLE DONALD H. STECKROTH<br>CASE NO. 13-13653 (DHS)<br><br>Chapter 11<br>(Jointly Administered) |

## FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC, *et al.*

Dated:  December 10, 2013

---

[1]  The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal identification number are:  710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford (4809), 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center (4730), 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center (4839), 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center (4716) and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center (4676).

*Approved by Judge Donald H. Steckroth March  06, 2014*

# TABLE OF CONTENTS

**Page**

**ARTICLE I RULES OF INTERPRETATION, COMPUTATION OF TIME AND
DEFINED TERMS** ................................................................................................... 2
   1.1.    "Adequate Protection Claim" ........................................................................ 3
   1.2.    "Administrative Expense Claim" ................................................................. 3
   1.3.    "Administrative Expense Claims Bar Date" .............................................. 4
   1.4.    "Administrative Expense Claims Objection Deadline" .......................... 4
   1.5.    "Affiliate" ....................................................................................................... 5
   1.6.    "Affiliated Landlords" .................................................................................. 5
   1.7.    "ALJ Proceedings" ....................................................................................... 5
   1.8.    "Allowed" ....................................................................................................... 5
   1.9.    "Assumed Medicare Provider Agreements" .............................................. 6
   1.10.   "Assumption Notice" .................................................................................... 6
   1.11.   "Avoidance Actions" .................................................................................... 6
   1.12.   "Backpay Claim" ........................................................................................... 6
   1.13.   "Backstop Funder" ....................................................................................... 6
   1.14.   "Backstop Funding Agreement" ................................................................. 6
   1.15.   "Ballot" ........................................................................................................... 6
   1.16.   "Bankruptcy Code" ...................................................................................... 7
   1.17.   "Bankruptcy Court" ..................................................................................... 7
   1.18.   "Bankruptcy Rules" ..................................................................................... 7
   1.19.   "Business Day" .............................................................................................. 7
   1.20.   "Cash" ............................................................................................................. 7
   1.21.   "Cash Collateral Orders" ............................................................................. 7
   1.22.   "Causes of Action" ....................................................................................... 8
   1.23.   "CBA Rejection Order" ................................................................................ 8
   1.24.   "Chapter 11 Case" ........................................................................................ 8
   1.25.   "Claim" ........................................................................................................... 8
   1.26.   "Claims Objection Deadline" ...................................................................... 9
   1.27.   "Claims and Noticing Agent" ..................................................................... 9
   1.28.   "Claims and Noticing Order" ..................................................................... 9
   1.29.   "Class" ............................................................................................................ 9
   1.30.   "Clerk" ............................................................................................................ 9
   1.31.   "CMS" ............................................................................................................. 9
   1.32.   "Collateral" .................................................................................................... 9
   1.33.   "Collective Bargaining Agreement(s)" ...................................................... 9
   1.34.   "Commencement Date" ................................................................................ 9
   1.35.   "Confirmation Date" .................................................................................... 9
   1.36.   "Confirmation Hearing" ............................................................................ 10
   1.37.   "Confirmation Objection Deadline" ........................................................ 10
   1.38.   "Confirmation Order" ................................................................................ 10
   1.39.   "Compensation and Benefit Plans" ......................................................... 10
   1.40.   "Creditor" .................................................................................................... 10
   1.41.   "Creditors' Committee" ............................................................................. 10

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

1.42.    "Cure" .......................................................................................................... 10
1.43.    "Danbury" ................................................................................................... 11
1.44.    "Debtors" .................................................................................................... 11
1.45.    "Debtors-in-Possession" ............................................................................ 11
1.46.    "DIP Financing Order" .............................................................................. 11
1.47.    "DIP Lender" .............................................................................................. 11
1.48.    "DIP Loan" ................................................................................................. 11
1.49.    "DIP Loan Claim" ...................................................................................... 11
1.50.    "Disbursing Agent" .................................................................................... 11
1.51.    "Disclosure Statement" .............................................................................. 12
1.52.    "Disputed" .................................................................................................. 12
1.53.    "Disputed Claim" ....................................................................................... 12
1.54.    "Disputed Claim Amount" ......................................................................... 12
1.55.    "Distribution" ............................................................................................. 12
1.56.    "Distribution Date" ..................................................................................... 13
1.57.    "Distribution Record Date" ........................................................................ 13
1.58.    "Docket" ..................................................................................................... 13
1.59.    "Effective Date" ......................................................................................... 13
1.60.    "Entity" ....................................................................................................... 13
1.61.    "Equity Interests" or "Interests" ................................................................ 13
1.62.    "Estate" ....................................................................................................... 13
1.63.    "Executory Contract" ................................................................................. 13
1.64.    "Exit Lender" .............................................................................................. 13
1.65.    "Facility" and collectively, the "Facilities" ............................................... 14
1.66.    "Fee Application" ....................................................................................... 14
1.67.    "First Administrative Expense Claim Bar Date" ........................................ 14
1.68.    "First Administrative Expense Claim Bar Date Order" .............................. 14
1.69.    "Final Order" .............................................................................................. 14
1.70.    "General Bar Dates" ................................................................................... 15
1.71.    "Governmental Unit" .................................................................................. 15
1.72.    "Holder" ...................................................................................................... 15
1.71.    "HUD" ......................................................................................................... 15
1.72.    "HUD Lender" ............................................................................................. 15
1.73.    "HUD Borrowers" ....................................................................................... 15
1.74.    "HUD Claim" .............................................................................................. 15
1.75.    "HUD Loan" ................................................................................................ 15
1.76.    "Impaired" ................................................................................................... 15
1.77.    "Indemnification Obligations" ................................................................... 16
1.78.    "Insurance Policies" ................................................................................... 16
1.79.    "Intercompany Claim" ................................................................................ 16
1.80.    "Lease Agreements" .................................................................................... 16
1.81.    "Lien" .......................................................................................................... 16
1.82.    "Litigation Rights" ...................................................................................... 16
1.83.    "Long Ridge" .............................................................................................. 16
1.84.    "M&T" ......................................................................................................... 16
1.85.    "M&T Borrowers" ....................................................................................... 16

51689/0001-9766400v4

1.86.    "M&T Claim"...................................................................................................... 17
1.87.    "M&T Loan" ...................................................................................................... 17
1.88.    "M&T Note" ...................................................................................................... 17
1.89.    "M&T Security Agreement" .............................................................................. 17
1.90.    "Management Agreements" ............................................................................... 17
1.91.    "Management Company" ................................................................................... 17
1.92.    "New Credit Agreement" .................................................................................. 17
1.93.    "New Credit Agreement Term Sheet"............................................................... 18
1.94.    "Newington"...................................................................................................... 18
1.95.    "NLRA".............................................................................................................. 18
1.96.    "NLRB".............................................................................................................. 18
1.97.    "Non-Ongoing Trade Vendor" .......................................................................... 18
1.98.    "Ongoing Trade Vendor Terms" ....................................................................... 18
1.99.    "Ongoing Trade Vendor" .................................................................................. 18
1.100.   "Order".............................................................................................................. 19
1.101.   "Ordinary Course Professional" ........................................................................ 19
1.102.   "Other Priority Claim" ...................................................................................... 19
1.103.   "Other General Unsecured Claim"..................................................................... 19
1.104.   "Other Secured Claim" ...................................................................................... 19
1.105.   "Parent Companies" ........................................................................................... 19
1.106.   "Patient Care Ombudsman" ............................................................................... 20
1.107.   "Person"............................................................................................................. 20
1.108.   "Plan" ................................................................................................................ 20
1.109.   "Plan Distribution Contribution Amount".......................................................... 20
1.110.   "Plan Documents" .............................................................................................. 20
1.111.   "Plan Sponsor Group" ....................................................................................... 20
1.112.   "Plan Supplement" ............................................................................................. 20
1.113.   "Postpetition Administrative Trade Claims"...................................................... 20
1.114.   "Postpetition Interest" ....................................................................................... 21
1.115.   "Prepetition"...................................................................................................... 21
1.116.   "Priority Tax Claim" ......................................................................................... 21
1.117.   "Professional".................................................................................................... 21
1.118.   "Professional Compensation and Reimbursement Claim".................................. 21
1.119.   "Proof of Claim"................................................................................................ 21
1.120.   "Pro Rata, Ratable or Ratable Share"................................................................ 21
1.121.   "Quarter" ........................................................................................................... 22
1.122.   "Reinstated"....................................................................................................... 22
1.123.   "Releasees"........................................................................................................ 22
1.124.   "Reorganized Debtors"...................................................................................... 23
1.125.   "RICO Action" .................................................................................................. 23
1.126.   "Schedules" ....................................................................................................... 23
1.127.   "Section 503(b)(9) Administrative Claim" ........................................................ 23
1.128.   "Section 503(b)(9) Administrative Claim Bar Date" ......................................... 23
1.129.   "Section 503(b)(9) Administrative Claim Bar Date Order"................................ 24
1.130.   "Secured Claim".................................................................................................. 24
1.131.   "Solicitation Procedures Order"......................................................................... 24

iii

1.132.   "Statutory Fees" ...................................................................................... 24
1.133.   "THCI Company" ..................................................................................... 24
1.134.   "THCI Mortgage" ..................................................................................... 25
1.135.   "Unimpaired" ........................................................................................... 25
1.136.   "Union" ..................................................................................................... 25
1.137.   "Unsecured Claim" ................................................................................... 25
1.138.   "Voting Deadline" .................................................................................... 25
1.139.   "Voting Record Date" ............................................................................. 25
1.140.   "Westport" ................................................................................................. 25
1.141.   "West River" ............................................................................................. 25

**ARTICLE II CLASSIFICATION AND TREATMENT OF CLAIMS AND
EQUITY INTERESTS** ............................................................................................ **26**
2.1.     Overview. ................................................................................................... 26
2.2.     Unclassified Claims. ................................................................................. 27
          A.      Administrative Expense Claims. ................................................ 27
          B.      Professional Compensation and Reimbursement Claims. ........ 28
          C.      Priority Tax Claims. .................................................................... 29
          D.      DIP Loan Claim. .......................................................................... 30
2.3.     Classified Claims and Equity Interests ................................................... 31
          A.      General. ......................................................................................... 31
          B.      Treatment of Classified Claims and Equity Interests ............... 32
          C.      Class 1:  Other Priority Claims .................................................. 32
          D.      Class 2: HUD Claim .................................................................... 32
          E.      Class 3: M&T Claim .................................................................... 33
          F.      Class 4:  Other Secured Claims ................................................. 34
          G.      Class 5: Allowed Ongoing Trade Vendor Claims ..................... 35
          H.      Class 6: Other General Unsecured Claims ............................... 37
          I.      Class 7:  Intercompany Claims .................................................. 37
          J.      Class 8: Equity Interests ............................................................ 38

**ARTICLE III ACCEPTANCE OR REJECTION OF THIS PLAN** .................................... **39**
3.1.     Voting Classes. .......................................................................................... 39
3.2.     Acceptance by Impaired Classes. ............................................................ 39
3.3.     Non-Consensual Confirmation. ............................................................... 39
3.4.     Postpetition Interest. ................................................................................. 40
3.5.     Special Provision Regarding Unimpaired Claims. ................................. 40
3.6.     Elimination of Vacant Classes. ................................................................ 40

**ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN** .................................. **41**
4.1.     Sources of Cash for Plan Distributions. ................................................. 41
4.2.     Funding of Ongoing Operating Losses. ................................................... 42
4.3.     Continued Corporate Existence. .............................................................. 42
4.4.     Members and Officers. .............................................................................. 42
4.5.     Exit Financing. .......................................................................................... 42
4.6.     Effectiveness of Securities, Instruments and Agreements. .................. 43
4.7.     Corporate Action; Effectuating Documents; Further Transactions. .... 43

iv

*Approved by Judge Donald H. Steckroth March  06, 2014*

| | | |
|---|---|---|
| 4.8. | Approval of Agreements. | 43 |
| 4.9. | Operation of the Debtor-in-Possession Between the Confirmation Date and the Effective Date. | 44 |
| 4.10. | Vesting of Property of the Estates. | 44 |
| 4.11. | Preservation of Causes of Action. | 45 |
| 4.12. | Exemption from Certain Transfer Taxes. | 45 |
| 4.13. | Non-Substantive Consolidation. | 46 |

**ARTICLE V PROVISIONS GOVERNING DISTRIBUTIONS** ........ **47**

| | | |
|---|---|---|
| 5.1. | Disbursing Agent. | 47 |
| 5.2. | Application of Distribution Record Date. | 47 |
| 5.3. | Compliance with Tax Requirements. | 47 |
| 5.4. | Means of Cash Payment. | 48 |
| 5.5. | Delivery And Distributions And Undeliverable Or Unclaimed Distributions. | 48 |
| | A.    Delivery of Distributions in General | 48 |
| | B.    Undeliverable Distributions. | 48 |
| 5.6. | De Minimus Distributions. | 49 |
| 5.7. | Fractional Dollars. | 49 |
| 5.8. | Allocation Of Plan Distributions Between Principal and Interest. | 49 |
| 5.9. | Setoffs and Recoupments. | 50 |
| 5.10. | Prepayments. | 50 |

**ARTICLE VI PROCEDURES FOR RESOLVING DISPUTED CLAIMS** ........ **50**

| | | |
|---|---|---|
| 6.1. | Prosecution of Objections to Claims. | 50 |
| 6.2. | Allowance Of Claims; No Distribution Pending Allowance. | 51 |
| 6.3. | Distributions After Allowance. | 51 |
| 6.4. | Controversy Concerning Impairment. | 52 |
| 6.5. | Reservation of Rights to Object to Allowance or Asserted Priority of Claims. | 52 |

**ARTICLE VII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........ **52**

| | | |
|---|---|---|
| 7.1. | Assumption and Assignment of Executory Contracts and Unexpired Leases. | 52 |
| 7.2. | Cure of Defaults Under Assumed Executory Contracts and Unexpired Leases. | 54 |
| | A.    Cure Procedure | 54 |
| 7.3. | Insurance Policies. | 55 |
| 7.4. | Indemnification Obligations. | 55 |
| 7.5. | Compensation and Benefit Plans. | 56 |
| 7.6. | Rejection of Executory Contracts and Unexpired Leases. | 56 |
| 7.7. | Deadline for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan. | 57 |

v

*Approved by Judge Donald H. Steckroth March  06, 2014*

**ARTICLE VIII RETENTION OF JURISDICTION** .................................................................. 57

**ARTICLE IX RELEASES AND RELATED PROVISIONS** ................................................. 60
    9.1.      Releases by the Debtors................................................................................ 60
    9.2.      Releases by Holders of Claims and Equity Interests....................................... 61
    9.3.      Injunctions or Stays. ...................................................................................... 63
    9.4.      Injunction. ...................................................................................................... 63
    9.5.      Exculpation..................................................................................................... 64
    9.6.      Discharge of Claims and Termination of Equity Interests. ............................. 65
    9.7.      Terms of Injunctions or Stays. ....................................................................... 65
    9.8.      Waiver of Enforcement of Subordination. ...................................................... 66

**ARTICLE X CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE** ............... 66
    10.1.    Conditions to Confirmation. ........................................................................... 66
    10.2.    Conditions Precedent to the Effective Date..................................................... 67
    10.3.    Effect of Failure of Conditions....................................................................... 67
    10.4.    Waiver of Conditions to Confirmation and Effective Date............................. 68

**ARTICLE XI MISCELLANEOUS PROVISIONS** ............................................................ 68
    11.1.    Administrative Expense Claims Bar Date........................................................ 68
    11.2.    Amendment or Modification of the Plan.......................................................... 70
    11.3.    Termination of Creditors' Committee. ............................................................ 70
    11.4.    Corporate Action. ........................................................................................... 70
    11.5.    Post-Effective Date Fees and Expenses. ......................................................... 71
    11.6.    Payment of Statutory Fees.............................................................................. 71
    11.7.    Severability of Plan Provisions. ...................................................................... 71
    11.8.    Revocation or Withdrawal of the Plan. ........................................................... 72
    11.9.    Successors and Assigns and Binding Effect..................................................... 72
    11.10.   Substantial Consummation. ............................................................................ 72
    11.11.   Notices. .......................................................................................................... 72
    11.12.   Governing Law. .............................................................................................. 73
    11.13.   Plan Supplement. ........................................................................................... 73
    11.14.   Headings. ....................................................................................................... 74
    11.15.   Exhibits/Schedules. ....................................................................................... 74
    11.16.   Filing of Additional Documents...................................................................... 74
    11.17.   Reservation of Rights. .................................................................................... 74
    11.18.   Section 1145 Exemption. ................................................................................ 74
    11.19.   Implementation............................................................................................... 74
    11.20.   Inconsistency. ................................................................................................ 75
    11.21.   Compromise of Controversies. ....................................................................... 75

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

## INTRODUCTION TO PLAN

710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford, 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center, 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center, 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center, (collectively, the "**Debtors**"), as debtors and debtors-in-possession in the above-captioned Chapter 11 Case, propose the following First Amended Joint Chapter 11 Plan of Reorganization of 710 Long Ridge Road Operating Company II, LLC, et al. (as defined below, the "**Plan**").

On February 24, 2013, each of the Debtors filed a petition for relief under the Bankruptcy Code. This document is the First Amended Joint Plan proposed by the Debtors. Filed contemporaneously with this Plan is the Debtors' First Amended Disclosure Statement which is provided to help you understand this Plan.[2] The Disclosure Statement contains, among other things, a discussion of the Debtors' history, a description of the Debtors' businesses, and a summary of the Plan.

Under the Plan, the Debtors intend to go forward with their current businesses. The income derived from those businesses, together with the Plan Distribution Contribution Amount and the commitment of the Backstop Funder hereunder, will be used in and contributed toward the funding of the Plan and otherwise meeting the Debtors' obligations going forward. In exchange for the consideration given by those non-Debtors in the Plan Sponsor Group, the Parent Companies will retain their Equity Interests in the Debtors. Upon emergence from

---

[2]If you would like a copy of the Disclosure Statement sent to you at the Debtors' expense, please make such request in writing to Cole, Schotz, Meisel, Forman & Leonard P.A., c/o Frances Pisano, 25 Main Street, Hackensack, New Jersey 07601, or email fpisano@coleschotz.com.

*Approved by Judge Donald H. Steckroth March  06, 2014*

chapter 11, the Debtors may also explore other restructuring alternatives, including a sale and/or

closure of one or more of the Facilities.  In connection therewith, the Debtors and certain non-

Debtor Affiliates have determined to retain an investment banker to explore the possibility of a

sale or sales of one or more of the Facilities.

 THE DEBTORS URGE ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS TO

READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY.  NO

SOLICITATION MATERIALS OTHER THAN THE DISCLOSURE STATEMENT AND

ANY DOCUMENTS, SCHEDULES, EXHIBITS OR LETTERS ATTACHED THERETO OR

REFERENCED THEREIN HAVE BEEN AUTHORIZED BY THE DEBTORS OR THE

BANKRUPTCY COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF

THIS PLAN.

 The Distributions to be made to Holders of Claims and Equity Interests in each of the

Classes of Claims are set forth in Article II herein.

## ARTICLE I

## RULES OF INTERPRETATION, COMPUTATION OF TIME AND DEFINED TERMS

 <u>Rules of Interpretation</u>.  For purposes of interpreting the Plan: (i) any reference herein to

a contract, instrument, release, indenture or other agreement or document being in a particular

form or on particular terms and conditions means that such document shall be substantially in

such form or substantially on such terms and conditions; (ii) any reference herein to an existing

document or exhibit filed, or to be filed, shall mean such document or exhibit, as it may have

been or may be amended, modified or supplemented from time to time; (iii) unless otherwise

specified, all references herein to articles and sections are references to articles and sections of

this Plan; (iv) the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather

than to a particular portion of this Plan; (v) captions and headings to articles and sections are

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

inserted for convenience of reference only and are not intended to be a part of or to affect the

interpretation hereof; (vi) the rules of construction set forth in section 102 of the Bankruptcy

Code shall apply; (vii) all exhibits and schedules to this Plan and all appendices, exhibits and

schedules to the Disclosure Statement are incorporated into this Plan, and shall be deemed to be

included in this Plan, regardless of when filed with the Bankruptcy Court; and (viii) whenever a

distribution of property is required to be made on a particular date, the distribution shall be made

on such date, or as soon as practicable thereafter.

    <u>Computation of Time</u>.  In computing any period of time prescribed or allowed hereby, the

provisions of Bankruptcy Rule 9006(a) shall apply.

    <u>Defined Terms</u>.  For purposes of this Plan, unless the context otherwise requires, all

capitalized terms not otherwise defined shall have the meanings ascribed to them below.  Any

term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the

Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or

Bankruptcy Rules, as applicable.

    1.1.    "<u>Adequate Protection Claim</u>" means any Claim of any of M&T or the HUD

Lender, as permitted under the DIP Order or the Cash Collateral Orders, and allowable under 11

U.S.C. § 507(b).

    1.2.    "<u>Administrative Expense Claim</u>" means any right to payment constituting a cost

or expense of administration of a Chapter 11 Case, as applicable, under sections 503(b) and

507(a)(2) of the Bankruptcy Code including, without limitation, Section 503(b)(9)

Administrative Claims, any actual and necessary costs and expenses of preserving the Estate of a

Debtor, as applicable, any actual and necessary costs and expenses of operating the business of a

Debtor, as applicable, any indebtedness or obligations incurred or assumed by a Debtor-in-

3

*Approved by Judge Donald H. Steckroth March  06, 2014*

Possession, as applicable, in connection with the conduct of its respective business including, without limitation, for the provision of goods and the rendition of services, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503(b) of the Bankruptcy Code, any fees or charges assessed against the Estate of a Debtor, as applicable, under section 1930 of chapter 123 of title 28 of the United States Code and all other claims entitled to administrative expenses claim status pursuant to a Final Order of the Bankruptcy Court, but excluding the DIP Loan Claim, Professional Compensation and Reimbursement Claims, Priority Tax Claims and Other Priority Claims.

     1.3.    "<u>Administrative Expense Claims Bar Date</u>" means, as applicable, (i) the First Administrative Expense Claim Bar Date with respect to Administrative Expense Claims that were required to be filed pursuant to the First Administrative Expense Claim Bar Date Order, (ii) the Section 503(b)(9) Administrative Claim Bar Date with respect to Section 503(b)(9) Administrative Claims, or (iii) with respect to those Administrative Expense Claims that were not required to be filed pursuant to the First Administrative Expense Claim Bar Date Order, including those Administrative Expense Claims that have been incurred or have arisen during the period from and after September 1, 2013 through the Effective Date, the day that is sixty (60) days from the Effective Date (or the first Business Day following such day).

     1.4.    "<u>Administrative Expense Claims Objection Deadline</u>" means the last day for filing objections to Administrative Expense Claims which shall be the later of (i) one hundred twenty (120) days after the Effective Date or (ii) ninety (90) days after the filing of such Administrative Expense Claim, as the same may be from time to time extended by the Bankruptcy Court.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

1.5.    "<u>Affiliate</u>" shall have the meaning set forth in section 101(2) of the Bankruptcy
Code and shall include, without limitation, those Affiliates identified with the Plan Supplement.

1.6.    "<u>Affiliated Landlords</u>" means, collectively, 710 Long Ridge Road, LLC, 240
Church Street, LLC, 1 Burr Road Company LLC, 245 Orange Avenue, LLC and 107 Osborne
Street, LLC.

1.7.    "<u>ALJ Proceedings</u>" means those various proceedings pending before the National
Labor Relations Board and presided over by an Administrative Law Judge, including the
following matters: Case Nos. 34-CA-12715, 34-CA-12732, 34-CA-12765, 34-CA-12766, 34-
CA-12768, 34-CA-12769, 34-CA-12770, 34-CA-12771, 34-CA-070823, 34-CA-072875, 34-
CA-075226, 34-CA-08335, 34-CA-08471, 34-CA-073303, and 34-CA-080215.

1.8.    "<u>Allowed</u>" means, with reference to any Claim or Equity Interest, proof of which
was timely and properly filed or, if no proof of a Claim or Equity Interest was filed, which has
been or hereafter is listed by the applicable Debtor in its Schedules, as liquidated in amount and
not disputed or contingent and, in each case, as to which:  (i) no objection to allowance has been
interposed within the applicable period fixed by this Plan, the Bankruptcy Code, the Bankruptcy
Rules, or the Bankruptcy Court, or (ii) an objection has been interposed and such Claim or
Equity Interest has been allowed, in whole or in part, by a Final Order; <u>provided</u>, <u>however</u>, that
any Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an
Order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  Unless
otherwise specified herein or by Order of the Bankruptcy Court, "Allowed Administrative
Expense Claim," or "Allowed Claim," shall not, for purposes of computation of Distributions
under this Plan, include interest on such Administrative Expense Claim or Claim from and after
the Commencement Date.

51689/0001-9766400v4

1.9.    "<u>Assumed Medicare Provider Agreements</u>" shall have the meaning set forth in Section 7.1 hereof.

1.10.    "<u>Assumption Notice</u>" shall have the meaning set forth in Section 7.2.A hereof.

1.11.    "<u>Avoidance Actions</u>" means any and all Causes of Action that any of the Debtors may assert under chapter 5 of the Bankruptcy Code or any similar applicable law, regardless of whether or not such Causes of Action are commenced as of the Effective Date.

1.12.    "<u>Backpay Claim</u>" means any Claim filed or asserted, or that could have been filed or asserted, by the Union, the NLRB and/or any employee for alleged unpaid wages, medical expenses, benefit contributions, and other costs resulting from any alleged unfair labor practice of any of the Debtors and which such Claim was incurred, arose or relates to a period prior to the Commencement Date.

1.13.    "<u>Backstop Funder</u>" means Care Realty, LLC.

1.14.    "<u>Backstop Funding Agreement</u>" means that certain agreement between and among the Debtors and Care Realty, LLC and the other members of the Plan Sponsor Group, to be included with the Plan Supplement, pursuant to which (i) the Backstop Funder shall agree to fund, as applicable, the obligations set forth in this Plan and (ii) the other members of the Plan Support Agreement shall waive their Claims.  The Backstop Funding Agreement shall be consistent with the provisions of this Plan and, with respect to the back stop of Class 5 Claims, not be subject to material conditions not identified herein including, but not limited to, any future determination(s) by the Debtors to sell or discontinue their respective businesses.

1.15.    "<u>Ballot</u>" means each of the ballot forms distributed by the Debtors to each member of an Impaired Class entitled to vote under Article II hereof in connection with the solicitation of acceptances or rejections of the Plan.

6

*Approved by Judge Donald H. Steckroth March  06, 2014*

1.16.  "Bankruptcy Code" means title 11 of the United States Code, as amended from

time to time, as applicable to the Chapter 11 Case.

1.17.  "Bankruptcy Court" means the United States Bankruptcy Court for the District of

New Jersey, having jurisdiction over the Chapter 11 Case, or if such court ceases to exercise

jurisdiction over the Chapter 11 Case, such court or adjunct thereof that exercises jurisdiction

over the Chapter 11 Case in lieu of the United States Bankruptcy Court for the District of New

Jersey.

1.18.  "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as

promulgated by the United States Supreme Court under section 2075 of title 28 of the United

States Code, and any Local Rules of the Bankruptcy Court, as amended from time to time, and as

applicable to the Chapter 11 Case.

1.19.  "Business Day" means any day other than a Saturday, Sunday or any other day on

which commercial banks in New York, New York are required or authorized to close by law or

executive order.

1.20.  "Cash" means legal tender of the United States of America or the equivalent

thereof, including bank deposits, checks and wire transfers.

1.21.  "Cash Collateral Orders" means the following Orders entered by the Bankruptcy

Court (i) *Interim Order (I) Authorizing the Debtors' Use of Cash Collateral Pursuant to 11*

*U.S.C. § 363, (II) Granting Adequate Protection under 11 U.S.C. §§ 361, 362 and 363, and (III)*

*Scheduling Final Hearing Pursuant to 11 U.S.C. § 363(c)(2) and Fed. R. Bankr. P. 4001(b)*

[Docket No. 45]; (ii) *Stipulation and Order Authorizing the Debtors' Continued Use of Interim*

*Cash Collateral Through and Including March 22, 2013* [Docket No. 126]; (iii) *Stipulation and*

7

*Approved by Judge Donald H. Steckroth March  06, 2014*

*Order Authorizing the Debtors' Continued Use of Interim Cash Collateral Through and Including April 9, 2013* [Docket No. 167]; and (iv) the DIP Financing Order.

1.22.   "<u>Causes of Action</u>" means any and all claims, actions, proceedings, causes of action, Avoidance Actions, suits, accounts, controversies, agreements, promises, rights of actions, rights to legal remedies, rights to equitable remedies, rights to payment and Claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or asserted directly or derivatively, in law, equity or otherwise, that any of the Debtors and/or the Estates may hold against any Person, but excluding those released, exculpated or waived pursuant to the Plan and Confirmation Order.

1.23.   "<u>CBA Rejection Order</u>" means that proposed form of *Order Granting Debtors' Motion to Reject the Continuing Economic Terms of the Expired Collective Bargaining Agreements with The New England Health Care Employees Union, District 1199, SEIU Pursuant to 11 U.S.C. § 1113(c)* attached as Exhibit "B" to the Debtors' *Omnibus Reply to Objections to the Debtors' Motion to Reject the Continuing Economic Terms of the Expired Collective Bargaining Agreements with The New England Health Care Employees Union, District 1199, SEIU Pursuant to 11 U.S.C. § 1113(c)* [Docket No. 692].

1.24.   "<u>Chapter 11 Case</u>" means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors, styled *In re 710 Long Ridge Road Operating Company II, LLC, et al.*, Chapter 11 Case No. 13-13653 (DHS), currently pending in the Bankruptcy Court.

1.25.   "<u>Claim</u>" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

8

1.26.   "Claims Objection Deadline" means the last day for filing objections to Claims, other than Administrative Expense Claims and Professional Compensation and Reimbursement Claims, which shall be one hundred twenty (120) days after the Effective Date, as the same may be from time to time extended by the Bankruptcy Court.

1.27.   "Claims and Noticing Agent" means Logan & Company, Inc.

1.28.   "Claims and Noticing Order" means that certain *Order Approving the Debtors' Retention of Logan & Company, Inc., as Noticing and Claims Agent Pursuant to 28 U.S.C. §156(c)*, entered by the Bankruptcy Court on February 27, 2013 [Docket No. 42].

1.29.   "Class" means any group of substantially similar Claims or Equity Interests classified by this Plan pursuant to section 1123(a)(1) of the Bankruptcy Code.

1.30.   "Clerk" means the Clerk of the Bankruptcy Court.

1.31.   "CMS" shall have the meaning set forth in Section 7.1 hereof.

1.32.   "Collateral" means any property or interest in property of the Estate of an applicable Debtor subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other, encumbrance is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code.

1.33.   "Collective Bargaining Agreement(s)" means, individually or collectively, the collective bargaining agreements between each applicable Debtor and the Union, effective from December 31, 2004 through March 16, 2011, covering the unionized employees at each of the Facilities.

1.34.   "Commencement Date" means February 24, 2013.

1.35.   "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on its Docket.

51689/0001-9766400v4

1.36.    "Confirmation Hearing" means the duly noticed hearing to be held in accordance
with section 1128(a) of the Bankruptcy Code at which confirmation of this Plan is considered by
the Bankruptcy Court, as such hearing may be adjourned or continued from time to time.

1.37.    "Confirmation Objection Deadline" means the date to be set by the Bankruptcy
Court by which all objections to confirmation of the Plan must be filed and served upon parties
in interest.

1.38.    "Confirmation Order" means the Order of the Bankruptcy Court confirming this
Plan pursuant to section 1129 of the Bankruptcy Code.

1.39.    "Compensation and Benefit Plans" shall have the meaning set forth in Section 7.5
hereof.

1.40.    "Creditor" means any Person that is the Holder of a Claim against any of the
Debtors.

1.41.    "Creditors' Committee" means the statutory committee of unsecured creditors
appointed in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

1.42.    "Cure" means with respect to the assumption of an Executory Contract (which
includes an unexpired lease) pursuant to section 365(b) of the Bankruptcy Code, (i) the
distribution of Cash, or the distribution of such other property as may be agreed upon by the
parties or ordered by the Bankruptcy Court, in an amount equal to all unpaid monetary
obligations, without interest, or such other amount as may be agreed upon by the parties under an
Executory Contract (which includes an unexpired lease), to the extent such obligations are
enforceable under the Bankruptcy Code and applicable bankruptcy law or (ii) the taking of such
other actions as may be agreed upon by the parties or ordered by the Bankruptcy Court.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

1.43.    "Danbury" means 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center.

1.44.    "Debtors" has the meaning set forth in the Introduction to the Plan.

1.45.    "Debtors-in-Possession" means the Debtors, each in their capacity as a debtor-in-possession in the Chapter 11 Case pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.46.    "DIP Financing Order" means the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364, Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure, and Local Rule 4001-4: (1) Authorizing Debtors to Obtain Postpetition Financing on Superpriority and Secured Basis; and (2) Authorizing the Continued Use of the Pre-Petition Lenders' Cash Collateral*, entered by the Bankruptcy Court on April 11, 2013 [Docket No. 234].

1.47.    "DIP Lender" means Capital One, N.A., the lender under the DIP Loan.

1.48.    "DIP Loan" means the loan to the Debtors memorialized by that certain Debtor In Possession Credit Agreement by and between the Debtors, as borrower, and Capital One, N.A., as lender, dated as of April 26, 2013, as amended, restated, supplemented or otherwise modified from time to time, and all documents executed in connection therewith, by the Debtors, as borrower, in favor of the DIP Lender, as lender, and as approved by the DIP Financing Order.

1.49.    "DIP Loan Claim" means the Claim of the DIP Lender arising under or pursuant to the DIP Loan, including, without limitation, the Claim for the payment of principal and interest on the DIP Loan, plus all reasonable fees and expenses arising under the DIP Loan.

1.50.    "Disbursing Agent" means the Reorganized Debtors or any party designated by the Reorganized Debtors, in their sole discretion, to serve as the disbursing agent under the Plan.

11

*Approved by Judge Donald H. Steckroth March  06, 2014*

1.51.   "Disclosure Statement" means the Debtors' First Amended Disclosure Statement

pursuant to section 1125 of the Bankruptcy Code relating to this Plan including, without

limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to

section 1125 of the Bankruptcy Code.

1.52.   "Disputed" means, (i) any Claim or Equity Interest proof of which was timely and

properly filed and that has been or hereafter is listed on the Schedules as unliquidated, disputed

or contingent, (ii) any Claim or Equity Interest which is disputed under this Plan or as to which

the Debtors or, if not prohibited by this Plan, any other party in interest has interposed a timely

objection and/or request for estimation in accordance with section 502(c) of the Bankruptcy

Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been

withdrawn or determined by a Final Order, and (iii) any Claim or Equity Interest proof of which

was required to be filed by Order of the Bankruptcy Court but as to which a proof of claim or

interest was not timely or properly filed.

1.53.   "Disputed Claim" means that portion (including, when appropriate, the whole) of

a Claim to which an objection has been filed by the applicable deadline for bringing such

objection and which objection has not been resolved in accordance with the procedures set forth

in this Plan.

1.54.   "Disputed Claim Amount" means the amount set forth in the proof of Claim

relating to a Disputed Claim or, if an amount is estimated with respect to a Disputed Claim in

accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, the amount

so estimated pursuant to an Order of the Bankruptcy Court.

1.55.   "Distribution" means any distribution to the holders of Allowed Claims and

holders of Allowed Equity Interests as of the Distribution Date.

12

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

1.56.   "<u>Distribution Date</u>" means the Effective Date and any subsequent date upon which a Distribution is made by the Disbursing Agent in accordance with the Plan to Holders of Allowed Claims and Allowed Equity Interests entitled to receive Distributions under the Plan.

1.57.   "<u>Distribution Record Date</u>" means the record date for determining entitlement to receive Distributions under the Plan on account of Allowed Claims and Allowed Equity Interests, which date shall be the third (3rd) Business Day after the Confirmation Date at 5:00 p.m. prevailing Eastern time.

1.58.   "<u>Docket</u>" means the docket in the Chapter 11 Case maintained by the Clerk.

1.59.   "<u>Effective Date</u>" means the date that is (i) at least one (1) day after the Confirmation Order becomes a Final Order, and (ii) all conditions to the Effective Date as set forth in Section 10.2 of this Plan have been satisfied or, if waivable, waived.

1.60.   "<u>Entity</u>" means an entity as defined in section 101(15) of the Bankruptcy Code.

1.61.   "<u>Equity Interests</u>" or "<u>Interests</u>" means all equity or ownership interests in an applicable Debtor including, but not limited to, all issued, unissued, authorized or outstanding membership interests together with any warrants, options or contract rights to purchase or acquire such interests at any time.

1.62.   "<u>Estate</u>" means an estate, as applicable, created upon the commencement of the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

1.63.   "<u>Executory Contract</u>" means any executory contract or unexpired lease as of the Commencement Date, subject to section 365 of the Bankruptcy Code, between a Debtor and any other Person or Persons, specifically excluding contracts and agreements entered into pursuant to this Plan or subject to section 1113 of the Bankruptcy Code.

1.64.   "<u>Exit Lender</u>" shall mean Capital One, N.A.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

1.65.   "Facility" and collectively, the "Facilities" means, individually or collectively, the applicable sub-acute and long-term nursing care facility for the elderly in Connecticut operated by the Debtors under the following names: (i) Long Ridge of Stamford, (ii) Newington Health Care Center, (iii) Westport Health Care Center, (iv) West River Health Care Center, and (v) Danbury Health Care Center.

1.66.   "Fee Application" means an application by a Professional for a Professional Compensation and Reimbursement Claim.

1.67.   "First Administrative Expense Claim Bar Date" means October 11, 2013, the last date fixed by the Bankruptcy Court pursuant to the First Administrative Expense Claim Bar Date Order, by which certain Administrative Expense Claims that were incurred or arose during the period from and after the Commencement Date through and including August 31, 2013, were required to have been filed.

1.68.   "First Administrative Expense Claim Bar Date Order" means that *Order (I) Establishing Administrative Claims Bar Date and (II) Approving (A) Proof of Administrative Claims Form, (B) Form and Manner of Serving Notice Thereof, and (C) Procedures for Filing Proof of Administrative Claims*, entered by the Bankruptcy Court on September 12, 2013 [Docket No. 533].

1.69.   "Final Order" means an Order of the Bankruptcy Court or a court of competent jurisdiction to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal, to petition for certiorari, or to move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or, if pending, as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing,

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal

Rules of Civil Procedure, or any analogous rules under the Bankruptcy Rules or applicable state

court rules of civil procedure, may be filed with respect to such Order shall not cause such Order

to not be a Final Order.

     1.70.   "General Bar Dates" means July 2, 2013 and August 23, 2013, the dates fixed by

the Bankruptcy Court for Creditors and Governmental Units, respectively, to file proofs of Claim

in the Chapter 11 Case.

     1.71.   "Governmental Unit" shall have the meaning set forth in section 101(27) of the

Bankruptcy Code.

     1.72.   "Holder" means the beneficial Holder of any Claim or Equity Interest.

     1.71.   "HUD" means the United States Department of Housing and Urban Development

Federal Housing Administration.

     1.72.   "HUD Lender" means, collectively, HUD and Housing & Healthcare Finance,

LLC, as beneficiary of Heartland Bank, a federal savings bank, as mortgagee and servicer of

loans insured by HUD.

     1.73.   "HUD Borrowers" means Newington, West River and the following non-Debtor

entities: (i) 240 Church Street, LLC and (ii) 245 Orange Avenue, LLC.

     1.74.   "HUD Claim" means the Claim of the HUD Lender in respect of the HUD Loan,

and shall include any Adequate Protection Claims.

     1.75.   "HUD Loan" means the loan from the HUD Lender to the HUD Borrowers on or

about June 1, 2010.

     1.76.   "Impaired" means when used in reference to a Claim or Equity Interest, a Claim

or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

1.77.   "Indemnification Obligations" shall have the meaning set forth in Section 7.4 hereof.

1.78.   "Insurance Policies" shall have the meaning set forth in Section 7.3 hereof.

1.79.   "Intercompany Claim" means, collectively, any Claim held by a Debtor against another Debtor or an Affiliate of a Debtor or any Claim held by an Affiliate of a Debtor against a Debtor.

1.80.   "Lease Agreements" means, individually and collectively, the unexpired non-residential real property leases with the Affiliated Landlords for the Facilities.

1.81.   "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

1.82.   "Litigation Rights" means the Causes of Action that any of the Debtors or their respective Estates may hold against any Person or Entity (except to the extent expressly released under the Plan).

1.83.   "Long Ridge" means 710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford.

1.84.   "M&T" means M&T Bank.

1.85.   "M&T Borrowers" means Danbury and the following non-Debtor entities: (i) 19301 Watkins Mill Road Operating Company, LLC d/b/a Montgomery Village Health Care Center; (ii) 1621 Route 22 West, LLC; (iii) 1621 Route 22 West Operating Company, LLC d/b/a Somerset Valley Rehabilitation & Nursing Center; (iv) 204 W. Main Street, LLC; and (v) 204 W. Main Street Operating Company, LLC d/b/a The Rehabilitation and Nursing Center at Firelands.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

1.86.   "M&T Claim" means the Claim of M&T Bank in respect of the M&T Loan, and shall include any Adequate Protection Claims.

1.87.   "M&T Loan" means the loan from M&T to the M&T Borrowers in the principal amount of $20,000,000.

1.88.   "M&T Note" means that certain Term Note dated September 15, 2010 in the principal amount of $20,000,000 issued by M&T Borrowers and payable to the order of Manufacturers and Traders Trust Company, as Lender.

1.89.   "M&T Security Agreement" means that certain Loan and Security Agreement dated as of September 15, 2010, by and between Manufacturers and Traders Trust Company, as Lender, and the M&T Borrowers.

1.90.   "Management Agreements" means, individually and collectively, the management agreement between each applicable Debtor and the Management Company.

1.91.   "Management Company" means HealthBridge Management, LLC.

1.92.   "New Credit Agreement" means that certain secured credit agreement between Reorganized Debtors, as borrower and the Exit Lender, in an aggregate principal amount of no less than the DIP Loan Amount, and with terms no less favorable in the aggregate to the Reorganized Debtors than those in the New Credit Agreement Term Sheet.   The New Credit Agreement may be effectuated by an amendment to, amendment and restatement of, or refinancing of, the DIP Loan and in the event the DIP Loan is assumed by the Reorganized Debtors, the New Credit Agreement may incorporate and govern the terms of the assumed DIP Loan on terms no less favorable in the aggregate for the Reorganized Debtors than those set forth in the New Credit Agreement Term Sheet.

51689/0001-9766400v4

1.93.    "New Credit Agreement Term Sheet" means the term sheet letter agreement, dated November 13, 2013, between the Debtors, as Borrower, and Capital One, N.A., a copy of which is attached as Exhibit "A" to the *Application in Support of Debtors' Motion for Order Authorizing Them to (I) Enter Into Letter Agreement in Connection with Anticipated Exit Financing and (II) Incur and Pay Related Fees and Expenses as Administrative Expenses* [Docket No. 609].

1.94.    "Newington" means 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center.

1.95.    "NLRA" means the National Labor Relations Act.

1.96.    "NLRB" means the National Labor Relations Board.

1.97.    "Non-Ongoing Trade Vendor" means any third party vendor that supplies goods, materials and/or renders services to any of the Debtors and which party holds an Unsecured Claim but either (i) is not conducting, or willing to continue to conduct, business with one or more of the Debtors as of the Voting Deadline or (ii) elects not to be an Ongoing Trade Vendor.

1.98.    "Ongoing Trade Vendor Terms" means those trade terms, practices, and programs, as described on Appendix E to the Disclosure Statement.

1.99.    "Ongoing Trade Vendor" means any third party vendor that supplies goods, materials and/or renders services to any of the Debtors and which party (i) holds an Unsecured Claim, (ii) the Debtors are conducting, and will continue to conduct, business as of the Voting Deadline; and (iii) agrees to provide from and after the Effective Date for a period of no less than one year Ongoing Trade Vendor Terms to each Debtor with which it transacted business with prior to the Commencement Date.

18

*Approved by Judge Donald H. Steckroth March  06, 2014*

1.100.  "Order" means an order or judgment of the Bankruptcy Court as entered on the

Docket.

1.101.  "Ordinary Course Professional" means any Professional retained by the Debtors

during the Chapter 11 Case pursuant to the *Final Order Authorizing the Debtors' Retention and*

*Compensation of Professionals Utilized by the Debtors in Ordinary Course of Business* entered

by the Bankruptcy Court on March 13, 2013 [Docket No. 109].

1.102.  "Other Priority Claim" means any Claim entitled to priority in right of payment

under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim, DIP

Loan Claim, Adequate Protection Claim, Professional Compensation and Reimbursement Claim,

Backpay Claim or Priority Tax Claim.

1.103.  "Other General Unsecured Claim" means any Unsecured Claim (other than

Ongoing Trade Vendor Claims), against one or more of the Debtors including, but not limited to

(i) Claims arising from the rejection of Executory Contracts (which includes any unexpired

lease) to which a Debtor is a party pursuant to this Plan or otherwise, (ii) Backpay Claims or

claims, if any, arising from the rejection or termination of the Collective Bargaining Agreements,

(iii) Claims of any Non-Ongoing Trade Vendor and (iv) Claims arising from any litigation or

other court, administrative or regulatory proceeding, including, without limitation, damages or

judgments entered against, or settlement amounts owing by a Debtor related thereto.

1.104.  "Other Secured Claim" means any Secured Claim arising prior to the

Commencement Date against one or more of the Debtors, as applicable, other than a M&T Claim

and HUD Claim, and not otherwise satisfied by an Order authorizing payment of such Other

Secured Claim before the Effective Date.

1.105.  "Parent Companies" means, collectively, THCI Company and THCI Mortgage.

19

*Approved by Judge Donald H. Steckroth March  06, 2014*

1.106.  "Patient Care Ombudsman" means Kevin P. Lombardo.

1.107.  "Person" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

1.108.  "Plan" means this First Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code, including, without limitation, the Plan Supplement and all exhibits, supplements, appendices and schedules hereto whenever filed, either in their present form or as the same may be altered, amended or modified from time to time whenever filed

1.109.  "Plan Distribution Contribution Amount" means the sum of Cash in the amount of $500,000 to be advanced by one or more members of the Plan Sponsor Group to the Debtors on the Effective Date to be utilized for distributions under and in accordance with the Plan to Holders of Allowed Other General Unsecured Claims.

1.110.  "Plan Documents" mean the agreements, documents and instruments entered into on or as of the Effective Date as contemplated by, and in furtherance of, the Plan.

1.111.  "Plan Sponsor Group" means, collectively, the Parent Companies, the Management Company, the Backstop Funder and the Affiliated Landlords.

1.112.  "Plan Supplement" means the forms of documents specified in Section 11.13 of this Plan and that the Debtors shall file with the Bankruptcy Court on or before a date that is five (5) days prior to the Voting Deadline and as such documents may be modified thereafter whenever filed.

1.113.  "Postpetition Administrative Trade Claims" means all liabilities of a Debtor, as applicable, for post-Commencement Date ordinary course obligations and trade payables of such Debtor's business as of the Effective Date (excluding any expenses incurred with respect to the administration of the Chapter 11 Case such as Professional Compensation and Reimbursement

20

*Approved by Judge Donald H. Steckroth March  06, 2014*

Claims) which would qualify as Allowed Administrative Expense Claims under section 503(b) of the Bankruptcy Code.

1.114. "Postpetition Interest" means interest accruing on and after the Commencement Date on a Claim.

1.115. "Prepetition" shall mean prior to the Commencement Date.

1.116. "Priority Tax Claim" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.117. "Professional" means a Person or Entity employed pursuant to a Final Order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Confirmation Date, pursuant to sections 327, 328, 329, 330 and/or 331 of the Bankruptcy Code, or for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code and shall include the Patient Care Ombudsman and any Person or Entity employed pursuant to a Final Order by the Patient Care Ombudsman.

1.118. "Professional Compensation and Reimbursement Claim" means a Claim of a Professional for compensation or reimbursement of costs and expenses relating to services incurred after the Commencement Date and prior to and including the Effective Date, but shall exclude a Claim of a Professional that is an Ordinary Course Professional.

1.119. "Proof of Claim" means any proof of claim filed with the Bankruptcy Court in connection with the Chapter 11 Case pursuant to section 501 of the Bankruptcy Code.

1.120. "Pro Rata, Ratable or Ratable Share" each mean a number (expressed as a percentage) equal to the proportion that an Allowed Claim in a particular Class bears to the

51689/0001-9766400v4

aggregate amount of or number of: (i) Allowed Claims plus (ii) Disputed Claims (in their

aggregate face or, if applicable, estimated amount) in such Class as of the date of determination.

1.121.  "Quarter" means the period beginning on the Effective Date and ending on the

next of December 31, March 31, June 30 and September 30, and each three month period

thereafter.

1.122.  "Reinstated" means (i) leaving unaltered the legal, equitable, and contractual

rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired

or (ii) notwithstanding any contractual provision or applicable law that entitles the Holder of a

Claim to demand or receive accelerated payment of such Claim after the occurrence of a default:

(a) curing any such default that occurred before or after the Commencement Date, other than a

default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section

365(b)(2) expressly does not require to be cured; (b) reinstating the maturity (to the extent such

maturity has not otherwise accrued by the passage of time) of such Claim as such maturity

existed before such default; (c) compensating the Holder of such Claim for any damages incurred

as a result of any reasonable reliance by such Holder on such contractual provision or such

applicable law; (d) if such Claim arises from a failure to perform a nonmonetary obligation other

than a default arising from failure to operate a nonresidential real property lease subject to

section 365(b)(l)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than

the Debtors or an insider of the Debtors) for any actual pecuniary loss incurred by such Holder as

a result of such failure; and (e) not otherwise altering the legal, equitable, or contractual rights to

which such Claim entitles the Holder.

1.123.  "Releasees" shall have the meaning set forth in Section 9.2 hereof.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

1.124.  "Reorganized Debtors" means 710 Long Ridge Road Operating Company II, LLC

d/b/a Long Ridge of Stamford, 240 Church Street Operating Company II, LLC d/b/a Newington

Health Care Center, 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care

Center, 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center

and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center, as

applicable, on and after the Effective Date.

1.125.  "RICO Action" means that Cause of Action commenced by, among others, the

Debtors, against the Union, among others, in the United States District Court for the District of

New Jersey, and bearing Case No. 12-cv-06371.

1.126.  "Schedules" means the schedules of assets and liabilities, the list of Holders of

Equity Interests and the statements of financial affairs and such other documents filed by each of

the Debtors under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all

amendments pursuant to Bankruptcy Rule 1009 and modifications thereto through the

Confirmation Date.

1.127.  "Section 503(b)(9) Administrative Claim" means a Claim against any of the

Debtors alleged to be entitled to an administrative expense priority under 11 U.S.C. § 503(b)(9)

for goods sold to a Debtor in the ordinary course of such Debtor's business and received by such

Debtor within twenty (20) days before the Commencement Date.

1.128.  "Section 503(b)(9) Administrative Claim Bar Date" means October 11, 2013, the

last date fixed by the Bankruptcy Court pursuant to the Section 503(b)(9) Administrative Claim

Bar Date Order, by which all Section 503(b)(9) Administrative Claims were required to have

been filed.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

1.129.  "Section 503(b)(9) Administrative Claim Bar Date Order" means the *Order Establishing Procedures Related to Claims Asserted Pursuant to 11 U.S.C. § 503(b)(9)*, entered by the Bankruptcy Court on September 12, 2013 [Docket No. 532].

1.130.  "Secured Claim" means a Claim that is secured by a Lien on property in which an Estate has an interest, which Lien is valid, perfected and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; provided, however, that a Secured Claim shall not include any portion of the Claim to the extent that the value of such entity's Collateral is less than the amount of such Claim.

1.131.  "Solicitation Procedures Order" means the *Order: (A) Approving the Disclosure Statement Pursuant to 11 U.S.C. § 1125(b); (B) Fixing a Record Date for Voting and Procedures for Filing Objections to the Plan and Temporary Allowance or Disallowance of Claims for Voting Purposes; (C) Scheduling a Hearing and Approving Notice and Objection Procedures in Respect of Plan Confirmation; (D) Approving Solicitation Packages and Procedures for Distribution Thereof; and (E) Approving the Form of Ballot and Establishment of Procedures for Voting on the Plan*, entered by the Bankruptcy Court on December [__], 2013 [Docket No. ___].

1.132.  "Statutory Fees" shall mean those fees or charges assessed against the Estate of a Debtor, as applicable, under section 1930 of chapter 123 of title 28 of the United States Code.

1.133.  "THCI Company" means THCI Company LLC, the 100% owner and sole member of each of Long Ridge, Newington, Westport and West River.

51689/0001-9766400v4

1.134.  "THCI Mortgage" means THCI Mortgage Holding Company, LLC, the 100% owner and sole member of Danbury.

1.135.  "Unimpaired" means, with reference to a Claim or Equity Interest, a Claim or Equity Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.136.  "Union" means collectively, New England Health Care Employees Union, District 1199, SEIU, New England Health Care Employees Pension Fund and New England Health Care Employees Training Fund.

1.137.  "Unsecured Claim" means any Claim against a Debtor that arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Commencement Date that is neither a Secured Claim nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

1.138.  "Voting Deadline" means January 16, 2014, the date fixed by the Bankruptcy Court pursuant to the Solicitation Procedures Order.

1.139.  "Voting Record Date" means December [___], 2013, the date established by the Bankruptcy Court as the date for determining those Holders of Claims against, and Equity Interests in, any of the Debtors entitled to vote on the Plan.

1.140.  "Westport" means 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center.

1.141.  "West River" means 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

## ARTICLE II

## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

2.1.    Overview.  This section classifies Claims and Equity Interests – except for

Administrative Expense Claims, Priority Tax Claims, Professional Compensation and

Reimbursement Claims and the DIP Loan Claim, which are not classified – for all purposes,

including voting, confirmation and Distribution under this Plan.  This section also provides

whether each Class of Claims or Equity Interests is Impaired or Unimpaired, and provides the

treatment each Class will receive under this Plan.  References in this Plan to the amount of

Claims are based on information reflected in the applicable Debtor's Schedules or in filed Proofs

of Claim, and are not intended to be admissions regarding the Allowed amount of the Claims or

waivers of the Debtors or their successors' rights to assert any otherwise available objection,

defense, recoupment, setoff, claim, or counterclaim against any Claim.  The following table

summarizes the Classes of Claims and Equity Interests under this Plan:

| CLASS | IMPAIRED/UNIMPAIRED | VOTING STATUS |
|---|---|---|
| Class 1- Other Priority Claims | Unimpaired | Conclusively presumed to have accepted the Plan, and therefore, not entitled to vote |
| Class 2 – HUD Claim | Impaired | Entitled to vote |
| Class 3 – M&T Claim | Impaired | Entitled to vote |
| Class 4 – Other Secured Claims | Unimpaired | Conclusively presumed to have accepted the Plan, and therefore, not entitled to vote |
| Class 5 – Ongoing Trade Vendor Claims | Impaired | Entitled to vote |
| Class 6 – Other General Unsecured Claims | Impaired | Entitled to vote |
| Class 7 – Intercompany Claims | Impaired | Conclusively presumed to have rejected the Plan, |

26

*Approved by Judge Donald H. Steckroth March  06, 2014*

| CLASS | IMPAIRED/UNIMPAIRED | VOTING STATUS |
|---|---|---|
|  |  | and therefore, not entitled to vote |
| Class 8 – Equity Interests | Unimpaired | Conclusively presumed to have accepted the Plan, and therefore, not entitled to vote |

2.2.    <u>Unclassified Claims</u>.  Certain types of Claims are not placed into voting classes;

instead, they are unclassified.  Such Claims are not considered Impaired, and Holders of such

Claims do not vote on this Plan because their Claims are automatically entitled to specific

treatment provided under the Bankruptcy Code.  As such, the Debtors have not placed such

Claims in a Class.  The treatment of these Claims is provided below:

A.    <u>Administrative Expense Claims</u>.

(i)    Subject to the allowance procedures and the deadlines

provided herein, and except to the extent that any entity entitled to payment of any Allowed

Administrative Expense Claim agrees to a different treatment, except as provided herein,

Allowed Administrative Expense Claims shall be paid in Cash in full by the Reorganized

Debtors on the Effective Date or as soon thereafter as is practicable, but not later than the later

of: (a) twenty (20) days after the Effective Date; or (b) thirty (30) days from the date of entry of a

Final Order determining and Allowing such Claim as an Administrative Expense Claim.

(ii)    Allowed Administrative Expense Claims representing

Postpetition Administrative Trade Claims shall be paid in full and/or performed by the applicable

Reorganized Debtor in the ordinary course of business in accordance with the terms and subject

to the conditions of any agreements or Bankruptcy Court Orders governing instruments

evidencing or other documents relating to, such transactions.

27

*Approved by Judge Donald H. Steckroth March  06, 2014*

(iii)    Notwithstanding anything herein to the contrary, all fees due and payable to the Clerk's Office pursuant to section 1930 of title 28 of the United States Code, including, without limitation, any United States Trustee quarterly fees incurred pursuant to section 1930(a)(6) of title 28 of the United States Code shall be paid on the Effective Date.

B.    Professional Compensation and Reimbursement Claims.  Any Person, including any Professional holding a Professional Compensation and Reimbursement Claim, seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code: (i) shall file respective final Fee Applications for services rendered and reimbursement of expenses incurred through the Effective Date no later than sixty (60) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and, (ii) if granted such an award by the Bankruptcy Court, shall be paid by the applicable Reorganized Debtor in full in such amounts as are Allowed by the Bankruptcy Court (a) seven (7) days after such Professional Compensation and Reimbursement Claim becomes an Allowed Professional Compensation and Reimbursement Claim, or as soon thereafter as is practicable, or (b) upon such other terms as may be mutually agreed upon between such Holder of an Allowed Professional Compensation and Reimbursement Claim and the Reorganized Debtors, on and after the Effective Date.  Failure to file a final Fee Application timely shall result in the Professional Compensation and Reimbursement Claim being forever barred and discharged.  Objections to such applications must be filed and served on the Reorganized Debtors, their counsel, counsel to the Creditors' Committee and the requesting Professional or other entity on or before the date that is thirty (30) days (or such longer period as

*Approved by Judge Donald H. Steckroth March  06, 2014*

may be allowed by order of the Bankruptcy Court) after the date on which the applicable

application was served.

Notwithstanding anything herein to the contrary, and except as otherwise provided by

prior Order of the Bankruptcy Court:  (i) payment of a Professional Compensation and

Reimbursement Claim that is an Allowed Claim as of the Confirmation Date shall be made on

the Effective Date; and (ii) payment of a Professional Compensation and Reimbursement Claim

that becomes an Allowed Claim following the Effective Date shall be made on or before the date

that is the earlier of (a) the date such Professional Compensation and Reimbursement Claim is

required to be paid in accordance with any applicable administrative order governing the

payment of fees and expenses of Professionals or (b) seven (7) days after an Order deeming such

Professional Compensation and Reimbursement Claim an Allowed Claim is entered by the

Bankruptcy Court.

A Professional that is an Ordinary Course Professional or a Professional that has been

excused pursuant to a prior Order of the Bankruptcy Court from any obligation to file a Fee

Application shall not be required to file a final Fee Application in accordance with the provisions

of this Section 2.2.B.

C.    Priority Tax Claims.  Each holder of an Allowed Priority Tax Claim shall

receive in full satisfaction of such Allowed Priority Tax Claim (i) payment in Cash equal to the

unpaid portion of such Allowed Priority Tax Claim on the Effective Date, (ii) over a period

through the fifth anniversary of the Commencement Date, deferred cash payments in an

aggregate amount equal to such Allowed Priority Tax Claim, plus interest on such aggregate

amount over such period or (iii) such other treatment as to which the applicable Debtor or the

applicable Reorganized Debtor, as the case may be, and such Holder shall have agreed upon in

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

writing; provided, however, that any Claim or demand for payment of a penalty (other than a

penalty of the type specified in section 507(a)(8)(G) of the Bankruptcy Code) shall be disallowed

pursuant to this Plan and the Holder of an Allowed Priority Tax Claim shall not assess or attempt

to collect such penalty from such applicable Debtor, Estate or such applicable Reorganized

Debtor.

        D.      <u>DIP Loan Claim</u>.  On the Effective Date, any and all DIP Loan Claims

shall be (i) paid in full in Cash, (ii) assumed by the applicable Reorganized Debtors on terms and

conditions acceptable to the DIP Lender, which terms and conditions may be evidenced by the

New Credit Agreement or in some other manner acceptable to the DIP Lender with terms no less

favorable in the aggregate for the Debtors and/or Reorganized Debtors than those in the New

Credit Agreement, or (iii) satisfied in such other manner with terms no less favorable in the

aggregate for the Debtors and/or Reorganized Debtors than those in the New Credit Agreement

as the applicable Debtors or Reorganized Debtors and the DIP Lender shall have agreed in

writing.  On the full payment or other satisfaction of such DIP Loan Claims, unless the DIP

Lender's Liens have been continued as part of the treatment of such Claims pursuant to clause

(ii) or (iii) above and the Confirmation Order, the DIP Lender's Liens shall be deemed released,

terminated and extinguished, in each case without further notice to or order of the Bankruptcy

Court, act or action under applicable law, regulation, order, or rule or the vote, consent,

authorization or approval of any Person; provided, however, that the DIP Lender shall take all

actions to effectuate and confirm such termination, release and discharge as reasonably requested

by the Debtors or the Reorganized Debtors.

51689/0001-9766400v4

2.3.    <u>Classified Claims and Equity Interests</u>

A.      <u>General</u>.  Except for the Administrative Expense Claims, Professional

Compensation and Reimbursement Claims, Priority Tax Claims and the DIP Loan Claim

discussed above, all Claims against, and Equity Interests in, the Debtors and with respect to all

property of the Debtors and their Estates, are defined and hereinafter designated in respective

Classes.  A Claim or Equity Interest is classified in a particular Class only to the extent that the

Claim or Equity Interest qualifies within the description of that Class, and is classified in another

Class or Classes, to the extent that any remainder of the Claim or Equity Interest qualifies within

the description of such other Class or Classes.  A Claim or Equity Interest is classified in a

particular Class only to the extent that the Claim or Equity Interest is an Allowed Claim[3] or

Allowed Equity Interest in that Class and has not been paid, released or otherwise satisfied or

waived before the Effective Date.  Notwithstanding anything to the contrary contained in this

Plan, no Distribution shall be made on account of any Claim that is not an Allowed Claim.

This Plan is intended to deal with all Claims against, and Equity Interests in, the Debtors

of whatever character, whether known or unknown, whether or not with recourse, whether or not

contingent or unliquidated, and whether or not previously Allowed by the Bankruptcy Court

pursuant to section 502 of the Bankruptcy Code.  However, only Holders of Allowed Claims and

Allowed Equity Interests will receive any distribution under this Plan.  For purposes of

determining Pro Rata distributions under this Plan and in accordance with this Plan, Disputed

Claims shall be included in the Class in which such Claims would be included if Allowed, until

such Claims are finally disallowed.

_____

[3] For purposes of this Plan, any general reference to "Allowed Claim" shall include Allowed
Administrative Expense Claims.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March 06, 2014*

B.        Treatment of Classified Claims and Equity Interests

C.        Class 1:  Other Priority ClaimsClassification.  Class 1 consists of Allowed

Other Priority Claims against a Debtor, as applicable.

(b)        Treatment.  On or as soon as reasonably practicable after the later

of (1) the Effective Date or (2) the Distribution Date immediately following the date on

which an Other Priority Claim becomes an Allowed Priority Claim, the Holder of an

Allowed Other Priority Claim shall receive (i) Cash equal to the amount of such Allowed

Other Priority Claim, without interest or (ii) such other treatment as to which such

applicable Debtor or Reorganized Debtor, as the case may be, and such Holder shall have

agreed upon in writing.

(c)        Impairment and Voting.  Class 1 Other Priority Claims are

Unimpaired under the Plan.  Therefore, Holders of Class 1 Other Priority Claims are not

entitled to vote to accept or reject the Plan and are conclusively deemed to have accepted

the Plan pursuant to section 1126(f) of the Bankruptcy Code.

D.        Class 2: HUD Claim

(a)        Classification.  Class 2 consists of the HUD Claim against

Newington and West River, collectively, which shall be Allowed in the amounts of no less than

(i) $7,897,702.43 with respect to Newington and (ii) $6,190,135.06 with respect to West River,

each as of October 18, 2013, less any payments that have been or will be made prior to the

Effective Date on account of the HUD Claim and such applicable escrows held by the HUD

Lender.

(b)        Treatment.  Unless the applicable Debtor or the applicable

Reorganized Debtor, as the case may be, and the HUD Lender shall have agreed to other

32

*Approved by Judge Donald H. Steckroth March  06, 2014*

treatment in writing, subject to the Debtors or the Reorganized Debtors entering into the New

Credit Agreement, the HUD Lender shall have its Claim Reinstated on the Effective Date,

subject to the terms of the Exit Financing (through the New Credit Agreement) and any

applicable intercreditor agreement with the Exit Lender, which shall, among other things,

subordinate the HUD Lender's Liens on Newington and West River to those to be held by the

Exit Lender.  Prepetition Liens with respect to such HUD Lender Claims shall survive the

Effective Date, and shall continue in accordance with contractual or statutory terms until such

HUD Claim has been paid in full; provided, however, that, if applicable, such Liens shall be

subject to the terms of the New Credit Agreement.

      To the extent the Debtors or Reorganized Debtors enter into the

New Credit Agreement, the HUD Lender shall retain all Liens, rights, priorities, security

interests and other encumbrances and rights granted to the HUD Lender under the DIP Order,

and the same shall remain in full force and effect despite the confirmation of the Plan and entry

of the Confirmation Order.

      (c)    <u>Impairment and Voting</u>.  Class 2 is Impaired under the Plan.

Therefore, the Holders of the Class 2 HUD Claim are entitled to vote to accept or reject the Plan.

      E.    <u>Class 3: M&T Claim</u>

      (a)    <u>Classification</u>.  Class 3 consists of the M&T Claim against

Danbury which shall be Allowed in the amount of no less than $16,652,900 as of October 31,

2013, less any payments that have been or will be made prior to the Effective Date on account of

the M&T Claim and such applicable escrows held by M&T.

      (b)    <u>Treatment</u>.  Unless the applicable Debtor or the applicable

Reorganized Debtor, as the case may be, and M&T shall have agreed to other treatment in

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

writing, subject to the Debtors or the Reorganized Debtors entering into the New Credit

Agreement, M&T shall have its Claim Reinstated on the Effective Date, subject to the terms of

the Exit Financing (through the New Credit Agreement) and any applicable intercreditor

agreement with the Exit Lender, which shall, among other things, subordinate M&T's Liens on

Danbury to those to be held by the Exit Lender.  Prepetition Liens with respect to such M&T

Claims shall survive the Effective Date, and shall continue in accordance with contractual or

statutory terms until such M&T Claim has been paid in full; provided, however, that, if

applicable, such Liens shall be subject to the terms of the New Credit Agreement.

To the extent the Debtors or Reorganized Debtors enter into the

New Credit Agreement, M&T shall retain all Liens, rights, priorities, security interests and other

encumbrances and rights granted to M&T under the DIP Order, and the same shall remain in full

force and effect despite the confirmation of the Plan and entry of the Confirmation Order.

(c)      Impairment and Voting.  Class 3 is Impaired under the Plan.

Therefore, M&T is entitled to vote to accept or reject the Plan.

F.      Class 4:  Other Secured Claims

(a)      Classification.  Class 4 consists of all Other Secured Claims

against a Debtor, as applicable.

(b)      Treatment.  Except to the extent that a Holder of an

Allowed Other Secured Claim agrees to less favorable treatment for such Holder, in exchange

for full and final satisfaction, settlement, release and discharge of each Other Secured Claim,

Holders of Allowed Other Secured Claims shall receive one of the following treatments, in the

sole discretion of the applicable Debtor, in full and final satisfaction of such Allowed Other

Secured Claims:  (i) the Debtors or the Reorganized Debtors shall pay such Allowed Other

34

*Approved by Judge Donald H. Steckroth March  06, 2014*

Secured Claims in full in Cash including the payment of any interest required to be paid under

section 506(b) of the Bankruptcy Code; (ii) the Debtors or the Reorganized Debtors shall deliver

the Collateral securing any such Allowed Other Secured Claim; or (iii) the Debtors or the

Reorganized Debtors shall otherwise treat any Allowed Other Secured Claim in any other

manner such that the Claim shall be rendered Unimpaired, including having its Claim Reinstated.

      (c)    <u>Impairment and Voting</u>.  Class 4 is Unimpaired by the Plan.

Therefore, the Holders of the Class 4 Other Secured Claims are conclusively presumed to have

accepted the Plan and, therefore, not entitled to vote to accept or reject the Plan.

      G.    <u>Class 5: Allowed Ongoing Trade Vendor Claims</u>[4]

      (a)    <u>Classification</u>.  Class 5 consists of all Allowed Ongoing

Trade Vendor Claims against a Debtor, as applicable, segregated into Subclass 5A through

Subclass 5E.  To qualify for treatment in Class 5, Holders of Claims must supply goods,

materials and/or render services (other than as an employee) to one or more of the Debtors and

must meet the following requirements: (i) the Debtors are conducting, and will continue to

conduct, business as of the Voting Deadline with such Holder; and (ii) such Holder agrees, by

election on such Holder's Ballot, to provide Ongoing Trade Vendor Terms to each Debtor with

which it transacted business with prior to the Commencement Date from and after the Effective

Date for a period of no less than one year.  A Holder of Claims that would otherwise qualify for

treatment as an Ongoing Trade Vendor, but elects not to provide Ongoing Trade Vendor Terms,

---

[4] Class 5 shall consist of the following subclasses: (i) Class 5A (Allowed Ongoing Trade Vendor Claims against Long Ridge); (ii) Class 5B (Allowed Ongoing Trade Vendor Claims against Newington); (iii) Class 5C (Allowed Ongoing Trade Vendor Claims against Westport); (iv) Class 5D (Allowed Ongoing Trade Vendor Claims against West River); and (v) Class 5E (Allowed Ongoing Trade Vendor Claims against Danbury).

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

shall be classified as an Other General Unsecured Claim and receive treatment as described under Class 6.

        (b)   <u>Treatment</u>.  Except to the extent that a Holder of an Allowed Ongoing Trade Vendor Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Ongoing Trade Vendor Claim, each Holder of an Allowed Ongoing Trade Vendor Claim will be paid in Cash an amount equal to 75% of such Holder's Allowed Ongoing Trade Vendor Claim (i) in twelve (12) equal monthly installments commencing on the Effective Date or as soon as reasonably practicable thereafter or (ii) in accordance with the terms of any agreement between the Debtors and such Holder with respect to such Allowed Ongoing Trade Vendor Claim.  If a creditor holds a Claim that becomes an Allowed Claim after the date in which these monthly installment payments commence, the Debtors shall pay such creditor a lump sum at the time that the subject Claim becomes Allowed equal to the monthly installments that such creditor would have received if he had been receiving payments as of the commencement date of the installment payments.  The Debtors reserve all rights to challenge the legal basis and amount of any asserted Ongoing Trade Vendor Claim, and each such Holder reserves all rights and defenses with respect to any such challenge.  If a Holder of an Ongoing Trade Vendor Claim fails to provide the Ongoing Trade Vendor Terms, and the Debtors have not defaulted under the Plan or otherwise failed to make the payments to such Holder as described herein, such Holder shall be subject to the disgorgement of its Distribution on account of its Ongoing Trade Vendor Claim and the reclassification of its Allowed Ongoing Trade Vendor Claim to an Other General Unsecured Claim.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

       (c)    <u>Impairment and Voting</u>.  Class 5 is Impaired under the Plan. Therefore, the Holders of Class 5 Ongoing Trade Vendor Claims are entitled to vote to accept or reject the Plan.

      H.    <u>Class 6: Other General Unsecured Claims</u>[5]

       (a)    <u>Classification</u>.  Class 6 consists of Other General Unsecured Claims against a Debtor, as applicable, segregated into Subclass 6A through Subclass 6E.

       (b)    <u>Treatment</u>.  Except to the extent that a Holder of an Allowed Other General Unsecured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other General Unsecured Claim, upon the fixing of all Allowed Other General Unsecured Claims (which in the case of the Backpay Claims shall mean the conclusion of the ALJ Proceedings and any right of appeal thereof), each Holder of an Allowed Other General Unsecured Claim shall receive their Pro Rata share of the Plan Distribution Contribution Amount.

       (c)    <u>Impairment and Voting</u>.  Class 6 is Impaired under the Plan. Therefore, the Holders of Class 6 Other General Unsecured Claims are entitled to vote to accept or reject the Plan.

      I.    <u>Class 7:  Intercompany Claims</u>[6]

---

[5]Class 6 shall consist of the following subclasses: (i) Class 6A (Allowed Other General Unsecured Claims against Long Ridge); (ii) Class 6B (Allowed Other General Unsecured Claims against Newington); (iii) Class 6C (Allowed Other General Unsecured Claims against Westport); (iv) Class 6D (Allowed Other General Unsecured Claims against West River); and (v) Class 6E (Allowed Other General Unsecured Claims against Danbury).

[6] Class 7 shall consist of the following subclasses: (i) Class 7A (Allowed Intercompany Claims in Long Ridge); (ii) Class 7B (Allowed Intercompany Claims in Newington); (iii) Class 7C (Allowed Intercompany Claims in Westport); (iv) Class 7D (Allowed Intercompany Claims in West River); and (v) Class 7E (Allowed Intercompany Claims in Danbury)

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

(a)    <u>Classification</u>:  Class 7 consists of all Intercompany Claims against a Debtor, as applicable, segregated into Subclass 7A through Subclass 7E.

(b)    <u>Treatment</u>.  All Intercompany Claims shall be cancelled and no distribution shall be made on account of such Claims.

(c)    <u>Impairment and Voting</u>.  Class 7 is Impaired under the Plan.  Because the Plan provides that the Holders of Class 7 Claims shall not receive or retain any property under the Plan on account of such claims, Holders of Class 7 Intercompany Claims are not entitled to vote to accept or reject the Plan and are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

J.    <u>Class 8: Equity Interests</u>[7]

(a)    <u>Classification</u>.  Class 8 consists of the Equity Interests in a Debtor, as applicable, held by the Parent Companies, and segregated into Subclass 8A through Subclass 8E.

(b)    <u>Treatment</u>.  In exchange for the forgiveness and cancellation of the Intercompany Claims including Claims that the Affiliated Landlords, the Management Company and/or the Parent Companies had or may have against a Debtor and its applicable Estate, and the commitments undertaken by the Backstop Funder and other members of the Plan Sponsor Group under the Plan, the Holder of the Class 8 Equity Interests shall retain their Equity Interests in the Debtors but will not receive any Distributions on account of such Equity Interests.

---

[7] Class 8 shall consist of the following subclasses: (i) Class 8A (Allowed Equity Interests in Long Ridge); (ii) Class 8B (Allowed Equity Interests in Newington); (iii) Class 8C (Allowed Equity Interests in Westport); (iv) Class 8D (Allowed Equity Interests in West River); and (v) Class 8E (Allowed Equity Interests in Danbury).

38

*Approved by Judge Donald H. Steckroth March  06, 2014*

(c) <u>Impairment and Voting</u>.  Class 8 is Unimpaired under the Plan.
Therefore, the Holders of the Class 8 Equity Interests are conclusively presumed to have
accepted the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

## ARTICLE III

## ACCEPTANCE OR REJECTION OF THIS PLAN

3.1.    <u>Voting Classes</u>.  Holders of Allowed Claims in each Impaired Class are entitled to
vote as a class to accept or reject this Plan.  Each Holder of an Allowed Claim in Classes 2, 3, 5
and 6 are entitled to vote to accept or reject this Plan.

3.2.    <u>Acceptance by Impaired Classes</u>.  An Impaired Class of Claims shall be deemed
to have accepted this Plan if (i) the Holders (other than any Holder designated under section
1126(e) of the Bankruptcy Code) of at least two-thirds (2/3) in amount of the Allowed Claims
actually voting in such Class have voted to accept this Plan and (ii) the Holders (other than any
Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half (1/2) in
number of the Allowed Class voting in such Class have voted to accept this Plan.

3.3.    <u>Non-Consensual Confirmation</u>.  At the Debtors' request, this Plan may be
confirmed under the so-called "cram down" provisions set forth in section 1129(b) of the
Bankruptcy Code if, in addition to satisfying the other requirements for confirmation, this Plan
"does not discriminate unfairly" and is determined to be "fair and equitable" with respect to each
Class of Claims or Equity Interests that has not accepted this Plan (*i.e.*, dissenting Classes).  The
Debtors will request confirmation under section 1129(b) of the Bankruptcy Code for any
Impaired Class that rejects this Plan.  The Debtors reserve the right to alter, amend, modify,
revoke or withdraw this Plan or any amendment or supplement thereto, including to amend or

39

*Approved by Judge Donald H. Steckroth March  06, 2014*

modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary, in accordance with section 1127 of the Bankruptcy Code and this Plan.

3.4.    <u>Postpetition Interest</u>.  In accordance with section 502(b)(2) of the Bankruptcy Code, the amount of all Claims against any of the Debtors shall be calculated as of the Commencement Date.  Except as otherwise explicitly provided herein, in an order of the Bankruptcy Court or in a section of the Bankruptcy Code, no holder of a Claim shall be entitled to or receive Postpetition Interest.

3.5.    <u>Special Provision Regarding Unimpaired Claims</u>.  Except as otherwise provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claim (including Unimpaired Claims that are Allowed pursuant to the Plan), including, without limitation, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims, and the Debtors' failure to object to such Claims in the Chapter 11 Case shall be without prejudice to the Reorganized Debtors' right to contest or defend against such Claims in (i) any appropriate non-bankruptcy forum as if such Chapter 11 Case had not been commenced or (ii) the Bankruptcy Court (such forum to be selected at the Debtors' or the Reorganized Debtors' option).

3.6.    <u>Elimination of Vacant Classes</u>.  Any Class of Claims or Equity Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Equity Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

40

*Approved by Judge Donald H. Steckroth March  06, 2014*

## ARTICLE IV

## MEANS FOR IMPLEMENTATION OF THE PLAN

In addition to the provisions set forth elsewhere in the Plan, the following shall constitute the means for implementation of the Plan:

4.1.    Sources of Cash for Plan Distributions.  Except as otherwise provided in this Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to this Plan may be obtained from existing Cash balances (which as of the Effective Date shall include the Plan Distribution Contribution Amount), the operations of the Debtors or the Reorganized Debtors, sales of assets or the exit financing pursuant to the New Credit Agreement, provided that, to the extent of any insufficiency for Allowed Claims as of the Effective Date (or thereafter solely as may be necessary to make Distributions on account of Allowed Class 5 Claims), funds shall be advanced to the applicable Debtor by the Backstop Funder solely to the extent provided for in the Backstop Funding Agreement or, as determined by the Debtors in their sole discretion, any member of the Plan Sponsor Group at the option of the advancing Debtor, as applicable, so long as such member(s) of the Plan Sponsor Group can advance such funds and is agreeable to advancing such funds to satisfy any insufficiency. Notwithstanding anything herein or in the Disclosure Statement to the contrary, nothing herein shall require the Backstop Funder or any member of the Plan Sponsor Group to fund any portion of the Backpay Claim except with respect to the funding of the Plan Distribution Contribution Amount.  Without limiting the foregoing, neither the Backstop Funder nor any member of the Plan Sponsor Group shall be responsible for any portion of the Backpay Claim to the extent such Backpay Claim is entitled to priority in right of payment under sections 503(b) or 507(a) of the Bankruptcy Code.  The Backstop Funder's contribution and commitment under this Plan with

41

*Approved by Judge Donald H. Steckroth March  06, 2014*

respect to Claims held by Other General Unsecured Claims Holders, whether on account of
Distributions to be made in accordance with Class 6 or otherwise (*e.g.*, on account of any
Priority Claim or Administrative Expense Claim) shall be limited to the funding of the Plan
Distribution Contribution Amount.  The Plan Distribution Contribution Amount shall be held in
escrow by Debtors' counsel as of the commencement of the Confirmation Hearing.

    4.2.   <u>Funding of Ongoing Operating Losses</u>.  For so long as each applicable Debtor or
Reorganized Debtor shall continue to own and operate a Facility, and subject to the terms of the
CBA Rejection Order, the Backstop Funder shall make such funds available to the applicable
Debtor to meet operating shortfalls solely to the extent identified in the projections attached to
the CBA Rejection Order and subject to the Backstop Funding Agreement.

    4.3.   <u>Continued Corporate Existence</u>.  After the Effective Date, each Reorganized
Debtor shall continue to exist in accordance with applicable law and pursuant to its
organizational documents in effect prior to the Effective Date, except to the extent such
organizational documents are amended, restated or replaced under this Plan.

    4.4.   <u>Members and Officers</u>.  On or after the Effective Date, the current members,
managers and officers of the Debtors will serve as managers, officers and members of the
Reorganized Debtors.

    4.5.   <u>Exit Financing</u>.  On the Effective Date, the Reorganized Debtors shall be
authorized to enter into the New Credit Agreement, as well as execute, deliver, file, record and
issue any notes, documents, or agreements in connection therewith, in each case without further
notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order,
or rule or the vote, consent, authorization or approval of any Person (other than as expressly
required by the New Credit Agreement).

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

4.6.    <u>Effectiveness of Securities, Instruments and Agreements</u>.  On the Effective Date, all documents set forth in the Plan, the Plan Supplement, and all other agreements entered into or documents issued pursuant to the Plan including, without limitation, any agreement entered into or instrument issued in connection with any of the foregoing shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto and shall be deemed to become effective simultaneously.  Each Holder of an Unsecured Claim is thereafter obliged to pursue their individual rights and interests due to the disbandment of the Committee upon occurrence of the Effective Date.

4.7.    <u>Corporate Action; Effectuating Documents; Further Transactions</u>.  On the Effective Date, all matters and actions provided for under the Plan that would otherwise require approval of the member or managers of the applicable Debtor or the applicable Reorganized Debtor or their successors-in-interest under the Plan including, without limitation, the issuance of all Plan Documents, shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the member and managers of each applicable Debtor and Reorganized Debtor.  Each of the Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

4.8.    <u>Approval of Agreements</u>.  The solicitation of votes on the Plan also shall be deemed as a solicitation for the approval of the Plan Supplement, the Plan Documents and all transactions contemplated by the Plan.  Entry of the Confirmation Order shall constitute approval of the Plan, the Plan Supplement, the Plan Documents and all transactions contemplated thereby.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

4.9.     Operation of the Debtor-in-Possession Between the Confirmation Date and the

Effective Date.  Each of the Debtors shall continue to operate as a Debtor-in-Possession, subject

to the supervision of the Bankruptcy Court, pursuant to the Bankruptcy Code, during the period

from the Confirmation Date through and until the Effective Date, and any obligation incurred by

a Debtor during that period shall, to the extent it would qualify as Allowed Administrative

Expense Claims under section 503(b) of the Bankruptcy Code, constitute an Administrative

Expense Claim.

4.10.    Vesting of Property of the Estates.  On or after the Effective Date, all property of

the Estates, all Causes of Action, and any property acquired by the Debtors, as applicable, under

or in connection with the Plan, shall vest in the applicable Reorganized Debtor on the Effective

Date free and clear of all Liens, Claims, Interests, charges and other encumbrances, except as

provided in this Plan or the Confirmation Order.  Additionally, all employees and employee

health and benefit plans, except and to the extent that such plans have been previously rejected or

modified by an order of the Bankruptcy Court on or before the Confirmation Date, shall be

transferred to the applicable Reorganized Debtor on the Effective Date or as soon as practicable

thereafter.  All employee policies in effect for each of the Debtors as of the Confirmation Date

shall be in effect for each of the Reorganized Debtors as of the Effective Date, but may be

amended thereafter at such Reorganized Debtor's sole discretion subject to applicable law.

From and after the Effective Date, each Reorganized Debtor may operate its

business, and may use, acquire and dispose of property without supervision or approval by the

Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code and Bankruptcy

Rules, but subject to the continuing jurisdiction of the Bankruptcy Court as set forth in Article

VIII of this Plan.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

4.11.   <u>Preservation of Causes of Action</u>. Except as otherwise provided in the Plan, the

Confirmation Order or in any document, instrument, release or other agreement entered into in

connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the

Reorganized Debtors will retain all of the Causes of Action, including the RICO Action and any

other Causes of Action against the Union; <u>provided</u>, <u>however</u>, that the Reorganized Debtors shall

not pursue and shall waive any Avoidance Actions (except to the extent such Claims or Causes

of Action that the Debtors have preserved against the Union, including the RICO Action,

constitute an Avoidance Action).  The Reorganized Debtors may enforce, sue on, settle or

compromise (or decline to do any of the foregoing) any and all of such Causes of Action,

including the RICO Action.  The failure of the Debtors to specifically list any claim, right of

action, suit, proceeding or other Cause of Action in the Plan does not, and will not be deemed to,

constitute a waiver or release by the Debtors or the Reorganized Debtors of such claim, right of

action, suit, proceeding or other Cause of Action and the Reorganized Debtors will retain the

right to pursue such claims, rights of actions, suits, proceedings or other Causes of Action in

their sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion,

claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim,

right of action, suit, proceeding or other Cause of Action upon or after the Confirmation or

consummation of the Plan.

4.12.   <u>Exemption from Certain Transfer Taxes</u>.  Pursuant to section 1146(a) of the

Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan,

the creation of any mortgage, deed of trust or other security interest, the making or assignment of

any lease or sublease, or the making or delivery of any deed or other instrument of transfer

under, in furtherance of, or in connection with the Plan, including, without limitation, any merger

51689/0001-9766400v4

agreements or agreements of consolidation, deeds, bills of sale or assignments executed in

connection with any of the transactions contemplated under the Plan shall not be subject to any

stamp, real estate transfer, mortgage recording or other similar tax.

4.13.    <u>Non-Substantive Consolidation</u>.  Although the Plan is presented as a joint plan of

reorganization, this Plan does not provide for the substantive consolidation of the Debtors'

Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively

consolidated for any reason.  Allowed Claims held against one Debtor will be satisfied solely

from the Cash and assets of such Debtor and its Estate, <u>provided</u> <u>that</u>, to the extent of any

insufficiency for Allowed Claims as of the Effective Date (or thereafter solely as may be

necessary to make Distributions on account of Allowed Class 5 Claims), funds shall be advanced

to the applicable Debtor by the Backstop Funder solely to the extent provided for in the Backstop

Funding Agreement or, as determined by the Debtors in their sole discretion, any member of the

Plan Sponsor Group at the option of the advancing Debtor, as applicable, so long as such

member(s) of the Plan Sponsor Group can advance such funds and is agreeable to advancing

such funds to satisfy any insufficiency.  Except as specifically set forth herein, nothing in this

Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that

any one or all of the Debtors is subject to or liable for any Claims against any other Debtor or

that any member of the Plan Sponsor Group is subject to or liable for any Claims against any

Debtor.  A Claim against multiple Debtors will be treated as a separate Claim against each

Debtor's Estate for all purposes including, but not limited to, voting and distribution; <u>provided</u>,

<u>however</u>, that no Claim will receive value in excess of 100% of the Allowed amount of such

Claim.  Notwithstanding anything to the contrary in this Plan, except solely to the extent

applicable with respect to the M&T Claims and the HUD Claims to the extent the Debtors enter

46

*Approved by Judge Donald H. Steckroth March  06, 2014*

in the New the New Credit Agreement, the Reinstated Claims and Impaired Claims and Equity

Interests of a particular Debtor or Reorganized Debtor shall remain the obligations solely of such

Debtor or Reorganized Debtor and shall not become obligations of any other Debtor or

Reorganized Debtor by virtue of this Plan, the Chapter 11 Case, or otherwise.

## ARTICLE V

## PROVISIONS GOVERNING DISTRIBUTIONS

5.1.     Disbursing Agent.  The Disbursing Agent shall make all distributions required

under the Plan (subject to the provisions of the Plan, including Article II, Article IV and Article

V hereof).

5.2.     Application of Distribution Record Date.  As of the close of business on the

Distribution Record Date, the claim registers for all Claims shall be deemed closed, and there

shall be no further changes in the record holders of such Claims.  Neither the Debtors, the

Reorganized Debtors or the Disbursing Agent shall have any obligation to recognize any transfer

of Claims occurring on or after the Distribution Record Date.  The Debtors, the Reorganized

Debtors and the Disbursing Agent shall be entitled to recognize and deal for all purposes under

the Plan only with those record holders stated on the claims registers as of the close of business

on the Distribution Record Date, to the extent applicable.

5.3.     Compliance with Tax Requirements.  In connection with the Plan and all

Distributions thereunder, the Reorganized Debtors and the Disbursing Agent shall comply with

all tax withholding and reporting requirements imposed on it by any governmental unit, and all

distributions pursuant to this Plan shall be subject to such withholding and reporting

requirements.  For tax purposes, Distributions received in respect of Allowed Claims will be

47

*Approved by Judge Donald H. Steckroth March  06, 2014*

allocated first to the principal amount of Allowed Claims with any excess allocated, if applicable, to unpaid interest that accrued, on such Claims.

5.4.    <u>Means of Cash Payment</u>.  Cash payments under the Plan will be in U.S. funds by checks drawn on a bank selected by the Reorganized Debtors, or by wire transfer from a bank, at the option of the Reorganized Debtors.

5.5.    <u>Delivery And Distributions And Undeliverable Or Unclaimed Distributions</u>.

A.    <u>Delivery of Distributions in General</u>.  Distributions to Holders of Allowed Claims shall be made at the address of the Holder of such Claim as indicated on the records of the applicable Debtor, or a filed proof of Claim, as applicable.

B.    <u>Undeliverable Distributions</u>.

(a)    <u>Holding of Undeliverable Distributions</u>.  If any Allowed Claim Holder's distribution is returned as undeliverable, no further distributions shall be made to such Holder unless and until the Debtors or Reorganized Debtors are notified in writing of such Holder's then-current address.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable.  Undeliverable Cash shall not be entitled to any interest, dividends or other accruals of any kind.

(b)    <u>After Distributions Become Deliverable</u>.  Within 20 days after the end of each Quarter following the Distribution Date, the Disbursing Agent shall make all distributions that become deliverable during the preceding Quarter, except as otherwise provided herein.

(c)    <u>Failure to Claim Undeliverable Distributions</u>.  In an effort to ensure that all Holders of valid Claims receive their allocated distributions, the Disbursing Agent will file with the Bankruptcy Court a listing of unclaimed distribution Holders.  Any Holder of

51689/0001-9766400v4

an Allowed Claim that does not assert a Claim pursuant to this Plan for an undeliverable

distribution within three months after the first attempted delivery shall have its Claim for such

undeliverable distribution discharged and shall be forever barred from asserting any such Claim

against the Debtors, the Reorganized Debtors, or their respective property.  In such cases, any

Cash held for distribution on account of such Claims shall be property of the applicable

Reorganized Debtor, free of any restrictions thereon, and shall revert to the account from which

such payment was originally issued to be distributed pursuant to this Plan.  Nothing contained in

this Plan shall require the Reorganized Debtors or the Disbursing Agent to attempt to locate any

Holder of an Allowed Claim.

     5.6.   <u>De Minimus Distributions</u>.  Any Holder of an Allowed Claim whose aggregate

distribution under this Plan is less than twenty-five dollars ($25) shall forfeit, at the option of the

Disbursing Agent, such amount to, and such amount shall vest in, the Reorganized Debtors for

distribution in accordance with the terms of this Plan.

     5.7.   <u>Fractional Dollars</u>.  Any other provision of this Plan notwithstanding, payments of

fractions of dollars shall not be made.  Whenever any payment of a fraction of a dollar under this

Plan would otherwise be called for, the actual payment made shall reflect a rounding of such

fraction to the nearest whole dollar (up or down), with half dollars being rounded up.

     5.8.   <u>Allocation Of Plan Distributions Between Principal and Interest</u>.  To the extent

that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness

and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal

amount of the Claim first and then, to the extent the consideration exceeds the principal amount

of the Claim, to accrued but unpaid interest.

49

*Approved by Judge Donald H. Steckroth March  06, 2014*

5.9.   <u>Setoffs and Recoupments</u>.  The Debtors and the Reorganized Debtors, as

applicable, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy

law, exercise any right of setoff or recoupment against any Allowed Claim and the distributions

to be made pursuant to this Plan on account of such Claim (before distribution is made or

account of such Claim), the claims, rights and causes of action of any nature that any of the

Debtors may hold against the Holder of such Allowed Claim; <u>provided</u>, <u>however</u>, that neither the

failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall

constitute a waiver or release by the Debtors or Reorganized Debtors of any such claims, rights

and causes of action that the Debtors or Reorganized Debtors may possess against such Holder.

5.10.   <u>Prepayments</u>.  Except as otherwise provided in the Plan or the Confirmation

Order, the Debtors shall have the right to prepay, without penalty, all or any portion of an

Allowed Claim upon authorization of the Bankruptcy Court; <u>provided</u>, <u>however</u>,  that any such

prepayment shall not be violative or, otherwise prejudice, the relative priorities and parities

among Classes of Claims.

## **ARTICLE VI**

## **PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

6.1.   <u>Prosecution of Objections to Claims</u>.  Except as set forth in the Plan or any

applicable Order of the Bankruptcy Court with respect to Administrative Expense Claims and

Professional Compensation and Reimbursement Claims, all objections to Claims must be filed

and served on the Holders of such Claims by the Claims Objection Deadline, as the same may be

extended by the Bankruptcy Court.  After the Effective Date, only the Reorganized Debtors shall

have the authority to file objections to Claims and to settle, compromise, withdraw, or litigate to

judgment objections to Claims regardless of whether the Claims were filed before or after the

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

Effective Date, including Administrative Expense Claims, and Professional Compensation and

Reimbursement Claims.  From and after the Effective Date, the Reorganized Debtors may settle

or compromise any Disputed Claim without approval of the Bankruptcy Court.

6.2.    <u>Allowance Of Claims; No Distribution Pending Allowance</u>.  Except as expressly

provided herein or in any order entered in the Chapter 11 Case prior to the Effective Date

(including the Confirmation Order), no Claim shall be deemed Allowed, unless and until such

Claim is deemed Allowed under the Bankruptcy Code or the Bankruptcy Court enters a Final

Order in the Chapter 11 Case allowing such Claim.  Except as expressly provided in this Plan or

in any Order entered in the Chapter 11 Case prior to the Effective Date (including the

Confirmation Order), each Reorganized Debtor on and after the Effective Date will have and

retain any and all rights and defenses such applicable Debtor had with respect thereto as of the

Effective Date.

Notwithstanding anything to the contrary contained herein, no payments or distributions,

if any contemplated by the Plan, will be made with respect to all or any portion of a Disputed

Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or

have been determined by Final Order, and the Disputed Claim, or some portion thereof, has

become an Allowed Claim.

6.3.    <u>Distributions After Allowance</u>.  To the extent that a Disputed Claim ultimately

becomes an Allowed Claim, a distribution, if any, will be made to the holder of such Allowed

Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the

date that the order or judgment of the Bankruptcy Court or other applicable court of competent

jurisdiction allowing any Disputed Claim becomes a Final Order, or the date upon which other

final resolution has been reached to Allow such Claim, the Disbursing Agent shall provide to the

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

holder of such Claim the distribution to which such holder is entitled under the Plan.

Notwithstanding the foregoing, and except as otherwise provided with respect to Ongoing Trade

Vendor Claims, the Disbursing Agent shall not be required to make distributions more frequently

than once every 90 days.

6.4.　<u>Controversy Concerning Impairment</u>.  If a controversy arises as to whether any

Claims or Equity Interests, or any Class of Claims or Equity Interests, is Impaired under this

Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy at or

before the Confirmation Date.

6.5.　<u>Reservation of Rights to Object to Allowance or Asserted Priority of Claims</u>.

Nothing herein will waive, prejudice or otherwise affect the rights of the Debtors, the

Reorganized Debtors to object at any time, including after the Effective Date, to the allowance or

asserted priority of any Claim.

## **ARTICLE VII**

## **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

7.1.　<u>Assumption and Assignment of Executory Contracts and Unexpired Leases</u>.

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, each Lease Agreement and

each Management Agreement shall be deemed assumed by the applicable Debtor and assigned to

the applicable Reorganized Debtor as of the Effective Date.  On the Effective Date, the Affiliated

Landlords and the Management Company shall be deemed to have waived any right to payment

of a Cure amount.  The Debtors reserve the right, at any time prior to the Confirmation Date, to

seek to assume or reject any Executory Contract or unexpired lease to which any of the Debtors

is a party.  The Confirmation Order shall constitute an Order of the Bankruptcy Court approving

the assumption and assignment of the contract and lease assumptions described above as of the

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

Effective Date.  Upon the Effective Date, the Affiliated Landlords and the Management

Company, respectively, shall be deemed to have consented to the assumption of the Lease

Agreements and the Management Agreement, respectively, contemplated by Bankruptcy Code

section 365(c)(1)(B), to the extent such consent is necessary for such assumption.

Each of the Debtors participate in the Medicare program pursuant to a Medicare provider

agreement with the Centers for Medicare & Medicare Services ("CMS"), which provider

agreement is considered to be an executory contract under 11 U.S.C. § 365.  On the Effective

Date, each of the Debtors shall assume each of their respective Medicare provider agreements

(collectively, "Assumed Medicare Provider Agreements").  With respect to the Assumed

Medicare Provider Agreements, the Cure amount pursuant to 11 U.S.C. § 365 shall include the

agreement by each of the Debtors to continue its participation in the Medicare program in the

ordinary course of business and to be governed by, and subject to, the terms and conditions of its

Assumed Medicare Provider Agreements and the incorporated Medicare statutes, regulations,

policies and procedures, including the recoupment of overpayments, if any.  Notwithstanding

any language to the contrary, nothing in the Disclosure Statement, Plan or the Confirmation

Order shall release (or operate to enjoin) CMS's right to recover any Medicare overpayment or

claim against any of the Debtors, if any, whether prepetition or post petition, including through

recoupment or setoff.  Notwithstanding anything in the Disclosure Statement, Plan, or

Confirmation Order to the contrary, the Cure Amount for assumption of the Medicare provider

agreements shall not be a sum certain set by the Debtors or the Bankruptcy Court, and

Bankruptcy Court shall not have jurisdiction to determine the nature or amount of any required

Cure of the Medicare provider agreements.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

7.2.    <u>Cure of Defaults Under Assumed Executory Contracts and Unexpired Leases</u>.

Except as set forth in Section 7.1 or as may otherwise be agreed to by the parties, within ninety

days after the Effective Date, or as due in the ordinary course of business, the applicable

Reorganized Debtor shall cure any and all undisputed defaults under any assumed Executory

Contracts and unexpired leases in accordance with section 365(b)(1) of the Bankruptcy Code.

Notice of the Cure amount for the Executory Contracts and unexpired leases will be set forth in

an applicable Assumption Notice.  Notwithstanding the foregoing, in the event of a dispute

regarding (i) the nature or amount of any cure obligation, (ii) the ability of a Debtor or any

assignee to provide "adequate assurances of future performance" (within the meaning of section

365 of the Bankruptcy Code) under the Executory Contracts and unexpired leases, or (iii) any

other matter pertaining to any such assumption, the cure obligation shall be satisfied no later than

thirty (30) days of the entry of a Final Order determining the obligation, if any, of the applicable

Debtor with respect thereto, or as may otherwise be agreed to by the parties.

A.    <u>Cure Procedure</u>.  No later than 14 calendar days prior to the Confirmation

Hearing, the Debtors will file and serve a notice ("Assumption Notice") to assume any

Executory Contract (which shall include any unexpired lease) pursuant to section 365 of the

Bankruptcy Code, which shall set forth the following information, to the best the Debtors'

knowledge, as applicable: (i) the Executory Contract to be assumed; (ii) the name and address of

the non-Debtor counterparty to such Executory Contract; (iii) the proposed cure amount, if any;

and (iv) the deadlines and procedures for filing objections to the Assumption Notice (as set forth

below).  **Parties objecting to a proposed assumption, including to the proposed cure**

**amount, must file and serve a written objection so that such objection is filed with the**

**Court and is actually received by the Debtors no later than seven (7) calendar days after**

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

the date the Debtors serve the relevant Assumption Notice.  If said non-Debtor
counterparty fails to timely respond or object, it shall be deemed to have consented to the
assumption of its contract or lease and to such proposed Cure amount for all purposes in
the Chapter 11 Case.

      7.3.    <u>Insurance Policies</u>.  All of the Debtors' insurance policies and any agreements,
documents, or instruments relating thereto (collectively, the "**Insurance Policies**"), are treated as
Executory Contracts under the Plan.  On the Effective Date, the applicable Reorganized Debtor
shall be deemed to have assumed all insurance policies and any agreements, documents, and
instruments relating to coverage of Claims covered by those insurance policies, subject to all
rights, remedies and defenses of the Debtors under any agreements, insurance policies and
applicable law.  Nothing in the Plan, or in any Order confirming the Plan, shall preclude
plaintiffs in pending litigation matters from pursuing their claims against the applicable Debtor
solely to the extent of available insurance coverage and proceeds.  Claims against any applicable
Debtor, to the extent of available insurance, are preserved, solely to the extent necessary to
pursue available coverage and proceeds, but any right to collect directly from the Debtors shall
be discharged by the Plan.  Nothing contained in this Article shall constitute or be deemed a
waiver of any Cause of Action that the Debtors may hold against any entity including, without
limitation, the insurer under any of the Debtors' Insurance Policies.

      7.4.    <u>Indemnification Obligations</u>.  For purposes of the Plan, the obligations of a
Debtor to defend, indemnify, reimburse or limit the liability of any present member, manager,
director, officer or employee who is or was a member, manager, director, officer or employee,
respectively, on or after the Commencement Date against any Claims or obligations pursuant to
each applicable Debtors' operating agreement, certificate of formation or similar corporate

51689/0001-9766400v4

governance documents, applicable state law, or specific agreement, or any combination of the

foregoing (collectively, the "**Indemnification Obligations**"), shall: (i) survive confirmation of

the Plan; (ii) remain unaffected thereby; and (iii) not be discharged, irrespective of whether

indemnification, defense, reimbursement or limitation is owed in connection with an event

occurring before, on or after the Commencement Date.  To the extent provided in this section,

such obligations shall be deemed and treated as Executory Contracts to be assumed by the

applicable Reorganized Debtor hereunder on the Effective Date and shall continue as obligations

of the applicable Reorganized Debtor following the Effective Date.

     7.5.   <u>Compensation and Benefit Plans</u>.  Except as otherwise expressly provided in the

Plan or in any contract, instrument, release, indenture or other agreement or document entered

into in connection with the Plan or otherwise rejected or modified prior to the Effective Date, all

of the Debtors' programs, plans, agreements and arrangements relating to employee

compensation and benefits, including programs, plans, agreements and arrangements subject to

sections 1113 and 1129(a)(13) of the Bankruptcy Code, entered into before the Commencement

Date and not since terminated (collectively, the "**Compensation and Benefit Plans**"), will be

deemed to be, and will be treated as though they are, executory contracts that are assumed under

this Article VII of the Plan, and the Debtors' obligations under such programs, plans, agreements

and arrangements will survive confirmation of the Plan.

     7.6.   <u>Rejection of Executory Contracts and Unexpired Leases</u>.  On the Effective Date,

all Executory Contracts and unexpired leases will be deemed rejected, other than: (i) the Lease

Agreements, (ii) the Management Agreements, (iii) the Insurance Policies, (iv) the

Indemnification Obligations, (v) the Compensation and Benefit Plans and (vi) any other

Executory Contracts and unexpired leases that a Debtor seeks to assume prior to the

56

*Approved by Judge Donald H. Steckroth March  06, 2014*

Confirmation Date or under this Plan.  The Confirmation Order shall constitute an order

approving such rejection as of the Effective Date.

      7.7.    <u>Deadline for Filing Proofs of Claim Relating to Executory Contracts and</u>

<u>Unexpired Leases Rejected Pursuant to the Plan</u>.  If the rejection by a Debtor, pursuant to the

Plan or otherwise, of an Executory Contract or unexpired leases gives rise to a Claim, a Proof of

Claim must be filed in accordance with Claims and Noticing Order and served upon the Debtors'

counsel or as otherwise may be provided in the Confirmation Order, by no later than thirty (30)

days after the later of (i) notice of entry of the Confirmation Order and (ii) other notice that the

Executory Contract or unexpired lease has been rejected.  Any Proofs of Claim not filed and

served within such time periods will be forever barred from assertion against the Debtors, the

Reorganized Debtors, the Estates and their property.  Unless otherwise Ordered by the

Bankruptcy Court, all Claims arising from the rejection of Executory Contracts and unexpired

leases shall be treated as Other General Unsecured Claims under the Plan.

<b><u>ARTICLE VIII</u></b>

<b><u>RETENTION OF JURISDICTION</u></b>

      The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out

of, and related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections

105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

      (a)    To hear and determine all matters with respect to the assumption or

rejection of any Executory Contract or unexpired lease to which any Debtor is a party or with

respect to which any Debtor may be liable, including, if necessary, the nature or amount of any

required Cure or the liquidation or allowance of any Claims arising therefrom;

57

*Approved by Judge Donald H. Steckroth March  06, 2014*

(b)    To hear and determine any and all adversary proceedings, applications, motion and contested or litigated matters arising out of, under or relate to, the Chapter 11 Case;

(c)    To hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

(d)    To enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(e)    To issue such Orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(f)    To consider any amendments to or modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)    To hear and determine all Professional Compensation and Reimbursement Claims and other Administrative Expense Claims;

(h)    To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(i)    Except as otherwise limited herein, to recover all assets of the Debtors and property of each Debtor's Estate, wherever located;

(j)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(k)    To hear any other matter not inconsistent with the Bankruptcy Code;

(l)    To enter a final decree closing the Chapter 11 Case;

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March 06, 2014*

(m)     To ensure that Distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

(n)     To decide or resolve any motions, adversary proceedings, contested or litigated matters pending in the Bankruptcy Court and any other matters pending in the Bankruptcy Court and grant or deny any applications involving any Debtor that may be pending in the Bankruptcy Court on the Effective Date;

(o)     To issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Plan, except as otherwise provided herein;

(p)     To determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Plan Documents;

(q)     To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

(r)     To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof; and

(s)     To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the General Bar Dates, the Administrative Expense Claim Bar Date, the hearing on the approval of the Disclosure Statement as containing adequate

51689/0001-9766400v4

information, the hearing on the confirmation of the Plan for the purpose of determining whether

a Claim or Equity Interest is discharged hereunder or for any other purpose.

Notwithstanding any language in the Disclosure Statement or this Plan to the contrary,

nothing herein is intended to confer jurisdiction on the Bankruptcy Court to the extent it does not

exist under the Bankruptcy Code or other applicable law.

## ARTICLE IX

## RELEASES AND RELATED PROVISIONS

9.1.    Releases by the Debtors.  **Upon substantial consummation, as defined in**

**section 1101(2) of the Bankruptcy Code, and then effective *nunc pro tunc* to the Effective**

**Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the**

**Debtors, the Reorganized Debtors and any Entity seeking to exercise the rights of each**

**Debtor's estate, including, without limitation, any successor to a Debtor or any Estate**

**representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy**

**Code, shall be deemed to forever release, waive, and discharge all claims, obligations, suits,**

**judgments, damages, demands, debts, rights, causes of action (including claims or causes of**

**action arising under chapter 5 of the Bankruptcy Code), and liabilities whatsoever in**

**connection with or related to the Debtors, the conduct of the Debtors' businesses, the**

**Chapter 11 Case or the Plan (other than the rights of the Debtors and the Reorganized**

**Debtors to enforce the Plan and the contracts, instruments, releases, indentures, and other**

**agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed**

**or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then**

**existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part**

**on any act, omission, transaction, event, or other occurrence taking place on or prior to the**

60

*Approved by Judge Donald H. Steckroth March 06, 2014*

**Effective Date in any way relating to the Debtors, the conduct of the Debtors' businesses, the Reorganized Debtors, the Chapter 11 Case, or the Plan, and that may be asserted by or on behalf of the Debtors, the Estates, or the Reorganized Debtors against (i) any of the Debtors, (ii) any of the present or former shareholders, members, directors, officers, employees or advisors of the Debtors, (iii) any Professionals of the Debtors, and (iv) the Creditors' Committee, its members, and its and their advisors, respectively (but not its members in their individual capacities); provided, however, that, nothing in this Section 9.1 shall be construed to release any party from actual fraud or gross negligence as determined by a Final Order; and provided, further, however, that nothing in this Section 9.1 shall be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee (other than any director or officer) that is based upon an alleged breach of a confidentiality, non-compete, or any other contractual or fiduciary obligation owed to any of the Debtors or the Reorganized Debtors.**

      9.2.    <u>Releases by Holders of Claims and Equity Interests</u>.  **Upon substantial consummation, as defined in section 1101(2) of the Bankruptcy Code, and then effective *nunc pro tunc* to the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim and/or Equity Interest that is entitled to receive a Distribution pursuant to the Plan shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against any Affiliate of any Debtor, including the Plan Sponsor Group/Backstop Funder, and any of the present or former shareholders, members, managers, directors, officers, employees or advisors of any of the Debtors or**

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

**their respective Affiliates, including the Plan Sponsor Group/Backstop Funder
(collectively, the "Releasees"), in connection with or related to the Debtors, the conduct of
the Debtors' businesses, the Chapter 11 Case, or the Plan (other than the rights under the
Plan and the contracts, instruments, releases, indentures, and other agreements or
documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent,
matured or unmatured, known or unknown, foreseen or unforeseen, then existing or
thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act,
omission, transaction, event, or other occurrence taking place on or prior to the Effective
Date in any way relating to the Debtors, the conduct of the Debtors' businesses, the
Chapter 11 Case, or the Plan; provided, however, that, nothing in this Section 9.2 shall be
construed to release any party from actual fraud or gross negligence as determined by a
Final Order.**

**Each of the Releasees shall be deemed to forever release, waive, and
discharge any claims, obligations, suits, judgments, damages, demands, debts, rights,
causes of action, and liabilities whatsoever arising on or prior to the Effective Date in any
way relating to the Debtors, the conduct of the Debtors' businesses, the Chapter 11 Case, or
the Plan, that such Releasees may hold in their individual capacities against each Holder of
a Claim and/or Equity Interest that is entitled to receive a Distribution pursuant to the
Plan; provided, however, that until the conclusion of the RICO Action, the Union shall not
be released by the Releasees on any claim raised or which could have been raised in the
RICO Action and nothing herein is intended nor shall limit the right of the Releasees to
recover against any defendant in the RICO Action.**

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

9.3.   <u>Injunctions or Stays</u>.  **All injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code and in the Plan, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Except as otherwise expressly provided in the Plan, under applicable law or to the extent necessary to enforce the terms and conditions of the Plan, the Confirmation Order or a separate Order of the Bankruptcy Court, all entities, creditors and equity and/or interest holders who have held, hold, or may hold Claims against or Equity Interests in any of the Debtors, are permanently enjoined, on and after the Confirmation Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or Order against any of the Debtors on account of any such Claim or Equity Interest, (iii) creating, perfecting or enforcing any encumbrance of any kind against any of the Debtors or against the property or interests in property of any of the Debtors on account of any such Claim or Equity Interest, and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Debtors, or against the property or interests in property of any of the Debtors on account of any such Claim or Equity Interest.  Such injunction shall extend to the Reorganized Debtors.**

9.4.   <u>Injunction</u>.  **On and after the Confirmation Date, all entities, creditors and equity and/or interest holders who have held, hold or may hold Claims against or Equity Interests in any of the Debtors, shall be enjoined, pursuant to section 105 of the Bankruptcy Code, from proceeding against any of the Releasees, for the collection of all or any portion of their Claim or Equity Interest or pursuing any Claim that is released**

63

*Approved by Judge Donald H. Steckroth March  06, 2014*

pursuant to this Article IX, said injunction to remain in effect only for so long as such
applicable Debtor complies with the terms of the Plan.  Any violation of the Plan that
remains uncured for thirty (30) days after receipt by the Debtors of written notice from
any party affected by such violation, shall automatically and without order of the
Bankruptcy Court result in the dissolution of the injunction granted hereunder as to said
affected party.

Notwithstanding the foregoing, the injunction granted hereunder shall not affect the
claims and rights of any creditor to proceed against a Releasee for collection on any
applicable guaranty; provided, however, so long as such applicable Debtor is not in default
under the Plan on any required payment beyond any relevant grace period, such creditor is
enjoined hereunder from proceeding against a Releasee for collection of any amounts paid
or to be paid under any applicable guaranty or by such applicable Debtor or Reorganized
Debtor under the Plan.

Notwithstanding anything contained herein to the contrary, the exclusive remedy
for payment of any claim or debt so long as the Plan is not in default shall be the Plan.

9.5.    Exculpation.  **The Debtors, the Reorganized Debtors, the Plan Sponsor
Group, the Creditors' Committee, each of the members of the Creditors' Committee, and
their respective members, partners, officers, directors, employees and agents (including
any attorneys, financial advisors, investment bankers and other professionals retained by
such Persons) shall have no liability to any Holder of any Claim or Equity Interest, or any
other party-in-interest, or any of their respective agents, employees, representatives,
advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or
omission in connection with, relating to, or arising out of the Chapter 11 Case, the**

64

*Approved by Judge Donald H. Steckroth March  06, 2014*

**formulation, negotiating, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omission that are the result of gross negligence or actual fraud and, in all respects, shall be entitled to rely on the advice of counsel with respect to their duties and responsibilities under this Plan.**

9.6.    Discharge of Claims and Termination of Equity Interests. Except as otherwise provided herein or in the Confirmation Order, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests (other than those Claims and Equity Interests that are Unimpaired or retained under this Plan) of any nature whatsoever against the Debtors or any of their assets or properties, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Equity Interests.  Upon the Effective Date, the Debtors and the Reorganized Debtors shall be deemed discharged and released under sections 524 and 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Equity Interests (other than those Claims and Equity Interests that are not Impaired or Reinstated under this Plan), including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

9.7.    Terms of Injunctions or Stays.  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation

51689/0001-9766400v4

Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays

contained in the Plan or the Confirmation Order shall remain in full force and effect in

accordance with their terms.

9.8.    <u>Waiver of Enforcement of Subordination</u>.  All subordination rights that a Holder

of a Claim or Equity Interest may have with respect to any Distribution to be made pursuant to

the Plan will be discharged and terminated, and all actions related to the enforcement of such

subordination rights hereby are permanently enjoined.  Accordingly, Distributions (if any)

pursuant to the Plan to holders of Allowed Claims and/or Equity Interests will not be subject to

payment to a beneficiary of such terminated subordination rights, or to levy, garnishment,

attachment or other legal process by a beneficiary of such terminated subordination rights.

## ARTICLE X

## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

10.1.    <u>Conditions to Confirmation</u>.  The following are conditions precedent to the

occurrence of the Confirmation Date, each of which must be waived or satisfied in accordance

with Section 10.4 of the Plan:

(a)    An Order shall have been entered finding that:

(i)    the Disclosure Statement contains adequate information

pursuant to section 1125 of the Bankruptcy shall have been issued by the Bankruptcy Court; and

(ii)    the Debtors, the Creditors' Committee and their respective

principals, officers, directors, attorneys, accountants, financial advisors, advisory affiliates,

employees, and agents solicited acceptance or rejection of the Plan in good faith pursuant to 11

U.S.C. § 1125(e); and

66

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

(iii)     the Confirmation Order confirming this Plan, as this Plan may have been modified in accordance with the terms hereof, shall conform to this Plan in all respects and shall have been entered by the Bankruptcy Court in form and substance satisfactory to the Debtors and the Plan Sponsor Group in their sole discretion.

10.2.   <u>Conditions Precedent to the Effective Date</u>.  The following are conditions precedent to the Effective Date, each of which must be satisfied or waived in accordance with Section 10.4 of the Plan:

(a)     The Confirmation Order shall authorize and direct that the Debtors and the Creditors' Committee take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases and other agreements or documents created in connection with the Plan, including the Plan Documents and the transactions contemplated thereby.

(b)     The Confirmation Order shall have become a Final Order.

(c)     The CBA Rejection Order shall have become a Final Order.

(d)     The Statutory Fees owing to the United States Trustee shall have been paid in full.

(e)     All other actions, authorizations, consents and regulatory approvals required (if any) and all Plan Documents necessary to implement the provisions of the Plan shall have been obtained, effected or executed in a manner acceptable to the Debtors or, if waivable, waived by the Person or Persons entitled to the benefit thereof.

10.3.   <u>Effect of Failure of Conditions</u>.  If each condition to the Effective Date has not been satisfied or duly waived within one (1) year after the Confirmation Date, then upon motion by any party in interest, made before the time that each of the conditions has been satisfied or

67

*Approved by Judge Donald H. Steckroth March  06, 2014*

duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the

Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that

notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of

the conditions to the Effective Date is either satisfied or duly waived by the Debtors, after

consultation with the Creditors' Committee before the Bankruptcy Court enters a Final Order

granting such motion.  If the Confirmation Order is vacated pursuant to this Article, the Plan

shall be deemed null and void in all respects including, without limitation, the discharge of

Claims pursuant to sections 524 and 1141 of the Bankruptcy Code and the assumptions or

rejections of Executory Contracts and unexpired leases provided for herein, and nothing

contained herein shall constitute a waiver or release of any Claims by or against the applicable

Debtor or prejudice in any manner the rights of the applicable Debtor.

10.4.    Waiver of Conditions to Confirmation and Effective Date.  Each of the conditions

to Confirmation and the Effective Date may be waived in writing, in whole or in part, by the

Debtors at any time, without notice or an Order of the Bankruptcy Court, but only after

consultation with the Creditors' Committee.  The failure of the Debtors to exercise any of the

foregoing rights will not be deemed a waiver of any other rights, and each such right will be

deemed an ongoing right that may be asserted at any time.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

11.1.    Administrative Expense Claims Bar Date.  All Administrative Expense Claims,

other than (i) those Administrative Expense Claims that were required to be filed pursuant to the

First Administrative Expense Claim Bar Date Order or the Section 503(b)(9) Administrative

Claim Bar Date Order, (ii) Professional Compensation and Reimbursement Claims, which are

68

Approved by Judge Donald H. Steckroth March  06, 2014

subject to the provisions of Section 2.2.B of this Plan, (iii) all fees payable and unpaid pursuant

to 28 U.S.C. § 1930, (iv) a liability incurred and payable in the ordinary course of business by a

Debtor (and not past due or otherwise Disputed by one or more of the Debtors); and (v) any

Administrative Expense Claims that have already been paid by one or more of the Debtors, shall

be filed with the Bankruptcy Court and served on counsel for the Debtors no later than the

Administrative Expense Claims Bar Date.  In the event that the Debtors or Reorganized Debtors

object to an Administrative Expense Claim, the Bankruptcy Court shall determine the Allowed

amount of such Administrative Expense Claim.  Notwithstanding the foregoing, (a) no

application seeking payment of Postpetition Administrative Trade Claim need be filed with

respect to an undisputed postpetition obligation which was paid or is payable by a Debtor in the

ordinary course of business; provided, however, that in no event shall a postpetition obligation

that is contingent or disputed and subject to liquidation through pending or prospective litigation,

including, but not limited to, obligations arising from personal injury, property damage, products

liability, consumer complaints, employment law (excluding claims arising under workers'

compensation law), secondary payor liability, or any other disputed legal or equitable claim

based on tort, statute, contract, equity, or common law, be considered to be an obligation which

is payable in the ordinary course of business; and (b) no application seeking payment of an

Administrative Expense Claim need be filed with respect to Cure owing under an Executory

Contract or unexpired lease if the amount of Cure is fixed by Order of the Bankruptcy Court.

　　　　Without otherwise limiting the foregoing, but for the avoidance of doubt, nothing in this

Plan is intended to extend the Administrative Expense Claims Bar Date with respect to any

Administrative Expense Claim that was required to be previously filed pursuant to any prior

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

Order of the Court, including, without limitation, the First Administrative Expense Claim Bar

Date Order or the Section 503(b)(9) Administrative Claim Bar Date Order.

11.2.   <u>Amendment or Modification of the Plan</u>.  The Debtors may alter, amend or

modify the Plan or any exhibits or schedules hereto under section 1127(a) of the Bankruptcy

Code at any time prior to the Confirmation Date.  The Debtors reserve the right to include any

amended exhibits or schedules in the Plan Supplement.  After the Confirmation Date and prior to

substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, the

Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the

Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan,

the Disclosure Statement or the Confirmation Order, and to accomplish such matters as may be

necessary to carry out the purposes and effects of the Plan so long as such proceedings do not

adversely affect the treatment of holders of Claims under the Plan; <u>provided</u>, <u>however</u>, that prior

notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of

the Bankruptcy Court.

11.3.   <u>Termination of Creditors' Committee</u>.  The appointment of the Creditors'

Committee shall terminate on the Effective Date for all purposes other than making a motion to

reopen the Chapter 11 Case, if necessary.

11.4.   <u>Corporate Action</u>.  Prior to, on or after the Effective Date (as appropriate), all

matters expressly provided for under the Plan that would otherwise require approval of the

interest holders or managers of the applicable Debtor shall be deemed to have occurred and shall

be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable

state law without any requirement of further action by the interest holders or managers of the

applicable Debtor.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

11.5.   <u>Post-Effective Date Fees and Expenses</u>.  From and after the Effective Date, the

Reorganized Debtors shall, in the ordinary course of business and without the necessity for any

approval by the Bankruptcy Court pay the reasonable fees and expenses of Professionals

thereafter incurred by the Debtors and the Reorganized Debtors, as the case may be, including,

without limitation, those fees and expenses incurred in connection with the implementation and

consummation of the Plan.

11.6.   <u>Payment of Statutory Fees</u>.  All fees payable pursuant to section 1930 of the title

28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation

Hearing, shall be paid in Cash equal to the amount of such fees on the Effective Date.  The

applicable Reorganized Debtor shall timely pay post-confirmation quarterly fees assessed

pursuant to 28 U.S.C. § 1930(a)(6) until such time as the Bankruptcy Court enters a final decree

closing the Chapter 11 Case, or enters an Order either converting this Chapter 11 Case to a case

under chapter 7 or dismissing this Chapter 11 Case.

11.7.   <u>Severability of Plan Provisions</u>.  If, prior to the Confirmation Date, any term or

provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the

Bankruptcy Court, solely at the request of the Debtors, shall have the power to alter and interpret

such term or provision to make it valid or enforceable to the maximum extent practicable,

consistent with the original purpose of the term or provision held to be invalid, void or

unenforceable, and such term or provision shall then be applicable as altered or interpreted.

Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and

provisions of the Plan shall remain in full force and effect and shall in no way be affected,

impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order

will constitute a judicial determination and will provide that each term and provision of this Plan,

71

as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

11.8.    Revocation or Withdrawal of the Plan.  The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date.  If the Debtors revoke or withdraw the Plan before the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against, or any Equity Interests in, any of the Debtors, or any Avoidance Actions or Causes of Action or other claims by or against any of the Debtors, the Creditor's Committee, or any Person or Entity or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

11.9.    Successors and Assigns and Binding Effect.  The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such Person or Entity, including, but not limited to, the Reorganized Debtors and all other parties-in-interest in the Chapter 11 Case.

11.10.   Substantial Consummation.  Upon the Debtors making the payments required on the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

11.11.   Notices.  All notices, requests and demands to or upon the Debtors to be effective shall be in writing and, unless otherwise expressly provided herein or in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile or electronic transmission, when received and telephonically confirmed, addressed as follows:

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

|                          |                                              |
|--------------------------|----------------------------------------------|
| If to the Debtors:       | 710 Long Ridge Road Operating Company II, LLC, *et al.* |
|                          | 173 Bridge Plaza North                       |
|                          | Fort Lee, NJ 07024                           |
|                          | Attn: Victor Matthew Marcos                  |
|                          |                                              |
| with copies to:          | Cole, Schotz, Meisel,                        |
|                          | Forman & Leonard, P.A.                       |
|                          | 25 Main Street                               |
|                          | P.O. Box 800                                 |
|                          | Hackensack, NJ 07602-0800                    |
|                          | Attn:   Michael D. Sirota, Esq.              |
|                          | Telephone:  (201) 489-3000                   |
|                          | Facsimile:  (201) 489-1536                   |
|                          | Email:  msirota@coleschotz.com               |
|                          |                                              |
| If to the Creditors'     | Porzio Bromberg & Newman P.C.                |
| Committee:               | 100 Southgate Parkway                        |
|                          | Morristown, NJ 07960-6465                    |
|                          | Attn:  Warren J. Martin, Esq.                |
|                          | Telephone:  (973) 538-4006                   |
|                          | Facsimile:  (973) 538-5146                   |
|                          | Email:  wjmartin@pbnlaw.com                  |

11.12.  <u>Governing Law</u>.  Except to the extent the Bankruptcy Code, Bankruptcy Rules or

other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise, the

rights and obligations arising under the Plan shall be governed by, and construed and enforced in

accordance with, the laws of the State of New Jersey, without giving effect to the principles of

conflicts of law of such jurisdiction.

11.13.  <u>Plan Supplement</u>.  Forms of all material agreements or documents related to the

Plan, if any, including but not limited to those identified in this Plan, shall be contained in the

Plan Supplement.  The Plan Supplement, if applicable, shall be filed by the Debtors with the

Clerk no later than five (5) days before the Voting Deadline and may be modified thereafter.

Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of

the Clerk during normal court hours.  Holders of Claims, or Equity Interest may obtain a copy of

the Plan Supplement upon written request to the Debtors' counsel.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

11.14.  <u>Headings</u>.  Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

11.15.  <u>Exhibits/Schedules</u>.  All exhibits and schedules to the Plan, including the Plan Supplement whenever filed, are incorporated into and are a part of the Plan as if set forth in full therein.

11.16.  <u>Filing of Additional Documents</u>.  On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

11.17.  <u>Reservation of Rights</u>.  Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Equity Interests before the Effective Date.

11.18.  <u>Section 1145 Exemption</u>.  Pursuant to section 1145(a) of the Bankruptcy Code, the offer, issuance, transfer or exchange of any security under the Plan, or the making or delivery of an offering memorandum or other instrument of offer or transfer under the Plan, shall be exempt from Section 5 of the Securities Act of 1933 or any similar state or local law requiring the registration for offer or sale of a security or registration or licensing of an issuer or a security.

11.19.  <u>Implementation</u>.  The Debtors shall take all steps, and execute all documents, including appropriate releases, necessary to effectuate the provisions contained in this Plan.

74

*Approved by Judge Donald H. Steckroth March  06, 2014*

11.20.  <u>Inconsistency</u>.  In the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Documents, the Plan Supplement, or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

11.21.  <u>Compromise of Controversies</u>.  Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors and all Holders of Claims and Equity Interests against the Debtors.

51689/0001-9766400v4

*Approved by Judge Donald H. Steckroth March  06, 2014*

DATED:  December 10, 2013

*[Signature page to the Plan of Reorganization.]*

**710 Long Ridge Road Operating Company II, LLC (on behalf of itself and all other Debtors)**

By:  */s/ Victor Matthew Marcos*
Name:  Victor Matthew Marcos
Title:    Vice President

**Counsel:**

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By:  */s/ Michael D. Sirota*
Michael D. Sirota
Gerald H. Gline
David M. Bass
Ryan T. Jareck
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602-0800
Telephone:  (201) 489-3000
Facsimile:  (201) 489-1536

Attorneys for 710 Long Ridge Road
Operating Company II, LLC, et al.,
Debtors-in-Possession

51689/0001-9766400v4

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
Gerald H. Gline, Esq.
David M. Bass, Esq.
Ryan T. Jareck, Esq.
Attorneys for 710 Long Ridge Road
Operating Company II, LLC, *et al.*,
Debtors-in-Possession

|  |  |
|---|---|
| In re:<br><br>710 LONG RIDGE ROAD OPERATING<br>COMPANY II, LLC, *et al.*,[1]<br><br>        Debtors-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>HONORABLE DONALD H. STECKROTH<br>CASE NO. 13-13653 (DHS)<br><br>Chapter 11<br>(Jointly Administered) |

## FIRST NON-MATERIAL MODIFICATIONS TO DEBTORS'
## FIRST AMENDED JOINT PLAN OF LIQUIDATION

710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford, 240

Church Street Operating Company II, LLC d/b/a Newington Health Care Center, 1 Burr Road

Operating Company II, LLC d/b/a Westport Health Care Center, 245 Orange Avenue Operating

Company II, LLC d/b/a West River Health Care Center and 107 Osborne Street Operating

Company II, LLC d/b/a Danbury Health Care Center, the within debtors and debtors-in-

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal identification number are: 710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford (4809), 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center (4730), 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center (4839), 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center (4716) and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center (4676).

*Approved by Judge Donald H. Steckroth March  06, 2014*

possession (collectively, the "Debtors"), by and through their counsel, Cole, Schotz, Meisel,

Forman & Leonard, P.A., hereby submit the following non-material modifications as set forth

below (the "Non-Material Modifications") to the First Amended Joint Chapter 11 Plan of

Reorganization of 710 Long Ridge Road Operating Company II, LLC, *et al.*, filed December

10, 2013 [Docket No. 759] (the "Plan") and will seek confirmation of the Plan with the Non-

Material Modifications.[2]  The Debtors submit that the Non-Material Modifications will have no

material impact upon the treatment of creditors.  The Non-Material Modifications are as follows:

1.      Article I of the Plan is amended to replace the following defined terms in their

entirety and all references in the Plan thereafter are adjusted accordingly:

> 1.109.  "<u>Plan Distribution Contribution Amount</u>" means the sum of
> Cash in the amount of $500,000 to be advanced by Care One, LLC
> to the Debtors on the Effective Date to be utilized for distributions
> under and in accordance with the Plan to Holders of Allowed
> Other General Unsecured Claims.

> 1.111 "<u>Plan Sponsor Group</u>" means, collectively, the Parent
> Companies, the Management Company, the Backstop Funder, Care
> One, LLC and the Affiliated Landlords.

2.      Section 4.1 of the Plan is amended by the replacement of the second to last

sentence thereof with the following:

> The contribution and commitment under this Plan by any member
> of the Plan Sponsor Group with respect to Claims held by Other
> General Unsecured Claims Holders, whether on account of
> Distributions to be made in accordance with Class 6 or otherwise
> (*e.g.*, on account of any Priority Claim or Administrative Expense
> Claim) shall be limited to the funding of the Plan Distribution
> Contribution Amount.

---

[2] All capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to them
in the Plan.

2

*Approved by Judge Donald H. Steckroth March  06, 2014*

3. Section 7.1 of the Plan is amended by deleting and replacing the first paragraph

thereof with the following:

> Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy
> Code, each Lease Agreement shall be deemed assumed by the
> applicable Debtor and assigned to the applicable Reorganized
> Debtor as of the Effective Date. On the Effective Date, the
> Affiliated Landlords shall be deemed to have waived any right to
> payment of a Cure amount. Each Management Agreement shall
> "ride through" the Chapter 11 Case and shall neither be assumed
> nor rejected by the Debtors. The Debtors reserve the right, at any
> time prior to the Confirmation Date, to seek to assume or reject
> any Executory Contract or unexpired lease to which any of the
> Debtors is a party. The Confirmation Order shall constitute an
> Order of the Bankruptcy Court approving the assumption and
> assignment of the contract and lease assumptions described above
> as of the Effective Date. Upon the Effective Date, the Affiliated
> Landlords shall be deemed to have consented to the assumption of
> the Lease Agreements contemplated by Bankruptcy Code section
> 365(c)(1)(B), to the extent such consent is necessary for such
> assumption.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for 710 Long Ridge Road
Operating Company II, LLC, *et al.*

By: ___ */s/ Michael D. Sirota* _____
    Michael D. Sirota, Esq.
    Gerald H. Gline, Esq.
    David M. Bass, Esq.
    Ryan T. Jareck, Esq.

DATED: January 17, 2014

51689/0001-10224712v1

*Approved by Judge Donald H. Steckroth March 06, 2014*

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
Gerald H. Gline, Esq.
David M. Bass, Esq.
Ryan T. Jareck, Esq.
Attorneys for 710 Long Ridge Road
Operating Company II, LLC, *et al.*,
Debtors-in-Possession

| | |
|---|---|
| In re:<br><br>710 LONG RIDGE ROAD OPERATING<br>COMPANY II, LLC, *et al.*,[1]<br><br>          Debtors-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>HONORABLE DONALD H. STECKROTH<br>CASE NO. 13-13653 (DHS)<br><br>        Chapter 11<br>     (Jointly Administered) |

## SECOND NON-MATERIAL MODIFICATIONS TO DEBTORS'
## FIRST AMENDED JOINT PLAN OF REORGANIZATION

710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford, 240

Church Street Operating Company II, LLC d/b/a Newington Health Care Center, 1 Burr Road

Operating Company II, LLC d/b/a Westport Health Care Center, 245 Orange Avenue Operating

Company II, LLC d/b/a West River Health Care Center and 107 Osborne Street Operating

Company II, LLC d/b/a Danbury Health Care Center, the within debtors and debtors-in-

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal identification number are:  710 Long Ridge Road Operating Company II, LLC d/b/a Long Ridge of Stamford (4809), 240 Church Street Operating Company II, LLC d/b/a Newington Health Care Center (4730), 1 Burr Road Operating Company II, LLC d/b/a Westport Health Care Center (4839), 245 Orange Avenue Operating Company II, LLC d/b/a West River Health Care Center (4716) and 107 Osborne Street Operating Company II, LLC d/b/a Danbury Health Care Center (4676).

*Approved by Judge Donald H. Steckroth March  06, 2014*

possession (collectively, the "Debtors"), by and through their counsel, Cole, Schotz, Meisel,

Forman & Leonard, P.A., hereby submit the following non-material modifications as set forth

below (the "Non-Material Modifications") to the First Amended Joint Chapter 11 Plan of

Reorganization of 710 Long Ridge Road Operating Company II, LLC, *et al.*, filed December

10, 2013 [Docket No. 759] (the "Plan") and will seek confirmation of the Plan with the Non-

Material Modifications.[2]  The Debtors submit that the Non-Material Modifications will have no

material impact upon or adversely affect the treatment of creditors.  The Non-Material

Modifications are as follows:

1.     Article I of the Plan is amended to replace the following defined terms in their

entirety and all references in the Plan thereafter are adjusted accordingly:

> 1.109.  "<u>Plan Distribution Contribution Amount</u>" means such
> amount to be utilized for Distributions under and in accordance
> with the Plan to Holders of Allowed Other General Unsecured
> Claims, comprised of the sum of (a) Cash in the amount of
> $500,000 to be advanced by Care One, LLC to the Debtors on the
> Effective Date and (b) upon the conclusion of the ALJ Proceedings
> and entry of a final non-appealable order of judgment, the
> effectiveness of which has not been stayed, by either the United
> States Court of Appeals for the D.C. Circuit or the United States
> Court of Appeals for the Second Circuit (the "**Backpay Claim
> Adjudication Date**"), if any, Cash in the amount of $4,500,000
> (the "**Backpay Claim Adjudication Date Distribution
> Advance**") to be advanced by Care One, LLC to the Debtors as
> follows: (i) $500,000 on the Backpay Claim Adjudication Date and
> (ii) the balance of the Backpay Claim Adjudication Date
> Distribution Advance in five (5) equal annual installments,
> commencing on the first anniversary of the Backpay Claim
> Adjudication Date and payable on each anniversary date thereafter;
> <u>provided</u>, <u>however</u>, that the Backpay Claim Adjudication Date
> Distribution Advance shall be reduced on a dollar for dollar basis

---

[2] All capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to them in the Plan.  Except as otherwise expressly set forth herein, nothing herein is intended to modify or otherwise amend the Plan or the First Non-Material Modifications to Debtors' First Amended Joint Plan of Liquidation [sic] [Docket No. 848] (the "First Non-Material Modifications").

51689/0001-10258912v1

*Approved by Judge Donald H. Steckroth March  06, 2014*

to the extent of the Operating Loss Backstop Distribution received by the Reorganized Debtors in accordance with Section 4.2 hereof; and, further, provided, however, that the amounts to be funded on account of the Plan Distribution Contribution Amount shall be limited to a maximum of 75% of the aggregate amount of Allowed Other General Unsecured Claims, such that each Holder of an Allowed Other General Unsecured Claim will be paid in Cash an amount no greater than 75% of such Holder's Allowed Other General Unsecured Claim.  The Plan Distribution Contribution Amount shall be used exclusively to pay Allowed Other General Unsecured Claims.[3]

1.111 "Plan Sponsor Group" means, collectively, the Backstop Funder, Care One, LLC, the Management Company and the Affiliated Landlords.[4]

1.123.  "Releasees" shall mean Care One, LLC, Care Realty, LLC, the Management Company, the Affiliated Landlords and the managers, directors, officers or employees of any of the Debtors or of any of Care One, LLC, Care Realty, LLC, the Management Company and the Affiliated Landlords, including but not limited to Victor Matthew Marcos, A. Alberto Lugo and Daniel E. Straus.

2.     Article I of the Plan is amended by adding the following defined terms:

1.93a.     "New Membership Interests" means the membership interests of each Reorganized Debtor authorized and to be issued in accordance with the Plan.

1.99a.     "Operating Loss Backstop Amount" means any amount to be funded by the Backstop Funder pursuant to Section 4.2 of the Plan.

1.99b.     "Operating Loss Backstop Distribution" shall have the meaning set forth in Section 4.2 hereof.

1.99c.     "Operating Loss Backstop Distribution Date" shall have the meaning set forth in Section 4.2 hereof.

---

[3] The amendment to the defined term "Plan Distribution Contribution Amount" shall supersede that set forth in paragraph 1 of the First Non-Material Modifications.

[4] The amendment to the defined term "Plan Sponsor Group" shall supersede that set forth in paragraph 1 of the First Non-Material Modifications.

51689/0001-10258912v1

*Approved by Judge Donald H. Steckroth March  06, 2014*

1.112a.  "Backpay Claim Adjudication Date" shall have the meaning set forth in Section 1.109 hereof.

1.112b.  "Backpay Claim Adjudication Date Distribution Advance" shall have the meaning set forth in Section 1.109 hereof.

3.     Section 2.3.H.(b) of the Plan is amended by adding (a) the following clause at the end of the last sentence thereof:

in an amount not to exceed 75% of such Holder's Allowed Other General Unsecured Claim

and (b) the following sentence thereafter:

No Distributions shall be made on account of Class 6 Other General Unsecured Claims until all Class 6 Other General Unsecured Claims become Allowed and, if unliquidated as of the Effective Date, the amount of all such Other General Unsecured Claims, shall have been fully and finally determined by a final order of a court of competent jurisdiction.

4.     Section 2.3.J. of the Plan is amended by deleting that Section and replacing it in its entirety with the following:

J.     Class 8: Equity Interests[*]

Classification.  Class 8 consists of the Equity Interests in a Debtor, as applicable, held by the Parent Companies, and segregated into Subclass 8A through Subclass 8E.

Treatment.  Each Holder of the Equity Interests in a Debtor, as applicable, shall receive no distributions on account of such Equity Interests.  On the Effective Date, all Equity Interests shall be cancelled, extinguished, and of no further force and effect.

Impairment and Voting.  Class 8 is Impaired under the Plan. The Holders of the Class 8 Equity Interests are conclusively presumed to have rejected the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

---

[*] Class 8 shall consist of the following subclasses: (i) Class 8A (Allowed Equity Interests in Long Ridge); (ii) Class 8B (Allowed Equity Interests in Newington); (iii) Class 8C (Allowed Equity Interests in Westport); (iv) Class 8D (Allowed Equity Interests in West River); and (v) Class 8E (Allowed Equity Interests in Danbury).

4

*Approved by Judge Donald H. Steckroth March  06, 2014*

5.      Section 4.1 of the Plan is amended as follows:

a.      by adding the following clause to the end of the first sentence thereof:

and such Reorganized Debtor shall be required to use those funds in order to satisfy such Claims.

b.      by adding the following clause to the end of the second sentence thereof:

(which includes the Operating Loss Backstop Distribution, if applicable).

c.      by replacing the second to last sentence thereof with the following:[5]

The contribution and commitment under this Plan by any member of the Plan Sponsor Group with respect to Claims held by Other General Unsecured Claims Holders, whether on account of Distributions to be made in accordance with Class 6 or otherwise (*e.g.*, on account of any Priority Claim or Administrative Expense Claim) shall be limited to the funding of the Plan Distribution Contribution Amount (which includes the Operating Loss Backstop Distribution, if applicable).

6.      Section 4.1 of the Plan is amended by adding the following after the last sentence thereof:

Upon the Effective date, the Plan Distribution Contribution Amount shall be deemed delivered to the Disbursing Agent, to be held in escrow by the Debtors' counsel, subject to and disbursed solely in accordance with and when permitted by Section 2.3(H)(b) of this Plan.  In addition, when and if applicable, the following amounts shall be delivered to the Disbursing Agent (by wire to the Debtors' counsel) and held in escrow by the Debtors' counsel, subject to and disbursed solely in accordance with and when permitted by Section 2.3(H)(b) of this Plan: (a) the Operating Loss Backstop Distribution by the Backstop Funder and/or, if applicable, (b) the Backpay Claim Adjudication Date Distribution Advance by Care One, LLC.

---

[5] This amendment set forth in this sentence shall supersede the amendment set forth in paragraph 2 of the First Non-Material Modifications.

51689/0001-10258912v1

*Approved by Judge Donald H. Steckroth March  06, 2014*

7.      Section 4.2 of the Plan is amended by adding the following sentence at the end

thereof:

In the event, but only to the extent, that the Backstop Funder is not
required to advance the aggregate amount of funds on a
consolidated basis to meet operating shortfalls in accordance with
this Section 4.2 of the Plan, the Backstop Funder shall advance to
the Reorganized Debtors on account of the Plan Distribution
Contribution Amount the aggregate amount of such unfunded
Operating Loss Backstop (the "**Operating Loss Backstop
Distribution Amount**") on the later of (a) December 31, 2018, and
(b) the date upon which the period covered by the CBA Rejection
Order expires (the "**Operating Loss Backstop Amount
Distribution Date**").

8.      Section 4.3 of the Plan is amended by deleting that Section and replacing it in its

entirety with the following:

4.3.    <u>Continued Corporate Existence; Issuance of New
Membership Interests</u>.  After the Effective Date, each Reorganized
Debtor shall continue to exist in accordance with applicable law
and pursuant to its organizational documents in effect prior to the
Effective Date, except to the extent such organizational documents
are amended, restated or replaced under this Plan.  On the Effective
Date, each Reorganized Debtor shall issue and deliver to Care Realty
the New Membership Interests, representing one hundred percent of
the equity interest in each Reorganized Debtor, as provided under the
Backstop Funding Agreement and this Plan and all instruments,
certificates, and other documents required to be issued or distributed
pursuant to this Plan without further act or action under applicable
law, regulation, order or rule.  The issuance of the New Membership
Interests shall be exempt from registration under applicable securities
laws pursuant to section 1145(a) of the Bankruptcy Code.

9.      Section 4.6 of the Plan is amended by deleting the last sentence of that Section

and replacing it in its entirety with the following

Holders of Unsecured Claims are thereafter obliged to pursue their
rights and interests without the presence of the Creditors'
Committee due to the disbandment of the Creditors' Committee
upon the occurrence of the Effective Date.

6

*Approved by Judge Donald H. Steckroth March  06, 2014*

10.   Section 6.1 of the Plan is amended by adding the following sentence in between

the second to last and last sentences of that section:

> Notwithstanding anything herein to the contrary, the Creditors'
> Committee shall have the authority to file objections to
> Professional Compensation and Reimbursement Claims after the
> Effective Date, and shall continue to exist after the Effective Date
> for this limited purpose and any other expressly identified herein.

11.   Section 7.3 of the Plan is amended by deleting that Section and replacing it in its

entirety with the following:

> 7.3   <u>Insurance Policies and Provider Agreements</u>.  All of the
> Debtors' insurance policies and any agreements, documents, or
> instruments relating thereto (collectively, the "**Insurance
> Policies**") and all of the Debtors' provider agreements with
> insurance companies, including any ancillary services agreements
> relating thereto (collectively, the "**Provider Agreements**"), are
> treated as Executory Contracts under the Plan.  On the Effective
> Date, the applicable Reorganized Debtor shall be deemed to have
> assumed all Provider Agreements and all Insurance Policies and
> any agreements, documents, and instruments relating to coverage
> of Claims covered by the Insurance Policies, subject to all rights,
> remedies and defenses of the Debtors under any agreements,
> Insurance Policies and applicable law.  Nothing in the Plan, or in
> any Order confirming the Plan, shall preclude plaintiffs in pending
> litigation matters from pursuing their claims against the applicable
> Debtor solely to the extent of available insurance coverage and
> proceeds.  Claims against any applicable Debtor, to the extent of
> available insurance, are preserved, solely to the extent necessary to
> pursue available coverage and proceeds, but any right to collect
> directly from the Debtors shall be discharged by the Plan.  Nothing
> contained in this Article shall constitute or be deemed a waiver of
> any Cause of Action that the Debtors may hold against any entity
> including, without limitation, the insurer under any of the Debtors'
> Insurance Policies.

12.   Section 9.1 of the Plan is amended by deleting the following phrase in the first

sentence:

> **(ii) any of the present or former shareholders, members,
> directors, officers, employees or advisors of the Debtors,**

; and replacing it with the following:

51689/0001-10258912v1

*Approved by Judge Donald H. Steckroth March  06, 2014*

**(ii) the Releasees,**

13.     Section 9.2 of the Plan is amended by deleting the following phrase from the first

sentence thereof:

**any Affiliate of any Debtor, including the Plan Sponsor
Group/Backstop Funder, and any of the present or former
shareholders, members, managers, directors, officers,
employees or advisors of any of the Debtors or their respective
Affiliates, including the Plan Sponsor Group/Backstop Funder
(collectively, the "Releasees"),**

; and replacing it with the following:

**the Releasees,**

14.     Section 9.2 of the Plan is further amended by adding the following clause at the

end of the last sentence of the first paragraph thereof:

**and/or (ii) their obligations under the HUD Loan and related
documents and/or M&T Loan and related documents.**

and the following sentence thereafter:

Unless otherwise ordered by the Bankruptcy Court, the failure by a
Reorganized Debtor and/or a member of the Plan Sponsor Group
to make any payment as required under the Plan that remains
uncured for thirty (30) days after receipt by the Debtors of written
notice from any party(ies) affected by such failure, shall
automatically and without order of the Bankruptcy Court result in
the release granted hereunder being deemed vacated solely as to
such affected party(ies) in such applicable Estate(s).

15.     Section 9.4 of the Plan is amended by adding the following sentence to the end

thereof:

Subject to all provisions of this Article IX, including the releases,
neither this Section 9.4 of the Plan nor any Confirmation Order
shall operate as an injunction with respect to, or otherwise limit or
enjoin, the NLRB's rights under the NLRA and any exclusive
jurisdiction thereunder to fix a claim against any Releasee in the
ALJ Proceedings.

51689/0001-10258912v1

*Approved by Judge Donald H. Steckroth March  06, 2014*

16.    Section 9.5 of the Plan is amended by deleting reference to the following parties:

"Plan Sponsor Group, "members" and "partners."

17.    Section 11.3 of the Plan is amended by deleting that Section and replacing it in its

entirety with the following:

11.3    Termination of Creditors' Committee.  The appointment of
the Creditors' Committee shall terminate on the Effective Date for
all purposes other than filing and/or objecting to Professional
Compensation and Reimbursement Claim(s), and making a motion
to reopen the Chapter 11 Cases, if necessary.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for 710 Long Ridge Road
Operating Company II, LLC, *et al.*

By*:*    */s/ Michael D. Sirota*
         Michael D. Sirota, Esq.
         Gerald H. Gline, Esq.
         David M. Bass, Esq.
         Ryan T. Jareck, Esq.

DATED:  February 3, 2014

51689/0001-10258912v1

*Approved by Judge Donald H. Steckroth March  06, 2014*

# EXHIBIT B

*Approved by Judge Donald H. Steckroth March  06, 2014*

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES
## TO BE ASSUMED

## EXHIBIT B

**710 LONG RIDGE ROAD OPERATING COMPANY II, LLC d/b/a Long Ridge of Stamford[1]**

| COUNTERPARTY TO LEASE OR CONTRACT. | DESCRIPTION OF CONTRACT OR LEASE | CURE AMOUNT |
|---|---|---|
| 710 Long Ridge Road, LLC<br>173 Bridge Plaza North<br>Fort Lee, NJ 07024 | Lease of real property at 710 Long Ridge Road, Stamford, CT 06902 | N/A[*] |
| Accelerated Care Plus Leasing, Inc.<br>4850 Joule Street<br>Bldg 1A<br>Reno, NV 89502 | Physical Therapy Equipment | $1,356.66 |
| Mail Finance<br>478 Wheelers Farms Road<br>Milford, CT 06461 | Lease # N12061069 | $283.13 |
| Xerox<br>P.O. Box 827598<br>Philadelphia, PA 19182 | Lease # 719263576 and #719263436 | $3,272.16 |
| Amanda Collins, Baine, MD<br>49 Arcadia Road<br>Old Greenwich, CT 06870 | Medical Director | $0.00 |
| Cablevision of So. Connecticut<br>P.O. Box 9256<br>Chelsea MA 02150-9256 | Cable | $3,725.40 |
| US Foods, Inc.<br>c/o Bryan Cave LLP<br>Attn: Leslie Allen Bayles and Aaron Davis<br>161 North Clark Street<br>Chicago, IL 60601 | Purchase Agency and Group Purchasing Agreements, including Senior Living Membership Form dated as of December 13, 2011; US Foods Customer Account Applications, Premier Purchasing Partners L.P. Group Purchasing Agreement dated as of July 1, 2010, and all other documents related to the purchase of products by the Debtors from US Foods | $33,581.27 |
| Cigna HealthCare of Connecticut, Inc.<br>c/o Cigna Legal<br>Attn: Mina Bergland, Ass't Director<br>900 Cottage Grove Road, B6LPA<br>Hartford, CT  06152 | Ancillary Services Agreements with Cigna HealthCare of Connecticut, Inc. and all other documents related thereto | $0.00 |

---

[1] This list is subject to Article VII of the Plan.  The failure to specify on this list any Executory Contract that is otherwise specified to be assumed under Article VII of the Plan, including without limitation each Assumed Medicare Provider Agreement, Insurance Policy, or Provider Agreement, shall not serve to reject such Executory Contracts, and such Executory Contracts shall be assumed in accordance with Article VII of the Plan notwithstanding their omission herefrom.

[*] For purposes of the Plan, the Affiliated Landlord has agreed to waive cure claim solely to the extent provided in Section 7.1 of the Plan.

*Approved by Judge Donald H. Steckroth March  06, 2014*

# EXECUTORY CONTRACTS AND UNEXPIRED LEASES
# TO BE ASSUMED

## EXHIBIT B

**245 ORANGE AVENUE OPERATING COMPANY II, LLC d/b/a West River Health Care Center[1]**

| COUNTERPARTY TO LEASE OR CONTRACT. | DESCRIPTION OF CONTRACT OR LEASE | CURE AMOUNT |
|---|---|---|
| **245 Orange Avenue LLC**<br>**173 Bridge Plaza North**<br>**Fort Lee, NJ 07024** | **Real Estate Lease of Property at 245 Orange Avenue, Milford, CT 06460** | N/A[*] |
| **Accelerated Care Plus Leasing, Inc.**<br>**4850 Joule Street, Bldg 1A**<br>**Reno, NV 89502** | **Physical Therapy Equipment** | $1,021.33 |
| **Mail Finance**<br>**478 Wheelers Farms Road**<br>**Milford, CT 06461** | **Lease #N12061018** | $284.42 |
| **THCI Master Tenant I LLC**<br>**173 Bridge Plaza North**<br>**Fort Lee, NJ 07024** | **West River Health Care Center Sublease between THCI Master Tenant I, LLC (Sublandlord) and 245 Orange Avenue Operating Company II, LLC, dated June 1, 2010 for real property located at 245 Orange Avenue, Milford, CT 06460** | N/A[*] |
| **THCI Master Tenant I LLC**<br>**173 Bridge Plaza North**<br>**Fort Lee, NJ 07024** | **HUD Facilities Master Lease by and among 245 Orange Avenue, LLC and THCI Master Tenant I LLC, dated June 1, 2010 for real property located at 245 Orange Avenue, Milford, CT 06460** | N/A[*] |
| **Xerox**<br>**PO Box 827598**<br>**Philadelphia, PA 19185** | **Lease #712414986, #712414945 and #712414978** | $1,971.59 |
| **Anuruddha Walaliyadda**<br>**11 New England Drive**<br>**Wallingford, CT 06492** | **Medical Director** | $3,000.00 |
| **Joseph A Balsamo MD**<br>**687 Campbell Ave.**<br>**West Haven, CT 06516** | **Medical Director** | $4,000.00 |
| **Cablevision of So. Connecticut**<br>**P.O. Box 9256**<br>**Chelsea MA 02150-9256** | **Cable** | $0.00 |

---

[1]This list is subject to Article VII of the Plan.  The failure to specify on this list any Executory Contract that is otherwise specified to be assumed under Article VII of the Plan, including without limitation each Assumed Medicare Provider Agreement, Insurance Policy, or Provider Agreement, shall not serve to reject such Executory Contracts, and such Executory Contracts shall be assumed in accordance with Article VII of the Plan notwithstanding their omission herefrom.

[*] For purposes of the Plan, the Affiliated Landlord has agreed to waive cure claim solely to the extent provided in Section 7.1 of the Plan.

*Approved by Judge Donald H. Steckroth March  06, 2014*

# EXECUTORY CONTRACTS AND UNEXPIRED LEASES
## TO BE ASSUMED

# EXHIBIT B

### 245 ORANGE AVENUE OPERATING COMPANY II, LLC d/b/a West River Health Care Center

| COUNTERPARTY TO LEASE OR CONTRACT. | DESCRIPTION OF CONTRACT OR LEASE | CURE AMOUNT |
|---|---|---|
| US Foods, Inc. c/o Bryan Cave LLP Attn: Leslie Allen Bayles and Aaron Davis 161 North Clark Street Chicago, IL 60601 | Purchase Agency and Group Purchasing Agreements, including Senior Living Membership Form dated as of December 13, 2011; US Foods Customer Account Applications, Premier Purchasing Partners L.P. Group Purchasing Agreement dated as of July 1, 2010, and all other documents related to the purchase of products by the Debtors from US Foods | $29,416.63 |
| Cigna HealthCare of Connecticut, Inc. c/o Cigna Legal Attn: Mina Bergland, Ass't Director 900 Cottage Grove Road, B6LPA Hartford, CT  06152 | Ancillary Services Agreements with Cigna HealthCare of Connecticut, Inc. and all other documents related thereto | $0.00 |

3

*Approved by Judge Donald H. Steckroth March  06, 2014*

# EXECUTORY CONTRACTS AND UNEXPIRED LEASES
# TO BE ASSUMED

# EXHIBIT B

**240 CHURCH STREET OPERATING COMPANY II, LLC d/b/a Newington Health Care Center[1]**

| COUNTERPARTY TO LEASE OR CONTRACT. | DESCRIPTION OF CONTRACT OR LEASE | CURE AMOUNT |
|---|---|---|
| 240 Church Street, LLC<br>173 Bridge Plaza North<br>Fort Lee, NJ 07024 | Lease of real property located at 240 Church Street, Newington, CT 06111 | N/A[*] |
| Accelerated Care Plus Leasing, Inc.<br>4850 Joule Street<br>Bldg. 1A<br>Reno, NV 89502 | Physical Therapy Equipment | $2,283.80 |
| Mail Finance<br>478 Wheelers Farms Rd<br>Milford, CT 06461 | Lease #N12061070 | $297.04 |
| THCI Master Tenant I LLC<br>173 Bridge Plaza North<br>Fort Lee, NJ 07024 | Newington Health Care Center Sublease between THCI Master Tenant I LLC (Sublandlord) and 240 Church Street Operating Company II, LLC dated June 1, 2010 for real property located at 240 Church Street Newington, CT 06111. | N/A[*] |
| THCI Master Tenant I LLC<br>173 Bridge Plaza North<br>Fort Lee, NJ 07024 | HUD Facilities Master Lease by and among 240 Church Street, LLC and THCI Master Tenant I LLC, dated June 1, 2010, for real property located at 240 Church Street, Newington, CT 06111. | N/A[*] |
| Xerox<br>PO Box 827598<br>Philadelphia, PA 19184 | Lease #712414069 | $454.78 |
| Consulting Cardiologists, PC<br>85 Seymour Street #719<br>Hartford, CT 06106-5560 | Medical Director | $21,250.00 |
| Cox Communications<br>P.O. Box 182656<br>Columbus, OH 43218-2656 | Cable | $862.60 |
| CWPM<br>25 Norton Place<br>P.O. Box 415<br>Plainville, CT 06062 | Waste Removal | $11,858.85 |
| DeLage Landen Financial Services<br>P.O.Box 41602<br>Philadelphia, PA 19101-1602 | Office Equipment Lease | $18,406.70 |

---

[1] This list is subject to Article VII of the Plan.  The failure to specify on this list any Executory Contract that is otherwise specified to be assumed under Article VII of the Plan, including without limitation each Assumed Medicare Provider Agreement, Insurance Policy, or Provider Agreement, shall not serve to reject such Executory Contracts, and such Executory Contracts shall be assumed in accordance with Article VII of the Plan notwithstanding their omission herefrom.

[*] For purposes of the Plan, the Affiliated Landlord has agreed to waive cure claim solely to the extent provided in Section 7.1 of the Plan.

*Approved by Judge Donald H. Steckroth March  06, 2014*

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES
## TO BE ASSUMED

## EXHIBIT B

**240 CHURCH STREET OPERATING COMPANY II, LLC d/b/a Newington Health Care Center**

| COUNTERPARTY TO LEASE OR CONTRACT. | DESCRIPTION OF CONTRACT OR LEASE | CURE AMOUNT |
|---|---|---|
| Newington Internal Med Primary Care, LLP<br>365 Willard Avenue, Suite 2-D<br>Newington, CT 06111 | Medical Director | $0.00 |
| US Foods, Inc.<br>c/o Bryan Cave LLP<br>Attn: Leslie Allen Bayles and Aaron Davis<br>161 North Clark Street<br>Chicago, IL 60601 | Purchase Agency and Group Purchasing Agreements, including Senior Living Membership Form dated as of December 13, 2011; US Foods Customer Account Applications, Premier Purchasing Partners L.P. Group Purchasing Agreement dated as of July 1, 2010, and all other documents related to the purchase of products by the Debtors from US Foods | $41,588.71 |
| Cigna HealthCare of Connecticut, Inc.<br>c/o Cigna Legal<br>Attn: Mina Bergland, Ass't Director<br>900 Cottage Grove Road, B6LPA<br>Hartford, CT  06152 | Ancillary Services Agreements with Cigna HealthCare of Connecticut, Inc. and all other documents related thereto | $0.00 |

5

*Approved by Judge Donald H. Steckroth March  06, 2014*

# EXECUTORY CONTRACTS AND UNEXPIRED LEASES
## TO BE ASSUMED

## EXHIBIT B

**1 BURR ROAD OPERATING COMPANY II, LLC d/b/a Westport Health Care Center**[1]

| COUNTERPARTY TO LEASE OR CONTRACT. | DESCRIPTION OF CONTRACT OR LEASE | CURE AMOUNT |
|---|---|---|
| **1 Burr Road, LLC**<br>173 Bridge Plaza North<br>Fort Lee, NJ 07024 | Lease of real property located at 1 Burr Road, Westport, CT 06880 | N/A[*] |
| **Accelerated Care Plus Leasing, Inc.**<br>4850 Joule Street<br>Bldg. 1A<br>Reno, NV 89502 | **Physical Therapy Equipment** | $1,117.22 |
| **Mail Finance**<br>478 Wheelers Farms Road<br>Milford, CT 06461 | Lease #N12061030 | $284.42 |
| **Xerox**<br>P.O. Box 827598<br>Philadelphia, PA 19186 | Lease #719271041 | $853.85 |
| **George M. Goldfarb M.D.**<br>1305 Post Road<br>Fairfield, CT 06824 | **Medical Director** | $10,000.00 |
| **Soundview Medical Associates LLC**<br>761 Main Ave<br>Norwalk, CT 06851 | **Medical Director** | $3,000.00 |
| **Stellar Private Cable Systems Inc**<br>975 East Tallmadge Avenue<br>Akron, OH 44310 | Cable | $0.00 |
| **US Foods, Inc.**<br>c/o Bryan Cave LLP<br>Attn: Leslie Allen Bayles and Aaron Davis<br>161 North Clark Street<br>Chicago, IL 60601 | **Purchase Agency and Group Purchasing Agreements, including Senior Living Membership Form dated as of December 13, 2011; US Foods Customer Account Applications, Premier Purchasing Partners L.P. Group Purchasing Agreement dated as of July 1, 2010, and all other documents related to the purchase of products by the Debtors from US Foods** | $28,813.88 |
| **Cigna HealthCare of Connecticut, Inc.**<br>c/o Cigna Legal<br>Attn: Mina Bergland, Ass't Director<br>900 Cottage Grove Road, B6LPA<br>Hartford, CT  06152 | **Ancillary Services Agreements with Cigna HealthCare of Connecticut, Inc. and all other documents related thereto** | $0.00 |

---

[1] This list is subject to Article VII of the Plan.  The failure to specify on this list any Executory Contract that is otherwise specified to be assumed under Article VII of the Plan, including without limitation each Assumed Medicare Provider Agreement, Insurance Policy, or Provider Agreement, shall not serve to reject such Executory Contracts, and such Executory Contracts shall be assumed in accordance with Article VII of the Plan notwithstanding their omission herefrom.

[*] For purposes of the Plan, the Affiliated Landlord has agreed to waive cure claim solely to the extent provided in Section 7.1 of the Plan.

*Approved by Judge Donald H. Steckroth March  06, 2014*

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES
## TO BE ASSUMED

## EXHIBIT B

### 107 OSBORNE STREET OPERATING II, LLC d/b/a Danbury Health Care Center[1]

| COUNTERPARTY TO LEASE OR CONTRACT. | DESCRIPTION OF CONTRACT OR LEASE | CURE AMOUNT |
|---|---|---|
| 107 Osborne Street, LLC<br>173 Bridge Plaza North<br>Fort Lee, NJ 07024 | Lease of real property at 107 Osborne Street, Danbury, CT 06810 | N/A* |
| Accelerated Care Plus Leasing, Inc.<br>4850 Joule Street<br>Bldg. 1A<br>Reno, NV 89502 | Physical Therapy Equipment | $1,021.33 |
| Mail Finance<br>478 Wheelers Farm Road<br>Milford, CT 06461 | Lease # N10061687 | $386.46 |
| Xerox<br>P.O. Box 827598<br>Philadelphia, PA 19182 | Lease # 717857825 and 717857833 | $654.87 |
| Michael & Michael LLC<br>P.O. Box 1242<br>Danbury, CT 06813 | Parking Agreement | $4,700.00 |
| Winter Brothers<br>307 White Street<br>Danbury, CT 06810 | Waste Removal | $5,285.61 |
| Western Connecticut Medical Group, PC<br>14 Research Drive<br>Bethel, CT 06801 | Medical Director | $22.18 |
| Stellar Private Cable Systems Inc.<br>975 East Tallmadge Avenue<br>Akron, OH 44310 | Cable | $7,572.48 |
| US Foods, Inc.<br>c/o Bryan Cave LLP<br>Attn: Leslie Allen Bayles and Aaron Davis<br>161 North Clark Street<br>Chicago, IL 60601 | Purchase Agency and Group Purchasing Agreements, including Senior Living Membership Form dated as of December 13, 2011; US Foods Customer Account Applications, Premier Purchasing Partners L.P. Group Purchasing Agreement dated as of July 1, 2010, and all other documents related to the purchase of products by the Debtors from US Foods | $29,627.51 |

---

[1] This list is subject to Article VII of the Plan.  The failure to specify on this list any Executory Contract that is otherwise specified to be assumed under Article VII of the Plan, including without limitation each Assumed Medicare Provider Agreement, Insurance Policy, or Provider Agreement, shall not serve to reject such Executory Contracts, and such Executory Contracts shall be assumed in accordance with Article VII of the Plan notwithstanding their omission herefrom.

* For purposes of the Plan, the Affiliated Landlord has agreed to waive cure claim solely to the extent provided in Section 7.1 of the Plan.

*Approved by Judge Donald H. Steckroth March  06, 2014*

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES
## TO BE ASSUMED

## EXHIBIT B

**107 OSBORNE STREET OPERATING II, LLC d/b/a Danbury Health Care Center**

| COUNTERPARTY TO LEASE OR CONTRACT. | DESCRIPTION OF CONTRACT OR LEASE | CURE AMOUNT |
|---|---|---|
| Cigna HealthCare of Connecticut, Inc. c/o Cigna Legal Attn: Mina Bergland, Ass't Director 900 Cottage Grove Road, B6LPA Hartford, CT  06152 | Ancillary Services Agreements with Cigna HealthCare of Connecticut, Inc. and all other documents related thereto | $0.00 |

8

*Approved by Judge Donald H. Steckroth March  06, 2014*

# EXHIBIT C

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

---

# CREDIT AGREEMENT

Dated as of _____, 2014

by and among

**710 LONG RIDGE ROAD OPERATING COMPANY II, LLC
D/B/A LONG RIDGE OF STAMFORD,**

**1 BURR ROAD OPERATING COMPANY II, LLC
D/B/A WESTPORT HEALTH CARE CENTER,**

**107 OSBORNE STREET OPERATING COMPANY II, LLC
D/B/A DANBURY HEALTH CARE CENTER**,

**240 CHURCH STREET OPERATING COMPANY II, LLC
D/B/A NEWINGTON HEALTH CARE CENTER, and**

**245 ORANGE AVENUE OPERATING COMPANY II, LLC D/B/A WEST RIVER
HEALTH CARE CENTER,**
**,**
as Borrower;

**THCI MORTGAGE HOLDING COMPANY LLC**, and

**THCI COMPANY LLC,**
as Accommodation Pledgor;

and

**CAPITAL ONE, NATIONAL ASSOCIATION**,
as Lender

---

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**TABLE OF CONTENTS**

**Page(s)**

**ARTICLE 1.         DEFINITIONS; PRINCIPLES OF CONSTRUCTION** ......................2

    **1.1**    **Specific Definitions** .........................................................................2

    **1.2**    **Other Interpretive Provisions**.....................................................24

    **1.3**    **Accounting Terms** .......................................................................25

    **1.4**    **Rounding** .....................................................................................25

    **1.5**    **Times of Day** ...............................................................................26

**ARTICLE 2.         GENERAL REVOLVING LOAN TERMS** ......................................26

    **2.1**    **The Revolving Loans** ...................................................................26

    **2.3**    **Funding of the Loans** ..................................................................26

    **2.4**    **Lockbox Accounts** .......................................................................27

    **2.5**    **Borrowing Base Exceeded** ...........................................................29

    **2.6**    **Repayment of the Revolving Loans** ............................................29

    **2.7**    **Interest**.........................................................................................29

    **2.8**    **Additional Interest Provisions** ....................................................29

    **2.9**    **Fees and Charges** ........................................................................30

    **2.10**    **Use of Proceeds** ..........................................................................30

    **2.11**    **Evidence of Indebtedness** ............................................................31

    **2.12**    **Payments Generally**.....................................................................31

    **2.13**    **Protective Advances** ....................................................................31

    **2.14**    **Taxes** ............................................................................................32

    **2.15**    **Credit of Payments and Proceeds** ..............................................32

    **2.16**    **Increased Costs** ...........................................................................33

    **2.17**    **Reserved** ......................................................................................34

    **2.18**    **Reserved** ......................................................................................34

    **2.19**    **Survival** .......................................................................................34

**ARTICLE 3.         CONDITIONS PRECEDENT TO LOANS** ...................................34

    **3.1**    **Closing** ........................................................................................34

    **3.2**    **Conditions of Initial Loan** ..........................................................34

    **3.3**    **Conditions to all Revolving Loans [and Letters of Credit]**.........36

    **3.4**    **Limited Waiver of Conditions Precedent** ...................................37

*Approved by Judge Donald H. Steckroth March  06, 2014*

## TABLE OF CONTENTS
### (continued)

Page(s)

**ARTICLE 4.        REPRESENTATIONS AND WARRANTIES**....................................37

    **4.1        Organization**............................................37

    **4.2        Authorization; Enforceability** ........................37

    **4.3        No Conflicts**.........................................37

    **4.4        Litigation**..........................................38

    **4.5        No Defaults**.........................................38

    **4.6        Restrictive Agreement**..............................38

    **4.7        Title** ..............................................38

    **4.8        No Bankruptcy Filing**...............................38

    **4.9        Solvency** ...........................................38

    **4.10        Full and Accurate Disclosure**......................39

    **4.11        Tax Filings**.......................................39

    **4.12        No Plan Assets**....................................39

    **4.13        Compliance**........................................40

    **4.14        Federal Reserve Regulations; Investment Company Act** ..............................40

    **4.15        Ownership of Borrower**.............................40

    **4.16        Management Agreement and Lease Agreements** ...........................40

    **4.17        Compliance with Environmental Laws**...............40

    **4.18        Employee Matters**.................................41

    **4.19        Intellectual Property**.............................41

    **4.20        Healthcare Authorizations**........................41

    **4.21        HIPAA/HITECH Compliance**..........................41

    **4.22        Reimbursement; Third-Party Payors**................42

    **4.23        Other Healthcare Regulatory Matters**..............42

    **4.24        Compliance with Healthcare Laws**..................42

    **4.25        Subordinated Indebtedness**........................44

    **4.26        Federal Employer Identification Number**...........44

    **4.27        Survival**..........................................45

**ARTICLE 5.        AFFIRMATIVE COVENANTS** ....................................45

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

## TABLE OF CONTENTS
### (continued)

Page(s)

| | | |
|---|---|---|
| 5.1 | Payment of Obligations | 45 |
| 5.2 | Preservation of Existence, Etc. | 45 |
| 5.3 | Maintenance of Properties | 45 |
| 5.4 | Maintenance of Insurance | 46 |
| 5.5 | Compliance With Laws | 46 |
| 5.6 | Books and Records | 47 |
| 5.7 | Inspection Rights; Field Audits | 47 |
| 5.8 | Environmental Matters | 47 |
| 5.9 | Additional Guarantors/Borrower | 48 |
| 5.10 | Collateral Records | 48 |
| 5.11 | Security Interests | 48 |
| 5.12 | Account Control Agreements | 48 |
| 5.13 | Additional Accommodation Pledgors | 49 |
| 5.14 | Landlord and Warehouse Agreements | 49 |
| 5.15 | Licenses | 49 |
| 5.16 | Reserved | 49 |
| 5.17 | Depository Accounts | 49 |
| 5.18 | Expenses | 49 |
| 5.19 | Indemnity | 49 |
| 5.20 | Subordination of Management Fees | 50 |
| 5.21 | Patriot Act Compliance | 50 |
| 5.22 | Healthcare Operations | 51 |
| 5.23 | Right of First Refusal | 52 |
| 5.24 | Further Assurances | 53 |
| 5.25 | Reserved | 53 |
| ARTICLE 6. | NEGATIVE COVENANTS | 53 |
| 6.1 | Liens | 54 |
| 6.2 | Investments | 54 |
| 6.3 | Indebtedness | 54 |

*Approved by Judge Donald H. Steckroth March  06, 2014*

# TABLE OF CONTENTS
## (continued)

Page(s)

6.4    Contingent Obligations .......................................................... 54

6.5    Loans ................................................................................. 54

6.6    Fundamental Changes ........................................................... 54

6.7    Asset Dispositions ................................................................ 54

6.8    Distributions; Certain Other Payments .................................... 54

6.9    Change in Nature of Business; Change to Organization Documents ........... 54

6.10   Transactions With Affiliates .................................................. 55

6.11   Burdensome Agreements ....................................................... 55

6.12   Use of Proceeds .................................................................. 55

6.13   Change of Control ............................................................... 55

6.14   Indebtedness Cancellation .................................................... 55

6.15   Certain Accounting Changes ................................................. 55

6.16   Healthcare Matters .............................................................. 55

6.17   Principal Place of Business; Location of Collateral .................... 56

6.18   ERISA ............................................................................... 56

6.19   Arrangements with Referral Sources ....................................... 56

6.20   Manager; Management Agreement ......................................... 57

6.21   Restrictive Agreements ........................................................ 57

6.22   IRS Form 8821 ................................................................... 57

6.23   Swap Agreements ................................................................ 57

6.24   Conduct of Business ............................................................ 57

6.25   Federal Employer Identification Number ................................. 57

ARTICLE 7.        FINANCIAL COVENANTS ...................................... 58

7.1    Reserved ........................................................................... 58

7.2    Reserved ........................................................................... 58

7.3    Reserved ........................................................................... 58

7.4    Reserved ........................................................................... 58

7.5    Reserved ........................................................................... 58

7.6    Reserved ........................................................................... 58

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

# TABLE OF CONTENTS
## (continued)

Page(s)

| | | |
|---|---|---|
| 7.7 | Reserved | 58 |
| 7.8 | Minimum Liquidity | 58 |
| 7.9 | Reserved | 58 |
| ARTICLE 8. | NOTICES AND REPORTING | 58 |
| 8.1 | Notices | 58 |
| 8.2 | Notice of Litigation and Other Matters | 59 |
| 8.3 | Borrowing Base Certificates | 61 |
| 8.4 | Financial Statements, Compliance Certificates and Projections | 61 |
| 8.5 | Other Reports | 62 |
| 8.6 | Accuracy of Information | 62 |
| 8.7 | Protected Health Information | 62 |
| ARTICLE 9. | DEFAULTS AND REMEDIES | 63 |
| 9.1 | Events of Default | 63 |
| 9.2 | Remedies | 66 |
| 9.3 | Application of Payments After Exercise of Remedies | 67 |
| 9.4 | Rights to Appoint Receiver | 68 |
| 9.5 | Collection of Accounts | 68 |
| 9.6 | Remedies Cumulative | 69 |
| 9.7 | Assistance and Cooperation | 69 |
| 9.8 | Severance | 69 |
| 9.9 | Delay | 70 |
| 9.10 | Lender's Right to Perform | 70 |
| 9.11 | License | 70 |
| 9.12 | Injunctive Relief | 70 |
| ARTICLE 10. | SALE OF LOANS; SECONDARY MARKET TRANSACTIONS | 71 |
| 10.1 | Sale of Loans | 71 |
| 10.2 | Secondary Market Transactions | 71 |
| ARTICLE 11. | EFFECTIVE DATE AND TERMINATION | 71 |

*Approved by Judge Donald H. Steckroth March  06, 2014*

# TABLE OF CONTENTS
## (continued)

Page(s)

| | | |
|---|---|---|
| **11.1** | **Effective Date and Termination** | 71 |
| 11.2 | Effect of Termination | 72 |
| **11.3** | **Survival** | 72 |
| **ARTICLE 12.** | **MISCELLANEOUS** | 72 |
| **12.1** | **Brokers and Financial Advisors** | 72 |
| **12.2** | **Lender's Discretion** | 73 |
| **12.3** | **Governing Law** | 73 |
| **12.4** | **Modification, Waiver in Writing** | 74 |
| **12.5** | **Trial by Jury** | 74 |
| **12.6** | **Waiver of Consequential Damages, Etc** | 74 |
| **12.7** | **Headings/Exhibits** | 75 |
| **12.8** | **Severability** | 75 |
| **12.9** | **Preferences** | 75 |
| **12.10** | **Waiver of Notice** | 75 |
| **12.11** | **Remedies of Borrower** | 75 |
| **12.12** | **Prior Agreements** | 76 |
| **12.13** | **Offsets, Counterclaims and Defenses** | 76 |
| **12.14** | **Publicity** | 76 |
| **12.15** | **No Usury** | 76 |
| **12.16** | **Conflict; Construction of Documents** | 77 |
| **12.17** | **No Third Party Beneficiaries** | 77 |
| **12.18** | **Assignment** | 77 |
| **12.19** | **Set-Off** | 77 |
| **12.20** | **Counterparts** | 78 |
| **12.21** | **Borrower Representative** | 78 |
| **12.22** | **Joint and Several** | 79 |
| **12.23** | **Release of Claims** | 87 |

*Approved by Judge Donald H. Steckroth March  06, 2014*

# TABLE OF CONTENTS
## (continued)

**Page(s)**

Schedule 1      -   Supplements to Specific Definitions
Schedule 2      -   Existing Obligations
Schedule 3.A   -   Exceptions to Representations and Warranties
Schedule 3.B   -   Ownership of Borrower
Schedule 4      -   Post Closing Items

Exhibit A          Form of Borrowing Base Certificate
Exhibit B          Form of Compliance Certificate
Exhibit C          Form of Revolving Note
Exhibit D          Form of Revolving Loan Notice
Exhibit E          Form of Guaranty

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

     **THIS CREDIT AGREEMENT** is dated as of [_____], 2014 (as the same may be modified, supplemented, amended or otherwise changed, this "*Agreement*") by and among **710 LONG RIDGE ROAD OPERATING COMPANY II, LLC**, a Delaware limited liability company doing business as Long Ridge of Stamford ("*Long Ridge*"), **1 BURR ROAD OPERATING COMPANY II, LLC**, a Delaware limited liability company doing business as Westport Health Care Center ("*Westport*"), **107 OSBORNE STREET OPERATING COMPANY II, LLC**, a Delaware limited liability company doing business as Danbury Health Care Center ("*Danbury*"), **240 CHURCH STREET OPERATING COMPANY II, LLC**, a Delaware limited liability company doing business as Newington Health Care Center ("*Newington*"), and **245 ORANGE AVENUE OPERATING COMPANY II, LLC**, a Delaware limited liability company doing business as  West River Health Care Center ("*West River*" and together with Long Ridge, Westport, Danbury, and Newington, collectively, "*Borrower*"), **THCI MORTGAGE HOLDING COMPANY LLC**, a Delaware limited liability company ("*THCI Mortgage*"), and **THCI COMPANY LLC**, a Delaware limited liability company ("*THCI*" and together with THCI Mortgage, collectively, "*Accommodation Pledgor*"), and **CAPITAL ONE, NATIONAL ASSOCIATION** (together with its successors and assigns, "*Lender*").

     **A**.    On February 24, 2013 (the "*Petition Date*"), Long Ridge, Westport, Danbury, Newington, and West River each filed a separate voluntary petition for relief under chapter 11 of the Bankruptcy Code (as defined in Section 1.1 hereof ) in the United States Bankruptcy Court for the District of New Jersey (the "*Bankruptcy Court*") and continued in the possession of their assets and in the management of their business pursuant to sections 1107 and 1108 of the Bankruptcy Code.

     **B**.    The Lender provided the Borrower with that certain debtor-in-possession revolving loan facility in an aggregate principal amount of $5,000,000 (the "*Postpetition Financing Facility*"), which was secured by substantially all of the assets of the Debtors pursuant to that certain *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364, Rule 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure, and Local Rule 4001-4: (1) Authorizing Debtors to Obtain Postpetition Financing On Superpriority and Secured Basis; and (2) Authorizing the Continued Use of the Pre-Petition Lenders' Cash Collateral,* dated April 9, 2013 [Dkt. No. 234] (the "*Final DIP Order*").

     **C**.    On May 7, 2013, the Bankruptcy Court entered an order [Dkt. No. ___] (the "*Confirmation Order*") confirming the Joint Plan of Reorganization for [ ], dated [ ], 201_ (as in effect on the date of confirmation thereof and as thereafter may be amended, the "*Reorganization Plan*").

     **D**.    In connection with the confirmation and implementation of the Reorganization Plan, the reorganized Borrowers have requested that the Lenders make available to Borrower the revolving credit facility described herein (the "*Revolving Facility*"), and the Lenders have agreed, subject to the terms and conditions hereof and in the Reorganization Plan, to enter into this Agreement.

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

**E.**     On the effective date of the Reorganization Plan (the "***Effective Date***"), the outstanding amounts under the Postpetition Financing Facility shall be paid with the proceeds of the Revolving Facility.

In consideration of the premises and the agreements, provisions and covenants herein contained, Borrower and Lender agree as follows:

## ARTICLE 1.  DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**1.1**     **Specific Definitions**.  The following terms have the meanings set forth below:

***Accommodation Pledgor***:   , THCI Company LLC, THCI Mortgage Holding Company, LLC and any Person other than a Guarantor which pledges its Equity Interests in Borrower to secure the Obligations.

***ACH***:  the Automated Clearing House or any successor reasonably acceptable to Lender.

***Account***: any and all of the "accounts" (as that term is defined in the UCC) of Borrower, whether now existing or hereafter arising.

***Account Debtor***: any Person obligated on any Account owing to Borrower.

***Affiliate***:  as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

***Agreement:***  the meaning set forth in the preamble in this Agreement.

***Applicable Law***: all Laws applicable to any Credit Party or other Person, or any conduct, transaction, agreement or matter in question, including all applicable statutory law, common law and equitable principles, and all provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of Governmental Authorities

***Applicable Libor Margin***: 2.75% per annum.

***Asset Disposition***: a sale, lease, license, consignment, transfer or other disposition of any property or assets of any Borrower, including a disposition in connection with a sale-leaseback transaction or synthetic lease.

***Assignment of Claims Act***: the Federal Assignment of Claims Act, 31 U.S.C. § 3727 et seq., as amended from time to time.

***Authorized Officer***:  an officer of each Credit Party authorized to bind each respective Credit Party and, solely for purposes of notices given pursuant to Article 2, any other officer or employee of the applicable Credit Party so designated by any of the foregoing officers in a written notice to Lender.  Any document delivered hereunder that is signed by an

*Approved by Judge Donald H. Steckroth March  06, 2014*

Authorized Officer of a Credit Party shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of such Credit Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Credit Party.

*Availability*:  the meaning set forth in Section 2.1(a).

*Availability Period*: the period from and including the Closing Date to the earliest of (a) the Revolving Loan Termination Date, and (b) the date of termination of the commitment of Lender to make Revolving Loans pursuant to Section 9.2.

*Bankruptcy Code*: title 11 of the United States Code entitled "Bankruptcy", 11 U.S.C. §§ 101, *et seq*., as now or hereinafter in effect, or any successor statute.

*Borrower*:  the meaning set forth in the preamble to this Agreement.

*Borrower Parties*:  the meaning set forth in Section 12.22(o).

*Borrower Party*:  the meaning set forth in Section 12.22(o).

*Borrower Representative*:  Long Ridge

*Borrowing Base*: as of the date of determination thereof, an amount equal to the sum of (A) eighty-five percent (85%) of Eligible Accounts minus (B) such reserves, in such amounts and with respect to such matters, as Lender may deem reasonably proper and necessary from time to time, as calculated with reference to the most recent Borrowing Base Certificate acceptable to Lender and otherwise in accordance with this Agreement.

*Borrowing Base Certificate*: a certificate to be delivered by Borrower setting forth a calculation of the Borrowing Base as of the date of such certificate, which certificate shall be substantially in the form of Exhibit A.

*Business Day*:  any day other than a Saturday, Sunday or any day on which commercial banks in New York, New York or Bethesda, Maryland are authorized or required to close by law or executive order.

*Capitalized Lease Obligations*: any Indebtedness represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP, consistently applied.

*Capital Expenditures*: for any period, the aggregate of all expenditures (including that portion of Capitalized Lease Obligations attributable to that period) made in respect of the purchase, construction or other acquisition of fixed or capital assets, determined in accordance with GAAP.

*Cash Equivalents*: (i) obligations issued or guaranteed by the United States of America or any agency thereof, (ii) commercial paper with maturities of not more than 180

*Approved by Judge Donald H. Steckroth March  06, 2014*

days and a published rating of not less than A-1 or P-1 (or the equivalent rating) by a Rating Agency, (iii) certificates of time deposit and bankers" acceptances having maturities of not more than 180 days and repurchase agreements backed by United States government securities of a commercial bank if (A) such bank has a combined capital and surplus of at least $500,000,000, or (B) its debt obligations, or those of a holding company of which it is a Subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency, and (iv) U.S. money market funds that invest solely in obligations issued or guaranteed by the United States of America or an agency thereof.

**Cash Management Agreements**: any and all cash management, overdraft, treasury, foreign exchange, lockbox, sweep-to-line, controlled disbursement, credit or debit card, EFT, ACH and other similar agreements entered into from time to time between Borrower and Lender or any Lender Affiliate.

**Casualty Loss**: the meaning set forth in Section 8.2(k).

**CCP**: the meaning set forth in Section 4.23.

**Change of Control**: with respect to Borrower Party, the result caused by the occurrence of any event or series of events which results in (i) any change in management (except to any Affiliate of any Borrower Party or other member of management in office as of the Closing Date) or control of any Borrower Party, or (ii) the pledge, hypothecation, encumbrance or transfer of any Equity Interest in any Borrower Party (directly or indirectly, beneficially, legally or otherwise), unless approved in writing by Lender in its sole and absolute discretion.

**Change in Law**: the occurrence, after the Closing Date, of any of the following: (a) the adoption of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the interpretation or application thereof by any Governmental Authority; or (c) compliance by Lender with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided, however, that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

**Citation**: any operational or physical plant deficiency with respect to any Healthcare Facility of which Borrower or any other Credit Party is notified in writing by any Governmental Authority or Government Reimbursement Program having regulatory or other oversight of such Healthcare Facility or the operations of Borrower at such Healthcare Facility, and with respect to which the potential penalty for such deficiency, if not cured or remedied within any permitted cure period, is a loss of licensure, decertification of such

4

Healthcare Facility from participation in any Government Reimbursement Program, the appointment of a temporary manager for such Healthcare Facility, the denial of payment for new admissions to such Healthcare Facility, the initiation of state monitoring of such Healthcare Facility, or the closure of such Healthcare Facility.

*Closing*: the meaning set forth in <u>Section 3.1</u>.

*Closing Date*: the meaning set forth in <u>Section 3.1</u>.

*CMS*:  the Centers for Medicare & Medicaid Services or any Governmental Authority succeeding to any of its principal functions.

*Code*:  the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

*Collateral*:  any and all assets and rights and interests in or to property of Borrower and any other Credit Party whether real or personal, tangible or intangible, in which a Lien is granted or purported to be granted pursuant to the Collateral Documents.

*Collateral Access Agreement*: an agreement, satisfactory in form and substance to Lender in its reasonable credit judgment, by which: (a) for any material Collateral located on leased premises, the lessor waives or subordinates any Lien it may have on the Collateral, and agrees to permit Lender to enter upon the premises and remove the Collateral or to use the premises to store or dispose of the Collateral; (b) for any Collateral held by a warehouseman, processor, shipper or freight forwarder, such Person waives or subordinates any Lien it may have on the Collateral, agrees to hold any Documents in its possession relating to the Collateral as agent for Lender, and agrees to deliver the Collateral to Lender upon request; (c) for any Collateral held by a repairman, mechanic or bailee, such Person acknowledges Lender's Lien, waives or subordinates any Lien it may have on the Collateral, and agrees to deliver the Collateral to Lender upon request; and (d) for any Collateral subject to a Licensor's Intellectual Property rights, the Licensor grants to Lender the right, vis-à-vis such Licensor, to enforce Lender's Liens with respect to the Collateral, including the right to dispose of it with the benefit of the Intellectual Property, whether or not a default exists under any applicable License.

*Collateral Assignment of Material Contracts:* each collateral assignment of Material Contracts executed by Borrower in favor of Lender satisfactory in form and substance to Lender, as the same may be amended, restated, replaced, severed, split, supplemented or otherwise modified from time to time.

*Collateral Documents*: all agreements, instruments and documents now or hereafter executed and delivered in connection with this Agreement pursuant to which Liens are granted or purported to be granted to Lender in Collateral securing all or part of the Obligations each in form and substance satisfactory to Lender, including, without limitation,

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

the Security Agreement, Pledge Agreement, the Collateral Assignment of Material Contracts and any agreements governing the Lockbox Accounts.

*Collections*:  with respect to any Account, all cash collections on such Account.

*Compliance Certificate*:  a certificate executed by Borrower Representative with respect to its compliance with the terms, conditions and covenants set forth in this Agreement as of the date of such certificate, which certificate shall be substantially in the form of Exhibit B.

*CON*: any certificate of need or similar license which determines that there is a need for a healthcare facility at a particular location or within a certain geographic region.

*Concentration Account*: the meaning set forth in Section 2.4(a).

*Contingent Obligation*:  as to any Person, any: (a) obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect: (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation; (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation; (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part); or (b) Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

*Contractual Obligation*:  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

*Control*:  with respect to any Person, either (i) ownership directly or indirectly of more than 50% of all Equity Interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise.

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

*Credit Parties*:  Borrower, each Accommodation Pledgor and each Guarantor, collectively.

*Credit Party*:  any of such Credit Parties, individually.

*Debtor Relief Laws*:  the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

*Default*:  the occurrence of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

*Default Rate*:  a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%).

*Derivative Obligations*:  every obligation of a Person under any forward contract, futures contract, exchange contract, swap, option or other financing agreement or arrangement (including, without limitation, caps, floors, collars and similar agreement), the value of which is dependent upon interest rates, currency exchange rates, commodities or other indices.

*Distributions*: any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of Borrower, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such capital stock or other Equity Interest or on account of any return of capital to Borrower's stockholders, partners or members (or the equivalent Person thereof).

*Documents*:  any and all of the "documents" (as that term is defined in the UCC), whether now existing or hereafter arising.

*Dollars* and *$*:  lawful money of the United States.

*EFT*:  electronic funds transfer.

*Early Termination Fee*: an amount equal to the product obtained by multiplying (a) the Revolving Commitment times (b)(i) one percent (1.0%), if, after the first anniversary of the Closing Date but prior to the second anniversary of the Closing Date, the Revolving Facility is terminated by Borrower or declared due and payable by Lender due to an Event of Default, or (ii) one half of one percent (0.5%), if, on or after the second anniversary of the Closing Date, the Revolving Facility is terminated by Borrower or declared due and payable by Lender due to an Event of Default.

*Eligible Account*: subject to the criteria below, an Account of Borrower, which was generated in the ordinary course of Borrower's business and consistent with past

7

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

practices, which was generated originally in the name of Borrower and not acquired via assignment or otherwise, and which Lender, in its reasonable credit judgment, in accordance with this definition, deems to be an Eligible Account.  The net amount of Eligible Accounts at any time shall be the face amount of such Eligible Accounts as originally billed minus all cash collections and other proceeds of such Account received from or on behalf of the Account Debtor thereunder as of such date and any and all returns, rebates, discounts (which may, at Lender's option, be calculated on shortest terms), credits, allowances or excise taxes of any nature at any time issued, owing, claimed by Account Debtors, granted, outstanding or payable in connection with such Accounts at such time.  Without limiting the generality of the foregoing, no Account shall be an Eligible Account if:

(a)     the Account or any portion of the Account is payable by a Person other than: (i) a commercial medical insurance company organized under the laws of any jurisdiction, having its principal office in the United States and licensed as an insurer in the state in which the services giving rise to such Account were rendered; (ii) a Blue Cross/Blue Shield Plan; (iii) any Government Account Debtor making payments under Medicare or Medicaid; or (iv) an HMO, PPO, or an institutional (as opposed to a natural person, *i.e.*, an individual) Account Debtor, organized under the laws of any jurisdiction in the United States, having its principal office in the United States;

(b)     the Account is an obligation of an Account Debtor that has suspended business, made a general assignment for the benefit of creditors, is unable to pay its debts as they become due or as to which a petition has been filed (voluntary or involuntary) under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or the Account is an Account as to which any facts, events or occurrences exist which could reasonably be expected to impair the validity, enforceability or collectability of such Account or reduce the amount payable or delay payment thereunder;

(c)     the Account Debtor is a natural person (*i.e.*, an individual), or an Affiliate of Borrower;

(d)     as to which any representation and warranty contained in any Loan Document with respect to such Account is not true and correct;

(e)     the Account remains unpaid more than one hundred fifty (150) days past the service date;

(f)     more than fifty percent (50%) of the aggregate balance of all Accounts owing from the Account Debtor (and its Affiliates but not including any Government Account Debtor making payments under Medicare or Medicaid) obligated on the Account are outstanding more than one hundred fifty (150) days after the applicable services were rendered;

(g)     without limiting the provisions of clause (f) above, fifty percent (50%) or more of the aggregate unpaid Accounts from the Account Debtor obligated on the Account are not deemed Eligible Accounts under this Agreement for any reason;

8

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

(h)    the Account and all others Accounts owed by any individual Account Debtor (and its Affiliates) (but not including any Government Account Debtor making payments under Medicare or Medicaid) to the extent that such Accounts exceed twenty-five percent (25%) of the net amount of all Eligible Accounts (calculated as set forth above) at any one time (including Accounts from any Government Account Debtor making payments under Medicare or Medicaid);

(i)    the Account is subject to any defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment of any kind (but such ineligibility shall extend only to the extent of such defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment), or Borrower owning such Account is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process;

(j)    the Account involves a workers' compensation claim which is not covered by a Third-Party Payor;

(k)    the applicable Account Debtor for such Account is any Governmental Authority, and, following a written request by Lender to Borrower, rights to payment of such Account have not been assigned to Lender pursuant to the Assignment of Claims Act, or  all other applicable statutes or regulations respecting the assignment of Government Accounts have not been complied with (for example, with respect to all Accounts payable directly by a Government Account Debtor);

(l)    if the Account arises from the performance of services, the services have not actually been performed or the services were undertaken in violation of any Law or the Account represents a progress billing for which services have not been fully and completely rendered;

(m)    the Account includes late charges or finance charges (but only such portion of the Account shall be ineligible);

(n)    the Account arises out of a cost report settlement account;

(o)    the Account is not subject to a valid and enforceable First Priority Lien in favor of Lender;

(p)    the Account is not evidenced by an invoice, statement or other documentary evidence satisfactory to Lender; or

(q)    the Account or Account Debtor fails to meet such other specifications and requirements which may from time to time be established by Lender in its reasonable credit judgment or has otherwise been excluded by Lender from the Borrowing Base in its reasonable credit judgment.

***Eligible Accounts***: each Eligible Account, collectively.

9

*Approved by Judge Donald H. Steckroth March  06, 2014*

WLDD DRAFT 2/20/2014

*Environmental Laws*: any and all Laws pertaining to the environment, natural resources, pollution, health (including any environmental clean up statutes and all regulations adopted by any local, state, federal or other Governmental Authority, and any statute, ordinance, code, order, decree, law rule or regulation all of which pertain to or impose liability or standards of conduct concerning medical waste or medical products, equipment or supplies), safety or cleanup that apply to any Credit Party with respect to the Healthcare Facilities and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601, *et seq.*), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901, *et seq.*), the Federal Water Pollution Control Act (33 U.S.C. § 1251, *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. § 5101, *et seq.*), the Clean Air Act (42 U.S.C. § 7401, *et seq.*), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136, *et seq.*), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001, *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651, *et seq.*), the Residential Lead-Based Paint Hazard Reduction Act (42 U.S.C. § 4851, *et seq.*), any analogous state or local laws, any amendments thereto, and the regulations promulgated pursuant to said laws, together with all amendments from time to time to any of the foregoing and judicial interpretations thereof.

*Environmental Notice*: a notice (whether written or oral) from any Governmental Authority or other Person of any possible material noncompliance with, investigation of a possible material violation of, litigation relating to, or potential fine or liability under any Environmental Law, or with respect to any material Environmental Release, environmental pollution or hazardous materials, including any complaint, summons, citation, order, claim, demand or request for correction, remediation or otherwise.

*Environmental Release*: a release as defined in or under any Environmental Law.

*Equity Interests*: with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in, including membership interests in and partnership interest in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in, including membership interests in and partnership interest in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in, including membership interests in and partnership interest in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

*ERISA*:  the Employment Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

*ERISA Affiliate*:  all members of a controlled group of corporations and all trades and business (whether or not incorporated) under common control and all other entities

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

which, together with Borrower, are treated as a single employer under any or all of Section 414(b), (c), (m) or (o) of the Code.

*Event of Default*:  the meaning set forth in <u>Section 9.1</u>.

*Expenses*:  any and all reasonable costs, fees and expenses of Lender in connection with: (i) the analysis, negotiation, preparation, execution, administration, delivery and termination of this Agreement, the other Loan Documents and the documents and instruments referred to herein and therein, and any amendment, amendment and restatement, supplement, waiver or consent relating hereto or thereto, whether or not any such amendment, amendment and restatement, supplement, waiver or consent is executed or becomes effective; (ii) the enforcement of Lender's rights hereunder, or the collection of any payments owing from, the Credit Parties under this Agreement and/or the other Loan Documents or the protection, preservation or defense of the rights of Lender hereunder and under the other Loan Documents; and (iii) any refinancing or restructuring of the credit arrangements provided under this Agreement and other Loan Documents in the nature of a "work-out" or of any Insolvency Proceedings, or otherwise, and including, without limitation, with respect to clauses (i), (ii) and (iii) above, any lien, litigation and other search costs, the reasonable fees, expenses and disbursements of legal counsel for Lender, including the reasonable charges of internal legal counsel, any fees or expenses incurred by Lender under <u>Section 5.7</u> for which Borrower or any other Credit Party are obligated thereunder, and reasonable charges of any expert, appraiser, auditor or other consultant to Lender.

*First Priority*:  with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject other than Permitted Liens.

*Fiscal Year*:  the fiscal year of Borrower and the other Credit Parties ending on December 31 in each calendar year.

*Fiscal Quarter*:  the fiscal period of Borrower and the other Credit Parties ending on March 31, June 30, September 30 and December 31 in each Fiscal Year.

*Fitch*:  the meaning set forth in the definition of *Rating Agency*.

*GAAP*:  generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

*Government Account Debtor*:  an Account Debtor that is a Government Reimbursement Program.

*Government Lists*:  (i) the Specially Designated Nationals and Blocked Persons Lists maintained by Office of Foreign Assets Control ("*OFAC*"), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Governmental Lists", or (iii) any similar lists maintained by the United States Department of

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

State, the United States Department of Commerce or any other Government Authority or pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Governmental Lists".

 ***Government Lockbox Account***:   an account or accounts maintained with Lender or another financial institution acceptable to Lender into which all Collections of Accounts on which Government Account Debtors are obligated are paid directly; the Government Lockbox Account shall be an account or accounts in the name of Borrower, and shall be the sole and exclusive property of Borrower.

 ***Government Reimbursement Program***:   (i) Medicare, (ii) Medicaid, (iii) TRICARE, (iv) the Federal Employees Health Benefit Program under 5 U.S.C. §§ 8902, *et seq.* or the Civilian Health and Medical Program of the Uniformed Services under 10 U.S.C. §§ 1079 and 1086, or (v) any agent, administrator, intermediary or carrier for any of the foregoing.

 ***Governmental Authority***:   any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) now or hereafter in existence.

 ***Governmental Authorization***:   any permit, license, registration, authorization, certificate, accreditation, plan, directive, consent order or consent decree of or from, or notice to, any Governmental Authority.

 ***Guarantor***:   each Person, if any, who on or after the Closing Date guarantees the payment and performance of the Obligations.

 ***Guarantors***: each Guarantor, collectively.

 ***Guaranty***:   each Guaranty, if any, made by any Guarantor in favor of Lender in form and substance satisfactory to Lender, individually.

 ***Guaranties***: each Guaranty, collectively.

 ***Hazardous Materials***:   any and all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

 ***Healthcare Authorizations***:   any and all Governmental Authorizations and permits, licenses, authorizations, certificates, certificates of need, accreditations and plans of third-party accreditation agencies (such as the Joint Commission) and Non-Government Payors (a) necessary to enable any Credit Party to engage in the Healthcare Services, participate in and receive payment under Government Reimbursement Programs and plans of Non-Government Payors or otherwise continue to conduct its business as it is conducted on

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

the Closing Date or (b) required under any Law relating to any Government Reimbursement Program or Law applicable to HMOs, PPOs, healthcare-related insurance companies, or Persons engaged in the Healthcare Services or (c) issued or required under Healthcare Laws applicable to the ownership of a Healthcare Facility.

> *Healthcare Facility*:  each skilled nursing facility, assisted living facility, independent living facility or similar facility listed on Schedule 1.1 attached hereto.

> *Healthcare Facilities*: each Healthcare Facility, collectively.

> *Healthcare Laws*:  any and all Laws relating to the possession, control, warehousing, marketing, sale and distribution of pharmaceuticals, the operation of medical or senior housing facilities (such as, but not limited to, nursing homes, skilled nursing facilities, rehabilitation hospitals, intermediate care facilities and adult care facilities), patient healthcare, patient healthcare information, patient abuse, the quality and adequacy of medical care, rate setting, equipment, personnel, operating policies, fee splitting, including, without limitation, (a) all federal and state fraud and abuse Laws, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(6)), the Stark Law (42 U.S.C. § 1395nn), the civil False Claims Act (31 U.S.C. § 3729, *et seq.*), (b) HIPAA/HITECH, (c) Medicare, (d) Medicaid, (e) quality of medical care and accreditation standards and requirements of all applicable state Laws or regulatory bodies, (f) all laws, policies, procedures, requirements and regulations pursuant to which Healthcare Authorizations are issued, and (g) any and all other applicable health care laws, regulations, manual provisions, policies and administrative guidance, including each of (a) through (g) as may be amended from time to time.

> *Healthcare Services*:  providing or arranging to provide or administering, managing or monitoring healthcare services, long-term care or any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto.  Notwithstanding the foregoing, unless Lender shall otherwise agree in writing, Healthcare Services shall not include (i) cosmetic surgery services, (ii) services rendered in respect of workers' compensation claims, or (iii) any services delivered for injury sustained in a motor vehicle accident.

> *HIPAA/HITECH*:  individually or collectively, the Health Insurance Portability and Accountability Act of 1996, commonly referred to as "HIPAA", and the Health Information Technology for Economic and Clinical Health Act, commonly referred to as "HITECH", as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

> *HIPAA/HITECH Compliance Date*:  the meaning set forth in Section 4.21.

> *HIPAA/HITECH Compliance Plan*:  the meaning set forth in Section 4.21.

> *HIPAA/HITECH Compliant*:  the meaning set forth in Section 4.21.

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

*HUD*:  The U.S. Department of Housing and Urban Development.

*HUD Loan*:  The mortgage loans existing on the Closing Date insured by HUD encumbering the Healthcare Facilities of Newington and West River.

*HUD Loan Documents*:  The notes, mortgages, regulatory agreements, security agreements, lock box agreements, intercreditor agreements (and any riders thereto) existing on the Closing Date and listed on Schedule 1.1 hereof to which Newington or West River is a party in respect of the HUD Loans.

*Indebtedness*:  without duplication, (a) all indebtedness of such Person for borrowed money, whether or not evidenced by bonds, debentures, notes or similar instruments, (b) all Capitalized Lease Obligations of such Person, (c) all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business), (d) all indebtedness secured by a Lien on the property of such Person, whether or not such indebtedness shall have been assumed by such Person, (e) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit (whether or not drawn) and banker's acceptances issued for the account of such Person, (f) all Derivative Obligations of such Person, (g) all Contingent Obligations, (h) all liabilities of any partnership or joint venture of which such Person is a general partner or joint venturer, and (i), all obligations of such Person to make any payment in connection with any warrants or any other Equity Interests including, without limitation, any put, redemption and mandatory dividends, of such Person or any Affiliate thereof.

*Indemnified Liabilities*:  the meaning set forth in Section 5.19.

*Indemnified Party*:  the meaning set forth in Section 5.19.

*Insolvency Proceeding*:  with respect to any Person: (a) a case, action or proceeding with respect to such Person: (i) before any court or any other Governmental Authority under any Debtor Relief Law; or (ii) for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, conservator (or similar official) of any Person or otherwise relating to the liquidation, dissolution, winding-up or relief of such Person; or (b) any general assignment for the benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement in respect of such Person's creditors generally or any substantial portion of its creditors, undertaken under any Law.

*Intangible Assets:*  all intangible assets (determined in accordance with GAAP) including, without limitation, goodwill, intellectual property, licenses, organizational costs, deferred amounts, covenants not to compete, unearned income and restricted funds.

*Intellectual Property*:  all intellectual and similar property of a Person, including inventions, designs, patents, patent applications, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases; all embodiments or fixations thereof and all related

11436681

*Approved by Judge Donald H. Steckroth March 06, 2014*

**WLDD DRAFT 2/20/2014**

documentation, registrations and franchises; all books and records describing or used in connection with the foregoing; and all licenses or other rights to use any of the foregoing.

*Intercreditor Agreement*:  the intercreditor agreement between Lender, M&T, and the lender of the HUD Loans, satisfactory in form and substance to Lender in its reasonable credit judgment.

*Inventory*:  any and all of the "inventory" (as that term is defined in the UCC) of Borrower, whether now existing or hereafter arising.

*Investment*:  as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of the properties and assets or Equity Interests or other securities of another Person, (b) a loan, advance or capital contribution to, assumption of debt of, or purchase or other acquisition of any other debt or Equity Interests in, another Person, including any partnership, membership or joint venture interest in such other Person and any arrangement pursuant to which the investor provides a Contingent Obligation for such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit.

*IRS*:  the United States Internal Revenue Service, or any Governmental Authority succeeding to any of its principal functions.

*Joint Commission*:  The Joint Commission for Accreditation of Healthcare Organizations or other similar agency.

*Joint Liability Payment*:  the meaning set forth in Section 12.22(g).

*Laws*:  collectively, all international, foreign, Federal, state and local statutes, laws (including common law), treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents, authorities, rulings, decrees, judgments, writs, injunctions, orders, awards or opinions, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, in each case whether or not having the force of law.

*Lease Agreements*:  those certain leases existing on the Closing Date between the Borrower and its Affiliates pursuant to which the Borrower leases the Healthcare Facilities, more particularly described on Schedule 1.2 hereof.

*Lender*:  the meaning set forth in the introductory paragraph hereto and, as the context requires.

*Lender Affiliate*:  with respect to Lender, any Person which, directly or indirectly, is in Control of, is Controlled by, or is under common Control with Lender.

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

**LIBOR Rate**:  with respect to each Reset Date, the rate (adjusted for statutory reserve requirements for LIBOR liabilities) for deposits in U.S. Dollars for a period of one month which appears on the Reuters Screen LIBOR01 Page as of 11:00 a.m., London time, on the day that is two London banking days preceding that Reset Date (if such rate does not appear on the Reuters Screen LIBOR01 Page the rate for that Reset Date will be determined as if the parties had specific "USD-LIBOR-Reference Banks" as the applicable rate. Any change in the interest rate resulting from a change in the LIBOR Rate shall become effective immediately upon the date on which such change in the LIBOR Rate shall be adopted by Lender.

**License**:  any license or agreement, excluding Healthcare Authorizations, under which Borrower or any other Credit Party is authorized to use Intellectual Property in connection with any manufacture, marketing, distribution or disposition of Collateral, any use of property, the operation of any Healthcare Facility or any other conduct of its business.

**Licensor**:  any Person from whom Borrower or any other Credit Party obtains the right to use any Intellectual Property.

**Lien**:  any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

**Liquidity Factors**:  percentages which Lender, in its reasonable credit judgment, may apply to Eligible Accounts by payor class (i.e., Medicare, Medicaid, commercial insurance, private pay, etc.) based upon Lender's review and analysis of, among other things, Borrower's historical collection history, contractual allowances, returns, rebates, discounts, credits and other allowances for each such payor class and taking into account other factors deemed appropriate by Lender which may result in the possible non-payment of Accounts for any reason by Account Debtors or possible diminution of the value of any Collateral, all in a manner consistent with Lender's underwriting practices and procedures for healthcare receivables financing.

**Loan**:  any Revolving Loan, individually.

**Loans**: any Revolving Loan, collectively.

**Loan Documents**:  this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or delivered to Lender in connection with the Loans, including the Revolving Note, the Collateral Documents, the Management Fee Subordination Agreement, all Subordination Agreements and any Guaranties; as each of the foregoing may be (and each of the foregoing defined terms shall refer to such documents as they may be) amended, restated, replaced, severed, split, supplemented or otherwise modified from time to time**.**

16

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

*Lockbox Accounts*:  collectively, the Government Lockbox Account, the Non-Government Lockbox Account and the Master Lockbox Account.

*Lockbox Bank*:  the meaning set forth in <u>Section 2.4(a)</u>.

*Management Agreement*:  the management agreement between Borrower and Manager, pursuant to which Manager is to manage the day-to-day operations of the Healthcare Facilities, as same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with <u>Section 6.20</u>.

*Management Fees*:  the management fees as set forth in the Management Agreement.

*Management Fee Subordination Agreement*:  that certain Management Fee Subordination Agreement dated as of the Closing Date by and among Lender, Borrower and Manager.

*Manager*:  HealthBridge Management, LLC, a New Jersey limited liability company, or any successor or replacement manager appointed by Borrower in accordance with <u>Section 6.20</u>.

*Master Lockbox Account*:  the meaning set forth in <u>Section 2.4(a)</u>.

*Material Adverse Effect*:  (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of Borrower, taken as a whole, on the value of any material Collateral, on the enforceability of any Loan Documents, or on the validity or priority of Lender's Liens on any material Collateral; (b) a material impairment of the ability of any Credit Party to perform its obligations under any Loan Document to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Credit Party of any Loan Document to which it is a party.

*Material Contract*:  the Management Agreement and any other contract or other arrangement, whether written or oral, to which Borrower is a party (other than the Loan Documents) (a) that is deemed to be a material contract under Item 601 of Regulation S-K of the federal securities laws, if applicable to Borrower, (b) for which breach, termination, nonperformance or failure to renew could reasonably be expected to have a Material Adverse Effect, or (c) that relates to other Indebtedness in an aggregate amount of $100,000 or more.

*Medicaid*:  collectively, the healthcare assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§ 1396, *et seq.*) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders, guidelines or requirements (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

*Medicare*: collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§ 1395, *et seq.*) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders or guidelines (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

*Minimum Liquidity*: as of any date, the sum of the following for Borrower collectively on a consolidated basis as of such date: (a) unrestricted cash on hand, plus (b) unrestricted Cash Equivalents, plus (c) unused Availability, plus (d) any liquidity reserves established by Lender in its sole discretion, the initial amount of which shall be $2,000,000.

*Moody's*: the meaning set forth in the definition of *Rating Agency*.

*M&T*: M&T Bank

*M&T Loans*: the loans existing on the Closing Date made by M&T to Danbury pursuant to the M&T Loan Documents.

*M&T Loan Documents*: The credit agreements, notes, mortgages, regulatory agreements, security agreements, lock box agreements, intercreditor agreements (and any riders thereto) existing on the Closing Date and listed on Schedule 1.1 hereof to which Danbury is a party in respect of the M&T Loans.

*Net Proceeds*: with respect to an Asset Disposition, proceeds (including, when received, any deferred or escrowed payments) received by Borrower in cash from such disposition, net of: (a) reasonable and customary costs and expenses actually incurred in connection therewith, including legal fees and sales commissions; (b) amounts applied to repayment of Indebtedness secured by a Permitted Lien senior to Lender's Liens on Collateral sold; (c) transfer or similar taxes; and (d) reserves for indemnities, until such reserves are no longer needed.

*Non-Government Account Debtor:* an Account Debtor that is not a Government Reimbursement Program.

*Non-Government Lockbox Account*: an account or accounts maintained with Lender or another financial institution acceptable to Lender into which all collections of Accounts of Borrower from Non-Government Account Debtors are obligated to be paid directly; the Non-Government Lockbox Account shall be an account or accounts in the name of Lender (or Borrower for the sole benefit of Lender), and shall be the sole and exclusive property of Lender.

*Non-Government Payors*: any Third-Party Payors other than the Government Reimbursement Programs.

*Notice*: the meaning set forth in Section 8.1.

*Approved by Judge Donald H. Steckroth March  06, 2014*

***Obligations***:  any and all existing and future debts, liabilities and obligations of every kind or nature at any time owing by Borrower and any other Credit Party to Lender or any other subsidiary of Lender or Lender Affiliate, whether under this Agreement, any other Loan Documents, or any other existing or future instrument, document or agreement, between any Credit Party or Lender or any other subsidiary of Lender or Lender Affiliate, whether joint or several, related or unrelated, primary or secondary, matured or contingent, due or to become due (including debts, liabilities and obligations obtained by assignment), and whether principal, interest, fees, indemnification obligations hereunder or Expenses (specifically including interest accruing after the commencement of any bankruptcy, insolvency or similar proceeding with respect to Borrower or any other Credit Party, whether or not a claim for such post-commencement interest is allowed), including, without limitation, debts, liabilities and obligations in respect of the Revolving Loans, Reimbursement Obligations and any extensions, modifications, substitutions, increases and renewals thereof; any and all of Borrower's or any other Credit Party's obligations under or in connection with a Swap Agreement; the payment of all amounts advanced by Lender or any other subsidiary of Lender or Lender Affiliate to preserve, protect and enforce rights hereunder and in the Collateral; and all Expenses incurred by Lender or any Lender Affiliate.  Without limiting the generality of the foregoing, Obligations shall include any other debts, liabilities or obligations owing to Lender or any Lender Affiliate in connection with any Cash Management Agreements as well as any other loan, advances or extension of credit, under any existing or future loan agreement, promissory note, or other instrument, document or agreement between Borrower or any other Credit Party and Lender or any Lender Affiliate.

***OFAC***:  the meaning set forth in the definition of ***Government Lists***.

***Offer***:  the meaning set forth in <u>Section 5.23</u>.

***Offer Acceptance Notice***:  the meaning set forth in <u>Section 5.23</u>.

***Offered Financing Transaction***:  the meaning set forth in <u>Section 5.23</u>.

***Option Period***:  the meaning set forth in <u>Section 5.23</u>.

***Organization Documents***:  (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

***Other Taxes***:  all present or future stamp, intangible or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

WLDD DRAFT 2/20/2014

hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

**Outstanding Amount**: with respect to the Revolving Facility on any date, the sum of the aggregate outstanding principal amount of all Revolving Loans as of such date, after giving effect, without duplication, to any borrowings and prepayments or repayments of Revolving Loans occurring on such date.

**Overadvance**: the meaning set forth in Section 2.5.

**Patriot Act**: the meaning set forth in Section 5.21.

**Patriot Act Offense**: any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under: (a) the criminal laws against terrorism; (b) the criminal laws against money laundering; (c) the Bank Secrecy Act, as amended; (d) the Money Laundering Control Act of 1986, as amended; or (e) the Patriot Act. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense.

**Payment Date**: the first day of each calendar month, commencing on the first day of the first full calendar month after the Closing Date.

**PBGC**: the Pension Benefit Guaranty Corporation or any Governmental Authority succeeding to any of its principal functions.

**PDF**: the meaning set forth in Section 12.20.

**Permitted Asset Disposition**: as long as no Default or Event of Default exists, an Asset Disposition that is: (a) a sale of Inventory in the ordinary course of business; (b) a disposition of equipment so long as the fair market or book value (whichever is more) of all such equipment disposed of during any twelve month period does not exceed One Hundred Thousand Dollars ($100,000) in the aggregate; (c) a disposition of Inventory that is obsolete, unmerchantable or otherwise unsalable in the ordinary course of business; (d) termination of a lease of real or personal property that is not necessary for the ordinary course of business, could not reasonably be expected to have a Material Adverse Effect and does not result from a default by Borrower; (e) a disposition of equipment which is replaced by equipment of similar value or function; or (f) approved in writing by Lender.

**Permitted Contingent Obligations**: (a) endorsements of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business; (b) Contingent Obligations incurred in the ordinary course of business with respect to surety, appeal or performance bonds or other similar obligations; and (c) guarantees of Indebtedness of other Person(s), provided that the aggregate amount of the Indebtedness guaranteed by any and all such guaranties shall not exceed, at any one time, $100,000.

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

WLDD DRAFT 2/20/2014

**Permitted Indebtedness**:  (a) Indebtedness to Lender in connection with the Revolving Loans or otherwise pursuant to the Loan Documents; (b) Indebtedness under any swap agreements (as defined in 11 U.S.C. § 101) with Lender or its affiliates (or with another financial institution approved by Lender in writing), provided such swap agreements are entered into in the ordinary course of business and not for speculative purposes; (c) unsecured trade payables incurred in the ordinary course of Borrower's business and which do not remain unpaid more than sixty (60) days after the due date thereof; (d) purchase money Indebtedness (including Capitalized Lease Obligations) hereafter incurred by Borrower to finance the purchase of fixed assets; provided that, (i) such Indebtedness, including any Permitted Contingent Obligations defined in clause (c) of the definition thereof, incurred in any fiscal year shall not exceed Twenty-Five Thousand Dollars ($25,000), and (ii) such Indebtedness shall not exceed the purchase price of the assets funded; (e) Indebtedness existing on the Closing Date that is identified and described  under the heading "Permitted Indebtedness" on <u>Schedule 1</u> hereto; and (f) Subordinated Indebtedness.

**Permitted Investments**:   With respect to any Borrower, (a) Investments existing on the Closing Date that are disclosed under the heading "Permitted Investments" on <u>Schedule 1</u> hereto, (b) Cash Equivalents and (c) any swap agreements (as defined in 11 U.S.C. § 101) with Lender (or with any of its affiliates) or any swap agreements (as defined in 11 U.S.C. § 101) made pursuant to Section 2.18 hereto.

**Permitted Liens**:  With respect to any Credit Party: (a)  Liens securing taxes, assessments or governmental charges or levies not delinquent; (b) Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance, social security and other like laws; (c) Liens on fixed assets and purchase money Indebtedness permitted under the definition of **Permitted Indebtedness**, provided that, (i) such Lien attached to such assets concurrently, or within twenty (20) days of the acquisition thereof, and only to the assets so acquired, and (ii) a description of the asset acquired is furnished to Lender; (d) Liens existing on the Closing Date and disclosed under the heading "Permitted Liens" on <u>Schedule 1</u> hereto; and (e) Liens in favor of Lender securing the Obligations and other Liens in favor of Lender.

**Person**:   any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, Governmental Authority, any other person or entity, and any fiduciary acting in such capacity on behalf of any of the foregoing.

**Plan**:   an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate, or any such plan to which Borrower or any ERISA Affiliate makes or is obligated to make contributions, which is subject to Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

**Pledge Agreement**:  any pledge agreement executed by Borrower or any other Credit Party or any Accommodation Party in favor of Lender, as the same may be amended, restated, replaced, severed, split, supplemented or otherwise modified from time to time.

**Protective Advances**:  the meaning set forth in <u>Section 2.13</u>.

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

*Rating Agency*:  each of Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("*S&P*"), Moody's Investors Service, Inc. ("*Moody's*"), and Fitch, Inc., a division of Fitch Ratings Ltd. ("*Fitch*") or any other nationally-recognized statistical rating organization to the extent any of the foregoing have been engaged by Lender or its designee in connection with or in anticipation of any Secondary Market Transaction.

*Reference Banks*:  major banks in the London interbank market selected by Lender.

*Required Insurance*:  the meaning set forth in Section 5.4.

*Reset Date*:  daily.

*Restrictive Agreement*:  an agreement (other than a Loan Document) that conditions or restricts the right of Borrower to incur or repay Indebtedness, to grant Liens on any assets, to declare or make Distributions, to modify, extend or renew any agreement evidencing Indebtedness (other than Permitted Indebtedness), or to repay any intercompany Indebtedness.

*Revolving Commitment*:  the sum of Five Million and 00/100 Dollars ($5,000,000.00).

*Revolving Facility*:  the meaning set forth in Section 2.1.

*Revolving Loan*:  the meaning set forth in Section 2.1.

*Revolving Loans*:  means each Revolving Loan, collectively.

*Revolving Loan Notice*:  a notice requesting the making of a Revolving Loan which shall be either be included as a part of a Borrowing Base Certificate or be delivered separately in substantially the form of Exhibit D.

*Revolving Loan Termination Date*:  the meaning set forth in Section 11.1.

*Revolving Note*:  that certain promissory note made by Borrower in favor of Lender evidencing the Revolving Loans substantially in the form of Exhibit C-1.

*Royalties*:  all royalties, fees, expense reimbursement and other amounts payable by Borrower under a License.

*S&P*:  the meaning set forth in the definition of *Rating Agency*.

*Security Agreement*:  any security agreement executed by Borrower in favor of Lender, as the same may be amended, restated, replaced, severed, split, supplemented or otherwise modified from time to time.

*Secondary Market Transaction*:  the meaning set forth in Section 10.2.

22

WLDD DRAFT 2/20/2014

**Servicer**:  a servicer selected by Lender to service the Loan, including any "master servicer" or "special servicer" appointed under the terms of any pooling and servicing agreement or similar agreement entered into as a result of a Secondary Market Transaction.

**Solvent**:  with respect to any Person on a particular date, that on such date: (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person; (b) the present fair market value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured; (c) such Person is able to realize upon its assets and pay its debts and other liabilities, including contingent liabilities, and other commitments as they mature in the normal course of business; and (d) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature.

**Subordinated Indebtedness**:  Indebtedness of Borrower or any Subsidiary that is subordinated to the Obligations in a manner satisfactory to Lender, and contains terms, including, without limitation, payment terms, satisfactory to Lender. All Subordinated Indebtedness as of the Closing Date is identified and described under the heading "Subordinated Indebtedness" on Schedule 1 hereto.

**Subordinated Indebtedness Documents**:  the Subordination Agreements and all other documents and instruments relating to the Subordinated Indebtedness and all amendments and modifications thereof permitted hereby.

**Subordination Agreements**:  individually and collectively, all subordination agreements, intercreditor agreements, consents and similar agreements among any Credit Party, Lender and any holder of Indebtedness, whether entered into on or prior to the date hereof or from time to time hereafter, together with all modifications, amendments and restatements of any of the foregoing, including, without limitation, the Intercreditor Agreement.

**Subsidiary**:  of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Borrower.

**Swap Agreement**:  a swap agreement (as defined in 11 U.S.C. § 101, as in effect from time to time), if any, between Borrower and Lender or its affiliates.

**Taxes**:  the meaning set forth in Section 2.14.

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

**Third-Party Payor**:  Government Reimbursement Programs, Blue Cross and/or Blue Shield, private insurers, managed care plans and any other Person or entity which presently or in the future reimburses providers for Healthcare Services.

**TRICARE**:  the program administered pursuant to 10 U.S.C. § 1071, *et seq.*), sections 1320a-7 and 1320a-7a of Title 42 of the United States Code and the regulations promulgated pursuant to such statutes.

**UCC**:  the Uniform Commercial Code as in effect in the State of Maryland.

**USD-LIBOR-Reference Banks**:  means that the rate for a Reset Date will be determined on the basis of the rates at which deposits in U.S. Dollars are offered by the Reference Banks at approximately 11:00 a.m., London time, on the day that is two (2) London banking days preceding that Reset Date to prime banks in the London interbank market for a period of one month commencing on that Reset Date and in an amount equal to the principal amount of the Revolving Note.  Lender will request the principal London office of each of the Reference Banks to provide a quotation of its rate.  If at least two (2) such quotations are provided, the rate for that Reset Date will be the arithmetic mean of the quotations.  If fewer than two quotations are provided as requested, the rate for that Reset Date will be the arithmetic mean of the rates quoted by major banks in New York City, selected by Lender, at approximately 11:00 a.m., New York City time, on that Reset Date for loans in U.S. Dollars to leading European banks for a period of one month commencing on that Reset Date and in an amount equal to the principal amount of the Revolving Note.

**Welfare Plan**:  an employee welfare benefit plan, as defined in Section 3(1) of ERISA.

**1.2    Other Interpretive Provisions.**  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "**include**," "**includes**" and "**including**" shall be deemed to be followed by the phrase "without limitation."  The word "**will**" shall be construed to have the same meaning and effect as the word "**shall**."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document and any Loan Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, extended, supplemented or otherwise modified in writing from time to time (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "**herein**," "**hereof**" and "**hereunder**," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections

WLDD DRAFT 2/20/2014

of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such Law and any reference to any Law or regulation shall, unless otherwise specified, refer to such Law or regulation as amended, modified or supplemented from time to time, and (vi) the words "*asset*" and "*property*" shall be construed to have the same meaning and effect and to refer to any and all tangible and Intangible Assets and properties, including cash, securities, accounts and contract rights.

(b)      In the computation of periods of time from a specified date to a later specified date, the word "*from*" means "*from and including*"; the words "*to*" and "*until*" each mean "*to but excluding*"; and the word "*through*" means "*to and including*."

(c)      Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)      There will be no presumption against any party (or its counsel) on the ground that such party (or its counsel) was responsible for preparing this Agreement, any other Loan Document or any part thereof.

**1.3      Accounting Terms.**

(a)      **Generally**.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, <u>except</u> as otherwise specifically prescribed herein.

(b)      **Changes in GAAP**.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and Borrower or Lender shall so request, Lender and Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of Lender); <u>provided that</u>, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) Borrower shall provide to Lender financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

(c)      reserved.

**1.4      Rounding.**  Any financial ratios required to be maintained by Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**1.5**     **Times of Day.**  Unless otherwise specified, all references herein to times of day shall be references to prevailing Eastern time (daylight or standard, as applicable).

## ARTICLE 2.   GENERAL REVOLVING LOAN TERMS

**2.1**     **The Revolving Loans.**

(a)     Subject to the terms and conditions set forth herein, Lender hereby establishes for the benefit of Borrower a revolving credit facility (the "***Revolving Facility***") pursuant to which Lender agrees to make loans (each such loan, a "***Revolving Loan***") to Borrower from time to time, on any Business Day during the Availability Period.   The Outstanding Amount shall not exceed at any time the lesser of (i) the Revolving Commitment and (ii) the Borrowing Base (such lesser amount, the "***Availability***").  Subject to the terms and conditions hereof, Borrower may borrow, repay and reborrow Revolving Loans hereunder during the Availability Period. The calculation of the Borrowing Base as of any time shall originally be made by Borrower and certified by an Authorized Officer pursuant to the delivery of a Borrowing Base Certificate under Section 8.3 hereof; provided, however, that Lender shall have the right to review and adjust any such calculation to the extent that the calculation was not made in accordance with this Agreement.

(b)     Lender shall also have the right and at any time and for any reason, to (i) reduce the dollar amount of Eligible Accounts by the amount of discounts, credits, allowances and returns of any kind then outstanding, issued, granted, owing, accrued or liable to be accrued and (ii) establish and fund reserves against the Borrowing Base and/or charge the same against the Revolving Facility as Revolving Loans at such time as it deems appropriate.  Lender shall also have the right to further adjust the Borrowing Base by applying Liquidity Factors to Eligible Accounts and adjusting such Liquidity Factors from time to time.

(c)     [Reserved].

**2.2**     **Reserved.**

**2.3**     **Funding of the Revolving Loans.**  Except for as otherwise provided in any applicable Cash Management Agreements, each Revolving Loan shall be made upon Borrower Representative's irrevocable notice to Lender, which may be given by telephone by an Authorized Officer of Borrower Representative. Each notice by Borrower Representative pursuant to this Section 2.3 must be confirmed promptly by delivery to Lender of a written Revolving Loan Notice, appropriately completed and signed by an Authorized Officer of Borrower Representative.  Such Revolving Loan Notice must be received by Lender not later than noon at least one (1) Business Day before the requested date of the Revolving Loan. Revolving Loan Notices received after noon shall be deemed received on the next Business Day. Each Revolving Loan shall be in a principal amount of at least Twenty Five Thousand Dollars ($25,000) or a whole multiple of One Thousand Dollars ($1,000) in excess thereof.

**WLDD DRAFT 2/20/2014**

Revolving Loans which may be made by Lender from time to time under the Revolving Facility shall be made available by crediting such proceeds to Borrower Representative's operating account with Lender or to such other Borrower account as Borrower Representative shall designate in writing.

**2.4    Lockbox Accounts.**

(a)    Borrower shall establish and maintain the Government Lockbox Account with Lender, a Lender Affiliate or another United States depository institution acceptable to Lender (the "*Lockbox Bank*"), subject to the provisions of this Agreement for receivables from Government Account Debtors.  Borrower shall execute with the Lockbox Bank a lockbox agreement or deposit account instruction agreement for the Government Lockbox Account in form and substance acceptable to Lender, and such other agreements related to such lockbox agreement as Lender may require.  Borrower shall ensure that all Collections of Accounts on which Government Account Debtors are obligated are paid directly into and deposited into the Government Lockbox Account within one (1) Business Day after receipt thereof and in precisely the form received, except for the endorsement of Borrower where necessary to permit the collection thereof, which Borrower hereby agrees to make, and that all funds deposited into the Government Lockbox Account are immediately transferred, subject to collection pursuant to any lockbox agreement, into either (i) if the Lockbox Bank for such Government Lockbox Account is an institution other than the Lender, into a depository account owned by Lender (the "*Concentration Account*"), or (ii) if the Lockbox Bank for such Government Lockbox Account is Lender, into a master depository account held in the name of [_____] subject to a deposit account control agreement in form and substance acceptable to Lender (the "*Master Lockbox Account*"), which agreement shall provide that all funds deposited into the Master Lockbox Account are to be immediately transferred into [_____].

(b)    Borrower shall establish and maintain the Non-Government Lockbox Account with the Lockbox Bank, subject to the provisions of this Agreement for receivables from Non-Government Account Debtors.  Borrower shall execute with the Lockbox Bank a separate lockbox agreement or deposit account control agreement for the Non-Government Lockbox Account in form and substance acceptable to Lender, and such other agreements related to such lockbox agreement as Lender may require.  Borrower shall ensure that all Collections of Accounts on which Non-Government Account Debtors are obligated are paid directly into and deposited in the Non-Government Lockbox Account within one (1) Business Day after receipt thereof and in precisely the form received, except for the endorsement of Borrower where necessary to permit the collection thereof, which Borrower hereby agrees to make, and that all funds deposited into the Non-Government Lockbox Account are immediately transferred, subject to collection pursuant to any lockbox agreement, into either (i) if the Lockbox Bank for such Non-Government Lockbox Account is an institution other than the Lender, into the Concentration Account, or (ii) if the Lockbox Bank for such Non-Government Lockbox Account is Lender, into the Master Lockbox Account.  In addition, Borrower shall ensure that the Net Proceeds from any Asset Disposition and any proceeds of insurance or condemnation awards paid in respect of any Casualty Loss are paid directly into

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

WLDD DRAFT 2/20/2014

the Non-Government Lockbox Account.  Lender alone shall have the power to access and make withdrawals from the Concentration Account.

(c)     In the event that Borrower receives any Collections that should have been sent to the Government Lockbox Account or the Non-Government Lockbox Account, Borrower shall promptly upon receipt (and in any event within one (1) Business Day of receipt) forward such Collections directly to the Government Lockbox Account or the Non-Government Lockbox Account, as applicable, in the form received, and promptly notify Lender of such event.  Until so forwarded, such Collections not generated from Government Account Debtors shall be held in trust for the benefit of Lender.

(d)     Borrower shall not withdraw any amounts from the accounts into which the Collections remitted to the Government Lockbox Account, the Non-Government Lockbox Account or the Master Lockbox Account are deposited, nor shall Borrower change the procedures or sweep instructions under the agreements governing the Government Lockbox Account, the Non-Government Lockbox Account, the Master Lockbox Account and related accounts.  Borrower shall cooperate with Lender in the identification and reconciliation on a daily basis of all amounts received in or required to be deposited into the Government Lockbox Account, the Non-Government Lockbox Account, or the Master Lockbox Account.

(e)     Notwithstanding anything in any lockbox agreement to the contrary, Borrower agrees that it shall be liable for any fees and charges in effect from time to time and charged by the Lockbox Bank in connection with the Lockbox Accounts, and that Lender shall not have any liability therefor.  Borrower further acknowledges and agrees that, to the extent such fees and charges are not paid by Borrower directly but are satisfied using Collections in the Lockbox Accounts, such fees and charges shall be deemed to be Revolving Loans made by Lender hereunder and, to the extent that the payment of such fees or charges by Borrower as provided herein results in any Overadvance under this Agreement, Borrower agrees to immediately (upon notice) repay to Lender the amount of such Overadvance.  Borrower agrees to indemnify and hold Lender harmless from any and all liabilities, claims, losses and demands whatsoever, including the reasonable fees and disbursements of legal counsel for Lender, including the reasonable charges of internal legal counsel, arising from or relating to actions of Lender or the Lockbox Bank pursuant to this Section 2.4 or any lockbox agreement.

(f)     Borrower agrees that all payments made to the Concentration Account or otherwise received by Lender, whether in respect of the Accounts or as proceeds of other Collateral or otherwise (except for proceeds of Collateral which are required to be delivered to the holder of a Permitted Lien which is prior in right of payment), will be applied on account of the Obligations in accordance with the terms of this Agreement, but, for purposes of calculating interest and fees hereunder, shall be subject to a three (3) Business Day clearance period.  If as the result of Collections of Accounts and/or any other cash payments received by Borrower pursuant to this Section 2.4 a credit balance exists with respect to the Concentration Account, or at anytime that no Revolving Loans are outstanding, such credit

11436681

balance shall not accrue interest in favor of Borrower, but, so long as no Event of Default then exists, shall be available to Borrower upon Borrower's written or telephonic request.

(g)    Borrower acknowledges and agrees that compliance with the provisions of this Section 2.4 is a material term of this Agreement, and that, in addition to and notwithstanding any other rights Lender may have hereunder, under any other Loan Document, under applicable law or at equity, upon each and every failure by Borrower to comply with any of such provisions Lender shall be entitled to assess a non-compliance fee which shall operate to increase the rate of interest otherwise in effect under this Agreement with respect to the Revolving Loans by two percent (2.0%) per annum during any period of non-compliance, whether or not a Default or an Event of Default occurs or is declared, provided that nothing shall prevent Lender from considering any failure to comply with the provisions of this Section 2.4 to be a Default or an Event of Default.

**2.5    Borrowing Base Exceeded.** If for any reason the Outstanding Amount at any time exceeds the lesser of the Revolving Commitment or the Borrowing Base then in effect (an "*Overadvance*"), Borrower shall immediately repay outstanding Revolving Loans in an aggregate amount equal to such excess.

**2.6    Repayment of the Revolving Loans.**    Borrower hereby unconditionally promises to pay to the order of Lender and shall repay to Lender on the Revolving Loan Termination Date the outstanding principal amount of the Revolving Loans on such date together with interest (with interest being determined in accordance with the provisions of Section 2.7(a).

**2.7    Interest.**

(a)    The unpaid principal amount of all Revolving Loans under the Revolving Facility shall bear interest, subject to the terms hereof, at a per annum rate equal to the LIBOR Rate, plus the Applicable LIBOR Margin.

(b)    Interest shall be payable monthly, in arrears, on each Payment Date, on the Revolving Loan Termination Date and as otherwise provided in this Agreement, including Section 2.4(f) hereof.

(c)    Changes in the interest rate applicable to the Revolving Loans shall become effective on the same day there is a change in the LIBOR Rate.

**2.8    Additional Interest Provisions.**

(a)    All computations of interest for the Loans shall be made on the basis of a year of 360 days and calculated for actual days elapsed.

(b)    After the occurrence and during the continuance of an Event of Default hereunder, the per annum effective rate of interest applicable to the Loans shall be increased by the Default Rate.   All such increases may be applied retroactively to the date of the

*Approved by Judge Donald H. Steckroth March  06, 2014*

occurrence of the Event of Default.  Borrower agrees that the Default Rate payable to Lender is a reasonable estimate of Lender's damages and is not a penalty.

(c)  All contractual rates of interest chargeable on outstanding principal under the Loans shall continue to accrue and be paid even after Default, an Event of Default, maturity, acceleration, judgment, bankruptcy, insolvency proceedings of any kind or the happening of any event or occurrence similar or dissimilar.

(d)  In no contingency or event whatsoever shall the aggregate of all amounts deemed interest hereunder and charged or collected pursuant to the terms of this Agreement exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto.  In the event that such court determines Lender has charged or received interest hereunder in excess of the highest applicable rate, Lender shall apply, in its sole discretion, and set off such excess interest received by Lender against other Obligations due or to become due and such rate shall automatically be reduced to the maximum rate permitted by such law.

**2.9    Fees and Charges.**

(a)  At Closing, Lender shall have fully earned and Borrower shall unconditionally pay to Lender, a non-refundable commitment fee of Thirty Seven Thousand Five Hundred Dollars ($37,500.00).

(b)  [Reserved].

(c)  On each Payment Date, on the Revolving Loan Termination Date and as otherwise provided in this Agreement, Borrower shall pay to Lender an unused fee in an amount equal to one half of one percent (0.50%) per annum of the difference derived by subtracting (i) the average daily Outstanding Amount during the preceding month, from (ii) the Revolving Commitment.

(d)  [Reserved].

(e)  In the event the Revolving Facility or this Agreement is terminated on a date prior to the Revolving Loan Termination Date, the Early Termination Fee, if any, shall be due and payable in full on the date of termination, together with all other Obligations, including without limitation all fees and Expenses due from Borrower to Lender.

(f)  All fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed in each calculation period, as applicable.  All fees hereunder shall be non-refundable and deemed fully earned when due and payable.

**2.10    Use of Proceeds.** The extensions of credit under and proceeds of the Revolving Facility shall be used only in connection with (a) the repayment of the outstanding amounts under the Postpetition Financing Facility, (b) financing Borrower's existing obligations under the Plan of Reorganization and (c) the operation of the Healthcare Facilities,

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

including for working capital of the Healthcare Facilities, to pay the fees and expenses incurred in connection with the Revolving Facility, and for general corporate purposes of the Healthcare Facilities.

### 2.11   Evidence of Indebtedness.

(a)    The Revolving Loans made by Lender shall be evidenced by a Revolving Note payable to Lender.  Lender may attach schedules to its Revolving Note and endorse thereon the date, amount and maturity of the Revolving Loans and payments with respect thereto.

(b)    Lender shall maintain accounts or records evidencing the Loans and principal and interest thereon.  In the event of any conflict between the accounts and records maintained by Lender and Borrower in respect of such matters, the accounts and records of Lender shall control in the absence of manifest error.

### 2.12   Payments Generally.  All payments to be made by Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or set-off.  Except as otherwise expressly provided herein, all payments by Borrower hereunder shall be made in Dollars immediately available to Lender by 11:00 a.m., prevailing Eastern Time, on the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower.  All payments received by Lender after 11:00 a.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by Borrower shall become due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.  Borrower hereby grants to Lender the right, in Lender's discretion, without notice to Borrower, to make (i) Revolving Loans and (ii) withdrawals from deposit accounts of Borrower with Lender to make payments on the Obligations, including any and all fees and Expenses, as and when due hereunder.  Borrower acknowledges that Borrower's failure to maintain sufficient funds in any deposit account for payment of any of the Obligations, or Lender's failure to withdraw from any deposit account, shall not relieve Borrower of any payment obligation under this Agreement or any other Loan Document.  Notwithstanding the foregoing, Borrower, at its option, may make payments from accounts other than deposit accounts with Lender.

### 2.13   Protective Advances.  Lender shall be authorized, in its sole discretion, at any time that a Default or Event of Default exists or any conditions in Article 3 are not satisfied, and without regard to the Revolving Commitment or the Borrowing Base, to make Revolving Loans ("*Protective Advances*"): (a) in such amounts as Lender deems necessary or desirable to preserve or protect any Collateral, or to enhance the collectability or repayment of Obligations; or (b) to pay any other amounts chargeable to Borrower under any Loan Documents, including fees and Expenses, including, without limitation, taxes, assessments, insurance, repairs, maintenance, storage and other charges and expenditures upon, against or otherwise relating to the Collateral or Lockbox Accounts or Agreements.  All Protective

Advances shall be Obligations, secured by the Collateral, and shall be treated for all purposes as Revolving Loans.

### 2.14    Taxes.

(a)    All payments by Borrower of principal of, and interest on, the Loans and all other amounts payable hereunder shall be made free and clear of and without deduction for any present or future income, excise, stamp or franchise taxes and other taxes, fees, duties, withholdings or other charges of any nature whatsoever imposed by any taxing authority, but excluding franchise taxes and taxes imposed on or measured by Lender's net income or receipts (such non-excluded items being called "***Taxes***").    In the event that any withholding or deduction from any payment to be made by Borrower hereunder is required in respect of any Taxes pursuant to any applicable law, rule or regulation, then Borrower will:

(i)    pay directly to the relevant authority the full amount required to be so withheld or deducted;

(ii)    promptly forward to Lender an official receipt or other documentation satisfactory to Lender evidencing such payment to such authority; and

(iii)    pay to Lender such additional amount or amounts as is necessary to ensure that the net amount actually received by Lender will equal the full amount Lender would have received had no such withholding or deduction been required.

Payments pursuant to this Section 2.14(a) shall be made within ten (10) days after the date Lender makes written demand therefor.

(b)    Moreover, if any Taxes are directly asserted against Lender with respect to any payment received by Lender hereunder, Lender may pay such Taxes and Borrower will promptly pay such additional amount (including any penalties, interest or expenses) as is necessary in order that the net amount received by Lender after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount Lender would have received had not such Taxes been asserted.

(c)    Without limiting the provisions of subsection (a) above, Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Laws.

(d)    If Borrower fails to pay any Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to Lender the required receipts or other required documentary evidence, Borrower shall indemnify Lender for any incremental Taxes, Other Taxes, interest or penalties that may become payable by Lender as a result of any such failure.

### 2.15    Credit of Payments and Proceeds.    Except during the continuance of an Event of Default, all proceeds of any repayment, including any prepayments of the Loans,

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

shall be applied by Lender as follows in the following order of priority: *First*, to fees, Expenses and any other amounts then due and owing under the Loan Documents; *Second*, accrued and unpaid interest; and *Third*, to principal on the Loans. In the event that Borrower shall fail to pay any of the Obligations when due and the Obligations have been accelerated pursuant to <u>Section 9.2</u>, all payments received by Lender upon the Loans and the other Obligations and all net proceeds from the enforcement of the Obligations shall be applied as set forth in <u>Section 9.3</u> in such order and in such manner as Lender shall elect in Lender's discretion.

### 2.16    Increased Costs.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, Lender;

(ii)    impose on Lender any other condition affecting this Agreement or the Loan or participation therein; or

(iii)    subject Lender to any taxes on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; and the result of any of the foregoing shall be to increase the cost to Lender of making or maintaining any Loan (or of maintaining its obligation to make any Loan) or to reduce the amount of any sum received or receivable by Lender hereunder (whether of principal, interest or otherwise), then Borrower will pay to Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

(b)    If Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on Lender's capital or on the capital of Lender's holding company, if any, as a consequence of this Agreement or the Loan to a level below that which Lender or Lender's holding company could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to Lender such additional amount or amounts as will compensate Lender or Lender's holding company for any such reduction suffered.

(c)    A certificate of Lender setting forth the amount or amounts necessary to compensate Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to Borrower Representative and shall be conclusive absent manifest error. Borrower shall pay Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

(d)    Failure or delay on the part of Lender to demand compensation pursuant to this Section shall not constitute a waiver of Lender's right to demand such compensation.

**2.17    Reserved.**

**2.18    Reserved.**

**2.19    Survival.**  All of Borrower's obligations under this Article 2 shall survive the termination of the Revolving Facility and the repayment of all of the Obligations.

## ARTICLE 3.  CONDITIONS PRECEDENT TO LOANS

**3.1    Closing.**  Subject to the satisfaction of the conditions of this Section 3 in the sole discretion of Lender, the Loans shall be made available on such date (the "***Closing Date***") and at such time as may be mutually agreeable to the parties contemporaneously with the execution hereof ("***Closing***").

**3.2    Conditions of Initial Loan.**  The obligation of Lender to make the initial Revolving Loan hereunder is subject to satisfaction of the following conditions precedent:

(a)    the Confirmation Order shall be in effect and consummation of the Reorganized Plan shall not have been reversed, modified, amended, vacated, enjoined or stayed (other than with the prior written consent of the Lender in its sole discretion);

(b)    the Effective Date shall have occurred as set forth in the Confirmation Order;

(c)    Lender shall have received all of the following, each of which shall be originals, telecopies or other electronic transmissions (followed promptly by originals) unless otherwise specified, each properly executed by an Authorized Officer of the signing Credit Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to Lender:

(i)    executed counterparts of this Agreement and the other Loan Documents required by Lender to be executed on the Closing Date;

(ii)    a Revolving Note executed by Borrower in favor of Lender;

(iii)    the Management Fee Subordination Agreement and all Subordination Agreements required by Lender, including Subordination Agreements with each landlord of Borrower subordinating each such landlord's rights to receive excess rent payments from Borrower;

(iv)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Authorized Officers of each Credit Party as Lender

*Approved by Judge Donald H. Steckroth March  06, 2014*

may require evidencing the identity, authority and capacity of each Authorized Officer thereof authorized to act as an Authorized Officer in connection with this Agreement and the other Loan Documents to which such Credit Party is a party;

   (v)   executed counterparts of the Intercreditor Agreement;

   (vi)   such Organization Documents and certifications as Lender may require to evidence that each Credit Party is duly organized or formed, and that each Credit Party is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification;

   (vii)   a certificate by an Authorized Officer of Borrower either (A) attaching copies of all consents, licenses and approvals required in connection with the execution, delivery and performance by Borrower and the validity against Borrower of the Loan Documents to which it is a party, and such consents, licenses and approvals shall be in full force and effect, or (B) stating that no such consents, licenses or approvals are so required;

   (viii)   a certificate signed by an Authorized Officer of Borrower Representative certifying: (A) that the conditions specified in this Section 3.2 have been satisfied, (B) that there has been no event or circumstance since October 31, 2013 that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, (C) that no event or circumstance has occurred or exists that constitutes a Default or an Event of Default, and (D) as to the solvency of Borrower and the other Credit Parties as of the Closing Date and after giving effect to the Loans made on the Closing Date; and

   (ix)   evidence that all Required Insurance has been obtained and is in effect;

  (d)  Lender shall have received payment in full of all fees required to be paid under Section 2.9 on or before the Closing Date shall have been paid;

  (e)  Lender shall have received on or before the Closing Date, lien searches (including UCC, tax lien, and judgment searches) demonstrating the absence of Liens on the Collateral of Borrower and the Accommodation Pledgors other than Permitted Liens;

  (f)  Lender shall have received: (i) copies of all filing receipts and acknowledgments issued by the appropriate Governmental Authority to evidence recordation or filing necessary to perfect the Lien of Lender on the Collateral or other satisfactory evidence of such recordation and filing; and (ii) evidence that such Lien constitutes a First Priority Lien in favor of Lender;

  (g)  Lender shall have received a completed Borrowing Base Certificate, prepared as of the Closing Date;

*Approved by Judge Donald H. Steckroth March  06, 2014*

(h)    Lender shall have received such financial statements, reports, certifications, and other operational information required to be delivered under this Agreement or otherwise required by Lender;

(i)    Borrower shall have established the Lockbox Accounts with the Lockbox Bank;

(j)    the existing obligations of Borrower in connection with Postpetition Financing Facility shall be terminated and paid in full at Closing;

(k)    Lender shall have received a favorable written opinion (addressed to Lender and dated the Closing Date) of legal counsel for Borrower and the other Credit Parties, in form and substance acceptable to Lender in its sole discretion;

(l)    Borrower and each other Credit Party shall have executed and filed IRS Form 8821 with the appropriate office of the Internal Revenue Service;

(m)    Lender shall have received general background verifications on such officers of the Borrower as Lender may request, in form and substance acceptable to Lender; and

(n)    Lender shall have received such other assurances, certificates, documents, consents or opinions, and completed such due diligence, as Lender may require.

**3.3    Conditions to all Revolving Loans**.  The obligation of Lender to make any Revolving Loan is subject to the following conditions precedent:

(a)    The representations and warranties of Borrower and each other Credit Party contained in Article 4 or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct on and as of the date of such Revolving Loan, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and except that for purposes of this Section 3.3, the representations and warranties contained in Section 4.10 shall be deemed to refer to the most recent statements furnished pursuant to clauses (b) and (c), respectively, of Section 8.4.

(b)    No Event of Default or Default shall exist, or would result from such proposed Revolving Loan or from the application of the proceeds thereof.

(c)    Lender shall have received, in form and substance satisfactory to it, such other assurances, certificates, documents or consents related to the foregoing as Lender reasonably may require.

(d)    Each Revolving Loan Notice submitted by Borrower Representative shall be deemed to be a representation and warranty that the conditions specified in this Section 3.3 have been satisfied on and as of the date of the applicable Revolving Loan.

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**3.4    Limited Waiver of Conditions Precedent**.  If Lender funds any Revolving Loan or grants any other accommodation when any conditions precedent are not satisfied (regardless of whether the lack of satisfaction was known or unknown at the time), it shall not operate as a waiver of: (a) the right of Lender to insist upon satisfaction of all conditions precedent with respect to any subsequent funding, issuance, creation or grant; or (b) any Default or Event of Default due to such failure of conditions or otherwise.

## ARTICLE 4.  REPRESENTATIONS AND WARRANTIES

Borrower and each other Credit Party represents and warrants to Lender as of the date hereof that, except to the extent (if any) disclosed on Schedule 3.A with reference to a specific Section of this Article 4:

**4.1    Organization**.  Borrower and each other Credit Party has been duly organized and is validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in every state in which it is now engaged.  Borrower and each other Credit Party is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, business and operations.  Borrower has no Subsidiaries.

**4.2    Authorization; Enforceability**.  Borrower and each other Credit Party has taken all necessary action to authorize the execution, delivery and performance of the Loan Documents executed and delivered by it.  The Loan Documents have been duly executed and delivered by Borrower and each other Credit Party and constitute legal, valid and binding obligations of Borrower and each other Credit Party enforceable against Borrower and such other Credit Party in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity.  The Loan Documents are not subject to, and Borrower has not (and no other Credit Party has) asserted, any right of rescission, set-off, counterclaim or defense, including the defense of usury.  No exercise of any of the terms or conditions of the Loan Documents, or any right thereunder, will render any Loan Document or any Swap Agreement unenforceable.

**4.3    No Conflicts**.  The execution, delivery and performance of the Loan Documents or any Swap Agreement by Borrower and each other Credit Party and the transactions contemplated thereby will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents or any Swap Agreement) upon any of the properties and assets of Borrower and each other Credit Party pursuant to the terms of, any agreement or instrument to which Borrower is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of its properties.  Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

Borrower and each other Credit Party of the Loan Documents or any Swap Agreement has been obtained and is in full force and effect.

**4.4    Litigation**.  There are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or threatened against or affecting Borrower, any other Credit Party, the Manager or any Healthcare Facility, which, if adversely determined, might, individually or in the aggregate have a Material Adverse Effect.

**4.5    No Defaults**.  No event or circumstance has occurred or exists that constitutes a Default or Event of Default.  No Borrower is in default, and no event or circumstance has occurred or exists that with the passage of time or giving of notice would constitute a default, under any Material Contract or in the payment of any Permitted Indebtedness. There is no basis upon which any party (other than Borrower) could terminate a Material Contract prior to its scheduled termination date. Borrower is not in default in any material.  Borrower is not in default any respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any document evidencing any Permitted Lien or any other agreement or instrument to which it is a party or by which it, any Healthcare Facility or the Collateral is bound and which could reasonably be expected to have a Material Adverse Effect on the Borrower.  There is no default, and no event or circumstance has occurred or exists that with the passage of time or giving of notice would constitute a default, under any HUD Loan Document or M&T Loan Document.

**4.6    Restrictive Agreement**. Except for the HUD Loan Documents and the M&T Loan Documents, Borrower is not a party to any Restrictive Agreement (other than a Restrictive Agreement entered into in connection with a purchase or lease of fixed or capital assets, including real property, that prohibits Liens on such fixed or capital assets, including real property) or any other agreement or instrument, or subject to any restriction, which might adversely affect Borrower, the Collateral or any Healthcare Facility, or Borrower's business, properties, operations or condition, financial or otherwise.

**4.7    Title**.  Borrower and each other Credit Party owns the property granted by it as Collateral under the Collateral Documents, free and clear of any and all Liens (other than Permitted Liens) in favor of any other Person.  Upon the proper filing of UCC financing statements, and the taking of the other actions required by Applicable Law, the Liens granted pursuant to the Collateral Documents will constitute valid and enforceable First Priority Liens on the Collateral in favor of Lender.

**4.8    No Bankruptcy Filing**.   Neither Borrower, any other Credit Party nor Manager is contemplating either the filing of any Insolvency Proceeding or has any knowledge of any Person contemplating the filing of any such petition against Borrower, any such Credit Party or Manager.

**4.9    Solvency.**  Borrower and each other Credit Party is Solvent.

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

WLDD DRAFT 2/20/2014

**4.10    Full and Accurate Disclosure**.  No statement of fact made by Borrower or any other Credit Party in any Loan Documents or any Swap Agreement contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading.  There is no material fact presently known to Borrower or any other Credit Party that has not been disclosed to Lender which adversely affects, or, as far as Borrower or any other Credit Party can reasonably foresee, might adversely affect, the Healthcare Facilities or the business, operations or condition (financial or otherwise) of Borrower or any other Credit Party.  All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower, each other Credit Party and the Healthcare Facilities (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower, each other Credit Party and the Healthcare Facilities as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP consistently applied throughout the periods covered, except as disclosed therein.  No Credit Party has material contingent liabilities, liabilities for taxes, unusual forward or long-term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations required to be disclosed in its financial statements which is not so disclosed.  Since October 31, 2013, no Material Adverse Effect has occurred in the financial condition, operations or business of Borrower, any other Credit Party or the Healthcare Facilities.  Borrower and each other Credit Party has disclosed to Lender all agreements, instruments and corporate or other restrictions to which Borrower or any such Credit Party is subject, and all other matters known to Borrower and such other Credit Party, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**4.11    Tax Filings**.  To the extent required, Borrower and each other Credit Party has filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed and have paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower and each other Credit Party, which, other than payroll taxes, if not paid, could reasonably be expected to result in a Material Adverse Effect.  Borrower and each other Credit Party believes that its tax returns (if any) properly reflect the income and taxes of Borrower and such other Credit Party for the periods covered thereby, subject only to reasonable adjustments required by the Internal Revenue Service or other applicable tax authority upon audit.

**4.12    No Plan Assets**.  As of the Closing Date and at all times thereafter (i) no Credit Party is or will be an "employee benefit plan," as defined in Section 3(3) of ERISA, (ii) none of the assets of any Credit Party constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. § 2510.3-101, (iii) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (iv) transactions by or with Borrower are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans.  As of the date hereof, neither Borrower, nor any member of a "controlled group of corporations" (within the meaning of Section 414 of the Code) which includes Borrower, maintains, sponsors or contributes to a "defined benefit plan" (within the meaning of Section 3(35) of

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA).

**4.13    Compliance**.  Borrower and each other Credit Party is in compliance in all material respects with the requirements of all Laws and all Governmental Authorizations applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted, or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**4.14    Federal Reserve Regulations; Investment Company Act**.  No part of the proceeds of the Loans will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Laws or any Loan Document.  No Credit Party is: (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 2005, as amended; or (iii) subject to any other Laws which purport to restrict or regulate its ability to borrow money.

**4.15    Ownership of Borrower**.  A list of the holders of the Equity Interests of Borrower and each other Credit Party is set forth in <u>Schedule 3.B</u> attached hereto and incorporated herein by reference, and no other Person has any rights and/or claim to any issued or unissued Equity Interest of Borrower or any other Credit Party, except as set forth on said <u>Schedule 3.B</u>.

**4.16    Management Agreement and Lease Agreements**.

(a)    The Management Agreement is in full force and effect.  There is no default, breach or violation existing thereunder, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto.

(b)    The Lease Agreements are in full force and effect.  There is no default, breach or violation existing thereunder, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto.

**4.17    Compliance with Environmental Laws**.  Borrower's and each other Credit Party's (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities) past or present operations, real estate or other properties and assets, including, without limitation, the Healthcare Facilities, are not subject to any federal, state or local investigation to determine whether any remedial action is needed to address any

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

environmental pollution, Hazardous Material or environmental clean-up.  No Credit Party (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities) has received any Environmental Notice.  Borrower has no contingent liability with respect to any Environmental Release, environmental pollution or Hazardous Materials on any real estate now or previously owned, leased or operated by it, including, without limitation, the Healthcare Facilities.

**4.18   Employee Matters**.  There are no controversies pending or, to the knowledge of any Credit Party (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities), threatened between Borrower and any of its employees, agents or independent contractors, other than employee grievances arising in the ordinary course of business which would not, in the aggregate, have a Material Adverse Effect, and each Borrower is in compliance with all Laws respecting employment and employment terms, conditions and practices except for such noncompliance which would not have a Material Adverse Effect.

**4.19   Intellectual Property**.  Borrower possesses adequate Intellectual Property to continue to conduct its business as heretofore conducted by it except to the extent that the failure to possess such items would not have a Material Adverse Effect.  No claim or litigation regarding any of the foregoing is pending or, to the best knowledge of Borrower, threatened by any Licensor or other Person, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**4.20   Healthcare Authorizations**. Borrower (a) has, or has made timely application for in accordance with Applicable Laws, all Healthcare Authorizations and other rights from, and has made all declarations and filings with, all applicable Governmental Authorities, all self regulatory authorities and all courts and other tribunals necessary to engage in the ownership, management and operation of the Healthcare Facilities, and (b) has not received a Citation, nor have any knowledge that any Governmental Authority is considering limiting, suspending or revoking any Healthcare Authorization.  All of such Healthcare Authorizations are valid and in full force and effect and Borrower is in material compliance with the terms and conditions of all such Healthcare Authorizations, except where failure to be in such compliance or for a Healthcare Authorization to be valid and in full force and effect would not have a Material Adverse Effect.

**4.21   HIPAA/HITECH Compliance**.  To the extent that and for so long as any Borrower or other Credit Party is a "covered entity" or "business associate" as either such term is defined under HIPAA/HITECH, each Borrower and other Credit Party: (a) has undertaken all necessary surveys, audits, inventories, reviews, analyses and/or assessments (including any necessary risk assessments) of all areas of its business and operations required by HIPAA/HITECH and/or that could be adversely affected by the failure of such Borrower or Credit Party to be HIPAA/HITECH Compliant (as defined below); (b) has developed a detailed plan and time line for becoming HIPAA/HITECH Compliant (a "***HIPAA/HITECH Compliance Plan***"); and (c) has implemented or will promptly implement those provisions of such HIPAA/HITECH Compliance Plan in all material respects necessary to ensure that each

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

Borrower and other Credit Party becomes HIPAA/HITECH Compliant.  For purposes hereof, "***HIPAA/HITECH Compliant***" shall mean that each Borrower and other Credit Party engaged in the ownership, management or operation of the Healthcare Facilities (x) is or will be in compliance with each of the applicable requirements of the so-called Administrative Simplification provisions of HIPAA, and any applicable requirements of HITECH, on and as of each date that any part thereof, or any final rule or regulation thereunder, becomes effective in accordance with its or their terms, as the case may be (each such date, a "***HIPAA/HITECH Compliance Date***") and (y) is not and could not reasonably be expected to become, as of any date following any such HIPAA/HITECH Compliance Date, the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any Government Reimbursement Program or other accreditation entity) that could result in any of the foregoing or that could reasonably be expected to have a Material Adverse Effect.

    **4.22    Reimbursement; Third-Party Payors**.  Borrower has provided to Lender copies of all participation agreements with Third-Party Payors with respect to the business operations of Borrower.  The Healthcare Facilities operated by Borrower and the services provided at such Healthcare Facilities are qualified for participation in the Government Reimbursement Programs, and Borrower is entitled to reimbursement under the Government Reimbursement Programs for services rendered at such Healthcare Facilities to qualified beneficiaries, and Borrower complies with the conditions of participation in all Government Reimbursement Programs and related contracts.  Borrower is in compliance in all material respects with contracts with Non-Government Account Debtors and is entitled to reimbursement under such contracts.  Without limitation, there are no conditions not complied with that could jeopardize participation in any Governmental Reimbursement Program or related contracts or otherwise could have a Material Adverse Effect.

    **4.23    Other Healthcare Regulatory Matters**.  Borrower has developed and implemented a current and effective corporate health care regulatory compliance program ("***CCP***").  As of the Closing Date, neither Borrower nor any Credit Party: (i) is a party to a corporate integrity agreement; (ii) has any reporting obligations pursuant to a settlement agreement, plan of correction, or other remedial measure entered into with a Governmental Authority; (iii) to Borrower's or such Credit Party's best knowledge (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities), is the subject of any investigation conducted by any Governmental Authority, including, without limitation, an investigation involving compliance with Healthcare Laws; (iv) is or has been a defendant in any qui tam/false claims act litigation; and (v) has been served with or received any written search warrant, subpoena, civil investigative demand or contact letter from any Governmental Authority related to their business operations or any Healthcare Facility owned or operated by them.

    **4.24    Compliance with Healthcare Laws**.

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

(a)       Borrower has timely filed or caused to be timely filed, all cost reports and other reports of every kind whatsoever required by a Government Reimbursement Program, to have been filed or made with respect to the business operations of Borrower and any such Credit Party (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities).  There are no claims, actions or appeals pending (and Borrower has not filed any claims or reports which should result in any such claims, actions or appeals) before any Governmental Authority pertaining to Borrower's business operations including, without limitation, any intermediary or carrier, the Provider Reimbursement Review Board or the Administrator of CMS, with respect to any Medicare or Medicaid cost reports or claims filed by Borrower, or any disallowance by any Governmental Authority in connection with any audit of such cost reports;

(b)       Borrower, each other Credit Party and Manager have obtained all necessary accreditations to operate its business as now conducted, and currently is in compliance with all statutory and regulatory requirements applicable to it, in each case, the failure of which would have a Material Adverse Effect;

(c)       Neither Borrower, any other Credit Party nor Manager (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities), is currently nor has in the past been subject to: (1) any state or local governmental investigation, inspection or inquiry related to any license or licensure standards applicable to Borrower or any Credit Party; (2) any federal, state, local governmental or private payor civil or criminal investigations, inquiries or audits involving and/or related to any federal, state or private payor healthcare fraud and abuse provisions or contractual prohibition of healthcare fraud and abuse; or (3) any federal, state or private payor inquiry, investigation, inspection or audit regarding Borrower or any Credit Party or their activities, including, without limitation, any federal, state or private payor inquiry or investigation of any Person having "ownership, financial or control interest" in Borrower or any Credit Party (as that term is defined in 42 C.F.R. § 420.201, *et seq.*) involving and/or related to healthcare fraud and abuse, false claims under 31 U.S.C. §§ 3729-3731 or any similar contractual prohibition, or any qui tam action brought pursuant to 31 U.S.C. § 3729, *et seq.*;

(d)       No director, officer, shareholder, employee or, to Borrower's knowledge, Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in Borrower or any other Credit Party, or Manager: (1) has had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. § 1320a-7a; (2) has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a-7b); (3) has been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of those offenses described in 42 U.S.C. § 1320a-7b or 18 U.S.C. §§ 669, 1035, 1347, 1518, including without limitation any of the following categories of offenses: (A) criminal offenses relating to the delivery of an item or service under any Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a-7b) or healthcare benefit program (as that term is defined in 18 U.S.C. § 24b); (B) criminal offenses under federal or state law relating to patient neglect or abuse in connection with the delivery of a healthcare item or service; (C) criminal offenses under Laws relating to fraud and abuse, theft, embezzlement, false statements to third parties, money laundering, kickbacks, breach of fiduciary responsibility or other

43

*Approved by Judge Donald H. Steckroth March  06, 2014*

financial misconduct in connection with the delivery of a healthcare item or service or with respect to any act or omission in a program operated by or financed in whole or in part by any federal, state or local governmental agency; (D) Laws relating to the interference with or obstruction of any investigations into any criminal offenses described in (1) through (3) above; or (E) criminal offenses under Applicable Laws relating to the unlawful manufacturing, distribution, prescription or dispensing of a controlled substance; or (4) has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§ 3729-3731 or qui tam action brought pursuant to 31 U.S.C. § 3729, *et seq.*;

(e)     Borrower and each other Credit Party (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities), is and shall continue to be in compliance with all Applicable Laws relating to its relationships with physicians in all material respects;

(f)     Borrower and each other Credit Party and Manager, and their employees and contractors (other than contracted agencies), in the exercise of their duties on behalf of Borrower and any other Credit Party, is and shall continue to be in compliance with all Healthcare Laws and any Laws applicable to the collections on Accounts, any contracts relating thereto or any other Collateral, or otherwise applicable to its business and properties, a violation of which could materially affect its ability to collect on its Accounts or repay the Obligations;

(g)     All Persons providing professional health care services for or on behalf of Borrower or any Credit Party (but with respect to each Credit Party other than Borrower, only with respect to the Healthcare Facilities) (either as an employee or independent contractor) are appropriately licensed to provide such services at the Healthcare Facilities; and

(h)     No Healthcare Authorizations of Borrower have been suspended, revoked, limited or denied renewal at any time.

**4.25    Subordinated Indebtedness**.    Borrower has delivered to Lender true and correct copies of all Subordinated Indebtedness Documents.    None of the Subordinated Indebtedness Documents have been amended or modified except pursuant to a written agreement which has been delivered to Lender.    No breach, default or event of default has occurred or is continuing under any Subordinated Indebtedness Documents, and no fact, circumstance, condition or event has occurred and is continuing which, with the giving of notice or passage of time or both, would constitute or result in a breach, default or event of default thereunder.

**4.26    Federal Employer Identification Number**.    Borrower has the following federal employer identification numbers:

Long Ridge            20-0114809

Westport             20-0114839

*Approved by Judge Donald H. Steckroth March  06, 2014*

| Danbury | 20-0114676 |
|---------|------------|
| Newington | 20-0114730 |
| West River | 20-0759229 |

**4.27    Survival**.  All of the representations and warranties in this Article 4 and elsewhere in the Loan Documents or any Swap Agreement (i) shall survive for so long as any of the Obligations remain owing to Lender and (ii) shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## ARTICLE 5.  AFFIRMATIVE COVENANTS.

So long as any Lender shall have any commitment to make any Loan hereunder, or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, Borrower and each other Credit Party covenants and agrees as follows:

**5.1    Payment of Obligations**.  Borrower shall pay and discharge as the same shall become due and payable, all its obligations and liabilities, including: (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by Borrower; (b) all lawful claims which, if unpaid, would by law become a Lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness.

**5.2    Preservation of Existence, Etc.** Borrower and each other Credit Party shall: (a) preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization, except as permitted by Section 6.9;  (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

**5.3    Maintenance of Properties**.  Borrower shall: (a) maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) use the standard of care typical in the industry in the operation and maintenance of its Healthcare Facilities.

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**5.4**    **Maintenance of Insurance**.    Borrower shall maintain insurance on all properties and assets of Borrower and each other Credit Party (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities) covering the repair and replacement costs of all such property (including the perils of flood and earthquake) and coverage for business interruption and professional liability and comprehensive general liability insurance with such insurance companies, in such reasonable amounts and covering such insurable risks as are at all times satisfactory to Lender and with respect to coverage limits, the limits and coverages as in effect on the Closing Date (the "*Required Insurance*").    All policies relating to Required Insurance, subject to the rights of any holder of a Permitted Lien having priority over the security interests of Lender, shall name Lender as an "additional insured," as applicable, and shall be made payable solely to Lender, in case of loss, under a standard non-contributory "mortgagee," "secured party" or "lender's loss payable" clause or endorsement, and are to contain such other provisions as Lender reasonably may require to fully protect Lender's interest in the Collateral and to any payments to be made under such policies.    Each loss payable endorsement in favor of Lender shall provide (x) for not less than thirty (30) days prior written notice to Lender of the exercise of any right of cancellation and (y) that Lender's right to payment under any property insurance policy will not be invalidated by any act or neglect of, or any breach of warranty or condition by, Borrower (or any of them) or any other party.    If an Event of Default shall have occurred and remain outstanding, Lender, subject to the rights of any holder of a Permitted Lien having priority over the security interests of Lender, shall have the sole right, in the name of Lender or Borrower (or any of them), to file claims under any insurance policies, to receive, receipt and give acquittances for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.    In the event Borrower fails to provide Lender with evidence of the Required Insurance in the manner set forth in this <u>Section 5.4</u>, Lender may, following written notice to Borrower Representative, purchase insurance at Borrower's expense to protect Lender's interests in the Collateral.    The insurance purchased by Lender may, but need not, protect Borrower's interests in the Collateral, and therefor such insurance may not pay any claim that Borrower may make or any claim that is made against Borrower in connection with the Collateral.    Borrower may later request that Lender cancel any insurance purchased by Lender, but only after providing Lender with satisfactory evidence that Borrower has the Required Insurance.    If Lender purchases insurance covering all or any portion of the Collateral, Borrower shall be responsible for the costs of such insurance, including interest (at the applicable rate set forth hereunder for Revolving Loans) and other charges accruing on the purchase price thereof, until the effective date of the cancellation or the expiration of the insurance, and Lender may add all of such costs, interest and other charges to the Obligations.    The costs of the premiums of any insurance purchased by Lender may exceed the costs of insurance that Borrower may be able to purchase on their own.

**5.5**    **Compliance With Laws**.    Borrower shall comply in all material respects with the requirements of all Laws (including Environmental Laws and Healthcare Laws) and obtain, maintain and comply in all material respects with all Governmental Authorizations and Healthcare Authorizations, in each instance, applicable to it or to its business or property,

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

except in such instances in which: (a) such requirement of Law (including Environmental Laws) is being contested in good faith by appropriate proceedings diligently conducted; (b) the failure to comply with any such Law (including Environmental Laws and Healthcare Laws) could not reasonably be expected to have a Material Adverse Effect; (c) the failure to obtain and maintain any such Governmental Authorization could not reasonably be expected to have a Material Adverse Effect; or (d) the failure to comply with any such Governmental Authorization or Healthcare Authorization could not reasonably be expected to have a Material Adverse Effect.

5.6 **Books and Records**. Borrower and each other Credit Party shall: (a) maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of Borrower or such other Credit Party, as the case may be; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over Borrower or such other Credit Party, as the case may be. Borrower shall maintain at all times books and records pertaining to the Collateral in such detail, form and scope as Lender shall require.

5.7 **Inspection Rights; Field Audits**. Borrower and each other Credit Party (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities) and each Manager shall permit representatives and independent contractors of Lender to visit and inspect any of its Healthcare Facilities and other properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, and to conduct a field examination and audit of the Collateral, all at the expense of Borrower and at such reasonable times during normal business hours, and as often as may be reasonably desired, upon reasonable advance notice to Borrower Representative; provided, however, that when an Event of Default exists Lender (or any of its respective representatives or independent contractors) may do any of the foregoing at the expense of Borrower at any time and as often as Lender deems necessary or advisable during normal business hours and without advance notice.

5.8 **Environmental Matters**. In addition to and without limiting the generality of Section 5.5, Borrower shall: (a) comply with all applicable Environmental Laws to the extent that noncompliance could reasonably be expected to have a Material Adverse Effect; (b) obtain and comply with any and all Governmental Authorizations required by applicable Environmental Laws to the extent that not obtaining and not complying with such licenses, approvals, notifications, and registrations could reasonably be expected to have a Material Adverse Effect; and (c) conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under applicable Environmental Laws following any Environmental Release, and promptly comply with all lawful orders and directives of any Governmental Authority regarding such Environmental Laws, except orders and directives that are being challenged in good faith. Without limiting the generality of the foregoing, if any Environmental Release occurs at or on any properties of Borrower or any other Credit Party (but with respect to the Credit Parties other than Borrower, solely with

11436681

*Approved by Judge Donald H. Steckroth March 06, 2014*

respect to the Healthcare Facilities), it shall act promptly and diligently to investigate and report to Lender and all appropriate Governmental Authorities the extent of, and to make appropriate remedial action to eliminate, such Environmental Release, whether or not directed to do so by any Governmental Authority.

**5.9**      **Additional Guarantors/Borrower**.  Borrower shall notify Lender at the time that any Person becomes a Subsidiary of Borrower, and promptly thereafter, at the option of Lender (and in any event within thirty (30) days), cause such Person to: (a) become a Borrower or a Guarantor, as to be designated by Lender, by executing and delivering to Lender a loan party joinder or such other document as Lender shall deem appropriate for such purpose or a Guaranty; (b) execute and deliver to Lender documents necessary to grant and perfect a First Priority Lien to Lender in all Collateral held by such Subsidiary and in all issued and outstanding Equity Interests of such Subsidiary owned by Borrower or such other Credit Party; and (c) deliver to Lender documents of the types referred to in clause (c) of Section 3.2, all in form, content and scope satisfactory to Lender.

**5.10**      **Collateral Records.**  Borrower shall execute and deliver promptly to Lender, from time to time, solely for Lender's convenience in maintaining a record of the Collateral, such written statements and schedules as Lender may require designating, identifying or describing the Collateral.  The failure by Borrower, however, to promptly give Lender such statements or schedules shall not affect, diminish, modify or otherwise limit the Liens on the Collateral granted pursuant to the Collateral Documents.

**5.11**      **Security Interests.**  Borrower and each other Credit Party shall: (a) defend the Collateral against all claims and demands of all Persons at any time claiming the same or any interest therein, other than those claiming an interest that is a Permitted Lien; (b) comply with the requirements of all Applicable Laws in order to grant to Lender valid and perfected First Priority security interests in the Collateral, with perfection, in the case of any investment property, deposit account or letter of credit, being effected by giving Lender control of such investment property or deposit account or letter of credit, rather than by the filing of a UCC financing statement with respect to such investment property; and (c) do whatever Lender may reasonably request, from time to time, to effect the purposes of this Agreement and the other Loan Documents, including: (i) filing notices of liens, UCC financing statements, fixture filings and amendments, renewals and continuations thereof; (ii) cooperating with Lender's representatives;  (iii) keeping stock records;  (iv) obtaining Collateral Access Agreement; and (v) paying claims which might, if unpaid, become a Lien on the Collateral. Lender is hereby authorized by Borrower and each other Credit Party to file any UCC financing statements covering the Collateral whether or not Borrower's or such other Credit Party's signature appear thereon.

**5.12**      **Account Control Agreements**. Borrower shall maintain at all times a valid and enforceable account control agreement with respect to each depository account of Borrower, in form and substance satisfactory to Lender in its reasonable discretion.

48

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

**5.13    Additional Accommodation Pledgors**. Borrower and each other Credit Party shall cause any Person who acquires Equity Interests in Borrower to become an Accommodation Pledgor by entering into a Pledge Agreement.

**5.14    Landlord and Warehouse Agreements.** Borrower and each other Credit Party shall, upon request, provide Lender with copies of all existing agreements entered into in connection with Borrower, and promptly after execution thereof provide Lender with copies of all future agreements, between Borrower and any landlord, warehouseman, processor, shipper, bailee or other Person that owns any premises at which any Collateral may be kept or that otherwise may possess or handle any Collateral and obtain a Collateral Access Agreement with any such landlord, warehouseman, processor, shipper, bailee or other Person.

**5.15    Licenses**. Borrower shall keep each License affecting any material Collateral, or any other material properties and assets of Borrower in full force and effect; promptly notify Lender of any proposed modification to any such License, or entry into any new License, in each case at least 30 days prior to its closing date; pay all Royalties when due; and notify Lender of any default or breach asserted by any Person to have occurred under any License.

**5.16    Reserved**.

**5.17    Depository Accounts**. Borrower shall maintain its primary depository checking accounts with Lender.

**5.18    Expenses**. Borrower shall reimburse Lender upon receipt of notice for all Expenses. Any Expenses due and payable by Borrower hereunder which are not paid within ten (10) days after demand shall accrue interest at the Default Rate and may be paid by Lender, in its sole discretion, pursuant to <u>Section 2.12</u>. The obligations and liabilities of Borrower under this <u>Section 5.18</u> shall survive the payment in full of the Obligations and the termination of this Agreement and the exercise by Lender of any of its rights or remedies under the Loan Documents.

**5.19    Indemnity**. Borrower and each other Credit Party (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities) shall defend, indemnify and hold harmless Lender and each Lender Affiliate and their respective successors and assigns, and the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing (including any Servicer) and each other Person, if any, who controls Lender, its Lender Affiliates or any of the foregoing (each, an "***Indemnified Party***"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be

49

*Approved by Judge Donald H. Steckroth March 06, 2014*

imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "***Indemnified Liabilities***") in any manner, relating to or arising out of or by reason of the Loans, including: (i) any breach by Borrower  or any other Credit Party of its obligations under, or any misrepresentation by Borrower or any other Credit Party contained in, any Loan Document or any Swap Agreement; (ii) the use or intended use of the proceeds of the Loans; (iii) any information provided by or on behalf of Borrower or any other Credit Party, or contained in any documentation approved by Borrower or any other Credit Party; (iv) possession of any Lien in any of the Collateral; (v) any Environmental Release or the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Materials on, from or affecting the Collateral or any Healthcare Facility; (vi) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Environmental Release or Hazardous Materials; (vii) any lawsuit brought or threatened, settlement reached, or government order relating to such Environmental Release or Hazardous Materials or any violation of Healthcare Laws; and (viii) any violation of the Environmental Laws which is based upon or in any way related to such Environmental Release or Hazardous Material or any violation of Healthcare Laws, including the reasonable fees and disbursements of legal counsel for Lender, including the reasonable charges of internal legal counsel, the reasonable fees and disbursements of environmental engineers and consultants, investigation and laboratory fees, response and remediation costs, court costs and litigation expenses; provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder to the extent that it is finally judicially determined that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party.  Any amounts payable to any Indemnified Party by reason of the application of this Section 5.19 shall be payable on demand and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Party until paid.  The obligations and liabilities of Borrower and any other Credit Party under this Section 5.19 shall survive the repayment of the Obligations, the termination of this Agreement and the exercise by Lender of any of its rights or remedies under the Loan Documents in any of the Collateral or otherwise.

**5.20    Subordination of Management Fees**. Borrower and each Credit Party shall cause any Manager to enter into a Management Fee Subordination Agreement, in form and substance satisfactory to Lender, pursuant which (a) all compensation due to such Manager is subordinated in right and time of payment to all Obligations hereunder, and (b) Lender has the right to terminate the engagement of such Manager upon or following the occurrence of any Default or Event of Default.

**5.21    Patriot Act Compliance**.

(a)    Borrower and each other Credit Party shall comply with the Patriot Act (as defined below) and all applicable requirements of governmental authorities having jurisdiction over Borrower, each other Credit Party and the Collateral, including those relating to money laundering and terrorism.  Lender shall have the right to audit each Credit Party's compliance with the Patriot Act and all applicable requirements of any Governmental Authority having jurisdiction over any such Credit Party and the Collateral, including those

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

relating to money laundering and terrorism.  In the event that Borrower or any other Credit Party fails to comply with the Patriot Act or any such requirements of any such Governmental Authority, then Lender may, at its option, cause Borrower or such other Credit Party to comply therewith and any and all reasonable costs and expenses incurred by Lender in connection therewith shall be added to the Obligations, shall be secured by the Collateral and the other Loan Documents and shall be immediately due and payable.  For purposes hereof, the term "*Patriot Act*" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

(b)    Neither Borrower nor any other Credit Party nor any officer, director, shareholder partner in Borrower or member of such partner nor any owner of a direct or indirect interest in Borrower (a) is listed on any Government Lists, (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense, or (d) is currently under investigation by any governmental authority for alleged criminal activity.

**5.22    Healthcare Operations**.

(a)    Borrower shall maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of any Healthcare Facility for its current use, all Healthcare Authorizations necessary under Healthcare Laws (i) to carry on the business of Borrower as it is conducted on the Closing Date, and (ii) if Borrower receives or has applied for reimbursements under any Governmental Reimbursement Program as part of its business, to continue to receive reimbursement thereunder in substantial compliance with all requirements for participation in, and for the licensure required to provide the services that are reimbursable under, any Governmental Reimbursement Program, including, without limitation, the Medicare and Medicaid Patient Protection Act of 1987, as the same may be amended, and such other Third-Party Payor programs as to which Borrower receives or has applied for reimbursement as part of its business.

(b)    Borrower shall cause all Healthcare Authorizations and any other agreements necessary for the use and operation of the Healthcare Facilities or as may be necessary for participation in Third-Party Payor Programs to remain in effect without reduction in the number of licensed beds or authorized beds for use in any Healthcare Facility.

(c)    Borrower shall following the occurrence and during the continuance of any Event of Default, upon Lender's request, if permitted by any applicable legal requirements and Contractual Obligations, turn over to Lender all resident deposits (and any

51

*Approved by Judge Donald H. Steckroth March  06, 2014*

interest theretofore earned thereon) with respect to the Healthcare Facilities, to be held by Lender subject to the terms of its related agreements.

(d)     Borrower shall provide to Lender upon request, an accurate, complete and current list of all participation agreements with Third-Party Payors with respect to the business of Borrower.

(e)     Borrower shall maintain a CCP which includes at least the following components and allows Lender and/or any outside consultants from time to time to review such CCP:   (i) standards of conduct and procedures that describe compliance policies regarding Laws with an emphasis on prevention of fraud and abuse; (ii) specific officer within high-level personnel identified as having overall responsibility for compliance with such standards and procedures; (iii) training and education programs which effectively communicate the compliance standards and procedures to employees and agents, including, without limitation, fraud and abuse Laws and illegal billing practices; (iv) auditing and monitoring systems and reasonable steps for achieving compliance with such standards and procedures including, without limitation, publicizing a report system to allow employees and other agents to anonymously report criminal or suspect conduct and potential compliance problems; (v) disciplinary guidelines and consistent enforcement of compliance policies including, without limitation, discipline of individuals responsible for the failure to detect violations of the CCP; and (vi) mechanisms to immediately respond to detected violations of the CCP.

(f)     If any Healthcare Facility is currently accredited by the Joint Commission, Borrower and each other Credit Party (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities) shall (i) maintain such accreditation in good standing and without limitation or impairment, (ii) promptly submit to the Joint Commission a plan of correction for any deficiencies listed on any Joint Commission accreditation survey report, and (iii) cure all such deficiencies within such time frame as is necessary to preserve and maintain in good standing and without limitation or impairment such Joint Commission accreditation.

(g)     If required under applicable Healthcare Laws, Borrower shall maintain in full force and effect a valid CON for no less than the number of beds and units in the Healthcare Facilities as of the Closing Date.

(h)     Borrower shall maintain any applicable CON free from restrictions or known conflicts which would materially impair the use or operation of each Healthcare Facility for its current use, and shall not permit any CON to become provisional, probationary or restricted in any way.

**5.23    Right of First Refusal**.  If at any time, Borrower, any other Credit Party or any of their Affiliates receives from a third party an offer, term sheet or commitment, or any amendments thereto, or makes a proposal accepted by any Person (each, an "*Offer*") which provides for   any working capital financing (other than equity financing which are not convertible into secured debt) to or for Borrower, Borrower or such other Credit Party shall

52

immediately notify Lender of the Offer in writing (including all material terms of the Offer), Lender shall have thirty (30) calendar days after receipt of such notice (the "*Option Period*") to agree to provide similar financing in the place of such Person upon substantially the same terms and conditions (or terms more favorable to Borrower) as set forth in the Offer; provided, however, that such Option Period shall be tolled during any period that Lender has requested from Borrower, but not yet received, financial and other information reasonably needed by Lender to determine whether to accept the Offer.  Lender shall notify Borrower in writing of Lender's acceptance of the Offer pursuant hereto (the "*Offer Acceptance Notice*"), in which case Borrower shall obtain such financing from Lender (or a Lender Affiliate designated by Lender) and shall not accept the Offer from such other Person.  If no Offer Acceptance Notice has been received from Lender within the Option Period, Borrower or such other Credit Party may consummate the Offer with the other Person on the terms and conditions set forth in the Offer (the "*Offered Financing Transaction*"); provided, however, that none of the foregoing or any failure by Lender to issue an Offer Acceptance Notice shall be construed as a waiver of any of the terms, covenants or conditions of any of the Loan Documents or any Swap Agreement.  If the Offered Financing Transaction is not closed on the terms set forth in the Offer or with the Person providing the Offer or during the one hundred twenty (120) calendar day period following the expiration of the Option Period, Borrower or such other Credit Party shall not be permitted to consummate the Transaction without again complying with this Section 5.23.  The provisions of this Section 5.23 shall survive the payment in full of the Obligations and termination of this Agreement for a period of 90 days.

**5.24    Further Assurances**.  Borrower and each other Credit Party shall: (a) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Obligations and/or for the better and more effective carrying out of the intents and purposes of the Loan Documents or any Swap Agreement, as Lender may reasonably require from time to time; and (b) upon Lender's request therefor given from time to time, pay for reports of UCC, federal tax lien, state tax lien, judgment and pending litigation searches with respect to Borrower and each other Credit Party, each such search to be conducted by search firms designated by Lender in each of the locations designated by Lender.

**5.25    Reserved**.

# ARTICLE 6.  NEGATIVE COVENANTS

So long as Lender shall have any commitment to make any Loan hereunder, or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, Borrower covenants and agrees as follows:

11436681

**6.1    Liens**.  Borrower shall not create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than Permitted Liens.

**6.2    Investments**.  Borrower shall not make any Investments, except for Permitted Investments.

**6.3    Indebtedness.**  Borrower shall not create, incur, assume or suffer to exist any Indebtedness, except for Permitted Indebtedness.

**6.4    Contingent Obligations.**  Borrower shall not create, incur, assume or suffer to exist any Contingent Obligation, except for Permitted Contingent Obligations.

**6.5    Loans**.  Borrower shall not make any loans or other advances of money to any Person, except: (a) advances to an officer or employee for salary, travel expenses, commissions and similar items in the ordinary course of business; (b) prepaid expenses and extensions of trade credit made in the ordinary course of business; and (c) deposits with financial institutions permitted hereunder.

**6.6    Fundamental Changes**.  Borrower and each other Credit Party shall not merge, dissolve, liquidate, consolidate with or into another Person, or transfer of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

**6.7    Asset Dispositions**.  Borrower shall not make any Asset Disposition, except a Permitted Asset Disposition.

**6.8    Distributions; Certain Other Payments**.  Borrower shall not declare or make, directly or indirectly, any Distribution, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests.

**6.9    Change in Nature of Business; Change to Organization Documents**. Borrower shall not engage in any business activity not related to the ownership and operation of the Healthcare Facilities or any business substantially related or incidental thereto. Borrower and each other Credit Party shall not (a) amend any of their respective Organization Documents (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities), (b) change their jurisdiction of formation or organization or their type or form of organization (*e.g.*, corporation or limited liability company), or (c) change their name or identity (including trade name or names) without notifying Lender of such amendment or change in writing at least thirty (30) days prior to the effective date thereof and, in the case of an amendment or change in business activity or type or form of organization of the Borrower, without first obtaining the prior written consent of Lender. Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.

11436681

**6.10    Transactions With Affiliates**.  Except for transactions disclosed to Lender in writing and in existence on the Closing Date that contain terms that are no less favorable to Borrower than those which might be obtained from a third party who is not an Affiliate of Borrower, Borrower shall not enter into any transaction of any kind with any of Borrower's Affiliates, whether or not in the ordinary course of business, without the prior written consent of Lender, in its sole and absolute discretion.  Without limitation, Lender may condition any such approval on receipt of a subordination agreement relating to such transaction on terms as required by Lender in its sole and absolute discretion.

**6.11    Burdensome Agreements**.  Borrower shall not enter into any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability of Borrower to create, incur, assume or suffer to exist Liens on property of such Person; provided, however, this Section 6.11 shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clause (d) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligations of such Person.

**6.12    Use of Proceeds**.  Borrower shall not use the proceeds of any Loan, whether directly or indirectly, and whether immediately, incidentally or ultimately, for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Laws or any Loan Document.

**6.13    Change of Control**.  Borrower shall not cause or permit any Change of Control.

**6.14    Indebtedness Cancellation**.  Borrower shall not cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

**6.15    Certain Accounting Changes**.  Borrower shall not (a) change its Fiscal Year end or (b) make any change in its accounting treatment and reporting practices except as required or permitted by GAAP.

**6.16    Healthcare Matters**.  Borrower shall not suffer or permit to occur any of the following:

(a)    any transfer of a Healthcare Authorization or rights thereunder to any Person (other than Borrower or Lender) or to any location other than a Healthcare Facility approved by Lender in advance in writing.

*Approved by Judge Donald H. Steckroth March  06, 2014*

(b)    any pledge or hypothecation of any Healthcare Authorization as collateral security for any Indebtedness other than Indebtedness to Lender;

(c)    any rescission, withdrawal, revocation, amendment or modification of or other alteration to the nature, tenor or scope of any Healthcare Authorization without Lender's prior written consent, including, without limitation, (I) any change to the authorized units/beds capacity of any Healthcare Facility and/or the number of units/beds approved by the applicable Governmental Authority, and (II) any transfer all or any part of any Healthcare Facility's authorized units or beds to another site or location.

(d)    any voluntary transfer of any resident of any Healthcare Facility to any other facility, unless such transfer is at the request of the resident (without economic incentives being given to the resident by an Affiliate of Borrower or Manager) or its payor or is for reasons relating to non-payment or the health, required level of medical care or safety of the resident to be transferred.

**6.17    Principal Place of Business; Location of Collateral**.  Borrower and each other Credit Party shall not change its principal place of business, its chief executive office or the location of any of the Collateral without first giving Lender thirty (30) days' prior notice.

**6.18    ERISA**.

(a)    Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under this Agreement or the other Loan Documents or any Swap Agreement) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)    Borrower shall not maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate of Borrower to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan or permit the assets of Borrower to become "plan assets," whether by operation of law or under regulations promulgated under ERISA.

(c)    Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Availability Period, as requested by Lender in its sole discretion, that (A) Borrower is not and does not maintain an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(3) of ERISA; (B) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (C) the assets of Borrower do not constitute "plan assets" within the meaning of 29 C.F.R. § 2510.3-101.

**6.19    Arrangements with Referral Sources**:    No Borrower shall enter into arrangements which: (i) provide remuneration to Persons in return for referrals to any

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

Healthcare Facilities; (ii) receive remuneration from Persons in return for referrals by any Healthcare Facilities; or (iii) otherwise violate the provisions of the Federal health care program exclusion provisions (42 U.S.C. § 1302a-7); the Civil Monetary Penalties Act (42 U.S.C. § 1302a-7a), the Federal health care program fraud and abuse provision (42 U.S.C. § 1320-7b) and other such Healthcare Laws.

**6.20    Manager; Management Agreement**.    Borrower shall not substitute or replace, or permit the substitution or replacement of, the Manager or make or consent to any cancellation or material modification, amendment, assignment, termination, supplement or cancellation of the Management Agreement without the prior written consent of Lender in its sole and absolute discretion.  The covenants, agreements and restrictions contained in this Section 6.20 are solely for the purposes of assuring that the Healthcare Facilities are managed and operated in a first-class manner consistent with Healthcare Laws and the preservation and protection of the Healthcare Facilities as security for the Obligations and shall not place responsibility for the control, care, management or repair of the Healthcare Facilities upon Lender, or make Lender responsible or liable for any negligence in the management, operation, upkeep, repair or control of the Healthcare Facilities. Borrower shall not suffer or permit any material breach or default to occur in any of Borrower's obligations under the Management Agreement, nor suffer or permit the same to terminate by reason of any failure of Borrower to meet any requirement thereof.

**6.21    Restrictive Agreements**.    Borrower shall not enter into any Restrictive Agreement, except: (a) a Restrictive Agreement as in effect on the Closing Date and shown on Schedule 3.A hereto; (b) a Restrictive Agreement relating to secured Permitted Indebtedness, if such restrictions apply only to the collateral for such Permitted Indebtedness; and (c) customary provisions in leases and other contracts restricting assignment thereof or Liens in the assets or real property covered thereby.

**6.22    IRS Form 8821**.    Borrower and each other Credit Party shall not alter, amend, restate, or otherwise modify, or withdraw, terminate or re-file the IRS Form 8821 required to be filed pursuant to Section 3.2.

**6.23    Swap Agreements**.    Borrower shall not enter into any Swap Agreement other than those approved by Lender in writing.

**6.24    Conduct of Business**.    Borrower shall not engage in any business, other than the operation of the Healthcare Facilities as conducted on the Closing Date and any activities incidental thereto or otherwise reasonably related thereto.

**6.25    Federal Employer Identification Number**.    Borrower shall not change its federal employer identification number.

**6.26    Leases.**    Borrower may not cancel, or materially modify, amend or supplement any Lease Agreement, or enter into any lease agreement for all or any portion of the

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

Healthcare Facilities other than the Lease Agreements, without the prior written consent of Lender in its sole and absolute discretion.

## ARTICLE 7.  FINANCIAL COVENANTS

    **7.1**    **Reserved**.

    **7.2**    **Reserved**.

    **7.3**    **Reserved**.

    **7.4**    **Reserved**.

    **7.5**    **Reserved**.

    **7.6**    **Reserved**.

    **7.7**    **Reserved**.

    **7.8**    **Minimum Liquidity**.  As of Closing and at all times thereafter, Minimum Liquidity shall not be less than Two Million Four Hundred Thousand Dollars ($2,400,000.00).

    **7.9**    **Reserved**.

## ARTICLE 8.  NOTICES AND REPORTING

    **8.1**    **Notices**.  All notices, consents, approvals and requests required or permitted under this Agreement or any other Loan Document (a "***Notice***") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, or, with respect to routine or administrative notices by electronic mail, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by notice to the other party):

| | |
|---|---|
| If to Lender: | Capital One, National Association<br>Commercial & Specialty Finance<br>4445 Willard Avenue, 6th Floor<br>Chevy Chase, MD 20815<br>Attn: Portfolio Manager Healthcare Real Estate |
| with a copy to: | Waller Lansden Dortch & Davis, LLP<br>511 Union Street, Suite 2700 |

11436681

**WLDD DRAFT 2/20/2014**

Nashville, TN 37219-8966
Attn: Katie G. Stenberg, Esq.

If to Borrower:          c/o Care One, LLC
                         173 Bridge Plaza North
                         Fort Lee, NJ 07024
                         Attn: Victor Matthew Marcos

with a copy to:          Cole, Schotz, Meisel, Forman & Leonard, P.A.
                         900 Third Avenue, 16th Floor
                         New York, NY 10022
                         Attn: David M. Bass, Esq.

A Notice shall be deemed to have been given: (i) in the case of hand delivery, at the time of delivery; (ii) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; (iii) in the case of overnight delivery, upon the first attempted delivery on a Business Day; or (iv) in the case of electronic mail, at the time of delivery.

**8.2    Notice of Litigation and Other Matters**.  Borrower and each other Credit Party (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities) shall promptly, and in any event within three (3) Business Days after any Borrower or any Authorized Officer of any Borrower obtains knowledge thereof, provide telephonic and written Notice to Lender of:

(a)    the commencement of all litigation, proceedings and investigations, including those by or before any Governmental Authority, and all actions and proceedings in any court or before any arbitrator against or involving Borrower or any of its properties, assets or businesses, which could reasonably be expected to have a Material Adverse Effect;

(b)    any notice of any violation received by Borrower or any other Credit Party (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities) from any Governmental Authority including any notice of violation of Healthcare Laws or Environmental Laws which in any such case could reasonably be expected to have a Material Adverse Effect;

(c)    any labor controversy that has resulted in, or threatens to result in, a strike or other work stoppage against Borrower;

(d)    any attachment, judgment, lien, levy or order exceeding Fifty Thousand Dollars ($50,000.00) that may be assessed against Borrower excluding judgments that are fully covered by insurance;

(e)    the occurrence of any "reportable event" (as defined in ERISA) which might result in the termination by the PBGC of any Plan covering any officer or employee of Borrower, any benefits of which are, or are required to be, guaranteed by PBGC, (y) receipt of

59

**WLDD DRAFT 2/20/2014**

any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor or (z) its intention to terminate or withdraw from any Plan;

   (f) the occurrence of any Default or Event of Default;

   (g) (i) any default under or termination of a Material Contract, or (ii) the assertion of any Intellectual Property Claim, if an adverse resolution of such Intellectual Property Claim could have a Material Adverse Effect;

   (h) any material Environmental Release by any Credit Party (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities) or on any property owned, leased or occupied by Borrower; or receipt by any Credit Party (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities) of any Environmental Notice;

   (i) the discharge of or any withdrawal or resignation by Borrower's certified independent accountants;

   (j) any other event which could reasonably be expected to constitute or cause a Material Adverse Effect;

   (k) promptly after any material property owned or used by any Borrower is (i) materially damaged or destroyed, or suffers any other material loss, or (ii) is condemned, confiscated or otherwise taken, in whole or in part, or the use thereof is otherwise diminished so as to render impracticable or unreasonable the use of such asset or property for the purpose to which such property was used immediately prior to such condemnation, confiscation or taking, by exercise of the powers of condemnation or eminent domain or otherwise, and in either case the amount of the damage, destruction, loss or diminution in value of the Collateral not covered by insurance equals or exceeds $25,000.00 (collectively, a "***Casualty Loss***");

   (l) (i) the receipt by any Credit Party (but with respect to the Credit Parties other than Borrower in each instance in this Section 8.2(l), solely with respect to the Healthcare Facilities) of any notice or request from any Governmental Authority or Government Reimbursement Program regarding any liability or claim of liability, (ii) any pending, threatened or actual investigation or survey of Borrower, any other Credit Party, or their directors, officers or managing employees by any Government Reimbursement Program, or any nongovernmental payor programs, (iii) Borrower or any other Credit Party becoming a party to a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services, (iv) Borrower or any other Credit Party becoming subject to reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority, (v) Borrower or any other Credit Party becoming the subject of any government payor program investigation conducted by any federal or state enforcement agency, (vi) Borrower or any other Credit Party becoming a defendant in any qui tam/False Claims Act litigation, (vii) Borrower or any other Credit Party being served with or received any search warrant, subpoena, civil investigative demand or contact letter by or from any

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

federal or state enforcement agency relating to an investigation, (viii) Borrower or any other Credit Party becoming subject to any written complaint filed with or submitted to any Governmental Authority having jurisdiction over Borrower or any other Credit Party or filed with or submitted to Borrower or such other Credit Party pursuant to their policies relating to the filing or submissions of such types of complaints, from employees, independent contractors, vendors, physicians, or any other Person that would indicate that such Borrower or such Credit Party has violated any Law; or

(m)   Borrower shall provide copies of all cost reports, operating surveys, rate reports, rate computation reports, licensing reports, deficiency notices, recoupment orders or similar reports from any Government Reimbursement Program, together with true and correct copies thereof, received for the prior calendar month; provided, however that any Citation shall be provided to Lender within one (1) Business Day after the receipt thereof. Notwithstanding the above provisions of this paragraph, upon the occurrence of an Event of Default, without limitation on any other rights or remedies, Lender may require delivery of all such reports and other items upon receipt or at such other times as Lender designates.

**8.3   Borrowing Base Certificates**. Each time a Revolving Loan is requested and, in any event at least monthly during the Availability Period (and more frequently if Lender shall request from time to time), and together with the financial reports required under Section 8.4 hereof, Borrower Representative shall deliver to Lender: (A) a Borrowing Base Certificate in form and substance satisfactory to Lender and signed by an Authorized Officer of Borrower Representative; (B) an aging of accounts receivable for Borrower in form and substance satisfactory to Lender; and (C) such other information in respect of Eligible Accounts and other Collateral as Lender may reasonably request, all prepared in accordance with GAAP and in a form satisfactory to Lender.

**8.4   Financial Statements, Compliance Certificates and Projections..**

(a)   <u>Monthly</u>.

(i)   As soon as available, but in no event later than thirty (30) days after each month of the Borrower, Borrower shall deliver to Lender consolidated and consolidating financial statements of Borrower and its Subsidiaries for such month certified by an Authorized Officer, which consolidated and consolidating financial statements shall include the consolidated and consolidating balance sheet of Borrower at the end of each such month and the consolidated and consolidating statement of income, statement of retained earnings and statement of cash flows for such month, all of which shall be in reasonable detail and prepared in accordance with GAAP.

(ii)   Contemporaneously with delivery of financial statements referred to in clause (i) above, Borrower shall deliver to Lender: (A) a Compliance Certificate executed by an Authorized Officer, (B) evidence satisfactory to Lender that all federal and state taxes to the extent such federal and state taxes are due, if any, have been paid in full,

*Approved by Judge Donald H. Steckroth March  06, 2014*

including, without limitation, payroll taxes and (C) reconciliation of accounts receivable to the balance of accounts receivable in Borrower's general ledgers.

(b) <u>Annually</u>.

(i) As soon as available and in any event within one hundred and twenty (120) days after the end of each Fiscal Year, Borrower shall deliver to Lender: (A) the consolidated and consolidating balance sheet of Borrower and its Subsidiaries as at the end of such Fiscal Year and the related consolidated and consolidating statements of income, stockholders' equity and cash flow for such Fiscal Year; and (B) a report with respect to the financial statements of Borrower from a recognized firm of certified public accountants selected by Borrower and reasonably acceptable to Lender, which report shall be issued pursuant to an audit prepared by such firm of certified public accountants in conformity with GAAP and shall be certified by an Authorized Officer, together with a Compliance Certificate certified by an Authorized Officer.

(ii) No later than sixty (60) days prior to the end of each Fiscal Year, Borrower shall deliver to Lender projected operating budgets for Borrower and its Subsidiaries for the upcoming Fiscal Year, prepared in accordance with GAAP.

**8.5    Other Reports.**

(a) Promptly upon receipt thereof, copies of all material reports, if any, submitted to Borrower, its managers or members by its independent public accountants in connection with their auditing function, including any management report and any management responses thereto; and

(b) Such other financial reports and other information regarding the operations, business affairs and financial condition of Borrower and the other Credit Parties as Lender may reasonably request.

**8.6    Accuracy of Information**.  All written information, reports, statements and other papers and data furnished by or on behalf of Borrower and each other Credit Party to Lender (other than financial forecasts and information prepared by third parties and required to be delivered to Lender by this Agreement) whether pursuant to this <u>Article 8</u> or any other provision of this Agreement, or any of the Loan Documents, shall be, at the time the same is so furnished, complete and correct in all material respects.

**8.7    Protected Health Information.**  All written information, reports, statements and other papers and data furnished by or on behalf of Borrower and each other Credit Party to Lender shall be furnished by Borrower and each other Credit Party in material compliance with all Applicable Laws regarding the use and/or disclosure of patient health information in order to comply with all Applicable Laws governing the security, integrity, and confidentiality of patient health information, including, but not limited to, regulations, standards and rules promulgated under the HIPAA/HITECH.  Borrower and each other Credit

WLDD DRAFT 2/20/2014

Parity agrees not to include or disclose any "protected health information" in any such information, reports, statements and other papers or data furnished by or on behalf of Borrower and each other Credit Party to Lender and further agrees to indemnify Lender pursuant to <u>Section 5.19</u> for any Indemnified Liabilities Lender may incur as a result of the provision of any "protected health information" by Borrower to Lender.

## ARTICLE 9.  DEFAULTS AND REMEDIES

    **9.1**    **Events of Default**.  An "Event of Default" shall exist under this Agreement if any of the following shall occur:

    (a)    **Payment**: If Borrower fails to make any payment of principal or interest, including with respect to any Overadvance, owing to Lender or any Lender Affiliates in respect to the Loans and the other Obligations on the date such payment is due and payable;

    (b)    **Other Obligations**:  If Borrower fails to make any payment of fees, Expenses or other monetary obligations owing to Lender or any Lender Affiliate arising out of or incurred in connection with this Agreement and the other Loan Documents or any Swap Agreement on the date any such payment is due and payable; <u>provided</u>, <u>however</u>, that in the event the Lender does not make (i) Revolving Loans or (ii) withdrawals from deposit accounts of Borrower with Lender to make payments of the fees, Expenses or other monetary obligations referenced in this sub-section (b), Lender shall provide Borrower with written notice of such non-payment and Borrower shall have five (5) days to pay same;

    (c)    **Covenants**:  If Borrower or any other Credit Party shall be in violation, breach or default of, or shall fail to perform, observe or comply with any covenant, obligation or agreement set forth in, this Agreement or any other Loan Document or any Swap Agreement and such violation, breach, default or failure shall not be cured within the applicable period set forth in the applicable Loan Document; <u>provided</u> that, with respect to the affirmative covenants set forth in <u>Article 5</u> (other than <u>Sections 5.1, 5.2, 5.7, 5.12 and 5.24</u>, for which there shall be no cure period), there shall be a thirty (30) calendar day cure period commencing from the earlier of (i) receipt by such Person of written notice of such breach, default, violation or failure, and (ii) the time at which such Person or any authorized officer thereof knew or became aware, or should have known or been aware, of such failure, violation, breach or default, but Lender shall have the right, in its sole discretion, not to make Revolving Loans during the cure period;

    (d)    **Representations, Warranties and Information**: If any representation or warranty made, or financial or other information provided, by Borrower or any other Credit Party in this Agreement and any other Loan Document or any Swap Agreement, or in any report, certificate, financial statement or other instrument, agreement or document provided by Borrower or any other Credit Party in connection with this Agreement or any other Loan Document, shall be false or misleading in any material respect as of the date the representation or warranty was made or the financial or other information was provided;

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

(e)      **Uninsured Loss**:  If there shall occur an uninsured damage to or loss, theft or destruction in excess of Seventy-Five Thousand Dollars ($75,000) in the aggregate with respect to the Collateral or other properties and assets of Borrower or any other Credit Party (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities);

(f)      **Insolvency Proceedings**:      If: (i) a receiver, liquidator or trustee shall be appointed for Borrower or any Credit Party; (ii) Borrower or any Credit Party shall be adjudicated a bankrupt or insolvent under any Debtor Relief Law; or (iii) any Insolvency Proceeding, shall be filed by or against, consented to, or acquiesced in by, Borrower or any Credit Party, as the case may be; provided, however, if such appointment, adjudication, or Insolvency Proceeding was involuntary and not consented to by Borrower or any Credit Party, as the case may be, only upon the same not being discharged, stayed or dismissed within sixty (60) days;

(g)      **Other Indebtedness**: If (i) Borrower shall default beyond any grace period in the payment of principal or interest of any Indebtedness in excess of One Hundred Fifty Thousand Dollars ($150,000) in the aggregate to any Person other than Lender or a Lender Affiliate; or (ii) Borrower otherwise defaults under the terms of any such Indebtedness if the effect of such default is to enable the holder of such Indebtedness to accelerate the payment of such Borrower's obligations, which are the subject thereof, prior to the maturity date or prior to the regularly scheduled date of payment;

(h)      **Swap Agreements**: If any termination payment shall be due by Borrower under any Swap Agreement and such amount is not paid within thirty (30) days of the due date thereof or a default, event of default, termination event or other similar condition or event (howsoever described in respect of Borrower) shall have occurred under any Swap Agreement;

(i)      **Liens**: If any Lien in favor of Lender shall cease to be a valid, enforceable First Priority Lien or if Borrower or any other Credit Party or any Governmental Authority shall assert any of the foregoing;

(j)      **Lockbox Instructions**: If any instruction or agreement regarding the Government Lockbox, the Non-Government Lockbox, the Master Lockbox Account, the Concentration Account or any related depository account is amended or terminated without the written consent of Lender, or if Borrower fails to forward any Collections to the applicable Government Lockbox Account or Non-Government Lockbox Account as required under Section 2.4(c), or if Borrower directs any Account Debtor to make a payment in respect of any Account to any place or account other than the applicable Government Lockbox Account or Non-Government Lockbox Account and such directions are not reversed within three (3) Business Days;

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

(k)     **Healthcare Authorizations**: If (i) any Healthcare Authorization of Borrower shall be revoked, fail to be renewed, suspended or otherwise terminated and such termination, revocation or failure to renew has or would have a Material Adverse Effect, (ii) Borrower shall fail to be eligible for any reason to participate in any Government Reimbursement Program or to accept assignments or rights to reimbursement thereunder, or (iii) any Non-Government Payor shall terminate, revoke or fail to renew Borrower's right to participate in any program that provides reimbursement for Healthcare Services and such termination, revocation or failure to renew has or would be have a Material Adverse Effect;

(l)     **Criminal Proceedings**: If any criminal proceeding is instituted against Borrower, or any Authorized Officer that has or would have a Material Adverse Effect;

(m)     **Investigations**:  If any indication or evidence received by Lender reasonably leads it to believe Borrower, any other Credit Party or any Authorized Officer may have directly or indirectly been engaged in any type of activity which, would be reasonably likely to result in the forfeiture of any property of Borrower or such other Credit Party to any Governmental Authority that could result in a Material Adverse Effect;

(n)     **Management Agreement; Lease Agreements**: If a default or event of default shall occur under the Management Agreement or any Lease Agreement that has not been cured, or waived in writing by Manager, within the time period set forth therein, or any Lease Agreement is cancelled, terminated, or otherwise ceases to be in full force and effect;

(o)     **Change of Control**:  If any Change of Control of Borrower shall occur;

(p)     **Judgments**:  If any final judgment for the payment of money in excess of Twenty-Five Thousand Dollars ($25,000) in the aggregate (i) which is not fully and unconditionally covered by insurance or (ii) for which Borrower has not established a cash or cash equivalent reserve in the full amount of such judgment, shall be rendered by a court of record against Borrower and such judgment shall continue unsatisfied and in effect for a period of thirty (30) consecutive days without being vacated, discharged, satisfied or bonded pending appeal;

(q)     **Execution Process**:  If any Person shall issue any execution or distraint process against the Collateral or any other property of Borrower and such execution or distraint shall continue unsatisfied and in effect for a period of thirty (30) consecutive days without being vacated, discharged, satisfied or bonded pending appeal;

(r)     **Termination of Business**: If Borrower ceases any material portion of its business operations as presently conducted;

(s)     **Pension Benefits**: If Borrower fails to comply with ERISA so that proceedings are commenced to appoint a trustee under ERISA to administer any Plans or the PBGC institutes proceedings to appoint a trustee to administer such Plan(s), or a Lien is

*Approved by Judge Donald H. Steckroth March  06, 2014*

entered to secure any deficiency or claim or a "reportable event" as defined under ERISA occurs;

(t)      **Material Adverse Change**: If any material adverse change in the Collateral, business, property, assets, prospects, operations or condition, financial or otherwise of Borrower or any other Credit Party (but with respect to the Credit Parties other than Borrower, solely with respect to the Healthcare Facilities), as determined by Lender in its sole discretion, or the occurrence of any other event which, in Lender's sole discretion, has or would have a Material Adverse Effect;

(u)      **Payroll Service**:   If Borrower shall fail to maintain a contractual relationship with a payroll provider acceptable to Lender, in its sole discretion, any time;

(v)      **Post Closing Items**:   If any Borrower or any other Credit Party shall fail to deliver or satisfy any of the post-closing items set forth on <u>Schedule 4</u> hereto within the time periods set forth on such <u>Schedule 4</u>;

(w)      **Subordinated Indebtedness**: If any default or event of default shall occur under any of the Subordinated Indebtedness Documents, any subordination or intercreditor provision in any Subordination Agreement or in any document or instrument governing Subordinated Indebtedness, shall cease to be in full force and effect, or Borrower, any other Credit Party or any other Person (including the holder of any applicable Subordinated Indebtedness) shall contest in any manner the validity, binding nature or enforceability of any such provision;

(x)      **Collateral**: If any of the Collateral having a fair market value of $100,000 is attached or seized by any other party;

(y)      **Bankruptcy**: If the Borrower fails to comply with or fully consummate the Reorganization Plan, or the Reorganization Plan or Confirmation Order is otherwise revoked.

(y)      **Cross Default to HUD Loan Documents and M&T Loan Documents**:  If any default or event of default has occurred or is continuing under the HUD Loan Documents or the M&T Loan Documents.

**9.2      Remedies**.  If any Event of Default occurs and is continuing, Lender shall have the right to take any or all of the following actions:

(a)      declare the commitment of Lender to make Revolving Loans to be terminated;

(b)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment,

*Approved by Judge Donald H. Steckroth March  06, 2014*

demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrower;

     (c)     Reserved;

     (d)     reduce the advance rates in respect of Eligible Accounts or take additional reserves against or otherwise modify the Borrowing Base; and

     (e)     exercise all rights and remedies available to Lender under the Loan Documents, including any right of set-off under Section 12.19, or under the UCC or any other Applicable Law;

provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to Borrower under the Bankruptcy Code, the obligation of Lender to make Revolving Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and other Obligations and all interest and other amounts as aforesaid shall automatically become due and payable without further act of Lender.

     **9.3**     **Application of Payments After Exercise of Remedies** Notwithstanding any other provisions of this Agreement to the contrary, after the exercise of remedies by Lender pursuant to Section 9.2 (or after the Loans (with accrued interest thereon) and all other Obligations under the Loan Documents shall have automatically become due and payable in accordance with the terms of such Section 9.2), all amounts collected or received by Lender on account of the  Obligations or any other amounts outstanding under any of the Loan Documents or in respect of the Collateral shall be applied  as follows (and Borrower irrevocably waives the right to direct the application of any such amounts in any other manner):

     FIRST, to the payment of all fees, costs and Expenses (including the reasonable fees and disbursements of legal counsel for Lender, and the reasonable costs of internal legal counsel) of Lender in connection with enforcing the rights of Lender under the Loan Documents and any Protective Advances made by Lender with respect to the Collateral under or pursuant to the terms of the Loan Documents;

     SECOND, to the payment of all of the other Obligations in such order or preference as Lender may determine in its sole discretion; and

     THIRD, to all other Obligations and other obligations which shall have become due and payable under the Loan Documents or otherwise and not repaid pursuant to clauses "FIRST" and "SECOND" above; and

     FOURTH, to the payment of the surplus, if any, to Borrower or whoever else may be lawfully entitled to receive such surplus.

*Approved by Judge Donald H. Steckroth March  06, 2014*

In carrying out the foregoing, amounts received shall be applied in the numerical order provided above until exhausted prior to application to the next succeeding category.

**9.4**   **Rights to Appoint Receiver**. Without limiting and in addition to any other rights, options and remedies Lender has under this Agreement, the other Loan Documents, the UCC, at law or in equity, and subject to the terms of the Intercreditor Agreement, if any, upon the occurrence and continuation of an Event of Default or the acceleration of the Loans pursuant to Section 9.2, Lender shall have the right to apply for and have a receiver appointed by a court of competent jurisdiction in any action taken by Lender to enforce its rights and remedies in order to manage, protect, preserve, sell or dispose of the Collateral and continue the operation of the business of Borrower and to collect all revenues and profits thereof and apply the same to the payment of all expenses and other charges of such receivership including the compensation of the receiver and to pay the Obligations as aforesaid until a sale or other disposition of such Collateral shall be finally made and consummated, in each case, to the extent permitted by Applicable Law.   BORROWER HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF RECEIVER AS PROVIDED ABOVE. BORROWER: (I) GRANTS SUCH WAIVER AND CONSENT KNOWINGLY AFTER HAVING DISCUSSED THE IMPLICATIONS THEREOF WITH COUNSEL; (II) ACKNOWLEDGES THAT (A) THE UNCONTESTED RIGHT TO HAVE A RECEIVER APPOINTED FOR THE FOREGOING PURPOSES IS CONSIDERED ESSENTIAL BY LENDER IN CONNECTION WITH THE ENFORCEMENT OF ITS RIGHTS AND REMEDIES UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND (B) THE AVAILABILITY OF SUCH APPOINTMENT AS A REMEDY UNDER THE FOREGOING CIRCUMSTANCES WAS A MATERIAL FACTOR IN INDUCING LENDER TO MAKE THE LOANS; AND (III) AGREES TO ENTER INTO ANY AND ALL STIPULATIONS IN ANY LEGAL ACTIONS, OR AGREEMENTS OR OTHER INSTRUMENTS IN CONNECTION WITH THE FOREGOING AND TO COOPERATE FULLY WITH LENDER IN CONNECTION WITH THE ASSUMPTION AND EXERCISE OF CONTROL BY THE RECEIVER OVER ALL OR ANY PORTION OF THE COLLATERAL, THE HEALTHCARE FACILITIES OR ANY OTHER PROPERTY OF BORROWER.

**9.5**   **Collection of Accounts**.   Subject to Applicable Law regarding Government Account Debtors, Lender may, at any time and from time to time after the occurrence and during the continuance of an Event of Default, whether before or after notification to any Account Debtor and whether before or after the maturity of any of the Obligations: (i) enforce collection of any Accounts of Borrower or other amounts owed to Borrower Party by suit or otherwise; (ii) exercise all of Borrower Party's rights and remedies with respect to proceedings brought to collect any Accounts or other amounts owed to such Borrower; (iii) surrender, release or exchange all or any part of any Accounts or other amounts owed to Borrower Party, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder; (iv) sell or assign any Account of Borrower Party or other amount owed to Borrower Party upon such terms, for such amount and at such

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

time or times as Lender deems advisable; (v) prepare, file and sign Borrower Party's name on any proof of claim in bankruptcy or other similar document against any Account Debtor or other Person obligated to Borrower Party; and (vi) do all other acts and things which are necessary, in Lender's sole discretion, to fulfill any Credit Party's obligations under this Agreement and the other Loan Documents and to allow Lender to collect the Accounts or other amounts owed to Borrower Party.  In addition to any other provision hereof, Lender may at any time, after the occurrence and during the continuance of an Event of Default, at Borrower's expense, notify Account Debtors (subject to applicable law regarding Government Account Debtors) to make payment directly to Lender of any amounts due or to become due thereunder (and once such notice has been given to an Account Debtor, no Credit Party shall give any contrary instructions to such Account Debtor during the continuance of an Event of Default without Lender's prior written consent).

**9.6    Remedies Cumulative**.  Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Obligations shall be declared, or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by Applicable Law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Collateral, the Collateral has been sold and/or otherwise realized upon in satisfaction of the Obligations or the Obligations have been paid in full.

**9.7    Assistance and Cooperation**.  Borrower agrees to assist and cooperate with Lender, and take any action which Lender may reasonably request or require of Borrower, in order to enable Lender to obtain and enjoy the full rights and benefits granted to Lender by Borrower and the other Credit Parties under this Agreement and the other Loan Documents, including specifically, at the cost and expense of Borrower, the use of their best efforts to assist in obtaining approval of any Governmental Authority for any transaction or action contemplated thereunder which is necessary under any Applicable Law or Contractual Obligation, and specifically, without limitation, the preparation, execution and filing with any such Person of any application for consent to assignment of Governmental Authorizations or otherwise.

**9.8    Severance**.  Lender shall have the right from time to time to sever the Revolving Note and the other Loan Documents into one or more separate notes, mortgages

**WLDD DRAFT 2/20/2014**

and other security documents in such denominations and priorities of payment and liens as Lender shall determine in its discretion for purposes of evidencing and enforcing its rights and remedies.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof.

**9.9    Delay**.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power consequent thereon.

**9.10    Lender's Right to Perform**.  If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of five (5) Business Days after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Obligations (and to the extent permitted under Applicable Laws, secured by the Collateral and other Loan Documents).  Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower Representative of any such failure.

**9.11    License**.  Lender is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property of Borrower or any other Credit Party, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral.  Borrower's rights and interests under Intellectual Property shall inure to Lender's benefit.

**9.12    Injunctive Relief**.  Borrower acknowledges and agrees that if Borrower fails to perform any covenant or obligation contained herein or under any of the other Loan Documents, Lender may have no adequate remedy in monetary damages and, accordingly, shall be entitled to an injunction, (including, without limitation, a temporary restraining order, preliminary injunction, writ of attachment or order compelling performance) against such non-performance, including, without limitation, maintaining the procedure set forth in this

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

Agreement with respect to Collections.  Lender shall not be deemed to have waived any other legal or equitable remedies under this Agreement, the other Loan Documents or at law if Lender shall seek injunctive relief under this <u>Section 9.12</u>.  Borrower waives any requirement for the posting of a bond or other security by Lender in connection with any such injunctive relief.

## ARTICLE 10.  SALE OF LOANS; SECONDARY MARKET TRANSACTIONS

**10.1    Sale of Loans**.  Lender shall have the right at any time and from time to time (i) to sell or otherwise transfer the Loans or any portion thereof or the Loan Documents or any interest therein to one or more investors, or (ii) to sell participation interests in the Loans to one or more investors.  In connection with any such sale, transfer or participation of the Loans or any portion thereof, Borrower shall, at Borrower's expense, use all reasonable efforts and cooperate fully and in good faith with Lender and otherwise assist Lender in consummating any such sale, transfer or participation.  All information regarding Borrower, any other Credit Party or the Collateral may be furnished, without liability to Lender, to any prospective purchaser or participant in the Loans upon such purchaser's or participant's execution of a commercially reasonable confidentiality agreement.  All documents, financial statements, appraisals and other data relevant to Borrower, any other Credit Party or the Loans may be exhibited to and retained by any such purchaser or participant in its files provided that such purchaser or participant has executed a commercially reasonable confidentially agreement.

**10.2    Secondary Market Transactions**.  Lender shall have the right at any time and from time to time to securitize the Loans or any portion thereof in a single asset securitization or a pooled loan securitization of rated single or multi-class securities secured by or evidencing ownership interests in the Revolving Note and the Collateral  Documents (each such securitization is referred to herein as a "***Secondary Market Transaction***").   In connection with any such Secondary Market Transaction, Borrower shall, at Borrower's reasonable expense, use all reasonable efforts and cooperate fully and in good faith with Lender and otherwise assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with any such Secondary Market Transactions.  All information regarding Borrower, Guarantor or the Collateral may be furnished, without liability to Lender, to any Person deemed necessary by Lender in connection with such Secondary Market Transaction.  All documents, financial statements, appraisals and other data relevant to Borrower, any other Credit Party or the Loans may be exhibited to and retained by any such Person.

## ARTICLE 11.  EFFECTIVE DATE AND TERMINATION

**11.1    Effective Date and Termination**.  This Agreement shall become effective on the Closing Date and shall continue in full force and effect until the third (3rd) anniversary of the Closing Date (the "***Revolving Loan Termination Date***") unless sooner terminated as

11436681

herein provided.  On or after the first anniversary of the Closing Date, Borrower may terminate this Agreement with at least fifteen (15) Business Days' prior written notice thereof to Lender, upon (a) the payment in full of all outstanding Loans, together with accrued and unpaid interest thereon, (b) the payment in full of the Early Termination Fee, and (c) the payment in full of all fees, Expenses and other Obligations together with accrued and unpaid interest thereon**.**

**11.2    Effect of Termination**.  The termination of this Agreement shall not affect any Credit Party's, Lender's or any Lender Affiliate's rights, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully disposed of, concluded or liquidated.  The security interests, Liens and rights granted to Lender hereunder and under the other Loan Documents shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that the Revolving Facility may from time to time be temporarily in a zero position or a credit balance exists with respect to the Concentration Account, until all of the Obligations of each Credit Party have been paid in full after the termination of this Agreement or each Credit Party has furnished Lender with an indemnification satisfactory to Lender and the Issuer with respect thereto.  Accordingly, each Credit Party waives any rights which it may have under the UCC to demand the filing of termination statements with respect to the Collateral, and Lender shall not be required to send such termination statements to each Credit Party, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations shall have been paid in full in immediately available funds.

**11.3    Survival**.  All obligations, covenants, agreements, representations, warranties, waivers and indemnities made by Borrower in any Loan Document shall survive the execution and delivery of the Loan Documents, the Closing, the making of the Loans and any termination of this Agreement until all Obligations are fully performed and indefeasibly paid in full in cash.  The obligations and provisions of Sections 5.18, 5.19, 5.23, 11.1, 11.3, 12.1, 12.5, 12.6, 12.11, 12.13, 12.14 and 12.23 shall survive the termination of this Agreement and the other Loan Documents and any payment, in full or in part, of the Obligations.

## ARTICLE 12.  MISCELLANEOUS

**12.1    Brokers and Financial Advisors**.  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the Loans.  Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses (including the reasonable fees and disbursements of legal counsel for Lender, including the reasonable  charges of internal legal counsel, whether incurred in connection with enforcing this indemnity or defending claims of third parties) of any kind in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower in connection with the transactions contemplated

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

herein.  The provisions of this <u>Section 12.1</u> shall survive the expiration and termination of this Agreement and the repayment of the Indebtedness.

**12.2    Lender's Discretion**.    Whenever pursuant to this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall be in the sole and absolute discretion of Lender (unless another standard is specified herein, in which event such other standard shall be applicable) and shall be final and conclusive.

**12.3    Governing Law**.

(a)    THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN MONTGOMERY COUNTY, MARYLAND AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT VICTOR MATTHEW MARCOS AND ANY OTHER AUTHORIZED OFFICER OF ANY BORROWER PARTY, AT THE NOTICE ADDRESS FOR BORROWER SET FORTH HEREIN, AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN THE STATE OF MARYLAND, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE OF BORROWER MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER (UNLESS LOCAL LAW REQUIRES ANOTHER

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

METHOD OF SERVICE), IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF MARYLAND.   BORROWER (i) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (ii) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN THE STATE OF MARYLAND (WHICH OFFICE SHALL BE DESIGNATED AS THE ADDRESS FOR SERVICE OF PROCESS), AND (iii) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN THE STATE OF MARYLAND OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

   **12.4    Modification, Waiver in Writing**.   No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.   Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.   Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.   In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount.

   **12.5    Trial by Jury**.   BORROWER AND EACH OTHER CREDIT PARTY HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.   THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND EACH OTHER CREDIT PARTY, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.   LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 12.5 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER AND ANY OTHER CREDIT PARTY.

   **12.6    Waiver of Consequential Damages, Etc.**  To the fullest extent permitted by Applicable Law, Borrower and each other Credit Party agree not to assert, and hereby waive, in any  legal action or other proceeding, any claim against Lender or any Lender Affiliate, on

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

any theory of liability, for special, indirect, consequential, special, exemplary or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Revolving Loan or the use of the proceeds thereof.

**12.7    Headings/Exhibits**.  The Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.  The Exhibits attached hereto, are hereby incorporated  by reference as a part of the Agreement with the same force and effect as if set forth in the body hereof.

**12.8    Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**12.9    Preferences**.  Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Indebtedness.  To the extent Borrower makes a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Indebtedness or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.  This provision shall survive the expiration or termination of this Agreement and the repayment of the Indebtedness.

**12.10   Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or any other Loan Document specifically and expressly requires the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to Applicable Laws, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which no Loan Document specifically and expressly requires the giving of notice by Lender to Borrower.

**12.11   Remedies of Borrower**.  If a claim or adjudication is made that Lender or any of its agents, including Servicer, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including Servicer, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Borrower specifically waives any

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

WLDD DRAFT 2/20/2014

claim against Lender and its agents, including Servicer, with respect to actions taken by Lender or its agents on Borrower's behalf.

**12.12  Prior Agreements**.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**12.13  Offsets, Counterclaims and Defenses**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents.  Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of such documents, and no such offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**12.14  Publicity**.  Neither Borrower nor any other Credit Party shall, whether now or in the future issue. any press releases or other public disclosure using the name "Capital One" or its Lender Affiliates or referring to this Agreement or the other Loan Documents without at least five (5) Business Days' prior notice to Lender and without the prior written consent of Lender unless (and only to the extent that) Borrower or such other Credit Party is required to do so under Law and then, in any event, Borrower or such other Credit Party will consult with Lender before issuing such press release or other public disclosure.  Borrower and each other Credit Party expressly consents to and authorizes the publication by Lender of a summary description of the transaction(s) contemplated by this Agreement in any format (including tombstones, deal listings or similar advertising materials), which may be published in one or more of financial or other industry periodicals, newspapers, reporting services, trade organizations, written promotional materials, web site, or otherwise.  In addition, Borrower or such other Credit Party expressly consents to and authorizes Lender to provide to financial or other industry periodicals, newspapers, reporting services or trade organizations information necessary and customary for inclusion of the transaction(s) in league table measurements, including the aggregate dollar value of the transaction.

**12.15  No Usury**.  Borrower and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this Section 12.15 shall control every other agreement in the Loan Documents.  If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Revolving Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Obligations, or if Lender's exercise of the option to accelerate the maturity of the Loans or any prepayment by Borrower results in

11436681

Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the unpaid principal amount of the Obligations (or, if the Obligations have been or would thereby be paid in full, refunded to Borrower), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loans shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loans until payment in full so that the rate or amount of interest on account of the Loans does not exceed the maximum lawful rate from time to time in effect and applicable to the Loans for so long as the Loans are outstanding.  Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**12.16  Conflict; Construction of Documents**.  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation and drafting of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them.

**12.17  No Third Party Beneficiaries**.  The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

**12.18  Assignment**.  The Loans, the Revolving Note, the Loan Documents and/or Lender's rights, title, obligations and interests therein may be assigned by Lender and any of its successors and assigns to any Person at any time in its discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise, including, without limitation to any Federal Reserve Bank in accordance with Applicable Law.  Upon such assignment, all references to Lender in this Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter stand in the place of Lender.  Neither Borrower nor any other Credit Party may assign its rights, title, interests or obligations under this Agreement or under any of the Loan Documents.

**12.19  Set-Off**.  Without limiting and in addition to any other rights, options and remedies Lender has under this Agreement,   the other Loan Documents, any Swap Agreement, the UCC, at law or in equity, Lender shall have the right, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by Borrower hereunder or under

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

any Swap Agreement (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Lender Affiliate to or for the credit or the account of Borrower.  Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

**12.20  Counterparts**.    This  Agreement  may  be  executed  in  any  number  of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopier, facsimile machine, portable document format ("*PDF*") or other electronic means shall be as effective as delivery of a manually executed counterpart of this Agreement.  The effectiveness of any such documents and signatures shall, subject to Applicable Laws, have the same force and effect as manually signed originals and shall be binding on Borrower and Lender.  Lender may also require that any such documents and signatures be confirmed by a manually signed original thereof; provided, however, that the failure to request or deliver the same shall not limit the effectiveness of any facsimile document or signature.  No party may raise the use of a telecopier, facsimile machine, PDF or other electronic means, or the fact that any signature was transmitted through the use of a telecopier, facsimile machine, PDF or other electronic means, as a defense to the enforcement of this Agreement.

**12.21  Borrower Representative**.

(a)      For so long as there are two or more Persons constituting Borrower hereto, each Borrower hereby irrevocably appoints and constitutes Borrower Representative as its agent to (i) request and receive the proceeds of advances in respect of the Loans (and to otherwise act on behalf of such Borrower pursuant to this Agreement and the other Loan Documents) from Lender in the name or on behalf of each such Borrower, (ii) receive statements of account and all other notices from Lender with respect to the Obligations or otherwise under or in connection with this Agreement and the other Loan Documents, (iii) execute and deliver Borrowing Base Certificates, Compliance Certificates and all other notices, certificates and documents to be executed and/or delivered by any Credit Party under this Agreement or the other Loan Documents; and (iv) otherwise act on behalf of such Credit Party pursuant to this Agreement and the other Loan Documents.

(b)      The authorizations contained in this Section 12.21 are coupled with an interest and shall be irrevocable, and Lender may rely on any notice, request, information supplied by Borrower Representative, every document executed by Borrower Representative, every agreement made by Borrower Representative or other action taken by Borrower Representative in respect of any Borrower or other Credit Party as if the same were supplied, made or taken by such Borrower or Credit Party.  Without limiting the generality of the foregoing, the failure of Borrower or other Credit Parties to join in the execution of any

*Approved by Judge Donald H. Steckroth March  06, 2014*

writing in connection herewith shall not relieve Borrower or other Credit Party from obligations in respect of such writing.  No purported termination of the appointment of Borrower Representative as agent shall be effective without the prior written consent of Lender.

      **12.22   Joint and Several**.  For as long as there are two or more Persons constituting Borrower hereto:

      (a)     Each Borrower shall be jointly and severally liable for all of the Obligations of Borrower (and each and every Borrower) under this Agreement, regardless of which of Borrower actually receives the proceeds or other benefits of the Loans or other extensions of credit hereunder or the manner in which Borrower, Lender or any Lender accounts therefor in their respective books and records.

      (b)     Each Borrower acknowledges that it will enjoy significant benefits from the business conducted by the other Borrower because of, *inter alia*, their combined ability to bargain with other Persons including without limitation their ability to receive the Loans and other credit extensions under this Agreement and the other Loan Documents which would not have been available to a Borrower acting alone.  Each Borrower has determined that it is in its best interest to procure the credit facilities contemplated hereunder, with the credit support of the other Borrower as contemplated by this Agreement and the other Loan Documents.

      (c)     Lender has advised Borrower that it is unwilling to enter into this Agreement and the other Loan Documents and make available the credit facilities extended hereby or thereby to any Borrower unless each Borrower agrees, among other things, to be jointly and severally liable for the due and proper payment of the Obligations of each other Borrower under this Agreement and the other Loan Documents.   Each Borrower has determined that it is in its best interest and in pursuit of its purposes that it so induce Lender to extend credit pursuant to this Agreement and the other documents executed in connection herewith (A) because of the desirability to each Borrower of the credit facilities hereunder and the interest rates and the modes of borrowing available hereunder and thereunder, (B) because each Borrower may engage in transactions jointly with other Borrower and (C) because each Borrower may require, from time to time, access to funds under this Agreement for the purposes herein set forth.   Each Borrower, individually, expressly understands, agrees and acknowledges, that the credit facilities contemplated hereunder would not be made available on the terms herein in the absence of the collective credit of all Borrower, and the joint and several liability of all Borrower.   Accordingly, each Borrower acknowledges that the benefit of the accommodations made under this Agreement to all Borrower, as a whole, constitutes reasonably equivalent value, regardless of the amount of the indebtedness actually borrowed by, advanced to, or the amount of credit provided to, or the amount of collateral provided by, any one Borrower.

      (d)     Each Borrower has determined that it has and, after giving effect to the transactions contemplated by this Agreement and the other Loan Documents (including,

*Approved by Judge Donald H. Steckroth March  06, 2014*

without limitation, the inter-Borrower arrangement set forth in this Section) will have, assets having a fair saleable value in excess of the amount required to pay its probable liability on its existing debts as they fall due for payment and that the sum of its debts is not and will not then be greater than all of its property at a fair valuation, that such Borrower has, and will have, access to adequate capital for the conduct of its business and the ability to pay its debts from time to time incurred in connection therewith as such debts mature and that the value of the benefits to be derived by such Borrower from the access to funds under this Agreement is reasonably equivalent to the obligations undertaken pursuant hereto.

(e)    Borrower Representative (on behalf of each Borrower) shall maintain records specifying (A) all Obligations incurred by each Borrower, (B) the date of such incurrence, (C) the date and amount of any payments made in respect of such Obligations and (D) all inter-Borrower obligations pursuant to this Section.  Borrower Representative shall make copies of such records available to Lender, upon request.

(f)    To the extent that Applicable Law otherwise would render the full amount of the joint and several obligations of any Borrower hereunder and under the other Loan Documents invalid or unenforceable, such Person's obligations hereunder and under the other Loan Documents shall be limited to the maximum amount which does not result in such invalidity or unenforceability; provided, however, that each Borrower's obligations hereunder and under the other Loan Documents shall be presumptively valid and enforceable to their fullest extent in accordance with the terms hereof or thereof, as if this Section were not a part of this Agreement.

(g)    To the extent that any Borrower shall make a payment under this Section of all or any of the Obligations (a "*Joint Liability Payment*") which, taking into account all other Joint Liability Payments then previously or concurrently made by any other Borrower, exceeds the amount that such Borrower would otherwise have paid if each Borrower had paid the aggregate Obligations satisfied by such Joint Liability Payments in the same proportion that such Person's "Allocable Amount" (as defined below) (as determined immediately prior to such Joint Liability Payments) bore to the aggregate Allocable Amounts of each of Borrower as determined immediately prior to the making of such Joint Liability Payments, then, following indefeasible payment in full in cash of the Obligations and termination of the Revolving Commitment, such Borrower shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Borrower for the amount of such excess, *pro rata* based upon their respective Allocable Amounts in effect immediately prior to such Joint Liability Payments.  As of any date of determination, the "Allocable Amount" of any Borrower shall be equal to the maximum amount of the claim which could then be recovered from such Borrower under this Section without rendering such claim voidable or avoidable under §548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

(h)    Each Borrower assumes responsibility for keeping itself informed of the financial condition of each other Borrower, and any and all endorsers and/or guarantors of

11436681

**WLDD DRAFT 2/20/2014**

any instrument or document evidencing all or any part of such other Borrower's Obligations, and of all other circumstances bearing upon the risk of nonpayment by such other Borrower of their Obligations and each Borrower agrees that Lender nor any Lender shall not have any duty to advise such Borrower of information known to Lender or any Lender regarding such condition or any such circumstances or to undertake any investigation not a part of its regular business routine.  If Lender or any Lender, in its sole discretion, undertakes at any time or from time to time to provide any such information to a Borrower, Lender nor any Lender shall be under any obligation to update any such information or to provide any such information to such Borrower or any other Person on any subsequent occasion.

(i)    Lender is hereby authorized, without notice or demand and without affecting the liability of a Borrower hereunder, to, at any time and from time to time, (A) renew, extend, accelerate or otherwise change the time for payment of, or other terms relating to, Obligations incurred by any Borrower, otherwise modify, amend or change the terms of any promissory note or other agreement, document or instrument now or hereafter executed by any Borrower and delivered to Lender; (B) accept partial payments on an Obligation incurred by any Borrower; (C) take and hold security or collateral for the payment of an Obligation incurred by any Borrower hereunder or for the payment of any guaranties of an Obligation incurred by any Borrower or other liabilities of any Borrower and exchange, enforce, waive and release any such security or collateral; (D) apply such security or collateral and direct the order or manner of sale thereof as Lender, in its sole respective discretion, may determine; and (E) settle, release, compromise, collect or otherwise liquidate an Obligation incurred by any Borrower and any security or collateral therefor in any manner, without affecting or impairing the obligations of any other Borrower.  Lender shall have the exclusive right to determine the time and manner of application of any payments or credits, whether received from a Borrower or any other source, and such determination shall be binding on each Borrower.  All such payments and credits may be applied, reversed and reapplied, in whole or in part, to any of an Obligation incurred by any Borrower as Lender shall determine in its respective sole discretion without affecting the validity or enforceability of the Obligations of the other Borrower.

(j)    Each Borrower hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (A) the absence of any attempt to collect an Obligation incurred by Borrower from any Borrower or any guarantor or other action to enforce the same; (B) the waiver or consent by Lender with respect to any provision of any instrument evidencing an Obligation incurred by Borrower, or any part thereof, or any other agreement heretofore, now or hereafter executed by a Borrower and delivered to Lender; (C) failure by Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for an Obligation incurred by any Borrower; (D) the institution of any proceeding under the Bankruptcy Code, or any similar proceeding, by or against any Borrower or other Credit Party, Lender's or any Lender's election in any such proceeding of the application of §1111(b)(2) of the Bankruptcy Code; (E) any borrowing or grant of a security interest by any Borrower as debtor-in-possession under §364 of the Bankruptcy Code; (F) the disallowance, under §502 of the Bankruptcy Code, of all or any portion of Lender's or any Lender's claim(s) for repayment of any of an

*Approved by Judge Donald H. Steckroth March  06, 2014*

Obligation incurred by any Borrower; or (G) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor.

(k)     Any notice given by Borrower Representative hereunder shall constitute and be deemed to be notice given by all Borrower, jointly and severally.  Notice given by Lender or any Lender to Borrower Representative hereunder or pursuant to any other Loan Documents in accordance with the terms hereof or thereof shall constitute notice to all Borrower.  The knowledge of any Borrower shall be imputed to all Borrower and any consent by Borrower Representative or any Borrower shall constitute the consent of and shall bind all Borrower.

(l)     This Section is intended only to define the relative rights of Borrower and nothing set forth in this Section is intended to or shall impair the obligations of Borrower, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement or any other Loan Documents.  Nothing contained in this Section shall limit the liability of any Borrower to pay the Loans made directly or indirectly to such Borrower and accrued interest, fees and Expenses with respect thereto for which such Borrower shall be primarily liable.

(m)     The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of each Borrower to which such contribution and indemnification is owing.  The rights of any indemnifying Borrower against another Borrower under this Section shall be exercisable upon the full and indefeasible payment of the Obligations and the termination of the Revolving Facility.

(n)     No payment made by or for the account of a Borrower, including, without limitation, (A) a payment made by such Borrower on behalf of an Obligation of another Borrower or (B) a payment made by any other person under any guaranty, shall entitle such Borrower, by subrogation or otherwise, to any payment from such other Borrower or from or out of property of such other Borrower and such Borrower shall not exercise any right or remedy against such other Borrower or any property of such other Borrower by reason of any performance of such Borrower of its joint and several obligations hereunder until all Obligations are paid in full and this Agreement has been terminated.

(o)     Additional Waivers.    Borrower acknowledges that, if Borrower is comprised of more than one person or entity (individually, a "Borrower Party" and collectively, the "Borrower Parties"), none of the Borrower Parties constitutes a guarantor because each of such parties is fully responsible for the Obligations.  In addition, and without limitation on the foregoing waiver or any other waivers contained in this Agreement or the other Loan Documents, each Borrower Party hereby unconditionally waives any defense to the enforcement of the Loan Documents based on the characterization of any such Borrower Party as a guarantor and without limitation, the obligations of such Borrower Party hereunder shall remain in full force and effect without regard to, and shall not be affected or impaired by the following, any of which may be taken without the consent of, or notice to, such Borrower

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

Party, nor shall any of the following give such Borrower Party any recourse or right of action against Lender:

(i)     Any express or implied amendment, modification, renewal, addition, supplement, extension (including extensions beyond the original term) or acceleration of or to any of the Loan Documents;

(ii)     Any exercise or non-exercise by Lender of any right or privilege under the Loan Documents;

(iii)     Any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to such Borrower Party or any other Borrower Party, or any guarantor (which term shall include any other party at any time directly or contingently liable for any of Borrower's obligations under the Loan Documents) or any affiliate of any Borrower Party, or any action taken with respect to the Loan Documents by any trustee or receiver, or by any court, in any such proceeding, whether or not such Borrower Party shall have had notice or knowledge of any of the foregoing;

(iv)     Any release or discharge of any other Borrower Party from its liability under any of the Loan Documents or any release or discharge of any endorser or guarantor or of any other party at any time directly or contingently liable for the Obligations;

(v)     Any subordination, compromise, release (by operation of law or otherwise), discharge, compound, collection, or liquidation of any or all of the Collateral described in any of the Loan Documents or otherwise in any manner, or any substitution with respect thereto;

(vi)     Any assignment or other transfer of any of the Loan Documents;

(vii)     Any acceptance of partial performance of the obligations;

(viii)     Any transfer or consent to the transfer of the Collateral described in the Loan Documents or otherwise (by one or more of the Borrower Parties); and

(ix)     Any bid or purchase at any sale of the Collateral described in the Loan Documents or otherwise.

(p)     Waivers.  Each Borrower Party unconditionally waives any defense to the enforcement of the Loan Documents, including:

(i)     All presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of the Loan Documents;

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

(ii)       Any right to require Lender to proceed against any other Borrower Party or any guarantor at any time or to proceed against or exhaust any security held by Lender at any time or to pursue any other remedy whatsoever at any time;

(iii)      The defense of any statute of limitations affecting the liability of such Borrower Party hereunder, the liability of any other Borrower Party or any guarantor under the Loan Documents, or the enforcement hereof, to the extent permitted by law;

(iv)      Any defense arising by reason of any invalidity or unenforceability of (or any limitation of liability in) any of the Loan Documents or any disability of any Borrower Party or any guarantor or of any manner in which Lender has exercised its rights and remedies under the Loan Documents, or by any cessation from any cause whatsoever of the liability of any Borrower Party or any guarantor;

(v)       Any defense based upon any lack of authority of the officers, directors, partners or agents acting or purporting to act on behalf of any Borrower Party or any principal of any Borrower Party or any defect in the formation of any Borrower Party or any principal of any Borrower Party;

(vi)      Any defense based upon the application by any Borrower Party of the proceeds of the Loan for purposes other than the purposes represented by such Borrower Party to Lender or intended or understood by Lender or such Borrower Party;

(vii)     Any defense based upon an election of remedies by Lender, including any election to proceed by judicial or nonjudicial foreclosure of any security, whether real property or personal property security, or by deed in lieu thereof, and whether or not every aspect of any foreclosure sale is commercially reasonable, or any election of remedies, including remedies relating to real property or personal property security, which destroys or otherwise impairs the subrogation rights of such Borrower Party or the rights of such Borrower Party to proceed against any other Borrower Party or any guarantor for reimbursement, or both;

(viii)    Any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in any other aspects more burdensome than that of a principal;

(ix)      Any defense based upon Lender's election, in any proceeding instituted under the Federal Bankruptcy Code, of the application of Section 1111(b)(2) of the Federal Bankruptcy Code or any successor statute;

(x)       Any defense based upon any borrowing or any grant of a security interest under Section 364 of the Federal Bankruptcy Code;

(xi)      Any duty of Lender to advise such Borrower Party of any information known to Lender regarding the financial condition of any other Borrower Party and all other circumstances affecting any other Borrower Party's ability to perform its

84

*Approved by Judge Donald H. Steckroth March  06, 2014*

WLDD DRAFT 2/20/2014

obligations to Lender, it being agreed that such Borrower Party assumes the responsibility for being and keeping informed regarding such condition or any such circumstances;

(xii)    Any right of subrogation, reimbursement, exoneration, contribution or indemnity, or any right to enforce any remedy which Lender now has or may hereafter have against any other Borrower Party or any benefit of, or any right to participate in, any security now or hereafter held by Lender; and

(xiii)    Without limiting the generality of the foregoing or any other provision hereof, any rights and benefits which might otherwise be available to such Borrower Party except as otherwise provided herein.

(q)    Subrogation.    Each Borrower Party understands that the exercise by Lender of certain rights and remedies may affect or eliminate such Borrower Party's right of subrogation against any other Borrower Party or any guarantor and that such Borrower Party may therefore incur partially or totally nonreimbursable liability hereunder.    Nevertheless, each Borrower Party hereby authorizes and empowers Lender, its successors, endorsees and assigns, to exercise in its or their sole discretion, any rights and remedies, or any combination thereof, which may then be available, it being the purpose and intent of such Borrower Party that the obligations hereunder shall be absolute, continuing, independent and unconditional under any and all circumstances.    Notwithstanding any other provision of the Loan Documents to the contrary, until all Obligations have been repaid, each Borrower Party hereby waives and releases any claim or other rights which such Borrower Party may now have or hereafter acquire against any other Borrower Party or any guarantor of all or any of the obligations of such Borrower Party hereunder that arise from the existence or performance of such Borrower Party's obligations under this Agreement or any of the other Loan Documents, including any right of subrogation, reimbursement, exoneration, contribution or indemnification, any right to participate in any claim or remedy of Lender against any other Borrower Party or any collateral which Lender now has or hereafter acquires, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, by any payment made hereunder or otherwise, including, without limitation, the right to take or receive from any other Borrower Party, directly or indirectly, in cash or other property or by setoff or in any other manner, payment or security on account of such claim or other rights. Upon the full repayment of the Obligations, each Borrower Party's rights of subrogation shall be in full force and effect.

(r)    Additional Waivers.    No Borrower Party shall be released or discharged, either in whole or in part, by Lender's failure or delay to (i) perfect or continue the perfection of any lien or security interest in any collateral which secures the obligations of any other Borrower Party, such Borrower Party, or any guarantor, or (ii) protect the property covered by such lien or security interest.

(s)    Independent Obligations.    The obligation of such Borrower Party hereunder is independent of the obligation of any other Borrower Party and, in the event of any default hereunder, a separate action or actions may be brought and prosecuted against such Borrower Party whether or not such Borrower Party is the alter ego of any other

85

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

Borrower Party and whether or not any other Borrower Party is joined therein or a separate action or actions are brought against any other Borrower Party.  Lender's rights hereunder shall not be exhausted until all of the Obligations have been fully paid and performed.

(t)    Subordination.

(i)    Each Borrower Party subordinates all present and future indebtedness owing by any other Borrower Party to such Borrower Party to the obligations at any time owing by any other Borrower Party to Lender under the Credit Agreement and the other Loan Documents.  Each Borrower Party assigns all such indebtedness to Lender as security for the Obligations.

(ii)    Each Borrower Party agrees to make no claim on such indebtedness until all obligations of any other Borrower Party under the Credit Agreement and the other Loan Documents have been fully discharged.

(iii)    Each Borrower Party further agrees not to assign all or any part of such indebtedness unless Lender is given prior notice and such assignment is expressly made subject to the terms of this Agreement and the other Loan Documents.  If Lender so requests, (i) all instruments evidencing such indebtedness shall be duly endorsed and delivered to Lender, (ii) all security for such indebtedness shall be duly assigned and delivered to Lender, (iii) such indebtedness shall be enforced, collected and held by such Borrower Party as trustee for Lender and shall be paid over to Lender on account of the Loan but without reducing or affecting in any manner the liability of such Borrower Party under the other provisions of this Agreement and the other Loan Documents, and (iv) such Borrower Party shall execute, file and record such documents and instruments and take such other action as Lender deems necessary or appropriate to perfect, preserve and enforce Lender's rights in and to such indebtedness and any security therefor.  If such Borrower Party fails to take any such action, Lender, as attorney in fact for such Borrower Party, is hereby authorized to do so in the name of such Borrower Party.  The foregoing power of attorney is coupled with an interest and cannot be revoked.

(u)    Bankruptcy No Discharge; Repayments.  So long as any of the obligations guaranteed hereunder shall be owing to Lender, no Borrower Party shall, without the prior written consent of Lender, commence or join with any other party in commencing any bankruptcy, reorganization or insolvency proceedings of or against any other Borrower Party. Each Borrower Party understands and acknowledges that by virtue of this Agreement, it has specifically assumed any and all risks of a bankruptcy or reorganization case or proceeding with respect to any other Borrower Party.  As an example and not in any way of limitation, a subsequent modification of the Obligations in any reorganization case concerning any other Borrower Party shall not affect the obligation of each such Borrower Party to pay and perform the Obligations in accordance with its original terms.  In any bankruptcy or other proceeding in which the filing of claims is required by law, each Borrower Party shall file all claims which such Borrower Party may have against any other Borrower Party relating to any indebtedness of any other Borrower Party to such Borrower Party and shall assign to Lender all rights of such Borrower Party thereunder.  If any Borrower Party does not file any such

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

claim, Lender, as attorney in fact for such Borrower Party, is hereby authorized to do so in the name of such Borrower Party or, in Lender's discretion, to assign the claim to a nominee and to cause proof of claim to be filed in the name of Lender's nominee.  The foregoing power of attorney is coupled with an interest and cannot be revoked.  Lender or its nominee shall have the right, in its reasonable discretion, to accept or reject any plan proposed in such proceeding and to take any other action which a party filing a claim is entitled to do.  In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Lender the amount payable on such claim and, to the full extent necessary for that purpose, each Borrower Party hereby assigns to Lender all of such Borrower Party's rights to any such payments or distributions; provided, however, such Borrower Party's obligations hereunder shall not be satisfied except to the extent that Lender receives cash by reason of any such payment or distribution.  If Lender receives anything hereunder other than cash, the same shall be held as collateral for amounts due under the Loan Documents.  Notwithstanding anything to the contrary herein, the liability of each Borrower Party hereunder shall be reinstated and revised, and the rights of Lender shall continue, with respect to any amount at any time paid by or on behalf of any Borrower Party on account of the Credit Agreement or the other Loan Documents which Lender shall restore or return by reason of the bankruptcy, insolvency or reorganization of any Borrower Party or for any other reasons, all as though such amount had not been paid.

**12.23  Release of Claims**.  Borrower and each other Credit Party does hereby (i) waive any claim in tort, contract or otherwise which Borrower or such other Credit Party may have against Lender or any of its Affiliates or their officers, directors, agents, or employees (collectively, "Lender Agents") which may arise out of the relationship between Borrower and any such Person prior to the Closing Date; and (ii) absolutely and unconditionally releases and discharges Lender, each of its Affiliates and the Lender Agents from any and all claims, causes of action, losses, damages or expenses which may arise out of any relationship between it and Lender, any such Affiliate or the Lender Agents which such Borrower may have as of the Closing Date.  Borrower and each Credit Party acknowledges that it makes this waiver and release knowingly, voluntarily and only after considering the ramifications of this waiver and release with its legal counsel.

[remainder of page intentionally left blank; signature page follows]

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

[Signature Page to Credit Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Credit Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER**:

**710 LONG RIDGE ROAD OPERATING COMPANY II, LLC**

By: _____
    Matt Marcos, Chief Financial Officer

**1 BURR ROAD OPERATING COMPANY II, LLC**

By: _____
    Matt Marcos, Chief Financial Officer

**107 OSBORNE STREET OPERATING COMPANY II, LLC**

By: _____
    Matt Marcos, Chief Financial Officer

**240 CHURCH STREET OPERATING COMPANY II, LLC**

By: _____
    Matt Marcos, Chief Financial Officer

**245 ORANGE AVENUE OPERATING COMPANY II, LLC**

By: _____
    Matt Marcos, Chief Financial Officer

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

[Signature Page to Credit Agreement]

**ACCOMMODATION PLEDGOR**:

**THCI MORTGAGE HOLDING COMPANY LLC**

By: _____

      Matt Marcos, Chief Financial Officer

**THCI COMPANY LLC**

By: _____

      Matt Marcos, Chief Financial Officer

2

*Approved by Judge Donald H. Steckroth March  06, 2014*

**WLDD DRAFT 2/20/2014**

[Signature Page to Credit Agreement]

**LENDER**:

**CAPITAL ONE, NATIONAL ASSOCIATION**

By: _____
    Name:
    Title:

*Approved by Judge Donald H. Steckroth March  06, 2014*

# **SCHEDULE 1**

Supplements to Specific Definitions

Healthcare Facilities:

Permitted Indebtedness:

Permitted Investments:

Permitted Liens:  Liens directly securing the HUD Loans and the M&T Loans, provided that such Liens are subject to the terms of the Intercreditor Agreement.

Subordinated Indebtedness:

*Approved by Judge Donald H. Steckroth March  06, 2014*

## **SCHEDULE 1.1**

HUD Loan Documents

M&T Loan Documents

[list]

*Approved by Judge Donald H. Steckroth March  06, 2014*

### <u>SCHEDULE 1.2</u>

Leases

[list]

*Approved by Judge Donald H. Steckroth March  06, 2014*

## SCHEDULE 2

Existing Obligations

11436681

## **<u>SCHEDULE 3.A</u>**

Exceptions to Representations and Warranties

## SCHEDULE 3.B

Ownership of Borrower

11436681

## **SCHEDULE 4**

Post Closing Items

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

## Exhibit A

Form of Borrowing Base Certificate

11436681

## **Exhibit B**

Form of Compliance Certificate

## **Exhibit C**

Form of Revolving Note

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

## **Exhibit D**

Form of Revolving Loan Notice

11436681

*Approved by Judge Donald H. Steckroth March  06, 2014*

## **Exhibit E**

Form of Guaranty

11436681